No. 25-2798

IN THE

UNITED STATES COURT OF APPEALS

FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| STATE OF ILLINOIS, a sovereign state; and the CITY OF CHICAGO, an Illinois municipal corporation, | ) ) ) ) | Interlocutory Appeal from the United States District Court for the Northern District of Illinois |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | No. 1:25-cv-12174 |
| DONALD J. TRUMP, in his official capacity as President of the United States; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; DEPARTMENT OF DEFENSE; PETER B. HEGSETH, in his official capacity as Secretary of the Department of Defense; UNITED STATES ARMY; DANIEL P. DRISCOLL, in his official capacity as Secretary of the Army, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | The Honorable APRIL M. PERRY, Judge Presiding. |
| Defendants-Appellants. | ) | |

## RESPONSE TO EMERGENCY MOTION FOR STAY PENDING APPEAL AND IMMEDIATE ADMINISTRATIVE STAY

Over the course of the past week, President Trump and Secretary Hegseth federalized several hundred troops from California, Illinois, and Texas and deployed them into Illinois via a series of orders that failed to comply with any relevant statutory or constitutional prerequisite. At the hearing on plaintiffs' motion for a temporary restraining order, counsel for defendants confirmed that this was

1

intentional, for defendants believe that the federalization of the National Guard requires no explanation, identifiable scope, or provable factual underpinning, and that federalization determinations are immune from Article III review. A273 Tr. 14:1-9; 26:17-27:14; 33:12-34:12, 52:5-22. Counsel also confirmed that absent an injunction, the federal government could and would use the troops consistent with the unbounded scope of the federalization orders—that is, to assist any federal agency on any federal mission that is occurring anywhere in Illinois. *Id.* 21:16-25; 23:25-24:20; 45:14-16. Finally, counsel confirmed that absent an injunction covering all National Guard deployment—irrespective of their home State— defendants could (and very well might) immediately deploy troops from another State into Illinois. *Id.* 120:18-20. The district court rejected such a "shockingly broad" interpretation of the President's authority, Doc. 70 at 42, and entered a 14-day temporary restraining order enjoining the "federalization and deployment of the National Guard of the United States within Illinois," Doc. 67.

This district court's order was correct, appropriate, and should not be stayed pending appeal. On the contrary, the order is necessary to restore at least two foundational constitutional principles: that the constitutional authority over the militia is primarily reserved to the States and that Congress provides for calling forth the militia into federal service. U.S. Const. art. I, § 8, cl. 15, 16. Relevant here, Congress has delegated authority to the President to federalize state National Guard personnel in one of three specifically enumerated situations: (1) there is a foreign "invasion" or danger thereof, (2) there is a "rebellion" or danger thereof, or

(3) "the President is unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406 (hereinafter "Section 12406" and, "Title 10 Status" for troops deployed under this authority). As the district court rightly concluded, none of these predicate scenarios exists in Illinois. In reaching this decision, the district relied on the scant evidence presented by defendants supporting the invocation of Section 12406 and, additionally, on its credibility determination that the few declarations submitted by defendants were "unreliable." Doc. 70 at 11. Defendants have not shown that these findings were clearly erroneous and, as a result, that they have a substantial probability of prevailing on their appeal. Their motion should be denied in its entirety.

## BACKGROUND

**A.    The President's longstanding plan to deploy the military to Chicago.**

President Trump has long fixated on deploying military forces in Illinois and, more specifically, Chicago. *E.g.*, Doc. 13-10 at 4 (2013 retweet: "we need our troops on the streets of Chicago, not in Syria"). His reasons are shifting, but largely center around crime, immigration, and Democratic leadership. In 2022 speeches, for example, he stated that the "next president needs to send the National Guard" to "dangerous neighborhoods in Chicago," and that he "wanted to send in the guard" to Chicago and other cities "run by Democrats." *Id.* at 11.

This summer and fall, the President has reiterated these themes. In August, he called Chicago "a mess" with an "incompetent" mayor and threatened to "straighten that one out," *id.* at 17; posted on social media that Governor Pritzker

was refusing to help prevent crime and "better straighten it out, FAST, or we're coming!" *id.* at 22-23; and emailed to supporters, "WE'RE GOING INTO CHICAGO" and "CHICAGO WILL BE LIBERATED," *id.* at 29-30.

On September 6, the President posted a meme of himself dressed as Lt. Col. Kilgore from the movie Apocalypse Now, a character famous for massacring civilians in a helicopter attack. *Id.* at 31. The meme, titled "Chipocalypse Now," showed Chicago's skyline burning as helicopters hovered overhead. *Id.* The President wrote, "Chicago about to find out why it's called the Department of WAR." *Id.* And in a September 30 speech to top military leaders, the President complained about what "the Democrats" had "done" to cities like Chicago and suggested using these cities as military "training grounds," adding, "we're going into Chicago very soon." *Id.* at 34.

Trump continued to make similar comments in October, including during the pendency of this litigation. For instance, on October 8, the President publicly called for Illinois's Governor and Chicago's Mayor to be jailed. Doc. 63-4 at 4.

## B.  "Operation Midway Blitz"

On September 8, the administration announced "Operation Midway Blitz," an effort to ramp up immigration-related arrests and deportations in the Chicago area. Doc. 13-12. As of September 12, Immigration and Customs Enforcement ("ICE") had detained nearly twice as many people through its facility in Broadview, Illinois,

as it did the previous year.[1]  And by October 3, the administration announced the operation had yielded over 1,000 arrests.  Doc. 13-13.

Throughout the course of this operation, however, federal agents have employed excessive and unnecessary force.  Last month, for example, agents shot and killed a father driving home from dropping off his son at daycare.[2]  More recently, agents stormed an apartment building at 1:00 a.m., entering nearly every unit, busting down doors, using flashbang grenades, dragging residents — some naked — outside and into U-Haul vans, and separating children from parents.[3]  During the raid, agents dragged a 67-year-old citizen outside in zip ties and left him there for nearly three hours before letting him go.[4]  One witness reported seeing children zip tied to each other as well.[5]

## C.    Protests at the Broadview ICE facility

In response to these heavy-handed tactics, small groups of individuals have gathered outside an ICE facility in Broadview, Illinois, a suburb of 8,000 people that

---

[1]  Lauren FitzPatrick, *How many immigrants has ICE arrested and detained so far this year?  Here's what we know*, WBEZ Chi., https://www.wbez.org/immigration/2025/09/12/immigration-customs-enforcement-ice-arrests-detentions-data-deportation-project-trac (Sept. 12, 2025).

[2]   Kim Bellware, *Videos of fatal ICE shooting in Chicago raise questions about DHS account*, Wash. Post, http://bit.ly/46SCJHJ (Sept. 28, 2025).

[3]  Cindy Hernandez, *Massive immigration raid on Chicago apartment building leaves residents reeling: 'I feel defeated'*, WBEZ Chi., http://bit.ly/4o1dQAA (Oct. 1, 2025).

[4]  *Id.*

[5]  Rebekah Riess, Bill Kirkos, *37 people arrested and American kids separated from parents after ICE raid at Chicago apartments*, https://bit.ly/4mZJY6U (Oct. 3, 2025).

is located 12 miles west of Chicago.  Doc. 13-5 at 1-2, 4.  The protests usually have fewer than 50 people—peaking at approximately 200—and have been peaceful.  *Id.* at 4, 12; Doc. 13-6 at 2-3.  Though some protesters have tried to stand or sit in the facility's driveway, ICE personnel have removed them, thus enabling vehicles to enter and exit the facility.  Doc. 13-5 at 4.

Despite the small size and peaceful nature of these protests, ICE has regularly tear gassed and pepper sprayed the protesters.  *Id.* at 5-10.  On September 27, a day with minimal ICE traffic and only a small crowd of quiet protesters closely monitored by local police, federal agents told Broadview Police to prepare for a "shitshow."  *Id.* at 9.  Throughout the rest of the day and into the evening, agents chased protesters into the street and deployed tear gas and pepper balls.  *Id.* at 9-10.  Following that incident, only 11 protesters were arrested, *id.* at 10, only five were charged with crimes, and federal prosecutors failed to obtain indictments against at least three of them.[6]

On October 2, Broadview Police, the Illinois State Police, and other state and local agencies announced a Unified Command to ensure public safety and order around the facility.  *Id.* at 11.  The next day, the Unified Command set up designated protest areas on the sidewalks outside the facility, which allowed for the peaceful exercise of First Amendment rights, and created an access lane for ICE and emergency vehicles.  *Id.* at 12-13.  The Command also kept officers onsite to

---

[6]  Jason Meisner, *Charges dropped against couple in Broadview immigration protest after federal grand jury refuses to indict*, https://bit.ly/4q2VTmW (Oct. 8, 2025).

direct protesters to the designated areas and maintain safety by ensuring separation between the protesters and traffic. *Id.* Protesters who resisted the Unified Command's attempts to maintain the designated protest areas were detained, and if necessary, arrested. *Id.* at 14.

ICE agreed that the United Command had achieved its goal of maintaining public safety while protecting First Amendment rights. Its Chicago field office director emailed an Illinois State Police official to echo "kudos from one of [his] onsite managers," who had asked to "pass along the effectiveness of this Unified Command." Doc. 63-2 at 10. The onsite manager noted that on October 4, there were "about 30 or so protesters up at the fence," but "[w]ithin about 5-10 minutes of [ICE] calling [the State Police], state and local law enforcement were onsite and immediately pushed back the protesters to the designated area without DHS's need to intervene." *Id.* at 10-11. By that night, "there were no protesters and state/local police had the entire area . . . secure and empty." *Id.* at 11.

## D.   National Guard troops are federalized and deployed into Illinois

On October 4, the same day as the protests referenced in ICE's email to the State Police, the federal National Guard Bureau chief sent a memorandum to Illinois's Adjutant General (the Commander of the Illinois National Guard), *see* 20 ILCS 1805/14, threatening to federalize Illinois's National Guard under Title 10 unless, within two hours, the State deployed troops in what is known as "Title 32" status—that is, a status funded by the federal government to support a federal mission at the President's request but remaining under command of their governor.

Doc. 13-2 at 5-6, 21; *see* Doc. 13-22 at 2-3. The Governor declined, citing the lack of public safety need or emergency. Doc. 13-2 at 6.

Shortly thereafter, Secretary Hegseth issued a memorandum providing for the federalization of "at least 300 National Guard personnel . . . to protect [ICE], Federal Protective Service, and other U.S. Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where violent demonstrations against these functions are occurring or are likely to occur based on current threat assessments and planned operations." Doc. 13-3. The memorandum cited an October 4 directive from the President. *Id.* On October 5, the Adjutant General received a second memorandum issued by Secretary Hegseth federalizing members of the Texas National Guard under Title 10 for use in Illinois. Doc. 13-2 at 7; Doc. 13-4.

On October 6, the White House placed a "memorandum" on its website in which the President invoked Section 12406 to federalize "at least" 300 Illinois National Guard members under Title 10 "until the Governor of Illinois consents" to a Title 32 mobilization. Doc. 63-5. The memorandum did not reference any of the three predicate requirements, asserting instead that unspecified incidents, "as well as the credible threat of continued violence, impede the execution of the laws of the United States." *Id.* As to scope, the President provided that "the deployed National Guard personnel may perform those protective activities that the Secretary of War determines are reasonably necessary to ensure the execution of Federal law in Illinois, and to protect Federal property in Illinois." *Id.* Defendants later submitted

8

an identical memorandum, though dated October 4, 2025, with their opposition brief in the district court.  Doc. 62-1 at 16-17.

On October 7, Texas National Guard and California National Guard personnel arrived in Illinois, and on October 8, the Illinois National Guard personnel prepared to mobilize.  Doc. 62-3 at 2-3.

**E.     The district court temporarily enjoins the federalization and deployment of the National Guard in Illinois.**

On October 6, plaintiffs filed suit, Doc. 1, and moved for temporary and/or preliminary injunctive relief on their claims that defendants' actions were *ultra vires* in violation of Section 12406 and the Posse Comitatus Act and unconstitutional under the Tenth Amendment, Doc. 13.

On October 9, the district court granted temporary injunctive relief enjoining the "federalization and deployment of the National Guard of the United States within Illinois."  Doc. 67 at 1.  The following day, the court issued a written order concluding that plaintiffs had presented a justiciable matter and shown a likelihood of success on the merits of their Section 12406 and Tenth Amendment claims, without reaching the Posse Comitatus Act.  Doc. 70 at 24-48.  The court further determined that plaintiffs demonstrated irreparable harm and that the balance of the equities and public interest favored entry of a temporary restraining order.  *Id.* at 48-51.  As noted, in reaching this decision, the court made findings related to the evidence presented by the parties, including some based on credibility assessments.  *E.g.*, *id.* at 10-11, 40, 43.  The order expires at the end of a 14-day period, at which

point the court will conduct a hearing to determine whether it should be extended for an additional 14 days.  Doc. 67.

## LEGAL STANDARD

"The standard for granting a stay pending appeal mirrors that for granting a preliminary injunction." *In re A & F Enters., Inc. II*, 742 F.3d 763, 766 (7th Cir. 2014).  The party seeking a stay "must show that it has a significant probability of success on the merits; that it will face irreparable harm absent a stay; and that a stay will not injure the opposing party and will be in the public interest." *Hinrichs v. Bosma*, 440 F.3d 393, 396 (7th Cir. 2006).  Furthermore, "[a]s with a motion for a preliminary injunction, a 'sliding scale' approach applies; the greater the moving party's likelihood of success on the merits, the less heavily the balance of harms must weigh in its favor, and vice versa." *In re A & F Enters., Inc. II*, 742 F.3d at 766.  Finally, in the context of a stay pending appeal, this court reviews "the district court's findings of fact for clear error, its balancing of the factors under the abuse of discretion standard and its legal conclusions de novo." *Hinrichs*, 440 F.3d at 396.

## ARGUMENT

### I.    This Court Lacks Appellate Jurisdiction.

This court lacks jurisdiction over this interlocutory appeal because "a temporary restraining order is not an appealable order," nor is a motion to stay such order pending appeal. *Geneva Assur. Syndicate, Inc. v. Medical Emergency Servs. Assoc.*, 964 F.2d 599, 600 (7th Cir. 1992).  Instead, interlocutory review is

limited "to orders granting or denying a preliminary injunction, which is a different animal from a temporary restraining order." *Id.*

To be sure, this court has construed certain temporary restraining orders as preliminary injunctions, there is no basis to do so here. An order has the "effect" of an appealable interlocutory order "when resort to the regular processes of litigation is unavailing, and the judge is unwilling to make a prompt decision even though delay erodes or obliterates the rights in question." *Cnty., Mun. Employees' Supervisors' & Foremen's Union Loc. 1001 v. Laborers' Int'l Union of N. Am.*, 365 F.3d 576, 578 (7th Cir. 2004); *United Airlines, Inc. v. U.S. Bank N.A.*, 406 F.3d 918, 923 (7th Cir. 2005) (allowing appeal from temporary restraining order in the form of "indefinite, non-appealable relief"). Here, however, the court acted promptly on the motion and granted relief for a 14-day period, at which point the court will hold a hearing to determine whether it should be extended for an additional 14 days consistent with Rule 65(b)(2). Doc. 67.

Furthermore, defendants may not obtain mandamus relief in this appeal, Mot. 9, because they have not filed the requisite petition under Federal Rule of Appellate Procedure 21(a). *Geaney v. Carlon*, 776 F.2d 140, 142-43 (7th Cir. 1985). Indeed, the case cited by defendants for their argument was properly initiated by such a petition. *In re Sandahl*, 980 F.2d 1118 (7th Cir. 1992).

## II. Defendants Lack A Significant Probability Of Success On The Merits.

### A. Defendants' actions are subject to judicial review.

The court below joined two other district courts and the Ninth Circuit in rejecting Defendants' audacious argument that the President's invocation of Section 12406 is categorically immune from judicial review.  Doc. 70 at 28-30; *Newsom v. Trump*, 141 F.4th 1032, 1050-51 (9th Cir. 2025) (*Newsom II*); *Oregon v. Trump*, No. 3:25-cv-1756-IM, ECF 56 at 17 & n.2 (D. Or. Oct. 4, 2025).  Those decisions were correct, and Defendants cannot show a significant probability of persuading this court to reach a different conclusion.

The Supreme Court has long recognized that "the Judiciary has a responsibility to decide cases properly before it, even those it would gladly avoid." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194 (2012) (cleaned up). Questions of statutory interpretation, including the meaning of Section 12406, are plainly justiciable.  *E.g.*, *Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025) (per curiam) (exercising judicial review over the meaning of the Alien Enemies Act); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is.").  Furthermore, "when presented with claims of judicially cognizable injury resulting from military intrusion into the civilian sector, federal courts are fully empowered to consider claims of those asserting such injury."  *Laird v. Tatum*, 408 U.S. 1, 15-16 (1972). Because the text of Section 12406 "does not make the President the sole judge of whether one or more of the statutory preconditions exist," the President's decision

to federalize and deploy the National Guard is subject to judicial review. *Newsom II*, 141 F.4th at 1047.

Defendants' motion reiterates the same expansive view of *Martin v. Mott*, 25 U.S. (12 Wheat.) 19, 30 (1827), that the Ninth Circuit rejected. *Newsom II*, 141 F.4th at 1046-50. *Martin* arose in a "vastly different" context, Doc. 70 at 28, and the district court correctly declined to disregard "the 200 years of judicial-review jurisprudence since *Martin*" by reading it as "conclusive" on "whether a Court can ever decide whether a President has properly invoked Section 12406," *id*. Defendants are unlikely to persuade this court otherwise.

## B.  Defendants have not shown a significant probability of success under Section 12406.

The district court rightly determined that plaintiffs are likely to succeed on the merits of their Section 12406 claim. Doc. 70 at 44. At the threshold, the President has failed in any official document to identify a specific predicate justification. On the contrary, the only official document issued by the President related to the federalization of Illinois troops cites none of the three statutory predicates, nor does it claim an invasion, rebellion, or inability to execute federal law. Doc. 62-1 at 16-17. Furthermore, none of the other documents—for example, the Hegseth memoranda—provide such information. Docs. 13-3, 13-4, 63-5. In litigation, defendants have claimed authority under the second and third predicates: rebellion and inability to execute federal law. Doc. 62 at 22-27. But as the district court correctly concluded, defendants have not shown that either is satisfied. Doc. 70 at 44.

### 1. There is no "rebellion" or "danger of a rebellion" in Illinois.

To start, the district court properly rejected defendants' litigation position that there is a "rebellion" or "danger of a rebellion" in Illinois. Doc. 70 at 34. To satisfy this statutory predicate, as the district court noted, defendants need to show "a deliberate, organized resistance, openly and avowedly opposing the laws and authority of the government as a whole by means of armed opposition and violence." *Id*. at 33. And here, there is simply no evidence that standard was met. In fact, defendants failed even to raise this as a justification in any of "the memoranda actually deploying the National Guard to Illinois." *Id*. at 34.

Furthermore, as the court explained, "[t]he unrest Defendants complain of has consisted entirely of opposition (indeed, sometimes violent) to a particular federal agency and the laws it is charged with enforcing." *Id*. "That is not opposition to the authority of the government as a whole," and defendants "have offered no explanation supporting the notion that widespread opposition to immigration enforcement constitutes the makings of a broader opposition to the authority of the federal government." *Id*.; *id*. at 9 (no evidence that any "acts of violence have been linked to a common organization, group, or conspiracy").

### 2. There is no basis for claiming the President is "unable" to "execute" federal law "with the regular forces" in Illinois.

Defendants likewise have not shown a significant probability of succeeding on their theory that the President "is unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(3). To start, defendants refuse to identify *which* federal laws the President purports to be unable to enforce or the

corresponding scope of authority that he has granted to the National Guard to enforce those laws. Doc. 70 at 14, 45. Rather, defendants have taken a maximalist approach, asserting the view that they do not need to do so because the President may invoke Section 12406(3) "if there was *any* repeated or ongoing violation of federal law in a community." *Id.* at 42. The district court rightly rejected this "shockingly broad" interpretation of the statute, noting in particular that, "[g]iven that Defendants have also contended that every state official who implements a sanctuary city policy is violating federal law, Defendants' position also seems to be that the National Guard may be deployed solely on the basis of state officials exercising their Constitutionally protected right to implement these policies." *Id.*

Furthermore, as the district court pointed out, such an interpretation is unmoored from the plain text of the statute, which requires nothing less than an *inability* to execute the laws with the regular forces. *Id.* at 34-35. This conclusion is buttressed by "the neighboring words with which [the text] is associated." *United States v. Williams*, 553 U.S. 285, 294 (2008). And here, the phrase "unable . . . to execute the laws of the United States" immediately follows two of the most extreme exigencies the United States (or any nation) could face: an invasion by a hostile foreign nation or a domestic rebellion. 10 U.S.C. §§ 12406(1)-(2).

Applying this standard, the district court was right to conclude that there is simply no credible evidence that the President is unable to execute the laws with the regular forces, even when taking into account the post hoc justifications offered by defendants in litigation. Doc. 70 at 43. Instead, the evidence shows that federal

courts in Illinois remain open, the individuals "who have violated the law by attacking federal authorities have been arrested," and enforcement of immigration law in Illinois has only *increased* in recent weeks. *Id.* at 40, 43; *see also, e.g.*, Doc. 13-13.

Nor has any protest activity rendered the President unable to execute federal law. As the district court found, the Broadview protests, which have been ongoing for months, have drawn only small groups of individuals and have not hindered the continued operation of the facility. Doc. 70 at 3-4, 43. To be sure, small groups of protestors have at times engaged in civil disobedience by attempting to block the coming and going of vehicles into and out of the parking lot of the ICE Broadview facility. *Id.* at 3-4. Nonetheless, federal agents have consistently succeeded in creating a path for these vehicles—even when the protests were at their apex—and ICE detainees have continued to be brought in and out of the facility. Doc. 13-5 at 4. And at no point has the size of any one of the protests outside of this facility numbered more than a couple hundred people. Doc. 70 at 3.

Likewise, as the court found, while there is also "evidence of property destruction, and discrete groups who have attempted to impede DHS agents, . . . there is significant evidence that DHS has not been unable to carry out its mission." Doc. 70 at 43. Rather, the evidence shows that "[a]ll federal facilities have remained open" and, "[t]o the extent there have been disruptions, they have been of limited duration and swiftly controlled by authorities." *Id.*

In short, taking all of this evidence together, the court properly concluded that "the factual conditions necessary for President Trump to have properly invoked Section 12406(3) simply do not exist." *Id.* And in fact, the court concluded that it would reach the same conclusion under the Ninth Circuit's more expansive standard, which requires only that the President show that the execution of federal law had been "significantly impeded." *Id.*

### 3. Defendants' arguments to the contrary are unpersuasive.

Defendants' primary complaint is that the district court did not afford more deference to the President. Mot. 13. But as the district court made clear, it *did* afford deference to the President's factual determinations, Doc. 70 at 31-32, which is all that was required, *e.g.*, *Marbury*, 5 U.S. (1 Cranch) at 177; *Rivers v. Roadway Exp., Inc.*, 511 U.S. 298, 312 (1994) ("A judicial construction of a statute is an authoritative statement."). And as even the Ninth Circuit's highly deferential standard acknowledges, the President's factual determination may be reviewed "to ensure that it reflects a colorable assessment of the facts and law within a 'range of honest judgment.'" *Newsom II*, 141 F.4th at 1051 (quoting *Sterling v. Constantin*, 287 U.S. 378, 399 (1932)).

Here, the district court made a "credibility assessment" that all of defendants' declarations were "unreliable," citing numerous and varied flaws. Doc. 70 at 10. For example, two of their declarations "refer to arrests made on September 27, 2025 of individuals who were carrying weapons and assaulting federal agents," but "neither declaration discloses that federal grand juries have refused to return an

indictment against at least three of those individuals." *Id.* Additionally, as the court reiterated multiple times, "[s]ome of what [defendants'] declarants complain about is, while aggravating, insulting, or unpleasant, also Constitutionally protected." Doc. 70 at 9 (citing examples of protestors exercising First and Second Amendment rights); *id.* at 10-11 (notes "troubling trend of Defendants' declarants equating protests with riots and a lack of appreciation for the wide spectrum that exists between citizens who are observing, questioning, and criticizing their government, and those who are obstructing, assaulting, or doing violence"). And as explained, these credibility determinations are reviewed for clear error, a standard that defendants do not even acknowledge or attempt to overcome.

In any event, it would have been appropriate for the court to afford less deference to the justifications provided by defendants, which may only be credited if provided in good faith. *Newsom II*, 141 F.4th at 1051. And here, defendants' justifications are a transparent pretext for carrying out the President's long-desired show of force in Chicago. As the district court recognized and detailed above, plaintiffs set forth "substantial evidence" that the President seeks to control "crime in Chicago," as demonstrated by the President's own pre- and post-deployment statements. Doc. 70 at 44. And "[w]hen asked at oral argument whether the National Guard was, in fact, being deployed to Illinois to 'stop crime,' Defendants' counsel did not disagree that this was the objective of the deployment." *Id.* at 14. Plaintiffs are wrong to suggest that this evidence should not be credited, Mot. 20; if

anything, it should carry more weight, since it shows that the President seeks use Section 12406 for purposes not authorized by that statute.

### C. Defendants have not shown a significant probability of success on plaintiffs' Tenth Amendment claim.

Additionally, the district court correctly determined that plaintiffs were likely to succeed on their Tenth Amendment claim because "by federalizing the Illinois National Guard, Defendants usurped Illinois's right to control its own National Guard forces." Doc. 70 at 47. Indeed, for many of the same reasons just discussed, defendants' actions encroach directly upon the foremost of reserved powers, "the police power, which the Founders denied the National Government and reposed in the States[.]" *United States v. Morrison*, 529 U.S. 598, 618 (2000).

Furthermore, although not reached by the district court, Doc. 70at 48 n.17, defendants violated the Tenth Amendment in another way—by offering the State an impermissibly coercive "choice": either deploy National Guard troops (or use state and local law enforcement resources) to carry out the federal government's civil immigration priorities or accept occupation by federal troops. In fact, the President stated in his October 4 memorandum that he was calling the Illinois National Guard into service "until the Governor of Illinois consents to a federally-funded mobilization, under Title 32" to assist federal law enforcement with the "deportation and removal" of immigrants. Doc. 13-2. Such coercion is unconstitutional. *E.g.*, *Printz v. United States*, 521 U.S. 898, 935 (1997); *New York v. United States,* 505 U.S. 144, 175 (1992).

### III.    The Equitable Factors Do Not Support A Stay.

Defendants will not face irreparable harm absent a stay; to the contrary, the unlawful deployment of military force in Illinois would irreparably harm plaintiffs in multiple ways, and the equitable factors strongly favor plaintiffs.

First, the deployment infringes on Illinois's sovereign interests in regulating and overseeing its own law enforcement activities. *See Tennessee v. Dep't of Educ.*, 104 F.4th 577, 613 (6th Cir. 2024) (sovereign injuries "constitute irreparable harm"). Second, plaintiffs would suffer irreparable harm from the violation of their police powers under the Tenth Amendment. Illinois' sovereign right to commit its law enforcement resources where it sees fit is the type of "intangible and unquantifiable interest[ ]" that courts have recognized as irreparable. *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011); *Kentucky v. Biden*, 23 F.4th, 585, 611 n.19 (6th Cir. 2022). Third, plaintiffs face "ongoing and concrete harm[s]" to their law enforcement and public safety interests. *Maryland v. King*, 567 U.S. 1301, 1303 (2012). As the district court recognized, the needless deployment of military troops, untrained for local policing, will escalate tensions and undermine the ordinary law enforcement activities of state and local entities, which would need to divert resources to maintain safety and order. Doc. 70 at 50-51.

Finally, the balance of the equities and the public interest strongly favor of Plaintiffs. The State seeks to protect its sovereignty, retain control over local policing, and protect the basic structure of American federalism from unprecedented intrusion. *See Laird v. Tatum*, 408 U.S. 1, 15 (1972). In contrast, the federal

government faces no harm from the denial of a stay because it "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Furthermore, the federal government remains able to enforce federal law, including immigration law, with "as many federal law enforcement officers as they believe appropriate to advance their mission." Doc. 70 at 50. There is no need, as the district court found, for the government to have "access to 500 National Guard members for . . . 14 days." *Id.*

## CONCLUSION

This court should decline to stay the district court's temporary restraining order pending appeal.

Respectfully submitted,

KWAME RAOUL
Attorney General
State of Illinois

JANE ELINOR NOTZ
Solicitor General

By:  /s/ Sarah A. Hunger
SARAH A. HUNGER
Deputy Solicitor General
MATTHEW J. FREILICH
AKANKSHA SHAH
EMILY A. VERNON
BRIANNA YANG
Assistant Attorneys General
115 South LaSalle Street
Chicago, Illinois 60603

(312) 814-5202
sarah.hunger@ilag.gov

Attorneys for the State of Illinois

**MARY B. RICHARDSON-LOWRY**
Corporation Counsel of the City of Chicago

By: /s/ Myriam Zreczny Kasper
MYRIAM ZRECZNY KASPER
Deputy Corporation Counsel
SUZANNE M. LOOSE
Chief Assistant Corporation Counsel
ELIZABETH M. TISHER
Assistant Corporation Counsel
City of Chicago Department of Law
2 North LaSalle Street, Suite 580
Chicago, Illinois 60602
312-744-3564
myriam.kasper@cityofchicago.org
suzanne.loose@cityofchicago.org
elizabeth.tisher@cityofchicago.org

Attorneys for the City of Chicago

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

I hereby certify that this motion complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 27(d)(1)(E) and Federal Rule of Appellate Procedure 32(a)(5) and 32(a)(6) because this motion has been prepared in proportionally spaced typeface using Microsoft Word 2013, in 12-point Century Schoolbook font, and complies with Federal Rule of Appellate Procedure 27(d)(2)(A) in that the motion contains 5,145 words.

/s/ Sarah A. Hunger
SARAH A. HUNGER

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on October 11, 2025, I electronically filed the foregoing Response with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I further certify that the other participants in this appeal are CM/ECF users, and thus will be served via the CM/ECF system.

By:    /s/ Sarah A. Hunger
       SARAH A. HUNGER