NO. 25-2798

# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

STATE OF ILLINOIS, et al.
*Plaintiffs–Appellees,*

v.

DONALD J. TRUMP, et al.,
*Defendants–Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
No. 1:25-cv-12174
The Honorable April M. Perry

**BRIEF FOR THE STATES OF MARYLAND, ARIZONA, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, HAWAI'I, MAINE, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OREGON, RHODE ISLAND, VERMONT, AND WASHINGTON; THE DISTRICT OF COLUMBIA; AND THE OFFICES OF THE GOVERNORS OF KANSAS, KENTUCKY, AND PENNSYLVANIA AS AMICI CURIAE IN OPPOSITION TO DEFENDANTS-APPELLANTS' EMERGENCY MOTION FOR STAY PENDING APPEAL**

ANTHONY G. BROWN
Attorney General of Maryland

MICHAEL DREZNER
ADAM KIRSCHNER
JAMES C. LUH
VIRGINIA A. WILLIAMSON
Assistant Attorneys General
200 Saint Paul Place

Baltimore, Maryland 21202
410-576-6959
MDrezner@oag.state.md.us
AKirschner@oag.state.md.us
JLuh@oag.state.md.us
VWilliamson@oag.state.md.us

*(Additional Amici on Signature Page)*

**TABLE OF CONTENTS**

Page

INTRODUCTION ...................................................................................1

INTERESTS OF AMICI CURIAE........................................................3

ARGUMENT ..........................................................................................4

I.    FEAR OF MILITARY RULE COMPELLED THE FRAMERS TO EMBED STATE
      CONTROL OF THE MILITIAS IN THE CONSTITUTION. ..........................................4

II.   DEFENDANTS' ACTIONS VIOLATE THE PRINCIPLES OF FEDERALISM.................7

III.  DEPLOYMENT OF THE NATIONAL GUARD INFRINGES ON THE SOVEREIGNTY
      AND POLICE POWERS RESERVED TO STATES...................................................10

CONCLUSION ......................................................................................14

# TABLE OF AUTHORITIES

Page

**Cases**

*Alden v. Maine*, 527 U.S. 706 (1999) .......................................................9

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592 (1982).....11

*Bissonette v. Haig*, 776 F.2d 1384 (8th Cir. 1985) ...................................4

*Duncan v. Kahanamoku*, 327 U.S. 304 (1946)........................................5

*Gregory v. Ashcroft*, 501 U.S. 452 (1991)..............................................9

*Laird v. Tatum*, 408 U.S. 1 (1972)........................................................4

*Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724 (1985) .......................11

*New York v. New Jersey*, 143 S. Ct. 918 (2023).....................................11

*New York v. United States*, 505 U.S. 144 (1992).....................................2

*Perpich v. Department of Def.*, 496 U.S. 334 (1990) ...............................6

*Printz v. United States*, 521 U.S. 898 (1997)..........................................10

*Reid v. Covert*, 354 U.S. 1 (1957)....................................................5, 6

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 15......................................................6

U.S. Const. art. II, § 2, cl. 1 ......................................................6

**Statutes**

10 U.S.C. § 12406................................................................8, 10

**Miscellaneous**

Army National Guard, *Basic Training Phases*, https://tinyurl.com/23n4kveh .......12

Articles of Confederation of 1781, art. VI, para. 4 ................................................5

*Declaration and Resolves of the First Continental Congress*, Yale L. Sch.: Avalon Project (Oct. 14, 1774), https://tinyurl.com/v2ntbfj7 ..............................5

Donald J. Trump, President of the United States, Remarks to the Department of War (Sept. 30, 2025), https://tinyurl.com/bddkuc5c ...................................2, 13

Frederick Bernays Wiener, *The Militia Clause of the Constitution*, 54 Harv. L. Rev. 181 (1940) .........................................................................................6

Mary C. Lawton, Memorandum from Antonin Scalia to the Deputy Att'y Gen. Re: L. Relating to Civ. Disturbances (Jan. 6, 1975), https://perma.cc/B628-5ANM. ...................................................................................................7

Motion to Vacate Stay or, in the Alternative, for Injunction Pending Appeal, *Newsom v. Trump*, No. 25-3727 (9th Cir. Oct. 7, 2025) ......................................9

Police Exec. Res. Forum, *MPD Leaders Should Remain in Charge of Their Police Department* (Aug. 16, 2025), https://tinyurl.com/3wn4f4z9 ...................11

President Dwight D. Eisenhower, *Radio and Television Address to the American People on the Situation in Little Rock*, The American Presidency Project (Sept. 24, 1957), https://tinyurl.com/yzer647h .........................................8

President George Bush, *Address to the Nation on the Civil Disturbances in Los Angeles, California*, The American Presidency Project (May 1, 1992), https://tinyurl.com/55mx5ch3 ...............................................................8

The Examination of Doctor Benjamin Franklin, Before an August Assembly, Relating to the Repeal of the Stamp Act, &c. (Feb. 13, 1766), https://tinyurl.com/577emuzh ...........................................................13

*The Federalist No. 29* (Alexander Hamilton) .........................................................8

U.S. Air Force, *Basic Military Training*, https://tinyurl.com/4wy75u4z ................12

U.S. Dep't of Def., *Trump Renames DOD to Department of War* (Sept. 5, 2025), https://tinyurl.com/ymy9w5zw ..............................................................13

William S. Fields & David T. Hart, *The Militia and the Constitution: A Legal History*, 136 Mil. L. Rev. 1 (1992).........................................................5

## INTRODUCTION

President Trump's attempted deployment of Illinois's National Guard and of out-of-state Guard forces in Illinois, without the consent of Illinois's Governor and in violation of the statute on which the President relies, are unlawful, unconstitutional, and undemocratic. His actions are inconsistent with the principle that freedom depends on the subordination of the military to civilian authority, they violate constitutional guarantees of federalism, and infringe on the sovereignty and police powers reserved to the States.

In the past few months, the Administration has sent or attempted to send National Guard members into one community after another, in California, the District of Columbia, Oregon, and now Illinois. These deployments have ballooned in scope and duration. California National Guard elements that were federalized in June for the ostensible purpose of responding to protests in Los Angeles have now, four months later, been sent to Oregon and Illinois to support the Administration's ever-changing and unlawful efforts.

Amici States are gravely concerned that their sovereignty, authority, and communities may be threatened next, and this concern is well-founded. On September 30, 2025, President Trump made plain his desire to "use some of these dangerous cities," namely "the ones that are run by the radical left Democrats," as

"training grounds for our military National Guard."[1]  In the same speech, President Trump declared "we're going to straighten them out one by one," adding that "we're going into Chicago very soon."  *Id.*  One week later, the President ordered the deployment of hundreds of federalized soldiers into Chicago.

The threat posed to the sovereignty of Amici States and our structure of federalism is immense.  The President's desire to use American cities as military "training grounds," to address crime, or to quash protests, does not permit the use of armed soldiers to accomplish these ends.  The Constitution "divides power among sovereigns and among branches of government precisely so that we may resist the temptation to concentrate power in one location as an expedient solution to the crisis of the day."  *New York v. United States*, 505 U.S. 144, 187 (1992).  The district court correctly found that the circumstances in Chicago come nowhere close to the type of emergency that would support the domestic deployment of federal soldiers.  This Court should similarly hold, and help safeguard the sovereign authority of Amici States, and the very foundations of our Republic.

---

[1] Donald J. Trump, President of the United States, Remarks to the Department of War (Sept. 30, 2025), https://tinyurl.com/bddkuc5c.

## INTERESTS OF AMICI CURIAE

The Amici States are 20 States, three Governor's Offices, and the District of Columbia, all of whom have strong interests in preventing the unlawful deployment of the National Guard.[2]

*First*, the Amici States are implicated by the repeated Guard deployments across the country, pursuant to a nearly boundless theory of federal authority.

*Second*, the States have an interest in ensuring their National Guard units are available and able to perform the essential services that they provide the States. Allowing an unlawful federalization of the National Guard pulls service members away from responding to emergencies and performing vital services for which they are specially trained, and which Amici States cannot replace.

*Third*, the States have an interest in protecting public safety and combating violence—sovereign police powers constitutionally reserved to the States. Defendants' actions exacerbate these challenges in the name of addressing them.

*Fourth*, the States have an interest in maintaining and promoting a free and open society in which lawful dissent is not chilled by the presence of military forces deployed domestically against protestors in our cities and towns. Each State has an interest in protecting the constitutional rights of its citizens to freedom of expression

---

[2] On October 10, 2025, this Court denied in part Defendants' motion for an immediate administrative stay, specifically "as to the deployment of the National Guard." Doc. 8, No. 25-2798 (7th Cir.).

and assembly—rights that are threatened by the unjustified use of domestic military force, whether in Illinois or in any of the Amici States.

## ARGUMENT

### I.    Fear of Military Rule Compelled the Framers to Embed State Control of the Militias in the Constitution.

"Civilian rule is basic to our system of government." *Bissonette v. Haig*, 776 F.2d 1384, 1387 (8th Cir. 1985), *on reh'g*, 800 F.2d 812 (8th Cir. 1986), *aff'd*, 485 U.S. 264 (1988).  Civilian authority is necessary to uphold our liberties, because the "use of military forces to seize civilians can expose civilian government to the threat of military rule and the suspension of constitutional liberties." *Id.*  Military force may also threaten "vital Fourth and Fifth Amendment rights," "chill[s] the exercise" of the rights to "speak freely and to vote," and can "create the atmosphere of fear and hostility which exists in territories occupied by enemy forces." *Id.*  Accordingly, "a traditional and strong resistance of Americans to any military intrusion into civilian affairs . . . has deep roots in our history." *Laird v. Tatum*, 408 U.S. 1, 15 (1972).  President Trump's unconstitutional deployment of the National Guard threatens this tradition and the freedoms it protects.

Since the birth of the republic, our leaders recognized that standing armies represent an inherent threat to liberty.  And they understood that, in peacetime, militias must not be deployed without the consent of the local populace, except in extraordinary circumstances.  One of the Founders' "well-established purpose[s]"

4

was to keep the military subordinate to civil authority. *Reid v. Covert*, 354 U.S. 1, 30 (1957) (plurality opinion); *see also Duncan v. Kahanamoku*, 327 U.S. 304, 320 (1946). Indeed, the deployment of British soldiers in the colonies galvanized a revolution; starting in 1768, King George III had quartered British troops in Boston "to intimidate the local populace." *Reid*, 354 U.S. at 27. The Founders thus embraced a commitment to civilian control, even as they faced down a war.

The Continental Congress stated in 1774 that "keeping a standing army in these colonies, in times of peace, without the consent of the legislature of that colony, in which such army is kept, is against law." *Declaration and Resolves of the First Continental Congress*, Yale L. Sch.: Avalon Project (Oct. 14, 1774), https://tinyurl .com/v2ntbfj7; *see also* William S. Fields & David T. Hart, *The Militia and the Constitution: A Legal History*, 136 Mil. L. Rev. 1, 26 (1992) (explaining that several early state declarations of rights agreed that "standing armies are dangerous to liberty, and ought not to be raised or kept up, without legislative consent"). And in drafting the Articles of Confederation, the Continental Congress placed primary reliance on state militias to provide security in emergencies, while eschewing the role of federal troops.[3] It further provided that each state's militia was limited to those functions needed for the "defense" of the state.

---

[3] Articles of Confederation of 1781, art. VI, para. 4.

Later, in drafting the Constitution, the Framers recognized that an army, while "a necessary institution," was also "dangerous to liberty if not confined within its essential bounds." *Reid*, 354 U.S. at 24. The Constitution reflects this delicate balance, and that is particularly true with respect to state militias: States retain the authority to appoint officers and train the militia, and Congress holds the power to "call[] forth the Militia" only in specified circumstances, namely, "to execute the Laws of the Union, suppress Insurrections and repel Invasions." U.S. Const. art. I, § 8, cl. 15. Accordingly, the President holds the role of "Commander in Chief of . . . the Militia of the several States," but only "when called into the actual Service of the United States." U.S. Const. art. II, § 2, cl. 1.

Consistent with this careful division of power, Congress has limited the President's authority to command state militias. In the early 20th century, Congress created the modern National Guard as the successor to the state militia and clarified the circumstances under which the National Guard may be federalized and deployed. *See Perpich v. Department of Def.*, 496 U.S. 334, 342 (1990). As the House Report accompanying the new law explained, the National Guard was "never designed to be a militia of the United States"; thus, the President could not call up the National Guard at his pleasure but only in specific enumerated "contingencies."[4] The House

---

[4] Frederick Bernays Wiener, *The Militia Clause of the Constitution*, 54 Harv. L. Rev. 181, 195 n.74 (1940) (quoting H.R. Rep. No. 1094, 57th Cong., 1st Sess., at 22-23 (1902)).

Report emphasized that "[i]t was the hereditary fear of standing armies, as a menace to liberty in time of peace, which led the framers of the Constitution to provide that the militia should always remain a militia of the States." *See id*.

## II.  Defendants' Actions Violate the Principles of Federalism.

Since 1792, the President has used militia in domestic law enforcement only as "a last resort," when needed to quell an insurrection, when necessary to enforce a federal court order, or when state and local law enforcement are unable to enforce the law.[5]  Thus, the militia or National Guard was called to respond to armed uprisings like the Whiskey Rebellion in 1794, the refusal to comply desegregation orders in Little Rock in 1957, and the Los Angeles riots in 1992.  Yet even when Presidents have deployed the National Guard, they have acknowledged the inherent limits of the Guard's authority, stressing that National Guard personnel are not "used to relieve local and state authorities of their primary duty to preserve the peace and order of the community" (as President Eisenhower put it in 1957), but

---

[5] Mary C. Lawton, Memorandum from Antonin Scalia to the Deputy Att'y Gen. Re: L. Relating to Civ. Disturbances (Jan. 6, 1975), https://perma.cc/B628-5ANM.

may be used, for example, to supplement state resources in preventing unrest "at the request of the Governor and the Mayor" (as President Bush explained in 1992).[6]

President Trump's invocation of 10 U.S.C. § 12406 to deploy armed National Guard soldiers and entangle them in protests—over the objection of Illinois's Governor—is a stunning break from law and tradition. Section 12406 is indeed a rarely invoked law that allows federal activation of the Guard only in response to an "invasion," "rebellion," or the President's inability to execute the federal laws. In fact, when debating the Constitution, Alexander Hamilton thought it "preposterous" that militia would ever be forcibly deployed to another jurisdiction to impose a President's will. *The Federalist No. 29* (Alexander Hamilton) (rejecting the "exaggerated and improbable suggestions" that federally controlled militia "of Virginia are to be dragged from their homes five or six hundred miles, to tame the republican contumacy of Massachusetts").[7]

Alexander Hamilton understandably trusted that the Constitution, and the guarantees of federalism therein, would protect the States "in a manner consistent

---

[6] President Dwight D. Eisenhower, *Radio and Television Address to the American People on the Situation in Little Rock*, The American Presidency Project (Sept. 24, 1957), https://tinyurl.com/yzer647h; President George Bush, *Address to the Nation on the Civil Disturbances in Los Angeles, California*, The American Presidency Project (May 1, 1992), https://tinyurl.com/55mx5ch3.

[7] As the district court noted, "not even the Founding Father most ardently in favor of a strong federal government believed that one state's militia could be sent to another state for the purposes of political retribution." A222.

with their status as residuary sovereigns and joint participants in the governance of the Nation." *See Alden v. Maine*, 527 U.S. 706, 748 (1999). After all, "[i]n the tension between federal and state power lies the promise of liberty." *Gregory v. Ashcroft*, 501 U.S. 452, 459 (1991). Defendants' actions, in seeking to deploy National Guard members to Chicago, shatter the Constitutional balance between state and federal authority.

The Trump Administration's shifting and expanding misuse of the National Guard exemplifies the concentration of power that the Founding Generation feared. For example, the Administration initially purported to justify its federalization of California National Guard elements as a response to protests in Los Angeles in June. But federalized California National Guard members were soon deployed to assist drug enforcement raids more than 140 miles away. *See* Motion to Vacate Stay or, in the Alternative, for Injunction Pending Appeal at 12, *Newsom v. Trump*, No. 25-3727 (9th Cir. Oct. 7, 2025). Now, months after the Los Angeles protests, hundreds of California National Guard members remain in federalized status, and the Administration has sent many of these members to support broad operations in Oregon, with some sent to conduct training in Illinois. *See* Doc. 63 at 8, No. 1:25-cv-12174 (N.D. Ill.).

Similarly, in the District of Columbia, the Administration first deployed approximately 800 D.C. National Guard members in August. Soon, thousands of

National Guard troops from eight states and the District were out in force on D.C. streets. And the deployments have been extended through at least the end of November.

Before the district court, Defendants set forth a nearly boundless interpretation of § 12406 purportedly allowing their deployment of soldiers to Illinois: that the National Guard may be federalized whenever "there was *any* repeated or ongoing violation of federal law in a community." A263; A314 Tr. 42:12-15. As a matter of text, however, § 12406 codifies the *rare* circumstances in which the National Guard may be activated and deployed by the President, such as when he "is unable with the regular forces to execute the laws of the United States." *See* 10 U.S.C. § 12406(3). Allowing the domestic deployment of soldiers where such circumstances are not present would fundamentally upset the balance of power between states and the federal government.[8] This Court should decline Defendants' invitation to take such an unprecedented and drastic step.

## III. Deployment of the National Guard Infringes on the Sovereignty and Police Powers Reserved to States.

The Constitution establishes a federal government of limited, enumerated powers, and a general police power is not among them. Rather, it is States that enjoy

---

[8] *Accord Printz v. United States*, 521 U.S. 898, 922 (1997) ("The power of the Federal Government would be augmented immeasurably if it were able to impress into its service—and at no cost to itself—the police officers of the 50 States.").

"great latitude under their police powers to legislate as 'to the protection of the lives, limbs, health, comfort, and quiet of all persons.'" *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985) (citation omitted). As the Supreme Court recently explained, the "ability to protect the people, property, and economic activity within its borders" is a "fundamental aspect of a State's sovereign power." *New York v. New Jersey*, 143 S. Ct. 918, 925 (2023).

Accordingly, Defendants' deployment of federalized National Guard soldiers infringes on Illinois's sovereignty and its ability to enforce state laws. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982) (explaining that States have a sovereign interest in "the exercise of sovereign power over individuals and entities within the relevant jurisdiction" and that "this involves the power to create and enforce a legal code, both civil and criminal").

The States' experience confirms that respecting local control of law enforcement makes policing more effective and safer for all involved. "Local agencies are responsive to their local communities in a way that federal agencies," and certainly federalized soldiers, "are not."[9] State and local law enforcement are more familiar with the laws they are enforcing. Their training and practices, such as rules of engagement and policies on use of force, are often tailored to local needs.

---

[9] Police Exec. Res. Forum, *MPD Leaders Should Remain in Charge of Their Police Department* (Aug. 16, 2025), https://tinyurl.com/3wn4f4z9.

Local police officers have built relationships with community members, understand relevant interests, and have greater knowledge of the geography, conditions, and people. By contrast, Defendants appear to view National Guard members, from anywhere in the country, as interchangeable and available to be deployed as law enforcement with minimal notice and training.[10] As the district court properly concluded, "the significance of the public's interest in having only well-trained law enforcement officers deployed in their communities and avoiding unnecessary shows of military force in their neighborhoods cannot be overstated." A271.

Moreover, National Guard units are not a natural fit for law enforcement missions. National Guard basic training is geared toward preparing a fighting force. *See* Army National Guard, *Basic Training Phases*, https://tinyurl.com/23n4kveh (last visited Oct. 8, 2025) (basic training for Army National Guard); U.S. Air Force, *Basic Military Training*, https://tinyurl.com/4wy75u4z (last visited Oct. 8, 2025) (basic training common to active-duty U.S. Air Force and Air National Guard). Indeed, the National Guard, when under federal control, is directly answerable to the Department of Defense, which Secretary Hegseth recently characterized as focusing

---

[10] At the district court hearing below, Defendants stated that even if the Court enjoined specific mobilization orders, Defendants would "have the right to send anybody from any other state tomorrow." A392 Tr. 120:18-20; *see also* Doc. 63-2 at 4, 1:25-cv-12174, (N.D. Ill.) (explaining that civil disturbance training for Texas National Guard members would be "compressed down to hours instead of days").

on "[m]aximum lethality, not tepid legality; violent effect, not politically correct."[11] It is therefore unsurprising that the deployment of federalized soldiers escalates community tensions and harms state economies.[12] Putting federalized troops on city streets can sow chaos and fear, and "is likely to lead to civil unrest, requiring deployment of state and local resources to maintain order." A270. And tourists, consumers, workers, and businesses are all chilled when the military patrols our communities. The Constitution and governing law protect Illinois, and indeed all States, from these injuries that result when "lethal" soldiers are sent into American communities.

In sum, President Trump has deployed the National Guard as domestic law enforcement *four times* in as many months—in California, the District of Columbia, Oregon, and now Illinois. Unless Defendants are checked by the rule of law, the President will, in his own words, send the military to yet more cities in Amici States "one by one" to "straighten them out."[13] The States accordingly urge this Court to

---

[11] U.S. Dep't of Def., *Trump Renames DOD to Department of War* (Sept. 5, 2025), https://tinyurl.com/ymy9w5zw.

[12] *See, e.g.*, The Examination of Doctor Benjamin Franklin, Before an August Assembly, Relating to the Repeal of the Stamp Act, &c. (Feb. 13, 1766) ("Suppose a military force sent into America . . . . They will not find a rebellion; they may indeed make one."), https://tinyurl.com/577emuzh.

[13] Donald J. Trump, President of the United States, Remarks to the Department of War (Sept. 30, 2025), https://tinyurl.com/bddkuc5c.

deny Defendants' motion, and thereby protect the sovereignty of the States and the civil liberties of all Americans.

## CONCLUSION

This Court should deny Appellants' Motion for a Stay Pending Appeal.

DATED this 11th day of October 2025.

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland

*/s/ Michael Drezner*
MICHAEL DREZNER
ADAM KIRSCHNER
JAMES C. LUH
VIRGINIA A. WILLIAMSON
Assistant Attorneys General
200 Saint Paul Place
Baltimore, MD 21202
410-576-6959
MDrezner@oag.state.md.us
AKirschner@oag.state.md.us
JLuh@oag.state.md.us
VWilliamson@oag.state.md.us

KRISTIN K. MAYES
Attorney General of Arizona

ROB BONTA
Attorney General of California

PHILIP J. WEISER
Attorney General of Colorado

WILLIAM TONG
Attorney General of Connecticut

KATHLEEN JENNINGS
Attorney General of Delaware

BRIAN L. SCHWALB
Attorney General of the District of Columbia

ANNE E. LOPEZ
Attorney General of Hawai'i

S. TRAVIS MAYO
Attorney for Governor Andy Beshear
Office of the Governor of Kentucky

ANDREA JOY CAMPBELL
Attorney General of Massachusetts

KEITH ELLISON
Attorney General of Minnesota

MATTHEW J. PLATKIN
Attorney General of New Jersey

LETITIA JAMES
Attorney General of New York

JOSH SHAPIRO
Governor of Pennsylvania

PETER F. NERONHA
Attorney General of Rhode Island

NICHOLAS W. BROWN
Attorney General of Washington

JUSTIN WHITTEN
Attorney for Governor Kelly
Office of the Governor of Kansas

AARON M. FREY
Attorney General of Maine

DANA NESSEL
Attorney General of Michigan

AARON D. FORD
Attorney General of Nevada

RAÚL TORREZ
Attorney General of New Mexico

JEFF JACKSON
Attorney General of North Carolina

DAN RAYFIELD
Attorney General of Oregon

CHARITY R. CLARK
Attorney General of Vermont

**CERTIFICATE OF SERVICE**

I certify that on October 11, 2025, I electronically filed the foregoing document with the Clerk of the Court of the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

DATED this 11th day of October 2025.

*s/ Michael Drezner*
Michael Drezner
