# IN THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

STATE OF ILLINOIS, *ET AL.*,
*Plaintiffs-Appellees,*

*v.*

DONALD J. TRUMP, *ET AL.*,
*Defendants-Appellants.*

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS DISTRICT COURT NO. 1:25-CV-12174*

## BRIEF OF *AMICUS CURIAE* NATIONAL SECURITY LEADERS FOR AMERICA

SAURISH APPLEBY-BHATTACHARJEE
GEOFFREY PIPOLY
Bryan Cave Leighton Paisner LLP
161 North Clark Street, # 4300
Chicago, Illinois 60601
saurish@bclplaw.com
Tel. (312) 602-5004

JEAN-CLAUDE ANDRÉ
Bryan Cave Leighton Paisner LLP
120 Broadway, Suite 300
Santa Monica, CA 90401

DANIEL C. SCHWARTZ
CHARLES TOMPKINS
Bryan Cave Leighton Paisner LLP
1155 F St NW
Washington, DC 20004

Attorneys for NATIONAL SECURITY LEADERS FOR AMERICA

# TABLE OF CONTENTS

**DESCRIPTION**                                                           **PAGE**

INTEREST OF *AMICUS CURIAE*...........................................................1

INTRODUCTION.........................................................................................2

ARGUMENT ................................................................................................3

    I.    The National Guard's Development as a Community-Based Force in the Absence of a Standing Army ..................5

    II.    Historical National Guard Deployments Show That President Trump's Federalization of the Illinois Guard Is a Dangerous Outlier............................................................6

        A.    The Civil Rights Era and Deployments of the National Guard Without Governors' Consent Only to Protect Important Constitutional Rights Amid State Defiance ......................................................7

        B.    The Modern Era: Most Recent Decisions to Federalize the National Guard Have Been Made at the Request of or in Cooperation with State Governors ..................................................................12

    III.    The Federalization of the National Guard Contravenes the Plain Text of § 12406 and Is Contrary to the Best Interests of the National Guard, Illinois, and the Nation ...................................................................................15

        A.    President Trump Improperly Federalized the Illinois National Guard................................................16

            1.    Because There Is No Ongoing "Rebellion" or "Danger of Rebellion," the President Could Not Lawfully Federalize the Illinois Guard Under 10 U.S.C. § 12406(2). ............................17

i

2.    Because He Was Not Unable to Execute the
      Laws of the United States, the President
      Could Not Lawfully Federalize the National
      Guard Under 10 U.S.C. § 12406(3).....................21

B.    Strict Compliance with Subsection 12406(3)'s
      Language Is Especially Important Because of the
      Negative Impact of President Trump's
      Deployment on the National Guard, Illinois, and
      the Nation....................................................28

      1.    President Trump's Deployment Diverted the
            National Guard from Its Core Duties
            Without Proper Training or Instruction.............29

      2.    President Trump's Deployment
            Undermined Public Trust in the Federal
            Government and its Military..............................33

CONCLUSION .........................................................36

# TABLE OF AUTHORITIES

**DESCRIPTION**                                              **PAGE(S)**

**Cases**

*Doe #1 v. Trump,*
  957 F.3d 1050 (9th Cir. 2020) ............................................................ 27

*Loper Bright Enters. v. Raimondo,*
  603 U.S. 369 (2024) ........................................................................... 17

*Martin v. Mott,*
  25 U.S. (12 Wheat.) 19 (1827) ..................................................... 26, 27

*Newsom v. Trump,*
  786 F. Supp. 3d 1235 (N.D. Cal. 2025) ............................................. 19

*Newsom v. Trump,*
  141 F.4th 1032 (9th Cir. 2025) .......................................................... 26

*Piraino v. Int'l Orientation Resources, Inc.,*
  137 F.3d 987 (7th Cir. 1998) .............................................................. 19

*United States v. Williams,*
  553 U.S. 285 (2008) ........................................................................... 25

**Statutes**

10 U.S.C. § 251 .................................................................................... 21

10 U.S.C. § 252 .................................................................................... 23

10 U.S.C.
  § 12406(1) ....................................................................................... 24
  § 12406(2) ........................................................................... 15, 17, 24
  § 12406(3) .............................................................................. *passim*

18 U.S.C. § 1385 .................................................................................. 30

**DESCRIPTION**                                                    **PAGE(S)**

**Statutes (cont'd)**

Calling Forth Act of 1792, 1 Stat. 264
  § 1 .................................................................... 21, 24
  § 2 .......................................................................... 21
  § 3 .......................................................................... 21

Insurrection Act of 1807, ch. 39, 2 Stat. 443 ......................... 22

Militia Act of 1792,
  § I ...................................................................... 21, 22
  § II ................................................................ 21, 22, 23

Militia Act of 1795,
  ch. 36, § 2, 1 Stat. 424 ............................................... 22

Militia Act of 1903,
  35 Stat. 399 (1908) .................................................... 24

Militia Act of 1903,
  108 Stat. 2663 (1994) ................................................. 24

Militia Act of 1903,
  ch. 196, § 4, 32 Stat. 775 ............................................. 23

Suppression of the Rebellion Act of 1861,
  ch. 25, § 1, 12 Stat. 281 .............................................. 23

**Constitutional Provisions**

U.S. Const. art. I ......................................................... 16

U.S. Const. art. I, § 8, cl. 15 ..................................... 2, 5, 16

U.S. Const. art. II ................................................... 2, 5, 16

U.S. Const. art. II, § 2 ................................................. 2, 5

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                   **PAGE(S)**

## Other Authorities

Anshu Siripurapu & Noah Berman, *What Does the U.S. National Guard Do?*, Council on Foreign Relations (June 10, 2025) ..................................... 6

David E. Engdahl, *Soldiers, Riots, and Revolution: The Law and History of Military Troops in Civil Disorders*, 57 Iowa L. Rev. 1, 60 (1971) ............................................................. 22

Edison Forman & Rebecca Lullo, *Understanding Domestic National Guard Missions*, Protect Democracy (Aug. 5, 2024) ........................................................ 6

Exec. Order No. 11053, Providing Assistance for the Removal of Unlawful Obstructions of Justice in the State of Mississippi, 27 Fed. Reg. 9693 (Sept. 30, 1962) .............................. 9

*Hurricane Katrina: The Role of the Governors in Managing the Catastrophe*, Hearing Before the S. Comm. on Homeland Security & Governmental Affairs, 109th Cong. 27–30 (2006) .................................................................. 14

Lyndon B. Johnson & Richard J. Daley, *Conversation of Apr. 6, 1968*, in Lyndon B. Johnson and Civil Rights, vol. 2, ed. Kent B. Germany (Univ. of Va. Press 2014) ...................................... 13

Sarah Fortinsky, *Chicago mayor: National Guard deployment 'illegal, unconstitutional … dangerous'*, The Hill (Oct. 7, 2025) ................................................................ 34, 35

Use of Force and Deadly Force Policy, *Cook County Sheriff's Office* (Aug. 17, 2020) ..................................... 31

**DESCRIPTION**                                                                 **PAGE(S)**

**Internet Sources**

Attorney General Raoul Files Lawsuit Against Trump
    Administration to Stop Unlawful Deployment of National
    Guard, *Office of The Illinois Attorney General* (Oct. 6,
    2025);
    https://illinoisattorneygeneral.gov/news/story/attorney-
    general-raoul-files-lawsuit-against-trump-administration-
    to-stop-unlawful-deployment-of-national-guard ............................... 34

Cal Guard, *California Army National Guard*, Cal. Military
    Dep't, https://calguard.ca.gov/army/ ...................................................... 6

Capt. Wayde Minami, *Baltimore Riot Was Maryland Air
    Guard's Largest Mobilization*, 175th Wing Pub. Affs. (Feb.
    22, 2010),
    https://www.175wg.ang.af.mil/News/Features/Display/Art
    icle/448514/baltimore-riot-was-maryland-air-guards-
    largest-mobilization/ ............................................................................ 13

*Chronology of the Integration of the University of Mississippi*,
    John F. Kennedy Presidential Libr. & Museum,
    https://microsites. jfklibrary.org/olemiss/chronology/ .......................... 9

*Civil Disturbance Operations in National Guard History*,
    NGB Pub. Affairs (Nov. 2020),
    https://www.nationalguard.mil/
    Portals/31/Resources/Fact%20Sheets/Civil%20Disturbanc
    e%20Operations%20Fact%20Sheet%20(Nov%202020).pdf ................. 7

Dave Roos, *7 Times Presidents Have Activated US Troops on
    American Soil*, HISTORY (June 11, 2025),
    https://www.history.com/articles/national-guard-federal-
    troops-deployments .............................................................................. 7

**DESCRIPTION**                                          **PAGE(S)**

## Internet Sources (cont'd)

*De-escalation Policies and Training*, Council on Crim. Just.
(Mar. 2021), https://assets.foleon.com/eu-central-1/de-
uploads-7e3kk3/ 41697/de-
escalation_training.9f4b662e97c2.pdf ................................................ 31

Directive OPS-046, Use of Force and Intermediate Weapons,
*Illinois State Police* (June 17, 2022),
https://isp.illinois.gov/StaticFiles/docs/DepartmentDirecti
ves/ OPS-046%20DIR.pdf ................................................................ 31

Elizabeth Castillo, *Six Things: The role of California's
National Guard in protests*, Cal Matters (June 3, 2020),
https://calmatters.org/justice/2020/06/california-national-
guard-role-protests-explained/ ............................................................ 6

Elizabeth Goitein, *What to Know About the Los Angeles
Military Deployment*, Brennan Ctr. for Just. (June 20,
2025), https://www.brennancenter.org/our-work/research-
reports/what-know-about-los-angeles-military-
deployment. ....................................................................................... 30

Fintan O'Toole, *A Show of Force*, N.Y. Rev. of Books (July 24,
2025), https://www.nybooks.com/articles/2025/07/24/a-
show-of-force-fintan-otoole/ .............................................................. 33

Gen. Joseph Lengyel et al., *Statement of Principles on
Domestic Deployment of the National Guard*, Count Every
Hero, https://counteveryhero.org/wp-
content/uploads/2024/07/CEH-Deployment-Principles.pdf .............. 28

*Governor Barnett's Declaration to the People of Mississippi*,
John F. Kennedy Presidential Libr. & Museum,
https://microsites.
jfklibrary.org/olemiss/controversy/doc2.html ...................................... 9

DESCRIPTION                                                    PAGE(S)

**Internet Sources (cont'd)**

Governor Pritzker Statement on the Illinois National Guard,
    *Office of the Governor* (Oct. 4, 2025), https://gov-pritzker-
    newsroom.prezly.com/governor-pritzker-statement-on-the-
    illinois-national-guard ....................................................................... 34

Joseph Nunn, *The Posse Comitatus Act Explained*, Brennan
    Ctr. for Just. (Oct. 14, 2021),
    https://www.brennancenter.org/our-work/ research-
    reports/posse-comitatus-act-explained ............................................. 11

Kiki Intarasuwan & Caitlin Yilek, *Former defense secretary's
    concern about the National Guard in L.A. is "loss of life
    like we saw in 1970"*, CBS News (June 11, 2025),
    https://www.cbsnews.com/news/chuck-hagel-defense-
    secretary-national-guard-la-reaction/ ............................................... 32

*LBJ sends federal troops to Alabama to protect a civil rights
    march*, HISTORY (Nov. 24, 2009),
    https://www.history.com/this-day-in-history/march-20/lbj-
    sends-federal-troops-to-alabama ....................................................... 10

Nat'l Archives, *Executive Order 10730: Desegregation of
    Central High School (1957)*,
    https://www.archives.gov/milestone-documents/executive-
    order-10730 .......................................................................................... 8

National Guard Bureau, *How We Began*, The National
    Guard, https://www.nationalguard.mil/About-the-
    Guard/How-We-Began/ ....................................................................... 4

Presidential Recordings Digital Edition,
    http://prde.upress.virginia.edu/conversations/4005994 ................... 13

DESCRIPTION                                                    PAGE(S)

**Internet Sources (cont'd)**

Robert W. Coakley, *The Role of Federal Military Forces in Domestic Disorders 1789-1878* (1988), https://tinyurl.com/ 566cb2cm ........................................................................ 5

*Troops in Los Angeles can detain but not arrest individuals, military official says*, Reuters (June 11, 2025) .................................. 31

*University of Alabama desegregated*, HISTORY (Feb. 9, 2010), https://www.history.com/this-day-in-history/june-11/university-of-alabama-desegregated ............................................ 10

## INTEREST OF *AMICUS CURIAE*

*Amicus curiae* National Security Leaders for America ("NSL4A")[1] is a volunteer organization with over 1,300 bipartisan members. Members include retired generals, admirals, and other command service officers, ambassadors, diplomats, and former federal government employees who served in Senior Executive Service positions in areas relating to United States national security, intelligence, public service, and diplomacy. NSL4A's mission is to preserve democratic norms, protect constitutional freedoms, and ensure that both civilian and military service remain non-politicized and operating in the best interest of American democracy and nonpartisanship.

NSL4A's members also include former National Guard command position-holders around the country. This experience gives NSL4A particular expertise to assist the Court in understanding the laws and regulations controlling the very limited circumstances under which the

---

[1] No counsel for a party authored this brief in whole or in part, and no one other than *amicus curiae*, its members, or its counsel made a monetary contribution intended to fund this brief's preparation or submission. *Amicus curiae* has received consent to this filing from Plaintiff-Appellee State of Illinois. As of this filing, Plaintiff-Appellee City of Chicago and Defendants-Appellants have not provided their positions regarding proposed *amicus curiae*'s request for leave.

President may federalize National Guard units away from their state governors and deploy them for federal use; and functions for which the President may, and may not, use federalized National Guard troops.

## INTRODUCTION

The National Guard has served a unique function in United States history. First formed in each of the original colonies, the Militia (as it was then known) served under the command of colonial governors. During the Revolutionary War, while much of the colonial Militia fought under General George Washington, that required specific action of the Continental Congress and agreement by colonial governors.

The Framers of the Constitution understood the reluctance of the new country's citizens to accept a national, federal army—partly due to the British occupation army's excesses. While Article II of the Constitution makes the President commander in chief of the armed forces, including the Militia "when called into the actual Service of the United States" (U.S. Const. art. II, § 2), Congress has the responsibility of determining under what circumstances the Militia may be "call[ed] forth … to execute the Laws of the Union." U.S. Const. art. I, § 8, cl. 15.

Because uninvited federalization of the National Guard severely impacts states' welfare and governors' responsibilities, Congress strictly controlled the President's ability to federalize the National Guard without the relevant governor's invitation or consent. Under 10 U.S.C. § 12406, there are three such circumstances: "whenever (1) the United States … is invaded or is in danger of invasion by a foreign nation; (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or (3) the President is unable with the regular forces to execute the laws of the United States."

When the President seeks to federalize the National Guard against that governor's wishes, particularly given the negative impact doing so has on the National Guard's readiness, the President must establish that section 12406's conditions have been met.

## ARGUMENT

On October 4, 2025, acting on authority from President Trump, the Secretary of Defense—against Illinois Governor J.B. Pritzker's wishes—federalized 300 Illinois National Guard Troops, who are now deployed to bases in the Chicagoland area with 400 Texas National Guard Troops. This stemmed from the supposed rationale that there was a "rebellion"

afoot in Chicago, which hindered federal law enforcement and threatened federal facilities, despite federal authorities' success in executing numerous immigration raids and arrests. The district court issued a temporary restraining order in favor of the Illinois plaintiffs. A motions panel of this Court granted an administrative stay of the district court's order barring the President's federalization of the Illinois National Guard, but declined to stay the district court's order prohibiting the deployment of Illinois and Texas National Guard troops within Illinois. Even though National Guard troops may not be deployed at this time, the activation of the Illinois National Guard and the insertion of Guard troops from another state, all against the wishes of Illinois's Governor, violated the plain language of section 12406, the Guard's purpose and mission, Illinois's sovereignty, and the traditional role of the Guard. The President's actions also jeopardize the National Guard's ability to carry out important state goals and undermine public trust in the Guard.

## I. The National Guard's Development as a Community-Based Force in the Absence of a Standing Army

The National Guard's origins trace back to the colonial period when militia units were formed to defend and secure early settlements.[2] What is now known as the National Guard sprung from this first organization of militia regiments in North America.

In the American Revolution's wake, the Constitution's Framers strongly opposed the notion of a standing army or a presidentially controlled militia.[3] So, in contrast to his Article II authority to act as commander in chief of the Army and the Navy, the President commands the Militia only "when called into the actual Service of the United States." U.S. Const. art. II, § 2. It remains up to Congress to enumerate when the Militia could be "call[ed] forth" to execute federal laws. U.S. Const. art. I, § 8, cl. 15.

Today, National Guard units continue to operate primarily as state militias while increasingly operating with U.S. military components

---

[2] National Guard Bureau, *How We Began*, The National Guard, https://www.nationalguard.mil/About-the-Guard/How-We-Began/ (last visited July 27, 2025).

[3] Robert W. Coakley, *The Role of Federal Military Forces in Domestic Disorders 1789-1878*, at 12 (1988), https://tinyurl.com/566cb2cm (last visited October 14, 2025).

overseas.[4] Guard members are not full-time soldiers, but rather community members leading civilian lives until called upon to serve.[5]

As a "community-based land force,"[6] the National Guard's primary purpose is to serve American communities domestically.[7] The Guard has always been comprised of state and local militias dedicated to serving the American people and their communities in times of crisis—not as partisan tools. Remaining nonpartisan is crucial to National Guard members' ability to serve their communities and retain public trust.

## II. Historical National Guard Deployments Show That President Trump's Federalization of the Illinois Guard Is a Dangerous Outlier

Because the National Guard is normally intended to remain under state control, Presidents have historically federalized the Guard only under extraordinary circumstances. Presidents activated the National

---

[4] Edison Forman & Rebecca Lullo, *Understanding Domestic National Guard Missions*, Protect Democracy (Aug. 5, 2024); Anshu Siripurapu & Noah Berman, *What Does the U.S. National Guard Do?*, Council on Foreign Relations (June 10, 2025).

[5] Elizabeth Castillo, *Six Things: The role of California's National Guard in protests*, Cal Matters (June 3, 2020), https://calmatters.org/justice/2020/06/california-national-guard-role-protests-explained/.

[6] Cal Guard, *California Army National Guard*, Cal. Military Dep't, https://calguard.ca.gov/army/ (last visited October 14, 2025).

[7] Forman & Lullo, *supra* note 4.

Guard during the Civil Rights Era to protect constitutional rights and the lives of citizens, against governors' wishes, only after state and local governments openly refused to do so in defiance of federal law. In those circumstances, there was no question that the federal laws against racial discrimination could not be enforced relying only on the "regular forces."[8]

### A. The Civil Rights Era and Deployments of the National Guard Without Governors' Consent Only to Protect Important Constitutional Rights Amid State Defiance

Following the end of Jim Crow laws and *de jure* racial segregation, presidents called upon the National Guard to defend the constitutional rights of citizens against state governments unwilling to recognize those rights. "Presidents rarely federalize a state or territory's guard without the consent of the governor."[9] Such decisions occurred only where governors were actively impeding the exercise of citizens' constitutional rights in violation of federal law.

---

[8] *Civil Disturbance Operations in National Guard History*, NGB Pub. Affairs (Nov. 2020), https://www.nationalguard.mil/Portals/31/Resources/Fact%20Sheets/Civil%20Disturbance%20Operations%20Fact%20Sheet%20(Nov%202020).pdf; *see also* Dave Roos, *7 Times Presidents Have Activated US Troops on American Soil*, HISTORY (June 11, 2025), https://www.history.com/articles/national-guard-federal-troops-deployments.

[9] Siripurapu & Berman, supra note 4.

The first example occurred in 1957, when then-governor of Arkansas, Orval Faubus, activated the state National Guard in defiance of a federal court order to prevent nine black students—the "Little Rock Nine"—from entering Central High. After discussions with President Eisenhower, Governor Faubus agreed to respect the desegregation order and promised to use the Arkansas National Guard to protect the Little Rock Nine. But Governor Faubus instead withdrew the Guardsmen, and an angry mob prevented the court-ordered integration. Given Governor Faubus's defiance of federal law, Arkansas Congressman Brooks Hays and Little Rock Mayor Woodrow Mann asked the President for help.[10] With Executive Order 10730, President Eisenhower placed the Arkansas National Guard under federal control and sent 1,000 U.S. Army paratroopers to assist in restoring order to Little Rock.[11]

The National Guard was federalized several more times during the Civil Rights Era when federal court orders could not be enforced with

---

[10] Nat'l Archives, *Executive Order 10730: Desegregation of Central High School (1957)*, https://www.archives.gov/milestone-documents/executive-order-10730 (last visited October 14, 2025).

[11] *Id.*

"regular forces."[12] For instance, in 1962, President John F. Kennedy called up the Mississippi National Guardsmen after the University of Mississippi refused to desegregate and enroll James Meredith in violation of a court order.[13] Before federalizing the Mississippi Guard, President Kennedy requested assurances from Governor Ross Barnett that the court order would be followed.[14] Governor Barnett instead publicly announced that he would "do everything in [his] power to prevent integration in [Mississippi] schools."[15] Because of Governor Barnett's refusal to deploy "regular forces" to enforce the law, President Kennedy issued Executive Order 11053, federalizing the Mississippi Guard to allow desegregation to continue unimpeded.[16]

The following June, President Kennedy federalized the Alabama National Guard to help integrate the University of Alabama against the

---

[12] NGB Pub. Affairs, *supra* note 9.

[13] Siripurapu & Berman, *supra* note 4.

[14] *Chronology of the Integration of the University of Mississippi*, John F. Kennedy Presidential Libr. & Museum, https://microsites.jfklibrary.org/olemiss/chronology/ (last visited October 14, 2025).

[15] *Governor Barnett's Declaration to the People of Mississippi*, John F. Kennedy Presidential Libr. & Museum, https://microsites.jfklibrary.org/olemiss/controversy/doc2.html (last visited Sept. 5, 2025).

[16] Exec. Order No. 11053, Providing Assistance for the Removal of Unlawful Obstructions of Justice in the State of Mississippi, 27 Fed. Reg. 9693 (Sept. 30, 1962).

wishes of Governor George Wallace, who, like the governors of Arkansas and Mississippi, actively opposed integration.[17]

Finally, in March 1965, President Lyndon B. Johnson federalized the Alabama National Guard after Alabama State Troopers attacked civil rights activists during a three-day march from Selma to Montgomery.[18] Like the previous Civil Rights Era federalizations, President Johnson's decision came only after a federal court ordered that the protestors be allowed to proceed protected by regular forces, and Governor Wallace refused to provide such protection.[19] In other words, federalizing and deploying the National Guard was necessary because federal law could not be executed using the "regular forces."

Following President Johnson's 1965 decision to federalize the National Guard to protect civil-rights activists against state-sanctioned violence, no president had again federalized the Guard against a state's wishes until President Trump's actions this year, in California, Illinois,

---

[17] *University of Alabama desegregated*, HISTORY (Feb. 9, 2010), https://www.history.com/this-day-in-history/june-11/university-of-alabama-desegregated.

[18] Roos, *supra* note 9.

[19] *LBJ sends federal troops to Alabama to protect a civil rights march*, HISTORY (Nov. 24, 2009), https://www.history.com/this-day-in-history/march-20/lbj-sends-federal-troops-to-alabama.

and Oregon.[20] The historical examples of federalization lacking a governor's approval share a common thread: they were implemented to protect individual constitutional rights *after* the president first attempted to gain the cooperation of state governors. In each case, it was clear that federal law could not be executed using "regular forces" because the governors involved openly opposed enforcement of the relevant federal court orders protecting persons' civil rights. That is not the situation here, and the President's efforts to force federalization of National Guard troops on the governor and people of Illinois set a dangerous precedent. Left unchecked, the President's actions may invite more common and authoritarian presidential control over state National Guard forces than the Framers contemplated, or the law permits.

Section 12406 constitutes Congress' delineation of the sole means by which the President may exercise control over the National Guard without the responsible governor's consent. Here, the President's

---

[20]     Joseph Nunn, *The Posse Comitatus Act Explained*, Brennan Ctr. for Just. (Oct. 14, 2021), https://www.brennancenter.org/our-work/research-reports/posse-comitatus-act-explained (last accessed, October 14, 2025).

federalization and deployment of Guard troops in Illinois does not meet those standards.

**B. The Modern Era: Most Recent Decisions to Federalize the National Guard Have Been Made at the Request of or in Cooperation with State Governors**

From 1967 to 1992, although the National Guard was federalized several times to quell violent, widespread riots in U.S. cities, these actions occurred only at the request of or in cooperation with the respective state governors.

In 1967, when Detroit experienced rampant rioting and violence sparked by racial tensions, police brutality, and unemployment, Michigan Governor George Romney and Detroit Mayor Jerome Cavanagh acknowledged their inability to restore order using "regular forces" and formally requested federal assistance. In response, President Johnson federalized the Michigan National Guard to help quell the chaos that resulted in 43 dead, 342 wounded, and more than 1,400 buildings destroyed.[21]

After Dr. Martin Luther King, Jr.'s assassination in 1968, President Johnson federalized National Guard troops in Washington,

---

[21] Roos, *supra* note 9.

D.C. (where the President has unique, direct control over the Guard), and in Baltimore and Chicago at the request of the Maryland governor[22] and the Chicago mayor.[23]

In 1992, California Governor Pete Wilson requested that President George H. W. Bush federalize the National Guard to respond to riots across Los Angeles following the acquittal of four LAPD officers on criminal charges relating to the video-recorded beating of Rodney King. Then, "[t]housands of people poured into the streets—smashing windows, looting stores, and tossing Molotov cocktails."[24] Ultimately, more than 60 people died during the riots, and property damage totaled over $1 billion—validating President Bush's mobilization of the California

---

[22] Capt. Wayde Minami, *Baltimore Riot Was Maryland Air Guard's Largest Mobilization*, 175th Wing Pub. Affs. (Feb. 22, 2010), https://www.175wg.ang.af.mil/News/Features/Display/Article/448514/baltimore-riot-was-maryland-air-guards-largest-mobilization/ (last accessed October 14, 2025).

[23] Lyndon B. Johnson & Richard J. Daley, *Conversation of Apr. 6, 1968*, in Lyndon B. Johnson and Civil Rights, vol. 2, ed. Kent B. Germany (Univ. of Va. Press 2014), Presidential Recordings Digital Edition, http://prde.upress.virginia.edu/conversations/4005994 (last accessed October 14, 2025).

[24] Roos, *supra* note 9.

National Guard only after Governor Wilson and Los Angeles's mayor requested assistance.[25]

In contrast, in 2006, President George W. Bush declined to federalize the National Guard in Louisiana following Hurricane Katrina because the then-governor of Louisiana opposed federalization.[26]

Viewed against this historical context, President Trump's decision to federalize the Illinois National Guard is an outlier, analogous only to his own federalization of the California National Guard in July 2025, and the Oregon National Guard in October 2025, over the objections of those states' governors. In both cases, district court judges have found the President's rationale for federalizing the Guard was unsupported by the facts on the ground. Unlike deployments during the Civil Rights Era that saw local and state governments' outright refusal to enforce applicable civil rights law, or the more recent federalizations to quell widespread, violent riots after governors admitted their own states' resources were overwhelmed, President Trump's federalization of and effort to deploy

---

[25] Roos, *supra* note 9.

[26] *Hurricane Katrina: The Role of the Governors in Managing the Catastrophe*, Hearing Before the S. Comm. on Homeland Security & Governmental Affairs, 109th Cong. 27–30 (2006) (testimony of Kathleen Blanco).

National Guard troops in Illinois exceeds his authority, in violation of 10 U.S.C. § 12406 and the Constitution. Given multiple district courts' rulings, not only in Chicago but also in Los Angeles and Portland, that the facts on the ground did not justify such federalization, these actions by the President and the Secretary of Defense appear to be politically motivated, rather than responding to the circumstances enumerated in section 12406.

III. **The Federalization of the National Guard Contravenes the Plain Text of § 12406 and Is Contrary to the Best Interests of the National Guard, Illinois, and the Nation**

In seeking a stay of the district court's order, the federal government contends that the President lawfully exercised his statutory authority under both: (i) 10 U.S.C. § 12406(2), which permits the president to call into federal service the National Guard of any state whenever "there is a rebellion or danger of a rebellion against the authority of the Government of the United States"; and (ii) 10 U.S.C. § 12406(3), which permits the President to federalize the National Guard whenever he is "unable with the regular forces to execute the laws of the United States." The district court temporarily restrained federalization of the Guard finding the President had failed to prove either requirement

of the statute had been met. The motions panel allowed the President's continued federalization of Illinois Guard troops but kept in place the prohibition against deploying those troops, along with National Guard troops sent from Texas, to Chicago and elsewhere.

As explained below, the President's authority to federalize Illinois's National Guard troops is strictly limited by section 12406 and his failure to first meet one or more of the statutory requirements weakens the effectiveness of the National Guard. The President's federalization of the Illinois National Guard, and concurrent deployment to Illinois of Guard troops from Texas, also undercuts the sovereignty of Illinois to use its critical resources as its governor deems necessary and to prevent an uninvited occupation of forces from another state. By employing the National Guard not where and when they are needed, the President threatens great harm to the Nation and its Constitutional principles.

### A. President Trump Improperly Federalized the Illinois National Guard

The power to call forth militias to "execute the Laws of the Union, suppress Insurrections and repel Invasions" is not an inherent Article II power of the President. It belongs, first and foremost, to Congress,

exercising its powers under Article I of the Constitution.[27] Only in rare and specific circumstances has Congress authorized the Executive to call a state militia or National Guard into federal service without a governor's invitation or consent. The authorizing statute limits presidential power to extraordinary circumstances: "invasion," "rebellion," and the inability to execute the laws using "regular forces." 10 U.S.C. § 12406. The plain text of section 12406, with its legislative history and Congress's limited delegation of its authority to the Executive, requires a narrow statutory application and, when challenged, putting the President to his proof.

1. **Because There Is No Ongoing "Rebellion" or "Danger of Rebellion," the President Could Not Lawfully Federalize the Illinois Guard Under 10 U.S.C. § 12406(2)**

To call the National Guard into federal service under 10 U.S.C. § 12406(2), the President must demonstrate that there "is a rebellion or danger of rebellion against the authority of the Government of the United States." As the district court rightly noted, the President is "entitled to a certain amount of deference on the question of whether the facts constitute the predicates laid out in Section 12406," including whether a

---

[27]     *See* U.S. Const. art. I, § 8, cl. 15.

rebellion existed.[28] Yet the court owes no deference to the President's determination of "what constitutes a rebellion" in the first place, a matter of "statutory interpretation … committed to the courts."[29]

Here, the activities that defendants identify as a "rebellion" were largely protests against actions taken by Immigration and Customs Enforcement ("ICE") and Customs and Border Patrol ("CBP") agents as part of an "immigration enforcement campaign dubbed 'Operation Midway Blitz'" that began in "September 2025."[30] These include protests through September and October 2025 outside an ICE Processing Center in Broadview, Illinois, which have resulted in federal agents "regularly deploy[ing] tear gas to disperse the crowd" or "stand[ing] on top of the building to shoot balls of pepper spray at protestors from above."[31] At these protests, crowd control was provided by officials from the Illinois State Police, Broadview Police, Cook County Sheriff's Office, and myriad other state and local law enforcement agencies in Illinois.[32] Where

---

[28]    D. Ct. Dkt. 70 ("D. Ct. Order."), at 31–32.

[29]    *Id.*, at 31 (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024)).

[30]    *Id.* at 3–4.

[31]    *Id.* at 4–6.

[32]    *Id.*

appropriate, some of the protestors were arrested on charges of battery or aggravated battery.[33]

Against this backdrop, the factual record developed before the district court does not establish the existence of a *rebellion*, defined as "a deliberate, organized resistance, openly and avowedly opposing the laws and authority of the government as a whole by means of armed opposition and violence."[34] Defendants, for their part, rehash their selective narrative regarding the conditions in the Chicagoland area preceding the President's October 4 federalization of the Illinois Guard,[35] which the district court expressly found was "not reliable" based on the record

---

[33]    *Id.* Further, as the district court noted, federal grand juries "have refused to return an indictment against at least three [arrested] individuals, which equates to a finding of a lack of probable cause that any crime occurred," rendering defendants' assertions of rampant lawlessness in and around Chicago overblown at best, and misleading at worst. *Id.* at 10.

[34]    *Id.* at 33 (citing *Newsom v. Trump*, 786 F. Supp. 3d 1235, 1251–53 (N.D. Cal. 2025).

[35]    *See* Dkt. 6, at 14–16.

evidence.[36] These findings and credibility determinations should not be second-guessed on appeal, particularly under clear-error review.[37]

In short, the district court's finding that defendants failed to prove that a "rebellion" existed should be affirmed. Not all protests are riots, and not all riots are "rebellions." And the Court should reject defendants' invitation to blindly defer to presidential proclamations by fiat that a "rebellion" is afoot simply because select groups of citizen-protestors voice opposition to the President's immigration enforcement tactics—almost always lawfully, with those few "who are obstructing, assaulting, or doing violence" facing quick consequences for their actions at the capable hands of federal, state, and local law-enforcement authorities.[38]

---

[36] D. Ct. Order at 11.

[37] "To be clearly erroneous, a decision must strike us as more than just maybe or probably wrong; it must strike us as wrong with the force of a five-week-old, unrefrigerated dead fish." *Piraino v. Int'l Orientation Resources, Inc.*, 137 F.3d 987, 990 (7th Cir. 1998) (cleaned up). And where, as here, "findings of fact are based on determinations about witnesses' credibility, the deference accorded the trial judge is even more significant." *Id.*

[38] D. Ct. Order at 11.

### 2. Because He Was Not *Unable* to Execute the Laws of the United States, the President Could Not Lawfully Federalize the National Guard Under 10 U.S.C. § 12406(3)

To federalize the National Guard under 10 U.S.C. § 12406(3), the President must demonstrate that he is "*unable* with the regular forces to execute the laws of the United States."[39] The inability to execute federal law using regular forces is the prerequisite. Facing mere opposition from the public or other difficulties is not enough; the statute makes clear that *inability* is what is required. The intent of the Framers, the distribution of powers between Congress and the President, and the history of the presidential use of this extraordinary power, make clear that § 12406(3) should be strictly construed to ensure compliance with the statute's plain text, purpose, and separation of powers. History, again, is instructive.

On the heels of the American Revolution, Congress passed the Militia Act of 1792, a predecessor to 10 U.S.C. § 12406.[40] Under Section I of the Act, the Second Congress delegated to the President the power to "call forth such number of the militia of the state or states" "in case of an

---

[39] 10 U.S.C. § 12406(3) (emphasis added).
[40] Calling Forth Act of 1792, ch. 28, § 1, 1 Stat. 264, 264; *cf.* 10 U.S.C. § 12406.

insurrection in any state … [*but only*] on application of the legislature of such state, or of the executive."[41] This language persists today, codified at 10 U.S.C. § 251.[42] Section II of the Act also permitted the President to call forth the militia without the request of the state "whenever the laws of the United States shall *be opposed* or the execution thereof *obstructed*."[43] But that authority could only be exercised after a court first recognized that prerequisite conditions for its invocation had been met. Further, the President had to issue a proclamation ordering "insurgents" to "disperse" prior to mobilization.[44]

Significantly, the Militia Act of 1792, in cases of insurrection and obstruction of federal law, did not allow the President to act alone. Both sections of the Act required action either from the state legislature or the federal judiciary. These limitations reflect Congress's intent—from its earliest days—to limit the President's authority to call forth state

---

[41]    Calling Forth Act of 1792 § 1, 1 Stat. at 264.

[42]    *Id.*; *see also* 10 U.S.C. § 251 ("Whenever there is an insurrection in any State against its government, the President may, upon the request of its legislature or of its governor if the legislature cannot be convened, call into Federal service such of the militia of the other States").

[43]    Calling Forth Act of 1792 § 2, 1 Stat. at 264 (emphasis added).

[44]    Calling Forth Act of 1792 § 3, 1 Stat. at 264.

militias. Indeed, the very notion of granting this authority to the Executive branch *at all* was contested.[45]

There have been legislative changes to Section II of the 1792 Militia Act over the next 200 years, which consistently narrowed the President's authority.[46] For example, Congress passed the Militia Act of 1861 on the eve of the Civil War, amending Section II to limit the circumstances under which the President could mobilize the militia to enforce federal law. No longer was it enough for the President to show that the laws of the United States were "*opposed*, or the execution thereof *obstructed*"; the President's ability to call forth the militia or the federal armed forces

---

[45] David E. Engdahl, *Soldiers, Riots, and Revolution: The Law and History of Military Troops in Civil Disorders*, 57 Iowa L. Rev. 1, 60 (1971) ("From the record of the House debate, it appears that the representatives were not troubled over the use of the militia in circumstances so grave as invasion or outright insurrection; but they were deeply concerned over the prospect of troops being used in common civilian situations 'to execute the laws of the Union.'").

[46] The Militia Act of 1792 had a three-year expiration date, upon which time the Militia Act of 1795 was enacted, permanently replacing the former but maintaining the "opposed" and "obstructed" language seen in Section II. *See* Militia Act of 1795, ch. 36, § 2, 1 Stat. 424, 424. Additionally, Congress enacted the Insurrection Act of 1807 not to amend the 1795 Act, but rather to supplement it by allowing the President to call forth, "in all cases of insurrection, or obstruction to the laws," and in addition to state militias, "such part of the land or naval force of the United States." *See* Insurrection Act of 1807, ch. 39, 2 Stat. 443, 443.

became conditional on the President's incapacity to enforce federal law otherwise. Thus, the President could activate the militia only when "it shall become *impracticable, in the judgment of the President* of the United States, to enforce … the laws of the United States[.]"[47]

This trend of narrowing the Executive's authority to call forth militias continued into the 20th century with the passage of the Militia Act of 1903.[48] There, Congress removed the qualification of relying on the President's "judgment" by eliminating previous language—"in the judgment of the President"[49]—and substituting an objective requirement that the President be "unable" to execute the laws using regular forces.[50] Congress has since retained this narrower language through subsequent revisions, confirming its intent that the President be held to an exacting standard when justifying a decision to federalize the National Guard.[51]

---

[47]    Suppression of the Rebellion Act of 1861, ch. 25, § 1, 12 Stat. 281, 281 (emphasis added) (current version codified at 10 U.S.C. § 252).

[48]    The Militia Act of 1903, ch. 196, § 4, 32 Stat. 775, 776.

[49]    *Id*. (when "the President is unable, with the other forces at his command, to execute the laws of the Union in any part thereof, it shall be lawful for the President to call forth … the militia").

[50]    *Id*.

[51]    *See* 35 Stat. 399, 400 (1908); 108 Stat. 2663, 2994 (1994).

Contrary to the plain text and the history of this limited delegation, defendants have argued "[the statute] is better read to authorize the President to call up the National Guard when he is unable to ensure *to his satisfaction* the faithful execution of federal laws[.]"[52] That is plainly not what the statute says. And defendants' tortured reading conflicts with the separation of powers and Congress's trend of limiting the Executive's authority to deploy the military domestically, a direct reflection of such separation.[53] Requiring an objective showing of the inability to execute federal law—rather than establishing the President's "own satisfaction" that the laws could be enforced—to invoke the authority granted in subsection (3) is also consistent with the remainder of the statute.

Subsections (1) and (2), for example, require an "invasion" or "rebellion" before the President can federalize the National Guard. Allowing the President to circumvent those preconditions whenever he is "unable to his own satisfaction" to enforce federal immigration policies

---

[52]     D. Ct. Dkt. 62 at 25 (emphasis added).
[53]     Calling Forth Act of 1792 § 1, 1 Stat. at 264; *cf.* 10 U.S.C. § 12406(3).

defeats the statute's purpose.[54] It is also contrary to the legislative history of § 12406, which specifically removed the "President's judgment" as a basis to federalize the Guard without the governor's prior consent or invitation. As such, the President's "judgment" or "satisfaction" as to whether federal laws may be executed with "regular forces" neither supplants nor precludes the Court's determination of the facts.

The district court correctly concluded that on the record before it, "there has been no showing that the civil power has failed," where the "agitators who have violated the law by attacking federal authorities have been arrested."[55] By defendants' own admission, they were able to execute the laws without activating the National Guard, documenting numerous arrests made by federal agents in response to unlawful activity by specific individuals.[56] There is no evidence that the President had been unable to enforce the laws of the United States in the normal course.

In this regard, the government's continuing reliance on *Martin v. Mott*, 25 U.S. (12 Wheat.) 19 (1827)—as conferring on the President carte

---

[54]    *See United States v. Williams*, 553 U.S. 285, 294 (2008) ("[A] word is given more precise content by the neighboring words with which it is associated.").

[55]    *See* D. Ct. Order at 40.

[56]    D. Ct. Dkt. 62 at 9.

blanche to federalize the National Guard without any objective review by the courts—is misplaced.[57] There, Mr. Mott refused to serve during the War of 1812. The Supreme Court deferred to the President's judgment that there was an "invasion" under the Militia Act of 1795 and ruled that his "decision [that there was an invasion justifying federalizing the militia] is conclusive upon all other persons." *Id.* at 30. Based on this antiquated decision, defendants insist that this Court must blindly defer to the President's determination that he cannot execute the laws of the United States in Chicago with "regular forces."

But much has changed since 1827. Most significantly, the Militia Act of 1903 specifically removed reliance on the President's judgment in determining whether section 12406's requirements had been met, instead subjecting that determination to judicial review. *See Doe #1 v. Trump*, 957 F.3d 1050, 1066–67 (9th Cir. 2020).

---

[57] *See Newsom v. Trump*, 141 F.4th 1032, 1050 (9th Cir. 2025) ("*Martin* does not compel us to accept the federal government's position that the President could federalize the National Guard based on no evidence whatsoever, and that courts would be unable to review a decision that was obviously absurd or made in bad faith.").

*Martin* is also not controlling because, by its plain text, the law-enforcement prong of § 12406(3) is conditional. That is, the President must determine and be prepared to prove that the federal government cannot execute the laws of the United States "with the regular forces," such as law enforcement available locally. Governor Pritzker contends the National Guard is not necessary to execute the laws of the United States. Any contention that the President could simply ignore that determination is not supported by the law on its face or its legislative history, much less the record below, which establishes "regular forces" have been—and remain—well-equipped to deal with the few "agitators" who break the law amidst the (far larger) group of protestors exercising their rights to "observ[e,] question[,] and criticiz[e]" their government.[58]

### B. Strict Compliance with Subsection 12406(3)'s Language Is Especially Important Because of the Negative Impact of President Trump's Deployment on the National Guard, Illinois, and the Nation

President Trump's unlawful deployment of the National Guard in the Chicagoland area misappropriates limited state resources to advance partisan political ends. This has real consequences. By abusing the power

---

[58] D. Ct. Order, at 10–11, 40.

to federalize the Guard, the President has harmed Illinois and its citizens by redirecting critical resources away from other needs and undermining the public trust in the National Guard.

Domestic deployment of the National Guard requires judicious consideration of "what is best for the nation, the states, and the Guard."[59] The President's deployment of National Guard troops in the Chicagoland area entirely failed to account for these factors. That misuse undermines the role of the National Guard, deters recruitment, and ultimately weakens a vital component of our national defense, leaving the country less prepared to respond to both domestic crises and foreign threats.

### 1. President Trump's Deployment Diverted the National Guard from Its Core Duties Without Proper Training or Instruction

In deciding the propriety of deploying the National Guard domestically, both the Executive and courts reviewing the Executive's actions should consider the National Guard's preparedness for the particular mission, as well as its ability to maintain readiness in case of

---

[59] Gen. Joseph Lengyel et al., *Statement of Principles on Domestic Deployment of the National Guard*, Count Every Hero, https://counteveryhero.org/wp-content/uploads/2024/07/CEH-Deployment-Principles.pdf (last visited October 14, 2025).

emerging crises.[60] Collaboration with governors, who possess critical insight into the preparedness and readiness of units, is a crucial part of this analysis.

**Preparedness.** President Trump deployed the National Guard in the Chicago area without sufficient instructions, training, or preparation. Elements of preparedness, in addition to adequate training, include having the appropriate equipment and resources, and a clear objective, timeline, chain of command, and instructions for use of force,[61] all of which were lacking here.

Per President Trump's October 4 deployment memorandum, the National Guard "may perform those military protective activities that the Secretary of [Defense] determines are reasonably necessary to ensure the protection and safety of Federal personnel and property."[62] The memorandum does nothing to clarify what is meant by "reasonably necessary" to protect ICE enforcement officers, and neither President Trump nor his administration has publicly specified the full range of

---

[60]     *See* Forman & Lullo, *supra* note 4; *see also* Siripurapu & Berman, *supra* note 4; Gen. Joseph Lengyel et al., *supra* note 56.

[61]     Gen. Joseph Lengyel et al., *supra* note 56.

[62]     D. Ct. Order at 45 (quoting D. Ct. Dkt. 62-1 at 16).

actions or amount of force that deployed Guardsmen are authorized to take in service of that stated purpose.[63] The lines are, at best, blurred between what constitutes protection and law enforcement functions, especially when the underlying functions of ICE are to implement enforcement measures.[64]

Compounding the confusion over the President's vague directive, the National Guard does not receive extensive training on protective and enforcement activities in the face of civil unrest. According to the Council on Criminal Justice, de-escalation training is one of the most effective methods of quelling civil unrest, something Illinois state and local law enforcement officers are specifically trained to do.[65] The military, by

---

[63]     *Id.*; *see also* Elizabeth Goitein, *What to Know About the Los Angeles Military Deployment*, Brennan Ctr. for Just. (June 20, 2025), https://www.brennancenter.org/our-work/research-reports/what-know-about-los-angeles-military-deployment.

[64]     Should such protection measures bleed into law enforcement measures, they would violate the Posse Comitatus Act. *See* 18 U.S.C. § 1385.

[65]     *De-escalation Policies and Training*, Council on Crim. Just. (Mar. 2021), https://assets.foleon.com/eu-central-1/de-uploads-7e3kk3/41697/de-escalation_training.9f4b662e97c2.pdf; *see also* Directive OPS-046, Use of Force and Intermediate Weapons, *Illinois State Police* (June 17, 2022), https://isp.illinois.gov/StaticFiles/docs/DepartmentDirectives/OPS-046%20DIR.pdf; Use of Force and Deadly Force Model Policy, Use of Force and Deadly Force Policy, *Cook County Sheriff's Office* (Aug. 17, 2020).

contrast, does not focus on de-escalation training. In fact, according to reports, the National Guard received only two days of training on how to handle civil disturbances before being deployed in Los Angeles as part of the President's federalization of Guard troops there.[66]

In the absence of clearly defined instructions and specialized training, deploying the National Guard into a politically charged and potentially volatile situation—as in Chicago and neighboring areas— poses serious risks both to members of the Guard and the public. As former Defense Secretary Chuck Hagel warned, such deployments can lead to tragic outcomes, recalling the 1970 Kent State shootings when improperly trained National Guard troops shot and killed unarmed students in Ohio.[67]

**Readiness.** President Trump's deployment also detracted from the National Guard's readiness, diverting it from its primary mission.[68] "Our

---

[66] *Troops in Los Angeles can detain but not arrest individuals, military official says*, Reuters (June 11, 2025), https://www.reuters.com/world/us/troops-los-angeles-can-temporarily-detain-individuals-no-arrest-authorities-2025-06-11/.

[67] Kiki Intarasuwan & Caitlin Yilek, *Former defense secretary's concern about the National Guard in L.A. is "loss of life like we saw in 1970"*, CBS News (June 11, 2025), https://www.cbsnews.com/news/chuck-hagel-defense-secretary-national-guard-la-reaction/.

[68] Gen. Joseph Lengyel et al., *supra* note 56.

leaders should treat the Guard as a last resort and a resource with limits on its capacity."[69]

In addition to depleting resources, inappropriate deployments can negatively affect recruitment and retention for the National Guard and the military. "Most Guard members have families and civilian lives that they must put on hold when deployed."[70] Unlike active-duty personnel, Guard members must navigate the complexities of two careers. As such, excessive and unnecessary deployments like the President's "seriously impair retention and exacerbate recruitment shortfalls within the National Guard,"[71] further detracting from its readiness. These harms to recruitment and retention will negatively impact the National Guard's ability to respond to domestic and international emergencies for the foreseeable future.

### 2. President Trump's Deployment Undermined Public Trust in the Federal Government and its Military

Beyond preparedness and readiness, decisionmakers must also consider whether deployment will negatively impact public trust in the

---

[69]    Forman & Lullo, *supra* note 4.

[70]    Gen. Joseph Lengyel et al., *supra* note 56.

[71]    Gen. Joseph Lengyel et al., *supra* note 56.

National Guard.[72] This is especially relevant when considering deployments on U.S. soil, where such decisions "should *never* be made to further a political agenda."[73] Because the National Guard is an apolitical institution, "[i]f some Americans come to associate the Guard with a political faction they oppose, it could weaken the Guard's ability to respond to emergencies affecting those communities."[74]

Using the Guard to "protect" immigration enforcement officers inextricably entangles it with the act of immigration enforcement, a heavily politicized and debated subject throughout the country, and particularly in Chicago. Indeed, Governor Pritzker, Illinois Attorney General Kwame Raoul, and Chicago Mayor Brandon Johnson have each

---

[72]    Gen. Joseph Lengyel et al., *supra* note 56.

[73]    Forman & Lullo, *supra* note 4.

[74]    *Id.*; *see also* Fintan O'Toole, *A Show of Force*, N.Y. Rev. of Books (July 24, 2025), https://www.nybooks.com/articles/2025/07/24/a-show-of-force-fintan-otoole/ ("Politicizing the military means dismantling its self-image as an institution that transcends partisan divisions, is broadly representative of the US population, and owes its primary loyalty not to the president but to the Constitution…. Trump's deployment of troops in Los Angeles … had no military purpose. It can best be thought of as a counterdemonstration."); Gen. Joseph Lengyel et al., *supra* note 56 ("Americans trust that when you call out the National Guard, you call out America and that when the National Guard arrives, their situation will improve. No deployment of the National Guard should break that trust. Indeed, were that trust to erode, it would dramatically weaken the ability of the Guard to respond to domestic emergencies.").

publicly condemned the deployment, calling it an overreach of federal authority and a politically motivated move designed to escalate tensions rather than restore order.[75]

The deployment has also had a polarizing effect within the National Guard and the communities it was ostensibly sent to protect. Unorthodox deployments, especially those perceived as politically motivated or lacking clear operational necessity, can erode trust in leadership and diminish the sense of purpose and pride that sustains Guard service. Broad opposition to the deployment of the National Guard undermines public trust and again deters recruitment and re-enlistment,[76] ultimately weakening a vital component of our national defense and leaving states and the country less prepared to respond to true (rather than imagined

---

[75] Governor Pritzker Statement on the Illinois National Guard, *Office of the Governor* (Oct. 4, 2025), https://gov-pritzker-newsroom.prezly.com/governor-pritzker-statement-on-the-illinois-national-guard; Attorney General Raoul Files Lawsuit Against Trump Administration to Stop Unlawful Deployment of National Guard, *Office of The Illinois Attorney General* (Oct. 6, 2025); https://illinoisattorneygeneral.gov/news/story/attorney-general-raoul-files-lawsuit-against-trump-administration-to-stop-unlawful-deployment-of-national-guard; Sarah Fortinsky, *Chicago mayor: National Guard deployment 'illegal, unconstitutional … dangerous',* THE HILL (Oct. 7, 2025).

[76] *Id.*

or exaggerated) threats. These consequences will be felt not just for the duration of the deployment, but for years to come.

## CONCLUSION

For the above reasons, the Court should affirm the district court.

DATED: October 14, 2025      Respectfully submitted,

BRYAN CAVE LEIGHTON PAISNER LLP

*/s/ Saurish Appleby-Bhattacharjee*

SAURISH APPLEBY-BHATTACHARJEE
Attorneys for NATIONAL SECURITY
LEADERS FOR AMERICA

# CERTIFICATE OF COMPLIANCE

I certify that:

1.     This brief complies with the length limits permitted by Fed. R. App. P. 29(a)(5) and Seventh Circuit Rule 29 because the brief contains 6,917 words, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable.

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word.

DATED: October 14, 2025           */s/ Saurish Appleby-Bhattacharjee*

                                                    SAURISH APPLEBY-BHATTACHARJEE
                                                    Attorneys for NATIONAL SECURITY
                                                    LEADERS FOR AMERICA