No. 25-2798

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

STATE OF ILLINOIS, et al.,
*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, *in his official capacity as President of the United States,* et al.,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of Illinois, No. 1:25-cv-12174 (Perry, J.)

## BRIEF FOR DEFENDANTS-APPELLANTS

BRETT A. SHUMATE
  *Assistant Attorney General*
ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
ANDREW M. BERNIE
J. KAIN DAY
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7517*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-2689*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................1

STATEMENT OF JURISDICTION .......................................................4

STATEMENT OF THE ISSUE ..............................................................6

PERTINENT STATUTES .......................................................................6

STATEMENT OF THE CASE.................................................................6

    A.   Legal Background................................................................. 6

    B.   Factual Background............................................................. 7

    C.   Prior Proceedings............................................................. 13

SUMMARY OF ARGUMENT...............................................................20

STANDARD OF REVIEW ....................................................................25

ARGUMENT..........................................................................................25

I.    The President Lawfully Federalized National Guardsmen to
Protect Federal Personnel and Property in the Chicago Area ..... 26

    A.   The Decision Whether to Call Up the National Guard Is
Committed Exclusively to the President ............................. 26

    B.   The President's Invocation of Section 12406 Was a Lawful
Response to Violent Threats to Federal Personnel and
Property ............................................................................. 37

II.    Plaintiffs Did Not Establish the Equitable Factors for Injunctive
Relief..................................................................................................60

CONCLUSION .....................................................................................65

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

CERTIFICATE OF RULE 30 COMPLIANCE

ADDENDUM

SHORT APPENDIX

# TABLE OF AUTHORITIES

**Cases:**                                                    **Page(s)**

*Baker v. Carr,*
   369 U.S. 186 (1962) ............................................................. 36

*C.Y. Wholesale, Inc. v. Holcomb,*
   965 F.3d 541 (7th Cir. 2020) ............................................ 25

*Dalton v. Specter,*
   511 U.S. 462 (1994) ........................................... 36, 38, 61

*Davis v. Michigan Dep't of Treasury,*
   489 U.S. 803 (1989) ............................................................. 45

*FCC v. Beach Commc'ns, Inc.,*
   508 U.S. 307 (1993) ............................................................. 40

*Holder v. Humanitarian Law Project,*
   561 U.S. 1 (2010) ................................................................. 39

*Houston v. Moore*
   18 U.S. (5 Wheat.) 1 (1820) ............................................. 34

*Illinois v. Trump,* No. 25-2798,
   2025 WL 2937065 (7th Cir. Oct. 16, 2025) ................. 5, 19, 33, 36, 56

*International Ass'n of Fire Fighters, Loc. 365 v. City of E. Chicago,*
   56 F.4th 437 (7th Cir. 2022) ............................................ 60

*Luther v. Borden,*
   48 U.S. (7 How.) 1 (1849) ........................... 2, 21, 29, 30, 35

*Martin v. Mott,*
   25 U.S. (12 Wheat.) 19 (1827) ........................ 2, 15, 21, 27, 27-28, 28,
                                                          29, 30, 33, 34, 35, 38, 52

*Monsanto Co. v. Geertson Seed Farms,*
   561 U.S. 139 (2010) ............................................................. 60

*Morgan v. Rhodes,*
   456 F.2d 608 (6th Cir. 1972).......................................... 29

iii

*Newsom v. Trump*,
141 F.4th 1032 (9th Cir. 2025) ............ 7, 13, 22, 37, 39, 44, 52, 61, 63

*NRC v. Texas*,
605 U.S. 665 (2025) ..................................................... 22, 38

*Parker Drilling Mgmt. Servs., Ltd. v. Newton*,
587 U.S. 601 (2019) ............................................................ 44

*Perpich v. Department of Def.*,
496 U.S. 334 (1990) ..................................................... 6, 49, 50

*Starbucks Corp. v. McKinney*,
602 U.S. 339 (2024) ............................................................ 61

*Sterling v. Constantin*,
287 U.S. 378 (1932) ..................................................... 31, 32

*Trump v. Hawaii*,
585 U.S. 667 (2018) ..................................................... 37, 40

*United States v. Miller*,
307 U.S. 174 (1939) ............................................................ 49

*Ysleta Del Sur Pueblo v. Texas*,
596 U.S. 685 (2022) ..................................................... 30, 31

## U.S. Constitution:

Art. I, § 8, cl. 15 ..................................................... 6, 25, 46, 49

Art. II, § 2, cl. 1 ................................................................... 7

Art. II, § 3 ............................................................................ 46

## Statutes:

Act of May 2, 1792, ch. 28, 1 Stat. 264................................................58

Act of Feb. 28, 1795, 1 Stat. 424 .........................................30, 44

Act of Jan. 21, 1903, ch. 196, 32 Stat. 776.............................................50

iv

Act of May 27, 1908, ch. 204, 35 Stat. 400 ............................50

10 U.S.C. § 252 ........................................................ 47

10 U.S.C. § 253 ........................................................ 47

10 U.S.C. § 275 ......................................................... 4

10 U.S.C. § 3500 (1964) ............................................ 51

10 U.S.C. § 3800 (1964) ............................................ 51

10 U.S.C. § 10101 ...................................................... 6

10 U.S.C. § 10106 ...................................................... 6

10 U.S.C. § 12406 ..................................... 1, 4, 7, 21, 26, 30

10 U.S.C. § 12406(2) ............................................ 56, 59

10 U.S.C. § 12406(2)-(3) .......................................... 2, 20, 25

10 U.S.C. § 12406(3) ............................ 30, 44, 45, 47, 50, 51

18 U.S.C. § 1385 ................................................ 14, 47

28 U.S.C. § 1292(a)(1) ............................................... 5

28 U.S.C. § 1331 ....................................................... 4

28 U.S.C. § 1361 ....................................................... 4

**Legislative Materials:**

H.R. Rep. No. 57-1094 (1902).................................50

H.R. Rep. No. 60-1067 (1908).................................50

**Other Authorities:**

*Authority to Use Troops to Prevent Interference With
    Federal Employees by Mayday Demonstrations
    and Consequent Impairment of Government Functions*,
    1 Supp. Op. O.L.C. 343 (1971).............................47

Jennifer K. Elsea, Cong. Rsch. Serv., R42659,
    *The Posse Comitatus Act and Related Matters: The
    Use of the Military to Execute Civilian Law* (2018)......................58, 59

35 Fed. Reg. 5003 (Mar. 24, 1970) ................................. 45, 51

*Nation: The Strike That Stunned the Country*, TIME
    (Mar. 30, 1970), https://time.com/archive/6875290/
    nation-the-strike-that-stunned-the-country/ ......................................45

*Rebellion*:

An American Dictionary of the English Language (1900).................57
Black's Law Dictionary (1st ed. 1891) ...............................57
Black's Law Dictionary (12th ed. 2024) .........................56
The Cyclopedic Dictionary of Law (1901).........................57
Webster's International Dictionary
    of the English Language (1903) .....................................57

3 Joseph Story, *Commentaries on the Constitution of the
    United States* (1833), https://perma.cc/9WHM-Y6VA...................27, 50

*Use of Marshals, Troops, and Other Federal Personnel
    for Law Enforcement in Mississippi*,
    1 Supp. Op. O.L.C. 493 (1964).........................................51

10 *The Documentary History of the Ratification of the
    Constitution* (John P. Kaminski & Gaspare J. Saladino
    eds., 1993)..............................................................49

## INTRODUCTION

In the last few months, the Chicago area has seen a sharp increase in violent protests aimed at thwarting the enforcement of federal law. Organized agitators have assaulted federal law enforcement officers with fireworks, bottles, rocks, and tear gas. They have followed federal officers, confronted officers at their homes, and offered bounties for the murder of senior immigration officials. Agitators have run government vehicles off the road, blockaded entries and exits from federal buildings, and damaged federal property. In one incident, ten vehicles surrounded a government vehicle, and when the federal officers exited that vehicle, an assailant, who was later found with a handgun, attempted to run them down with her vehicle. To address these incidents, federal law enforcement officers have been forced away from their regular responsibilities to work 12-hour shifts guarding federal personnel and property.

Because federal law enforcement officers in the Chicago area are stretched beyond their means, the President activated the National Guard to help protect federal personnel and property there. Under 10 U.S.C. § 12406, the President is authorized to call up members of the

National Guard into federal service when "there is a rebellion or danger of a rebellion against the authority of the Government of the United States" or "the President is unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(2)-(3). Both conditions apply here: there is at least a danger of rebellion in the Chicago area, and mob violence has prevented federal officers from enforcing federal law.

The district court disagreed, entering an extraordinary order enjoining the President's federalization and deployment of the National Guard in Illinois. The district court had no sound basis for inserting itself into the military chain of command, and its order was flawed in multiple respects.

First, the district court erred in second-guessing the President's judgment that Section 12406's statutory conditions were satisfied. Nearly 200 years ago, the Supreme Court made clear that these judgment calls are for the President to make and that his determinations are conclusive upon all persons. *See Martin v. Mott*, 25 U.S. (12 Wheat.) 19 (1827). This includes the courts—not just subordinate military officers. *See Luther v. Borden*, 48 U.S. (7 How.) 1, 43 (1849). The President alone

is authorized to evaluate whether the facts and law justify action under Section 12406.

Second, even if the President's decision were reviewable, the record amply supports the President's federalization decision here. Any such review must be highly deferential—both because plaintiffs assert a nonstatutory *ultra vires* claim and because the President is afforded great deference when exercising his statutory authority to respond to exigent circumstances and ensure national security. At most, the President's decision can be reviewed to determine whether the President had a colorable basis to federalize and deploy members of the National Guard. Applied here, the facts more than adequately support the President's decision, both with respect to enforcement of the laws (Section 12406(3)) and at least a danger of rebellion (Section 12406(2)). When ongoing violence, threats of violence, and harassment targeted at obstructing the enforcement of federal immigration laws have stretched the regular forces beyond their capacity and left them unable to adequately enforce the laws, the President can call up the Guard in response to the most acute dangers and the most significant drain on federal enforcement resources.

Third, the district court erred in weighing the equities. The court's order improperly impinges on the Commander in Chief's supervision of military operations, countermands a military directive to officers in the field, and puts federal officers (and others) in harm's way. These concrete harms far outweigh plaintiffs' speculation about inflamed tensions. Accordingly, plaintiffs cannot carry their burden of demonstrating that the equitable factors favor injunctive relief. This Court should vacate the district court's order.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. §§ 1331, 1361. Plaintiffs purported to raise claims related to the Tenth Amendment, the Take Care Clause, the Militia Clause, principles of equal sovereignty and separation of powers in the U.S. Constitution; 10 U.S.C. §§ 275, 12406; and the Administrative Procedure Act.

On October 9, 2025, the district court entered a putative temporary restraining order, barring defendants' federalization and deployment of the National Guard within Illinois. SA1-2. The same day, defendants noticed an appeal from that order. GA237-38. On October 23, 2025, the district court extended its temporary restraining order through final

judgment but stayed the portion of that injunction that barred federalization. GA360-61.

This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1). As a panel of this Court already concluded, the putative temporary restraining order has "sufficient hallmarks of a preliminary injunction." *Illinois v. Trump*, No. 25-2798, 2025 WL 2937065, at *4 (7th Cir. Oct. 16, 2025) (per curiam). The district court issued the order, along with a comprehensive opinion, after an adversarial hearing and extensive briefing through which the federal government strongly challenged the basis for the order. The order also threatens to inflict irreparable harm by exposing federal property and officials to a grave threat of lawless mob violence and by exposing lawful federal immigration enforcement efforts to the likelihood of active interference and obstruction, thus warranting immediate review. Since the stay panel's decision, and by the consent of the parties, the district court has also extended its order well beyond the 28-day limit on temporary restraining orders.

## STATEMENT OF THE ISSUE

Whether the district court erred when it enjoined the President's federalization and deployment of National Guard troops to protect federal personnel and property in the Chicago area.

## PERTINENT STATUTES

Pertinent statutes are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Legal Background

**1.**    The Constitution authorizes Congress to raise and support a national Army and to organize "the Militia." *See* U.S. Const. art. I, § 8, cl. 15.    Exercising that authority, Congress has "created the National Guard of the United States, a federal organization comprised of state national guard units and their members." *Perpich v. Department of Def.*, 496 U.S. 334, 338 (1990) (quotation marks omitted).    The National Guard is composed of both the State National Guard, under the command of the several States, and the National Guard of the United States, a federal entity under the federal chain of command, *see* 10 U.S.C. § 10101.    Once called into federal service, "members of the National Guard . . . lose their status as members of the state militia during their period of active duty," *Perpich*, 496 U.S. at 347, become federal soldiers, 10 U.S.C. § 10106, and

serve under the President as Commander in Chief, *see* U.S. Const. art. II, § 2, cl. 1.

**2.** Congress has granted the President authorities under which he may call forth National Guardsmen, including 10 U.S.C. § 12406, which authorizes the President to federalize Guardsmen if certain conditions are met. As relevant here, the second and third conditions provide:

> Whenever . . . (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or (3) the President is unable with the regular forces to execute the laws of the United States . . . the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to . . . suppress the rebellion, or execute those laws.

*Id.*

**B.     Factual Background**

**1.** Throughout the summer, U.S. Immigration and Customs Enforcement (ICE) saw a sharp increase in violent protests and attempts to impede its duties of enforcing the Nation's immigration laws. *See* GA208. In Los Angeles, violent mobs attacked federal officers with concrete chunks and commercial-grade fireworks and used dumpsters as battering rams to breach federal buildings. *See Newsom v. Trump*, 141 F.4th 1032, 1041 (9th Cir. 2025) (per curiam). In Portland, agitators assaulted federal officers with rocks, bricks, and incendiary devices,

followed federal officers to their homes, and threatened to kill them on social media. GA213-17. In late September, a man opened fire on an ICE field office in Dallas, killing two detainees and injuring another. GA217-18.

The level of violence directed at immigration officials in Chicago has been the highest that a 23-year federal law enforcement veteran has seen and at points has eclipsed the violence in other cities. GA223, GA227-28. Federal officers have been physically attacked and seriously injured: one officer had his beard ripped from his face, and others have been hospitalized for injuries like torn ACLs. GA192-196, GA207. While driving, federal officers have been followed by groups of vehicles and rammed by other drivers. GA225-27. One officer was followed to his home and aggressively confronted. GA196. His home was later broken into, and his service weapon was stolen from the safe in his car. GA196. Officers have received death threats on social media. GA193, GA196, GA207, GA228-29. And local gang members placed a $10,000 bounty on the life of a senior immigration officer. GA207, GA225.

The violence escalated throughout September and into October. In early October, for example, ten vehicles surrounded and boxed in a

government vehicle carrying U.S. Customs and Border Protection (CBP) agents while driving on a public road. GA226. Two drivers rammed the government vehicle on both sides, and when the federal officers exited the vehicle, one of the assailants drove her vehicle directly at one of the officers. GA226. Faced with an imminent threat of death or serious bodily injury, the officer was forced to discharge his firearm, striking the driver, who fled the scene and was later found to be in possession of a handgun. GA226. Approximately 200 rioters then converged near the scene, and over the next four hours, rioters attacked the officers, throwing objects, including glass bottles, at them. GA226. CBP diverted other officers to assist, but those officers were also attacked and rammed by vehicles while they were driving to the scene. GA195. And later that same day, ICE officers were surrounded by rioters who slashed their vehicle's tires, forcing the officers to abandon the vehicle for their own safety. GA195-96.

ICE's facility located a few miles outside of Chicago, known as the Broadview Processing Center, has been a focal point of unrest. GA198-206. Federal personnel have been punched, hit, and assaulted with potentially blinding lasers and devices that risk causing permanent

hearing loss. GA199, GA203, GA206. Rioters have launched fireworks and thrown bottles, rocks, and tear gas at officers stationed outside the building. GA203-206. Rioters have blocked, swarmed, and slashed the tires on vehicles entering or leaving the facility—all while the federal employees are trapped inside. GA199. They have organized themselves offsite and transported in new rioters armed with shields, protective padding, and gas masks. GA206. More than thirty ICE officers have been injured during these assaults, GA207, and loaded handguns have later been discovered in the possession of several arrested individuals, GA206, GA214, GA216-18. Even "employees of nearby businesses, mistak[en] . . . for ICE employees," have been accosted and their personal vehicles vandalized. GA200.

Federal law enforcement officers have been diverted from their regular responsibilities to protect federal personnel and property in Chicago. GA207-08, GA227. ICE has mandated 12-hour duty shifts for officers providing security to the Broadview facility and has been forced to redeploy personnel from around the country and across different ICE components, significantly impeding those officers' ordinary law enforcement missions. GA202-03, GA207. ICE has also solicited

assistance from other DHS components as well as other federal agencies, undermining those agencies' own law-enforcement efforts. GA223, GA227, GA229. And while federal officers have attempted to contact local police for assistance, the local police have often failed to respond to calls for assistance or their response has been delayed. GA197-98, GA225-26.

2. Based on this escalating violence in the Chicago area, DHS requested assistance from the Department of War (DoW) to safeguard federal personnel, facilities, and operations. *See* GA165-66, GA171-72. The President, in turn, judged that Section 12406's conditions were satisfied and called forth members of the National Guard to protect federal personnel and property in the region. GA177-78. The President explained that "[f]ederal facilities in Illinois, including those directly supporting [ICE] and the Federal Protective Services (FPS), have come under coordinated assault by violent groups intent on obstructing Federal law enforcement activities." GA177. "These groups have sought to impede the deportation and removal of criminal aliens through violent demonstrations, intimidation, and sabotage of Federal operations." GA177. And the "violent activities," the President observed, "appear[ed]

to be increasing . . . , particularly in and around the city of Chicago." GA177.

The President determined that "these incidents, as well as the credible threat of continued violence, impede the execution of the laws of the United States" and that "the regular forces of the United States are not sufficient to ensure the laws of the United States are faithfully executed." GA177. The President accordingly "call[ed] into Federal service at least 300 members of the Illinois National Guard" to "protect ICE, FPS, and other United States Government personnel who are executing Federal law in the State of Illinois, and Federal property in the State of Illinois." GA178. Pursuant to the President's directive, the Secretary of War mobilized 300 Illinois Guard members, GA185, and then mobilized up to 400 members of the Texas National Guard, GA187.

**3.** The President's conclusions and the DoW directives were consistent with the assessments the President made when federalizing National Guard members to protect federal officials from the mob violence in Los Angeles and Portland. *See* GA180-81. The Ninth Circuit has stayed a district court order enjoining that Los Angeles deployment, concluding that the President likely acted lawfully in invoking Section

12406.  *See Newsom*, 141 F.4th at 1040-41.  And a panel of the Ninth Circuit stayed a district court order enjoining the deployment of Guardsmen to Portland.[1]

## C.    Prior Proceedings

**1.**  On October 6, 2025, the State of Illinois and the City of Chicago sued the President, the Secretary of War, and other federal officials and agencies involved in the mobilization and deployment of the National Guard in Illinois.  GA4-6.  The plaintiffs principally assert that the President's federalization and deployment of National Guardsmen in response to violence in Chicago was *ultra vires* and failed to satisfy the criteria specified in Section 12406.  GA53-54.  Plaintiffs also purport to raise claims under the Tenth Amendment; the Militia Clause; the Take Care clause; principles of state sovereignty and separation of powers in the U.S. Constitution; and the Administrative Procedure Act.  GA55-67.  Separately, the plaintiffs assert that using federal Armed Forces, including the National Guard, for "protest management or the

---

[1] The en banc Ninth Circuit vacated this stay and granted rehearing, but the temporary restraining order on appeal in that case subsequently expired and has been superseded by a final judgment.

suppression of violent crime or property damage" would violate the Posse Comitatus Act (PCA). GA54-55; *see* 18 U.S.C. § 1385.

The plaintiffs moved for a temporary restraining order on the same day that they filed their complaint. GA70-128. At a status hearing later that day, the district court set an expedited briefing schedule and scheduled a hearing for October 9 on the plaintiffs' request for injunctive relief.

**2.** At the conclusion of the October 9 hearing, the court issued an oral ruling, to be followed by a written opinion, and entered an injunction. *See* SA1-2 (order); GA239-359 (transcript). The court's October 9 order enjoins the federal defendants (with the exception of the President) from "ordering the federalization and deployment of the National Guard of the United States within Illinois." SA1.

In the court's written opinion, which largely tracks its oral ruling, the district court concluded that plaintiffs are likely to succeed on the merits. SA3-53. While the district court mused on issues that might relate to the PCA, *see* SA46-49, it declined to reach a decision on plaintiffs' PCA claim, SA49. Instead, the district court based its injunction only on Section 12406, and it recognized that plaintiffs' Tenth

Amendment claim rises and falls with plaintiffs' Section 12406 arguments. SA49-50.

On the merits, the district court first made what it called a "credibility assessment" between the plaintiffs' and defendants' declarants. SA12-13. The court ultimately concluded that "Defendants' declarants' *perceptions* are not reliable," SA13 (emphasis added), but it did not resolve any specific factual dispute between the parties or conclude that any fact set forth in defendants' final declarations was not true. *See* SA12-13. Rather, the court questioned the federal declarants' "candor" and "ability to accurately *assess* the facts," relying entirely on extra-record materials. SA12 (emphasis added). Setting aside its purported credibility finding, the district court seemed to acknowledge that defendants' declarants describe "organized, repeated, violent, and increasingly hostile attacks on ICE agents, their personal property, and ICE property." *See* SA36 n.14.

Next, the district court concluded that plaintiffs are likely to succeed on their Section 12406 claim. The court began by holding the President's federalization decision is subject to judicial review, attempting to distinguish *Martin v. Mott*, 25 U.S. (12 Wheat.) 19 (1827),

based on the specific facts in that case and subsequent precedent on the scope of judicial review. SA28-31. The court also concluded that the President is not entitled to deference as to the meaning of the text in Section 12406 or the application that text to the facts. *See* SA33. The court purported to give defendants a "certain amount of deference on the question of whether the facts constitute the predicates laid out in Section 12406." SA33. And it characterized the applicable standard as requiring "a substantially reasonable picture justifying the Executive's position." SA34.

Addressing Section 12406(2), the district court concluded plaintiffs are likely to succeed in showing that no "rebellion" or "danger of rebellion" justified federalizing and deploying National Guardsmen in Illinois. It construed "rebellion" narrowly, limiting the term to a "deliberate, organized resistance, openly and avowedly opposing the laws and authority of the government as a whole by means of armed opposition and violence." SA34-35. Applying that definition here, the district court reasoned the violence in Illinois could not constitute even a danger of rebellion because the violence was "entirely [in] opposition" to a specific

agency (DHS) and the laws that agency enforces, rather than the government as a whole.  SA36.

Likewise, the district court concluded that plaintiffs are likely to succeed in showing that Section 12406(3) did not justify the President's federalization and deployment decision.  It construed the phrase "unable . . . to execute the laws" as requiring a complete failure of "the civil power" of government.  SA42.  Based on that interpretation, the district court concluded that Section 12406(3) could not support the President's decision because at least some law enforcement was still possible in Illinois when the National Guard was federalized and deployed.  SA42. In addition, the court construed "regular forces" to mean the standing military forces.  SA37-40.  Thus, according to the district court, the President was required to deploy the standing military to Illinois before calling up Guardsmen, and his failure to do so precluded reliance on Section 12406(3).  SA40.

In the alternative, the district court concluded that law enforcement in the Chicago area had not been "significantly impeded" by the violent protests there.  SA45 (quotation marks omitted).  It did so without discussing or expressly deferring to defendants' assessment of

the relevant facts. In the district court's opinion, because federal facilities remained open and immigration arrests and deportations were on the rise, "the factual conditions necessary" to invoke Section 12406(3) "simply do not exist." SA45.

Finally, the district court concluded that the equitable factors favored an injunction. The court started by addressing irreparable injury, finding that plaintiffs would suffer two distinct harms absent an injunction. First, according to the district court, any violation of the Tenth Amendment constitutes irreparable injury to plaintiffs' sovereign interests. SA51. Second, the district court speculated that deployment of the National Guard would lead to further civil unrest, thereby taxing state resources. SA51-52. On the balance of hardships and the public interest, the court characterized the harm to defendants as "*de minimis*" without addressing the ongoing threats to federal personnel and property. SA52-53.

3. On October 11, 2025, a panel of this Court granted in part and denied in part the federal government's emergency request for an administrative stay. Dkt. 8. The panel stayed the portion of the district court's October 9 injunction that had enjoined the federalization of the

National Guard in Illinois, but it declined to stay the portion of the injunction forbidding the deployment of federalized National Guard troops within Illinois. *Id.* As a result, the Guardsmen remain under federal command but cannot perform the protective mission the President ordered.

On October 16, 2025, a panel of this Court granted in part and denied in part the federal government's motion for a stay pending appeal on the same terms—*i.e.*, allowing the federalization to proceed during litigation but not the deployment. *Illinois v. Trump*, No. 25-2798, 2025 WL 2937065 (7th Cir. Oct. 16, 2025) (per curiam). The panel agreed that the district court's October 9 order is an appealable injunction. *Id.* at *4. On the merits, however, the panel held that the government is not likely to succeed on appeal in showing that the President's federalization order was lawful under Section 12406(2) or (3). *Id.* at *4-7. As for the equities, the panel acknowledged that "the federal government has a strong interest in the protection of its agents and property," but it nonetheless declined to permit the President to deploy the federalized National Guard to safeguard federal personnel and property during the ongoing litigation. *Id.* at *7.

On October 21, 2025, the government filed a stay application with the Supreme Court—seeking both an administrative stay and a stay pending appeal of the district court's injunction. That Court has requested additional briefing on the meaning of the "regular forces" but has not yet issued a decision.

On October 23, 2025, the district court extended its temporary restraining order through final judgment but, consistent with the panel's stay decision, stayed the portion of its order that would otherwise enjoin federalization of the National Guard. GA360-61.

## SUMMARY OF ARGUMENT

Section 12406 authorizes the President to call forth National Guard members "in such numbers as he considers necessary" whenever "there is a rebellion or danger of a rebellion against the authority of the Government of the United States" or "the President is unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(2)-(3).

In the face of violent protests and unrest targeted at preventing enforcement of federal immigration laws, the President invoked Section 12406 and called up members of the National Guard to protect federal

personnel and property in Illinois. That order was consistent with the President's statutory authority under 10 U.S.C. § 12406 and with the Tenth Amendment. The district court concluded otherwise only by second-guessing the President's discretion—something courts lack the competence and authority to do. The district court's order should be vacated.

**I.A.** As a threshold matter, the President's decision to federalize the Guard is not subject to judicial review. The Supreme Court long ago established that the President's exercise of the authority vested in him by Congress to call up the militia is committed to his exclusive discretion by law. *Martin v. Mott*, 25 U.S. (12 Wheat.) 19 (1827). That rule applies to the courts, just as much as it applied to the militiaman in *Martin*. *See Luther v. Borden*, 48 U.S. (7 How.) 1, 43 (1849). Congress enacted Section 12406 against the backdrop of these decisions and is presumed to have incorporated that settled judicial construction.

**B.** In all events, review of the President's decision to federalize and deploy the National Guard must be highly deferential. Plaintiffs raise a nonstatutory *ultra vires* claim, and even assuming that vehicle is available to challenge the President's actions, *ultra vires* claims must be

"strictly limited." *NRC v. Texas*, 605 U.S. 665, 681 (2025). What is more, as the Ninth Circuit recently explained, the President is entitled to great deference when exercising his statutory authority to call forth the National Guard in response to exigent circumstances. *Newsom v. Trump*, 141 F.4th 1032, 1048 (9th Cir. 2025). At most, review should be limited to considering only whether the President's decision "reflects a colorable assessment of the facts and law within a range of honest judgment." *Id.* at 1051 (quotation marks omitted).

Applied here, the President's decision was amply justified. The level of violence directed at immigration officials in Chicago at times has been the highest that a 23-year federal law enforcement veteran has seen. GA223, GA227-28. That violence has required reallocating law enforcement officers to protect federal personnel and property, draining resources that would otherwise go to enforcing the federal immigration laws. GA207-08, GA227. This evidence more than supports the President's determinations under Sections 12406(2) and (3). When ongoing violence, threats of violence, and harassment targeted at obstructing the enforcement of federal immigration laws have stretched the regular forces beyond their capacity and left them unable to

adequately enforce the laws, the President can call up the Guard in response to the most acute dangers and the most significant drain on federal enforcement resources.

The district court ignored or minimized this evidence—without any legally justifiable basis. Chiefly, the district court built its analysis on a deeply flawed understanding of the statutory text. The phrase "unable with the regular forces to execute the laws," as used in Section 12406(3), does not require a complete failure of civil law—such that any modicum of enforcement capacity prevents calling forth the Guard. That standard would render Section 12406(3) a virtual nullity. And the phrase "regular forces" cannot refer to the standing military forces. It would be illogical and contrary to the plain text if Section 12406(3) required the President to enforce the laws with the standing military forces before calling up National Guardsmen. Finally, the "rebellion or danger of rebellion" referred to in Section 12406(2) does not require opposition to the government as a whole, a point which history and longstanding practice confirm.

In addition to misinterpreting the text, the court performed its own assessment of the facts, which is inconsistent with the highly deferential

review afforded to the President's federalization and deployment decisions. SA45. The district court also categorically disregarded defendants' evidence—purporting to make "credibility" determinations that were based on extra-record materials and an unsupported distrust of the federal declarants.

**II.** The equitable factors also strongly favor the federal government, and the district court erred in concluding otherwise. Indeed, the Court could vacate the injunction without any consideration of the merits because plaintiffs failed to show irreparable harm. The federalization of Guardsmen solely for protection of federal officials and property does not itself qualify as irreparable harm warranting an injunction. Plaintiffs provided no evidence that this modest and time-limited deployment is likely to have any effect on any state function. And plaintiffs' professed concerns about inflaming tensions (which the district court accepted) are implausible. Finally, even if plaintiffs had demonstrated some harm, any such harm is far outweighed by the federal government's need to protect ICE agents and other federal personnel seeking to do their jobs and to protect federal property from targeted harm.

## STANDARD OF REVIEW

This Court reviews the district court's grant of an injunction for abuse of discretion, but questions of law are reviewed de novo. *C.Y. Wholesale, Inc. v. Holcomb*, 965 F.3d 541, 545 (7th Cir. 2020). To secure a preliminary injunction, plaintiffs were required to show that they (1) were "likely to succeed on the merits," (2) were "likely to suffer irreparable harm in the absence of preliminary relief," (3) that "the balance of equities tip[ped] in [their] favor," and (4) that "an injunction [was] in the public interest." *Id.*

## ARGUMENT

The Constitution authorizes Congress to "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions." U.S. Const. art. I, § 8, cl. 15. In Section 12406, Congress empowered the President to "call into Federal service" members of the National Guard "[w]henever," *inter alia*, "there is a rebellion or danger of a rebellion against the authority of the Government of the United States" or "the President is unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(2)-(3). The President judged that

those conditions were satisfied in Chicago, and there is no lawful basis for plaintiffs or the district court to override that judgment.

## I. The President Lawfully Federalized National Guardsmen to Protect Federal Personnel and Property in the Chicago Area

The district court erred when it concluded that plaintiffs are likely to succeed on the merits. The President's invocation of 10 U.S.C. § 12406 was lawful and consistent with a long historical tradition, tracing back to President Washington's response to the Whiskey Rebellion, of relying on the militia to assist in responding to violent resistance to federal law enforcement. Most fundamentally, the decision whether to call up the National Guard to protect federal personnel and federal property is for the President to make—not the plaintiffs or a federal district court. And regardless, the district court's cramped construction of Section 12406 and its disregard for the sworn declarations of federal officials are indefensible.

### A. The Decision Whether to Call Up the National Guard Is Committed Exclusively to the President

As a threshold matter, both the statutory language and historical tradition make clear that the President's decision whether to federalize

the Guard is not subject to second-guessing by plaintiffs or a federal district court.

**1.** The Supreme Court long ago established that the President's exercise of the authority vested in him by Congress to call up the militia is committed to his exclusive discretion by law. During the War of 1812, there was much debate over who was entitled to make the exigency determination necessary to call forth the militia. 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1205, at 89-90 & 90 n.3 (1833), https://perma.cc/9WHM-Y6VA (*"Commentaries"*) (collecting cases). Courts in Connecticut and Massachusetts even held that "the governors of the states to whom orders were addressed by the President to call forth the militia . . . were entitled to judge for themselves whether the exigency had arisen and were not bound by the opinion or orders of the President." *Id.* (punctuation and capitalization altered). But in *Martin* v. *Mott*, 25 U.S. (12 Wheat.) 19 (1827), the Supreme Court rejected that notion.

In *Martin*, a member of the militia of New York had challenged the penalties imposed on him by a court martial after he refused to comply with orders to report for federal service as part of the War of 1812. *See*

*Martin*, 25 U.S. at 20-23 (statement of the case). President Madison had called the state militia into federal service pursuant to a 1795 law providing "that whenever the United States shall be invaded, or be in imminent danger of invasion from any foreign nation or Indian tribe, it shall be lawful for the President of the United States to call forth such number of the militia of the State or States most convenient to the place of danger, or scene of action, as he may judge necessary to repel such invasion." *Id.* at 29 (opinion of the Court) (quotation marks omitted). This Court refused to entertain the contention that the President had misjudged the danger of such an invasion, explaining that "the authority to decide whether the exigency has arisen[] belongs exclusively to the President," whose decision "is conclusive upon all other persons." *Id.* at 30.

That conclusion, the Court explained, "necessarily results from the nature of the power itself." *Martin*, 25 U.S. at 30. To be effective, the President's authority to call up the militia must receive "unhesitating obedience" from his military subordinates, consistent with "command of a military nature." *Id.* The Court also emphasized that the 1795 law "confided" the power to call up the militia "to the Executive of the Union"

as Commander in Chief and thus "necessarily constituted" the President himself as "the judge of the existence of the exigency in the first instance." *Id.* at 31; *accord Luther v. Borden*, 48 U.S. (7 How.) 1, 43 (1849) (asking rhetorically whether, "[a]fter the President has acted and called out the militia, is a Circuit Court of the United States authorized to inquire whether his decision was right," and observing that extending the judicial power so far would be "a guarantee of anarchy"); *see also*, *e.g.*, *Morgan v. Rhodes*, 456 F.2d 608, 610 (6th Cir. 1972) (observing that, although plaintiffs have sought to challenge "[e]xecutive decisions to call out military force . . . a number of times in the history of the Republic," in "no instance" have "the courts . . . sought to substitute judicial judgment for the constitutionally empowered judgment of the executive"), *rev'd on other grounds*, *Gilligan v. Morgan,* 413 U.S. 1, 6-12 (1973).

Those same principles apply here. At bottom, the plaintiffs seek to use this suit to second-guess the President's judgment that recent and repeated acts of violence targeting federal facilities and personnel in Illinois warrant calling up the National Guard—including because the violence has left the President sufficiently "unable" to ensure faithful

"execut[ion]" of federal law. 10 U.S.C. § 12406(3). Like the 1795 law at issue in *Martin*, Section 12406 makes clear that Congress has granted "the authority to decide whether" the statutory prerequisites are satisfied "exclusively to the President." *Martin*, 25 U.S. at 30. That prevents plaintiffs and the courts from questioning the President's decision making. *Luther*, 48 U.S. at 43.

Importantly, the relevant language in Section 12406 is materially indistinguishable from the statute that was at issue in *Martin*. *Compare* 10 U.S.C. § 12406 ("whenever" one of three exigencies exists "the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to" address that exigency), *with* Act of Feb. 28, 1795, 1 Stat. 424 ("whenever the United States shall be invaded, or be in imminent danger of invasion . . . it shall be lawful for the President of the United States to call forth such number of the militia of the State or States . . . as he may judge necessary to" address that invasion). Thus, when Congress enacted the language that now exists in Section 12406, it was legislating with the decision in *Martin* as a backdrop. *Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 700 (2022) ("This Court generally assumes that, when Congress

enacts statutes, it is aware of this Court's relevant precedents."). And its enactment is presumed to bring along with it the established meaning of the statutory language—namely that the President's decision to federalize and deploy National Guard members is unreviewable. *See id.* at 700-01.

The Supreme Court's decision in *Sterling v. Constantin,* 287 U.S. 378 (1932), only confirms that the President's judgment is not reviewable. There, a federal court had enjoined a state agency from implementing orders to limit oil production during a boom; the Governor of Texas had declared martial law in parts of the State during the litigation and had responded to the injunction by ordering the state militia to shut down oil wells operating in violation of production limits; and the federal court then enjoined the Governor's orders. *See* 287 U.S. at 387-391, 396-397. This Court upheld the lower court's determination that the Governor's orders establishing production controls were reviewable and were unconstitutional. *Id.* at 398, 404.

In doing so, however, the Court in *Sterling* emphasized that when "the [E]xecutive is appropriately vested with the discretion to determine whether an exigency requiring military aid for that purpose has arisen,"

the executive's "decision to that effect is conclusive." 287 U.S. at 399. And the Court attributed that proposition to *Martin*, which it cited and quoted approvingly. *See id.* The exercise of judicial review in *Sterling* itself did not violate that principle, the Court explained, because the case concerned the lawfulness of the Governor's production controls—not the Governor's antecedent decision to call up the militia in the face of what the Governor found to be an insurrection in the State. *See id.* at 401-402 ("Fundamentally, the question here is not of the power of the Governor to proclaim that a state of insurrection, or tumult, or riot, or breach of the peace exists, and that it is necessary to call military force to the aid of the civil power." "The question before us is simply with respect to the Governor's attempt to regulate by executive order the lawful use of complainants' properties in the production of oil.").

**2.** The district court and stay panel attempted to narrow *Martin* in two ways, neither of which holds water.

The district court first understood *Martin* to have turned on the identity of the plaintiff—a militiaman challenging the federalization— and on the fact that the case involved a "foreign invasion" rather than a "purely domestic" controversy. SA31-32. The stay panel agreed,

stressing the historical context of the British invasion. *Illinois v. Trump*, No. 25-2798, 2025 WL 2937065, at *5 (7th Cir. Oct. 16, 2025) (per curiam). But nothing about the rationale of this Court's decision should be limited to those particular facts.

To start, *Martin* expressly announced a broader rule: the President is "the sole and exclusive judge [of] whether the exigency has arisen," and "his decision is conclusive upon all other persons." 25 U.S. at 29-30. Wholly apart from military discipline, the Court was concerned that "the existence of the exigency and thus the legality of the orders of the President would depend not on his own judgment of the facts, but upon the finding of those facts upon proofs submitted to" the judicial factfinder. *Id.* at 33.

Nor is there a basis for distinguishing between militiamen and their state-officer superiors. In *Martin*, the Court reasoned that "[i]f a superior officer has a right to contest the orders of the President upon his own doubts as to the exigency having arisen, it must be equally the right of every inferior officer and soldier." *Martin*, 25 U.S. at 30. Allowing that course of conduct would be "subversive of all discipline," so the President's decision must be conclusive on *all* persons. *See id.* at 31.

Given this language, it is clearly wrong to read *Martin* to apply to challenges brought by Guardsmen but not to apply to challenges brought by their superior officers, like the state officials here. After all, when state actors serve as "commander in chief of the [state] militia," they must be "subject" to "the orders of him who is made commander in chief of all the militia of the Union." *See Houston v. Moore*, 18 U.S. (5 Wheat.) 1, 40 (1820) (Johnson, J., concurring).

Moreover, the *Martin* Court grounded its decision in the "nature of the power" at issue, meaning the President's authority to call the militia into federal service under his command—an authority that would be substantially undermined if "subordinate officers or soldiers are pausing to consider whether they ought to obey, or are scrupulously weighing the evidence of the facts upon which the commander in chief exercises the right to demand their services." *Martin*, 25 U.S. at 30. Those concerns apply equally where, as here, the President calls up the National Guard to address violent unrest in a State, and elected state officials ask a court to reweigh "the evidence of the facts upon which the commander in chief exercise[d]" his authority. *Id.*

For similar reasons, the foreign invasion at issue in *Martin* is no point of distinction. First, the Court's analysis did not turn on the specific factual predicate necessary for the President to call forth the militia. *See Martin*, 25 U.S. at 29-31. Rather, the Court focused on the President's power and role in responding to exigent circumstances—whether that be an invasion, a rebellion, or an inability to enforce the laws. *See id.* And there is no reason to think the President would have unreviewable discretion for some decisions under Section 12406, *e.g.*, calling forth the militia in response to an invasion, while lacking similar discretion for other bases on which Guardsmen might be federalized. The text of the statute draws no such distinction. Nor did Joseph Story, *Martin*'s author, when he discussed whether the President is the "sole and exclusive" judge of the required exigency. *Commentaries* § 1205, at 89-90; *see also id.* § 1204, at 88-89 (noting Congress provided "like provisions" for all the bases on which the militia might be called forth). Even if there were some doubt, the Supreme Court itself applied *Martin* in the context of an entirely domestic dispute. *See Luther v. Borden*, 48 U.S. (7 How.) 1, 43 (1849).

Separate from the facts at issue in *Martin*, the district court next understood modern developments in the political question doctrine as supporting reviewability of the President's federalization decision. SA31. But this misunderstands the relevant issue here. *Martin* stands for the proposition that, when Congress enacts a statute giving the President unreviewable discretion, courts lack authority to review decisions under that statute. It is that proposition, not the political question doctrine, that controls. And nothing in the Supreme Court's more recent decisions undermines that rule or its application here. The Supreme Court has continued to rely on *Martin* for the proposition that "calling up of [the] militia" is nonjusticiable, *see, e.g.*, *Baker v. Carr*, 369 U.S. 186, 213 (1962), and even outside the military context, the Court has repeatedly emphasized that "[h]ow the President chooses to exercise the discretion Congress has granted him is not a matter for [judicial] review." *Dalton v. Specter*, 511 U.S. 462, 476 (1994).

The district court and stay panel attempted to draw a distinction between the statutory text at issue in *Dalton* and the relevant text here. SA28; *Illinois*, 2025 WL 2937065, at *5. But that argument is irrelevant. The Supreme Court has already decided in *Martin* that language

indistinguishable from Section 12406 committed to the President's discretion any decision to federalize Guardsmen. Analogies to *Dalton*, or even this Court's disagreement with the outcome in *Martin*, do nothing to alter that conclusion.

**B.    The President's Invocation of Section 12406 Was a Lawful Response to Violent Threats to Federal Personnel and Property**

Even if the President's determination to call up the Illinois National Guard were subject to review, the President acted well within the authority vested in him by Section 12406's provisions regarding both inability to execute the laws and the danger of rebellion.

**1.**    The President's decision to call up Guardsmen, at minimum, must be entitled to "highly deferential" review. *Newsom v. Trump*, 141 F.4th 1032, 1040 (9th Cir. 2025). As even the district court recognized, the President enjoys broad discretion on matters of national security, particularly when exigent circumstances are involved. SA33-34; *see also Trump v. Hawaii*, 585 U.S. 667, 704 (2018). And federalization of the Guard is just such a circumstance. The President's power to command the militia "in times of insurrection and invasion" is a "natural incident[] to the duties of superintending the common defence, and of watching over

the *internal peace of the confederacy.*" *Martin*, 25 U.S. at 30 (emphasis added) (quotation marks omitted).  Accordingly, the President must be given wide latitude when invoking Section 12406—assuming such a decision is reviewable at all.

What is more, the nature of plaintiffs' claim demands great deference.  Plaintiffs raise a nonstatutory *ultra vires* claim against the President's federalization decision.  SA32, GA53.  Even assuming that actions of the President could be reviewed on such a basis, *cf. Dalton*, 511 U.S. at 474, the Supreme Court has recently reiterated that nonstatutory *ultra vires* review must be "strictly limited" in order to prevent plaintiffs from circumventing the limitations Congress enacted in the APA and other modern judicial-review statutes, *NRC v. Texas*, 605 U.S. 665, 681 (2025).  *Ultra vires* review is "a Hail Mary pass" that "rarely succeeds." *Id.* at 681-82 (quotation marks omitted).  So any *ultra vires* review of federalization decisions must be especially circumscribed.  To prevail, plaintiffs must prove that defendants acted "entirely in excess of [their] delegated powers and contrary to a *specific prohibition* in a statute." *Id.* at 681 (quotation marks omitted).  A mere violation of law will not do. *See id.*

Thus, assuming judicial review is available, courts must limit their analysis to considering whether the President made a "colorable assessment of the facts and law within a range of honest judgment." *See Newsom*, 141 F.4th at 1051 (quotation marks omitted).

While purporting to give deference to defendants' decision, the district court nevertheless reasoned that defendants must identify "some of the facts upon which [they] base[] [their] conclusions" and offer "explanations which paint a substantially reasonable picture justifying the Executive's position." SA34. It also refused to defer to the President's colorable assessment of the law, SA33, creating a conflict with the Ninth Circuit's decision in *Newsom*, 141 F.4th at 1051. That apparently heightened standard was legal error. SA34. The President is entitled to great deference on both the facts and the law, and his decision need not be "reasonable"—just colorable. To the extent the district court applied rational-basis review, relying primarily on *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), that standard does not apply to plaintiffs *ultra vires* claims. There may be ways in which rational-basis review and "colorable" basis review under *Newsom* are similar, but those standards are not identical. And even if rational-basis review did apply, such

review requires upholding government action so long as there is a plausible basis for that action. *See Trump v. Hawaii*, 585 U.S. 667, 704 (2018); *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993).

**2.** Applied here, the President had a colorable basis in fact and law for federalizing the National Guardsmen in Illinois. The President reasonably determined that recent incidents of violence directed against DHS personnel and facilities in Illinois "impede the execution of the laws of the United States," and that "the regular forces of the United States are not sufficient to ensure the laws of the United States are faithfully executed, including in Chicago." GA177. Those judgments fully satisfied the third condition specified in Section 12406.

As the President explained in the October 4 memorandum, "[f]ederal facilities in Illinois . . . have come under coordinated assault by violent groups intent on obstructing Federal law enforcement activities." GA177. Federal officers in the Chicago area have been repeatedly assaulted and threatened. GA193, GA196, GA203, 207, GA228-29. Agitators have perpetrated coordinated ambushes of federal agents; attacked them with moving vehicles; thrown rocks, bottles, pepper spray, and other objects at them; shot fireworks at them, which can burn and

cause blindness and other significant injury when detonated at close range; and injured and hospitalized them. GA194, GA203-05, GA223-25. Rioters have also damaged federal buildings, rammed and vandalized federal vehicles, and blocked federal officers from entering or exiting the Broadview facility. GA192, GA199-204, GA223-25. An alleged leader of the Latin Kings gang in Chicago is being prosecuted for placing a bounty of $10,000 on the murder of a Border Patrol Chief. GA196, GA225. Indeed, the district court even seemed to recognize that defendants' declarants described "organized, repeated, violent, and increasingly hostile attacks on ICE agents, their personal property, and ICE property." *See* SA36.

Plaintiffs' own evidence confirms the dire situation in Chicago. One of plaintiffs' declarants described protests at Broadview with hundreds of people, GA133, and protests occurring "almost around the clock," GA133. Another declarant confirmed that on October 4, there was a collision involving a government vehicle at one location and that a large crowd formed at another location and threw objects at law enforcement. *See* GA234-35. Plaintiffs likewise acknowledged that protesters have impeded ICE operations by unlawfully blocking their vehicles from

entering and exiting an ICE building, GA91, and that protesters have attempted to break through lines of law enforcement officers, GA95.

These activities have substantially interfered with DHS's ability to enforce federal law in the Chicago area, including both federal immigration laws and federal laws protecting federal personnel and property. *See*, *e.g.*, GA207-08, GA219. Federal law enforcement officers have been diverted from their regular law enforcement responsibilities to protect federal personnel and property in Chicago. GA207-08, GA227. ICE has mandated 12-hour duty shifts for officers providing security to the Broadview facility and has been forced to redeploy personnel from around the country and across different ICE components, significantly impeding those officers' ordinary law enforcement missions. GA202-03, GA207-08. ICE has also solicited assistance from other DHS components as well as other federal agencies, undermining those agencies' own law-enforcement efforts. GA223, GA227, GA229.

Accordingly, the President was well within his authority to determine that repeated acts of violence in Illinois warranted invoking Section 12406. Violence and the threat of violence have both directly impeded DHS enforcement operations and rendered DHS unable to

enforce the federal laws that protect federal personnel and property. As a result, DHS has been forced to divert even more officers and resources away from law enforcement activities and towards the protection of federal buildings and personnel—exacerbating the problem.

To be sure, federal officers and agents have continued to attempt to accomplish their duties to the best of their ability in the face of coordinated violence and obstructive crowds. But that is not the relevant legal standard. Immigration enforcement in Chicago would be far more effective if DHS were not facing coordinated, prolonged, violent assault. And DHS would be far better situated to protect federal persons and property if it were not subject to constant threats of violence. The President, therefore, was well within his authority to federalize and deploy National Guardsmen to Illinois.

**3.** The district court disagreed, concluding that the President lacked any basis for invoking Section 12406(3). In reaching this conclusion, the district court misinterpreted the relevant statutory text and substituted its own judgment for that of the President.

**First**, the district court built its analysis on a deeply flawed understanding of Section 12406(3).

Contrary to the district court's view, Section 12406(3) cannot plausibly be read to require a complete failure of "the civil power" of the United States. The district court's own analysis belies any such conclusion. Historically, the militia could "only be called forth when the forces of obstruction were 'too powerful to be suppressed by the ordinary course of judicial proceedings, or by the powers vested in the marshals.'" SA42 (quoting Act of Feb. 28, 1795, 1 Stat. 424). But Congress removed that requirement in the modern statutory text, thereby doing away with any requirement that the "civil power" fail before the militia may be deployed. *See* 10 U.S.C. § 12406(3). So the district court's heavy reliance on the fact that "federal facilities remain open" is without basis. *E.g.*, SA45.

Nor does Section 12406(3) require the President to be "completely precluded from executing the relevant laws" before he may call up the National Guard. *See Newsom*, 141 F.4th at 1051. *But see* SA37. To read the statute in that way would render Section 12406(3) a virtual nullity, in contravention of the "cardinal principle of interpretation that courts must give effect, if possible, to every clause and word of a statute." *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601, 611 (2019)

(quotation marks omitted). Plaintiffs' reading would also be impossible to square with historical practice, including President Nixon's decision to call up the National Guard in 1970 in response to a postal strike. 35 Fed. Reg. 5003, 5003 (Mar. 24, 1970). That strike was initially localized: some postal employees continued to work, and some mail service continued. *See Nation: The Strike That Stunned the Country*, TIME (Mar. 30, 1970), https://time.com/archive/6875290/nation-the-strike-that-stunned-the-country/. Under the district court's flawed interpretation, the President could not have called up the Guard until delivery of all mail nationwide became completely impossible.

The district court viewed its all-or-nothing construction of Section 12406(3) as supported by dictionaries defining "unable" to mean "[n]ot able." SA37. The court understood those definitions to connote a "binary approach: ability or not, capability or not." SA37. But "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme," *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989), and the phrase "execut[ing] the laws" lacks any analogous binary connotation, 10 U.S.C. § 12406(3). That phrase instead echoes the constitutional language authorizing Congress to provide for

the calling forth of the militia to "execute the Laws of the Union," U.S. Const. art. I, § 8, cl. 15, as well as to the President's authority to "take Care that the Laws be faithfully executed," *id.*, art. II, § 3. Consistent with those background authorities and read as a whole, Section 12406(3) authorizes the President to call up the National Guard when he is unable to ensure the faithful execution of federal laws by those who regularly enforce the laws. He need not wait until all law-execution is impossible.

Separately, the district court misconstrued the "regular forces" in Section 12406 as limited to the standing military forces. *See* SA37. Section 12406(3) authorizes the President to call up the National Guard when he is "unable . . . to execute the laws," and "with the regular forces" qualifies that condition. Instead of asking whether the President is unable to execute the laws with the use of any and all federal officers and employees, the provision focuses on whether the President is unable to execute the laws "with the regular forces" in particular. Put differently, the term refers to a subset of federal actors—"the regular forces"—and asks whether the President is able to "execute the laws" with them, obviating the need to call up the National Guard. In this context, "regular forces" most naturally refers to the specific civilian forces that

regularly execute the laws at issue that are currently being obstructed. It is their inability to execute the laws that requires the use of the National Guard.

By contrast, it is unnatural in this context to construe "regular forces" to refer to the standing military. After all, the standing military does not "regular[ly]" "execute the laws." 10 U.S.C. § 12406(3). Indeed, under the PCA, the standing military is generally prohibited from "execut[ing] the laws," unless "expressly authorized by the Constitution or [an] Act of Congress." 18 U.S.C. § 1385. To be sure, the standing military can sometimes execute the laws under other federal statutes, such as the Insurrection Act. *See, e.g.*, 10 U.S.C. §§ 252, 253. And the standing military also can sometimes facilitate the execution of the laws pursuant to the President's Article II authority "to use troops for the protection of federal property and federal functions." *Authority to Use Troops to Prevent Interference With Federal Employees by Mayday Demonstrations and Consequent Impairment of Government Functions*, 1 Supp. Op. O.L.C. 343, 343-44, 343 (1971). Nevertheless, it would be odd for Congress to condition the President's ability to call up the National Guard to execute the obstructed laws on whether he is unable to execute

those laws with the standing military, given that the standing military typically cannot do so, in part due to another law passed by Congress.

The structure of Section 12406 underscores that "regular forces" refers to the civilian law-enforcement officers who regularly execute the obstructed laws. Unlike clause (3), clauses (1) and (2)—which authorize the President to call up the National Guard to address invasions and rebellions—do not impose a condition that he must first determine he is "unable" to address those threats "with the regular forces." This would be illogical under plaintiffs' interpretation, but makes perfect sense under defendants' interpretation. It makes perfect sense that the "regular forces" condition is included only in clause (3) if those forces refer only to the civilian law-enforcement officers who regularly execute the obstructed laws at issue. Civilian law-enforcement officers are typically ill-suited to respond to invasions or rebellions. By contrast, it would make no sense that the "regular forces" condition is included only in clause (3) if those forces refer to the standing military. After all, the standing military is far better suited to address invasions and rebellions than obstructions to civil law enforcement.

Moreover, this Nation has a longstanding norm favoring the use of the militia over the standing army to ensure the execution of the laws during domestic disturbances. That preference has its roots in the "widespread fear" at the Founding "that a national standing Army posed an intolerable threat to individual liberty and to the sovereignty of the separate States." *Perpich v. Department of Def.*, 496 U.S. 334, 340 (1990). Because of "[t]he sentiment . . . strongly disfavor[ing] standing armies[,]" the common view [at the Founding] was that adequate defense of country and laws could be secured through the Militia—civilians primarily, soldiers on occasion." *United States v. Miller*, 307 U.S. 174, 179 (1939).

This view is echoed in the Constitution, which expressly allows the militia to execute the laws, while remaining silent as to the standing military's ability to do so. *See* U.S. Const. art. I, § 8, cl. 15. As James Madison explained, giving the federal government authority to call up the state militia was a "safe" option compared to reliance on the standing military. *See* 10 *The Documentary History of the Ratification of the Constitution* 1301 (John P. Kaminski & Gaspare J. Saladino eds., 1993). This is also how Joseph Story defended the Militia Clause. "[I]f the militia could not be called in aid" of civil authorities in cases of violent

opposition to the laws, then "it would be absolutely indispensable to the common safety to keep up a strong regular force in time of peace." *Commentaries* § 1196, at 81-82.

Given this historical preference for use of the militia to quell domestic disturbances, it would be anomalous to read Section 12406 as requiring deployment of the standing military before the militia could be called forth. And there is no basis to conclude that Congress broke from this historical tradition when it first used the words "regular forces" in the statutory predecessor to 10 U.S.C. § 12406(3). *See* Act of May 27, 1908, ch. 204, § 3, 35 Stat. 400 (amending Act of Jan. 21, 1903, ch. 196, § 4, 32 Stat. 776). This legislation sought to build on an earlier law meant to strengthen and modernize the militia, not to subordinate it to the standing army. *See Perpich*, 496 U.S. at 341-342; H.R. Rep. No. 57-1094 (1902) (noting the bill "would result in greatly improving the efficiency of the National Guard as the second line of the country's defense in time of war"); H.R. Rep. No. 60-1067 (1908) (noting that was also a purpose of the 1908 amendments to the law).

Post-enactment practice also confirms the meaning of "regular forces." In 1970, President Nixon found that a postal-worker strike was

"preventing the execution of" the postal laws and authorized the Secretary of Defense to call up the National Guard "to execute" those laws. 35 Fed. Reg. at 5003. In doing so, he invoked the statutory authority now codified at 10 U.S.C. § 12406(3). *See id.* (citing 10 U.S.C. §§ 3500, 3800 (1964)). And in finding that he was "unable solely with the regular forces" to execute the postal laws, he was clearly referring to the postal workers rather than the standing military. *See id.* After all, he also authorized the Secretary of Defense to use the standing military as necessary; he did not say that the standing military alone would be unable to solve the problem; and he did not direct that the National Guard could be used only insofar as the standing military proved insufficient. *See id.* Indeed, Presidents have traditionally used the standing military to execute the laws "only as a last resort" "when no other solution seem[ed] possible." *Use of Marshals, Troops, and Other Federal Personnel for Law Enforcement in Mississippi*, 1 Supp. Op. O.L.C. 493, 497 (1964) (quotation marks omitted).

In all events, the district court erred even if the "regular forces" in Section 12406(3) refers to the standing military. In calling up the National Guard in Illinois, the President "determined that the regular

forces of the United States are not sufficient to ensure the laws of the United States are faithfully executed." GA177 (quotation marks omitted). That determination did not specify who "the regular forces" were, much less exclude the standing military from consideration. *See* GA177. And the President had a colorable basis for concluding that use of the standing military, rather than the National Guard, would significantly impede execution of the laws, thereby justifying federalization under the standard announced in *Newsom*, 141 F.4th at 1052. Normally, "[w]hen the President exercises an authority confided to him by law, the presumption is[] that it is exercised in pursuance of law." *E.g.*, *Martin*, 25 U.S. at 32-33. There is no reason to depart from that presumption here.

There is especially no reason for such a departure since there was ample basis in the record for such a determination. DHS agents are facing violent resistance on the streets of Illinois—including ambushes where their vehicles are rammed by trucks and dangerous projectiles are thrown at them, potentially motivated by bounties placed on their heads by local gangs and transnational cartels. *See supra*, pp. 7-13. Compared to the standing military, whose primary function is to fight wars and kill

our enemies abroad, National Guardsmen, who are civilians temporarily called up to serve, have deep experience in deescalating domestic disturbances among their fellow citizens. In fact, one of respondents' own witnesses, a retired Army general, stated that soldiers in the standing army have "an aggressive mindset" because their "mission" is to "destroy the enemy," not "try to prevent confrontation and reduce the use of lethal force." GA154. Likewise, given the strident opposition of state and local political leaders, who are actively campaigning for DHS to leave Illinois and have compared federal agents to roving bands of violent criminals and Nazi troopers, *see* GA228, the President could reasonably have determined that deploying the standing military would result in even more strident resistance, resulting in even more tepid support from state and local police, *see* GA228.

**Second**, in addition to misunderstanding the statutory text, the district court did not give the President's federalization decision the deference it is owed.

Nowhere is this more apparent than in the district court's so-called "credibility" determination, discounting the testimony from all of defendants' declarants. The district court did not observe and assess the

declarants' testimony, nor did it resolve any specific factual dispute between the parties or conclude that any fact set forth in defendants' final declarations was not true. *See* SA12-13. Rather, the court questioned the federal declarants' "candor" and "ability to accurately *assess* the facts." SA12 (emphasis added). It ultimately concluded that the declarants' "perceptions are not reliable." SA13. But the court did so without articulating or applying any deference on whether those perceptions were at least colorable—the relevant standard. Indeed, it applied deferential review only to the "facts of this case as the [district] [c]ourt [had] found them." SA34. That was error. The district court was also required to defer to defendants' understanding of the basic facts, and its failure to do so amounts to substituting its judgment for that of the President.

Worse still, the district court based its "credibility" determination on extra-record materials that do nothing to undermine defendants' declarations. The court appears to have conducted its own investigation—based on evidence admittedly "outside of the record." GA340. The court proceeded to decide that nothing DHS or ICE officials said in their declarations could be credited because two grand juries have

failed to return indictments against violent, armed protestors[2] and other courts have issued preliminary rulings in legal proceedings wholly unrelated to the President's federalization decisions. SA12; GA339-41. That is the very definition of an abuse of discretion, and it is clear evidence the district court abdicated its responsibility to defer to the President.

That abdication crops up other places in the district court's opinion as well. Most notably, the district court concluded that "the factual conditions necessary" to invoke Section 12406(3) "simply do not exist." But it did so without considering defendants' evidence and based only on the Court's own characterization of the situation on the ground. SA45 (characterizing the disruptions as "of limited duration" and "swiftly controlled"). That is far from the deferential review required under the statutory text.

**4.** The President's action under Section 12406 was independently warranted under the provision authorizing him to call the

---

[2] There is, of course, an obvious risk of grand-jury nullification in some cases when state and local leaders publicly malign DHS officers as "jackbooted thugs" and a "rogue, reckless group of heavily armed and masked" vigilantes. GA228.

National Guard into federal service when "there is a rebellion or danger of a rebellion against the authority of the Government of the United States." 10 U.S.C. § 12406(2). The district court erred in concluding otherwise.

The district court understood the term "rebellion" to "mean a deliberate, organized resistance, openly and avowedly opposing the laws and authority of the government as a whole by means of armed opposition and violence," *see* SA35, and the stay panel "substantially agree[d]," *Illinois*, 2025 WL 2937065, at *6. Under that approach, anything short of civil war is unlikely to clear the "very high threshold" that the district court perceived. SA35.

But the term "rebellion" is properly read to encompass the violent resistance to lawful enforcement of federal immigration law occurring in Illinois. Black's Law Dictionary defines rebellion to include "[o]pen resistance or opposition to an authority or tradition" and "[d]isobedience of a legal command or summons." *See Rebellion*, Black's Law Dictionary (12th ed. 2024). The same understanding prevailed in 1903, when Congress first enacted what is now Section 12406. *See* 32 Stat. at 776 (authorizing the President to call forth the state militias into active

56

federal service in the case of, among other things, "rebellion against the authority of the Government of the United States"). Dictionaries from the 1890s and 1900s define "rebellion" to focus on deliberate resistance to the government's laws and authority. *See Rebellion*, Black's Law Dictionary (1st ed. 1891) ("Deliberate, organized resistance, by force and arms, to the laws or operations of the government, committed by a subject."); *Rebellion*, An American Dictionary of the English Language (1900) ("Open resistance to lawful authority."); *Rebellion*, The Cyclopedic Dictionary of Law (1901) ("[T]he forcible opposition and resistance to the laws and process lawfully issued"); *Rebellion*, Webster's International Dictionary of the English Language (1903) ("Open resistance to, or defiance of, lawful authority.").

Congress plainly used "rebellion" in its broader sense in Section 12406. Otherwise, the provision would fail to encompass numerous instances, both before and after its initial enactment in 1903, in which the President has called the militia into federal service to address open defiance of federal authority in situations that fell short of organized efforts to overthrow the government.

Most famously, President Washington called up the militia to assist in suppressing the Whiskey Rebellion—a violent protest in western Pennsylvania targeted at tax assessors attempting to collect a federal excise tax on distilled whiskey. *See* Jennifer K. Elsea, Cong. Rsch. Serv., R42659, *The Posse Comitatus Act and Related Matters: The Use of the Military to Execute Civilian Law* 8 (2018) (CRS Report). President Washington took that action under a 1792 statute that did not by its terms refer to "rebellion." *See id.*; *see also* Act of May 2, 1792, ch. 28, §§ 1-2, 1 Stat. 264, 264. But when Congress later enacted statutes referring to a "rebellion," those statutes plainly extended to cover this original historical precedent of violent opposition limited to a particular federal law—precisely what occurred in Illinois, and what the district court and plaintiffs' flawed reading would not cover.

The Whiskey Rebellion, moreover, is only one example of a range of civil disorders that members of the militia and other federal military forces have long been called upon to address. Throughout the early years of the republic, Presidents routinely called out troops to suppress opposition to other federal revenue laws. *See* CRS Report 9-12. In the late 1800s and early 1900s, states frequently requested assistance from

federal troops to address violence stemming from labor disputes and miners' strikes. *See* CRS Report 13-14, 35-37. And Presidents Eisenhower and Johnson used the federalized National Guard to ensure the enforcement of federal civil rights laws and to protect civil rights advocates in the 1950s and 1960s. *See* CRS Report 37-38.

The events around Chicago exhibit many of the same features as these historical precedents—violent and forceful opposition to the lawful authority of the federal government in its enforcement of particular federal laws. *See supra*, pp. 7-13. Moreover, the statutory text makes clear that Section 12406(2) empowers the President to act when there is a "danger of a rebellion," even if a "rebellion" has not yet materialized. 10 U.S.C. § 12406(2). And the President had ample basis to find that the danger of a rebellion was present. *See supra*, pp. 7-13. To the extent the district court believed that the President was required to make some form of express written declaration of a "rebellion brewing" in Illinois before relying on Section 12406(2), the court was mistaken. SA36. Nothing in Section 12406 requires such a written finding, and the court identified no other provision purporting to require one. But in all events, the President *has* determined that violent resistance impeding law enforcement is a

form of rebellion, and that determination by its terms would cover the situation in Illinois. *See* GA180-81.

## II.  Plaintiffs Did Not Establish the Equitable Factors for Injunctive Relief

The district court's order should be vacated for the independent reason that plaintiffs did not show that the remaining stay factors warrant the "extraordinary relief of an injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 166 (2010).

1.  Plaintiffs did not establish irreparable harm. That itself requires vacatur of the injunction. *See International Ass'n of Fire Fighters, Loc. 365 v. City of E. Chicago*, 56 F.4th 437, 446 (7th Cir. 2022) (holding irreparable harm is a "threshold" requirement). Initially, plaintiffs' claim of irreparable harm is implausible given the limited size and scope of the federalization. Only 300 members of the Illinois National Guard were called into federal service. That is approximately *eight percent* of the number of Guardsmen that were federalized and deployed to the Los Angeles area in June—in addition to approximately 700 Marines that deployed in Los Angeles. And even as to that much larger federalization and deployment, the Ninth Circuit held that "[b]oth irreparable harm and the public interest weigh in favor of [d]efendants,"

*Newsom*, 141 F.4th at 1054. The 300 Illinois National Guard members federalized also amounts to less than *three percent* of the Illinois National Guard. *See* GA159. The district court identified two supposed types of irreparable harms warranting an injunction here. Neither withstands scrutiny.

First, the district court held that plaintiffs will necessarily suffer a constitutional injury due to defendants' alleged Tenth Amendment violation. But as the district court recognized, the Tenth Amendment analysis here is entirely derivative of the question of whether Section 12406 authorizes the federalization and deployment. *Dalton*, 511 U.S. at 473 ("claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims"). Plaintiffs' claim is therefore fundamentally statutory, not constitutional, and alleged violations of a federal statute do not give rise to any presumption of irreparable harm. *See Starbucks Corp. v. McKinney*, 602 U.S. 339, 345-48 (2024). Nor can plaintiffs logically complain about the federalization and deployment of Texas Guard members, since plaintiffs lack any sovereign interest in the *federal status* of the Texas Guard—the only question at issue in this appeal.

Second, the district court found irreparable harm based on claims that the Guard's presence will purportedly lead to increased protests, supposedly requiring additional state resources. SA51-52. First of all, reliance on any such "harm" is improper because the argument is not based on anything the Guard will do, but on the theory that people the Guard does not control will protest the Guard's presence. A rioter's veto is unacceptable even when directed to constrain private activity; it certainly is not a valid basis for enjoining the President's acts in protection of federal officials and property. In any event, the court's prediction of how violent rioters will react to the presence of organized, lawful, armed force is implausible. Similar predictions by California officials were proven wrong in practice. Indeed, California recently sought to vacate the stay of the district court's injunction of the Los Angeles federalization and deployment, in part by arguing that "the California Highway Patrol has not seen any large-scale, protest-related activities in the area since June 19." *See* Motion at 11, *Newsom v. Trump*, No. 25-3727 (9th Cir. Oct. 7, 2025), ECF No. 126.1.

**2.** The federal government's significant interest in protecting federal personnel and property far outweighs any speculative harms

plaintiffs identified. The federal government has "an uncontested interest in the protection of federal agents and property and the faithful execution of law" and threats directed at federal personnel and property harm that interest. *Newsom,* 141 F.4th at 1054. The government also suffers irreparable harm when federal immigration officials are prevented from safely and successfully enforcing the law. That some individuals have protested peacefully, and that officers have been able to continue with some enforcement of the laws, does not diminish the threat posed by the agitators who have attacked and threatened federal personnel and property. Nor does it diminish the harms that follow from the substantial impediment to law enforcement that mob violence has created in the Chicago area. As explained above, the level of violence directed at immigration officials in Chicago has been the highest that a 23-year federal law enforcement veteran has seen and at points has eclipsed the violence in other cities. GA223, GA227-28. Federal officers have been physically attacked and seriously injured: one officer had his beard ripped from his face, and others have been hospitalized for injuries like torn ACLs. GA192-196, GA207. While driving, federal officers have been followed by groups of vehicles and

rammed by other drivers.  GA225-27.  ICE's facility located a few miles outside of Chicago, known as the Broadview Processing Center, has been a focal point of unrest—creating a significant risk of damage to federal property as well.  GA198-206.  Plaintiffs' speculative harms cannot outweigh the harm that would befall federal persons and property if the district court's injunction were affirmed.

## CONCLUSION

The Court should vacate the district court's injunction.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. McARTHUR
*Deputy Assistant Attorney
General*

MARK R. FREEMAN
SHARON SWINGLE
ANDREW M. BERNIE

*/s/ J. Kain Day*
J. KAIN DAY
*Attorneys, Appellate Staff
Civil Division, Room 7517
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 353-2689
Sharon.swingle@usdoj.gov*

November 2025

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Circuit Rule 32 because it contains 12,437 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ J. Kain Day*
J. KAIN DAY

# CERTIFICATE OF SERVICE

I hereby certify that on November 19, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system on all counsel of record.

*/s/ J. Kain Day*
J. KAIN DAY

# CERTIFICATE OF RULE 30 COMPLIANCE

The appendix and short appendix include the materials required by Circuit Rule 30(a) and (b).

_/s/ J. Kain Day_
J. KAIN DAY

# ADDENDUM

# TABLE OF CONTENTS

10 U.S.C. § 12406.................................................................A1

**10 U.S.C. § 12406**

## § 12406. National Guard in Federal service: call

Whenever—

(1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;

(2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or

(3) the President is unable with the regular forces to execute the laws of the United States;

the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws. Orders for these purposes shall be issued through the governors of the States or, in the case of the District of Columbia, through the commanding general of the National Guard of the District of Columbia.

# SHORT APPENDIX

# TABLE OF CONTENTS

Temporary Restraining Order, Dkt. 67 (Oct. 9, 2025)..........................SA1

Opinion and Order, Dkt. 70 (Oct. 10, 2025).........................................SA3

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| STATE OF ILLINOIS, a sovereign state; and the CITY OF CHICAGO, an Illinois municipal corporation, | Case No. 25-cv-12174 |
| Plaintiffs, | **Judge April M. Perry** |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; DEPARTMENT OF DEFENSE; PETER B. HEGSETH, in his official capacity as Secretary of the Department of Defense; UNITED STATES ARMY; DANIEL P. DRISCOLL, in his official capacity as Secretary of the Army, | |
| Defendants. | |

## TEMPORARY RESTRAINING ORDER

This Court GRANTS Plaintiffs' Motion for a Temporary Restraining Order, Doc. 3, and ORDERS as follows:

1. Defendants,[1] their officers, agents, assigns entered, and all persons acting in concert with them, are temporarily enjoined from ordering the federalization and deployment of the National Guard of the United States within Illinois.

2. This Temporary Restraining Order is at 5:55 P.M. central time on this 9th day of October 2025 and expires on October 23, 2025 at 11:59 P.M.

---

[1] President Trump, one of the name Defendants, is not enjoined by this Order.

**SA1**

3. Within two (2) calendar days of entry of this Temporary Restraining Order, Plaintiffs shall post a nominal bond of $100. The bond shall be filed in the Clerk's Office and be deposited into the registry of the Court.

4. Defendants' Request to Stay or Administratively Stay the Temporary Restraining Order, Doc. 62 at 58, is DENIED.

5. A telephone hearing will be held on October 22, 2025, at 9:00 A.M. to address whether this Temporary Restraining Order should be extended for an additional fourteen (14) calendar days.

Dated: October 9, 2025

_____
APRIL M. PERRY
United States District Judge

SA2

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| STATE OF ILLINOIS, a sovereign state; and the CITY OF CHICAGO, an Illinois municipal corporation, | Case No. 25-cv-12174 |
| Plaintiffs, | Judge April M. Perry |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; DEPARTMENT OF DEFENSE; PETER B. HEGSETH, in his official capacity as Secretary of the Department of Defense; UNITED STATES ARMY; DANIEL P. DRISCOLL, in his official capacity as Secretary of the Army, | |
| Defendants. | |

## OPINION AND ORDER

Since this country was founded, Americans have disagreed about the appropriate division of power between the federal government and the fifty states that make up our Union. This tension is a natural result of the system of federalism adopted by our Founders. And yet, not even the Founding Father most ardently in favor of a strong federal government believed that one state's militia could be sent to another state for the purposes of political retribution, calling such a suggestion "inflammatory," and stating "it is impossible to believe that [a President] would

1

SA3

employ such preposterous means to accomplish their designs."[1] But Plaintiffs contend that such

an event has come to pass, and argue that National Guard troops from both Illinois and Texas

have been deployed to Illinois because the President of the United States wants to punish state

elected officials whose policies are different from his own. Doc. 13 at 8.[2] Plaintiffs further argue

that President Donald J. Trump has exceeded the authority granted to him by 10 U.S.C. § 12406,

violated the Tenth Amendment, and that the deployment of federalized troops violates the Posse

Comitatus Act. *Id.* at 9. Before this Court is a request for a temporary restraining order ("TRO")

and preliminary injunction barring mobilization of the National Guard or deployment of the U.S.

---

[1] "A sample of this is to be observed in the exaggerated and improbable suggestions which have taken place respecting the power of calling for the services of the militia. That of New-Hampshire is to be marched to Georgia, of Georgia to New-Hampshire, of New-York to Kentuke and of Kentuke to Lake Champlain. Nay the debts due to the French and Dutch are to be paid in Militia-men instead of Louis d'ors and ducats. At one moment there is to be a large army to lay prostrate the liberties of the people; at another moment the militia of Virginia are to be dragged from their homes five or six hundred miles to tame the republican contumacy of Massachusetts; and that of Massachusetts is to be transported an equal distance to subdue the refractory haughtiness of the aristocratic Virginians. Do the persons, who rave at this rate, imagine, that their art or their eloquence can impose any conceits or absurdities upon the people of America for infallible truths?

If there should be an army to be made use of as the engine of despotism what need of the militia? If there should be no army, whither would the militia, irritated by being called upon to undertake a distant and hopeless expedition for the purpose of rivetting the chains of slavery upon a part of their countrymen direct their course, but to the seat of the tyrants, who had meditated so foolish as well as so wicked a project; to crush them in their imagined intrenchments of power and to make them an example of the just vengeance of an abused and incensed people? Is this the way in which usurpers stride to dominion over a numerous and enlightened nation? Do they begin by exciting the detestation of the very instruments of their intended usurpations? Do they usually commence their career by wanton and disgustful acts of power calculated to answer no end, but to draw upon themselves universal hatred and execration? Are suppositions of this sort the sober admonitions of discerning patriots to a discerning people? Or are they the inflammatory ravings of chagrined incendiaries or distempered enthusiasts? If we were even to suppose the national rulers actuated by the most ungovernable ambition, it is impossible to believe that they would employ such preposterous means to accomplish their designs."

The Federalist No. 29, at 186-187 (Alexander Hamilton) (Jacob Ernest Cooke ed., 1961).

[2] All "Doc." citations reference the ECF docket number and page number assigned by the docketing system.

military over the objection of the Governor of Illinois. Doc. 3. For the reasons that follow, Plaintiffs' motion for a TRO is GRANTED, in part.[3]

## FACTUAL BACKGROUND

The events relevant to this case begin in the unassuming Village of Broadview, a small suburb approximately twelve miles west of downtown Chicago. Doc. 13-5 at 2. In addition to approximately 8,000 residents, Broadview is also home to an Immigration and Customs Enforcement ("ICE") Processing Center, where ICE detainees are temporarily held before being transported elsewhere. *Id*. at 3. Across the street from the ICE Processing Center is a parking lot leased by ICE for vehicles and equipment storage. *Id*. For the past nineteen years, the ICE Processing Center has regularly been visited by small groups who hold prayer vigils outside. Doc. 13-6 at 3.

In early September 2025, ICE's Chicago Field Office Director informed the Broadview Police Department that approximately 250 to 300 Customs and Border Patrol ("CBP") agents would begin arriving in Illinois for an immigration enforcement campaign dubbed "Operation Midway Blitz." Doc. 13-5 at 2-5. This escalation in enforcement activity caused a corresponding increase in protests near the ICE Processing Center. *Id*. at 5. On some occasions, demonstrators have stood or sat down in the driveway leading to the ICE Processing Center. ICE has then physically removed those individuals, and ICE vehicles have come and gone as needed. *Id*. The typical number of protestors is fewer than fifty. *Id*. The crowd has never exceeded 200. *Id*.

---

[3] The Court declines at this time to enter a Preliminary Injunction, and also to extend the scope of the TRO to include the military, a complex issue that is discussed at length below.

3

**SA5**

On September 12, there were between eighty and one hundred protestors present outside of the ICE Processing Center singing, chanting, and holding small musical instruments. *Id*. Around 10:00 a.m., twenty to thirty federal agents parked across the street and walked toward the ICE Processing Center in camouflage tactical gear with masks covering their faces, which represented a "noticeable shift" from the way agents had previously approached the building. *Id*. at 6. In the opinion of the Broadview Police, this development caused the tone of the protestors to change. *Id*. The crowd grew louder and began to press closer to the building. *Id*. Broadview Police responded, positioning themselves between the ICE Processing Center and the protestors, and when the agents went inside, the crowd calmed down and Broadview Police relocated to the outer perimeter of the crowd. *Id*. Throughout the rest of the day, the crowd chanted, and some individuals stood in the driveway to the ICE Processing Center. *Id*. ICE intermittently grabbed those people to move them physically out of the driveway. *Id*. ICE agents eventually gave a dispersal order through a loudspeaker, threatening to deploy chemical agents if the protestors did not leave. *Id*. Approximately twenty to thirty minutes later, ICE deployed tear gas and pepper spray at the crowd. *Id*. Since September 13, Broadview Police and the Illinois State Police ("ISP") have set up surveillance cameras to continually record and monitor activity in the area. *Id*. at 7.

Protestors have continued to assemble outside of the ICE Processing Center. *Id*. ICE agents regularly deploy tear gas to disperse the crowd or stand on top of the building to shoot balls of pepper spray at protestors from above. *Id*. at 7-8. It is the opinion of the Broadview Police Department that the use of chemical agents against protestors "has often been arbitrary and indiscriminate," at times being used on crowds as small as ten people. *Id*. at 8.

4

**SA6**

On September 26, a group of between 100 to 150 protestors gathered outside of the ICE Processing Center, and ICE again deployed pepper spray and tear gas. Doc. 13-5 at 9. The Broadview Police Department requested assistance from Illinois's law enforcement mutual aid network, and ISP, Maywood Police Department, Westchester Police Department, and LaGrange Police Department sent a total of six cars. *Id*. at 9-10. One road was closed for approximately five hours. *Id.* at 10.

That same day, DHS sent a memorandum requesting "immediate and sustained assistance from the Department of War … in order to safeguard federal personnel, facilities, and operations in the State of Illinois." Doc. 13-2 at 15. The memorandum claimed that "Federal facilities, including those directly supporting Immigration and Customs Enforcement … and the Federal Protective Service … have come under coordinated assault by violent groups intent on obstructing lawful federal enforcement actions. These groups are actively aligned with designated domestic terrorist organizations and have sought to impede the deportation and removal of criminal noncitizens through violent protest, intimidation, and sabotage of federal operations." *Id*. DHS requested deployment "of approximately 100 [Department of War] personnel, trained and equipped for mission security in complex urban environments. These personnel would integrate with federal law enforcement operations, serving in direct support of federal facility protection, access control, and crowd control measures." *Id*. at 16.

On September 27, CBP informed Broadview Police that they should prepare for an increase in the use of chemical agents and ICE activity in Broadview, and that it was "going to be a shitshow." Doc. 13-5 at 10. That day, Broadview Police monitored the "small crowd of quiet protestors" who were outside the ICE Processing Center and watched as federal officials formed a line and marched north up the street, pushing the crowd to another location. *Id*. Federal

5

**SA7**

officials dismantled a water and snack tent that protestors had been using and later that evening deployed tear gas, pepper spray, and pepper balls at protestors. *Id*. at 10-11.

On September 28, Illinois was asked to voluntarily send Illinois National Guard troops to protect federal personnel and property at the ICE Processing Center in Broadview. Doc. 13-2 at 4. Governor Pritzker declined that request, concluding that "there were no past or present current circumstances necessitating it." *Id*.

On October 2, Broadview Police, ISP, Cook County Sheriff's Office, Cook County Department of Emergency Management and Regional Security, and the Illinois Emergency Management Agency publicly announced a joint "Unified Command" to coordinate public safety measures in Broadview around the ICE Processing Center. Doc. 13-5 at 12.

On October 3, approximately 200 protestors gathered outside of the ICE Processing Center, some of whom were elected officials and members of the media. *Id*. at 13. In turn, there were approximately 100 state and local law enforcement officers on site who established designated protest areas. *Id*. Although some protestors attempted to come close to federal vehicles, state and local law enforcement officers were able to maintain control and arrested approximately five people for disobeying or resisting law enforcement, with two arrests for battery or aggravated battery. *Id*. at 15; Doc. 13-15 at 16. Federal law enforcement detained twelve people. Doc. 13-15 at 16.

On October 4, there were approximately thirty protestors at the ICE Processing Center. Doc. 63-2 at 10. According to DHS's representative at the ICE Processing Center, local law enforcement arrived within five to ten minutes, immediately pushed the protestors back to the

6

**SA8**

designated protest areas, and controlled the scene. *Id*. at 10-11. DHS did not have to intervene with any protestors. *Id*. at 11.

Despite this, on the same day, the President issued a memorandum stating that the "situation in the State of Illinois, particularly in and around the city of Chicago, cannot continue. Federal facilities in Illinois, including those directly supporting Immigration and Customs Enforcement (ICE) and the Federal Protective Services (FPS), have come under coordinated assault by violent groups intent on obstructing Federal law enforcement activities…I have determined that these incidents, as well as the credible threat of continued violence, impede the execution of the laws of the United States. I have further determined that the regular forces of the United States are not sufficient to ensure the laws of the United States are faithfully executed, including in Chicago." Doc. 62-1 at 16. This memorandum authorized the federalization of Illinois National Guard members under 10 U.S.C. § 12406. *Id*. at 17. It further authorized those personnel to "perform those protective activities that the Secretary of War determines are reasonably necessary to ensure the execution of Federal law in Illinois, and to protect Federal property in Illinois." *Id*.

Also on October 4, the Department of War asked the Adjutant General of the Illinois National Guard to agree to the mobilization of 300 Illinois National Guard troops pursuant to 32 U.S.C. § 502(f). Doc. 13-2 at 5, 21. The Illinois National Guard Adjutant General was informed that if he did not agree in the next two hours, "the Secretary of War will direct the mobilization of as many members of the ILNG as he may deem necessary under Title 10 United States Code." *Id*. at 21. Governor Pritzker reaffirmed his position that there was no public safety need necessitating such a deployment. Doc. 13-15 at 24. Later that day, the Secretary of War issued a memorandum calling forth "at least 300 National Guard personnel into Federal service…to

**SA9**

protect U.S. Immigration and Customs Enforcement, Federal Protective Service, and other U.S. Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where violent demonstrations against these functions are occurring or are likely to occur based on current threat assessments and planned operations." *Id*. at 29.

On October 5, a few dozen protestors were present at the ICE Processing Center. Doc. 63-2 at 11. State and local officers responded with approximately one dozen patrol cars, and DHS did not have to intervene with protestors. *Id*. Internal communications between DHS and ISP Sunday night referred to it as "great thus far this weekend." *Id*. DHS further stated "It's clear that ISP is the difference maker in this scenario, and we are grateful for their leadership. Hopefully, we can keep it up for the long-haul." *Id*.

That same day, the Secretary of War issued a memorandum ("Texas Memorandum") mobilizing up to 400 members of the Texas National Guard. Doc. 13-2 at 34. The Texas Memorandum referenced a June 7, 2025 Presidential Memorandum federalizing "at least 2,000 National Guard personnel" pursuant to Title 10 "to protect U.S. Immigration and Customs Enforcement and other U.S. Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where violent demonstrations against these functions are occurring or are likely to occur based on current threat assessments and planned operations." *Id*.; Doc. 13-11 at 2. It further stated that on "October 4, 2025, the President determined that violent incidents, as well as the credible threat of continued violence, are impeding the execution of the laws of the United States in Illinois, Oregon, and other locations throughout the United States." Doc. 13-2 at 34.

**SA10**

Apart from the above protest activity, ICE has reported to Broadview Police acts of vandalism like the slashing of tires on fifteen vehicles, the "keying" of ICE vehicles, and sugar being put in vehicles' fuel tanks. Doc. 13-5 at 8, 11. The ICE Processing Center has continuously remained open and operational throughout the protest activity. *Id*. at 11. Broadview Police are not aware of any occasion where an ICE vehicle was prevented from entering or exiting due to activity by protestors. *Id*. In the opinion of the Broadview Police Department and ISP, state and local law enforcement officers are able to maintain safety and control outside of the ICE Processing Center. *Id*.; Doc. 13-15 at 17. Similarly, the Superintendent of the Chicago Police Department has indicated that his officers have responded unrest involving ICE in order to maintain public safety. Doc. 63-3.

Defendants report significantly more violence in the Chicago area than the Broadview Police or ISP. Specifically, Defendants provided declarations from DHS Chicago Field Office Director Russell Hott and CBP Chief Patrol Agent Daniel Parra that detail various instances of violence across Cook County between June 2025 and the present. Doc. 62-2, Doc. 62-4. Some of what these declarants complain about is, while aggravating, insulting, or unpleasant, also Constitutionally protected. *See, e.g*., Doc. 62-2 at 6 (describing a rally to "get ICE ouf of Chicago!" accompanied by a photograph of destroyed property); *id*. at 19 (describing protestors' use of bullhorns). For example, a protestor who happens to lawfully possess a weapon while protesting is exercising both their First and Second Amendment rights. There is no evidence within the declarations that, to the extent there have been acts of violence, those acts of violence have been linked to a common organization, group, or conspiracy.[4] And with respect to

---

[4] This is not to say that some acts of violence, like boxing in immigration enforcement vehicles, have not been coordinated acts among the people involved. There is simply no evidence linking these discrete acts to each other.

9

**SA11**

Defendants' declarants' descriptions of the ICE Processing Center protests, the version of the facts set forth in these affidavits are impossible to align with the perspectives of state and local law enforcement presented by Plaintiffs.

The Court therefore must make a credibility assessment as to which version of the facts should be believed. While the Court does not doubt that there have been acts of vandalism, civil disobedience, and even assaults on federal agents, the Court cannot conclude that Defendants' declarations are reliable. Two of Defendants' declarations refer to arrests made on September 27, 2025 of individuals who were carrying weapons and assaulting federal agents. *See* Doc. 62-2 at 19; Doc. 62-4 at 5. But neither declaration discloses that federal grand juries have refused to return an indictment against at least three of those individuals, which equates to a finding of a lack of probable cause that any crime occurred. *See United States v. Ray Collins and Jocelyne Robledo*, 25-cr-608, Doc. 26 (N.D. Ill. Oct. 7, 2025); *United States v. Paul Ivery*, 25-cr-609 (N.D. Ill.). In addition to demonstrating a potential lack of candor by these affiants, it also calls into question their ability to accurately assess the facts. Similar declarations were provided by these same individuals in *Chicago Headline Club et. al. v. Noem*, 25-cv-12173, Doc. 35-1, Doc. 35-9 (N.D. Ill.), a case which challenged the Constitutionality of ICE's response to protestors at the Broadview ICE Processing Center. In issuing its TRO against DHS Secretary Kristi Noem, the court in that case found that the plaintiffs would likely be able to show that ICE's actions have violated protestors' First Amendment right to be free from retaliation while engaged in newsgathering, religious exercise, and protest, and Fourth Amendment rights to be free from excessive force. *Id*. at Doc. 43. Although this Court was not asked to make any such finding, it does note a troubling trend of Defendants' declarants equating protests with riots and a lack of appreciation for the wide spectrum that exists between citizens who are observing, questioning,

10

**SA12**

and criticizing their government, and those who are obstructing, assaulting, or doing violence.[5] This indicates to the Court both bias and lack of objectivity. The lens through which we view the world changes our perception of the events around us. Law enforcement officers who go into an event expecting "a shitshow" are much more likely to experience one than those who go into the event prepared to de-escalate it. Ultimately, this Court must conclude that Defendants' declarants' perceptions are not reliable.[6]

Finally, the Court notes its concern about a third declaration submitted by Defendants, in which the declarant asserted that the FPS "requested federalized National Guard personnel to support protection of the Federal District Court on Friday, October 10, 2025." Doc. 62-3. This purported fact was incendiary and seized upon by both parties at oral argument. It was also inaccurate, as the Court noted on the record. To their credit, Defendants have since submitted a corrected declaration, and the affiant has declared that they did not make the error willfully. Doc. 65-1. All of the parties have been moving quickly to compile factual records and legal arguments, and mistakes in such a context are inevitable. That said, Defendants only presented declarations from three affiants with first-hand knowledge of events in Illinois. And, as described above, all three contain unreliable information.

---

[5] At oral argument, Defendants' counsel repeatedly referred to the idea that protestors who wear gas masks are demonstrating a desire to do physical violence to law enforcement, even when pressed by the Court that masks are protective equipment, not offensive weapons. Presumably, counsel does not believe that the CBP officers who have engaged in street patrols in and around Chicago are also demonstrating a desire to do physical violence, though they are both wearing masks and carrying weapons. Additionally, the Court notes that despite the claim that protestors are wearing gas masks, most of the photos submitted by Defendants show protesters wearing Covid-19 masks. Doc. 62-2 at 13.

[6] The Court also notes that DHS's informal email representations to ISP about the state of affairs in Broadview align more with ISP's declarations presented by Plaintiffs than they do with DHS's declarations.

Plaintiffs contend that the deployment of the Illinois and Texas National Guard comes not from any good faith concern about the ability of federal law enforcement to do their jobs unimpeded, but rather from President Trump's animus for Illinois's elected officials. In support of this argument, Plaintiffs attach social media posts by President Trump attacking Illinois Governor JB Pritzker as "weak," "pathetic," "incompetent," and "crazy." Doc. 13-10 at 17, 19, 22-23. Plaintiffs have also presented evidence that President Trump strongly disagrees with various policy decisions by Illinois officials, including "sanctuary" policies in Illinois and the City of Chicago that limit the cooperation between local law enforcement and federal immigration authorities. *See, e.g.*, *id*. at 12 ("No more Sanctuary Cities! […] They are disgracing our Country […] Working on papers to withhold Federal Funding for any City or State that allows these Death Traps to exist!!!"); 32-33 ("This ICE operation will target the criminal illegal aliens who flocked to Chicago and Illinois because they knew Governor Pritzker and his sanctuary policies would protect them and allow them to roam free on American streets. President Trump and Secretary Noem stand with the victims of illegal alien crime while Governor Pritzker stands with criminal illegal aliens.").

Though courts have consistently upheld legal challenges to sanctuary policies as consistent with the rights reserved to states by the Tenth Amendment,[7] President Trump, Department of Homeland Security Secretary Kristi Noem, and Attorney General Pamela Bondi have stated that they believe Illinois officials are violating federal law, and have suggested that their support for these policies should result in criminal prosecution. For example, on August 13, 2025, Attorney General Bondi sent letters to Governor Pritzker and Chicago Mayor Brandon

---

[7] *See, e.g., United States v. Illinois*, No. 25-cv-1285, 2025 WL 2098688, at *27 (N.D. Ill. July 25, 2025) (collecting cases).

Johnson informing them that "[a]s the chief law enforcement officer of the United States, I am committed to identifying state and local laws, policies, and practices that facilitate violations of federal immigration laws or impede lawful federal immigration operations, and taking legal action to challenge such laws, policies, or practices. Individuals operating under the color of law, using their official position to obstruct federal immigration enforcement efforts and facilitating or inducing illegal immigration may be subject to criminal charges….You are hereby notified that your jurisdiction has been identified as one that engages in sanctuary policies and practices that thwart federal immigration enforcement to the detriment of the interests of the United States. This ends now." Doc. 13-9 at 2-3.

Plaintiffs have also presented evidence demonstrating President Trump's longstanding belief that crime in Chicago is out of control, and that federal agents should be used to stop that crime. *See, e.g.,* Doc. 13-10 at 4 ("we need troops on the streets of Chicago, not in Syria"); *id.* at 8 ("If Chicago doesn't fix the horrible 'carnage' going on […] I will send in the Feds!"); *id.* at 10 (If Democrat leaders in Chicago "don't straighten it out, I'll straighten it out"); 11 ("The next president needs to send the National Guard to the most dangerous neighborhoods in Chicago until safety can be successfully restored, which can happen very, very quickly.") 17 ("[T]he National Guard has done such an incredible job [in Washington, D.C.] working with the police….Chicago's a mess. You have an incompetent mayor, grossly incompetent and we'll straighten that one out probably next. That'll be our next one after this and it won't even be tough."). On August 25, 2025, President Trump stated: [W]e will solve Chicago within one week, maybe less. But within one week we will have no crime in Chicago." *Id.* at 18. On September 2, 2025, President Trump posted on social media: "Chicago is the worst and most dangerous city in the World, by far. Pritzker needs help badly, he just doesn't know it yet. I will

13

**SA15**

solve the crime problem fast, just like I did in DC. Chicago will be safe again, and soon." *Id*. at 28. On September 3, 2025, President Trump sent a fundraising email which stated: "I turned our Great Capital into a SAFE ZONE. There's virtually no crime. NOW I WANT TO LIBERATE CHICAGO! The Radical Left Governors and Mayors of crime ridden cities don't want to stop the radical crime. I wish they'd just give me a call. I'd gain respect for them. Now hear me: WE'RE GOING TO DO IT ANYWAY." *Id*. at 29-30 (emphasis in original). When asked at oral argument whether the National Guard was, in fact, being deployed to Illinois to "stop crime," Defendants' counsel did not disagree that this was the objective of the deployment. Nor did counsel limit the scope of that mission in any meaningful sense.

## HISTORICAL BACKGROUND

As discussed, this case concerns questions of federalism and the Constitutional and statutory limits placed on the President's ability to deploy National Guard troops for purposes of domestic law enforcement. Especially at issue is the scope of 10 U.S.C. § 12406, the statutory predicate for the current National Guard deployment in Illinois. Because there is not an abundance of case law interpreting Section 12406, the Court begins with some historical background.

### A. The Constitution

During the Constitutional Convention of 1787, one topic of hot debate among the Founders was how to properly scope the federal government's military powers. Indeed, among the grievances directed against King George III by signatories to the Declaration of Independence was his keeping "in Times of Peace, Standing Armies, without the Consent of our Legislatures." Decl. of Independence para. 13 (U.S. 1776). Thus, while the Founders recognized

that well-trained soldiers were necessary "for providing for the common defense" of our young nation, they were concerned "that a national standing Army posed an intolerable threat to individual liberty and to the sovereignty of the separate states." *Perpich v. Dept. of Defense*, 496 U.S. 334, 340 (1990); *see also Reid v. Covert*, 354 U.S. 1, 23–24 (1957) ("The Founders envisioned the army as a necessary institution, but one dangerous to liberty if not confined within its essential bounds."). Further informing some Founders' suspicion of standing armies was the fact that local militias of individual states had played a vital role in securing the recent victory in the Revolutionary War. *See* Frederick Bernays Wiener, *The Militia Clause of the Constitution*, 54 Harv. L. Rev. 181, 182–83 (1940).

Another concern among some Founders was the extent of the federal government's powers to deploy federal military forces—including federalized militia—for purposes of general law enforcement. For instance, in response to a proposal to add language to the Constitution which would empower the federal government to "call forth the force of the Union" against states that passed laws contravening those of the union, James Madison moved successfully for its removal, opining that such use of force against a state "would look more like a declaration of war, than an infliction of punishment." Robert W. Coakley, *The Role of Federal Military Forces in Domestic Disorders 1789–1879* 8 (citing Max Farrand, *The Records of the Federal Convention*, vol. 1 at 54). During the ratification debates, Patrick Henry expressed fears that the language of the Militia Clause allowing Congress to have the militia called forth to execute the laws of the Union would open the door to federal troops engaging in domestic law enforcement. 3 J. Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 387 (1836) [hereinafter "Elliot Debates"]. Antifederalist Henry Clay expressed similar concerns and asked the Federalists "for instances where opposition to the laws did not

15

**SA17**

come within the idea of an insurrection." *Id*. at 410. To this, Madison replied that "there might be riots, to oppose the execution of the laws, *which the civil power might not be sufficient to quell*." *Id.* (emphasis added). Patrick Henry pressed the issue, charging that granting power of "calling the militia to enforce every execution indiscriminately" would be "unprecedented," and a "genius of despotism." *Id*. at 412. To this, Madison noted the "great deal of difference between calling forth the militia, when a combination is formed to prevent the execution of the laws, and the sheriff or constable carrying with him a body of militia to execute them in the first instance; which is a construction not warranted by the [Militia] clause." *Id.* at 415.

Confronted with such concerns, even federalist proponent Alexander Hamilton rejected the notion that the militia could enforce domestic law, opining that given "the supposition of a want of power to require the aid of the POSSE COMITATUS is entirely destitute of colour, it will follow, that the conclusion which has been drawn from it, in its application to the authority of the federal government over the militia is as uncandid as it is illogical." The Federalist No. 29, at 188 (Alexander Hamilton) (Jacob Ernest Cooke, ed., 1961). To Hamilton, then, it was nothing more than an "exaggerated and improbable suggestion[]" that the federal government would command one state's militia to march offensively into the territories of another, given how assuredly such conduct would invite "detestation" and "universal hatred" by the people of the would-be usurper. *Id*. at 186–87.

On September 17, 1787, the U.S. Constitution was ratified. Many of the concerns debated by the Founders reflect in its contours. Regarding the militia, the Founders chose to vest Congress—not the President—with constitutional power "to provide for calling forth the Militia to execute the laws of the Union, suppress insurrections, and repel invasions," U.S. Const. art. I, § 8, cl. 15 (the "Calling Forth Clause"), as well as to provide for the "organizing, arming, and

disciplining the militia, and for governing such part of them as may be employed in the service of the United States." U.S. Const. art. I, § 8, cl. 16. The President, then, would be the "Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States." U.S. Const. art. 2, § 2, cl. 1.

That the Framers understood the Calling Forth Clause narrowly can be seen in Congress's earliest efforts to put the clause into legislative practice. In 1792, Congress enacted an Act to "provide for calling forth the Militia to execute the laws of the Union, suppress insurrections and repel invasions." Act of May 2, 1792, 1 Stat. 264 (1792). In 1795, Congress repealed the 1792 Act and passed an amended version. Act of February 28, 1795, 1 Stat. 424 (1795). In both versions, Congress authorized the President to call upon the militia in response to invasion or insurrection without much limitation. But for the President to call forth the militia in cases where "the laws of the United States shall be opposed, or the execution thereof obstructed," stricter controls were imposed. *Id.* Specifically, Congress authorized the calling forth of militia only when the forces of obstruction were "too powerful to be suppressed by the ordinary course of judicial proceedings, or by the powers vested in the marshals" by the Act. *Id.* These early efforts demonstrate contemporaneous understanding that military deployment for purpose of executing the laws was to be an act of last resort, only after other systems had failed.

Beyond the Calling Forth Clause, other Constitutional provisions respond to Founders' concerns about specters of military overreach. For instance, the Founders chose not to consolidate control over the nation's standing army and naval forces into a single branch of federal government. Power to command was vested in the President, U.S. Const. art. II, § 2, cl. 1, but power to actually "declare War," "raise and support armies," and "provide and maintain a

Navy" entrusted to Congress. U.S. Const. art. I, § 8, cls. 11–13; *see also* The Federalist No. 24, at 153 (Alexander Hamilton) (Jacob Ernest Cooke, ed., 1961) (noting "the whole power of raising armies was lodged in the *legislature*, not in the *executive*") (emphasis in original). Moreover, two of the Constitution's first ten Amendments articulate safeguards against the military: the Second Amendment—with its assurance that well-regulated militias would be prepared and armed to fight for the security of the states—and the Third Amendment, with its prohibition on quartering of soldiers in times of peace.

Finally, the Constitution and its early amendments also reflect another long-standing American principle: that the states possess a "residuary and inviolable dual sovereignty." The Federalist No. 39, at 256 (James Madison) (Jacob Ernest Cooke, ed., 1961); *see also Printz v. United States*, 521 U.S. 898, 918 (1997) ("It is incontestible that the Constitution established a system of 'dual sovereignty'"); *Carter v. Carter Coal Co.*, 298 U.S. 238, 294 (1936) (the Framers "meant to carve from the general mass of legislative powers, then possessed by the states, only such portions as it was thought wise to confer upon the federal government"). This conception is reflected throughout the Constitution's text, but particularly in the Tenth Amendment, which states that "the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. These reserved and residuary powers include, among other things, "the police power, which the Founders denied the National Government and reposed in the States." *United States v. Morrison*, 529 U.S 598, 618 (2000); *see also Patterson v. State of Kentucky*, 97 U.S. 501, 503 (1878) (the "power to establish the ordinary regulations of police has been left with the individual States, and cannot be assumed by the national government"); *Carter*, 298 U.S. at 295 ("It is no longer open to question that the general government, unlike the

states … possesses no inherent power in respect to the internal affairs of the states.") (citation omitted).

### B. Posse Comitatus Act

American rejection of military encroachment into domestic law enforcement was explicitly rejected in 1878, with the passage of the Posse Comitatus Act. As amended, it provides that:

> Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both.

18 U.S.C. § 1385.

The historical context that gave rise to the Posse Comitatus Act merits discussion. After the Civil War, federal troops were deployed to states of the former Confederacy for purposes of keeping public order and enforcing federal law. *See* Sean J. Kealy, *Reexamining the Posse Comitatus Act: Toward a Right to Civil Law Enforcement*, 21 Yale L. & Pol. Rev. 383, 393 (2003). While deployed, these troops carried out such law enforcement duties as enforcing taxes, arresting members of the Ku Klux Klan, and guarding polling places to ensure newly enfranchised former slaves could cast their votes in accord with federal law protections. *Id*. n. 59. In response to this exercise of federal power, Congressmen from Southern states pushed for, and succeeded, in passing the Posse Comitatus Act as a means to "limit the direct active use of federal troops by law enforcement officers to enforce the laws of this nation." *United States v. Hartley*, 796 F.2d 112, 114 (5th Cir. 1986) (internal quotes and citations omitted).

As detailed further below, the Court's decision today does not turn on the merits of Plaintiffs' claim that Defendants violated the Posse Comitatus Act. That said, the Act represents

another moment that America recognized the importance of checking military intrusion into civilian law enforcement.

### C. The Origins of 10 U.S.C. § 12406

The final piece of our historical puzzle is 10 U.S.C. § 12406, which Defendants represent supplies the authority for the deployment of federalized National Guard troops into Illinois. In its current incarnation, it provides:

> Whenever
>
>> (1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;
>>
>> (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or
>>
>> (3) the President is unable with regular forces to execute the laws of the United States;
>>
>> the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel invasion, suppress rebellion, or execute those laws.

10 U.S.C. § 12406.

Key provisions of Section 12406's language originate with the Dick Act of January 21, 1903, 32 Stat. 775–80 (1903), and Militia Act of 1908, 35 Stat. 399–403 (1908). In the leadup to their enactment, leading federal executives expressed their views on the inadequacy of the nation's militia. *E.g.*, President Roosevelt, address to Congress (December 3, 1901) (commenting that the existing laws governing the organization of the militia were "obsolete and worthless"); *Id.* Secretary of War Elihu Root (sharing similar view on the lack of a disciplined militia system to support the nation's "small Regular Army"). Responding to these concerns, Congress passed the Dick Act. Among its innovations, the Dick Act authorized substantial

20

**SA22**

funding for professional equipment (Section 3) and training by federal regular forces (Section 20). Dick Act, 32 Stat. 775. Beyond these modernizations, the Dick Act also represents the first statutory usage of the name "National Guards" to refer to the state militias. *Id*. at 333–34 (1988). Congress revisited the subject matter of the newly modernized National Guard with the Militia Act enacted May 27, 1908 ("1908 Act"). By that time, the Dick Act's modernization efforts were largely understood a success. As then-Acting Secretary of War Robert Shaw put in his report to Congress on the 1908 bill, "As a result of the initial expenditure [under the Dick Act] the organized militia is now fairly well clothed, armed, and equipped for active military service." *See* H.R. Rep. No. 60-1067, at 6 (1908).

Among other amendments, the 1908 Act made two changes of note. First, it proposed to authorize the President to call forth the National Guard to serve "either within *or without* the territory of the United States" for the first time. 35 Stat. 400; cf. also *See* H.R. Rep. No. 1094, 57th Cong. (1902) at 22-23 (describing, at a time prior to this change, how "services required of the militia can be rendered only upon the soil of the United States or of its Territories"). This new language was accompanied by a change to the calling forth articles, which as of the 1908 Act read,

> That whenever the United States is invaded, or in danger of invasion from any foreign nation, or of rebellion against the authority of the Government of the United States, or the President is unable **with the regular forces at his command** to execute the laws of the Union in any part thereof, it shall be lawful for the President to call forth such number of the militia … as he may deem necessary to repel such invasion, suppress such rebellion, or to enable him to execute such laws.

35 Stat. 400 (emphasis added). In his comments on the bill, Secretary Shaw characterized these two changes—the new Presidential authority to call the militia abroad and changes to Section 4—as complementary provisions. Specifically, Shaw noted:

> This wholesome and patriotic provision [for the National Guard to operate outside the United States] originates in the organized militia and constitutes an offer of their services in case of national emergency during the entire period of the emergency as measured by the call of the President, and is coupled with the reasonable and proper requirement that—
>
> "When the *military needs* of the Federal Government arising from the necessity to execute the laws of the Union, suppress insurrection, or repel invasion can not be met by the regular forces, the organized militia shall be called into the service."

H.R. Rep. No. 60-1067, at 6 (1908) (emphasis added). Thus, Shaw understood the 1908 Act as a step towards making the National Guard "an essential and integral part of the first line of national defense." *Id*. at 6–7. Through the twentieth century, Congress continued to bring the National Guard more into the fold of the nation's general military apparatus. *See generally* Jeffrey A. Jacobs, Reform of the National Guard: A Proposal to Strengthen the National Defense, 78 Geo. L.J. 625, 629—31 (1990).

## LEGAL STANDARD

A request for injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original). The standard for issuing a TRO is the same as is required to issue a preliminary injunction. *See Merritte v. Kessel*, 561 Fed. Appx. 546, 548 (7th Cir. 2014). To obtain a TRO, the movant must demonstrate: (1) a likelihood of success on the merits; (2) that there is no adequate remedy at law; and (3) that the movant will suffer irreparable harm if the relief is not granted. *Smith v. Exec. Dir. of Indiana War Mem'ls*

*Comm'n*, 742 F.3d 282, 286 (7th Cir. 2014). If the movant makes this showing, the court then "must weigh the harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction." *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019). Finally, in balancing the harms, the court must consider the public interest in granting or denying the requested relief. *Ty, Inc. v. Jones Grp., Inc.,* 237 F.3d 891, 895 (7th Cir. 2001).

## ANALYSIS

Plaintiffs allege that Defendants' actions have violated (1) the statutory authority granted to the President in 10 U.S.C. § 12406; (2) Illinois's sovereign rights as protected in the Tenth Amendment; and (3) the Posse Comitatus Act. Plaintiffs argue that they are likely to succeed on all of their claims, that they will suffer irreparable harm absent injunctive relief, and that the balance of equities and public interest weigh in their favor. Defendants respond that President Trump has determined that the statutory criteria under Section 12406 have been met, and that the Court must give that determination deference. Defendants further argue that if the Court finds that deployment of the National Guard was proper under Section 12406, Plaintiffs cannot succeed on the merits of any of their claims.

The Court notes that its determinations for the purposes of this TRO are necessarily preliminary ones, based on the materials presented thus far, and constrained by the amount of time that the Court has had to review this weighty and urgent matter. The Court has had less than five days to consider 200 years of history, a factual record of approximately 500 pages, extensive briefing that raises complex issues of law for which there is limited precedent, and the six amicus curiae briefs that have been filed. With those caveats in mind, the Court determines that a TRO is warranted.

## I.  Justiciability

Defendants first challenge Plaintiffs' standing to seek a TRO based on their claim that Defendants' deployment of federalized National Guard into Illinois violates 10 U.S.C. § 12406. Federal courts have jurisdiction only over "cases" and "controversies," U.S. Const. art. III § 2, cl. 1, and so "any person invoking the power of a federal court must demonstrate standing to do so." *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013). Article III standing requires that Plaintiffs have a concrete and particularized injury in fact, actual or imminent, that is fairly traceable to the defendant's conduct and likely to be redressed by judicial relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). A party moving for entry of a TRO must establish their standing to do so. *E.g., Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020). "The standards for granting a temporary restraining order and preliminary injunction are the same." *USA-Halal Chamber of Commerce, Inc. v. Best Choice Meats, Inc.*, 402 F. Supp. 3d 427, 433 n.5 (N.D. Ill. 2019) (collecting cases)). Because the "burden to demonstrate standing in the context of a preliminary injunction motion is at least as great as the burden of resisting a summary judgment motion," the party whose standing is challenged must establish that standing "by affidavit or other evidence … rather than general allegations of injury." *Speech First*, 968 F.3d at 638 (first quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 907 n.8 (1990); then quoting *Six Star Holdings, LLC v. City of Milwaukee*, 821 F.3d 795, 801 (7th Cir. 2016)).

A state has a recognized "interest in securing observance of the terms under which it participates in the federal system." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607–08 (1982). Accordingly, states have been found to possess standing "when they believe that the federal government has intruded upon areas traditionally within states' control." *Kentucky v. Biden*, 23 F.4th 585, 598 (6th Cir. 2022); *see also Texas v. United States*,

809 F.3d 134, 153 (5th Cir. 2015) (noting "states may have standing based on … federal assertions of authority to regulate matters they believe they control). Here, Plaintiffs have introduced evidence suggesting that Defendants intend to unlawfully deploy the National Guard to Illinois, where they are to engage in crime-fighting and other activities falling within the ambit of Illinois's sovereign police powers. No more is needed from the record to establish Plaintiffs' standing to pursue a TRO.

The Court is not persuaded by Defendants' argument that Plaintiffs cannot challenge deployment of the Texas National Guard because the Illinois Governor has no legally protected interest in controlling the militia of another state. This misses the point: Plaintiffs' claimed injury is not loss of an ability to control or command, but the loss of its own sovereign rights.[8] Nor is the Court compelled by Defendants' assertion that intrusion into Plaintiffs' sovereign police powers is too generalized to support standing. It is true that grievances may be too generalized to support Article III injury if what the plaintiff seeks is "relief that no more directly and tangibly benefits him than it does the public at large." *Defs. Of Wildlife*, 504 U.S. at 573-74. That is not the case here, though, as Illinois's evidence describes injuries directed to its specific sovereign interests, not the interests of states generally.[9] For these reasons, the Court concludes that Plaintiffs have standing.

---

[8] The Court discusses these sovereign rights in the context of irreparable harm below.

[9] Defendants also argue that Plaintiffs lack standing because states to which National Guard are deployed fall outside Section 12406's "zone of interests." As a threshold matter, the Court questions how relevant the "zone of interests" test is to this case, given its primary usage in cases involving claims brought under the Administrative Procedure Act. *See Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 394–99 (1987) (concluding that "[t]he 'zone of interest' test is a guide for deciding whether, in view of Congress' evident intent to make agency action presumptively reviewable, a particular plaintiff should be heard to complain of a particular agency decision."). But even if the test applies, the Court has no trouble concluding that Illinois would fall within its zone of interests, given the history of the Militia Clause (from which Section 12406 draws its language) and the Founders' concerns regarding unchecked federal deployment of militias into the states.

Next, the Court considers Defendants' argument that it is outside the power of the Judiciary to review this case. "In general, the Judiciary has a responsibility to decide cases properly before it." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194 (2012) (quoting *Cohens v. Virginia,* 6 Wheat. 264, 404, 5 L.Ed. 257 (1821)). The Supreme Court has carved out a "narrow exception to that rule, known as the 'political question' doctrine." *Id.* When a controversy turns on a political question, courts lack the authority to decide the dispute. *Id.* The political question doctrine does not apply simply because the litigation challenges the authority of one of the coordinate political branches, nor "merely 'because the issues have political implications.'" *Id.* at 196 (quoting *INS v. Chadha,* 462 U.S. 919, 943 (1983)). Rather, the political question doctrine applies "where there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it.'" *Id.* at 195 (quoting *Nixon v. United States,* 506 U.S. 224, 228 (1993)). The political question doctrine is a doctrine "of 'political *questions*,' not one of 'political cases.'" *Baker v. Carr*, 369 U.S. 186, 217 (1962).

Defendants raise two points in support of their argument that the President's decision to invoke Section 12406 is not reviewable. First, Defendants cite in passing the rule that when a valid statute "commits [a] decision to the discretion of the President," the President's exercise of discretion is not subject to judicial review. Doc. 62 at 28 (quoting *Dalton v. Specter*, 511 U.S. 462, 474 (1994)). The Court takes no issue with this general premise but finds it does not apply here. Section 12406 "permits the President to federalize the National Guard '[w]henever' one of the three enumerated conditions are met, not whenever <u>he determines</u> that one of them is met." *See Newsom v. Trump*, 786 F. Supp. 3d 1235, 1248 (N.D. Cal. 2025) (quoting 10 U.S.C. § 12406) (emphasis in original). Thus, the decision whether to federalize the National Guard,

26

**SA28**

though undoubtedly a decision delegated to the President, is not one committed to his discretion alone. The political question doctrine does not apply on this ground.

Second, Defendants rely on *Martin v. Mott*, 25 U.S. (12 Wheat.) 19, 30 (1827) for the specific proposition, untethered to modern political question doctrine jurisprudence, that the issue of whether the President properly mobilized the National Guard is not subject to judicial review. *Martin* involved President Madison's use of the New York militia during the War of 1812. Plaintiff, Jacob Mott, refused to report for duty. Mott was court-martialed and fined, and the State seized his property to satisfy the debt. Mott then brought an action for replevin in state court, arguing that the seizure was illegal because President Madison's order federalizing the New York militia was invalid. Among other objections, Mott argued that the avowry (the pleading justifying the taking of Mott's property) was fatally defective because it failed to allege that the exigency (the invasion) in fact existed. *Id.* at 23–28. By the time these issues reached the Supreme Court, the war had taken thousands of American lives and had been over for nearly twelve years. Harry L. Cole, *The War of 1812* at 94 (1965).

At issue in *Martin* was the meaning of the 1795 Act,[10] a precursor to 10 U.S.C. § 12406, which provided: "[W]henever the United States shall be invaded, or be in imminent danger of invasion from any foreign nation or Indian tribe, it shall be lawful for the President ... to call forth such number of the militia ... as he may judge necessary to repel such invasion." *Martin*, 25 U.S. at 29. The Supreme Court held that whether the President's authority to call forth the militia had been properly invoked, that is, whether the exigency of an actual or imminent invasion had in fact arisen, was an issue to be decided solely by the President, and not subject to be contested

---

[10] Act of February 28, 1795, 2. Stat. 424 (1795). The Court discussed this statute earlier, noting the Act's separation of provisions for the President to call forth the militia in response to invasion or insurrection versus for purposes of executing domestic law.

"by every militia-man who shall refuse to obey the orders of the President." *Id.* at 29–30. The language of the opinion is strikingly forceful. *E.g.*, *id.* at 30 ("We are all of opinion, that the authority to decide whether the exigency has arisen, belongs exclusively to the President, and that his decision is conclusive upon all other persons."). However, the *Martin* Court reached its decision with facts and in a context vastly different from those present here. This Court reads *Martin*'s forcefulness of speech as a reaction to those particular facts, and not as conclusive on the broader issue of whether a Court can ever decide whether a President has properly invoked Section 12406.[11]

In large part, *Martin* was a reaction to the challenger seeking review. The Supreme Court there found it preposterous that whether an exigency existed could be "considered as an open question, upon which every officer to whom the orders of the President are addressed, may decide for himself, and equally open to be *contested by every militia-man* who shall refuse to obey the orders of the President[.]" *Id.* at 29–30 (emphasis added). To that end, the Court found that the President's conclusion must be unquestionable because militiamen's "prompt and unhesitating obedience to orders is indispensable." *Id.*; *see also Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 206 n.1 (2012) (Sotomayor, J., and Breyer, J., concurring in part and

---

[11] It is not necessary, nor appropriate, for the Court to pass on the continued viability of *Martin*. *Newsom v. Trump*, 141 F.4th 1032, 1050–51 (9th Cir. 2025). *Martin* remains binding upon this Court until the Supreme Court says that it is not. However, case law does not govern where it does not apply. Moreover, as seemingly sweeping as the language of *Martin* is, so too is *Laird v. Tatum* in the opposite direction:

> when presented with claims of judicially cognizable injury resulting from military intrusion into the civilian sector, federal courts are fully empowered to consider claims of those asserting such injury; there is nothing in our Nation's history or in this Court's decided cases, including our holding today, that can properly be seen as giving any indication that actual or threatened injury by reason of unlawful activities of the military would go unnoticed or unremedied.

408 U.S. 1, 15–16 (1972).

concurring in the judgment) (describing the need for prompt and unhesitating obedience to Presidential orders as the reasoning for the *Martin* decision). Moreover, *Martin* also relied on the "nature of the power itself"—the power to call forth the militia in response to an *invasion*. The Supreme Court has often recognized that the President's authority over foreign affairs and matters of war to be among the least appropriate for judicial review. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952) (acknowledging that policies regarding foreign relations and the War Powers are largely immune from judicial review). Here, the modern version of the foreign invasion prong of section 12406 is not at issue; the only relevant circumstances are purely domestic.[12]

Finally, in the 200 years of judicial-review jurisprudence since *Martin*, the Supreme Court has provided ample guidance for when the political question doctrine should or should not apply. In that time, the Supreme Court has instructed that courts must make a "discriminating inquiry into the precise facts and posture of the particular case" before deciding that the political question doctrine applies. *Baker v. Carr*, 369 U.S. 186, 217 (1962). Having done so here and

---

[12] *Luther v. Borden* is also distinguishable as resting on a rationale not relevant here. There, the President was asked to call forth the militia by one of two bodies of government competing for authority in Rhode Island, and by consenting to the request, the President necessarily recognized one as the lawful government. 48 U.S. 1, 44 (1849) ("For certainly no court of the United States, … would have been justified in recognizing [a different party than the President] as the lawful government; or in treating as wrongdoers or insurgents the officers of the government which the President had recognized, and was prepared to support by an armed force. In the case of foreign nations, the government acknowledged by the President is always recognized in the courts of justice."). This interpretation of *Luther* is well-settled. *See Baker v. Carr*, 369 U.S. 186, 222 (1962) ("[S]everal factors were thought by the Court in *Luther* to make the question there 'political': the commitment to the other branches of the decision as to which is the lawful state government; the unambiguous action by the President, in recognizing the charter government as the lawful authority; the need for finality in the executive's decision; and the lack of criteria by which a court could determine which form of government was republican."); *Hamdi v. Rumsfeld*, 542 U.S. 507, 590 (2004) (Thomas, J., dissenting) (explaining *Luther* as holding that "courts could not review the President's decision to recognize one of the competing legislatures or executives"); *see also Williams v. Suffolk Ins. Co.*, 38 U.S. 415, 418 (1839) ("When the executive branch of the government, ... assume[s] a fact in regard to the sovereignty of any island or country, it is conclusive on the judicial department."). The recognition of a foreign sovereign is not relevant to today's decision.

having found the facts and posture of this case to be vastly different from those in *Martin*, the Court is comfortable concluding that *Martin*'s holding does not bar judicial review.

## II. Likelihood of Success on the Merits

### A. 10 U.S.C. § 12406

Now that the Court has concluded that it can reach the merits of the case, it does so by beginning with 10 U.S.C. §12406. [13]

Section 12406 states:

> Whenever—
>
> (1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;
>
> (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or
>
> (3) the President is unable with the regular forces to execute the laws of the United States;
>
> the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws.

10 U.S.C. § 12406.

When interpreting a statute that leaves key terms undefined, the court must "interpret the words consistent with their 'ordinary meaning ... at the time Congress enacted the statute.'" *Wisconsin Cent. Ltd v. United States*, 585 U.S. 274, 277 (2018) (quoting *Perrin v. United States*,

---

[13] Plaintiffs pursue their claim that Defendants violated 10 U.S.C. § 12406 on an *ultra vires* basis. To bring an *ultra vires* claim, plaintiffs must demonstrate that a defendant "violated a clear statutory mandate and exceeded the scope of [their] delegated authority." *Am. Soc'y of Cataract & Refractive Surgery v. Thompson*, 279 F.3d 447, 456 (7th Cir. 2002). Section 12406 is nothing if not a delegation of authority, and so Court's analysis of whether Plaintiffs are likely to succeed on the merits will hinge on the degree to which Defendants' action are in violation of Section 12406's command.

444 U.S. 37, 42 (1979)). Several sources may be useful for determining a term's ordinary meaning at a particular time, including contemporaneous judicial decisions and dictionary definitions, *see id*. at 277–78, and how the term was used in other statutes enacted around the time, *see Perrin*, 444 U.S. at 43. Statutory interpretation is, however, a holistic endeavor "which determines meaning by looking … to text in context, along with purpose and history." *Gundy v. United States*, 588 U.S. 128, 140–41 (2019). Similarly, when defining the scope of delegated authority, a court must look "to the text in context and in light of the statutory purpose." *Id.*

Before turning to the meaning of Section 12406's subsections, a note on deference: Defendants are not entitled to "deference" on the issue of what constitutes a rebellion for the purposes of the Act, nor what it means to be "unable with the regular forces to execute the laws." Those are matters of statutory interpretation, a function committed to the courts. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) ("Whatever respect an Executive Branch interpretation was due, a judge 'certainly would not be bound to adopt the construction given by the head of a department.' Otherwise, judicial judgment would not be independent at all.") (internal citation omitted); *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 131–32 (2015) (Thomas, J., concurring) ("[T]he Constitution does not empower Congress to issue a judicially binding interpretation of the Constitution or its laws. Lacking the power itself, it cannot delegate that power to an agency."). The Court will not, therefore, simply accept Defendants' assertion that the deployment satisfies the strictures of Section 12406. *See* Antonin Scalia and Bryan A. Garner, *Reading Law* 53 (2012) ("Every application of a text to particular circumstances entails interpretation.").

Defendants are, however, entitled to a certain amount of deference on the question of whether the facts constitute the predicates laid out in Section 12406. Section 12406 prongs (2)

and (3) broadly engage with matters of national security, and in that context the Executive is necessarily better suited than the judiciary to evaluate the precise nature of the threat. *See Holder v. Humanitarian L. Project*, 561 U.S. 1, 33–35 (2010). Therefore, Defendants are "not required to conclusively link all the pieces in the puzzle before we grant weight to its empirical conclusions." *Id.* Still, Defendants must support their position by pointing the Court to some of the facts upon which it bases its conclusions and by offering explanations which paint a substantially reasonable picture justifying the Executive's position. *E.g.*, *id.* (requiring government to explain how support for terrorist organization's non-violent functions constituted material support to a terrorist organization, and concluding that explanation reasonable, rather than simply crediting government's belief that plaintiffs' conduct came within the statute's prohibition); *Hirabayashi v. United States*, 320 U.S. 81, 94–95 (1943) (giving Executive and Congress "wide scope for the exercise of judgment and discretion" but nonetheless basing its decision on "whether in the light of all the facts and circumstances there was any substantial basis for the conclusion ... that the curfew as applied [to Japanese Americans in the wake of Pearl Harbor] was a protective measure necessary to meet the threat of sabotage and espionage"). With that standard of review in mind, the Court proceeds to determine the applicability of Section 12406(2) or 12406(3) to the facts of this case as the Court has found them.

### 1. Section 12406(2)

Second 12406(2) permits the federalization of the National Guard when there is "rebellion or danger of a rebellion against the authority of the Government of the United States." "Rebellion" is not defined by Title 10, and so the Court turns to sources indicating the term's ordinary meaning at the time Congress enacted the statute. In so doing, the Court substantially agrees with the interpretation provided by the Northern District of California and the District of

32

**SA34**

Oregon. *See Newsom v. Trump*, 786 F. Supp. 3d 1235, 1251–55 (N.D. Cal. 2025); *Oregon v. Trump*, No. 3:25-CV-1756-IM, 2025 WL 2817646, at *12–13 (D. Or. Oct. 4, 2025).

In the late 1800s and early 1900s, "rebellion" was understood to mean a deliberate, organized resistance, openly and avowedly opposing the laws and authority of the government as a whole by means of armed opposition and violence. *Newsom v. Trump*, 786 F. Supp. 3d 1235, 1251–53 (N.D. Cal. 2025) (collecting authorities). And should the dictionary definitions leave any doubt, the text of subsection (2) itself requires that the rebellion be "against the authority of the Government of the United States." 10 U.S.C. § 12406(2).

This sets a very high threshold for deployment of the National Guard: As an example, during the late 1800s, after the close of the Civil War, the Supreme Court and several statutes referred to the Civil War as constituting a "rebellion." *United States v. Anderson*, 76 U.S. 56, 71 (1869) ("As Congress, in its legislation for the army, has determined that the rebellion closed on the 20th day of August, 1866."); *id.* at 70 ("On the 20th day of August, 1866, the President of the United States, after reciting certain proclamations and acts of Congress concerning the rebellion, ... did proclaim ... that the whole insurrection was at an end, and that peace, order, and tranquility existed throughout the whole of the United States of America. This is the first official declaration that we have, on the part of the Executive, that the rebellion was wholly suppressed[.]"); Act of March 2, 1867, 14 Stat. 432 (approving in all respects President's proclamations as to those "charged with participation in the late rebellion against the United States").

Are we, then, in danger of something akin to another Civil War? The President would be entitled to great deference on the question of whether that state of affairs exists. But it does not appear as though President Trump has made that conclusion. The June 7, 2025 memorandum issued by President Trump states that "[t]o the extent that protests or acts of violence directly

33

**SA35**

inhibit the execution of the laws, they constitute a form of rebellion against the authority of the Government of the United States." Doc. 62-1 at 19. This is a legal conclusion, not a factual one. And in all of the memoranda actually deploying the National Guard to Illinois, the Court does not see any factual determination by President Trump regarding a rebellion brewing here. Rather, those memoranda refer specifically to difficulty executing the laws, indicating that Section 12406(3), not 12406(2) provided the basis for the deployment of the National Guard.

This is sensible, because the Court cannot find reasonable support for a conclusion that there exists in Illinois a danger of rebellion satisfying the demands of Section 12406(2). The unrest Defendants complain of has consisted entirely of opposition (indeed, sometimes violent) to a particular federal agency and the laws it is charged with enforcing. That is not opposition to the authority of the federal government as a whole. Defendants have offered no explanation supporting the notion that widespread opposition to immigration enforcement constitutes the makings of a broader opposition to the authority of the federal government.[14]

### 2. Section 12406(3)

Turning to Section 12406(3), the parties dispute both its meaning and whether its conditions have been met. With no Seventh Circuit or Supreme Court decision on Section 12406(3)'s meaning, the Court embarks—as it must—on its own, text-based interpretation of the statute. The phrase "unable with the regular forces to execute the laws of the United States" contains several key terms.

---

[14] Even if the Court were to have credited Defendants' version of the facts, Defendants still would not have any support for the conclusion that the organized, repeated, violent, and increasingly hostile attacks on ICE agents, their personal property, and ICE property suggests anything more than an opposition to immigration law enforcement and immigration policy, as opposed to the authority of the Government as a whole.

First, "unable." In the late 1800s and early 1900s, "unable" was understood to mean "not having sufficient power or ability," being incapable. Universal Dictionary of the English Language Vol. 4 at 4900 (1900) ("Not able; not having sufficient power or ability; not equal to any task; incapable."); Noah Webster, A Dictionary of the English Language at 454 (1868) ("Not able; not having sufficient strength, knowledge, skill, or the like."); William Dwight Whitney, The Century Dictionary Vol. VIII at 6578 (1895) ("1. Not able. 2. Lacking in ability; incapable."). These definitions evoke a binary approach: ability or not, capability or not. This reading is consistent with the legislative history: In the words of Secretary Shaw, Section 12406(3) was to be used when "the military needs of the Federal Government arising from the necessity to execute the laws of the Union, … *can not* be met by the regular forces." H.R. Rep. No. 60-1067, at 6 (1908) (emphasis added).

Next, the meaning of "with the regular forces." Several historical sources indicate that the phrase "regular forces" was understood at the time of enactment to mean the soldiers and officers regularly enlisted with the Army and Navy, as opposed to militiamen who did not make it their livelihoods to serve their country but instead took up arms only when called forth in times of national emergency.

First, numerous statutes from the early 1800s through when Section 12406(3) was enacted use the word "regular" or "regular forces" to distinguish the standing army from the militia. For example, in 1806, Congress passed a statute entitled "An Act for establishing Rules and Articles for the government of the Armies of the Unites States" which primarily set forth the duties and obligations of soldiers and officers in the army. 2 Stat. 359 (1806). Most articles are to this effect, but the statute also includes an article stating,

> "All officers, serving by commission from the authority of any
> particular state, shall, on all detachments, courts martial, or other

35

**SA37**

> duty, wherein they may be employed in conjunction with the
> *regular forces* of the United States, take rank, next after all officers
> of the like grade in said regular forces, notwithstanding the
> commissions *of such militia* or state officers may be elder than the
> commissions of the *officers of the regular forces* of the United
> States."

Act of April 10, 1806, 2 Stat. 359 (emphases added). The distinction again appears in 1903.

Then, Congress passed an act entitled "An Act to promote the efficiency of the militia and for

other purposes." 32 Stat. 775. That statute states, "That the militia, when called into the actual

service of the United States, shall be subject to the same Rules and Articles of War as the *regular*

troops of the United States." Act of January 21, 1903, 32 Stat. 775. And in 1908, in the same act

effecting the change which led to the modern Section 12406, section 2 states:

> [W]hether known and designated as National Guard, militia, or
> otherwise, [the militia] shall constitute the organized militia. On
> and after January twenty-first, nineteen hundred and ten, the
> organization, armament, and discipline of the organized militia in
> the Several States … shall be the same as that which is now or may
> hereafter be prescribed for the *Regular* Army of the United States

Act of May 27, 1908, 35 Stat. 399 § 2.

In addition to these statutory instances of the terms "regular" and "forces" being used to

distinguish the military (in particular the Army) from the militia, there are several examples of

courts discussing the important differences between the "regular forces" and the militia. In

*McClaughry v. Deming*, Justice Peckham explained:

> [A]t all times there has been a tendency on the part of the regular,
> whether officer or private, to regard with a good deal of reserve, to
> say the least, the men composing the militia as a branch not quite
> up to the standard of the Regular Army, either in knowledge of
> martial matters or in effectiveness of discipline, and it can be
> readily seen that there might naturally be apt to exist a feeling
> among the militia that they would not be as likely to receive what

36

**SA38**

> they would think to be as fair treatment from regulars, as from
> members of their own force.

*McClaughry v. Deming*, 186 U.S. 49, 56 (1902). The opinion repeats this distinction throughout, several times. *E.g.*, *id.* at 56 ("there was a substantial difference between the regular forces and the militia"); *id.* ("While it may be that there was then no particular distrust or jealousy of the Regular Army, the provision in question recognized, as we have said, the difference there was between the two bodies, the regulars and the militia or volunteers."). In the lower court decision before the Eighth Circuit, it was similarly observed when speaking about the militia as compared to the regular Army that,

> The decisions of the courts had recognized the two forces as
> different,— the one as temporary, called forth by the exigency of
> the time, to serve during war or its imminence, and then to be
> dissolved into its original elements; the other as permanent and
> perpetual, to be maintained in peace and in war.

*Deming v. McClaughry*, 113 F. 639, 643 (8th Cir.), *aff'd*, 186 U.S. 49 (1902) (emphasis added).

Even today in the statutory context surrounding Section 12406, Title 10 makes repeated use of the words "regular" and "forces" in close proximity to each other to refer to the military (the Army, Navy, etc.) to the exclusion of the National Guard. *See, e.g.*, 10 U.S.C. § 10103 ("Whenever Congress determines that more units and organizations are needed for the national security than are in the regular components of the ground and air forces, the Army National Guard of the United States and the Air National Guard of the United States, or such parts of them as are needed, … shall be ordered to active duty and retained as long as so needed.").

Altogether then, the phrase "unable with the regular forces to execute the laws of the United States" means that in order for the President to call forth the militia to execute the laws, the President must be incapable with the regular forces—that is, lacking the power and force

with the military alone—to execute the laws. This understanding of "regular forces" is not only consistent with the ordinary meaning of "regular forces" at the time Section 12406's operative language was initially enacted, but it makes sense given the evolution of the Army over time.

At the Founding, the militia was understood to be the main fighting force of the nation. *Youngstown*, 343 U.S. at 644–45 (Jackson, J., concurring in the judgment). But by the early 1900s calling-forth act amendments, Congress had provided through several means for the military to become significantly stronger and more robust. In that context, Congress specified that the regular forces must be relied upon until the point of failure before the militia (by then named the National Guard) could be federalized. The specification was a recognition that by that time the regular forces (that is, the Army, Navy, etc.) were better equipped to handle matters of national emergency. *See McClaughry*, 186 U.S. at 57 ("History shows that no militia, when first called into active service, has ever been equal to a like number of regular troops.").

Here, Defendants have made no attempt to rely on the regular forces before resorting to federalization of the National Guard, nor do Defendants argue (nor is there any evidence to suggest) that the President is incapable with the regular forces of executing the laws. Therefore, the statutory predicate contained within Section 12406(3) has not been met on that basis alone.

The Court is not, of course, suggesting that the President can or should use the military to solve every domestic concern. The question remains when "the regular forces" may be called upon to execute the laws. And that answer must not lie in the Militia Clause alone. When Congress made reference in the 1908 Act to the regular forces being used to execute the laws, Congress implicitly drew on the War Powers, which govern declaring war and commanding of the armed forces. *Ex parte Quirin*, 317 U.S. 1, 26, *modified sub nom. U.S. ex rel. Quirin v. Cox*, 63 S. Ct. 22 (1942) ("The Constitution thus invests the President as Commander in Chief with

the power to wage war which Congress has declared, and to carry into effect all laws passed by Congress for the conduct of war."). Thus, the answer to what it means for the regular forces to fail to execute the laws depends on both the meaning of the Militia Clause (from which the statute borrows the phrase "execute the Laws")[15] and the scope of the War Powers. The materials interpreting and explaining those sources suggest two important limitations.

First, the ratification debates suggest that the phrase "execute the Laws" within the Militia Clause itself (from which Section 12406 borrows its language) was only to apply in cases where the civil power had first failed. During the ratification debates, in response to the concerns of the antifederalists, James Madison repeatedly assured them that the "execute the Laws" portion of the Militia Clause was only to be utilized in the case of opposition to "the execution of the laws, *which the civil power might not be sufficient to quell*." Elliot Debates, *supra*, at 410 (emphasis added). Madison dismissed the idea that the Clause was granting the power to call forth the militia "to enforce every execution [of law] indiscriminately." *Id*. at 412. And Alexander Hamilton called the idea that the militia of one state would be brought to another to "tame" that state's "contumacy" an "absurdit[y]." The Federalist No. 29, at 186. Altogether then, the assurances of our Founders makes clear that the power to call forth the militia to execute the laws was not to be employed merely in cases of the need for law enforcement, nor even when a state might stubbornly oppose the authority of the federal government. Only when "the civil power might not be sufficient" was the provision allowing the calling forth of the militia to execute the laws to apply. This understanding of when the militia might execute the laws is consistent with the Framers' broader concerns:

---

[15] Scalia & Garner, *Reading Law* 73 ("[I]f a word is obviously transplanted from another legal source, ... it brings the old soil with it." (quoting Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947)). The Court applies this principle to the phrase "execute the laws" which has remained unchanged from the Militia Clause itself, save for capitalization.

> The nation began its life in 1776, with a protest against military usurpation. It was one of the grievances set forth in the Declaration of Independence, that the king of Great Britain had 'affected to render the military independent of and superior to the *civil power.*' The attempts of General Gage, in Boston, and of Lord Dunmore, in Virginia, to enforce martial rule, excited the greatest indignation. Our fathers never forgot their principles; and though the war by which they maintained their independence was a revolutionary one, though their lives depended on their success in arms, they always asserted and enforced the subordination of the military to the civil arm.

*Ex parte Milligan*, 71 U.S. 2, 37 (1866) (emphasis added); *see also Luther v. Borden*, 48 U.S. 1, 61 (1849) (contrasting "civil power" with "martial law"); Act of February 28, 1795, 1 Stat. 424 (1795) (evidencing Congress's early understanding that the militia only be called forth when the forces of obstruction were "too powerful to be suppressed by the ordinary course of judicial proceedings, or by the powers vested in the marshals" by the Act).

Here, there has been no showing that the civil power has failed. The agitators who have violated the law by attacking federal authorities have been arrested. The courts are open, and the marshals are ready to see that any sentences of imprisonment are carried out. Resort to the military to execute the laws is not called for.

Second, the separation of powers and division of War Powers specifically suggests that in the absence of a total failure of the civil power, the President must have an independent source of authority (independent from the Militia Clause or the Section 12406 delegation) expressly authorizing him to deploy the military domestically:

> Congress, not the Executive, should control utilization of the war power as an instrument of domestic policy. Congress, fulfilling that function, has authorized the President to use the army to enforce certain civil rights. On the other hand, Congress has forbidden him to use the army for the purpose of executing general laws except when expressly authorized by the Constitution or by Act of Congress.

*Youngstown Sheet & Tube Co.*, 343 U.S. at 644–45 (Jackson, J., concurring in the judgment). By the express language of the Posse Comitatus Act, the answer to when the armed forces may be utilized to execute the laws must at least be: exceedingly rarely. The Posse Comitatus Act was passed not long before the Section 12406 language referring to the regular forces came into being. 18 U.S.C. § 1385. The Posse Comitatus Act uses similar language to the precursor to Section 12406, forbidding the willful use of "any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise *to execute the laws*." *Id.* "We generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts." *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 176 (1988). Thus, "laws dealing with the same subject—being *in pari materia* (translated as "'in like manner') should if possible be interpreted harmoniously." Antonin Scalia and Bryan A. Garner, *Reading Law* 252 (2012). The Posse Comitatus Act makes it a criminal offence to use the Army, Navy, Marine Corps, and Air Force to "execute the laws" unless expressly authorized by Congress. 18 U.S.C. § 1385. And as Justice Jackson in his well-known *Youngstown* concurrence has recognized, while this prohibition likely does not apply to hold the President criminally liable, the Act nonetheless operates to "forbid[]" the President "to use the army for the purpose of executing general laws except when expressly authorized by the Constitution or by Act of Congress." *Youngstown Sheet & Tube Co.*, 343 U.S. at 644–45 (Jackson, J., concurring in the judgment). There is no indication that Section 12406 was intended to repeal the Posse Comitatus Act and effect a sweeping implied authorization for the President to use the armed forces for the purposes of executing the laws. *See* Scalia and Garner, *Reading Law* 255 ("[R]epeals by implication are disfavored"). Therefore, military law enforcement must only be authorized as the Posse Comitatus Act suggests, where it is *expressly* authorized.

To that end, Congress has enacted a number of specific statutes that allow the armed forces to participate directly in law enforcement in certain circumstances. This last category includes the Insurrection Act and twenty-five other statutes. *E.g.,* 16 U.S.C. § 23 (empowering troops to prevent trespassers or intruders from entering the Yellowstone National Park), 16 U.S.C. § 78 (same, but with Sequoia National Park, the Yosemite National Park, and the General Grant National Park); 22 U.S.C. §§ 401–408 (empowering the President to "employ such part of the land or naval forces of the United States as he may deem necessary to carry out" provisions forbidding the illegal exportation of war materials); 25 U.S.C. § 180 (empowering president to employ military forces to remove persons settling on reservation land). Section 12406 is no such statute.

### i.    *Alternative Interpretations*

Defendants offer their own interpretation of Section 12406(3), based on their reading of *Newsom v. Trump*, 141 F.4th 1032 (9th Cir. 2025), which is that it authorizes the President to call the National Guard whenever he is "unable to ensure to his satisfaction the faithful execution of the federal laws by the federal officers who regularly enforce them, without undue harm or risk to officers." Doc. 62 at 35. This interpretation is shockingly broad: Defense counsel confirmed during oral argument that it would allow the federalization of the National Guard if there was *any* repeated or ongoing violation of federal law in a community. Given that Defendants have also contended that every state official who implements a sanctuary city policy is violating federal law, Defendants' position also seems to be that the National Guard may be deployed solely on the basis of state officials exercising their Constitutionally protected right to implement these policies.

Defendants' definition was properly rejected by the Ninth Circuit. On the issue of Section 12406(3)'s meaning, the Ninth Circuit in *Newsom* declined to adopt the lower court's definition of the section that "so long as some amount of execution of the laws remain[ed] possible, the statute cannot be invoked." *Newsom*, 141 F.4th at 1051. But it also rejected the position asserted by Defendants that "minimal interference with the execution of laws [would] justify invoking § 12406(3)," as such a reading "would swallow subsections one and two, because any invasion or rebellion renders the President unable to exercise *some* federal laws." *Id.* (emphasis in original). Rather, the Ninth Circuit held that since evidence suggested execution of federal law had been "significantly impeded," invocation of 12406(3) was proper. *Id.* at 1052. That is a far cry from Defendants' proposed definition.

In any event, while decisions of the Ninth Circuit are "not binding" on this Court, *Hays v. United States*, 397 F.3d 564, 567 (7th Cir. 2005), and the Court frankly does not agree that "significantly impeded" is the same thing as "unable," the Court would still find that Plaintiffs are likely to succeed on the merits even were the Ninth Circuit standard applied. As discussed, there is evidence of protests, some of which have included acts of violence. There is also evidence of property destruction, and discrete groups who have attempted to impede DHS agents. At the same time, there is significant evidence that DHS has not been unable to carry out its mission. All federal facilities have remained open. To the extent there have been disruptions, they have been of limited duration and swiftly controlled by authorities. Pairing all this with evidence that federal immigration officials have seen huge increases in arrests and deportations, *see* Doc. 13 at 34–35; *id.* at 34 n.124, the Court concludes that even under the Ninth Circuit standard, the factual conditions necessary for President Trump to have properly invoked Section 12406(3) simply do not exist.

For the foregoing reasons, the Court finds Plaintiffs are likely to succeed on the merits of their *ultra vires* claim that Defendants' deployment of the National Guard to Illinois violated 10 U.S.C. § 12406.

## B. The Tenth Amendment and Posse Comitatus Act

Plaintiffs also allege that the National Guard deployment Defendants plan to carry out will involve a host of activity well outside the bounds of the President's authority, and that these acts would violate the Posse Comitatus Act and Tenth Amendment.

Plaintiffs offer substantial evidence in support of their concerns that the scope and purpose of the National Guard's deployment in Illinois could intrude into the general police powers generally reserved to the states. That evidence primarily consists of President Trump's social media posts concerning crime in Chicago. In one post, just about one month before President Trump authorized the deployment of the National Guard in Illinois, the President promised: "I will solve the crime problem" in Chicago, "just like I did in DC," where the President previously deployed the National Guard. Doc. 13-10 ¶ 59; *id.* ¶ 44 (similar, in August 2025). President Trump further stated: "Chicago will be safe again, and soon." *Id*. The following day, in a fundraising email, President Trump stated: "I turned our Great Capital into a SAFE ZONE. There's virtually no crime. NOW I WANT TO LIBERATE CHICAGO! The Radical Left Governors and Mayors of crime ridden cities don't want to stop the radical crime. I wish they'd just give me a call. I'd gain respect for them. Now hear me: WE'RE GOING TO DO IT ANYWAY." *Id*. ¶ 60.

The President of the United States's promises on official matters are to be treated with great respect, particularly those made during his Presidency and respecting specific matters of Executive action. Additionally, nothing within the official communications deploying the

44

**SA46**

National Guard is inconsistent with President Trump's plan to utilize the National Guard to combat crime in Chicago. President Trump's October 4, 2025 memorandum authorizes the National Guard to "perform those protective activities that the Secretary of War determines are reasonably necessary to ensure the execution of Federal law in Illinois, and to protect Federal property in Illinois." Doc. 62-1 at 16.[16] At oral argument, the Court pressed counsel for Defendants to clarify the scope of the National Guard's mission. Asked if the National Guard would limit its operations to just Cook County, where the incidents of concern occurred, counsel noted that operations throughout Illinois were possible. Asked if the National Guard, once deployed, would be authorized to respond to assistance requests by employees of any federal agency—not just DHS—counsel did not know. And asked what sort of activities the Guard would be authorized to perform for purposes of carrying out their mission, counsel professed no knowledge as to whether or not the National Guard would engage in crowd and traffic control, street patrols, searches, or pursuits: the sort of regular police activities traditionally carried out by state and local law enforcement.

Defense counsel suggests that it is inappropriate to use any of President Trump's social media posts or speeches when considering this case, citing *Trump v. Hawaii*, 585 U.S. 667 (2018). In that case, the petitioner sought to establish that the President's proclamation restricting

---

[16] Defendants do not assert that any inherent power is a stand-alone source of the President's authority to deploy the National Guard, but at times appear to conflate the power to federalize the militia with the power to protect federal personnel and property. Whatever the President's authority to protect federal property and personnel, he may not do so *with the National Guard* unless one of the statutory predicates under section 12406 is met. That statutory delegation is the only source of the President's authority to federalize the militia; without it, the power would remain entirely with Congress, and it would be a usurpation of Congressional power to federalize the National Guard for reasons not covered by that delegation. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635–38 (1952) ("When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter.").

the entry of aliens from several majority-Muslim nations but neutral to religion on its face, was unlawful under the Establishment Clause. *Id.* at 702–06. Specifically, the petitioner sought to establish that the proclamation "was motivated not by concerns pertaining to national security but by animus toward Islam." *Id.* at 681. The statutory merits turned on whether the President, under his grant of statutory authority, had found that the entry of the covered aliens "would be detrimental to the interests of the United States," which the Court found the President had. *Id.* at 683. As for petitioner's Establishment Clause claim, that depended on whether the Proclamation was unconstitutionally motivated by religious animus. *Id.* at 705–07. To prove their claim, plaintiffs sought to rely on sever statements made by the "President and his advisers casting doubt on the official objective of the Proclamation." *Id.* at 699. Prior to taking office, President Trump's statements explicitly endorsed a "total and complete shutdown of Muslims entering the United States." *Id.* at 700. But after taking office, the President's statements were less specific. *Id.* at 700–01. In an appeal challenging the grant of a nationwide preliminary injunction on the Proclamation, the Court held that it could consider the President's extrinsic statements but that it would uphold the challenged proclamation "so long as it can reasonably be understood to result from a justification independent of unconstitutional grounds." *Id.* at 705. The choice of this standard was motivated in large part by the extraordinary deference owed to the office of the President in matters of relations with foreign powers and precedent suggesting that decisions in the arena of alien admission should be upheld so long as there existed a facially legitimate reason for the decision. *Id.* at 703–04.

Today's case differs from *Trump v. Hawaii* in several important respects. For one, the issue here is not what motivated President Trump when he deployed the National Guard, but rather what the authorization memoranda allows and how it will be carried out. Moreover, this

case does not concern foreign relations, an arena where the President's decisions are largely immune from judicial review. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952). Rather, this case concerns relations with the State of Illinois, a matter of federalism routinely arbitrated by the courts. Finally, President Trump's statements were made during his Presidency, close in time to his official action, and will likely be looked to by the members of his administration who are tasked with implementing his order. For these reasons, the Court believes *Trump v. Hawaii* does not preclude a finding that the National Guard have been deployed to "solve crime" in Chicago.

That said, there has been little argument on this issue specifically and there is even less evidence that has been presented about what, exactly, the National Guard are being trained to do or where they would be doing it. Perhaps most importantly, a decision is not required for the purposes of this TRO. In the interest of judicial restraint, the Court declines to make a finding at this time what, exactly, the scope of the National Guard's mission entails.

Turning to the law: As discussed, the Tenth Amendment provides that "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const., Tenth Am. These reserved and residuary powers include, among other things, "the police power, which the Founders denied the National Government and reposed in the States." *United States v. Morrison*, 529 U.S 598, 617-18 (2000); *see also Patterson v. State of Kentucky*, 97 U.S. 501, 503 (1878) (the "power to establish the ordinary regulations of police has been left with the individual States, and cannot be assumed by the national government"). One of Plaintiffs' theories of Tenth Amendment harm is that by federalizing the Illinois National Guard, Defendants usurped Illinois's right to control its own National Guard forces. As there are constitutionally recognized grounds for the National

Guard to be called forth by the President, *see* U.S. Const., art. I § 8, cl. 15, the Court understands this theory to rise and fall with Plaintiffs' 10 U.S.C. § 12406 claim, insofar as the Court does not understand Plaintiffs' theory to be that even a proper invocation of 10 U.S.C. § 12406 would violate the Tenth Amendment. Given the Court's conclusion that Plaintiffs are likely to succeed on their *ultra vires* claim, it finds Plaintiffs would also be likely to succeed on this theory of a Tenth Amendment violation.[17]

Plaintiffs also contend that they are entitled to a TRO enjoining Defendants from deploying the federalized National Guard based on the Posse Comitatus Act. Defendants raise a number of arguments for why Plaintiffs are unlikely to succeed on the merits of this claim, including that (1) the Act provides no basis to enjoin deployment of the National Guard, only the Guards' activities; (2) Plaintiffs lack a cause of action to enforce the Act in either equity or through a private right of action; (3) the Act expressly permits federalized troops to engage in law enforcement; and (4) the Guard has not been authorized to execute the laws in violation of the Act. Given that the Court has already determined likelihood of success on the merits on other grounds, it declines to reach the merits of the Posse Comitatus Act claim at this time.

### III. No Adequate Remedy at Law and Irreparable Harm

In addition to showing a likelihood of success on the merits, Plaintiffs must also show that "irreparable injury is likely in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Here, the Court concludes that Plaintiffs have demonstrated at least two types of irreparable harm.

---

[17] Plaintiffs press two additional theories of Tenth Amendment harm: that Defendants' deployment of the National Guard was a means to coerce and punish Illinois for enacting certain laws and that the deployment would intrude on Illinois's general police power. As they are not strictly necessary for this Court's decision on Plaintiff's motion for a TRO, the Court declines to reach these alternative theories at this time.

48

**SA50**

First, as is discussed above, the Court concludes that Defendants' actions likely violate the Tenth Amendment, and "[t]he existence of a continuing constitutional violation constitutes proof of an irreparable harm." *Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978). The presence of National Guard members from Texas makes the constitutional injury especially significant. "Not only do States retain sovereignty under the Constitution, there is also a 'fundamental principle of *equal* sovereignty'" among the States. *Shelby Cty. v. Holder*, 570 U.S. 529, 544 (2013) (emphasis in original). Alexander Hamilton defended state militias on the understanding that they would be made up of "our sons, our brothers, our neighbours, . . . men who are daily mingling with the rest of their countrymen," and who would be appointed by the elected leaders of that state. *See* The Federalist No. 29, at 185 (Alexander Hamilton) (Jacob Ernest Cooke, ed., 1961). Here, to have a National Guard from Texas be deployed to Illinois against the wishes of Illinois's elected leaders arguably empowers Texas at the expense of Illinois, injuring Illinois's right to be "equal in power, dignity, and authority" to every other state. *Coyle v. Smith*, 221 U.S. 559, 567 (1911).[18]

Second, the Court finds that deployment of National Guard members is likely to lead to civil unrest, requiring deployment of state and local resources to maintain order. There has been overwhelming evidence presented that the provocative nature of ICE's enforcement activity has caused a significant increase in protest activity, requiring the Broadview Police, ISP, and other state and local law enforcement agencies to respond. *See, e.g.*, Doc. 13-5; Doc. 13-15; Doc. 13-14. Given that National Guard members "are trained to effectively destroy enemies in combat

---

[18] For this same reason, the Court does not find persuasive Defendants' argument that Plaintiffs do not have standing to challenge the deployment of the Texas National Guard in Illinois. The Court easily concludes that a state may suffer injury by having another state's troops deployed within its jurisdiction. Given that they wear separate uniforms and have different training, the fact that all of the National Guard members have been "federalized" does not persuade the Court that they are all the same.

49

SA51

scenarios" rather than to de-escalate conflicts, Doc. 13-7 ¶ 29, the Court believes that allowing them to deploy at the Broadview Processing Center or anywhere else in Illinois will only add fuel to the fire that Defendants themselves started.[19] And Plaintiffs, quite literally, are responsible for putting out those fires, as well as treating any injuries that may result. *See* Doc. 13-5 at 4 (noting that the Broadview Fire Department is responsible for providing paramedics and hospital transportation for the ICE Processing Center). This diversion of limited state and local resources is an irreparable harm for which Plaintiffs have no adequate remedy at law.

## IV. Balance of Harms and Public Interest

Finally, the balance of the equities and public interest weigh in favor of granting Plaintiffs' request for a TRO. ICE's enforcement activity has resulted in significantly higher numbers of deportations and arrests in 2025 as compared with 2024. Doc. 13 at 34, n.124. State and local police have indicated that they are ready, willing, and able to keep the peace as ICE continues its operations in Chicago. Doc. 13-5; Doc. 13-15. Defendants remain free to deploy as many federal law enforcement officers as they believe appropriate to advance their mission. Therefore, the harm of denying Defendants access to 500 National Guard members is *de minimis*. In contrast, the significance of the public's interest in having only well-trained law enforcement officers deployed in their communities and avoiding unnecessary shows of military force in their neighborhoods cannot be overstated. Chicago's history of strained police-community relations, which has stemmed in part from lack of police training and inappropriate uses of force, is well-documented. *See, e.g.*, *Illinois v. City of Chicago*, Case No. 17-CV-6260, 2019 WL 398703, at *1 (N.D. Ill. Jan. 31, 2019) (Chicago Police Department Consent Decree).

---

[19] In both Los Angeles and Portland, the National Guard's presence has caused an increase in civil unrest. *Oregon v. Trump*, Case No. 3:25-CV-1756-IM, 2025 WL 2817646, at *14 (D. Or. Oct. 4, 2025).

To add to this milieu militarized actors unfamiliar with local history and context whose goal is "vigorous enforcement" of the law, Doc. 62 at 34, is not in the community's interest.

## **CONCLUSION**

For the foregoing reasons, the Court GRANTS Plaintiffs' request for a TRO. Pursuant to Federal Rule of Civil Procedure 65(d)(1) and *MillerCoors LLC v. Anheuser-Busch Cos.*, 940 F.3d 922 (7th Cir. 2019), the Court has entered the terms of the TRO in a separate document. Doc. 67.

Date: October 10, 2025

April M Perry

**United States District Judge**