No. 25-2798

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

————————————

STATE OF ILLINOIS, et al.,
*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, *in his official capacity as President of the United States,* et al.,
*Defendants-Appellants.*

————————————

On Appeal from the United States District Court
for the Northern District of Illinois, No. 1:25-cv-12174 (Perry, J.)

————————————

**APPENDIX FOR DEFENDANTS-APPELLANTS**
————————————

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. McARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
ANDREW M. BERNIE
J. KAIN DAY
*Attorneys, Appellate Staff
Civil Division, Room 7517
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 353-2689*

# TABLE OF CONTENTS

Complaint, Dkt. 1 (Oct. 6, 2025) ..................................................................GA1

Memorandum In Support Of Plaintiffs' Motion For A Temporary Restraining
    Order And Preliminary Injunction, Dkt. 13 (Oct. 6, 2025) ........................GA70

Declaration of Chief Thomas Mills, Dkt. 13-5 (Oct. 6, 2025) ..............................GA129

Declaration of Lieutenant General Jeffrey S. Buchanan, (Retired), Dkt. 13-7
    (Oct. 6, 2025) ..................................................................................GA145

Declaration of Matthew K. Swearingen, Dkt. 13-22 (Oct. 6, 2025)......................GA156

Declaration of General Steven S. Nordhaus, Dkt. 62-1 (Oct. 8, 2025)................GA162

Declaration of Field Office Director Russell Hott, Dkt. 62-2 (Oct. 8, 2025) ......GA188

Declaration of Chief Patrol Agent Daniel I. Parra, Dkt. 62-4 (Oct. 8, 2025).......GA220

Declaration of Chicago Police Department Superintendent Larry Snelling,
    Dkt. 63-3 (Oct. 9, 2025) ................................................................GA231

Notice of Appeal, Dkt. 68 (Oct. 9, 2025) ................................................GA237

Transcript of Proceedings, Dkt. 82 (Oct. 9, 2025)...................................GA239

Agreed Extension of Temporary Restraining Order, Dkt. 98 (Oct. 23, 2025).....GA360

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| STATE OF ILLINOIS, a sovereign state; and the CITY OF CHICAGO, an Illinois municipal corporation, | |
| Plaintiffs, | |
| v. | Case No. 25 Cv 12174 |
| DONALD J. TRUMP, in his official capacity as President of the United States; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; DEPARTMENT OF DEFENSE; PETER B. HEGSETH, in his official capacity as Secretary of the Department of Defense; UNITED STATES ARMY; DANIEL P. DRISCOLL, in his official capacity as Secretary of the Army, | Judge |
| Defendants. | |

## COMPLAINT FOR EMERGENCY, DECLARATORY, AND INJUNCTIVE RELIEF

### Introduction

1.      The American people, regardless of where they reside, should not live under the threat of occupation by the United States military, particularly not simply because their city or state leadership has fallen out of a president's favor. To guard against this, foundational principles of American law limit the president's authority to involve the military in domestic affairs. Those bedrock principles are in peril.  Secretary Hegseth, on October 4th, invoked 10 U.S.C. § 12406 to federalize and bring under Department of Defense control up to 300 members of the Illinois National Guard, over the objection of the Governor of Illinois ("Federalization Order"), and, on October 5th, another up to 400 National Guard from the State of Texas to deploy into Chicago

("Texas Mobilization Order").  These advances in President Trump's long-declared "War" on Chicago and Illinois are unlawful and dangerous.  The Court should enjoin the Federalization Order, Texas Mobilization Order, and any subsequent effort to achieve the same end with the National Guard of the United States or other U.S. military, immediately and permanently.

2.    At the Pentagon on September 30, 2025, Trump pitched his plan to use American soldiers to punish his political enemies to hundreds of United States military leaders.  He told them that they must prioritize "defending the homeland" against the "invasion from within" in American cities run by "radical-left Democrats," specifically including Chicago. He stated his intention to use our neighborhoods "as training grounds for our military."[1]

3.    This is just the most recent in months of threats by Trump, Secretary of the Department of Defense Peter Hegseth, Secretary of the Department of Homeland Security Kristi Noem and others in the Trump administration—threats that are entirely unrelated to circumstances in Illinois or the needs of federal law enforcement.

4.    In one example that received significant news coverage, on September 6, 2025, Trump posted on social media an image of the Chicago skyline in flames, stating "Chicago about to find out why it's called the Department of WAR," including a depiction of himself in the image of the fictitious warmonger character Lt. Col. Kilgore from the 1979 film *Apocalypse Now*, titling the post "Chipocalypse Now."

5.    To the extent that Defendants have offered any basis at all to deploy the military to Illinois, it is based on a flimsy pretext: protests outside a two-story ICE processing facility in Broadview, a suburb of Chicago with less than 8,000 residents. But far from promoting public

---

[1] The transcript is available at https://rollcall.com/factbase/trump/transcript/donald-trump-speech-department-of-defense-leaders-quantico-september-30-2025/.

GA2

safety in the Chicago region, Defendants' provocative and arbitrary actions have threatened to undermine public safety by inciting a public outcry.

6.      Among other things, Trump and Noem have sent a surge of SWAT-tactic trained federal agents to Illinois to use unprecedented, brute force tactics for civil immigration enforcement; federal agents have repeatedly shot chemical munitions at groups that included media and legal observers outside the Broadview facility; and dozens of masked, armed federal agents have paraded through downtown Chicago in a show of force and control. The community's horror at these tactics and their significant consequences have resulted in entirely foreseeable protests. In response to those protests, local and state law enforcement agencies, including the Broadview Police Department, the Cook County Sheriff's Office, the Illinois State Police, and others, have been deployed to Broadview to maintain the peace. And ICE continues to operate the facility to process the hundreds of individuals it has detained in recent weeks. There is no legal or factual justification for Defendants' Federalization Order.

7.      Defendants' deployment of federalized troops to Illinois is patently unlawful. Plaintiffs ask this court to halt the illegal, dangerous, and unconstitutional federalization of members of the National Guard of the United States, including both the Illinois and Texas National Guard. Because this federalization is patently pretextual and baseless, Defendants cannot satisfy any of the three prerequisites for involuntarily federalizing any of the National Guard of the United States under 10 U.S.C. § 12406. Not only have the defendants acted outside the authority of 10 U.S.C. § 12406, but their conduct also violates the Posse Comitatus Act, the Administrative Procedure Act, and, of paramount concern, several provisions of the U.S. Constitution.

8.      The Trump administration's illegal actions already have subjected and are subjecting Illinois to serious and irreparable harm. The deployment of federalized National Guard,

3

**GA3**

including from another state, infringes on Illinois's sovereignty and right to self-governance. It will cause only more unrest, including harming social fabric and community relations and increasing the mistrust of police. It also creates economic harm, depressing business activities and tourism that not only hurt Illinoisians but also hurt Illinois's tax revenue. Illinois asks this Court to declare these actions unlawful and enjoin them, immediately as well as permanently.

9.     For these and other reasons discussed below, Defendants' actions should be declared unlawful and preliminarily and permanently enjoined.

## Jurisdiction and Venue

10.     This Court has jurisdiction over this matter under 28 U.S.C. § 1331 because this matter arises under the Constitution, laws, or treaties of the United States.

11.     This Court may provide the requested relief because there is a controversy under 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief under 28 U.S.C. §§ 1361, 2201-2202, 5 U.S.C. §§ 702, 704-706, and the Court's equitable powers.

12.     Venue lies in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the Northern District of Illinois.

## Parties

13.     Plaintiff State of Illinois is a sovereign state in the United States of America. Illinois is represented by Kwame Raoul, the Attorney General of Illinois, who is the chief legal officer of Illinois and authorized to sue on the State's behalf. Under Illinois law, the Attorney General is authorized to represent the State's interests by the Illinois Constitution, article V, § 15. *See* 15 Ill. Comp. Stat. 205/4.

14.     Plaintiff City of Chicago is a municipal corporation and home rule unit organized and existing under the constitution and laws of the State of Illinois.

15.     Defendant Donald J. Trump is the President of the United States of America. He is the Commander-in-Chief of the United States' armed forces, including state National Guard units when under federal control. He is sued in his official capacity.

16.     The United States Department of Homeland Security (DHS) is a cabinet agency in the Executive Branch of the federal government. DHS's primary functions are preventing the entry of terrorists and their weapons into our country; securing borders, territorial waters, ports, terminals, waterways, and air; carrying out the immigration enforcement functions vested by the Immigration and Naturalization Act, as well as establishing national immigration enforcement policies and priorities; and administering customs laws. 6 U.S.C. § 202. U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP) are each component agencies within DHS.

17.     Defendant Kristi Noem is the Secretary of DHS. As Secretary, Defendant Noem is responsible for all actions taken by the agency. She is sued in her official capacity.

18.     Defendant United States Department of Defense (DoD) is a cabinet agency in the Executive Branch of the federal government. DoD is responsible for coordinating the activities of the United States' armed forces, including the National Guard when under federal control.[2]

19.     Defendant Peter Hegseth is the Secretary of Defense. As Secretary, defendant Hegseth is responsible for all actions taken by the agency. He is sued in his official capacity.

---

[2] On September 5, 2025, President Trump signed Executive Order 14347, entitled "Restoring the United States Department of War," purporting to assign "Department of War" as the secondary chosen name for the Department of Defense. However, this Complaint will refer to the agency by its statutory name, the Department of Defense, as only Congress is vested with the authority to change the name of cabinet-level executive agencies, and it made no change.

5

**GA5**

20.     Defendant United States Army (Army) is the primary land service branch of the United States military. The Army is a component of DOD, which is a cabinet agency in the Executive Branch of the federal government.

21.     Defendant Daniel P. Driscoll is the Secretary of the Army. He is the leader of the Army and is responsible for all actions taken by the Army. He is sued in his official capacity.

## Legal Background

### I.    The National Guard

22.     The modern National Guard originates from the longstanding tradition of organized local militias. During the Constitutional Convention, the founders recognized the importance of militias. But they disagreed about who should control them. Federalists advocated for centralized control by the federal government; anti-Federalists advocated for state authority.

23.     The debate was resolved by a compromise reflected in the Militia Clauses of the United States Constitution. These clauses provide Congress with the authority "[t]o provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions" and "[t]o provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States." U.S. Const. art. I, § 8, cls. 15. But the clauses "reserve[e] to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress." *Id*. art. I, § 8, cls. 16.

24.     States generally maintained control over local militias throughout the remainder of the eighteenth and nineteenth centuries. It was not until Congress enacted the Militia Act of 1903 that the federal government began to assert greater control over these militias, which the statute officially named the "National Guard." Pub. L. No. 57-33, § 3, 32 Stat. 775.

6

**GA6**

25.    Federal control over the National Guard increased during the twentieth century, culminating in the "Total Force Policy" announced by the Department of Defense in the 1970s. Under this policy, the National Guard was incorporated into the military reserve. Later, in the 1990s, the National Guard further transitioned from a reserve force to an operational unit that could be quickly activated and readily utilized in any major conflict.

26.    In recent years, the National Guard has been deployed in a wide variety of missions, ranging from providing emergency assistance during natural disasters to serving abroad in military campaigns in Iraq and Afghanistan.

27.    Today, members of the National Guard may serve in one of three capacities: State Active Duty status, Title 10 status, and Title 32 status.

28.    First, members of the National Guard may serve in "State Active Duty" status. This means they exercise state functions under the authority of their state's governor, and their actions generally are governed by state law. When natural disasters occur in Illinois, for example, Governor Pritzker frequently authorizes the Illinois National Guard to engage in relief efforts.

29.    Second, members of the National Guard may be "federalized" and serve in what is known as "Title 10" status. Under 10 U.S.C. § 12406, for example: "Whenever (1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation; (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or (3) the President is unable with the regular forces to execute the laws of the United States; the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws."

30.    Critically, the statute requires that an order for Title 10 deployment "shall be issued through the governor[.]" 10 U.S.C. § 12406.  Therefore, Illinois National Guard members may serve in "Title 10" status only with the approval of the Governor. Once these National Guard members have been "federalized," they are, for all purposes relevant here, legally equivalent to members of the federal armed services.  In that posture, National Guard members serve federal missions under federal command and control.

31.    Third, members of the National Guard may serve in a hybrid status under Title 32 of the United States Code. In particular, 32 U.S.C. § 502(f)(2)(A) provides that, "[u]nder regulations to be prescribed by the Secretary of the Army or Secretary of the Air Force, as the case may be, a member of the National Guard may," under certain circumstances, "be ordered to perform" enumerated duties, including "[s]upport of operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense." Although National Guard members serving in Title 32 status serve federal missions, they remain under the command and control of their home state's governor. *E.g.,* 32 U.S.C. § 328(a), (c); *see* 10 U.S.C. § 12401; *United States v. Hutchings*, 127 F.3d 1255, 1258 (10th Cir. 1997).

32.    One crucial distinction between National Guard members deployed in Title 32 and those deployed in Title 10 status is that only members deployed in Title 10 status are "federalized" and functionally equivalent to members of the federal armed services. As members of the federal armed services, National Guard members deployed in Title 10 status are subject to the Posse Comitatus Act, which generally forbids military service members from participating in civilian law enforcement activities.

## II.    The Posse Comitatus Act

33.    The United States has a deeply rooted "'traditional and strong resistance of Americans to any military intrusion into civilian affairs.'" *United States v. Dreyer*, 804 F.3d 1266,

1272 (9th Cir. 2015) (quoting *Laird v. Tatum*, 408 U.S. 1, 15 (1972)). This tradition is reflected in the Third Amendment to the United States Constitution, which prohibits quartering of soldiers and in other provisions ensuring civilian control of the military. *Id.*; U.S. Const. amend. III. The Illinois Constitution also explicitly provides that "The military shall be in strict subordination to the civil power." Ill. Const. Art. XII, § 2.

34.     This tradition is also reflected in the Posse Comitatus Act (PCA), 18 U.S.C. § 1385, which prohibits use of the military to enforce civilian laws.

35.     Congress first codified this principle in 1878, enacting the precursor to the modern PCA to bring to an end to the use of federal troops to enforce the law in the former rebel states of the south once civil government had been re-established. *United States v. Yunis*, 681 F. Supp. 891, 892 (D.D.C. 1988), *aff'd*, 924 F.2d 1086 (D.C. Cir. 1991).

36.     The current version of the PCA makes it a felony to use the military "as a posse comitatus or otherwise to execute the laws," unless such use is "expressly authorized by the Constitution or Act of Congress." 18 U.S.C. § 1385.

37.     Reinforcing the PCA is the Congressional directive of 10 U.S.C. § 275, commanding the Secretary of Defense to "prescribe such regulations as may be necessary" to ensure that any military support of civilian law enforcement activity "does not include or permit direct participation by a member of the Army, Navy, Air Force, or Marine Corps in a search, seizure, arrest, or other similar activity" unless specifically authorized by law. *Newsom v. Trump*, No. 25-CV-04870-CRB, 2025 WL 2501619, at *29 (N.D. Cal. Sept. 2, 2025) (enjoining National Guard actions executing the law because they would violate the PCA, "including but not limited to engaging in arrests, apprehensions, searches, seizures, security patrols, traffic control, crowd control, riot control, evidence collection, interrogation, or acting as informants").

GA9

38. National Guard members who have been called into federal service under 10 U.S.C. § 12406 are subject to both the PCA and the regulations promulgated under 10 U.S.C § 275. *See* 10 U.S.C. 12405 ("Members of the National Guard called into Federal service are, from the time when they are required to respond to the call, subject to the laws and regulations governing the Army or the Air Force . . ."); Department of Defense Instruction 3025.21, Defense Support of Civilian Law Enforcement Agencies ("DODI 3025.21") (applicable to federalized National Guard members) and Enclosure 3 (prohibiting military participation in e.g., arrests, apprehension, stop and frisk, crowd control).

39. 10 U.S.C. § 12406 does not contain any express authorization from Congress for the National Guard to engage in domestic law enforcement, including civil immigration enforcement.

40. The National Guard troops, when federalized, are legally the same as U.S. military, and operate under the Department of Defense rules. Department of Defense guidance provides instructions regarding the civilian law enforcement tasks, including direct assistance, that are not allowed to be carried out by the U.S. military (including National Guard members federalized under Title 10). DODI 3025.21.

41. Those Department of Defense instructions cover a broad swath of law enforcement tasks and make clear that the directive of October 4 cannot lawfully be carried out by federalized national guard troops. In particular, the Federalization Order and preceding memoranda and statements identify policing protesters and crowd control functions that are squarely within the Department of Defense's own definition of prohibited civilian law enforcement by a U.S. military member. DODI 3025.21, encl. 3, ¶ 1.c.(1).

**GA10**

42.     Similarly, the Immigration and Nationality Act (INA), which prescribes who may execute immigration warrants and conduct immigration searches, arrests, and interrogation, makes no provision for any member of the military or the National Guard to participate in these activities. *See* 8 U.S.C. §§ 1357(a), (g); 8 C.F.R. §§ 287.5(a), (c)–(e). Nor do members of the military or National Guard receive the training required by the INA to qualify them to carry out these activities. 8 C.F.R. §§ 287.5(c)(1)–(4),  (c)(5)(ii), (d), (e)(1), (e)(3), (e)(4).

**Factual Allegations**

**I.    Defendants Have a Long History of Animus towards Chicago and Illinois**

43.     President Trump has long directed threatening and derogatory statements towards the State of Illinois, the City of Chicago, and its leaders.

44.     The supposed current emergency is belied by the fact that Trump's Chicago troop deployment threats began more than ten years ago. In a social media post from 2013 Trump writes "we need our troops on the streets of Chicago, not in Syria."

45.     As President, Trump would go on to characterize Chicago in October 2019 as "the worst sanctuary city in America" that "protects criminals at a level few could even imagine," and further claiming that "Afghanistan is a safe place by comparison."

46.     In the spring and summer of 2020, when the killing of George Floyd by Minneapolis police sparked nationwide protests and civil disturbances, President Trump derided "the radical-left wing mobs that you see all over in some of the cities," specifically citing Chicago and "so many different places that are run by Liberal Democrats."

47.     Three years ago, in 2022, Trump was between his presidential terms.  In two separate speeches that summer, Trump shared his plans for Chicago, stating in July 2022 that the "next president needs to send the National Guard to the most dangerous neighborhoods in

Chicago." He reiterated that point at the August 2022 CPAC speech, saying that the problem was "these cities that were run by Democrats going so bad so fast."

48.    While running for his current term as President, Trump continued to demonize cities where Democrats had been elected as leaders. On August 20, 2024, he said that "cities…almost all are run by democrats…you can't walk across the street to get a loaf of bread. You get shot, you get mugged, you get raped, you get whatever it may be . . . ."

49.    Since retaking office on January 20, 2025, Trump issued several executive orders intended to deter states and localities from implementing or keeping "sanctuary" policies or laws— laws that preclude components of state or local governments from participating in federal *civil* immigration enforcement in various ways.

50.    Those "sanctuary"-targeting Executive Orders, each issued earlier in 2025, were: Executive Order 14159, Protecting the American People Against Invasion; Executive Order 14218, Ending Taxpayer Subsidization of Open Borders; and Executive Order 14287, Protecting American Communities from Criminal Aliens. All focus on defunding state and local "sanctuary jurisdictions," including by claiming that "sanctuary" jurisdictions "use their authority to violate, obstruct, and defy the enforcement of Federal immigration laws," and by accusing them of undertaking a "lawless insurrection." Executive Order 14287 ¶ 4.

51.    From the Trump administration's comments before and after these Executive Orders, it was clear that they were meant to target, among others, the State of Illinois and City of Chicago, which have laws making clear their non-participation in federal *civil* immigration enforcement.

52.    In 2017, Illinois passed the TRUST Act, 5 ILCS 805/15, which sets a "[p]rohibition on enforcing federal civil immigration laws." It was signed into law by Bruce

12

**GA12**

Rauner, then-Governor of Illinois, a Republican.  Ill. Pub. Act 100-463 (eff. Aug. 28, 2017).  In

2021, Illinois enacted amendments to the TRUST Act, known as the Way Forward Act, that

expanded the limits on participation by state and local law enforcement in federal civil immigration

enforcement. Ill. Pub. Act 102-234 (eff. Aug. 2, 2021).

53.    The City of Chicago Welcoming City Ordinance also generally prohibits local

Chicago law enforcement and other government participation in federal *civil* immigration

enforcement activities. Chicago Mun. Code § 2-173.

54.    In 2022, the Seventh Circuit held that the TRUST Act, as amended by the Way

Forward Act, was "a permissible exercise of the State's broad authority over its political

subdivisions within our system of dual sovereignty." *McHenry Cnty. v. Kwame Raoul*, 44 F.4th

581, 585 (7th Cir. 2022).

55.    Soon after the "sanctuary jurisdiction" EO of Trump's second term, the Trump

administration filed suit against the State of Illinois, City of Chicago, Cook County, and others,

seeking to invalidate their immigration-related laws. The United States alleged that the laws

created national security and public safety threats posed by noncitizens and violated the U.S.

Constitution. *United States v. Illinois*, No. 25 CV 1285 (N.D. Ill.) (filed Feb. 6, 2025) As explained

below, a federal district court in Chicago dismissed that lawsuit in July 2025.  *United States v.*

*Illinois*, No. 25 CV 1285, 2025 WL 2098688, at *27 (N.D. Ill. July 25, 2025).

56.    In addition to issuing EOs ordering defunding of "sanctuary" jurisdictions, and

suing the Plaintiffs and others, Trump made public statements threatening them, including on April

10, 2025, falsely claiming they protect criminals and calling them "Death Traps":

13

**GA13**



**← Truth Details**
2442 replies

**Donald J. Trump** ✖ ➕
@realDonaldTrump

No more Sanctuary Cities! They protect the Criminals, not the Victims. They are disgracing our Country, and are being mocked all over the World. Working on papers to withhold all Federal Funding for any City or State that allows these Death Traps to exist!!!

**8.9k** ReTruths **38.3k** Likes                     Apr 10, 2025, 8:35 AM

57.    On April 18, 2025, Stephen Miller, White House Deputy Chief of Staff for Policy and the Homeland Security Advisor leveled the accusation that "Sanctuary cities shield criminal illegal aliens from removal." Although not a lawyer, he opined that "these cities are engaged in systemic criminal violations and that they are engaged in a scheme to nullify and obstruct the duly enacted laws of the United States of America." Miller specifically cited Chicago, along with Los Angeles and Boston, saying the cities were "waging war against the very idea of nationhood."

58.    In accordance with the president's effort to defund sanctuary cities, the Trump administration, acting through various federal agencies, has sought to assert a sweeping entitlement to use state law enforcement officers for federal immigration enforcement. It has done so by requiring Illinois and other states to agree to cooperate with federal immigration enforcement activities as a condition for receiving billions of dollars in federal funding.

59.    For example, beginning in March 2025, the U.S. Department of Homeland Security and its sub-agencies, including Federal Emergency Management Agency ("FEMA"), sought to upend the state-federal emergency management system, holding critical emergency preparedness and response funding hostage unless Illinois and other states promised to devote their criminal enforcement and other state agency resources to the federal government's civil immigration enforcement.

14

**GA14**

60.     Forced to choose between foregoing federal funds or facing compulsory diversion of limited law enforcement resources to enforce federal immigration law beyond what Illinois law allows, Illinois, with other states, brought suit to challenge those coercive conditions. *State of Illinois v. Federal Emergency Management Agency*, 25-cv-00206 (D.R.I.) (filed May 13, 2025). In September 2025, the court granted summary judgment to the states, holding among other things that those conditions violated the Constitution and were tantamount to "economic dragooning." *Illinois v. Fed. Emergency Mgmt. Agency*, No. CV 25-206 WES, 2025 WL 2716277, at *14 (D.R.I. Sept. 24, 2025).

61.     Illinois and other states have similarly challenged coercive immigration-enforcement conditions by the U.S. Department of Transportation, *California v. U.S. Dept. of Transportation*, 25-cv-00208 (D.R.I.) (filed May 13, 2025) and the U.S. Department of Justice, *New Jersey v. U.S. Dept. of Justice*, 25-cv-00404 (D.R.I.) (filed August 18, 2025).

62.     The funding for Illinois jeopardized by these coercive actions by the Trump administration totals over $2 billion.  Those funds are critical to the state's service to its residents and used by Illinois to maintain state and local roads and bridges, protect against and respond to natural disasters, and provide emergency shelter to crime victims and conduct sexual assault forensic exams, among other things.

63.     In the midst of these immigration-related federal defunding actions and responsive lawsuits, DHS published, on May 29, 2025, a list of 500 purported "sanctuary jurisdictions" around the country.  It accused them of "shamefully obstructing" the Trump administration's deportation plans and "shielding dangerous criminal aliens."  Fox News Channel 32 Chicago accurately characterized the list as an escalation of "efforts to penalize states and cities that limit cooperation with federal immigration authorities."

64.     However, days later, based on widespread news reporting as early as June 1st, that first sanctuary jurisdiction list was gone.  As reported, very soon after publishing the list, the Trump administration faced objections from Republican stronghold jurisdictions that found themselves on the list.  The Department of Homeland Security quickly and quietly removed the list from the website where it had been posted.

65.     Then on July 25, 2025, the federal district judge presiding over the United States' lawsuit regarding Illinois's, Chicago's and Cook County's immigration-related laws and policies dismissed the case.  *United States v. Illinois*, No. 25 CV 1285, 2025 WL 2098688, *27 (N.D. Ill. July 25, 2025). In concluding that there was no claim for the United States to pursue, the court held that "the Sanctuary Policies reflect [Illinois's, Chicago's and Cook County's] decision to not participate in enforcing civil immigration law—a decision protected by the Tenth Amendment and not preempted by the INA. Finding that these same Policy provisions constitute discrimination or impermissible regulation would provide an end-run around the Tenth Amendment. It would allow the federal government to commandeer States under the guise of intergovernmental immunity— the exact type of direct regulation of states barred by the Tenth Amendment."  *Id.*

66.     Less than two weeks later, the Trump administration posted a new version of its sanctuary jurisdiction target list.  That August 5, 2025, publication shortened the list from about 500 to just 35 jurisdictions.  The new sanctuary "jurisdiction" list targeted twelve states (including Illinois, California, and Oregon), the District of Columbia, eighteen cities (including Chicago), and four counties (including Cook County).

67.     Although DOJ stated its intention in pressuring "sanctuary jurisdictions" was to "compel compliance with federal law," in reality the administration's efforts sought to impermissibly force sovereign states like Illinois to disavow their own laws and subjugate

16

**GA16**

themselves to the political whim of the Trump administration. The August 5 publication specifically bragged about the success of a "threatening" letter that coerced Louisville, Kentucky to revoke its "sanctuary policies."

68. Days later, on August 8, 2025, Noem on behalf of DHS appeared at a press conference in a suburb near Chicago and continued the pressure on Plaintiffs to change their laws.

69. Specifically, defendant Noem stated that she was in Illinois because "elected leaders in this State of Illinois are ignoring the law" and being "obstructionists when it comes to getting dangerous criminal off of their streets." She specifically named Governor Pritzker and Mayor Johnson as examples of who she was claiming "worked so hard to protect these dangerous criminals," saying "they'd rather be a sanctuary state and continue to put those individuals above American citizens."

70. On August 13, 2025, defendants' coercive conduct regarding state law continued. That day, Attorney General Bondi sent letters to 32 of the 35 jurisdictions on the August 5 list, including Governor Pritzker for Illinois, and Mayor Johnson for Chicago. The letters contended that "sanctuary jurisdiction policies have undermined this necessary cooperation and obstructed federal immigration enforcement, giving aliens cover to perpetrate crimes in our communities and evade the immigration consequences that federal law requires."

71. Bondi's August 13 letters further stated that, to ensure full cooperation in federal immigration enforcement efforts, "the President has directed the Attorney General of the United States, in coordination with the Secretary of Homeland Security, to identify sanctuary jurisdictions and notify them of their unlawful sanctuary status and potential violations of federal law." The letters did not include any specifics regarding any particular law(s), nor did they reflect any

17

**GA17**

recognition of prior court rulings holding the state laws valid.  The letter demanded a response by August 19, 2025.

72.    This letter from Attorney General Bondi followed Trump's deployment of troops to Los Angeles in June and Washington D.C. in early August, both jurisdictions on the Trump administration's "sanctuary jurisdictions" list.

73.    On August 19, Governor Pritzker's office replied in a letter that reiterated the state's adherence to its own laws, including the TRUST Act, and reminded the U.S. Attorney General that federal courts had rejected the Trump administration's legal challenges to those laws.[3]

74.    Three days later, on August 22, 2025, during an Oval Office appearance to announce the 2026 FIFA World Cup draw, Trump stated that Chicago would be the next target for a military deployment as part of a federal crime crackdown. Trump stated at that event: "Chicago's a mess. You have an incompetent mayor, grossly incompetent and we'll straighten that one out probably next. That'll be our next one after this and it won't even be tough."

75.    On August 25, Trump referenced again plans for a federal military deployment in Chicago, stating "We go in, we will solve Chicago within one week, maybe less. But within one week, we will have no crime in Chicago, just like we have no crime in D.C."  He also made a social media post criticizing Chicago and Mayor Johnson and stating the desire to bring the national guard D.C. playbook to Chicago:

---

[3]    Letter from A. Spillane to P. Bondi (Aug. 19, 2025), *available at* https://www.politico.com/f/?id=00000198-cc6b-da96-abff-de6f2c310000.



76.     On August 29, 2025, on behalf of the Trump administration, Stephen Miller stated

that "the highest degree of national security and public safety concern are in sanctuary cities," such

that the President would be "prioritizing enforcement in these sanctuary jurisdictions as a matter

of public safety and national security."

77.     When asked specifically about the administration's plans for Chicago, Miller said

that "this administration is committed to the eradication of organized street violence . . . as one of

our top public safety objectives" and referenced "homegrown" threats as well as "foreign criminal

cartels."  Miller then made the outrageous and outlandish accusation that, "the Democrat party as

an institution at every level—its judges, its lawyers, its community activists, and its politicians—

exist to serve these criminal thugs."

78.     That same day, August 30th, Trump posted on Truth Social unsupported crime

statistics about Chicago and threatened that Governor Pritzker with federal forces, stating: "Six

people were killed, and 24 people were shot, in Chicago last weekend, and JB Pritzker, the weak

and pathetic Governor of Illinois, just said that he doesn't need help in preventing CRIME. He is

CRAZY!!! He better straighten it out, FAST, or we're coming! MAGA. President DJT[.]"

79.     Less than an hour later, Trump posted on Truth Social that "nothing can stop what

is coming:"



80.     On September 1st, Trump again claimed that Chicago and Illinois, along with Los

Angeles, New York and Baltimore, should "work with" the Trump administration like in D.C.,

where the National Guard were deployed over the Mayor's objection, and then Plaintiffs could be

"A CRIME FREE ZONE."

81.     The next day, September 2nd, in the Oval Office, Trump made clear that he planned

to deploy National Guard troops to Chicago.  Trump was asked, "Have you decided you're

definitely going to send National Guard troops to Chicago?"

82.     In response, Trump criticized Governor Pritzker on crime, saying that, in "three

weeks, he's lost almost 20 people, killed," and calling Chicago "a hellhole" worse than

"Afghanistan."  When pressed with the follow up question, "Have you made your mind up on

Chicago though?," Trump answered, "We're going in. I didn't say when, we're going in."

83.     Trump's social media posts on September 2nd continued his pronouncements, including a Truth Social post that falsely stated that "CHICAGO IS THE MURDER CAPITAL OF THE WORLD!"



84.     Another post by Trump that same day also falsely called Chicago the "worst and most dangerous city in the World, by far." The post stated that Governor "Pritzker needs help badly," and claimed Trump would "solve the crime problem fast, just like I did in DC."

85.     The next day, September 3rd, Trump repeated his Oval Office promise that "We're going into Chicago!" in a fundraising email to his supporters:



21

**GA21**



86.    On September 6, 2025, the President shared on social media an image of himself

dressed as a military officer from the film *Apocalypse Now*, rebranded as, "Philocaly's Now."  The

post riffed on a line from the film in which a character celebrated using napalm on a Vietnamese

village, writing "I love the smell of deportations in the morning..." Referring to the announcement

by Trump and defendant Hegseth a day earlier that they would rebrand the Department of Defense

22

**GA22**

as the "Department of War," the post also threatened that "Chicago about to find out why it's called

the Department of WAR."



87.    Two days later, on September 8, defendant DHS announced, "Operation Midway

Blitz," and stated that ICE "will target the criminal illegal aliens who flocked to Chicago and

Illinois because they knew Governor Pritzker and his sanctuary policies would protect them and

allow them to roam free on American streets."

88.    The Trump administration then sent Chicagoland the same federal immigration

enforcement teams that had perpetrated workplace and other public raids in Los Angeles earlier in

2025.  Those raids caused injuries and unconstitutional detentions, along with mass panic and

protest.

89.    The federal law enforcement teams sent to Chicago were led by same DHS leadership from those Los Angeles, Customs and Border Protection Commander of Operations Gregory Bovino.  Many were from Custom and Border Protection's Office of Field Operations' Special Response Team (SRT), a specialized tactical unit analogous to SWAT.

90.    Although DHS claimed the "blitz" was to nab "the worst of the worst criminal illegal aliens in Chicago," in reality the focus of the agents was warrantless *civil* immigration arrests, not criminal arrests using criminal warrants.  Although conducting arrests for civil offenses, many agents were filmed using violent arrest tactics.

91.    Nearly immediately, the brute force tactics had foreseeably harmful consequences. For example, on the morning of September 12, 2025, in Franklin Park, Illinois, two of these DHS agents shot and killed a longtime area resident and father, following an attempted warrantless vehicle stop.  The victim had just dropped off his toddler at daycare.  DHS immediately put out a statement putting the blame on the victim, which quickly was contradicted by witness videos.

92.    Citizens already had expressed concern about ICE agent tactics, but the killing of an unarmed man, along with a perceived cover-up and lack of accountability, increased community ire.

93.    The Chicago area federal immigration operation involves the use of the ICE Processing Center on Beach Street in Broadview, Illinois, a suburb of Chicago.  The modest, two-story ICE facility is used to process immigrants who are subject to detention or removal under U.S. immigration laws.   The facility is not designed for holding detainees overnight, but reports that detainees are being held there improperly drew community attention.

94.    Small demonstrations began taking place outside the ICE facility months ago, particularly a twice-weekly religious gathering and prayer vigil.

**GA24**

95.     Following the September "blitz" and particularly the killing of the local father, protests outside Broadview became larger and more regular.  Even so, the protests have been small, most often with fewer than 100 people, including significant attendance by clergy, media, and local elected officials.  On September 12, in the morning, between 80 and 100 protestors assembled outside the ICE facility in Broadview.  Initially, the crowd was singing and chanting. Some of them had small musical instruments. The crowd that morning included several older individuals and individuals using wheelchairs and canes. Broadview Police officers were also on the scene.

96.     At around 10:00 a.m. that morning, 20-30 federal agents parked their vehicles in the parking lot on the opposite side of the street from the facility and began to walk across the street toward the ICE facility.  The agents were dressed in camouflage tactical gear and had masks covering their faces. According to the Broadview Police Chief in a sworn declaration, "September 12 was the first day that I recall seeing federal agents on scene dressed in that manner. It was a very noticeable shift in my mind."

97.     As agents approached, masked and dressed in tactical gear, the tone of the crowd of protestors changed. The crowd grew louder and began to press closer to the building. Broadview Police officers positioned themselves on the public way, between the 1930 Beach Street building and the crowd, attempting to keep the crowd on the public way and off of the DHS property. When the masked, camouflaged federal agents went into the building, the crowd calmed down, and Broadview Police officers relocated to the outer perimeter of the crowd.

98.     Also, that day, federal agents with long guns appeared on the roof of the facility. Throughout that day, the crowd of protestors loudly chanted, and some individuals stood in the driveway to the building as ICE vehicles attempted to enter and exit the premises, transporting detainees. ICE assembled their own Special Weapons and Tactics (SWAT) team or Special

**GA25**

Reaction Team (SRT) to respond to the protestors. ICE agents intermittently grabbed people, physically moving them out of the driveway leading into the parking lot of the ICE facility. DHS at some point began to use tear gas and pepper spray against the crowd.

99.     That scene has recurred outside the ICE processing facility in Broadview, with DHS agents consistently appearing armed, in tactical gear and masked, including several on the rooftop, regularly deploying chemical munitions at protestors, along with other abusive tactics.

100.    According to the sworn statement of the Broadview police chief who witnessed this conduct daily, the "use of chemical agents by federal agents at the ICE facility in Broadview has often been arbitrary and indiscriminate. At times it is used when the crowd is as small as ten people. The deployment of chemical agents is dangerous to the health of both demonstrators and first responders on the scene. In addition, when ICE agents deploy chemical agents, it causes the crowd of protesters to disperse, sometimes running into the road, which is dangerous both for them and for motorists. Broadview police officers have had to attempt to position themselves in a way that directs the crowd to disperse in a safe manner. Over the course of my career in law enforcement, the way in which federal agents have indiscriminately used chemical agents in Broadview is unlike anything I have seen before."

101.    The Mayor of Broadview sent DHS a letter on September 26, demanding they cease and desist that conduct. She decried the "relentless deployment of tear gas, pepper spray, mace, and rubber bullets" by DHS agents against protesters. She wrote that ICE's response to protesters exercising their First Amendment rights outside the Broadview facility is "endangering nearby village residents" and harming Broadview's police and firefighters. "In effect, you are making war on my community," she wrote. "And it has to stop."

26

**GA26**

102.    The same day, ICE Acting Director Todd Lyons wrote back to the Mayor of Broadview.  Lyons threatened Mayor Thompson and suggested that ICE's behavior was retaliatory for Broadview's compliance with Illinois' TRUST Act, stating: "[f]ailure to help provide relief [to ICE agents from protest activities] makes you a party to the obstruction of justice . . . The only siege in Broadview is the one being waged against the United States government. You can either continue to be part of the problem or choose to be part of the solution by directing your police to enforce local ordinances and working with us to remove violent offenders."

103.    According to a sworn statement by the Broadview Police Chief, the next morning, Saturday, September 27, Bovino and several CBP agents came to the Broadview Police station. They told the Broadview Police that the DHS agents would bring a "shitshow" to Broadview that weekend, including that they would be increasing deployment of chemical arms, such as tear gas and pepper spray.

104.    As it had promised, DHS continued to employ those tactics outside Broadview, including indiscriminately using those weapons on peaceful protesters, members of the media, and legal observers.  Late on Sunday morning, September 28, 2025, a CBS News Chicago reporter stated that she was alone, driving her truck to the facility, when a masked federal agent shot a pepper ball at her from about 50 feet inside the fence. There were no protests or protesters on scene at the time.  The attack caused the chemical agent to fill the inside of her truck, leaving white residue on her windshield and causing her face to feel "on fire for at least the last 10 minutes or so," as well as causing her to vomit.

105.    The Broadview Police Department now has an open criminal investigation into the chemical munitions attack by an as-yet-unidentified ICE or CBP agent at the Broadview facility.

106.     As this DHS show of force in Broadview was escalating, CBP appeared in tactical gear with large weapons in hand around the City of Chicago. On September 25, 2025, Greg Bovino, head of the CBP operations in Chicago, led a small fleet of "Border Patrol" boats downtown on the Chicago River, with officers armed with semi-automatic rifles. Photographs in the local news showed the boats passing the upscale Riverwalk, in the area of the Trump Tower:



107.     The CBP boats were seen again on the Chicago River in the following days, seemingly doing nothing more than eponymous showboating.

108.     However, the day after the Border Protection's first unimpeded river fleet cruise, DHS executed a memo expressing an urgent need for support in Illinois from the "Department of War." Specifically, on September 26, DHS requested from DoD 100 troops to protect ICE facilities in Illinois with "immediate and sustained assistance" because of a fictional "coordinated assault by violent groups . . . actively aligned with designated domestic terror organizations . . . ." DoD's National Guard Bureau informally made this request to Illinois for its National Guard troops on September 27, which Illinois refused the following day.

109.     Two days after this request, on Sunday, September 28, around 100 DHS agents, dressed in militaristic tactical gear and carrying semi-automatic rifles, patrolled the Chicago

business district near Millenium Park and Michigan Avenue.  They positioned themselves in large groups on major pedestrian thoroughfares in tourist and commercial areas.



110.    Following that provocative display of heavily armed DHS resources and, because of their conduct against protestors, including use of chemical munitions, Illinois State Police ("ISP") became involved in coordinating public safety measures at the Broadview facility.

111.    At the request of Broadview Police Department ("BPD"), on October 2, 2025, the ISP, the Cook County Sheriff's Office, the Cook County Department of Emergency Management and Regional Security, and the Illinois Emergency Management Agency, engaged to form a joint operation outside the Broadview ICE facility.  This included putting barricades in place around a street near the facility to establish designated free speech protest areas off of the public road and a few blocks from the ICE facility. It also included staffing the location with ISP troopers.

112.    On October 3rd, 2025, Kristi Noem, the United States Secretary of Homeland Security, orchestrated a visit to the Broadview facility designed to provoke those who could hear or see the visit. Throughout this visit, rather than avoiding the protesters, Secretary Noem and her entourage, including Bovino, entered areas congested with protesters, even when there were alternative routes that would have avoided those areas.

29

**GA29**

113.    Defendant Noem was videotaped speaking to assembled DHS agents about protestors outside of the ICE facility in which she stated: "Today, when we leave here we're going to go hard. We're going to hammer these guys that are advocating for violence against the American people . . . we're going to go out there and we're going to make sure that there's consequences for the way that they're behaving and that we're going to prosecute them"  Noem's comments about protestors "advocating for violence against the American people" are unsupported by public reports, and appear to conflate the First Amendment-protected speech of protestors with political violence.

114.    Noem then introduced Bovino, who began his speech saying, "It's roll up time here, state instrument is a hard power, you're going to be put into full effect." Although at that time demonstrators were confined to a free speech area blocks from the ICE facility, and managed by ISP and local police, Bovino called demonstrators an "unsafe crowd." He further stated, "we're going to roll them all the way out of here, and when they resist what happens? They get arrested. So it's now going to be a free arrest zone . . . I'm giving them one warning . . . They're getting it here as soon as we leave."

115.    Subsequently, Secretary Noem's motorcade, in a large armored, tactical vehicle known as a BearCat, exited the facility through an entrance congested with protesters, rather than the alternative, which was not. She then proceeded to an area with protesters on all sides and exited the vehicle.  Because she affirmatively went to the protest area, the U.S. Secret Service was required to extend the protective perimeter, resulting in federal agents engaging with protesters and prompting ISP involvement. There was no legitimate purpose under federal law for this conduct by defendant Noem.

30

**GA30**

116.     At the protests that day outside Broadview, ISP and local police made a total of five arrests.  Upon information and belief, federal agents also made arrests.  Despite the provocative actions of Noem and DHS, the actions of protestors were managed with a routine law enforcement response.

117.     During this period, the Trump administration's decrying of Illinois and its leadership continued.  A September 26, 2025, White House press release, titled "Democrats' Unhinged Crusade Against ICE Fuels Bloodshed" listed dozens of federal, state and local political figures who had made statements critical of ICE's activities, including many Illinois elected officials: Governor Pritzker, Chicago Mayor Brandon Johnston, Rep. Robin Kelly, Rep. Delia Ramirez, and Rep. Nikki Budzinski.

118.     The release falsely called these officials' protected First Amendment speech part of "a wave of Radical Left terror" and a "battle cry for violence."  This allegation of "terror" to describe Democratic elected officials exercising their free speech rights seemed intended to connect with Trump's September 22nd Executive Order, Designating ANTIFA as a Domestic Terrorist Organization.

119.     On September 26, the White House issued National Security Presidential Memorandum 7, which similarly characterized political opposition to ICE and criticisms of fascism and authoritarianism as violent incitement and terroristic activity.

120.     A few days later, on September 30 at the Pentagon, Trump and Hegseth addressed a gathering of about 800 top military leaders.  Trump took the opportunity again to attack Chicago, stating: "You know, the Democrats run most of the cities that are in bad shape. We have many cities in great shape too, by the way. I want you to know that. But it seems that the ones that are run by the radical left Democrats, what they've done to San Francisco, Chicago, New York, Los

31

**GA31**

Angeles, they're very unsafe places and we're going to straighten them out one by one." He went on to say, "And this is going to be a major part for some of the people in this room. That's a war too. It's a war from within."

121.    Trump then stated that he had informed defendant Hegseth, "we should use some of these dangerous cities as training grounds for our military National Guard, but military, because we're going into Chicago very soon." Defendant Hegseth has now taken formal action to do so.

## II.    The Trump Administration's Unlawful Deployment of National Guard

122.    The first formal step of the deployment at issue in this complaint occurred on that same day, September 26, 2025, with a memo from DHS to DoD ("September 26 DHS memo" or "DHS memo").

123.    Presumably referring to the ICE facility in Broadview, the DHS memo asked DoD for 100 troops to protect ICE "facilities" in Illinois with "immediate and sustained assistance" because of a purported but fictional "coordinated assault by violent groups . . . actively aligned with designated domestic terror organizations . . . ."

124.    The DHS memo was sent by email directly to a member of the Illinois National Guard (ILNG) on September 29, 2025. The DHS memo specifically requests troops for the task of "mission security in complex urban environments[,]" stating that the troops "would integrate with federal law enforcement operations, serving in direct support of federal facility protection, access control, and crowd control measures."

125.    No next step occurred with respect to Illinois for another week, as the Trump administration appeared to focus on ordering the federalization of Oregon's National Guard, as described further below.

126. Then, the morning of October 4th, the Adjutant General of the Illinois National Guard, General Rodney C. Boyd, received by email a formal memorandum from the National Guard Bureau of the U.S. Department of Defense ("October 4, 2025 National Guard Bureau Memo" or "National Guard Bureau Memo"). The National Guard Bureau Memo and email at 10:23 a.m. that morning, bore the subject, "Request for Illinois National Guard Federal Protection Mission." It stated: "I am writing to inform you that the President has directed the mobilization of at least 300 members of the Illinois National Guard (ILNG) to protect federal personnel, functions, and property in Illinois." It provided no further information about the specifics of the intended deployment, nor any order or memorandum from the President.

127. The National Guard Bureau memo further explicitly stated that if the "request" for 300 troops was not acceded to within two hours, defendant Hegseth would federalize and deploy under Title 10 status as many Illinois National Guard troops as he chose. Specifically, it stated: "Due to the circumstances and immediate nature of this requirement, if ILNG forces are not mobilized under Title 32 in the next 2 hours, the Secretary of War will direct the mobilization of as many members of the ILNG as he may deem necessary under Title 10 United States Code." The National Guard Bureau memo offered thanks for support in an "emergent situation," without providing any legal citation or factual support.

128. The National Guard Bureau memo further stated: "If your Governor agrees to a Title 32 mobilization of the ILNG, we will work with the Department of Homeland Security and other federal officials to coordinate mission details with you. To be clear, we believe time is of the essence and failure to mobilize sufficient forces quickly to address the situation may risk lives and property damage. I respectfully request that you inform me immediately if your Governor is unable or unwilling to mobilize the ILNG under Title 32 to perform the necessary protective functions."

33

**GA33**

Governor Pritzker's office received no direct request or memorandum from any of the defendants regarding a Title 32 National Guard mobilization request at any time.

129.    General Boyd responded to the National Guard Bureau memo in the early afternoon by email, stating: "The Governor will not call National Guard troops into Title 32 status. There is no public safety need or other emergency requiring the National Guard and, therefore, the Governor objects to the federalization of the National Guard."

130.    The evening of October 4, General Boyd received a memorandum from defendant Hegseth, purporting to call Illinois National Guard into federal service pursuant to 10 U.S.C. § 12406 (the "Federalization Oder"). The Federalization Order, purporting to overrule the objection of the Governor of Illinois to bring Illinois's National Guard into the service of the Trump administration, had only two paragraphs, as shown below.



**SECRETARY OF WAR**
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

OCT - 4 2025

MEMORANDUM FOR THE ADJUTANT GENERAL, ILLINOIS NATIONAL GUARD
THROUGH: THE GOVERNOR OF ILLINOIS

SUBJECT: Calling Members of the Illinois National Guard into Federal Service

On October 4, 2025, the President of the United States called forth at least 300 National Guard personnel into Federal service pursuant to section 12406 of title 10, U.S. Code, to protect U.S. Immigration and Customs Enforcement, Federal Protective Service, and other U.S. Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where violent demonstrations against these functions are occurring or are likely to occur based on current threat assessments and planned operations.

This memorandum further implements the President's direction. Up to 300 members of the Illinois National Guard will be called into Federal service effective immediately for a period of 60 days. The Chief of the National Guard Bureau will immediately coordinate the details of the mobilization with you, in coordination with the Chairman of the Joint Chiefs of Staff and Commander, U.S. Northern Command. The mobilized Service members will be under the command and control of the Commander, U.S. Northern Command.

131.    The memo's only language indicating its basis for invoking Section 12406 was its purpose to "protect [ICE], Federal Protective Service, and other U.S. Government personnel who are performing federal functions, including the enforcement of Federal law, and to protect Federal

34

**GA34**

property, at locations where violent demonstrations against these functions are occurring or are likely to occur based on current threat assessments and planned operations." It provided no information about either the "threat assessments" or "planned operations" referenced in the memorandum, or the basis for the assertion that violent demonstrations would be "likely" based on either. Its only citation to authority of any kind is its reference to unspecified "President's direction."

132.    The Federalization Order from defendant Hegseth neither cited nor attached any order from the President invoking Section 12406, as required by law.

133.    On October 5, General Boyd of the Illinois National Guard learned of and received another memorandum, purporting to invoke Section 12406 to federalize national guard troops from the State of Texas into Illinois and Oregon ("the Texas Mobilization Order"). The Texas Mobilization Order was an undated memorandum from defendant Hegseth that, similar to that issued the prior weekend in Oregon, referenced the June 7 Presidential memorandum that had been used as support for the federalization of California's National Guard months prior.

134.    The Texas Mobilization Order stated that, on October 4, 2025, "the President had determined that violent incidents, as well as the credible threat of continued violence, are impeding the execution of the laws of the United States in Illinois, Oregon, and other locations throughout the United States." It purported to authorize, pursuant to 10 U.S.C. § 12406, up to 400 Texas National Guard troops for an initial period of 60 days, subject to extension, "to perform federal protection missions where needed, including in the cities of Chicago and Portland."

135.    Despite referencing an October 4, 2025 Presidential determination as the basis for its action, the Texas Mobilization Order provided no order from the President for the extraordinary

**GA35**

action.  The State of Illinois learned from a credible source that the physical deployment of the Texas National Guard troops to Illinois was planned for the following day, October 6th.

### III.    The Trump Administration's Wave of Domestic Troop Deployments

136.    Defendants' unlawful deployment of the Illinois National Guard, over the objection of the state, is similar to the unlawful course of conduct they have taken against other disfavored states and cities.  Prior to the Federalization Order and Texas mobilization order regarding deployment in Illinois, defendants federalized National Guard troops in California, Washington, D.C., and Oregon over the objection of each of their leaders. No circumstances in any of these jurisdictions warranted federalization of troops under Section 12406, but each has "sanctuary" laws, Democratic leadership, and has been the subject of Trump's taunts about "crime."  Each of them, including Chicago and Illinois, is being targeted for this harmful and coercive conduct by defendants.

137.    In his first troop deployment in Los Angeles, Trump's federalization of the California National Guard on June 7, 2025, followed by only one day the beginning of aggressive immigration enforcement activity in the vicinity. The immigration enforcement tactics inspired community outrage and protest response. President Trump's June 7 authorizing memorandum to defendants Hegseth, Noem, and Bondi cited 10 U.S.C. § 12406 as legal authority for federalizing the California National Guard and claimed, as his factual basis, violence, disorder, and damage to federal property, as follows:

> Numerous incidents of violence and disorder have recently occurred and threaten to continue in response to the enforcement of Federal law by U.S. Immigration and Customs Enforcement (ICE) and other United States Government personnel who are performing Federal functions and supporting the faithful execution of Federal immigration laws. In addition, violent protests threaten the security of and significant damage to Federal immigration detention facilities and other Federal property.

**GA36**

138.    California challenged that deployment in court.  On September 2, 2025, the federal

court in California found that the Trump administration had "instigated a months-long deployment

of the National Guard and Marines to Los Angeles for the purpose of establishing a military

presence there and enforcing federal law. Such conduct is a serious violation of the Posse

Comitatus Act." *Newsom v. Trump*, 3:25-cv-04870-CRB, 2025 WL 2501619, at *43 (N.D. Cal.

Sept. 2, 2025), *appeal docketed*, No. 25-5553 (9th Cir. Sept. 3, 2025).  That decision is now stayed

while on appeal.

139.    With California National Guard two months into their Los Angeles area

deployment, on August 11, the Trump administration's focus turned to Washington, D.C.  At a

press conference at the White House that day, President Trump announced the planned deployment

of the D.C. National Guard into the district to "to rescue our nation's Capitol from crime,

bloodshed, bedlam and squalor and worse."  He called it "liberation day in DC," and said, "we're

gonna take our Capitol back."

140.    At the same briefing, defendant Hegseth announced that day that National Guard

troops would be deployed in D.C. to "stand with their law enforcement partners"—which, he said,

was the "same thing" the National Guard did in Los Angeles.  The Trump administration deployed

National Guard troops from D.C. and seven other states into that city.

141.    On September 4, 2025, the District of Columbia sued the Trump Administration for

violating various statutes as well as the U.S. Constitution. D.C. alleged that, among other harms,

the "encroachment of National Guard troops in the District has also already caused harm to public

safety in the District." Compl. at ¶¶ 129-30, *District of Columbia v. Trump*, No. 25 C 3005 (D.

D.C. Sept. 4, 2025).

37

**GA37**

142.    On September 28, 2025, the Trump administration announced the federalization of the Oregon National Guard over the Oregon Governor's objection. With a two-paragraph cover memo, only one paragraph of which even regarded Oregon, the "Secretary of War" sent a "MEMORANDUM FOR THE ADJUTANT GENERAL, OREGON NATIONAL GUARD THROUGH: THE GOVERNOR OF OREGON" with the "SUBJECT: Calling Members of the Oregon National Guard into Federal Service[.]"

143.    The first paragraph of the September 28 memorandum to Oregon's Adjutant General referenced the June 7 memo that had been used for federalizing the California National Guard, and it attached that June 7 memo.

144.    In remarkable similarity to the October 4 memorandum received by Illinois, the September 28 Oregon memorandum stated only directives without any specific basis for the federalization of the Oregon National Guard, as follows:

> This memorandum further implements the President's direction. 200 members of the Oregon National Guard will be called into Federal service effective immediately for a period of 60 days. The Chief of the National Guard Bureau will immediately coordinate the details of the mobilization with you, in coordination with the Chairman of the Joint Chiefs of Staff and Commander, U.S. Northern Command. The mobilized Service members will be under the command and control of the Commander, U.S. Northern Command.

145.    Oregon promptly filed suit to prevent this unlawful conduct.  On October 4, 2025, a federal district court granted Oregon's motion for a temporary restraining order and held that plaintiffs in that case were "likely to succeed on their claim that the President's federalization of the Oregon National Guard exceeded his statutory authority under 10 U.S.C. § 12406 was *ultra vires*", and also exceeded the President's "constitutional authority and violated the Tenth Amendment." *Oregon v. Trump*, No. 3:25-cv-1756-IM, at 16 (D. Or. Oct. 4, 2025).

146.     The Oregon court recognized that, "This case involves the intersection of three of the most fundamental principles in our constitutional democracy. The first concerns the relationship between the federal government and the states. The second concerns the relationship between the United States armed forces and domestic law enforcement. The third concerns the proper role of the judicial branch in ensuring that the executive branch complies with the laws and limitations imposed by the legislative branch. Whether we choose to follow what the Constitution mandates with respect to these three relationships goes to the heart of what it means to live under the rule of law in the United States." *Id.* at 2.

147.     On these questions, the court concluded that: "this country has a longstanding and foundational tradition of resistance to government overreach, especially in the form of military intrusion into civil affairs . . . . This historical tradition boils down to a simple proposition: this is a nation of Constitutional law, not martial law. Defendants have made a range of arguments that, if accepted, risk blurring the line between civil and military federal power—to the detriment of this nation." *Id.* at 30.

148.     However, even as that court entered its temporary restraining order against the defendants on October 4, 2025, the Trump administration ordered the redeployment of hundreds of the federalized California National guard troops from California to Oregon, without the consent of the Governor of Oregon.  The Texas mobilization order also seeks to send Texas National Guard to Oregon, in addition to Illinois.  This appears to be a clear end-run effort around the Oregon district court's temporary restraining order preventing defendants from federalizing the Oregon National Guard for deployment in Oregon.

149.     Oregon filed an emergency motion to enjoin those efforts.  At an October 5 emergency hearing before the court, the district judge enjoined both new deployment orders, in

which defendant Hegseth, on behalf of the Trump administration, had sought to deploy other states'
National Guard to Oregon.

150.    As defendants have made clear, the Trump administration's troop deployment plan
in Illinois is simply a continuation of the administration's militaristic vision of troops deployed
across the country. That deployment in Illinois follows a pattern of involuntary National Guard
deployment in four other jurisdictions is further evidence that defendants' actions are not based on
the facts on the ground in Illinois or the needs of federal law enforcement here and are, accordingly,
unlawful.

**IV.    No Factual or Legal Predicate Exists for Deploying the Military in Illinois**

151.    When Trump was articulating his plans to send troops to Chicago on August 22nd,
Governor Pritzker responded the next day that, "There is no emergency that warrants the President
of the United States federalizing the Illinois National Guard" or sending in federal agents.

152.    There is no insurrection in Illinois.

153.    There is no rebellion in Illinois.

154.    The federal government is able to enforce federal law in Illinois.

155.    The manufactured nature of the crisis is clear. Trump first announced his plans to
send National Guard troops to Chicago from the Oval Office on August 22, 2025.  His rationale
then, as at many points, was his view of Chicago and Illinois as crime ridden.  At that event, he
asserted that his national guard deployment in Washington D.C. had reduced crime and he wanted
to send troops in Chicago for the same reason.

156.    Trump stated: "National Guard has done such an incredible job working with the
police and we haven't had to bring in the -- the regular military which we're willing to do if we
have to. And after we do this, we'll go to another location and we'll make it safe also. We're going

**GA40**

to make our country very safe. We're going to make our cities very, very safe. Chicago's a mess. You have an incompetent mayor, grossly incompetent and we'll straighten that one out probably next. That'll be our next one after this and it won't even be tough."

157.    Therefore, this decision was made long before recent events, and Trump's true plan is impermissibly to use federalized national guard as a crime-fighting force.

158.    As recently as yesterday, Trump again made clear that his purpose in sending troops to Chicago is to fight crime.  On October 5, 2025, President Trump addressed reporters in front of Marine One, spoke about crime in Chicago, and said of the city, "they need help." He then claimed that he had "solved the crime" in Washington D.C., where he previously had sent troops, and said "we're going to do that in Chicago."

159.    Additionally, as explained above, any assertion that the facts in Illinois require this extraordinary step is also belied by the fact that defendants have used the same playbook of involuntary deployment of the National Guard in four other jurisdictions in just the last few months.

160.    In fact, DHS's first formal memo seeking the deployment of National Guard troops in Illinois, dated September 26, 2025, claimed an urgent need because of "lawless riots."  That assertion was plainly untrue, as evidenced by the fact that no further steps to deploy the National Guard occurred for more than a week, until the morning of October 4, 2025.

161.    Now, the Federalization Order claims that DHS needs 300 military members to protect ICE's "federal facilities" in Illinois, and the Secretary of Defense offers Illinois National Guard members for that task. What facilities, for what purpose, and under what authority none of the memos say.

162.    ICE has no detention facilities in Illinois, according to its own website. It has exactly one "processing" center, in Broadview. Otherwise, its only "facilities" in the state of Illinois are three office locations.

163.    DHS's claim that the request for military intervention is made because of "lawless riots" or its claim that the request is to "protect federal facilities" suggest that it could be relying on the existence of protests outside the single ICE processing facility in Broadview.  However, far from lawless riots, the Broadview protests have been small, primarily peaceful, and unfortunately escalated by DHS's own conduct, seemingly for the goal of using them as a pretext for the Chicago troop deployment that was announced by Trump long ago.

164.    Although Illinois State Police regularly partners with federal law enforcement on criminal matters, the only requests made to ISP from DHS relating to the Broadview facility were from DHS's Homeland Security Investigations (HSI), and ISP responded to each of them. One concerned an arrested protester in possession of a firearm; ISP clarified that the protester had a valid Firearm Owner Identification card and Concealed Carry Permit. The second involved traffic management for a potential protest, and the third was a request for ISP's video of the area surrounding the ICE facility. When ISP ultimately joined the joint unified command, it was not because of any need for support or help from DHS, but instead to support Broadview Police.

165.    Therefore, the limited protest activity also has not prevented the Trump administration from enforcing federal laws.

166.    Defendant DHS has loudly touted its immigration enforcement success in Operation "Midway Blitz".  In an October 3rd press release regarding the operation's success, DHS wrote that ICE and CBP "have arrested more than 1,000 illegal aliens." Even before the "blitz," ICE's Illinois law enforcement activity in 2025 was up by a significant factor, and

immigration detentions had more than doubled, according to September 12, 2025 WBEZ reporting based on collected data for January through July of 2024 and 2025.

167.    News reports about DHS's activities in the area also make clear they are able to enforce federal law.

168.    On September 16, 2025, defendant Noem came in person to suburban Illinois to oversee a DHS raid on a home that included helicopters and many federal agents breaking down the door of a U.S. citizen's home in Elgin, Illinois, without presentation of a warrant. According to a local report, the "entire street was blocked off by armed ICE agents wearing fatigues and using military vehicles[,]" and "helicopters, bright lights and smoke bombs were used in the raid."

169.    According to reporting by WBEZ and other news outlets, during the raid overseen by Noem, DHS detained several occupants of the home, including two U.S. citizens. Tricia McLaughlin, DHS Assistant Secretary, posted on social media that day to tout several arrests ICE had made that morning "so far" in the Chicago area.

170.    On September 19, 2025, DHS's official social media account on X, @DHSgov, reposted a local news video showing an ICE agent outside the ICE facility Broadview violently throwing to the ground a Congressional candidate who had been there to protest the detention conditions.  The posted stated: "You will not stop @ICEgov and DHS law enforcement from enforcing our immigration laws[.]"

171.    On September 25, 2025, CBP was seen using four boats with armed agents positioned on them traveling up and down the Chicago River in the Loop. CBP Chief Michael W. Banks posted several photos of this event, including several posed to highlight boats against the Trump Tower's marquee, with the caption "Where streets end, our Marine Unit begins. On the

43

**GA43**

Chicago River, CBP leadership stays vigilant. Our ability to patrol on the water extends the reach of enforcement."

172.    The next day, September 26th—the same day as DHS's memo expressing a purported need for 100 National Guard troops —DHS continued to make clear that demonstrations and protests have not had any impact on their ability to carry out their mission. That day, DHS issued a press release titled, "DHS Is Fighting Back Against Antifa Violence," with the subheading "Antifa-aligned domestic terrorists have nowhere to hide: DHS is upholding the rule of law."

173.    The September 26 press release focused on DHS's success in its mission and then set out a series of reports of arrests made and charges filed against those it considered as seeking to get in DHS's way, including in Broadview, Illinois.  The release made clear that: "Antifa and their friends haven't stopped us. They're not even slowing us down."

174.    On September 27, 2025, after Bovino and DHS agents had visited the Broadview Police Department in the morning, as described above, Bovino and other DHS agents in tactical gear were seen marching freely through the streets adjoining the Broadview ICE facility, entering and exiting the fencing that they erected surrounding the facility. At times when individual demonstrators temporarily obstructed traffic in the right-of-way, DHS appeared able to clear vehicle passage.

175.    At some point late in the night of September 27, DHS officials outside the ICE facility in Broadview formed a line and marched north on one of two available streets DHS could use to exit the building, Beach Street, pushing the crowd up the street and forcing them to relocate to Lexington Avenue. That evening, those agents also deployed chemical munitions, including tear gas, pepper spray, and pepper bullets at the protesters.

GA44

176.    Based upon what DHS agents told the Broadview Police Chief the next morning, as relayed in his sworn declaration, on the night of September 27, DHS agents detained eleven protesters.   According to a September 29 press release from the U.S. Attorney's Office for the Northern District of Illinois, five protesters were charged with federal offenses. Federal law continued, and continues, to be enforced in Illinois.

177.    In addition, dozens of DHS agents dressed in tactical gear and carrying semi-automatic rifles walked the streets of downtown Chicago on September 28. Their presence on the streets was a demonstration of force. And that confident show of force in downtown Chicago makes clear that the statutory basis for Title 10 has not been met.

178.    On September 29, CBP Commander-at-Large Bovino, the head of the "blitz," led more than 300 agents in raiding a large apartment building on the south side of Chicago. As part of the operation, agents rappelled down to the building from Blackhawk helicopters among other military style tactics.   While it is not clear whether any part of that conduct was within any lawful federal authority, defendants were not impeded in executing this large-scale planned operation.

179.    Following the operation that night, in a video recorded interview at the site of the apartment raid, Bovino stridently directed a message at Governor Pritzker, "Don't worry, Governor Pritzker, we've got it covered from here.  This is just the beginning… We're gonna roll on and on. We're gonna turn and burn, Governor.  We're going from this one to the next to the next to the next."

180.    Also, that same day, the Trump administration asserted that it can and would enforce federal law and, where it perceives the need, it would assign additional federal law enforcement, components of DOJ, to assist DHS. On September 29, Attorney General Bondi issued a memo titled, ENDING POLITICAL VIOLENCE AGAINST ICE. It decried a new era of

political violence and cited incidents such as the Dallas shooting at an ICE facility, as well as the non-ICE-related killing of Charlie Kirk. The memo included misleading descriptions of the protests outside Broadview in the days just before, over the weekend of September 26-28.

181.    Leaving aside the disputed predicate of the memo, the document makes clear that DOJ is fully capable of enforcing federal law.  It states, in part: "The Department of Justice will stand strong when federal law enforcement officers are attacked or threatened for doing their sworn duty on behalf of the United States government. I am directing the Bureau of Alcohol, Tobacco, Firearms and Explosives, the United States Marshals Service, the Drug Enforcement Administration, and the Federal Bureau of Investigation to immediately direct all necessary officers and agents to defend ICE facilities and personnel whenever and wherever they come under attack, including in Portland and Chicago."

182.    Upon information and belief, DOJ already had assigned agents from these components to provide support to DHS and has been continuing to do so since issuing the September 29 Bondi memo. Plaintiffs are not aware of any other federal agencies providing support similar to what DOJ offered in the Bondi memo, although most, if not every, other federal agency also has sworn officers and agents as well and could do the same.

**V.    The Federalized National Guard Deployment Harms Illinois**

**A.    The State's Sovereign Interests are Injured**

183.    Illinois's sovereignty is harmed by this unlawful incursion by the infringement of its sovereign interest in managing law enforcement within its own borders, including the authority to manage protests and unrest.

184.    The police powers reserved to the State of Illinois includes the authority to regulate its internal law enforcement activities. *United States v. Morrison*, 529 U.S. 598, 618 (2000). Likewise, those powers include the work of policing its own populace.

**GA46**

185.    Defendants' efforts to overtake the state's authority in this regard functionally supersedes Illinois's authority to regulate and oversee its own local and state law enforcement.   It reflects an unconstitutional attempt to infringe on Illinois's power.

186.    The Federalization Order and the implementing agency actions also injure Illinois's abilities to give full effect to its own laws protecting residents' health, safety, and rights, harming its sovereign interests and intruding on an area traditionally left to the States.

187.    Defendants' purported use of National Guard troops to control protests or guard property amounts to a usurpation of the role of domestic law enforcement. The state has neither requested nor consented to federal intervention to take over that law enforcement role, which is being carried out by local enforcement under their lawful authority. The impending use of federalized troops to engage in domestic law enforcement, without the State's consent, threatens an irreparable injury to Illinois's sovereign interest in managing its own law enforcement activities.

188.    Defendants' conduct also will directly and concretely interfere with current and planned law enforcement activities of state and local authorities.   State and local law enforcement agencies, including variously the Broadview Police Department, the Cook County Sheriff's Office, the Chicago Police Department, and the Illinois State Police, along with other municipal police forces who provide support to these departments and each other when necessary through mutual aid agreements, have in place their own plans and protocols for maintaining safety and order in Illinois communities.   They are trained and resourced to execute those plans, including in coordination with each other, and do so regularly.

189.    The unlawful deployment of federalized National Guard troops to usurp that law enforcement role will directly interfere with the ability of state and local law enforcement to deal with any given situation. The presence of military units purporting to exercise law enforcement

authority creates confusion among the public and threatens to undermine the work of local law enforcement in maintaining order and combating local crime. This is especially concerning as numerous state and local law enforcement and community initiatives in the past years have been implemented, leading to a significant reduction in crime in the State and City of Chicago.

190.    Further, military troops are not law enforcement. They are not trained in law enforcement in the professional manner that Plaintiffs' own law enforcement are trained for the role of constitutional policing, including property protection and crowd control during protest activity, along with other domestic law enforcement responsibilities. As explained above, the needless presence of federalized troops will lead directly to escalated tensions and increased protest activity, interfering with state and local law enforcement's ability to maintain order. It will require diversion of state and local law enforcement and state and local resources.

191.    Recent deployment of troops elsewhere in the country have provoked protests and escalated tensions. Those military incursions included operations that were directly calculated as shows of force, intended to demonstrate federal presence and strength in otherwise peaceful locations. *See Newsom,* 2025 WL 2501619 at *7 (describing federal troops stationed in Humvees and tactical vehicles outside MacArthur Park in Los Angeles). As in those instances, Defendants' deployment of troops in Illinois communities will provoke and escalate protests and unrest and will require the State to divert its law enforcement personnel and resources to deal with unrest that the federal military presence has created.

192.    In addition to the sovereign injury to Illinois, Plaintiffs are harmed in multiple other ways by defendants' unlawful conduct.

GA48

**B.** **The Diversion of National Guard Personnel, Rendering them Unable to Engage in Other Critical Work, Harms the State of Illinois.**

193. Defendants' unlawful federalization and deployment of the Illinois National Guard will concretely harm the State's interests by rendering those members unable to engage in other critical work.

194. Illinois National Guard (ILNG) members are trained to carry out important missions, where necessary, and at great cost, both to themselves personally and to the state. Most ILNG members are part time reservists who have civilian jobs. They commit a minimum of one weekend per month and two additional weeks per year, primarily for training and maintaining unit readiness.

195. Except for when it has been lawfully called into federal service, ILNG answers to its Commander-in-Chief, the Governor of Illinois. The Governor calls members of the ILNG into active duty to serve the needs of Illinois in numerous ways, including to assist with emergent and unpredictable situations the State could face at any moment. The Governor, in consultation with other state government officials and local law enforcement, is in the best position to determine the needs of the State and how the Guard could be deployed to meet those needs.

196. The Illinois National Guard's resources are limited. While the ILNG has about 12,775 total members, only some of those are presently available for assignment over the next six months. Others are unavailable because, among other reasons, they are already deployed in federal services overseas or at military bases in the United States; engaged in the ILNG's essential administrative functions; or in basic training. Unlawfully federalizing even a portion of these Guard members impairs the State's capacity to respond to emergencies.

197. Since September 11, 2001, ILNG members have faced an increased operations tempo that has included longer training periods in more advanced specialties. For example, ILNG

**GA49**

members recently completed an annual training on how to respond to cyberattacks. They specifically perform work to protect Illinois's elections infrastructure from cyberattacks and other intrusions.

198.    They also recently performed training on response to chemical and biological weapons attacks, as well as on responding to man-made and natural disasters, including site search, rescue, mass decontamination, medical triage, and fatality recovery.

199.    In its role as a state entity, ILNG also has been called into state active duty to respond to disasters including several instances of severe flooding in the state, as well as severe winter weather. And it has provided significant planning and support for large-scale events, like the Democratic National Convention in 2024, which hosted 50,000 people.

200.    With a federal deployment of ILNG members, the State does not have the benefit of all of its ILNG members, including if needed by the State for emergency response efforts. Given the ILNG's limited resources, and the inherent uncertainty about what needs might arise, needlessly calling hundreds of the ILNG's members into federal service for a months-long period places Illinois in jeopardy.

## C.    The Federal Deployment Will Harm Plaintiffs' Ability to Provide Important Services to the Community

201.    The deployment of federalized national guard troops into Illinois will cause great and immediate harm. This harm will occur to Plaintiffs regardless of whether the deployment is of Illinois National Guard or another military.

202.    In addition to the above harms, a deployment will hinder the provision of needed social services and health care and redirect valuable resources away from their proper use on behalf of the City of Chicago and the State.

203.    Among other harms and impacts on resources, the City of Chicago's Office of Emergency Management & Communications will have to divert important resources away from needed services and planning as a result of any troop deployment in the greater Chicago area.

204.    The Chicago Police Department ("CPD") has likewise incurred substantial costs protecting public safety at large events that generated protest activity, as a military deployment would. For example, Chicago hosted the Democratic National Convention in 2024. In connection with that event, CPD spent $30 million on operations, overtime compensation, and other expenses. These costs can increase when responding to unplanned protests. For instance, in 2020, CPD spent about $90 million responding to often-unplanned protests and civil unrest following George Floyd's murder.

205.    Based on these facts, it is reasonably likely that the deployment of the National Guard would impose costs on CPD and other City departments while diverting those departments' resources away from their usual responsibilities.

**D.    Defendants' Actions Will Also Harm the State of Illinois and the City of Chicago by Suppressing Business Activity.**

206.    Defendants' conduct threatens the economic well-being of the people of Illinois. In recent months, unlawful federal deployments and militarized raids in California and the District of Columbia have directly and rapidly chilled economic activity. The deployment of troops in California stifled economic activity in the Los Angeles area. Restaurants, festivals, and farmers' markets shut down, as individuals were afraid to leave their homes due to militarized raids. As the *Newsom* court observed, federal immigration-enforcement actions and the deployment of the National Guard has "sent economic shockwaves through southern California." 2025 WL 2501619, at *14. A study employing U.S. Census Bureau data found that federal immigration actions had "profoundly negative consequences for California's economy," comparable only to the Great

Recession and Covid-19 pandemic. *Newsom v. Trump*, Case No. 25-4870, Dkt. 183, Ex. 14 at 7 (N.D. Cal. Sept. 2, 2025). The number of people reporting to work in California's private sector decreased by 3.1% in June 2025 and by 4.9% in July 2025, even though those numbers increased elsewhere. *Id.* at 1, 4. The study explained: "As a result of [federal] enforcement actions, many noncitizens avoided work, school, and other public spaces, leading to declines in consumption, business, work and employment." *Id.* at 2. A Los Angeles Chamber of Commerce official confirmed that the National Guard deployment harmed "small businesses throughout the region," explaining that businesses saw "a sharp decrease in customers," "increased staffing shortages," and incurred "additional costs" for "security" and other expenses. *Id.*, Dkt. 183-3 ¶¶ 5-9. Attendance at public events in Los Angeles also suffered. For example, the director of an LGBTQ+ organization that holds an annual event in a predominantly Latino neighborhood stated that 2,000 fewer people attended the post-deployment event this year compared to prior years. *Id.*, Dkt. 183-6 ¶¶ 4, 13-14.

207.    Similarly, according to reporting in the Washington Post, the deployment of National Guard troops in the District of Columbia depressed key industries, including tourism, restaurants, and hospitality services.  Within a week after the deployment of federal troops in D.C., foot traffic in the District dropped 7 percent on average, with restaurant reservations showing an even steeper drop.

208.    Defendants' military incursion into Illinois threatens similar immediate harms by depressing business activities, travel, and tourism in Illinois communities.  Chicago taxes various sales and services. E.g., Mun. Code of Chi. §§ 3-24-030 (hotel tax), 3-30-030 (restaurant tax); 3-40-010 (sales tax). Thus, when businesses in Chicago experience declining sales, Chicago receives less tax revenue.

209.    Defendants' conduct also threatens financial harm to the government of Illinois in multiple ways.  The military incursion's chilling effect on economic activity will directly decrease tax revenue collected by the State and by the City of Chicago. In the District of Columbia, troop deployment has resulted in a reduction of work hours for some District workers, and a corresponding decline in income tax withholding paid to the District government.

210.    Deployment of troops in Illinois communities threatens similar harm to both City of Chicago and State of Illinois tax revenues.

**First Claim for Relief**
***Ultra Vires* Action – Violation of 10 U.S.C. § 12406**
**Against All Defendants**

211.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

212.    Under 10 U.S.C. § 12406, only the President is permitted to federalize a state's National Guard, and they are only permitted to do so when (1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation; (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or (3) the President is unable with the regular forces to execute the laws of the United States.  The order issued by the President pursuant to this provision must specify the basis for this invocation, including, for subsection (3), what laws the President is unable to execute.  None of that was done here.  Moreover, no factual circumstances satisfying any of those predicates are present in Illinois. Defendants' actions to the contrary—including in the Federalization Order and the Texas Mobilization Order—are patently pretextual and lack any good faith basis.

213.    Defendants have not identified any "invasion by a foreign nation."

214.    Nor is there any "rebellion or danger of a rebellion."  The assertion that National Guard troops are needed to protect federal facilities is both untrue and legally insufficient.  Neither the June 7, 2025 Presidential memorandum, nor the federalization or Texas mobilization order identified any particular location or event as a basis for federalizing state military.  However, to the extent that protests in Broadview, Illinois, are the Defendants' excuse for this deployment in Illinois, they are insufficient.

215.    The protests in Broadview are contained to a small area a few blocks from an ICE facility, are being successfully managed, and do not in any way constitute a rebellion or danger of a rebellion.  Likewise, no other facts warrant a finding of rebellion in the State of Illinois.

216.    Nor have Defendants cited even a single instance in which they were "unable . . . to execute the laws of the United States" as would be required under Section 12406. For example, they have not identified an inability to detain or deport those who are unlawfully present in the United States due to protests in Broadview.

217.    In addition, the Federalization Order and the Texas Mobilization Order contravene Section 12406 by failing to identify the federal laws that the President purports to be unable to execute and by failing to specify a corresponding scope of authority to execute "those laws."

218.    By ignoring these prerequisites for an invocation of 10 U.S.C. § 12406, and relying on pretextual, baseless, and bad-faith invocation of Section 12406, Defendants are acting *ultra vires*.

### Second Claim for Relief
### *Ultra Vires* Action — Violation of the Posse Comitatus Act and 10 U.S.C. § 275
### Against All Defendants

219.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

220.    The Posse Comitatus Act forbids the armed forces from engaging in law enforcement "except in cases and under circumstances expressly authorized by the Constitution or Act of Congress." 18 U.S.C. § 1385.

221.    Consistent with the limitations imposed by the PCA, the Title 10 statutory scheme itself expressly limits the scope of activities that can be performed by the military. For instance, 10 U.S.C. § 275 provides that "The Secretary of Defense shall prescribe such regulations as may be necessary to ensure that any activity (including the provision of any equipment or facility or the assignment or detail of any personnel) under this chapter does not include or permit direct participation by a member of the Army, Navy, Air Force, or Marine Corps in a search, seizure, arrest, or other similar activity unless participation un such activity by such member is otherwise authorized by law."

222.    Neither the Constitution nor any Act of Congress permits Defendants to use the armed forces, including the National Guard, for routine law enforcement, such as protest management or the suppression of violent crime or property damage.

223.    The Court need look no further than Defendants' own statements on social media and to United States military leaders to conclude that this troop deployment is being made for purposes that are plainly incompatible with the Posse Comitatus Act and 10 U.S.C. § 275.

224.    By ignoring the PCA and 10 U.S.C. § 275, Defendants are acting *ultra vires*.

**Third Claim for Relief**
**Tenth Amendment of the U.S. Constitution**
**Against All Defendants**

225.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

226.     The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

227.     Defendants' federalization of members of the Illinois National Guard usurps the Governor of Illinois's role as Commander-in-Chief of the National Guard in Illinois, which he could and would use if necessary, and violates the State's sovereign role over local law enforcement, pursuant to its police powers.

228.     Under our system of federalism, policing and crime control remain one of the most basic rights reserved to the States. "Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000). "[T]he power to establish the ordinary regulations of police has been left with the individual States and cannot be assumed by the national government." *Patterson v. State of Kentucky*, 97 U.S. 501, 503 (1878).

229.     Local control of law enforcement is also essential to the protection of liberty and government accountability. "Because the police power is controlled by 50 different States instead of one national sovereign, the facets of governing that touch on citizens' daily lives are normally administered by smaller governments closer to the governed. The Framers thus ensured that powers which 'in the ordinary course of affairs, concern the lives, liberties, and properties of the people' were held by governments more local and more accountable than a distant federal bureaucracy." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012) (quoting The Federalist No. 45, at 293 (J. Madison)).

56

**GA56**

230.    The Federalization Order's deployment of federalized military forces to protect federal personal and property from "violent demonstrations" that "are occurring or are likely to occur"  represents the exact type of intrusion on State power that is at the heart of the Tenth Amendment, especially where, as here, there is no evidence that local law enforcement was incapable of asserting control and ensuring public safety. State officials in conjunction with local officials, such as the Broadview Police Department and the Cook County Sheriff's Department, are in the best position to determine what resources are necessary to preserve public safety amid protest activity, and to intervene to enforce public safety and criminal laws when warranted.

231.    In addition to infringing upon the States' police powers, Defendants' actions in calling up and deploying members of the Illinois National Guard are designed to coerce Illinois into abandoning its own statutory prerogatives and instead adopt President Trump's policy priorities.

232.    "The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997).

233.    Similarly, the federal government "may not simply 'commandee[r] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program.'" *New York v. U.S.,* 505 U.S. 144, 161 (1992) (quoting *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc*., 452 U.S. 264, 288 (1981)). Such impermissible pressure can occur "whether Congress directly commands a State to regulate or indirectly coerces a State to adopt a federal regulatory system as its own."  *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 578.

234.    Defendants' actions forced such an impermissible "choice": use state and local law enforcement resources to carry out the federal government's civil immigration priorities or accept occupation by federal troops.  Then, in advance of the Federalization Order, Defendants posed an additional coercive "choice":  either deploy the National Guard under state control or be subject to federalization via 10 U.S.C. § 12406.

235.    Additionally, Defendants' actions place Illinois National Guard members under federal command and control, usurping the Governor's authority to command them and depriving the State of Illinois of their services.  These actions thus violate the Tenth Amendment because the President lacks constitutional authority to call forth the militia in a manner that exceeds the authority delegated to him by Congress. Indeed, Congress is granted the authority to "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions." U.S. Const. art. I, § 8, cl. 15. Congress has exercised that authority through 10 U.S.C. § 12406 which, as explained, does not authorize Defendants' decision to federalize the Illinois National Guard.  By acting in a manner that "exceeds the National Government's enumerated powers," Defendants have "undermine[d] the sovereign interests of States." *Bond v. United States*, 564 U.S. 211, 225 (2011).

236.    Finally, to the extent Defendants' actions are deemed to fall within the scope of 10 U.S.C. § 12406, then such use of Section 12406 constitutes an as-applied violation of the Tenth Amendment insofar as it restricts the State's ability to exercise its reserved police power over its citizens, including through an impermissible coercive choice.

**Fourth Claim for Relief**
**Violation of Equal Sovereignty Under the U.S. Constitution**
**Against All Defendants**

237.     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

238.     "Not only do States retain sovereignty under the Constitution, there is also a 'fundamental principle of *equal* sovereignty' among States." *Shelby Cnty., Ala. v. Holder*, 570 U.S. 529 U.S. 529, 544 (2013) (citation omitted). The Supreme Court has long recognized that our nation "was and is a nation of States, equal in power, dignity, and authority," and that this "constitutional equality of the States is essential to the harmonious operation of the scheme upon which the Republic was organized." *Coyle v. Smith,* 221 U.S. 559, 567, 580 (1911).

239.     This "fundamental principle of equal sovereignty remains highly pertinent in assessing subsequent disparate treatment of States" by the federal government. *Shelby Cnty,* 570 U.S. at 544 (citation omitted).

240.     Defendants have trampled these principles by selecting certain politically disfavored jurisdictions – including Chicago and Illinois – for an involuntary deployment of military troops under federal control. "And despite the tradition of equal sovereignty," Defendants have applied this harsh infringement on state sovereignty "to only [three] states" and the District of Columbia. *Id.* at 544.

241.     Such an "extraordinary departure from the traditional course of relations between the States and the Federal Government" can only be justified by dire and "unique circumstances," and must be limited to "areas where immediate action" is truly necessary. *Id.* at 546.

242.     Defendants have treated the States differently, subjecting only some States to involuntary National Guard deployment without satisfying that high bar.  On the contrary,

59

**GA59**

defendants have failed to provide even a reasonable explanation for the differential treatment. Instead, Defendants have treated certain States differently based solely on whether the administration approves of the State and local policies within those States. Illinois, Oregon, California, and the District of Columbia, all states and cities disfavored by Defendants, have been the subject of involuntary federalization of National Guard troops. Defendants have not deployed state National Guards in any other state without their consent. Such disparate treatment without any basis violates the principle of equal sovereignty. Defendants' selection of Illinois for National Guard federalization and deployment is, at best, arbitrary and, at worst, a politically motivated retaliation for Plaintiffs' adoption of policies that the President disfavors, and it harms the state of Illinois.

**Fifth Claim for Relief**
**Violation of the Administrative Procedure Act § 706(2)(A) - Arbitrary and Capricious Against Agency Defendants**

243.    Plaintiffs reallege and incorporate the foregoing allegations as if fully set forth herein.

244.    Under the Administrative Procedure Act, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," or that is "contrary to constitutional right [or] power," 5 U.S.C. § 706(2)(A)-(B).

245.    Defendants United States Department of Homeland Security, United States Department of Defense, United States Army are each an "agency" under the APA, 5 U.S.C. § 551(1).

246.    The DOD and Secretary Hegseth's Federalization Order, federalizing up to 300 members of the Illinois National Guard at the request of DHS and Secretary Noem, and the Texas Mobilization Order, federalizing up to 400 members of the Texas National Guard to deploy to

60

**GA60**

Illinois and Oregon, each constitute final agency action because each represents the "consummation" of the agency's decision-making process and an action "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation and quotation marks omitted).

247.    An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). This requires that an agency provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). This "reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019).

248.    Agencies may not rely on explanations that are "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Id.* A court "may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 576 U.S. 743, 758 (2015) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)).

249.    Defendants DHS, DOD, and Army have provided no reasoned basis or explanation for these final agency actions.  On the contrary, for the reasons described herein, the implementation by DHS, DOD, and Army of the Federalization Order, and/or the Texas Mobilization Order is arbitrary and capricious because, as discussed above, each relies on false statements and is pretextual.

250.    Finally, the Federalization Order and the Texas Mobilization Order are further arbitrary and capricious because each is in excess of constitutional and statutory authority, including the limitations in 10 U.S.C. § 12406 and the Posse Comitatus Act.

**Sixth Claim for Relief**
**Violation of the Administrative Procedure Act 5 U.S.C. § 706(2)(A)-(C) - Action in Excess of Statutory and Regulatory Authority, Not in Accordance with Law, and Contrary to Law**
**Against Agency Defendants**

251.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

252.    Under the Administrative Procedure Act, a court must "hold unlawful and set aside agency action" that is "not in accordance with the law," that is "contrary to constitutional right [or] power," or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C).

253.    Defendants United States Department of Homeland Security, United States Department of Defense, and the United States Army are each an "agency" under the APA, 5 U.S.C. § 551(1).

254.    Congress enacted the APA "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024) (quoting *U.S. v. Morton Salt*, 338 U.S. 632, 644 (1950)). In *Loper Bright*, the Supreme Court clarified that historical principles of "respect" did not equate to deference, and that "Section 706 makes clear that agency interpretations of statutes—like agency interpretations of the Constitution—are *not* entitled to deference." *Id.* at 392. Rather, it "remains the responsibility of the court to decide whether the law means what the

agency says." *Id.* (quoting *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 109 (Scalia, J., concurring in judgment)).

255.    The DOD and Secretary Hegseth's Federalization Order, federalizing up to 300 members of the Illinois National Guard at the request of DHS and Secretary Noem, and the Texas Mobilization Order constitute final agency action because each represents the "consummation" of the agency's decision-making process and because it represents action "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation and quotation marks omitted).

256.    For the reasons discussed above, the Federalization Order is contrary to and exceeds authority in numerous laws and regulations, including 10 U.S.C. § 12406, the Posse Comitatus Act, and 10 U.S.C. § 275.

257.    The DOD and Secretary Hegseth's Texas Mobilization Order, federalizing up to 400 members of the Texas National Guard at the request of DHS and Secretary Noem also constitutes final agency action because it represents the "consummation" of the agency's decision-making process and because it represents action "from which legal consequences will flow." *Bennett*, 520 U.S. at 178 (citation and quotation marks omitted).

258.    For the reasons discussed above, the Texas Mobilization Order is contrary to and exceeds authority in numerous laws and regulations, including 10 U.S.C. § 12406, the Posse Comitatus Act, and 10 U.S.C. § 275.

259.    And, for the reasons described herein, the implementation by defendants Department of Defense, Department of Homeland Security, and the U.S. Army of the Federalization Order and the Texas Mobilization Order is contrary to and in excess of authority

**GA63**

and limitations in 10 U.S.C. § 12406, the Posse Comitatus Act, and 10 U.S.C. § 275, as well as their implementing regulations.

**Seventh Claim for Relief**
**Violation of the U.S. Constitution Separation of Powers**
**Against All Defendants**

260.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

261.    The Constitution's separation of powers doctrine and the Take Care Clause all place limitations on the exercise of executive authority.

262.    The separation of powers doctrine is "foundational" and "evident from the Constitution's vesting of certain powers in certain bodies." *Seila Law LLC v. CFPB*, 591 U.S. 197, 227 (2020); *see also Trump v. United States*, 603 U.S. 593, 637-38 (2024).

263.    The Constitution grants Congress the power to regulate the domestic activities of state militias and to authorize the President to "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions." U.S. Const. art. I, § 8, cl. 15. The Constitution limits the President's authority to act as Commander-in-Chief of the "Militia of the several States" to instances when they are "called into the actual Service of the United States." U.S. Const. art. II, § 2, cl. 1.

264.    The Executive's powers are limited to those specifically conferred by "an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). The Executive has no power "to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

265.    Defendants have violated the Separation of Powers doctrine by asserting authority over Illinois's state Militia that the Constitution and federal law expressly assign to Illinois.

**GA64**

266.    Additionally, defendants have violated the Separation of Powers doctrine by disregarding the limits in the Posse Comitatus Act and 10 U.S.C. § 275 barring the participation of federal military forces in law enforcement.

267.    This court is authorized to enjoin any action by the Executive and his agencies that "is unauthorized by statute, exceeds the scope of constitutional authority, or is pursuant to unconstitutional enactment." *Youngstown Sheet & Tube Co. v. Sawyer*, 103 F. Supp. 569, 576 (D.D.C. 1952), aff'd, 343 U.S. 579 (1952).

### Eighth Claim for Relief
### Violation of the U.S. Constitution Militia Clauses
### Against All Defendants

268.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

269.    The Militia Clauses expressly provide that "Congress shall have Power … To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions…." U.S. Const. art. I, § 8, cl. 15.  They further provide that Congress has authority "To provide for organizing, arming, and disciplining the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of Officers, and the Authority of training the Militia according to the discipline prescribed by Congress…" U.S. Const. art. I, § 8, cl. 16.

270.    Defendants have violated each of the Milita Clauses by asserting authority over Illinois's state Militia that the Constitution and federal law expressly assigns to Illinois Additionally, Defendants have violated each of the Militia Clauses by disregarding the limits in the Posse Comitatus Act and 10 U.S.C. § 275 barring the participation of federal military forces in law enforcement.

271.    This court is authorized to enjoin any action by the Executive and his agencies that "is unauthorized by statute, exceeds the scope of constitutional authority, or is pursuant to unconstitutional enactment." *Youngstown*, 103 F. Supp. at 576.

**Ninth Claim for Relief**
**Violation of the U.S. Constitution Take Care Clause**
**Against All Defendants**

272.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

273.    The Take Care Clause provides that the Executive must "take Care that the Laws be faithfully executed . . . ." U.S. Const. art. II, § 3; *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes laws and the President . . . faithfully executes them.") (internal quotation marks and citation omitted).

274.    The Executive violates the Take Care Clause where it overrides statutes enacted by Congress and signed into law or duly promulgated regulations implementing such statutes. *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) (holding that "the President is without authority to set aside congressional legislation by executive order"); *Kendall v. United States*, 37 U.S. (12 Pet.) 524, 613 (1838) (rejecting argument that by charging the President with faithful execution of the laws, the Take Care clause "implies a power to forbid their execution").

275.    Defendants have violated the Take Care Clause doctrine by asserting authority over Illinois's state Militia that the Constitution and federal law expressly assigns to Illinois. Additionally, Defendants have violated the Take Care Clause doctrine by and disregarding the limits in the Posse Comitatus Act and 10 U.S.C. § 275 barring the participation of federal military forces in law enforcement.

66

**GA66**

276.    This court is authorized to enjoin any action by the Executive and his agencies that "is unauthorized by statute, exceeds the scope of constitutional authority, or is pursuant to unconstitutional enactment." *Youngstown*, 103 F. Supp. at 576.

### Prayer for Relief

Wherefore, Plaintiffs request that the Court enter judgment against Defendants and award the following relief:

A.  Declare that Defendants' federalization and deployment of the National Guard of the United States, any state National Guard, or deployment of the U.S. military in Illinois, including under 10 U.S.C. § 12406, is unconstitutional and/or unlawful because it: (a) is *ultra vires*; (b) violates the APA; and (c) is contrary to the Constitution of the United States;

B.  Hold unlawful and enjoin Defendants' federalization and deployment of the National Guard of the United States, any state National Guard, or deployment of the U.S. military, pursuant to the Federalization Order, the Texas Mobilization Order, and any similar order effectuating the mobilization of the National Guard of the United States, any state National Guard, or deployment of the U.S. military in Illinois over the objection of the Governor of Illinois;

C.  Permanently and preliminarily enjoin defendant Hegseth and the Department of Defense from federalizing or otherwise deploying forces in implementation of the Federalization Order, the Texas Mobilization Order, and any similar order effectuating the mobilization of the National Guard of the United States, any state National Guard, or deployment of the U.S. military in Illinois over the objection of the Governor of Illinois;

D.  Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2202, vacate and set aside the Federalization Order, the Texas Mobilization Order, and any similar order effectuating the mobilization of the National Guard of the United States, any state National Guard, or deployment of the U.S. military in Illinois over the objection of the Governor of Illinois;

E.  Award the Plaintiffs their costs and reasonable attorneys' fees; and

F.  Award such additional relief as the interests of justice may require.

Dated this 6th Day of October, 2025

KWAME RAOUL
*Attorney General of Illinois*

by:

 /s/  Sarah J. North
CARA HENDRICKSON
Executive Deputy Attorney General
CHRISTOPHER WELLS
Division Chief, Public Interest Division
SARAH J. NORTH
Deputy Division Chief, Public Interest
Division
SARAH HUNGER
Deputy Solicitor General
KATHARINE ROLLER
Complex Litigation Counsel
GRETCHEN HELFRICH
Deputy Chief, Special Litigation Bureau
KATHERINE PANNELLA
Senior Assistant Attorney General
SHERIEF GABER
MICHAEL TRESNOWSKI
Assistant Attorneys General
Office of the Illinois Attorney General
115 South LaSalle Street
31st Floor
Chicago, Illinois 60603
(312) 814-3000
Cara.Hendrickson@ilag.gov
Christopher.Wells@ilag.gov
Sarah.North@ilag.gov
Katharine.Roller@ilag.gov
Gretchen.Helfrich@ilag.gov
Katherine.Pannella@ilag.gov
Sherief.Gaber@ilag.gov
Michael.Tresnowski@ilag.gov

*Counsel for the State of Illinois*

GA68

MARY B. RICHARDSON-LOWRY
Corporation Counsel of the City of Chicago

By: /s/ Stephen J. Kane
Stephen J. Kane
Chelsey B. Metcalf
City of Chicago Department of Law
121 North LaSalle Street, Room 600
Chicago, Illinois 60602
312-744-6934
stephen.kane@cityofchicago.org
chelsey.metcalf@cityofchicago.org

*Counsel for the City of Chicago*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| STATE OF ILLINOIS, a sovereign state; CITY OF CHICAGO, an Illinois municipal corporation, | |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; DEPARTMENT OF DEFENSE; PETER B. HEGSETH, in his official capacity as Secretary of the Department of Defense; UNITED STATES ARMY; DANIEL P. DRISCOLL, in his official capacity as Secretary of the Army | Case No. 25-12174<br><br>Judge |
| Defendants. | |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................... 1

FACTUAL BACKGROUND ....................................................................................... 3

    A.    Congress has determined when the President may call the National Guard into federal service. ........................................................................................................................ 3

    B.    President Trump has disparaged Chicago for years. ...................................... 4

    C.    Since returning to office, President Trump has repeatedly targeted Chicago and Illinois with detrimental, and often unlawful, executive actions. ............................................. 5

    D.    After troop deployments in Los Angeles and Washington, D.C., President Trump said Chicago would be next. ...................................................................................................... 8

    E.    Since September 8, the Trump administration has targeted the Chicago area for increased immigration enforcement through "Operation Midway Blitz." ............................... 12

    F.    The recent protests at ICE's detention facility in suburban Broadview do not warrant a troop deployment. ................................................................................................................. 14

        1.    Prior to Operation Midway Blitz, ICE officials anticipated protests in Broadway, but those protests have not stopped the operation. ......................................................... 15

        2.    Federal agents have escalated their response to small and peaceful protests in Broadview, predictably increasing protest activity. ................................................. 16

        3.    Despite provocative behavior by federal agents, the Broadview protests have not stopped federal agents from executing federal law. ............................................... 17

        4.    Multiple state and local law enforcement agencies, including the Illinois State Police, have formed a unified command in Broadview to manage public safety and protect First Amendment rights around ICE's facility. ............................................. 18

        5.    Despite clearly provocative action by administration officials—including DHS Secretary Noem—protests in Broadview remained lawful and mostly peaceful on October 3. .................................................................................................................. 19

    G.    On October 4, President Trump ordered the federalization and deployment of "at least" 300 National Guard troops in Illinois over the Governor's objection. ..................................... 20

LEGAL STANDARD ................................................................................................ 22

ARGUMENT .............................................................................................................. 23

    I.    Plaintiffs have standing to challenge the federal administration's actions. ................. 23

    II.    Plaintiffs are likely to succeed on their claim that deploying National Guard troops in Illinois is *ultra vires* and exceeds the President's authority in 10 U.S.C. § 12406. ................. 25

        A.    The President has failed to properly invoke his limited authority in 10 U.S.C. § 12406. .......................................................................................................................... 25

        B.    There is no basis for claiming the President is "unable" to "execute" federal law in Broadview or anywhere else in Illinois. ......................................................................... 27

        C.    There is no "rebellion" or "danger of a rebellion" in Illinois. ...................................... 33

i

**GA71**

D.   The President cannot avoid or minimize judicial scrutiny of his use of Section 12406. .................................................................................................................. 35

    1.   The federalization and deployment of National Guard troops in Illinois over the Governor's objection is subject to judicial review. ................................... 36

    2.   The Court owes the President and his administration no deference. ........................ 38

III.   Plaintiffs are likely to succeed on their claim that the deployment of federal troops in Illinois violates the Tenth Amendment. ..................................................................... 41

IV.   Plaintiffs are likely to succeed on their claim that the Posse Comitatus Act prohibits the deployment of federal troops in Illinois. .................................................................... 44

V.   The State of Illinois will suffer irreparable harm—including profound sovereign injury—without an injunction. ....................................................................................... 47

VI.   The impending deployment of Texas National Guard troops in Illinois is unlawful for the same reasons—and more—and compounds the grave, irreparable injury to Illinois's sovereignty. .................................................................................................................. 50

CONCLUSION ....................................................................................................................... 52

**GA72**

## TABLE OF AUTHORITIES

### Cases

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592 (1982) ........................... 24

*Biden v. Nebraska*, 600 U.S. 477 (2023) ................................................... 24

*Bond v. United States*, 564 U.S. 211 (2011) ............................................... 43

*Boumediene v. Bush*, 553 U.S. 723 (2008) ................................................ 40

*City of El Cenizo v. Texas*, 890 F.3d 164 (5th Cir. 2018) ................................. 52

*Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976) ....... 23

*Ex parte Milligan*, 71 U.S. 2 (1866) ...................................................... 35

*FBI v. Fikre*, 601 U.S. 234 (2024) ....................................................... 23

*GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357 (7th Cir. 2019) ................. 23

*Indiana Right to Life Victory Fund v. Morales*, 112 F.4th 466 (7th Cir. 2024) ..... 22, 23

*INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) ............................................. 40

*J.A.V. v. Trump*, 781 F. Supp. 3d 535 (S.D. Tex. 2025) ................................... 41

*Kentucky v. Biden*, 23 F.4th 585 (6th Cir. 2022) ......................................... 24

*Korte v. Sebelius*, 735 F.3d 654 (7th Cir. 2013) ......................................... 23

*Laird v. Tatum*, 408 U.S. 1 (1972) ....................................................... 36

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ................... 49

*Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531 (7th Cir. 2021) ...................... 47

*Martin v. Mott*, 25 U.S. 19 (1827) ....................................................... 36

*Maryland v. King,* 567 U.S. 1301 (2012) .................................................. 47

*National Federation of Independent Business v. Sebelius,* 567 U.S. 519 (2012) ...... 42, 43

*Newsom v. Trump*, 141 F.4th 1032 (9th Cir. 2025) ..................................... 25, 34

*Newsom v. Trump*, 786 F. Supp. 3d 1235 (N.D. Cal. 2025) ............................... 9, 34

*Newsom v. Trump*, No. 25-CV-04870-CRB, 2025 WL 2501619 ......................... 10, 24, 25

*Nken v. Holder*, 556 U.S. 418 (2009) ........................................................... 49

*Ohio v. Envtl. Prot. Agency*, 603 U.S. 279 (2024) ....................................... 48

*Oregon v. Trump*, No. 3:25-cv-1756-IM .................................................. passim

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013) .................................. 49

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47 (2006) .................... 23

*Shelby County v. Holder*, 570 U.S. 529 (2013) ............................................. 52

*Sterling v. Constantin*, 287 U.S. 378 (1932) ............................................... 39

*Swain v. Junior,* 958 F.3d 1081 (11th Cir. 2020) ........................................ 48

*Trump v. J.G.G.*, 145 S. Ct. 1003 (2025) ................................................... 40

*Unite Here Local 1 v. Hyatt Corp.*, 862 F.3d 588 (7th Cir. 2017) ............... 40

*United States v. Dreyer*, 804 F.3d 1266, 1272 (9th Cir. 2015) .................... 45

*United States v. Hutchings*, 127 F.3d 1255, (10th Cir. 1997) ...................... 45

*United States v. Morrison*, 529 U.S. 598 (2000) .......................................... 24

*USA-Halal Chamber of Commerce, Inc. v. Best Choice Meats, Inc.*, 402 F. Supp. 3d 427, (N.D. Ill. 2019) ................................ 22

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, (2008) .......................... 49

*Youngstown Sheet and Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ............... 35, 37, 38, 45

*Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189 (2012) .................... 23

**Statutes**

10 U.S.C. § 10106 ........................................................................................ 45

10 U.S.C. § 12405 ........................................................................................ 45

10 U.S.C. § 12406 ................................................................................... passim

10 U.S.C. § 275 ........................................................................................... 46

10 U.S.C. §§ 251-55 .................................................................................... 45

18 U.S.C. § 1385 ...................................................................................... 44, 45

Ill. Pub. Act 100-463 (eff. Aug. 28, 2017) .................................................... 6

Militia Act of 1795 ................................................................................................ 37

**Other Authorities**

Executive Order 14159 ............................................................................................ 5

The Declaration of Independence ........................................................................ 36

**Regulations**

Department of Defense Instruction, Defense Support of Civilian Law Enforcement Agencies
3025.21 .............................................................................................................. 45

**Constitutional Provisions**

U.S. Const. amend. III ........................................................................................... 36

U.S. Const. amend. X ...................................................................................... 41, 42

U.S. Const. art. I, § 8, cl. 15 .............................................................................. 3, 41

U.S. Const. art. I, § 8, cl. 15–16 .......................................................................... 24

U.S. Const. art. I,, § 8, cl. 15–16 ........................................................................ 24

## INTRODUCTION

Since President Trump took office for the second time, his deployment of federal troops to the Chicago area has been a question of when, not if. The inevitability of this action—forecasted in countless posts and public statements—is confirmation of its illegality.

Nothing happening anywhere in Illinois justifies the President's extraordinary decision to deploy federalized National Guard troops over the objection of this state's Governor. Both the Constitution and Congress have carefully circumscribed the conditions under which the President can wield such an audacious power in our federalist system. None of those conditions exist in Illinois. There is no foreign invasion. There is no actual or imminent rebellion. And there is nowhere in Illinois where the President is unable to execute federal law.

Nonetheless, on October 4, 2025, President Trump ordered the federalization and deployment of "at least" 300 members of the Illinois National Guard in this state over the Governor's objection.[1] Effectuating the President's order, the Secretary of Defense, Pete Hegseth, directed a memorandum to the Adjutant General of the Illinois National Guard instructing him to activate these troops under 10 U.S.C. § 12406 ("October 4 Federalization Order").[2] The October 4 Federalization Order stated the troops were to "protect" federal property and personnel—specifically, "U.S. Immigration and Customs Enforcement, Federal Protective Service, and other U.S. government personnel" performing federal functions.[3] The October 4 Federalization Order referred to providing such protection "at locations where violent demonstrations against these

---

[1] Ex. 1, Declaration of Bria Scudder, (Scudder Decl.) at Exhibit 1-D (Oct. 4, 2025 Gen. Steven S. Nordhaus Memorandum for the Adjutant Gen., Ill. Nat'l Guard, re: "Request for Illinois National Guard Federal Protection Mission"); Ex. 2, Oct. 4, 2025 Sec'y of Def. Memorandum for the Adjutant Gen., Ill. Nat'l Guard Through: the Governor of Ill., re: "Calling Members of the Illinois National Guard into Federal Service" ("October 4 Federalization Order").
[2] Ex. 2, October 4 Federalization Order.
[3] *Id*.

1

**GA76**

functions are occurring or are likely to occur based on current threat assessments and planned operations."[4]

The October 4 Federalization Order followed small protests at a single temporary detention facility for U.S. Immigration and Customs Enforcement ("ICE") in Broadview, Illinois—a suburb of approximately 8,000 residents twelve miles from downtown Chicago.[5] For over 19 years, small groups have gathered on Fridays outside the ICE facility in Broadview, often to hold prayer vigils.[6] Since the launch of "Operation Midway Blitz," an aggressive immigration enforcement campaign targeting the Chicagoland area, the Broadview protests have grown, but only once have they had more than 200 participants.[7] At times, the number of federal agents protecting the property has exceeded the number of protestors. Although the protests in recent weeks have included acts of civil disobedience and a handful of arrests, the protests have never come close to stopping federal immigration enforcement in Illinois. Far from it: on October 3, the same day as the largest protest to date in Broadview, the President's administration announced that Operation Midway Blitz has yielded 1,000 immigration-related arrests in the Chicago area in less than a month.

The President is using the Broadview protests as a pretext. The impending federal troop deployment in Illinois is the latest episode in a broader campaign by the President's administration to target jurisdictions the President dislikes—because of their Democratic leadership, their so-called "sanctuary" policies preventing local police from becoming de facto federal immigration agents, or some other reason. Just days ago, the President made his intent undeniably clear when

---

[4] Ex. 2, October 4 Federalization Order.
[5] Ex. 4, Declaration of Chief Thomas Mills, Broadview Police Department ("Mills Decl.") ¶¶ 5, 16-58.
[6] Ex. 5, Declaration of Father Brendan Curran, OP ("Curran Decl.") ¶¶ 2-8; Ex. 4 (Mills Decl.) ¶ 9.
[7] Ex. 4 (Mills Decl.) ¶ 19.

he told U.S. military leaders that Chicago and other cities "should" be used as "training grounds for our military" amid a "war from within."[8]

The Court can and should stop the administration's lawlessness by enjoining implementation of the October 4 Federalization Order and the October 5 Texas Mobilization Order (collectively, the "Orders"). Any of three different claims warrant immediate injunctive relief. First, the Orders exceed the President's authority under the laws prescribed by Congress, including 10 U.S.C. § 12406. Second, the Orders violate the Tenth Amendment: by usurping the Governor's control over the Guard, by intruding on Illinois's general police power, and by attempting to coerce Illinois into abandoning a statewide policy the President dislikes. Third, the mission prescribed by the Orders cannot be done without defying the Posse Comitatus Act. This Court should immediately enter a temporary restraining order and preliminarily enjoin the President's unlawful troop deployment in Illinois.[9]

## FACTUAL BACKGROUND

### A. Congress has determined when the President may call the National Guard into federal service.

The Constitution gives Congress, not the President, the power "to provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions." U.S. Const. art. I, § 8, cl. 15. Congress has exercised this authority in different federal statutes that create three active statuses for National Guard forces.[10]

---

[8] NBC Chicago Staff and The Associated Press, "Trump calls for using US cities like Chicago as a 'training ground' for military," NBC Chicago (Sept. 30, 2025), available at https://www.nbcchicago.com/news/local/trump-calls-for-using-us-cities-like-chicago-as-a-training-ground-for-military/3831694/.

[9] Yesterday evening, on October 5, the State of Illinois learned of an additional order purporting to federalize and mobilize up to 400 members of the Texas National Guard ("Texas Mobilization Order") under 10 U.S.C. § 12406 for deployment in Illinois, including, specifically, Chicago. See Ex. 3. As with the October 4 Federalization Order regarding the Illinois National Guard, the Texas Mobilization Order is unlawful and should be preliminary enjoined, as discussed *infra* § VI.

[10] Ex. 6, Declaration of Lt. Gen. Jeffrey S. Buchanan (Retired) (Buchanan Decl.), ¶¶ 11-14.

3

**GA78**

First, the National Guard could be activated by the state in which the National Guard unit is based—commonly referred to as "State Active Duty."[11] Second, the National Guard could be activated pursuant to Title 32 of the United States Code.[12] In "Title 32 status," a state's governor makes a request for the federal government to bring troops into active duty for a particular mission, and the governor remains in command of the National Guard troops performing the mission while the federal government bears the costs.[13] Third, the National Guard can be activated pursuant to Title 10 of the United States Code—the type of activation being contested here.[14]

In "Title 10 status," the National Guard is considered "federalized" and acts as part of the federal military, subject to the command of the President in his capacity as Commander-in-Chief.[15] Federalized National Guard troops serving under Title 10 may not engage in domestic law enforcement activities, subject to specific exceptions.[16] Through this lawsuit, the Plaintiffs challenge the President's decision to federalize the Illinois National Guard over the Governor of Illinois's objection.

### B.  President Trump has disparaged Chicago for years.

The federalization and deployment of the National Guard in the Chicago area is the direct result of President Trump's longstanding and well-documented animus toward Illinois and Chicago. The day before he was first elected President, on November 7, 2016, then-candidate Trump tweeted about Chicago claiming: "The crime is unbelievable. You can't walk to the store and get a loaf of bread. Often, you get shot."[17] As President, Trump would go on to characterize Chicago in October 2019 as "the worst sanctuary city in America" that "protects criminals at a

---

[11] *Id*. ¶ 12
[12] *Id*. ¶ 13.
[13] *Id*..
[14] Ex. 6 (Buchanan Decl.) ¶ 14.
[15] *Id*. ¶ 14.
[16] *Id*. ¶ 15.
[17] Ex. 9, Declaration of Sherief Gaber ("Gaber Decl."), ¶ 20.

4

level few could imagine," and further claiming that "Afghanistan is a safe place by comparison."[18] In the summer of 2020, when the killing of George Floyd by Minneapolis police sparked nationwide protests and civil disturbances, President Trump derided "the radical-left wing mobs that you see all over in some of the cities," specifically citing Chicago and "so many different places that are run by Liberal Democrats."[19]

Trump's targeting of Chicago continued after he left office and as he prepared to seek the presidency again. In a July 2022 speech, Trump asserted that "the next president needs to send the National Guard" to Chicago.[20] A month later, he decried "cities that were run by Democrats going so bad, so fast."[21] Trump repeated this theme in his 2024 campaign, claiming again that in "cities" that are "run by Democrats . . . you can't walk across the street to get a loaf of bread. You get shot. You get mugged. You get raped. You get whatever it may be."[22]

### C. Since returning to office, President Trump has repeatedly targeted Chicago and Illinois with detrimental, and often unlawful, executive actions.

Immediately upon taking office again, President Trump translated his hostile rhetoric toward Illinois, Chicago, and other disfavored jurisdictions into executive action. The day of his second inauguration, January 20, 2025, President Trump signed Executive Order 14159, titled "Protecting the American People Against Invasion."[23] The order targeted "sanctuary jurisdictions" that allegedly "seek to interfere with the lawful exercise of Federal law enforcement operations."[24] In the order, President Trump directed the U.S. Attorney General and the Secretary of Homeland Security to take action "to the maximum extent possible under law" to "ensure that so-called

---

[18] *Id.* ¶ 25.
[19] *Id.* ¶ 29.
[20] *Id.* ¶ 33.
[21] Ex. 9 (Gaber Decl.) ¶ 34.
[22] *Id.* ¶ 35.
[23] Exec. Order No. 14159, 90 Fed. Reg. 8443 (2025).
[24] *Id.*, Sec. 17.

**GA80**

'sanctuary' jurisdictions . . . do not receive access to Federal funds," and to "undertake any other lawful actions, civil or criminal," based on "any such jurisdiction's practices that interfere with the enforcement of Federal law."[25]

Shortly thereafter, on February 6, 2025, Attorney General Bondi, in one of her first official acts, filed a lawsuit against the State of Illinois, its Governor, JB Pritzker, the City of Chicago, and its Mayor, Brandon Johnson.[26] The lawsuit sought to invalidate so-called "sanctuary" policies in this state and its largest city, which generally restrict state and local police from assisting with federal civil immigration enforcement.[27] Illinois's so-called "sanctuary" law, the TRUST Act, first took effect in 2017, when it was signed by then-Governor Rauner, a Republican.[28] The Trump administration's challenge to the TRUST Act was dismissed by Judge Lindsay Jenkins of this Court in August, though the deadline for the federal government to appeal the dismissal has not yet expired.[29]

In addition to targeting Chicago and Illinois with litigation, the President's lieutenants have also sought to carry out his directive to strip them of federal funds appropriated by Congress. Following the President's directive to withhold federal funds from "sanctuary" jurisdictions, the U.S. Department of Homeland Security ("DHS") has attempted to force states and localities to accept conditions on federal grant funding requiring them to assist with federal immigration enforcement or lose those funds.[30] Illinois, together with several other states, challenged these immigration-related grant conditions as unlawful, obtaining a final judgment and injunction against DHS and its sub-agencies on September 24, 2025.[31] Undeterred, DHS tried another tack:

---

[25] *Id.*
[26] *United States v. Illinois*, No. 25 CV 1285 (N.D. Ill.) (filed Feb. 6, 2025).
[27] *United States v. Illinois*, No. 25 CV 1285, 2025 WL 2098688, at *2 (N.D. Ill. July 25, 2025).
[28] Ill. Pub. Act 100-463 (eff. Aug. 28, 2017).
[29] *United States v. Illinois*, 2025 WL 2098688, at *27.
[30] *See Illinois v. FEMA*, No. 25-cv-206, 2025 WL 2716277 (D.R.I. Sept. 24, 2025).
[31] *Id.*

arbitrarily slashing discretionary grant funding earmarked for so-called "sanctuary" states and redirecting those funds to more favored states.[32] But that approach has also been rebuffed, at least initially, with a temporary restraining order entered on September 30, 2025.[33]

Meanwhile, Chicago, Cook County, and Illinois have all been designated "sanctuary" jurisdictions in a list first published by DHS on May 29, 2025.[34] DHS described the listed jurisdictions, initially totaling around 500 American communities, as "shamefully obstructing" the federal administration's deportation efforts and "shielding dangerous criminal aliens."[35] But by June 1, 2025, DHS unpublished the initial list following objections from several of the included jurisdictions, some of which were led by Republicans.[36] Later, on August 5, 2025, the DOJ published an updated "sanctuary" jurisdiction list with 35 entries—nearly all of which are states and municipalities led by Democrats.[37] Chicago, Cook County, and Illinois are all included.[38] In announcing the updated "sanctuary" jurisdiction list, Attorney General Bondi stated that DOJ would "continue bringing litigation against sanctuary jurisdictions and work closely with [DHS] to eradicate these harmful policies around the country."[39]

The republished "sanctuary" jurisdiction list prompted further actions by DHS and DOJ. On August 8, Secretary Noem traveled to a Chicago suburb to denounce "elected leaders in this State of Illinois" who she claimed "are ignoring the law" and being "obstructionists when it comes

---

[32] *See Illinois v. Noem*, No. 25-cv-495 (D.R.I.) (filed Sept 29, 2025).
[33] *Id.*, Dkt. 14.
[34] Compl. ¶ 63
[35] *Id.*
[36] Compl. ¶ 64.
[37] U.S. Dep't of Justice, "Justice Department Publishes List of Sanctuary Jurisdictions," Press Release (Aug. 5, 2025) ("DOJ Sanctuary List"), available at: https://www.justice.gov/opa/pr/justice-department-publishes-list-sanctuary-jurisdictions.
[38] *Id.*
[39] *Id.*

to getting dangerous criminals off of their streets."[40] Secretary Noem specifically named Illinois's Governor Pritzker and Chicago's Mayor Johnson as examples, saying "they'd rather be a sanctuary state" than protect American citizens from dangerous criminals.[41] Not to be outdone, on August 13, 2025, Attorney General Bondi sent threatening letters to Governor Pritzker and Mayor Johnson blaming their "sanctuary jurisdiction policies" for allegedly "obstruct[ing] federal immigration enforcement, giving aliens cover to perpetrate crimes in our communities and evade the immigration consequences that federal law requires."[42] The purported purpose of the August 13 letters was to provide notice to the recipient jurisdictions of "their unlawful sanctuary status and potential violations of federal law."[43]

### D. After troop deployments in Los Angeles and Washington, D.C., President Trump said Chicago would be next.

Amid these threats by his cabinet officials, on August 22, 2025, President Trump returned to a proposal he had floated almost exactly three years prior, in July 2022: sending National Guard troops to Chicago.[44] The proposal had become far more concrete by late August 2025. By that point, President Trump had already deployed federalized National Guard troops in two cities, Los Angeles and Washington, D.C., that, like Chicago, have Democratic leaders and so-called "sanctuary" status.[45]

---

[40] Christian Piekos and Sarah Schulte, "DHS Secretary Kristi Noem accuses Illinois leaders of being 'obstructionist' in Chicago area visit," ABC7 (Aug. 8, 2025), available at https://abc7chicago.com/post/dhs-secretary-kristi-noem-chicago-friday-speak-immigration/17470258/.
[41] Matt Masterson, "Homeland Security Head Noem Criticizes Pritzker, Johnson in Illinois Visit While Local Officials Brand Her a 'Liar'", WTTW (Aug. 8, 2025), available at https://news.wttw.com/2025/08/08/homeland-security-head-noem-criticizes-pritzker-johnson-illinois-visit-while-local.
[42] Ex. 7, August 13, 2025 Letter from Att'y Gen. Bondi to Governor Pritzker; Ex. 8, August 13, 2025 Letter from Att'y Gen. Bondi to Mayor Johnson.
[43] *Id.*
[44] Ex. 9 (Gaber Decl.) ¶ 33 (July 26, 2022 speech), ¶ 43 (August 22, 2025 remarks).
[45] *See* U.S. Dep't of Justice, "Justice Department Publishes List of Sanctuary Jurisdictions," Press Release (Aug. 5, 2025), available at: https://www.justice.gov/opa/pr/justice-department-publishes-list-sanctuary-jurisdictions.

On the evening of June 6, 2025, a protest against the Trump administration's immigration policies outside the federal courthouse in Los Angeles resulted in property damage, a burned vehicle, and injuries to some federal officers on the scene. *See Newsom v. Trump*, 786 F. Supp. 3d 1235, 1243 (N.D. Cal. 2025). The following morning, June 7, 2025, President Trump issued a memorandum to Secretary of Defense Hegseth, Attorney General Bondi, and Secretary Noem, in which he claimed:

> Numerous incidents of violence and disorder have recently occurred and threaten to continue in response to the enforcement of Federal law by U.S. Immigration and Customs Enforcement (ICE) and other United States Government personnel who are performing Federal functions and supporting the faithful execution of Federal immigration laws . . . To the extent that protests or acts of violence directly inhibit the execution of the laws, they constitute a form of rebellion against the authority of the Government of the United States.[46]

The June 7 Presidential Memorandum further declared that "[i]n light of these incidents and credible threats of continued violence," the President was "call[ing] into Federal service members and units of the National Guard" in order to "temporarily protect ICE" and other federal government personnel and facilities.[47] The President cited 10 U.S.C. § 12406 as the authority for his order federalizing the National Guard, though he did not name a specific state's National Guard or identify the location of the deployment.[48]

Subsequent to the June 7 Presidential Memorandum, President Trump's administration deployed both California National Guard troops—who had been federalized over the objection of California's Governor, a Democrat—and active-duty U.S. Marines to Los Angeles. *Newsom v. Trump*, 786 F. Supp. 3d at 1245. California and its Governor immediately sued to stop the deployment and initially obtained a temporary restraining order in federal district court, though a

---

[46] Ex. 10, June 7, 2025 Presidential Memorandum.
[47] *Id.*
[48] *Id.*

9

**GA84**

Ninth Circuit panel vacated it. *See Newsom v. Trump*¸ 141 F.4th 1032 (9th Cir. 2025). In addition to being deployed around federal buildings in Los Angeles, California National Guard troops also performed additional missions assisting federal law enforcement in the broader Los Angeles metropolitan area—and sometimes far beyond. *See Newsom v. Trump*, No. 25-CV-04870-CRB, 2025 WL 2501619 (N.D. Cal. Sept. 2, 2025). A federal district court later ruled that several of those missions and actions violated limitations in a century-and-a-half-old federal law, the Posse Comitatus Act, on domestic use of the military for civilian law enforcement. *Id.* That ruling is currently on appeal in the Ninth Circuit.

In the wake of the Ninth Circuit's ruling, President Trump deployed National Guard troops in Washington, D.C., another so-called "sanctuary" city with a Democratic mayor.[49] Through an August 11, 2025 order, President Trump mobilized National Guard troops purportedly "to address the epidemic of crime in our Nation's capital"—though crime in Washington had been declining according to his own administration.[50] Because of Washington's unique status as a federal jurisdiction, rather than a state, the authority invoked differed from the troop deployment in California in June.[51] The President also authorized the use of National Guard members from states outside of Washington, D.C., which multiple Republican Governors promptly agreed to provide.[52]

---

[49] U.S. Dep't of Justice, "Justice Department Publishes List of Sanctuary Jurisdictions," Press Release (Aug. 5, 2025), available at: https://www.justice.gov/opa/pr/justice-department-publishes-list-sanctuary-jurisdictions.

[50] August 11, 2025 Presidential Memorandum, https://www.whitehouse.gov/presidential-actions/2025/08/restoring-law-and-order-in-the-district-of-columbia/; U.S. Atty's Office, D.C., "U.S. Attorney Ed Martin Jr. Highlights Successful Local Prosecutions During First 100 Days," Press Release (Apr. 29, 2025), available at: https://www.justice.gov/usao-dc/pr/us-attorney-ed-martin-jr-highlights-successful-local-prosecutions-during-first-100-days (25% drop in violent crime year-to-date).

[51] August 11, 2025 Presidential Memorandum, https://www.whitehouse.gov/presidential-actions/2025/08/restoring-law-and-order-in-the-district-of-columbia/.

[52] Joseph Ax, "More Republican governors send National Guard to Washington, backing Trump," Reuters (Aug. 19, 2025), available at https://www.reuters.com/world/us/more-republican-governors-send-national-guard-washington-backing-trump-2025-08-19/.

Amid these ongoing troop deployments in California and Washington, in late August and early September, President Trump repeatedly announced his plan to send federal troops to Chicago:

- Speaking to reporters on August 22 from the Oval Office, President Trump remarked that "the National Guard has done such an incredible job working with the police," and "I think Chicago will be our next and then we'll help with, uh, New York."[53]

- On August 25, President Trump again referenced plans for a Chicago troop deployment, stating: "We go in, we will solve Chicago within one week, maybe less. But within one week, we will have no crime in Chicago just like we have no crime in D.C."[54]

- On August 30, after Governor Pritzker voiced opposition to a potential Chicago troop deployment, President Trump posted on social media that the Governor "better straighten it out, FAST, or we're coming!"[55]

- On September 2, President Trump called Chicago "a hellhole" and worse than Afghanistan; when asked whether he had made up his mind "on Chicago," the President answered simply: "We're going in – I didn't say when, we're going in."[56]

- On September 3, President Trump sent a fundraising email to his supporters with the subject "We're going to Chicago!" The email began: "**WE'RE GOING INTO CHICAGO**. I'm not saying when, but we're going in!" Claiming he had "turned our Great Capital into a Safe Zone," President Trump declared: "**NOW I WANT TO LIBERATE CHICAGO!**" After decrying that "The Radical Left Governors and Mayors of crime ridden cities don't want to stop the radical crime," the President assured his supporters: "<u>WE'RE GOING TO DO IT ANYWAY</u>."[57]

This weeks-long torrent of declarations about Chicago reached a temporary crescendo on Saturday, September 6, when President Trump posted this image on social media:

---

[53] Ex. 9 (Gaber Decl.) ¶ 43.
[54] *Id.* ¶ 44.
[55] *Id.* ¶ 52.
[56] *Id.* ¶ 57.
[57] Ex. 9 (Gaber Decl.) ¶ 60.



In its imagery, language, and font, the post evoked a character from the 1979 Vietnam War film, *Apocalypse Now*, who led a helicopter attack on a Vietnamese village, massacring several civilians.[58]

### E. Since September 8, the Trump administration has targeted the Chicago area for increased immigration enforcement through "Operation Midway Blitz."

Two days after the President's "Chicocalpyse Now" post, the President's administration announced the launch of Operation Midway Blitz on September 8.[59] The announced purpose of the operation was to target "the criminal illegal aliens who flocked to Chicago and Illinois because they know Governor Pritzker and his sanctuary policies would protect them and allow them to roam free on American streets."[60] Within eleven days of announcing the start of Operation Midway Blitz, a DHS spokesperson claimed on September 19 that the operation had resulted in "almost

---

[58] *Id.* ¶ 61.
[59] Ex. 11, DHS, "ICE Launches Operation Midway Blitz in Honor of Katie Abraham to Target Criminal Illegal Aliens Terrorizing Americans in Sanctuary Illinois," Press Release (Sept. 8, 2025) ("DHS Sept. 8 Press Release").
[60] *Id.*

550 arrests," and declared that DHS "will not be deterred by sanctuary politicians or violent rioters."[61]

This initial wave of arrests also quickly brought tragedy. On September 12—day five of Operation Midway Blitz—in suburban Franklin Park, Illinois, an ICE officer shot and killed Silverio Villegas-Gonzalez, a 38-year-old father of two as he was driving home from dropping his three-year-old son off at daycare.[62] Although neither of the involved ICE officers had body-worn cameras, videos of the incident and its aftermath from other sources contradicted various aspects of a hastily issued DHS press release describing the shooting officer as "seriously injured" by a "criminal illegal alien."[63]

In addition to the high-profile fatal shooting on September 12, DHS leadership and officials engaged in prominent and provocative displays of force throughout Chicago and its suburbs in the rollout of Operation Midway Blitz. On September 16—four days after a shooting by an agent under her command—Secretary Noem came to the Chicago area to ride along with federal immigration agents executing early-morning raids and other actions.[64] In particular, Secretary Noem accompanied Greg Bovino, the U.S. Customs and Border Protection ("CBP") agent who led the immigration enforcement operations in Los Angeles that coincided with the National Guard deployment there.[65] Agent Bovino has also led conspicuous patrols with large groups of CBP

---

[61] CBS News Chicago, "Nearly 550 arrested during Chicago area immigration crackdown so far, official says," (Sept. 19, 2025), available at: https://www.cbsnews.com/chicago/news/400-ice-arrests-chicago-operation-midway-blitz/.
[62] Kim Bellware, "Videos of fatal ICE shooting in Chicago raise questions about DHS account," Washington Post (Sept. 28, 2025), available at: https://www.washingtonpost.com/immigration/2025/09/28/ice-officers-chicago-shooting-dhs-video/.
[63] Id.
[64] Commander Op At Large CA Gregory K. Bovino, @CMDROpAtLargeCA, 12:26 p.m., Sept. 18, 2025 post on X.com, available at: https://x.com/CMDROpAtLargeCA/status/1968730847168643176; Secretary Kristi Noem, @Sec_Noem, 8:53 a.m., Sept. 18, 2025 post on X.com, available at: https://x.com/Sec_Noem/status/1968674758838391049.
[65] Camilo Montoya-Galvez, "Border official who oversaw Los Angeles immigration raids arrives in Chicago as Trump widens crackdown," CBS News (September 10, 2025), available at: https://www.cbsnews.com/news/immigration-chicago-gregory-bovino-border-official-trump/.

agents through downtown Chicago—both on foot and on the Chicago River. For example, on September 25, several CBP boats sailed through a downtown stretch of the Chicago River with Agent Bovino visibly perched on the bow.[66] A similar boat patrol took place on September 28, accompanied by foot patrols on dry ground.[67] Specifically, on a warm, sunny Sunday afternoon, Agent Bovino led dozens of fatigue-clad, masked, and, in some cases, heavily armed CBP agents on foot through the Chicago Loop and other nearby neighborhoods.[68]

Since then, detentions and arrests have continued. In a large-scale operation on October 1, federal agents stormed an apartment building in Chicago's South Shore neighborhood, detaining several dozen residents, including multiple children who are U.S. citizens.[69] On October 3, 2025, DHS issued a press release—coinciding with Secretary Noem's visit that day to an ICE temporary detention center in Broadview, Illinois—touting 1,000 arrests in Operation Midway Blitz.[70]

### F.  The recent protests at ICE's detention facility in suburban Broadview do not warrant a troop deployment.

Since at least May 2025, small groups of protestors have gathered outside an ICE temporary detention facility in Broadview, a suburb of Chicago approximately twelve miles west

---

[66] Mack Liederman, "Armed Border Agents' Cruise On Chicago River Slammed As 'Photo Op' By Alderman," Block Club Chicago (Sept. 26, 2025), available at https://blockclubchicago.org/2025/09/26/armed-border-agents-cruise-on-chicago-river-slammed-as-photo-opp-by-alderman/.
[67] Chip Mitchell, et al., "Feds march into Downtown Chicago; top border agent says people are arrested based partly on 'how they look,'" WBEZ Chicago (Sept. 29, 2025), available at: https://www.wbez.org/immigration/2025/09/29/feds-march-into-downtown-chicago-top-border-agent-says-people-are-arrested-based-on-how-they-look.
[68] James Neveau, JC Navarrete and Matt Stefanski, "Armed Border Patrol agents patrol downtown Chicago, drawing mayoral criticism," NBC Chicago (Sept. 29, 2025), available at: https://www.nbcchicago.com/news/local/chicago-politics/armed-border-patrol-agents-patrol-downtown-chicago-drawing-mayoral-criticism/3830594/; Adriana Perez, "In show of force, dozens of armed federal immigration agents patrol downtown Chicago," Chicago Tribune (Sept. 28, 2025), available at: https://www.chicagotribune.com/2025/09/28/immigration-agents-patrol-downtown/.
[69] Cindy Hernandez, "Massive immigration raid on Chicago apartment building leaves residents reeling: 'I feel defeated,'" WBEZ Chicago (Oct. 1, 2025), available at: https://www.wbez.org/immigration/2025/10/01/massive-immigration-raid-on-chicago-apartment-building-leaves-residents-reeling-i-feel-defeated.
[70] Ex. 12, DHS, "Secretary Noem travels to Chicago as Operation Midway Blitz Reaches More than 1,000 Illegal Aliens Arrested," Press Release (Oct. 3, 2025).

of the Loop.[71] ICE's facility in Broadview serves as a processing and temporary detention center for individuals detained by ICE and other DHS agencies in the Chicagoland area for civil immigration enforcement.[72] The crowd of protestors has typically been fewer than fifty people.[73] Since the initiation of Operation Midway Blitz on September 8, the size of some of the protests in Broadview has increased, but even at its largest, the size of the crowd only once exceeded 200 people (and then it was about 250 people)—including elected officials, their staff, legal observers, and members of the media who have been present for some of the protests.[74] The protests have tended to occur Fridays, though small groups have also assembled on Sunday mornings to pray outside the facility.[75]

### 1. Prior to Operation Midway Blitz, ICE officials anticipated protests in Broadway, but those protests have not stopped the operation.

On September 2, 2025—as President Trump was repeatedly threatening a troop deployment in Chicago—ICE's Chicago Field Director Russell Hott and Assistant Field Director Jimmy Bahena met with Broadview's Chief of Police, Thomas Mills.[76] In that meeting, Director Hott informed Chief Mills and his staff that, beginning the next day, a large number of federal agents, including approximately 250 to 300 CBP agents, would begin arriving in Illinois to assist with a ramped-up immigration enforcement campaign in the Chicagoland area.[77] Director Hott stated their goal was to make large numbers of immigration-related arrests and stated that the ICE facility in Broadview would be the primary processing location for the operation.[78] Director Hott

---

[71] Ex. 4 (Mills Decl.) ¶¶ 5-6, 9.
[72] *Id*. ¶ 6.
[73] *Id*. ¶ 18.
[74] *Id*. ¶ 18-19.
[75] Ex. 4 (Mills Decl.) ¶ 9.
[76] *Id*.
[77] *Id*.
[78] *Id*.

stated that the facility would operate continuously, seven days per week for approximately 45 continuous days.[79]

Director Hott also informed Chief Mills that ICE officials expected numerous protests, including potential property damage and assaults against law enforcement personnel, similar to what had occurred in Los Angeles earlier in the year.[80] ICE officials also expected there to be impacts on traffic and businesses in the immediate vicinity of ICE's detention center, located at 1930 Beach Street in Broadview.[81]

In early- to mid-September, some protestors began to stand or sit down in the driveway that ICE vehicles use to access the detention facility in Broadview.[82] When this has happened, ICE and other federal agents have at times physically removed the individuals from the driveway, allowing ICE vehicles to ultimately be able to enter and exit the facility as needed.[83] Chief Mills is not aware of any occasion on which an ICE vehicle was actually prevented from entering or exiting the ICE facility at 1930 Beach Street due to activity by protestors.[84] When protestors have engaged in this form of civil disobedience, federal agents have responded, including by physically removing the individuals from the driveway, allowing ICE vehicles to ultimately proceed.[85]

### 2. Federal agents have escalated their response to small and peaceful protests in Broadview, predictably increasing protest activity.

While the crowd of protesters at the Broadview facility has typically been fewer than fifty people, some of the protests grew to up to 200, and on one occasion 250, people. This includes elected officials, their staff, legal observers, and members of the media who have been present for

---

[79] Ex. 4 (Mills Decl.) ¶ 10.
[80] *Id.* ¶ 11.
[81] *Id.* ¶¶ 6, 9, 11.
[82] *Id.* ¶ 17.
[83] Ex. 4 (Mills Decl.) ¶ 17.
[84] *Id.* ¶ 44.
[85] *Id.* ¶ 17.

some of the protests. The increase in protest activity in Broadview has been the predictable response to unreasonable aggressive and provocative actions by ICE and CBP.

For example, during Operation Midway Blitz, in Broadview or in and around Chicagoland, ICE or CBP agents have, among other things:

- dressed in camouflage tactical gear and with masks covering their faces;[86]
- shot and killed Silverio Villegas-Gonzalez in Franklin Park, another western Chicago suburb;[87]
- intermittently grabbed protestors, physically moving them; and[88]
- deployed tear gas and pepper spray at the protestors in Broadview.[89]

Broadview Police Chief Mills characterized the use of chemical agents by federal officials at the ICE facility in Broadview as often arbitrary, indiscriminate, and unlike anything he has seen before in his 35-year career in law enforcement, including 32 years spent as an officer and high-ranking member of the Chicago Police Department ("CPD").[90]

### 3. Despite provocative behavior by federal agents, the Broadview protests have not stopped federal agents from executing federal law.

Around 7:00 a.m. on Saturday, September 27, three Chevrolet Tahoe SUVs appeared in the Broadview Police Department's parking lot without invitation.[91] Federal agents, including Agent Bovino of the CBP, emerged from the vehicles with a message for the Broadview police: prepare for "a shitshow."[92] Specifically, federal agents, including Agent Bovino, told the Broadview police to expect increased use of chemical munitions and increased ICE activity in Broadview.[93]

---

[86] *Id.* ¶ 21.
[87] Kim Bellware, "Videos of fatal ICE shooting in Chicago raise questions about DHS account," Washington Post (Sept. 28, 2025), available at: https://www.washingtonpost.com/immigration/2025/09/28/ice-officers-chicago-shooting-dhs-video/.
[88] Ex. 4 (Mills Decl.) ¶ 23.
[89] *Id.* ¶ 24.
[90] *Id.* ¶¶ 4, 31
[91] *Id.* ¶ 38.
[92] *Id.*
[93] *Id.*

That afternoon and evening, September 27, Agent Bovino and his colleagues followed through on their warning. Groups of federal agents repeatedly chased people on foot through the streets of Broadview in ongoing vehicle traffic.[94] Around dusk, Agent Bovino and a large team of fatigue-clad, tactically equipped, and masked federal agents escorted multiple federal vehicles out of the ICE detention facility.[95] And, again, federal agents fired pepper balls, rubber bullets, and teargas cannisters at protestors.[96] Over the course of the protests on September 26 and 27 in Broadview, DHS reported making a total of eleven arrests of protestors, though only five of the individuals arrested have been criminally charged.[97]

### 4. Multiple state and local law enforcement agencies, including the Illinois State Police, have formed a unified command in Broadview to manage public safety and protect First Amendment rights around ICE's facility.

Following the protests in Broadview on September 26 and 27, at the request of the Broadview Police Department, the Illinois State Police ("ISP") joined with multiple state and local law enforcement agencies—the Broadview Police Department, the Cook County Sheriff's Office, the Cook County Department of Emergency Management and Regional Security, and the Illinois Emergency Management Agency ("IEMA")—to establish a unified command "to coordinate public safety measures in Broadview" around ICE's temporary detention facility.[98]

An October 2 press release announcing the establishment of the unified command described its purpose and mission as follows:[99]

---

[94] "Agents chase after protesters, smoke and pepper bullets deployed outside Broadview ICE facility" ABC 7 Chicago (Sept. 26, 2025), available at https://www.youtube.com/watch?v=Byews1aX7XI.
[95] "Protest continues outside ICE facility in Broadview," CBS News (Sept. 27, 2025), available at https://www.cbsnews.com/chicago/video/protest-continues-outside-ice-facility-in-broadview/; *see also* Ex. 13, Declaration of Gil Kerlikowske ("Kerlikowske Decl."), ¶¶ 46-51; Ex 15, Declaration of Commander Jacqueline Cepeda (Cepeda Decl.) at ¶ 8.
[96] Ex. 4 (Mills Decl.) ¶¶ 35-36, 40.
[97] Sabrina Franza, "Arrested Broadview ICE protestors appear in court; 2 held, 3 released," CBS News Chicago (Sept. 29, 2025), available at: https://www.cbsnews.com/chicago/news/broadview-ice-facility-protesters-arrest-court/.
[98] Ex. 4 (Mills Decl.) ¶¶ 46-47.
[99] *Id*. ¶ 48.

> The Unified Command is setting up designated areas where people can safely exercise their rights, which will support the safety of the public, and ensure vehicular traffic can safely access the roads in the area. The goal of the Unified Command is to protect the health and safety of all individuals, including nearby Broadview residents and businesses, and enable the peaceful expression of First Amendment rights. The agencies involved in this operation will neither assist nor obstruct enforcement of federal immigration statutes in compliance with state and federal law.
>
> Uniformed officers will be on site to help direct people to the designated areas. In addition to protecting the safety and rights of people peacefully expressing their views, these measures will also ensure that third parties that need access to the facility – including attorneys and legal representatives, people bringing medicine to detainees, and representatives from foreign consulates – will maintain clear points of access to the facility.

The October 2 press release also informed the public of where both the designated protest areas and restricted areas in the vicinity of the ICE facility in Broadview. The unified command remains in place at the facility in Broadview as of the filing of this brief.

> ### 5. Despite clearly provocative action by administration officials—including DHS Secretary Noem—protests in Broadview remained lawful and mostly peaceful on October 3.

On October 3, the unified command instituted by state and local law enforcement successfully secured the protest and allowed protestors to voice their views, despite the challenges created by provocative actions taken by federal officials, including Secretary Noem.[100]

On the morning of October 3, Secretary Noem appeared on the roof of the ICE facility in Broadview.[101] Secretary Noem's presence was not welcome by state and local officials, including Broadview Chief of Police Thomas Mills, because it made their job harder.[102] When Secretary Noem departed from the ICE facility, her SUV was accompanied by a large armored tactical

---

[100] *Id.* ¶ 57.
[101] Asal Rezaei, et al., "Pritzker: Noem should 'no longer be able to step foot' in Illinois without accountability as she visits Broadview facility," CBS News Chicago (Oct. 3, 2025), available at: https://www.cbsnews.com/chicago/news/pritzker-noem-illinois-accountability-friday-visit-reports/.
[102] Ex. 4 (Mills Decl.) ¶ 54.

vehicle and several heavily armed federal agents.[103] Secretary Noem's vehicle proceeded to a location a few blocks away where ICE vehicles were parked.[104] In the parking lot, Secretary Noem got out of her vehicle within twenty-five feet of nearby protestors and for the apparent purpose of attempting to provoke them.[105]

Despite Secretary Noem's antics, the apparently 100 state and local police officers securing the Broadview protest that day kept her safe while also allowing protestors to voice their views.[106] In the times where protestors attempted to move through the line being maintained by state and local police around designated protest areas, those officers made a few temporary detentions and a total of five arrests throughout the day on October 3.[107] Because of the professionalism of the state and local law enforcement assisting the unified command in Broadview, protestors in Broadview were able to exercise their First Amendment rights without being subjected to the reckless use of chemical agents.[108]

### G.  On October 4, President Trump ordered the federalization and deployment of "at least" 300 National Guard troops in Illinois over the Governor's objection.

Within hours of the largely peaceful protest in Broadview on October 3, at 10:23 a.m. on Saturday, October 4, the Adjutant General of the Illinois National Guard received via email a memorandum from U.S. Air Force General Steven S. Nordhaus, the Chief of the National Guard Bureau in Washington, D.C.[109] Although titled "Request for Illinois National Guard Federal Protection Mission," General Nordhaus's memorandum was in fact an ultimatum.[110]

---

[103] *Id.*
[104] *Id.*
[105] *Id.*
[106] Ex. 4 (Mills Decl.) ¶ 57.
[107] *Id.* ¶ 55.
[108] *Id.* ¶ 57.
[109] Ex. 1 (Scudder Decl.) at Exhibit 1-C (Oct. 4, 2025, 10:23 a.m. S. Nordhaus email to R. Boyd re: "Request for Assistance of ILNG in T32").
[110] *Id.* at Exhibit 1-D.

Noting that "the President has directed the mobilization of at least 300 members of the Illinois National Guard (ILNG) to protect federal personnel, functions, and property in Illinois," General Nordhaus continued:

> [T]he Secretary of War has been authorized to first provide additional federal funding for 300 members of the ILNG under Title 32 United States Code, Section 502(f), and request that they perform this mission in a non-federalized status under your command and control.[111]

Confirming that the request was essentially performative, General Nordhaus instructed that "if ILNG forces are not mobilized under Title 32 in the next 2 hours, the Secretary of War will direct the mobilization of as many members of the ILNG as he may deem necessary under Title 10 United States Code."[112] Approximately two hours later, Governor Pritzker notified the public of the federal government's ultimatum and reported his reply in a press statement: "I will not call up our National Guard to further Trump's acts of aggression against our people."[113]

Later that day on October 4, Secretary Hegseth issued the October 4 Federalization Order calling forth "at least 300 National Guard personnel into Federal service" pursuant to 10 U.S.C. § 12406, "to protect U.S. Immigration and Customs Enforcement, Federal Protective Service, and other U.S. Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect federal property, at locations where violent demonstrations against these functions are occurring or are likely to occur based on current threat assessments and planned operations. This memorandum further implements the President's direction…."[114]

---

[111] *Id.* ¶ 1.
[112] *Id.* ¶ 2.
[113] Office of the Governor, JB Pritzker, "Governor Pritzker Statement on the Illinois National Guard," Press Release (Oct. 4, 2025), available at: https://gov-pritzker-newsroom.prezly.com/governor-pritzker-statement-on-the-illinois-national-guard.
[114] Ex. 2, October 4 Federalization Order.

President Trump had already made clear the true objective earlier in the week, however. Building on comments he had been making for some time, on September 30 the President addressed hundreds of U.S. military leaders summoned in person from their posts around the world.  During those remarks he described his mission—to use military troops in cities run by so-called "radical left Democrats," including Chicago, to "straighten them out":

> You know, the Democrats run most of the cities that are in bad shape . . . [T]he ones that are run by the radical left Democrats, what they've done to San Francisco, Chicago, New York, Los Angeles, they're very unsafe places and we're going to straighten them out one by one. And this is going to be a major part for some of the people in this room. That's a war too. It's a war from within. Controlling the physical territory of our border is essential to national security.
>
> * * *
>
> I want to salute every service member who has helped us carry out this critical mission. It's really a very important mission. And I told Pete [Hegseth], we should use some of these dangerous cities as training grounds for our military[,] National Guard, but military, because we're going into Chicago very soon.[115]

At bottom, this motion and this lawsuit ask the Court to do a simple thing in assessing the lawfulness of the challenged troop deployment in Illinois: take the President at his word.

## LEGAL STANDARD

To be entitled to a preliminary injunction or a temporary restraining order, a plaintiff must "demonstrate[e] a likelihood of success on the merits and a likelihood of irreparable harm in the absence of preliminary relief." *Indiana Right to Life Victory Fund v. Morales*, 112 F.4th 466, 471 (7th Cir. 2024) (cleaned up); *USA-Halal Chamber of Commerce, Inc. v. Best Choice Meats, Inc.*, 402 F. Supp. 3d 427, 433 n.5 (N.D. Ill. 2019) ("The standards for granting a temporary restraining order and preliminary injunction are the same."). If the plaintiff succeeds in making this showing, plaintiff must also "convince [the court] that the balance of equitable interests tips in favor of

---

[115] Ex. 9 (Gaber Decl.) ¶ 66.

injunctive relief." *Indiana Right to Life*, 112 F.4th at 471. This inquiry requires a court to "consider both the 'the public interest' as well as the 'competing harms' that would flow to the parties from a grant or denial of the requested injunction." *Id*. (*quoting Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013)). When the government is a party to the lawsuit injunction, the public interest and the harm to the party merge. *Missouri v. Trump*, 128 F.4th 979, 997 (8th Cir. 2025).

The Seventh Circuit employs a "sliding scale" approach to this balancing: "if a plaintiff is more likely to win, the balance of harms can weigh less heavily in its favor, but the less likely a plaintiff is to win the more that balance would need to weigh in its favor." *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019) (cleaned up).

## ARGUMENT

### I. Plaintiffs have standing to challenge the federal administration's actions.

This Court has the power and the duty to review whether the deployment of federalized National Guard troops in Illinois—over the objection of the Governor—is a valid exercise of the President's constitutional and statutory authority. *FBI v. Fikre*, 601 U.S. 234, 241 (2024) (federal courts have a "virtually unflagging obligation" to consider cases within their jurisdiction) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 817 (1976)); *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194 (2012) ("In general, the Judiciary has a responsibility to decide cases properly before it, even those it would gladly avoid.") (cleaned up).

As a threshold matter, the State of Illinois has standing because of the sovereign injury inflicted on it by the President's unlawful deployment of National Guard troops in Illinois. Standing is necessary to "satisfy Article III's case-or-controversy requirement," and the presence of one plaintiff with standing in a multi-plaintiff case is sufficient to meet this requirement. *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006). Standing exists when a plaintiff has "suffered an injury in fact—a concrete and imminent harm to a legally

23

protected interest . . . that is fairly traceable to the challenged conduct and likely to be redressed by the lawsuit." *Biden v. Nebraska*, 600 U.S. 477, 489 (2023). The asserted injury must be "legally and judicially cognizable." *United States v. Texas*, 599 U.S. 670, 676 (2023).

Like any sovereign state, Illinois has "an interest in securing observance of the terms under which it participates in the in the federal system." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607–08 (1982); *Newsom v. Trump*, No. 25-CV-04870-CRB, 2025 WL 2501619, at *13 (N.D. Cal. Sept. 2, 2025) (same). "States also have sovereign interests to sue when they believe that the federal government has intruded upon areas traditionally within states' control." *Kentucky v. Biden*, 23 F.4th 585, 598 (6th Cir. 2022). States retain the authority to regulate and command their militias—now organized as the National Guard—except when these units have been lawfully called forth into federal service in accordance with conditions set by Congress. U.S. Const. art. I, § 8, cl. 15–16. The Constitution also generally reserves the "police power" for the States, not the federal government. *United States v. Morrison*, 529 U.S. 598, 618 (2000). Protecting public health and safety are among the more "conspicuous examples of the traditional application of the police power." *Berman v. Parker*, 348 U.S. 25, 32 (1954). And there is "no better example of the police power" than deterring and punishing criminal misconduct. *Morrison*, 529 U.S. at 618; *accord Cohens v. Virginia*, 6 Wheat. 264, 426, 428, (1821) (Marshall, C.J.) (stating that it is "clear . . . that congress cannot punish felonies generally").

The President's troop deployment in Illinois inflicts injury on the state in at least three ways. First, the President has unlawfully usurped Illinois's control over its own Illinois National Guard units, depriving Illinois of its constitutionally protected prerogative to supervise its state militia. U.S. Const. art. I, § 8, cl. 15–16. Second, the non-consensual deployment of federalized National Guard troops in Illinois, purportedly to address protests and crowd control, intrudes on

Illinois's sovereign police power. *See Morrison*, 600 U.S. at 489. Third, the deployment of the National Guard inflicts economic harm on the State of Illinois and the city of Chicago. These injuries are also judicially cognizable and capable of redress through the judicial process, as an injunction against the deployment order would stop the ongoing sovereign injury to Illinois. *See Newsom v. Trump*, 141 F.4th 1032, 1045–64 (9th Cir. 2025) (challenge to president's order federalizing the California National Guard under 10 U.S.C. § 12406(3) was justiciable); *Newsom v. Trump*, No. 25-CV-04870-CRB, 2025 WL 2501619, at *13 (N.D. Cal. Sept. 2, 2025) (claim that president violated the Posse Comitatus Act, 18 U.S.C. § 1385, was cognizable and redressable); *Oregon v. Trump*, No. 3:25-cv-1756-IM, ECF 56 (Oct. 4, 2025 Op. and Ord.). Because of the ongoing injury inflicted on Illinois and Chicago by the unlawful deployment National Guard troops, and further injuries that are certain to result, the State of Illinois and City of Chicago have standing to bring this suit.

## II. Plaintiffs are likely to succeed on their claim that deploying National Guard troops in Illinois is *ultra vires* and exceeds the President's authority in 10 U.S.C. § 12406.

Defendants claim 10 U.S.C. § 12406 gives the President authority to federalize members of the National Guard and deploy them in this state over the objection of the Governor. They are wrong. None of the perquisites for federalization and deployment under Section 12406 exist and, in fact, the President has failed to even identify a purported justification. The deployment order is facially deficient, exceeds the President's authority, is *ultra vires*, and must be enjoined.

### A. The President has failed to properly invoke his limited authority in 10 U.S.C. § 12406.

Section 12406 authorizes the President to "call into Federal service members and units of the National Guard of any State" in three specific circumstances: (i) "whenever" the United States is "invaded or in danger of invasion by a foreign nation," (ii) "there is a rebellion or danger of a rebellion against the authority of the Government of the United States," or (iii) "the President is

unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406. Section 12406 further requires the President to issue "[o]rders for these purposes . . . through the governors of the States." *Id.*

The President has issued no such order satisfying these requirements. To start, there is no order from the President himself, let alone one that is issued "through the governor[]" of Illinois. Instead, the October 4 Federalization Order comes from Secretary Hegseth, who asserts that "[o]n October 4, 2025, the President of the United States called forth at least 300 National Guard personnel into Federal service pursuant to section 12406."[116] But Secretary Hegseth's memorandum attaches no such order from the President, nor has Governor Pritzker received such an order.[117]  Accordingly, Section 12406 has not been properly invoked.

Furthermore, Secretary Hegseth's October 4 Federalization Order and the Texas Mobilization Order are also insufficient for the additional reason that they fail to identify which of the three statutory predicates applies here: they make no claim of an invasion, rebellion, or inability to execute federal law.[118] Instead, Secretary Hegseth claims only that the National Guard will "protect" federal personnel and property, "including the enforcement of Federal law."[119] These stated justifications are insufficient under the plain text of Section 12406, which identifies three specific and limited circumstances under which Section 12406 may be invoked.

Finally, Plaintiffs are aware of no document—issued by the President or anyone else—that provides any specific basis for the deployment of the National Guard to Illinois, let alone one that satisfies the statutory requirements. On the contrary, the only document issued by the President

---

[116] Ex. 2, October 4 Federalization Order.
[117] As explained *infra,* while the Texas Mobilization Order cites the June 7 Presidential Memorandum, that Memorandum was issued nearly four months ago and does not relate to any current facts in Illinois or the current needs of federal law enforcement in Illinois. The June 7 Presidential Memorandum, therefore, is not a presidential order that can support the mobilization of the National Guard in the Texas Mobilization Order.
[118] Ex. 2, October 4 Federalization Order.
[119] Ex. 2, October 4 Federalization Order and Ex. 3, Texas Mobilization Order.

that could plausibly be related to this deployment and that has been made available to Plaintiffs is the June 7 Presidential Memorandum order issued in the wake of protests in California.[120] But that memorandum is not the stated basis for the Illinois deployment; instead, Secretary Hegseth's memorandum relies on an unseen directive issued by the President on October 4, 2025.[121] Furthermore, the June 7 Presidential Memorandum makes no actual finding that any of the three statutory prerequisites have been satisfied in any specific state, and is thus insufficient as a standalone directive.[122]

All told, Illinois has not received any justification from the President as to why he invoked Section 12406 on October 4, 2025, and in the Texas Mobilization Order, and certainly not one that satisfies statutory and constitutional guaranties. The failure to provide such an explanation at the time of the deployment is unlawful and constitutes an independent basis for preliminary injunctive relief. Furthermore, to the extent Defendants attempt to provide a document purporting to provide such justifications—regardless of its provenance—that document should be afforded no deference. Instead, to the extent defendants are entitled to any deference, *see infra,* Defendants must stand on the justifications offered to Illinois when they invoked Section 12406—an extraordinary exercise of authority over a sovereign state—in the documents that were provided at the time of deployment.

## B.  There is no basis for claiming the President is "unable" to "execute" federal law in Broadview or anywhere else in Illinois.

Notwithstanding the lack of any contemporaneous justification, the President may view the primary source of his authority for the Illinois troop deployment as the third prong of Section 12406, given the aforementioned documents referencing the enforcement of federal law. But given

---

[120] Ex. 10, June 7 Presidential Memorandum.
[121] Ex. 2, October 4 Federalization Order.
[122] Ex. 10, June 7 Presidential Memorandum.

27

**GA102**

the lack of any appropriate justification in the relevant documents, it is unclear *which* federal laws he is currently unable to execute. Nor is it evident from present circumstances. On the contrary, the President remains able to execute federal law:  this court remains open, federal criminal prosecutions remain ongoing, and, as explained, *supra*, enforcement of immigration law has *increased* in recent weeks in Illinois.[123]

Indeed, the federal government's own data, statements, and actions undermine any claim that it is "unable" to "execute" federal law in Illinois—whether in Broadview, Chicago, or anywhere else in this state. 10 U.S.C. § 12406(3).

According to DHS data, as of the end of July, ICE had made at least 1,441 arrests and 4,900 detentions in Illinois in 2025.[124] Compared to the same time period for 2024, ICE arrests and detentions in 2025 in Illinois are up 59% and 185%, respectively.[125] Arrests by ICE and assisting federal agencies have also increased significantly since the September 8 announcement of Operation Midway Blitz targeting the Chicago area. Within eleven days of announcing the start of Operation Midway Blitz,[126] a DHS spokesperson claimed on September 19 that the operation had resulted in "almost 550 arrests," and declared that DHS "will not be deterred by sanctuary

---

[123] *See*, *for example*, U.S. Attorney's Office, Northern District of Illinois, "Five Individuals Charged in Federal Court in Chicago with Assaulting or Resisting Federal Agents Engaged in Immigration Enforcement Operations," Press Release (Sept. 29, 2025), available at: https://www.justice.gov/usao-ndil/pr/five-individuals-charged-federal-court-chicago-assaulting-or-resisting-federal-agents; U.S. Attorney's Office, Northern District of Illinois, "Three Chicago-Area Men Indicted in Federal Court for Allegedly Scheming to Open Credit Cards in the Name of Deceased Individuals," Press Release (Sept. 29, 2025), available at: https://www.justice.gov/usao-ndil/pr/three-chicago-area-men-indicted-federal-court-allegedly-scheming-open-credit-cards; U.S. Attorney's Office, Northern District of Illinois, "Federal Indictment Charges Chicago Police Officer with Conspiring to 'Straw Purchase' Firearms on Behalf of Acquaintance," Press Release (Sept. 24, 2025), available at: https://www.justice.gov/usao-ndil/pr/federal-indictment-charges-chicago-police-officer-conspiring-straw-purchase-firearms; U.S. Attorney's Office, Northern District of Illinois, "Federal Judge Sentences Man to More than Seven Years in Prison for Robbing U.S. Postal Service Carrier in Chicago," Press Release (Sept. 23, 2025), available at: https://www.justice.gov/usao-ndil/pr/federal-judge-sentences-man-more-seven-years-prison-robbing-us-postal-service-0.
[124] Lauren FitzPatrick, "How many immigrants as ICE arrested and detained so far this year? Here's what we know," WBEZ (Sept. 12, 2025), available at: https://www.wbez.org/immigration/2025/09/12/immigration-customs-enforcement-ice-arrests-detentions-data-deportation-project-trac; *see also* Data Deportation Protect, "Immigration and Customs Enforcement," https://deportationdata.org/data/ice.html (sorted by "Apprehension State").
[125] *See* FitzPatrick, *supra* note 124 124.
[126] Ex. 11, DHS September 8 Press Release.

politicians or violent rioters."[127] On October 3—when the largest protest to date occurred in Broadview—DHS boasted that during Operation Midway Blitz, it had "arrested more than 1,000 illegal aliens."[128]

As part of the operation, federal agents have also engaged in conspicuous patrols in Chicago and the surrounding suburbs, including deploying boats from CBP on the Chicago River on September 25 and 28, and conducting a large-scale foot patrol with over 40 CBP agents in downtown Chicago on September 28.[129] In the course of the CBP's September 28 patrol through downtown Chicago, agents made multiple spontaneous arrests and chased several individuals on foot through major downtown streets.[130]

Despite all the ostentatious federal law enforcement activity occurring in the Chicago area, the President may attempt to argue that his invocation of Section 12406(3) arises from small protests outside a single ICE temporary detention facility in Broadview.[131] The ICE facility in Broadview has drawn small groups of protestors for months, during which time the operation of the facility has continued unabated.[132] Amid these protests, as of September 12, 2025, ICE had

---

[127] "Nearly 550 arrested during Chicago area immigration crackdown so far, official says," CBS News, Sept. 19, 2025, available at: https://www.cbsnews.com/chicago/news/400-ice-arrests-chicago-operation-midway-blitz/.
[128] Ex. 12, DHS October 3 Press Release.
[129] Mohammad Samra, et al., "Border Patrol spotted with guns on Chicago River in Trump's latest deportation push," Chicago Sun-Times (Sept. 26, 2025), available at: https://chicago.suntimes.com/immigration/2025/09/25/border-patrol-chicago-river-immigration-enforcement-greg-bovino-deportation; Michelle Gallardo, "Federal immigration agents, Border Patrol boat seen in downtown Chicago," ABC7 (Sept. 28, 2025), available at: https://abc7chicago.com/post/ice-chicago-today-federal-immigration-agents-border-patrol-boat-seen-downtown-live/17899424/; Adriana Perez, "In show of force, dozens of armed federal immigration agents patrol downtown Chicago," Chicago Tribune (Sept. 28, 2025), available at: https://www.chicagotribune.com/2025/09/28/immigration-agents-patrol-downtown/.
[130] Chip Mitchell, "Feds march into downtown Chicago; top border agent says people are arrested based on 'how they look'," Chicago Sun-Times (Sept. 28, 2025), available at: https://chicago.suntimes.com/immigration/2025/09/28/ice-agents-spotted-downtown-on-michigan-avenue-along-chicago-river.
[131] Ex. 4 (Mills Decl.) ¶ 16.
[132] *Id*. ¶ 44.

detained 3,182 more people at its Broadview facility or in downtown Chicago this year than in 2024—a 185% increase.[133]

In recent weeks, small groups of protestors have at times engaged in civil disobedience by attempting to block the coming and going of vehicles into and out of the parking lot of the ICE Broadview facility.[134] Nonetheless, federal agents have consistently succeeded in creating a path for these vehicles, and ICE detainees have continued to be brought in and out of the facility.[135] At no point has the size of any one of the protests outside the ICE Broadview facility been more than a couple hundred people.[136]

The hyperbolic characterization of the small-scale protests in Broadview by DHS confirms that these protests are being used as a pretext for an unlawful, long-planned troop deployment— and not because DHS is in fact "unable" to "execute" federal law in Illinois.[137] DHS initiated the first definitive step toward a federalized National Guard deployment in its September 26 memorandum to DOD, requesting a troop deployment "in the State of Illinois," without referencing Broadview at all.[138] As confirmation that the September 26 DHS-to-DOD memorandum is untethered to facts on the ground in Illinois, the document is a verbatim copy of another DHS memorandum, also dated September 26, requesting a troop deployment in Oregon that differs in only two ways: substituting "Illinois" for "Oregon" and changing the number of

---

[133] *See* FitzPatrick, *supra* note 124; *see also* https://deportationdata.org/data/ice.html (sorted by "Apprehension State").

[134] Ex. 4 (Mills Decl.) ¶ 17.

[135] *Id*. ¶ 44

[136] Ashlyn Wright, et al., "U.S. Border Patrol takes over security of Broadview ICE facility, protests continue over the weekend," WGN (Sept. 27, 2025), available at: https://wgntv.com/news/operation-midway-blitz/protesters-rally-outside-broadview-ice-facility-against-operation-midway-blitz/ (noting that "[a]bout 100 demonstrators" gathered outside the Broadview ICE facility" on Saturday, September 28); Ex. 4 (Mills Decl.) ¶ 19; *see also* Ex. 13, Declaration of Gil Kerlikowske ("Kerlikowske Decl."), ¶¶ 44-45.

[137] *See* Ex. 14, Declaration of Major Donald Orseno ("Orseno Decl."), ¶ 45; *see also* Ex. 13 (Kerlikowske Decl.), ¶¶ 43-45

[138] Ex. 9 (Gaber Decl.) Ex. 9-C, DHS, Andrew J. Whitaker Memorandum to Col. Anthony Fuscellaro, "Request for Assistance from the Department of War for Federal Facility Protection Support to the Department of Homeland Security," (Sept. 26, 2025) (September 26 DHS Memo).

troops requested.[139] A federal district court has already concluded that the attempted federalization of the Oregon National Guard originating from the the a substantively identical DHS request is "untethered to facts." *Oregon*, No. 3:25-cv-07156, ECF 56, at 23. So too with the ongoing attempt to federalize the National Guard in Illinois.

The actions of federal officials since the September 26 DHS-to-DOD memorandum belie the notion that the protests in Broadview exceed law enforcement's capacity to address them. *See* 10 U.S.C. § 12406 (referring to inability to execute federal law with the "regular forces"). When confronted with a protest of approximately 100 people on the evening of September 27 outside the Broadview ICE facility, federal agents dispersed the protestors and arrested eleven people, including a journalist, in the process.[140] Far from being overwhelmed by this protest, a DHS spokesperson bragged on social media about the number of arrests its agents made in response.[141] And although DHS declared all 200 people at the protest to be "rioters," only eleven people had been arrested by federal agents, and, as of September 29, only five had been criminally charged by federal prosecutors.[142]

If the September 27 protest in Broadview had truly threatened to render the federal government incapable of executing federal law, then presumably the federal officials in charge of the ICE facility in Broadview would have focused their energy, attention, and resources on

---

[139] *Id.*

[140] Ashlyn Wright, et al., "U.S. Border Patrol takes over security of Broadview ICE facility, protests continue over the weekend," WGN (Sept. 27, 2025), available at: https://wgntv.com/news/operation-midway-blitz/protesters-rally-outside-broadview-ice-facility-against-operation-midway-blitz/ (noting that "[a]bout 100 demonstrators" gathered outside the Broadview ICE facility" on Saturday, September 27); Cindy Hernandez, et al., "Broadview officials say ICE agents warned that mayor's comments would bring consequences," Chicago Sun-Times (Sept. 27, 2025), available at: https://chicago.suntimes.com/news/2025/09/27/ice-broadview-action-mayor-katrina-thompson-immigration; @DHSgov, 8:50 a.m., Sept. 28, 2025 post on X.com, available at: https://x.com/DHSgov/status/1972297960319832252.

[141] @DHSgov, 8:50 a.m., Sept. 28, 2025 post on X.com, available at: https://x.com/DHSgov/status/1972297960319832252.

[142] ABC7 Chicago Digital Team, "Neurodivergent man among 5 protesters charged after clash at Broadview ICE facility, supporters say," ABC7 (Sept. 29, 2025), available at: https://abc7chicago.com/post/ice-chicago-today-protesters-expected-return-broadview-facility-weekend-clashes/17902425/.

securing it the following day, September 28. Instead, CBP sent dozens of armed, fatigue-clad Border Patrol agents led by Agent Bovino through downtown Chicago—twelve miles removed from the ICE facility in Broadview.[143] These actions are impossible to square with any good-faith argument from the federal government that it is unable to execute federal law in Broadview or anywhere else in Illinois.

Likewise, the protests in Broadview on October 3 remained largely peaceful and under the control of the over 100 state and local police who were deployed there.[144] Federal vehicles loaded with federal agents and officials came and went throughout the day notwithstanding the protest.[145] Through their professionalism and training,[146] state and local police both kept the peace and protected vigorous exercise of the First Amendment—all without resorting to teargas or pepper balls.[147] Even Secretary Noem felt comfortable making a conspicuous, unannounced appearance at the ICE facility in Broadview, on October 3, getting out of her vehicle within twenty-five feet of protestors, and stopping by the Broadview Town Hall.[148] That is not the conduct of agency leadership that requires military deployment to execute federal laws.

Finally, this Court should reject any attempt by the President to interpret the phrase "unable . . . to execute the laws of the United States" to require anything less than what the plain text requires. A contrary reading, if accepted, would contradict basic statutory interpretation principles and effect a startlingly broad executive power-grab that Congress did not intend. Indeed, the Supreme Court has repeatedly counseled that a word or phrase in a statute "is given more precise

---

[143] Adriana Perez, "In show of force, dozens of armed federal immigration agents patrol downtown Chicago," Chicago Tribune (Sept. 28, 2025), available at: https://www.chicagotribune.com/2025/09/28/immigration-agents-patrol-downtown/.
[144] Ex. 4 (Mills Decl.) ¶¶ 49-58.
[145] *Id*. ¶¶ 53-54.
[146] Ex. 14 (Orseno Decl.) ¶¶ 8-15.
[147] Ex. 4 (Mills Decl.) ¶ 57.
[148] *Id*. ¶ 54.

content by the neighboring words with which it is associated." *United States v. Williams*, 553 U.S. 285, 294 (2008). And here, the phrase "unable . . . to execute the laws of the United States" immediately follows two of the most extreme exigencies the United States (or any nation) could face: an invasion by a hostile foreign nation or a domestic rebellion. 10 U.S.C. §§ 12406(1)-(2). Such exigencies are thankfully rare. *E.g., Martin v. Mott*, 25 U.S. 19, 30 (1827) (such rare and extraordinary events constitute "sudden emergencies" implicating "great occasions of state, and under circumstances which may be vital to the existence of the Union"). Reading the third predicate in Section 12406 in light of the first two, the phrase "unable . . . to execute the laws" necessarily describes a scenario comparable in magnitude to an invasion or rebellion. Protests, civil disobedience, or sporadic unlawful acts by a handful of individuals within an otherwise peaceful crowd do not come remotely close to that threshold.

Simply put, nothing that has occurred at or around the ICE facility in Broadview has rendered the federal government "unable" to "execute the laws of the United States" with the "regular forces" under any remotely colorable definition of those statutory terms. *See* 10 U.S.C. §12406. At most, the Broadview protests are a convenient pretext—not a good-faith reason—to carry out the President's long-established, preexisting plan to deploy federal troops in the Chicago area. The Court should invalidate the unlawful invocation of Section 12406(3) effectuated through Secretary Hegseth's October 4 Federalization Order and the Texas Mobilization Order.

### C.  There is no "rebellion" or "danger of a rebellion" in Illinois.

There is no "rebellion" or "danger of a rebellion against the authority of the United States" anywhere in Illinois. 10 U.S.C. § 12406(2). Any claim by the Trump administration to the contrary would be farcical if the consequences were not so dire.

President Trump has been recklessly conjuring the specter of rebellion since at least his June 7 Presidential Memorandum responding to protests in Los Angeles, where he asserted: "To

the extent that protests or acts of violence directly inhibit the execution of the laws, they constitute a form of rebellion against the authority of the Government of the United States."[149] Under this telling, the President would have spotted at least three incipient rebellions brewing across the country in the last four months—in Los Angeles, Portland, and now suburban Broadview. The two district courts to have ruled on his "rebellion" talk have swatted it away. *Oregon v. Trump*, No. 3:25-cv-1756-IM, ECF 56, at 25-26 (Oct. 4, 2025 Op. and Ord.); *Newsom v. Trump*, 786 F. Supp. 3d 1235, 1253-55 (N.D. Cal. 2025) (*Newsom I*), *stayed pending appeal*, 141 F.4th 1032 (9th Cir. 2025) (*Newsom II*). Even the Ninth Circuit panel declined to consider the President's "rebellion" declaration. *Newsom II*, 141 F.4th at 1051.

This Court can and should become the third to summarily reject any assertion that a "rebellion" exists such that the Illinois National Guard may be federalized and deployed here. As the district court in Oregon stated in the last few days, a "rebellion" under Section 12406(2) must be "violent," "armed," "organized," "open and avowed," and aimed at "the government as a whole—often with an aim of overthrowing the government—rather than in opposition to a single law or issue." *Oregon*, No. 3:25-cv-1756-IM, ECF 56 at 25 (quoting *Newsom I*, 786 F. Supp. 3d at 1253). There is no activity in Illinois that comes close to this definition.

Far from seeking to overthrow the entire federal government, the Broadview protests are clearly focused on a specific issue: the President's immigration crackdown. That is why the protests are occurring in Broadview—a previously low-key, low-profile suburb of Chicago. The fact that Broadview is even a topic of discussion is evidence that the protests there are specific to the President's immigration agenda. *See Oregon*, No. 3:25-cv-1756-IM, ECF 56 at 25. That the Broadview protests are focused on the President's immigration policies, not toppling the federal

---

[149] Ex. 10, June 7 Presidential Memorandum.

**GA109**

government, is further confirmed by the fact that they have coincided with ramped-up immigration enforcement through Operation Midway Blitz.

Far from being "violent" and "armed," the Broadview protests have largely been peaceful.[150] The size of the Broadview protests have also never exceeded a few hundred people—indicating a degree of organization that pales in comparison to other recent protests in the Chicago area.[151] The ISP considers the Broadview protests small-scale.[152] By contrast, Chicago has seen much larger-scale protests, including the 2020 presidential inauguration and the Gaza and Palestinian-related protests.[153] Given their comparative focus, scale, and character, the protests in Broadview are hardly sufficient to add to the very short list of bona fide "rebellions" throughout the history of this country.

### D. The President cannot avoid or minimize judicial scrutiny of his use of Section 12406.

The President and his administration have taken the audacious position in litigating the recent California National Guard deployment that a President's decision to invoke Section 12406 is categorically immune from judicial review. Both the district court and the Ninth Circuit rejected this extreme position, and this Court should also. *See Newsom II*, 141 F.4th at 1050-51. Just a few days ago, the district court in Oregon similarly rejected it. *Oregon*, No. 3:25-cv-1756-IM, ECF 56 at 17 & n.2. Even in the face of the U.S. Civil War and foreign conflict, federal courts have not shied from judicial review of and checks upon presidential overreach in the domestic use of military authority. *See Ex parte Milligan*, 71 U.S. 2 (1866) (granting habeas relief despite presidential suspension of habeas corpus during the U.S. Civil War); *Youngstown Sheet & Tube*

---

[150] Ex. 4 (Mills Decl.) ¶¶ 9, 20-23, 49.
[151] *Id*. ¶¶ 19, 49.
[152] Ex. 14 (Orseno Decl.) ¶ 45; *see also* Ex. 13 (Kerlikowske Decl.), ¶¶ 44-45
[153] Ex. 14 (Orseno Decl.) ¶ 22.

**GA110**

*Co. v. Sawyer*, 343 U.S. 579 (1952) (invalidating presidential seizure of steel mills during the Korean War). Court intervention is even more justified here—where a sovereign state challenges a peacetime domestic deployment with no remotely comparable exigency.

**1. The federalization and deployment of National Guard troops in Illinois over the Governor's objection is subject to judicial review.**

The President's claim to unreviewable authority over domestic troop deployments disregards the founding of this nation and its subsequent history and tradition. One of the grievances against King George III in the Declaration of Independence was that he had "affected to render the Military independent and superior to the Civil power." The Declaration of Independence para. 14 (U.S. 1776). Likewise, Britain's king had "kept among us, in times of peace, Standing Armies without the Consent of our legislatures," and had "Quarter[ed] large bodies of troops among us"—an objection later translated into the Third Amendment's prohibition on non-consensual quartering of troops in civilian homes. *Id.* paras. 13, 16; U.S. CONST. amend. III. Our founding charters thus affirm the "traditional and strong resistance of Americans to any military intrusion into civilian affairs." *Laird v. Tatum*, 408 U.S. 1, 15-16 (1972). Consistent with that tradition, "when presented with claims of judicially cognizable injury resulting from military intrusion into the civilian sector, federal courts are fully empowered to consider claims of those asserting such injury." *Laird*, 408 U.S at 15-16; *accord Newsom II*, 141 F.4th at 1050-51.

In other recent cases, the current federal administration has asserted that its attempt to shield its unlawful militarism from judicial scrutiny stems from a 198-year-old Supreme Court case, *Martin v. Mott*, 25 U.S. 19 (1827), decided in a readily distinguishable context. In *Martin*, the Supreme Court reviewed the seizure of property from a New York militiaman as a fine for his failure to report for duty during the War of 1812. *Id.* at 21-22. The militiaman challenged the property seizure by claiming that the President's order calling forth the militia was invalid. *Id.* at

36

**GA111**

23-24. President Madison issued the challenged order under the Militia Act of 1795, in which Congress specified that "whenever the United States shall be invaded, or in imminent danger of invasion from any foreign nation or Indian tribe," the President could "call forth such number of the militia of the State or States most convenient to the place of danger, or scene of action, as he may judge necessary to repel such invasion[.]" *Id.* at 29 (quoting Militia Act of 1795). Rejecting the militiaman's contention that President Madison's calling forth of the militia did not comport with the statute, *Martin* observed that "the authority to decide whether the exigency has arisen, belongs exclusively to the President, and that his decision is conclusive upon all other persons." *Id.* at 30.

*Martin* does not insulate the President's domestic deployment of American troops from judicial review in this case. To begin with, *Martin* dealt with an anticipated invasion by a foreign nation—one that not only came to pass but that yielded occupation of the nation's capital and the burning of the President's residence. *See, e.g.*, Alfred W. Blumrosen, Steven M. Blumrosen, *Restoring the Congressional Duty to Declare War*, 63 RUTGERS L. REV. 407, 453 (2011). The non-reviewability of executive authority exercised in that scenario is not transferable to the current context. This case involves a peacetime deployment purportedly to respond to a few hundred protestors objecting to ramped-up immigration enforcement outside a single temporary detention facility in a single, small, suburban municipality. That is hardly comparable to a war-time mobilization order issued on the brink of an invasion by a hostile foreign nation.

Even apart from the radically different factual context, subsequent Supreme Court precedent affirms that judicial review is available and appropriate even when a President purports to exercise military authority within the United States. Decided 125 years after *Martin*, *Youngstown*, 343 U.S. 579 (1952) exemplifies the role federal courts must play in checking

unlawful presidential action even amid an ongoing foreign war. When President Truman seized steel mills in which strikes threatened the nation's steel supply during the Korean War, the Supreme Court did not shirk from reviewing that order: "The President's power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself." *Youngstown*, 343 U.S. at 585. Finding no such authority for the President's seizure order, the Court declared it invalid. *Id.* at 589. Writing separately in his now-canonical concurrence, Justice Jackson articulated the controlling legal principle that animates this lawsuit: "Congress has forbidden [the President] to use the army for the purpose of executing general laws except when *expressly* authorized by the Constitution or by Act of Congress." *Id.* at 644-45 (Jackson, J., concurring) (emphasis supplied).

In letter and in spirit, the orders deploying federal troops to Illinois are an attempt to "use the army for the purposes of executing general laws," including both criminal and immigration laws. *Id.* As in *Youngstown*, this Court may review whether these orders arise from authority conferred on the President by the Constitution or Congress. Because the challenged orders are based on no such authority, this Court may invalidate them.

## 2. The Court owes the President and his administration no deference.

Having failed to evade judicial review entirely in California and Oregon, the President and his administration are certain to press for a highly deferential standard of review in this Court. As explained above, the deployment orders contain *no* rationale and should, for that reason alone, be accorded no deference.

While the orders contain no rationale from the President, the President's own words do offer explanation. To the extent a reason could be attributed to the President, his announced plan to send the military to Chicago to "straighten them out" ought to be considered by this Court as

38

**GA113**

the (coercive and unlawful) rationale for this deployment.[154] Even if the other reasons articulated by the President over the past several months—that Chicago is a purported hotbed of crime, that the state is controlled by "radical left Democrats," or that local "sanctuary" laws are disfavored are considered, they are each, individually or collectively, further evidence that no explanation given by the President satisfies Section 12406.

Even if the President were now allowed to offer a post-deployment order rationalization to be considered by this Court, the deployment orders at issue here fail under any standard, including even a highly deferential one.

To be sure, the Ninth Circuit's preliminary view was that "*Martin* and its progeny" require federal courts to "give a great level of deference to the President's determination that a predicate condition exists" under Section 12406. *Newsom II*, 141 F.4th at 1048. But the Ninth Circuit also conceded that "courts may at least review the President's determination to ensure that it reflects a colorable assessment of the facts and law within a 'range of honest judgment.'" *Id.* at 1051 (quoting *Sterling v. Constantin*, 287 U.S. 378, 399 (1932)). The President, who has not spoken in any official document related to the October 4 Federalization Order or the Texas Mobilization Order, cannot clear even this modest hurdle here. The President has been threatening to deploy federal troops in the Chicago area for years without regard to the facts on the ground and with a mix of justifications ranging from "crime" to Illinois's so-called "sanctuary" policies. The recent protests outside the ICE facility in Broadview are a transparent pretext for carrying out this long-desired, lawless show of unnecessary force. In other words, the President's decision to federalize and deploy National Guard troops in Illinois was "made in bad faith" and is therefore invalid. *Id.* at 1050.

---

[154] Ex. 9 (Gaber Decl.) ¶ 66.

In all events, this Court should reject as unpersuasive the Ninth Circuit's overly deferential standard of review under Section 12406—a standard that is, of course, "not binding authority in this circuit." *Unite Here Local 1 v. Hyatt Corp.*, 862 F.3d 588, 604 (7th Cir. 2017). For starters, the Ninth Circuit's interpretation of Section 12406 lacks any support in the text or history of Section 12406 itself. Quite the contrary: before 1903, when Congress enacted what is now Section 12406, the Militia Act had authorized the President to federalize the militia "whenever . . . it shall become ***impracticable, in the judgment of the President*** . . . to enforce . . . the laws of the United States." 12 Stat. 281, 281 (1861) (emphasis added). But in 1903, Congress made two important changes: it (1) substituted "unable" for "impracticable" and (2) omitted any reference to the President's judgment. The Ninth Circuit essentially chose to read this deferential language back into Section 12406. But that outcome is entirely at odds with one of the most "compelling" "principles of statutory construction": "Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-443 (1987).

Even if *Martin* implied the need for extreme judicial deference to the President's determinations regardless of Section 12406's text and history (it doesn't), the Ninth Circuit erred in overlooking subsequent Supreme Court precedent engaging in far less obsequious judicial review. At least since *Youngstown*, 343 U.S. 579, the Supreme Court has recognized the critical importance of unflinching judicial checks on presidential power—even in wartime, and even when the President acts in the realm of foreign affairs. *E.g.*, *Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025); *Boumediene v. Bush*, 553 U.S. 723, 797-798 (2008); *United States v. Nixon*, 418 U.S. 683, 692-697 (1974); *see Baker v. Carr*, 369 U.S. 186, 213 (1962) (*Martin* stands for the limited proposition that courts will "refus[e] to review the political departments' determination of when

40

or whether a war has ended"); *Newsom v. Trump*, No. 25-cv-04870-CRB, 2025 WL 2501619, at
*20 n.18 (N.D. Cal. Sept. 2, 2025) (*Youngstown* "undermined the exact precedent that the Ninth
Circuit relied on in affording the President significant discretion under § 12406"). This year alone,
courts have rejected an expansive reading of *Martin* that would preclude or circumscribe judicial
review of actions taken by the President under other statutes. *E.g.*, *J.A.V. v. Trump*, 781 F. Supp. 3d
535, 547-54 (S.D. Tex. 2025) (Alien Enemies Act). If this Court must choose, it should follow this
persuasive line of authority and reject the Ninth Circuit's ill-advised deference.

**III.    Plaintiffs are likely to succeed on their claim that the deployment of federal troops
in Illinois violates the Tenth Amendment.**

The President's deployment of National Guard troops to Illinois over the Governor's
objection is unlawful for an additional reason: it violates the Tenth Amendment. U.S. Const.
amend. X; *accord Oregon*, No. 3:25-cv-07156, ECF 56, at 26-27. The federalization and
deployment of the National Guard violates Illinois's retained sovereignty under the Tenth
Amendment in three ways: (1) by unlawfully usurping Illinois's control over its National Guard
forces; (2) by punishing and coercing Illinois for enacting a state law the President dislikes; and
(3) by intruding on Illinois's general police power to protect the public's health, safety, and welfare
through, among other things, routine law enforcement.

The October 4 Federalization Order places Illinois National Guard members under federal
command and control, usurping the Governor's authority to command them and depriving the
State of Illinois of their services.[155] Through the Militia Clauses in the Constitution, the Framers
carefully apportioned responsibility over the "militia"—now embodied in the National Guard—
between the federal government and the states. U.S. Const. art. I, § 8, cl. 15-16. The Tenth
Amendment "reserved to the States" those "powers not delegated to the United States by the

---

[155] *See* Ex. 6 (Buchanan Decl.) ¶ 14; Ex. 21, Declaration of Matthew K. Swearingen ("Swearingen Decl."), ¶ 12.

Constitution, nor prohibited by it to the States." U.S. Const. amend. X. Because of this reservation of state power, Illinois, like its sister states, "has a Tenth Amendment power to control its National Guard to the extent it is not cabined by the Militia Clause." *Oregon*, No. 3:25-cv-07156, ECF 56, at 27. By "federalizing state National Guardsmen for federal service when no statutory or constitutional authority permitted their federalization," the President and his administration have "interfered with the constitutional balance of power between the federal and state governments." *Id.* The Tenth Amendment requires this Court to reset that balance by invalidating the October 4 Federalization Order.

The October 4 Federalization Order and the Texas Mobilization Orders are also an attempt to impermissibly coerce Illinois into rescinding a sovereign choice the President does not like. Even using recognized instruments of federal power—like Congress's Spending Clause authority or, in this case, the Militia Clauses—can violate the Tenth Amendment when the effect is like "a gun to the head." *National Federation of Independent Business v. Sebelius*, 567 U.S. 519, 581 (2012) ("*NFIB*"). As confirmed by the President's own words and his relentless campaign of targeted, hostile executive actions, the President wants Illinois to abandon a specific state law he does not like: the TRUST Act, Illinois's so-called "sanctuary" law.

The President's resort to the "calling forth" power in the Militia Clauses is at least the third different federal power he has weaponized against Illinois in his campaign to dragoon Illinois into federal immigration enforcement. First, his administration sued under the Supremacy Clause to try to invalidate the TRUST Act head-on. *See generally Illinois*, 2025 WL 2098688. When that failed, the President turned to leveraging federal grant dollars—authorized by Congress through the Spending Clause—to force Illinois into either foregoing those funds or abandoning its statewide policy. Although that campaign is likewise failing, multiple battles on that front remain ongoing.

*See Illinois v. FEMA*, No. 25-206, ECF 71 (D. R.I. Sept. 24, 2025 Mem. and Ord.); *Illinois v. Noem*, No. 1:25-cv-00495, ECF 14 (D. R.I. Sept. 30, 2025 TRO). Now, with the October 4 Federalization Order and the Texas Mobilization Order, the President has reached for yet another federal tool to attempt to coerce Illinois into compliance with the President's preferred policy position.

At each of these steps, the President's campaign against Illinois's so-called "sanctuary" law has been coercive. That coercion has far surpassed the threshold for a Tenth Amendment violation. Both on its own, and as a particularly volatile escalation of a wide-ranging campaign of intimidation, the federalization orders inflict a degree of coercion that the Tenth Amendment does not allow. *See NFIB*, 567 U.S. at 581; *accord Murphy* ("[C]onspicuously absent from the list of powers given to Congress is the power to issue direct order to the governments of the States.").

The police power is foremost among the powers "reserved for the States" by the Tenth Amendment. The Framers ensured that that the powers which "'in the ordinary course of affairs, concern the lives, liberties, and properties of the people'" are "held by governments more local and more accountable than a distant federal bureaucracy." *NFIB*, 567 U.S. at 536 (quoting The Federalist No. 45, at 293 (J. Madison). The police power encompasses "the facets of governing that touch on citizens' daily lives," and it is "controlled by 50 different States instead of one national sovereign." *Id.* at 536. The dispersion and localization of the police power through our federalist system operates "as a check on the power of the Federal Government" in the interest of "protect[ing] the liberty of the individual from arbitrary power." *Id.* (quoting *Bond v. United States*, 564 U.S. 211, 222 (2011)).

A month into Operation Midway Blitz, the people living in the Chicago region find themselves at the whim of a federal administration brandishing the instruments of its power. Now,

**GA118**

the President has added federal troops to the mix, ordering them on an ill-defined, open-ended mission to accompany undefined "federal personnel" or protect undefined "federal property."[156] California's recent experience demonstrates that protecting federal "personnel" and "property" can bring National Guard troops to any number of places and communities. *See generally Newsom v. Trump*, No. 25-CV-04870-CRB, 2025 WL 2501619 (N.D. Cal. Sept. 2, 2025), *appeal pending*, No 25-5553 (9th Cir. 2025). When federal troops arrive, each of these Illinois communities will cede some portion of "local control" over "citizens' daily lives" to a "distant"—and openly hostile— "federal bureaucracy." By all but guaranteeing these intrusions throughout communities in the Chicagoland area, the October 4 Federalization Order and the Texas Mobilization Order violate the Tenth Amendment and must be enjoined from taking effect.

### IV. Plaintiffs are likely to succeed on their claim that the Posse Comitatus Act prohibits the deployment of federal troops in Illinois.

In addition to exceeding the President's authority under Section 12406 and violating the Tenth Amendment, the mobilization of National Guard in Illinois violates the Posse Comitatus Act. 18 U.S.C. § 1385. Since 1878, the Posse Comitatus Act has prohibited the U.S. military from engaging in civilian law enforcement unless expressly authorized by Congress. And yet, the very reason for the federal troop deployment in Illinois is to engage in civilian law enforcement activities like protest response and crowd control. This Court can and should enjoin the October 4 Federalization Order and the Texas Mobilization Order because they conflict with the Posse Comitatus Act and, as such, exceed the authority vested in the President and his administration. At a minimum, this Court should enjoin any federalized National Guard or other U.S. military service members deployed in Illinois from engaging in civilian law enforcement activities in violation of the Posse Comitatus Act.

---

[156] Ex. 2, October 4 Federalization Order.

44

"Congress has forbidden [the President] to use the army for the purpose [of] executing general laws except when *expressly* authorized by the Constitution or Act of Congress." *Youngstown Sheet and Tube Co. v. Sawyer*, 343 U.S. 579, 644-45 (Jackson, J., concurring). The Posse Comitatus Act is the longstanding codification of this principle. It does so by imposing criminal liability on members of the military who "execute the laws of the United States" except when "expressly authorized by the Constitution or an Act of Congress." 18 U.S.C. § 1385. Military members subject to the Posse Comitatus Act may not act as a "posse comitatus," or those "upon whom a sheriff could call for assistance in preventing any type of civil disorder." *United States v. Dreyer*, 804 F.3d 1266, 1272 (9th Cir. 2015). National Guard members in Title 10 status—as the Illinois National Guard members deployed under the October 4 Federalization Order or Texas Mobilization Order will be—are subject to the Posse Comitatus Act. 10 U.S.C. § 12405 (National Guard members "called into Federal Service" are "subject to the laws and regulations governing the Army or the Air Force"); 10 U.S.C. § 10106 ("The Army National Guard while in the service of the United States is a component of the Army."); *See also United States v. Hutchings*, 127 F.3d 1255, 1257-58 (10th Cir. 1997); *United States v. Benish*, 5 F.3d 20, 25-26 (3d Cir. 1993). The limited exceptions Congress has created for the Posse Comitatus Act include statutes like the Insurrection Act, 10 U.S.C. §§ 251-55, but neither the Insurrection Act nor any other exception has been invoked here (nor could they be). The statutory authority the President has invoked, 10 U.S.C. § 12406, is not one of those exceptions.

Federal law and the Department of Defense's own regulations confirm the wide range of activities that the federal troops deployed in Illinois must not perform because of the Posse Comitatus Act. *See* Ex. 16, Department of Defense Instruction, Defense Support of Civilian Law Enforcement Agencies 3025.21, Enclosure 3 ¶ 1.c (Feb. 27, 2023) (Incorporating Change 1, Eff.

Feb. 8, 2019) (regulations implementing Posse Comitatus Act). Congress has conferred on the Secretary of Defense the power to enact regulations to ensure that no member of the U.S. military engages in "direct participation . . . in a search, seizure, arrest, or other similar activity unless participation in such activity by such member is otherwise authorized by law." 10 U.S.C. § 275. The Secretary of Defense has enacted those regulations through, *inter alia*, Department of Defense Instruction 3025.21, Defense Support of Civilian Law Enforcement Agencies ("DODI 3025.21"). In addition to reiterating the statutory prohibitions on searches, seizures, and arrests, DODI 3025.21 further prohibits members of the U.S. military from a wide range of specific "forms of direct civilian law enforcement assistance," including:

> A search or seizure . . . An arrest; apprehension; stop and frisk; engaging in interviews, interrogations, canvassing, or questioning of potential witnesses or suspects; or similar activity . . . Using force or physical violence, brandishing a weapon, discharging or using a weapon [except in self-defense or defense of others] . . . Evidence collection; security functions; crowd and traffic control; and operating, manning, or staffing checkpoints . . . Surveillance or pursuit of individuals, vehicles, items, transactions, or physical locations, or acting as undercover agents, informants, investigators, or interrogators.

Ex. 16, DODI 3025.21, Enclosure 3 ¶ 1.c (Feb. 27, 2023) (Incorporating Change 1, Eff. Feb. 8, 2019). In other words, federal law prohibits the National Guard troops deployed in Illinois from engaging in the vast majority of what civilian law enforcement does daily—no stops or arrests, no investigations or surveillance, no security functions, no crowd or traffic control.

Given the long list of prohibited actions specified in DOD's own regulations, there is simply no way federalized National Guard troops can perform their assigned mission without violating the Posse Comitatus Act. DOD's own implementing regulations for the Posse Comitatus Act specify that federal troops may not "staff[] checkpoints, perform "security functions," pursue "individuals" or "vehicles," or engage in "crowd and traffic control[.]" Ex. 16, DODI 3025.21, Enclosure 3 ¶ 1.c (Feb. 27, 2023) (Incorporating Change 1, Eff. Feb. 8, 2019). Given the facial

46

**GA121**

contradiction between these limitations and the assigned mission, the federalization orders run headlong into the Posse Comitatus Act. For this additional reason, they must be enjoined.

**V.    The State of Illinois will suffer irreparable harm—including profound sovereign injury—without an injunction.**

There can be no serious dispute that the remaining equitable factors justify an injunction against the President's unlawful deployment orders.

At a minimum, the State of Illinois will suffer irreparable harm in the absence of an injunction. Harm is irreparable if legal remedies are "seriously deficient as compared to the harm suffered." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021). The President's unlawful deployment of military force in Chicago harms Plaintiffs in multiple ways that can never be redressed through remedies at law. In the absence of injunctive relief, the State of Illinois is already enduring a substantial sovereign injury from the uncalled-for deployment of federal troops, a usurpation of the police power the Constitution expressly grants the States. A sovereign injury "is itself sufficient to establish irreparable harm." *City of Evanston v. Sessions*, No. 18 C 4853, 2018 WL 10228461, at *4 (N.D. Ill. Aug. 9, 2018). The sovereign injury to Illinois is more than sufficient, standing alone, to support injunctive relief.

But there is more. The "ongoing and concrete harm[s]" to Illinois and Chicago's "law enforcement and public safety interests" are irreparable. *See Maryland v. King,* 567 U.S. 1301, 1303 (2012). Those harms include the diversion of Illinois National Guard members from their state responsibilities, impairing the State of Illinois's ability to call upon the Guard to protect itself and its citizens to respond to a natural disaster or other emergency. Those harms also include the increased unrest the military deployment threatens to provoke, requiring increased expenditure and diversion of resources by state and local law enforcement agencies to maintain order.[157] *Cf. Swain*

---

[157] *See* Ex. 14 (Orseno Decl.) ¶¶ 66.

47

**GA122**

*v. Junior,* 958 F.3d 1081, 1090 (11th Cir. 2020) (finding irreparable harm because government officials "will lose the discretion … to allocate scarce resources among different county operations necessary to fight the pandemic"); *see also Abbott v. Perez,* 585 U.S. 579, 602 n.17 (2018) (the "inability [of the State] to enforce its duly enacted plans clearly inflicts irreparable harm on the State").

Third, deploying military troops to Chicago threatens irreparable economic and financial harms to Illinois, Chicago, and our residents. The experience of Los Angeles and Washington, D.C. under federalized military occupation demonstrates that such an occupation wreaks havoc on local economies, particularly the restaurant and tourism sectors.[158] Those harms would likely be visited on the Chicagoland area as well, if federalized troops are deployed here.[159] That harm to local businesses would, in turn, shrink Illinois's and Chicago's tax revenues, which depend in significant part on industries that would suffer from a decrease in tourism, such as entertainment, rental cars, retail, and hotels.[160] Those financial harms are potentially devastating: in an average month, the State of Illinois takes in $313,103,426 from sales, car rental, hotel, and cannabis taxes alone, and the City of Chicago collected more than half a billion dollars in entertainment, hotel, and sales taxes alone in 2024, which made up nearly one fourth of local tax revenue for Chicago's operating fund.[161] And they are irreparable, because the United States has sovereign immunity. *Ohio v. Envtl. Prot. Agency*, 603 U.S. 279, 292 (2024) (finding that non-recoverable costs traced to federal action are sufficient to show irreparable harm).

---

[158] Ex. 17, Declaration of Jack Lavin ("Lavin Decl.") ¶¶ 6, 8; Ex. 18, Declaration of Sam Toia ("Toia Decl.") ¶¶ 6-7.
[159] Ex. 17 (Lavin Decl.) ¶¶ 7, 9-10; Ex. 18 (Toia Decl.) ¶¶ 8-10.
[160] Ex. 19, Declaration of Rosalind Harmon ("Harmon Decl.") ¶¶ 8, 12; Ex. 20, Declaration of Marvin Salao ("Salao Decl.") ¶¶ 13, 15, 17, 19.
[161] Ex. 19 (Harmon Decl.) ¶¶ 8-9; Ex. 20 (Salao Decl.) ¶¶ 14, 16, 18-19.

Plaintiffs need not wait before obtaining injunctive relief. *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 788 (7th Cir. 2011) ("[T]he alleged harm need not be occurring or be certain to occur before a court may grant relief.") Rather, plaintiffs need only show a "presently existing actual threat." *Id*. Here, the Defendants' plan to deploy military troops is clear, as evidenced by the October 4 Federalization Order and the Texas Mobilization Order.

Finally, injunctive relief is appropriate where (1) the balance of the equities tips in the applicants' favor and (2) the injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). These "factors merge" when the government is the party to be enjoined. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

The balance of the equities tips sharply in Plaintiffs' favor. Plaintiffs seek to protect their sovereignty, retain control over local policing, and prevent completely unnecessary disruption to one of the world's leading local economies. They have filed this suit to protect the basic structure of American federalism from this administration's unprecedented intrusion. On the other hand, the federal government faces no harm from an injunction. The federal government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (holding that "[t]here is generally no public interest in the perpetuation of unlawful agency action," but rather, "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operation" (internal quotation marks omitted)). The federal government has enforced federal law in Illinois for decades without the support of active-duty military forces. It may continue to enforce such laws even with Plaintiffs' requested injunction in place. This Court can and should enjoin the unlawful deployment orders issued by President Trump's administration.

49

**GA124**

**VI.    The impending deployment of Texas National Guard troops in Illinois is unlawful for the same reasons—and more—and compounds the grave, irreparable injury to Illinois's sovereignty.**

After approximately 5:00 p.m. on the evening of Sunday, October 5, members of Governor Pritzker's administration received information through informal channels that approximately 200 members of the Texas National Guard will be deployed in Illinois beginning October 6. A few hours later, Governor Pritzker's administration received a copy of an undated memorandum from Secretary Hegseth directed to the Adjutant General of the Texas National Guard regarding "Calling Members of the Texas Guard into Federal Service," (the "Texas Mobilization Order") in which Secretary Hegseth asserts:[162]

> On June 7, 2025, the President of the United States called forth at least 2,000 National Guard personnel into Federal service pursuant to [10 U.S.C. § 12406] to protect [ICE] and other [federal] personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where violent demonstrations against these functions are occurring or are likely to occur based on current threat assessments and planned operations. On October 4, 2025, the President determined that violent incidents, as well as the credible threat of continued violence, are impeding the execution of the laws of the United States in Illinois, Oregon, and other locations through the United States.

The undated Texas Mobilization Order further indicates that "up to 400 members of the Texas National Guard" would be mobilized purportedly under 10 U.S.C. § 12406 "to perform federal protection missions were needed, including in the cities of Portland and Chicago."[163] Because of the grave intrusion on Illinois's sovereignty posed by this development, Plaintiffs are compelled to seek immediate relief against this additional unlawful action now.

Defendants' plan to deploy federalized troops to Illinois under 10 U.S.C. § 12406—regardless of where they are from—fails to meet the requirements of that statute. In other words, for all the reasons that the October 4 Federalization Order regarding the Illinois National Guard is

---

[162] Ex. 3, Texas Mobilization Order.
[163] *Id.*

unlawful, the Texas Mobilization Order is likewise unlawful and *ultra vires*. The Section 12406 perquisites do not exist, and the Governor Pritzker has not formally received an order of any kind regarding the Texas National Guard, so any such order has not been issued "through" him. *Id.*

The Texas Mobilization Order is even more "untethered to the facts" on the ground in Illinois. *Oregon*, No. 3:25-cv-1756-IM, ECF 56 at 23. By invoking the June 7 Presidential Memorandum—issued after protests in California—the Texas Mobilization Order confirms that the plan to send federal troops to Illinois predates any recent events in Illinois. Events that occur after a decision has already been made cannot form the factual predicate for that decision.

Although the Texas Mobilization Order also refers to "violent incidents" considered by President Trump on October 4, there is no indication where these events took place or when. The federal government has already failed in arguing that "violence in a different state" can justify invocation of Section 12406, *Oregon*, No. 3:25-cv-1756-IM, ECF 56 at 21, and for good reason: allowing such an unbounded universe would undermine the high threshold Congress set for invoking Section 12406. *Id.* at 22. Because "violence *elsewhere* cannot support troop deployments *here*," the geographically unspecified "violent incidents" in the Texas Mobilization Order provide no support for sending troops from Texas to Illinois. *Id.*

In addition to being factually unsupported, the Texas Mobilization Order gets the law wrong. The President's purported October 4 "determ[ination]" was that "violent incidents" and "a credible threat of continued violence" are "impeding the execution of the laws of the United States" in Illinois, Oregon, and unspecified "other locations" in the United States.[164] But Section 12406(3) refers to the President being "unable" to execute federal law. *See* 10 U.S.C. § 12406(3). The word

---

[164] Ex. 3, Texas Mobilization Order.

**GA126**

"impeding" appears nowhere in Section 12406. The Texas Mobilization Order is thus *ultra vires* on its face because it relies on a triggering condition that Congress has not adopted.

Deploying Texas National Guard members to Illinois is also a violation of the Tenth Amendment. The unauthorized federal deployment of troops one from state into another state is a particularly jarring afront to the non-consenting state's sovereign "integrity"—territorial and otherwise—and "dignity." *Shelby County v. Holder*, 570 U.S. 529, 543 (2013) (quoting *Bond v. United States*, 564 U.S. 211, 221 (2011)). And as noted, the federalization and deployment of Illinois National Guard troops is already, by itself, an unduly coercive attempt to force Illinois to abandon its sovereign choice not to assist with federal civil immigration enforcement. Sending in troops from another state that has made the opposite choice—the choice favored by the President— makes the coercion all the more transparent and egregious. *See City of El Cenizo v. Texas*, 890 F.3d 164 (5th Cir. 2018) (upholding Texas statute regarding local immigration enforcement).

Finally, as explained above, the Texas Mobilization Order is also inconsistent with the Posse Comitatus Act, because the mission specified cannot be reconciled with the limitations imposed by that statute and DOD's own implementing regulations. The Texas Mobilization Order suffers from the same defects as the October 4 Federalization Order regarding the Illinois National Guard. The Court should enjoin them both.

## CONCLUSION

For the foregoing reasons, the Court should grant the State of Illinois and City of Chicago's motion and enter a temporary restraining order and preliminary injunction against implementation of the October 4 Federalization Order, the Texas Mobilization Order, and any similar order effectuating the mobilization of the National Guard of the United States, any state National Guard, or deployment of the U.S. military over the objection of the Governor of Illinois.

Dated: October 6, 2025

**MARY B. RICHARDSON-LOWRY**
*Corporation Counsel of the City of Chicago*


By: /s/ Stephen J. Kane

STEPHEN J. KANE
CHELSEY B. METCALF
City of Chicago Department of Law
121 North LaSalle Street, Room 600
Chicago, Illinois 60602
312-744-6934
stephen.kane@cityofchicago.org
chelsey.metcalf@cityofchicago.org

*Counsel for the City of Chicago*

Respectfully submitted,

**KWAME RAOUL**
*Attorney General of Illinois*


By: */s/* Christopher G. Wells

CARA HENDRICKSON
Executive Deputy Attorney General
CHRISTOPHER WELLS
Division Chief, Public Interest Division
SARAH J. NORTH
Deputy Division Chief, Public Interest Division
SARAH HUNGER
Deputy Solicitor General
KATHARINE ROLLER
Complex Litigation Counsel, Public Interest
Division
GRETCHEN HELFRICH
Deputy Chief, Special Litigation Bureau
KATHERINE PANNELLA
Senior Assistant Attorney General, Civil Rights
Bureau
SHERIEF GABER
MICHAEL TRESNOWSKI
Assistant Attorneys General, Special Litigation
Bureau
Office of the Illinois Attorney General
115 South LaSalle Street
31st Floor
Chicago, Illinois 60603
(312) 814-3000
Cara.Hendrickson@ilag.gov
Christopher.Wells@ilag.gov
Sarah.North@ilag.gov
Katharine.Roller@ilag.gov
Gretchen.Helfrich@ilag.gov
Katherine.Pannella@ilag.gov
Sherief.Gaber@ilag.gov
Michael.Tresnowski@ilag.gov

*Counsel for the State of Illinois*

**GA128**

# EXHIBIT 4

## DECLARATION OF CHIEF THOMAS MILLS

I, Thomas Mills, pursuant to 28 U.S.C. § 1746, hereby declare:

1.    I am over the age of 18 and understand the obligations of an oath.

2.    I am Chief of Police of the Broadview Police Department in the Village of Broadview, Illinois. Broadview Police Department is a department of 31 full-time sworn and civilian members serving in patrol, investigative, and administrative units.

3.    I am familiar with the information in the statements set forth below either through personal knowledge, consultation with my staff, or from my review of relevant documents. If called as a witness, I could and would testify competently based on information and belief to the matters set forth below.

4.    I have been Chief of the Broadview Police Department since October 2021. Before becoming Chief of the Broadview Police Department, I served for two months as First Deputy for the City of Chicago Office of Emergency Management and Communications. Before that, I served with the Chicago Police Department for 32 years. I began my career with the Chicago Police Department as a patrol officer and, over the course of my career, worked on the federal Drug Enforcement Agency (DEA) task force, as an investigator with the Bureau of Internal Affairs, as a Community Policing Sergeant, as a sergeant on the federal U.S. Marshals Service task force, as a lieutenant and Captain in various roles, and as a Commander in the Bureau of Detectives. At the time of my retirement from the Chicago Police Department, I was Deputy Chief of the Bureau of Counterterrorism.

5.    The Village of Broadview is a small suburb of the City of Chicago, with a population of approximately 8,000 people. Broadview is situated approximately 12 miles west of downtown Chicago.

### ICE's Detention Facility at 1930 Beach Street in Broadview

6. There is a United States Immigration and Customs Enforcement (ICE) Processing Center located within the Village of Broadview, at 1930 Beach Street (which I will refer to as the "ICE facility"). My understanding is that when individuals are arrested by ICE agents in the Chicagoland area, they are transported to the ICE facility in Broadview and processed there before being transported elsewhere for longer-term detention.

7. I recently learned that, in addition to the Beach Street facility, ICE leases 50-75 parking spots from a private landowner in a parking lot on the opposite side of Beach Street. These parking spots are used to store ICE vehicles and other equipment.

8. Following President Trump's inauguration in January 2025, activity at the ICE facility in Broadview has increased. This has included increased presence of federal personnel and increased use of the facility for processing detainees.

9. Since at least May 2025, I have been aware that small groups of protestors have conducted demonstrations outside of the ICE facility at 1930 Beach Street. Initially, this took the form of small groups that would assemble on Friday and Sunday mornings to pray outside of the facility. My understanding is that some religously-affiliated protestors have been holding Friday or Sunday vigils of that nature for many months and possibly years outside of the 1930 Beach Street facility.

### Meeting with ICE Officials on September 2, 2025

10. On September 2, 2025, at the Broadview Police Department, I, along with three other BPD employees, met with ICE Chicago Field Office Director Russell Hott and Assistant Field Director Jimmy Bahena at their request. In that meeting, Director Hott informed us that, beginning the next day, a large number of federal agents, including approximately 250-300 agents

from United States Customs and Border Patrol (CBP), would begin arriving in Illinois to assist with a ramped-up immigration enforcement campaign in the Chicagoland area. Director Hott stated their goal was to make large numbers of immigration-related arrests and stated that the ICE facility in Broadview would be the primary processing location for the operation. Director Hott stated that the facility would operate seven days per week for approximately 45 continuous days.

11.    Director Hott also informed us that they expected numerous protests, including potential property damage and assaults against law enforcement personnel. They also expected there to be impacts on traffic and businesses in the immediate vicinity. Director Hott stated that Sam Bell, a supervisor with the Federal Protective Service (FPS), had jurisdiction over the provision of security for the ICE facility in Broadview.

12.    At the September 2 meeting, we informed Director Hott that the Broadview Police and Fire Departments would continue to respond to all calls for service from ICE but would not assist with ICE's civil immigration enforcement activities.

13.    At the same meeting, we inquired whether ICE had medical personnel at the Beach Street facility to provide medical attention to detainees when needed. They informed us that ICE does not have medical personnel working at the Beach Street facility.

14.    As a result, ICE contacts the Village of Broadview to request paramedics when someone in its custody is injured or has a medical issue requiring attention. In those instances, the Broadview Fire Department transports the individual to the hospital, if needed, but federal personnel are required to respond to the hospital to continue to hold the person in custody. Broadview Police Department will not guard or detain individuals who are in federal custody based on civil immigration-related violations.

15.     I am aware of the Broadview Fire Department transporting ICE detainees to the hospital on three or four occasions within the last two to three weeks, because ICE is not itself equipped to provide a medical transport when needed.

**Friday Protests at the ICE Facility in Broadview during "Operation Midway Blitz"**

16.     Throughout the month of September, as immigration enforcement in the Chicago region has ramped up in what ICE has called "Operation Midway Blitz," the number of protestors gathering outside of the ICE facility in Broadview has increased.

17.     In early- to mid-September, at some of the Friday protests, some demonstrators would attempt to stand or sit down in the driveway that ICE vehicles use to access the facility at 1930 Beach Street. When this happened, ICE agents would physically remove the individuals from the driveway, and ICE vehicles would ultimately be able to enter and exit the facility as needed.

18.     Since on or around Friday, September 12, there have been protestors outside the ICE facility in Broadview almost around the clock, although not in large numbers. The crowd is typically fewer than 50 people.

19.     Friday is the day of the week on which the group of people protesting outside the ICE facility is largest. On Fridays, elected officials sometimes join the crowd outside the facility. There are also often individuals from the news media present. But, even at its largest, the size of the crowd had not exceeded 200, including elected officials and their staff, legal observers, and members of the media prior to Friday, October 3.

20.     On Friday, September 12, between 80 and 100 protestors assembled in the morning to demonstrate outside of the ICE facility on Beach Street. Initially, the crowd was singing and chanting. Some of them had small musical instruments. The crowd that morning included several

older individuals and individuals using wheelchairs and canes. Broadview Police officers were also on the scene.

21.     At around 10:00 a.m. that morning, 20-30 federal agents parked their vehicles in the parking lot on the opposite side of Beach Street and began to walk across the street toward the ICE facility. The agents were dressed in camouflage tactical gear and had masks covering their faces. September 12 was the first day that I recall seeing federal agents on scene dressed in that manner. It was a very noticeable shift in my mind.

22.     As agents approached the ICE facility that day, September 12, the tone of the crowd of protestors changed. The crowd grew louder and began to press closer to the building. Broadview Police officers positioned ourselves on the public way, between the 1930 Beach Street building and the crowd, attempting to keep the crowd on the public way and off of ICE's property. When the federal agents went into the building, the crowd calmed down, and Broadview Police officers relocated to the outer perimeter of the crowd.

23.     Throughout that day, the crowd of protestors loudly chanted, and some individuals stood in the driveway to the building as ICE vehicles attempted to enter and exit the premises, transporting detainees. ICE assembled their own Special Weapons and Tactics (SWAT) team or Special Reaction Team (SRT) to respond to the protestors. ICE agents intermittently grabbed people, physically moving them out of the driveway leading into the parking lot of the ICE facility.

24.     At some point, ICE agents gave a dispersal order over a loudspeaker, ordering the crowd to disperse and threatening to deploy chemical agents if protestors did not leave. Approximately 20 to 30 minutes later, ICE began to deploy tear gas and pepper spray at the crowd.

25.     Individual protesters arrived and left throughout the day. By around 3:00 p.m. that afternoon, the crowd began to thin.

26.     After the protest on September 12, I instructed my command staff to relocate our department's mobile video surveillance camera. We positioned the camera across the street from the ICE facility, in a private business' parking lot, pointing toward the front of 1930 Beach Street. The camera has been continuously recording from that location since September 13.

27.     In addition, Illinois State Police ("ISP") have put up surveillance cameras to monitor activity in the area. One camera is positioned at the 25th Avenue exit from Interstate 290, to monitor vehicle traffic. The other one is located in a parking lot across the street from the Beach Street ICE facility, facing the front of 1930 Beach Street.

### Friday, September 19 Protest

28.     On Friday, September 19, protestors again assembled outside of the ICE facility in Broadview. That day, several elected officials, including Lieutenant Governor Julianna Stratton were on scene. ICE agents again deployed pepper spray and tear gas at various points to disperse the crowd.

29.     On September 19, when ICE agents deployed chemical agents, the crowd of protestors ran toward Broadview Police officers on the scene, verbally expressing anger at Broadview Police for the chemical agents. People from the crowd were coughing and their eyes were red. As individuals covered in chemicals interacted with police officers, officers themselves became contaminated by the chemical agents and began to experience their effects. Some officers were not able to see. As a result, Deputy Chief Brandy Johnson instructed officers to relocate away from the area where the teargas had been deployed.

30.     Since on or around Friday, September 19, ICE's use of chemical agents near its processing facility in Broadview has recurred regularly. On that day and at various times since then, some ICE agents have stood on top of the 1930 Beach Street building in tactical gear and

shot balls of pepper spray at protesters from above. ICE agents also deploy tear gas canisters on the ground.

31.     The use of chemical agents by federal agents at the ICE facility in Broadview has often been arbitrary and indiscriminate. At times it is used when the crowd is as small as ten people. The deployment of chemical agents is dangerous to the health of both demonstrators and first responders on the scene. In addition, when ICE agents deploy chemical agents, it causes the crowd of protesters to disperse, sometimes running into the road, which is dangerous both for them and for motorists. Broadview police officers have had to attempt to position themselves in a way that directs the crowd to disperse in a safe manner. Over the course of my career in law enforcement, the way in which federal agents have indiscriminately used chemical agents in Broadview is unlike anything I have seen before.

32.     On September 20, ICE officials informed Broadview Police Department that tires on 15 ICE vehicles had been slashed. However, ICE officials would provide only general information to police department staff. Agents would not give us specific information regarding the vehicles' make, model, Vehicle Identification Numbers (VINs), or the specific damage done to each vehicle. Broadview Police Department documented the incident as we would any other instance of property damage within the village, but the report was generic due to the lack of specific information that was provided.

### The Federal Government Constructed a Fence on Broadview's Property

33.     In the early morning hours of September 23, ICE or others working for the federal government erected a fence on the Village of Broadview's public way, adjacent to the 1930 Beach Street facility. The fence cuts across Beach Street, physically separating the southernmost portion of the street from the rest of the thoroughfare. The fence blocks vehicles from using the road as a

throughway, including those belonging to the Broadview Fire Department. In the event of a fire or other emergency at a business on Beach Street, the fire department would be unable to access those businesses to provide emergency services. The Broadview Fire Department sent a letter to Director Hott on September 23, demanding that ICE remove the fence from Broadview's public way.

34.     After the erection of the fence, due to protestors' inability to approach the front of the Beach Street facility, protestors have begun to demonstrate outside of 2000 South 25th Avenue, which abuts the parking lot on the opposite side of Beach Street where ICE leases space and that ICE agents use to access their vehicles. Thus, the crowd has recently been bifurcated, with a relatively larger group assembling on 25th Avenue and a smaller contingent remaining outside the fence on Beach Street.

### Friday, September 26 Protest

35.     On Friday, September 26, a larger group of between 100 and 150 protesters assembled outside 2000 25th Street in Broadview. The crowd of people was spilling onto the public road. In addition, the larger group of protesters elicited a strong response from ICE. ICE agents deployed more tear gas and more pepper spray at protestors and jostled people as they physically moved individuals.

36.     There was also a smaller crowd of people outside the ICE facility at 1930 Beach Street. When ICE agents deployed chemical agents near the facility at 1930 Beach Street, it forced the crowd there to run north on Beach Street away from the building and then east, towards the other crowd on 25th Avenue.

37.     That day, Broadview Police Department put out a traffic-related call to the Illinois Law Enforcement Alarm System (ILEAS), which is Illinois' law enforcement mutual aid network. Six cars from other law enforcement agencies, including Illinois State Police (ISP), Maywood

Police Department, Westchester Police Department, and La Grange Police Department responded. To ensure everyone's safety, we closed 25th Avenue between Lexington Street and Roosevelt Road from approximately nine o'clock in the morning until approximately noon. Later that evening, we put out a second traffic-related ILEAS call and again closed 25th Avenue between Lexington Street and Roosevelt Road from approximately 8:30 p.m. until approximately 10:30 p.m.

### Saturday, September 27 Protest

38.     On Saturday, September 27, at around 7:00 a.m. in the morning, Gregory Bovino of the United States Customs and Border Patrol and several federal agents drove into the Broadview Police Department's parking lot in three Chevrolet Tahoes. Broadview Police Sergeant McIlvenny met them in the parking lot and asked them to leave. Bovino and his fellow agents stated that they wanted to provide information to the police department. They stated to Sergeant McIlvenny that we should prepare for their planned increased use of chemical agents and planned increased ICE activity in the Village of Broadview. One of the federal agents threatened that it was "going to be a shitshow." The federal agents then left.

39.     On Saturday, September 27, however, there was a small crowd of quiet protestors with minimal ICE traffic coming in and out of the Beach Street facility. Broadview Police Department kept a close eye on demonstrations and was able to manage the scene on our own. There was no need for us to request assistance from ISP or other agencies.

40.     During the protests on the evening of September 27, at some point, federal officials formed a line outside the 1930 Beach Street facility and marched north on Beach Street, pushing the crowd up the street and forcing them to relocate to Lexington Avenue. That evening, federal officials dismantled a tent with water and snacks that protesters had erected on Beach Street. I am

also aware that federal agents deployed teargas, pepper spray, and fired pepper balls at protestors that evening.

41.     Early in the morning on Sunday, September 28, I learned on the 5:00 a.m. morning news that 11 people had been arrested outside the ICE facility. I was surprised to learn about the arrests; there had been no calls to the police department for service overnight.

## Requests for Investigative Support

42.     On September 29, I contacted Director Hott to request a point of contact for three criminal matters the police department is investigating that allegedly involved federal agents. Those incidents include two hit-and-run incidents allegedly involving vehicles striking pedestrians and one criminal damage to property incident involving a news media reporter. Director Hott responded on September 29, indicating the agency would cooperate and stating that Assistant Field Director Ray Hernandez oversees the ICE facility in Broadview and should be able to assist with any local needs. However, Director Hott did not provide contact information for Mr. Hernandez.

43.     In the same email, Director Hott stated that ICE vehicles had been keyed and sugar had been put in vehicles' fuel tanks. The email from Director Hott on September 29 was the first time I learned of any damage to ICE vehicles other than the slashing of tires that had been reported to us weeks earlier. We have followed up with Director Hott for additional information.

44.     Throughout the protests in September and before, the ICE facility has continued to operate. I am not aware of any occasion on which an ICE vehicle was actually prevented from entering or exiting the 1930 Beach Street ICE facility due to activity by protestors.

45.     In addition, Broadview Police Department has responded to every call for service we have received from ICE during this period.

**Establishment of Unified Command with the ISP and Other Local Police Agencies**

46.     After the protests during the weekend of September 26 through September 28, I met with state and local police leaders the following week on Wednesday, October 1, to discuss a plan to safely police the anticipated protests at the ICE facility on the upcoming Friday, October 4. I had previously been in touch with the ISP on multiple occasions about the protests outside the ICE facility, and the ISP was very supportive with resources and guidance.

47.     As a result of the October 1 meeting with the ISP, which also included the Cook County Sheriff's Office, the Broadview Police Department joined a joint unified command ("Unified Command") consisting of our department, the ISP, the Cook County Sheriff's Office, the Cook County Department of Emergency Management and Regional Security, and the Illinois Emergency Management Agencdy ("IEMA").

48.     The establishment of the Unified Command was publicly announced on October 2, 2025 in a press release, which I have attached to this declaration as Exhibit A. As described in the October 2 press release, the purpose of the Unified Command is "to coordinate public safety measures in Broadview around the facity being used by U.S. Immigration and Customs Enforcement (ICE)." In the October 2 press release, the Unified Command described our mission and plan as follows:

> The Unified Command is setting up designated areas where people can safely exercise their rights, which will support the safety of the public, and ensure vehicular traffic can safely access the roads in the area. The goal of the Unified Command is to protect the health and safety of all individuals, including nearby Broadview residents and businesses, and enable the peaceful expression of First Amendment rights. The agencies involved in this operation will neither assist nor obstruct enforcement of federal immigration statutes in compliance with state and federal law.
>
> Uniformed officers will be on site to help direct people to the designated areas. In addition to protecting the safety and rights of people peacefully expressing their views, these measures will also ensure that third parties that need access to the facility – including attorneys and legal representatives, people bringing medicine to detainees, and representatives from foreign consulates – will maintain clear points of access to the facility.

**Friday, October 3 Protest**

49.     On October 3, as we at the Unified Command expected, there was a protest outside the ICE facility in Broadview. Beginning early in the morning, throughout the day, and late into the evening, there were large numbers of state and local law enforcement present and assisting the mission of the Unified Command. The number of protestors present changed some throughout the day. My sense was that the peak of the protest—the moment when the largest number of protestors were present—was in the morning. At its peak, the number of protestors present was approximately 200 people, including media and some elected officials. In terms of state and local police officers, my best estimate is that we had approximately 100 officers assisting the Unified Command on scene at the protests on October 3.

50.     As we forecased in our October 2 press release, the Unified Command established "designated protest areas" around the ICE facility. The image below from the October 2 press release shows the areas that were initially designated as protest areas:



51.     The designated protest areas shown in green were chosen to ensure that protestors remained off of the roadway as much as possible—for their own safety, for the safety of state and local law enforcement, and for the safety of federal agents. My understanding was that the vehicles

being used by ICE and other federal agencies, including the Border Patrol, required access to the public streets to get in and out of the ICE facility, which is property owned and operated by the federal government. My understanding was that like any property owner in Broadview, the federal government can use the public street to access its own property with its own vehicles.

52.    On the morning of October 3, ISP troopers deployed along the designated protest areas to ensure separation between protestors and any vehicle traffic that might come through. There were some indiviudal protestors who initially tried to remain in the public street, which was outside of the designated protest areas.

53.    Over the course of the day, vehicles carrying federal agents came in and out of the ICE facility using the public street. Some protestors attempted to press in close to the federal agents' vehicles, but the state and local police operating under the Unified Command were largely able to maintain the integrity of the designated protest areas.

54.    At one point, I saw Kristi Noem, the Secretary of the Department of Homeland Security, in the parking lot of the ICE facility. I recognized her because I have seen her in the news. I did not appreciate Secretary Noem's presence. When she rode out of the ICE facility by vehicle, it made our job at the Unified Command harder because the protestors to become angry and vocal. As Secretary Noem was leaving, her vehicle, an SUV, was accompanied by a large armored tactical vehicle and several heavily armed federal agents. Secretary Noem's vehicle proceeded a few blocks away to a parking lot where ICE vehicles were parked. She got out of her vehicle along with Agent Bovino in an area with protestors on both sides—within approximately 25 feet of her. The crowd reacted with angry shouts. In my personal opinion, her presence and actions seemed to be intended to provoke the crowd. I did not see any legitimate law enforcement purpose for what she was doing.

55.     Around the time Secretary Noem was leaving the ICE facility, there were some protestors who resisted officers' attempts to maintain the designated protest areas. In the times where protestors attempted to move through the line being maintained by state and local police, state and local police had to make a few temporary detentions and, in some cases, arrests. My understanding is that state and local police arrested around five people at the protests in Broadview on October 3.

56.     Over the course of the day, the state and local police operating under the Unified Command adjusted the location of the designated protest areas to do our best ensure that no one was harmed, either by vehicular traffic or through some other cause, like an altercation.

57.     Overall, I believe the Unified Command accomplished its mission of maintaining public safety and protecting protestors' First Amendment rights on October 3. At no point did I witness state or local police officers deploying any chemical agents, such as teargas, pepper balls, or pepper spray against protestors. For the first sime in several Fridays in Broadview, I also did not witness any federal agents using chemical munitions. Because of the professionalism of the state and local enforcement who assisted the Unified Command, protestors were able to exercise their First Amendment rights without being subjected to the type of reckless use of chemical agents I had witnessed on the previous three Fridays in Broadview.

58.     The Unified Command is capable of handling the ongoing protests in Broadview. Based on my experience over the course of my 35 years in law enforcement, the situation in Broadview is currently under control. I do not believe that the National Guard is necessary. If anything, I believe their presence in Broadview would do more harm than good by potentially escalating the situation.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 4th day of October, 2025.

Chief Thomas Mills
Broadview Police Department
Village of Broadview, Illinois

# EXHIBIT 6

## DECLARATION OF LIEUTENANT GENERAL JEFFREY S. BUCHANAN, (RETIRED)

I, Lieutenant General Jeffrey S. Buchanan, (Retired), declare that the following is true and correct:

1.    I am a retired Lieutenant General of the United States Army with extensive experience commanding active component and National Guard troops.

2.    This declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

### BACKGROUND AND QUALIFICATIONS

3.    As a Lieutenant General of the United States Army, I commanded U.S. Army North (Fifth Army). U.S Army North conducts Multi-Domain Operations in support of U.S. Northern Command in order to detect, deter and defeat threats to the Homeland and conducts defense support of civil authorities and theater security cooperation initiatives to defend the United States and its interests.

4.    I was commissioned as a Lieutenant in the Infantry in May 1982 after graduating from the University of Arizona with a Bachelor of Science in Wildlife Ecology. I hold a Master of Arts in Leadership Development from the United States Military Academy.

5.    My duty assignments in the United States Army included command and staff positions within the 82nd Airborne Division, 25th Infantry Division, 101st Airborne Division, and 10th Mountain Division. I served as a Company and Battalion Tactical Officer at the U.S. Military Academy, the Director for Operations (J3) of Joint Task Force Full Accounting, and the Senior Light Infantry Task Force Trainer at the National Training Center.

6.    I served four combat tours in Iraq and one tour in Afghanistan.

7.    I have extensive experience commanding Soldiers in domestic missions. For example, I led the military response in support of FEMA for five major hurricanes (Matthew, Harvey, Irma, Maria, and Florence). I also led more than 6,000 Soldiers and Marines supporting the Department of Homeland Security for security of the southwest border of the United States. Furthermore, I served as commanding general U.S. Army Military District of Washington/Joint Force Headquarters-National Capitol Region from 2013–2015. In that role I led military forces in support of a number of law enforcement agencies, including direct support of the U.S. Capitol Police during National Special Security Events, such as the annual State of the Union Address.

8.    Many of the Soldiers under my command, both abroad and within the United States, were members of the National Guard.

9.    After a 37-year career in the Army, I retired from active duty in September 2019. In my retirement, I serve as a volunteer deputy (and ranch liaison) at the Santa Cruz County Sheriff's Office in Arizona. To serve in this position, I completed over 100 hours of hands-on and classroom training, including firearms and taser qualifications, drug identification, public assistance, community policing, securing a crime scene, liability, preserving evidence, and more. I also completed more than 100 hours of ride-along (FTO) training with sworn officers before patrolling the remote areas of the county on my own.

10.    I have been asked by the Office of the Illinois Attorney General to provide expert testimony regarding the use of the military for domestic law enforcement.

**OPINIONS**

**I.    Federalized National Guard members are generally not authorized to engage in domestic law enforcement tasks.**

11.    Before members of the National Guard can serve a mission, they must be activated. In general, there are three active statuses for National Guard forces.

12.     First, the National Guard could be activated by the State or Commonwealth in which the National Guard unit is based. This is commonly referred to as "State Active Duty." The governor of the State or Commonwealth activates the guard unit, often in response to an emergency or in anticipation of a particular need. When the members of the National Guard serve in this capacity, they fall under the governor's chain of command. The costs of using the National Guard in State Active Duty are borne by the State or Commonwealth.

13.     Second, the National Guard could be activated pursuant to Title 32 of the United States Code. Under Title 32, the governor of a State or Commonwealth makes a request for the federal government to bring troops into active duty for a particular mission. Under this authority, the troops fall under the command of the governor, but the costs of using the National Guard are borne by the federal government.

14.     Third, the National Guard could be activated pursuant to Title 10 of the United States Code. Under Title 10, the National Guard is considered federal military, subject to the command of the U.S. President. National Guard serving under Title 10 are commonly called "federalized" National Guard troops.

15.     While National Guard troops serving under State Active Duty or under Title 32 may engage in domestic law enforcement tasks (subject to restrictions under state law), federalized National Guard troops serving under Title 10 may not engage in domestic law enforcement activities, subject to specific exceptions.

16.     By domestic law enforcement activity, I mean the day-to-tasks police officers perform. The tasks include, but are not limited to, patrolling neighborhoods, conducting traffic stops, interviewing witnesses, performing security functions, arresting, apprehending, or detaining individuals, issuing citations, executing search warrants, and conducting criminal investigations.

17.     These domestic law enforcement tasks are distinct from the tasks of infantry Soldiers, which include attacking enemy positions, conducting raids, capturing prisoners, and seizing and defending key terrain. Though there are many different occupational specialties in the military (such as infantry, engineers, artillery, and aviation), only military police (or security police in the Air Force) are trained in law enforcement tasks.

18.     While in command of military forces serving in support of civilian law enforcement agencies, I relied on instruction from the Department of Defense regarding what tasks such forces could or could not perform. The most recent version of such instruction is Department of Defense Instruction, Defense Support of Civilian Law Enforcement Agencies 3025.21 (Feb. 27, 2013) (Incorporating Change 1, Eff. Feb. 8, 2019). That guidance document provides that federal troops may not perform direct civilian law enforcement assistance tasks, including: "A search or seizure . . . An arrest; apprehension; stop and frisk; engaging in interviews, interrogations, canvassing, or questioning of potential witnesses or suspects; or similar activity . . . Using force or physical violence, brandishing a weapon, discharging or using a weapon [except in self-defense or defense of others] . . . Evidence collection; security functions; crowd and traffic control; and operating, manning, or staffing checkpoints . . . Surveillance or pursuit of individuals, vehicles, items, transactions, or physical locations, or acting as undercover agents, informants, investigators, or interrogators." DODI 3025.21, Enclosure 3 ¶ 1.c.(1). I commanded my troops in accord with the principles described in DODI 3025.21.

18.     In my experience commanding troops serving in post-hurricane emergency response missions, I have developed extensive understanding of the authority governing out-of-state National Guard troops serving in another State.

19.    Under the Emergency Management Assistance Compact (EMAC), States and Commonwealths can share resources from all disciplines, including members of the National Guard.

20.    Unless activated under Title 10 (federalized), when National Guard troops from one State serve in another State, they are generally subject to the operational control of the supported State.

21.    For example, when I commanded military forces in Puerto Rico after the devastation of Hurricane Maria, I commanded National Guard troops (under Title 10) from several states supporting the effort. Their chain of command was federal and that chain terminated in the President. We also had a number of Guard troops operating under Title 32 status. While these troops served in Puerto Rico, they served under the local operational control of the governor of Puerto Rico.

22.    I am not familiar with any scenario in which members of the National Guard from one State (in a State Active Duty or Title 32 status) were sent to support a mission in another State without coordination with the supported State.

## II.    For federal troops to support local law enforcement, extensive coordination and training are necessary.

23.    I have extensive experience commanding troops who have served in a supporting role to law enforcement. For example, I have commanded troops who supported U.S. Capitol Police for major events such as the annual State of the Union address. I have also commanded troops who supported the United States Customs and Border Protection at the southwest border of the United States in 2018 and 2019. In both contexts, the troops I commanded did not engage in domestic law enforcement tasks. They did not perform any of the tasks listed in DODI 3025.21, Enclosure 3 ¶ 1.c.(1). Instead, the troops were engaged in well-defined, discrete military tasks.

24.     Extensive coordination is required for the effective use of active-duty military troops to support local law enforcement. For example, for active-duty military to support U.S. Capitol police to secure the State of the Union address, the military and local law enforcement cooperate at every level. This cooperation includes meetings, rehearsals, and information sharing. The coordination process begins more than six months before the event. Without such coordination, activity duty military would not be able to effectively support local law enforcement.

25.     Similarly, extensive training is required for the effective use of active-duty military troops to support law enforcement. When I commanded active-duty troops who supported federal law enforcement at the southwest border, those troops received specific scenario-based training based on the specific tasks that were required of them at the border. Without such training, activity duty military would not be able to effectively support law enforcement.

26.     When federal military troops are deployed to support domestic law enforcement, they are normally prohibited from performing law enforcement tasks, including presence patrols, crowd control, or making arrests. Federal military troops could likely only perform such tasks if the President invokes the Insurrection Act.

**III.    U.S. military troops, including members of the National Guard, do not receive the training necessary to engage in domestic law enforcement.**

27.     I have had the unique experience of serving as both a member of the military and as a local law enforcement officer.

28.     For me to effectively serve in local law enforcement, I required extensive training regarding skills that I did not need in the military.

29.     First, I needed to learn de-escalation techniques. Infantry members are trained to effectively destroy enemies in combat scenarios. As a result, they do not learn how to take the

temperature out of a confrontation. This skill, however, is part of daily life as a local law enforcement officer.

30.    Second, I needed to learn how to make a traffic stop. As a member of the military, I was never trained in making traffic stops, nor was such training necessary to effectively serve. I learned how to manage the many risks involved in making traffic stops, as well as the extensive regulations governing such interactions. None of this was part of my military training.

31.    Third, I needed to learn how to effectively clear a room or a structure. While military members learn to clear rooms, the task is completely different in a domestic civilian context.

32.    Fourth, I needed to learn how to use nonlethal force. Law enforcement officers often carry a taser and/or pepper spray and must be trained on the use of such tools. Both tasers and pepper spray are used by law enforcement as part of a graduated response. Both are intended to incapacitate a subject without having to resort to lethal force such as a firearm. With the exception of military police, members of the military do not carry tasers nor pepper spray, nor do they receive training regarding those tools.

33.    Fifth, I needed to learn the rules governing the use of force in a domestic scenario. Law enforcement officers are subject to local policies, state law, and federal law governing when the use of force is appropriate against a civilian. None of these policies or laws apply to military officers in combat. As a result, members of the military are not trained on such policies. When I commanded military forces on the Southwest border in 2018 and 2019, I mandated extensive scenario-based training so that our troops (mostly Soldiers and Marines) could apply the Rules for Use of Force (RUF) without consulting a card or asking the opinion of a lawyer. Those rules are intended to enable military forces to accomplish their mission in a domestic context, and protect

both our troops and the civilians they encounter. As a result of that training, I am confident that our troops were prepared for the challenges of operating on the southwest border. It is critical to note, however, that they were not performing any of the law enforcement tasks listed in DODI 3025.21, Enclosure 3 ¶ 1.b.(5)

34.     Sixth, I needed to learn how to properly engage in defensive tactics for close quarters combat. In the military, I was trained in the use of mixed martial arts tactics, including the use of chokeholds, to engage with enemy combatants at close range. In the law enforcement context, however, many such tactics are both prohibited and disfavored, as the goal of a close quarters confrontation is to neutralize the potential threat and apply handcuffs.

35.     Seventh, I needed to learn how to properly conduct a criminal investigation. Law enforcement officers must know how to build a case by securing a crime scene, preserving evidence, and conducting witness interviews and interrogations. Generally, members of the military are not required to perform such detective work. Absent specific training regarding the criminal investigation process, a member of the military would be unable to successfully solve crime through investigations and prosecutions.

36.     Eighth, I needed to learn how to use discretion appropriately as a law enforcement officer. For example, if a law enforcement officer observes a car driving over 100 miles per hour, an officer must make a series of split-second decisions regarding the appropriateness of vehicle chase. The officer needs to immediately consider factors such as the ongoing risk to life created by the speeding vehicle, the probability of successfully stopping the speeding vehicle through a chase, the capabilities of the officer, and the rules and laws governing such a decision. Officers must make that decision in a matter of seconds, and they cannot do so without extensive training. While military members make countless split-second decisions, weighing the risk and rewards of

certain courses of action, I have learned that the context of those decisions is drastically different in the domestic law enforcement context.

37. Finally, and perhaps most importantly, a different mindset is necessary for local law enforcement. The mission of the infantry (which was my branch in the Army) is to close with and destroy the enemy. This tends to produce an aggressive mindset, and that mindset is what we need in our infantry troops in combat. I have learned that it is not the mindset of an effective police officer, who must always try to prevent confrontation and reduce the use of lethal force.

38. I had to receive over a month of training to serve as a local law enforcement officer, notwithstanding my extensive experience in the military.

39. It is my opinion that members of the military are ill-suited to engage in domestic law enforcement tasks unless they receive extensive scenario-based training on the particular tasks required by the mission.

40. Furthermore, if federal military troops were sent to support federal officers enforcing civil provisions of federal law (such as immigration law), the troops would likely lack familiarity with the laws and regulations governing the federal officers' conduct.

**IV.     The uncoordinated use of untrained U.S. military troops in American cities to engage in civilian law enforcement would result in tremendous harm.**

41. Policing is a risky activity. It could easily result in harm to both civilians and officers if done incorrectly. Routine activities such as traffic stops, searches, or arrests could turn into tragedies if they are not conducted by trained individuals in coordination with one another. Sending troops untrained in domestic law enforcement into a city, without local coordination, creates a substantial risk that someone innocent will be hurt.

42. Furthermore, I am gravely concerned that the use of the military for domestic law enforcement would lead to a loss of trust in the military among the American people. The Army is

older than our country and for the entirety of our nation's history, the perception of most Americans is that our military is non-partisan. After all, we swear an oath to the Constitution, not a political leader or a political party. To my knowledge, in every poll conducted over the last 40 years (the entirety of my active duty time), the military has been at or near the top of all institutions that people of our country have confidence in. I am concerned about creating the perception among the American people that the military is or will be used for political means. The confidence that our citizens have in our military is based on trust.  Rebuilding trust once it has been lost is a difficult task.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on _____October 2, 2025_____ at _____Patagonia, Arizona_____

Lieutenant General Jeffrey S. Buchanan (Retired)

# EXHIBIT 21

## DECLARATION OF MATTHEW K. SWEARINGEN

I, Matthew K. Swearingen, declare under penalty of perjury that the following is true and correct:

1. I am a resident of the State of Illinois. I am over the age of 18 and have personal knowledge of all the facts stated herein, except those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am the General Counsel of the Illinois Department of Military Affairs (IDMA). I have served in that role since November 2021. As General Counsel of IDMA, I provide legal support to the executive staff that oversees the Illinois National Guard (ILNG).

3. I previously served in the ILNG for over twenty years in military occupational specialties as an infantryman, all-source intelligence analyst, and judge advocate general, with capstone assignments as a platoon sergeant, senior intelligence sergeant, and brigade judge advocate. I have completed deployments for missions or training to Germany, Bulgaria, Iraq, and Egypt.

4. The ILNG comprises the Air and Army National Guard (ILANG & ILARNG), which are part of the organized military of the State of Illinois. ILANG and ILARNG are federally recognized units and are components of the United States military reserve forces. As such, the ILNG has both a federal and a state mission.

5. At the federal level, the ILNG provides trained units and qualified personnel for active duty in the armed forces of the United States during times of war, national emergency, or when national security requires. At the state level, the ILNG serves as a capable force for the Governor that can provide statewide assistance during

natural or man-made disasters, large-scale civil disturbances, and other emergencies, as necessary.

6. The ILNG is part of the IDMA, a state agency that works under the executive authority of the Governor of Illinois and performs numerous functions to assist the ILNG, including planning and organizing deployments and training.

7. Upon enlisting in the ILNG, members attend Basic Combat Training, which focuses on building up members' physical fitness, teaching combat skills, and instilling core values, including discipline and teamwork. After Basic Combat Training, members attend Advanced Individual Training, which is focused on members' specific assigned jobs within the ILNG, also known as Military Occupational Specialties (MOS). Trainings continue throughout members' enlistment.

8. There are three duty status categories in the ILNG: State Active Duty, Title 10, or Title 32 status. In general, these statuses determine whether an operation is funded by the State of Illinois or the United States and whether the ILNG is under the command and control of the Governor or of the President, in their respective capacities as Commander-in-Chief.

9. In State Active Duty, the ILNG is fully paid for by the State of Illinois, and federal funds are not obligated for any personnel or units. Servicemembers in State Active Duty serve under the command and control of the Governor of Illinois.

10. ILNG members may also serve in a Title 32 status. Under Title 32, the federal government may request the Governor to provide the ILNG's assistance for federal missions. In this hybrid status, ILNG is under the command and control of the Governor, but the mission or training periods are paid for with federal funds. As an example, the ILNG was in a Title 32 status during COVID-19 testing and vaccination efforts in 2020 and 2021.

11. When the ILNG is operating in either a State Active Duty or Title 32 status, the Governor of Illinois is its Commander-in-Chief (*see* 20 ILCS 1805/9).

12. Alternatively, the ILNG may be called into federal service under Title 10 of the United States Code. When the ILNG is called into federal service under Title 10, it becomes a component of the regular active-duty Army and federal National Guard. In Title 10 status, the ILNG is paid for by the federal government and is under the command and control of the President.

13. Although Title 10 deployment of the ILNG typically entails being deployed in a foreign country as part of a U.S. military mission, members have been in Title 10 status domestically. This most commonly occurs while members are stationed at a military base within the United States, or while in transit to or from foreign military missions or to backfill for active-duty troops deployed overseas.

14. There are approximately 12,775 members of the ILNG. Of that number, there are approximately 1,137 members that are currently deployed under Title 10 of the United States Code. Another approximately 1,700 members of the ILNG either have not completed their initial entry training or have a medical issue that might prevent them from being deployed or utilized for a state-side mission.

15. From 2019 through 2025, a total of 5,072 service members were activated for State Active Duty. Additionally, 2,899 members were placed in Title 32 status for COVID-19 testing- and vaccination-related operations. From 2019-2025, approximately 6,700 ILNG members were mobilized or placed on Title 10 Federal Active Duty orders. (These numbers count multiple deployments of the same servicemember separately; as such, the number of unique servicemembers deployed is somewhat lower than the above.)

16. Most ILNG members serve as reserve forces, meaning that their role in the ILNG is part-time, and they are generally employed in civilian jobs separate from their work

3 of 5

**GA159**

as servicemembers. Members of the reserve forces commit a minimum of one weekend per month and two weeks per year to the ILNG, much of which is devoted to training and maintaining unit readiness.

17. Since September 11, 2001, ILNG members have been required to adjust to an increased operations tempo that includes longer training periods in more advanced specialties.

18. For example, ILNG members recently completed an annual cybersecurity exercise called Cyber Shield that trained members on how to respond to a cyber-attack. The ILNG Chemical, Biological, Radiological, Nuclear, and Explosive Enhanced Response Force Package (CERF-P) team recently completed an annual certification on responding to man-made and natural disasters, with training that included site search, rescue, mass decontamination, medical triage, and fatality recovery.

19. This training prepares ILNG members to intervene in emergent situations to protect and serve the people of the State of Illinois, something they do regularly.

20. For example, in 2019 and 2020, 748 members of the ILNG were called into State Active Duty by the Governor to respond to flooding. ILNG members activated during this State Active-Duty mission assisted with filling sandbags and monitoring dams and levees.

21. In another example, in 2020, 584 members of the ILNG were called into State Active Duty by the Governor to support Illinois' response to the COVID-19 pandemic. ILNG members on this State Active-Duty mission managed and operated COVID-19 testing sites across the state.

22. In another example, in 2022, 132 members of the ILNG were called into State Active Duty by the Governor to respond to dangerous winter storms. ILNG members activated during this mission assisted in locating stranded motorists.

23. The ILNG also regularly responds to other types of threats to the people of Illinois. For example, in 2020 and 2022, members of the ILNG helped secure Illinois elections against cyber threats. ILNG members activated during this State Active-Duty mission assisted with monitoring the Illinois State Board of Elections' network infrastructure, to protect it from cyber-attacks and intrusions.

24. In addition, the Governor has called members of the ILNG into State Active-Duty to assist with security arrangements for large-scale events by, for example, providing logistical support to local and state law enforcement.

25. For example, in 2024, the Governor called members of the ILNG into State Active-Duty to assist with security arrangements for the Democratic National Convention, which was expected to draw 50,000 visitors to the City of Chicago. Servicemembers began preparing for this mission months ahead of the opening of the event on August 19, 2024, and coordinated extensively in advance with various government agencies, including the U.S. Secret Service, Chicago Police Department, Illinois State Police, and Illinois Emergency Management Agency.

26. The data provided in this declaration was previously compiled pursuant to requests for reports from the Governor as Commander-in-Chief of the ILNG in accordance with 20 ILCS 1805/22(c).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on September 29, 2025, at Springfield, Illinois.

Declaration of Matthew K. Swearingen

**IN THE UNITED STATES COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| STATE OF ILLINOIS, et al. | ) | |
| | ) | |
| *Plaintiff(s),* | ) | |
| | ) | No. 25-cv-12174 |
| v. | ) | Hon. April M. Perry |
| | ) | |
| DONALD TRUMP, et al. | ) | |
| | ) | |
| *Defendant(s)* | ) | |

<u>DECLARATION OF GENERAL STEVEN S. NORDHAUS</u>

I, General Steven S. Nordhaus, pursuant to 28 U.S.C. § 1746, hereby state and declare as follows:

**Relevant Personal History**

1.     This declaration is based on my personal knowledge, as well as information made available to me during the routine execution of my official duties.

2.     This declaration is submitted in support of Defendants' opposition to Plaintiffs' Motion for a Temporary Restraining Order (TRO).

3.     I currently serve as the Chief of the National Guard Bureau and as a member of the Joint Chiefs of Staff. In these capacities, I serve as a military adviser to the President, Secretary of War, and the National Security Council.

4.     As the Chief of the National Guard Bureau, one of my duties is to assist the Secretary of War in facilitating and coordinating the use of National Guard personnel and resources. It is my job and the mission of our agency to coordinate with other Federal agencies, the combatant commands, and the adjutants general of the 54 National Guards pursuant to 10 U.S.C. § 10503.

5.     It is common practice that the Chief of the National Guard Bureau communicates directly with the adjutant general of a state to coordinate National Guard activity, including where coordination with the governor is needed. As Chief, I have typically engaged at this level with the state adjutants general, who are representatives of their respective governors in relation to National Guard activities. My staff, including my Director of Operations (J3), pursuant to Department of War (DoW) policy, obtain state support of federal missions by engaging officials at a state's Joint Forces Headquarters (JFHQ), which is composed of state NG leadership and a state's adjutant general, who in turn advise their governor. *See* Department of Defense Directive 5105.83.

6.     I previously served as the Director of Operations at the National Guard Bureau (J3) from fall of 2019 to August 2022. During this time, I gained extensive experience implementing the processes through which state National Guards are mobilized. Specifically, I was a primary point of contact with state National Guard officials to mobilize National Guardsmen to assist with the responses to events including: the coronavirus pandemic, the protests following the death of George Floyd in May 2020 and during the events at the U.S. Capitol on January 6, 2021. I also served as a primary point of contact on the mobilization of the National Guard to California in June 2025.

**National Guard Background**

7.     The National Guard Bureau is a federal agency under the DoW that is the "channel of communications on all matters pertaining to the National Guard, the Army National Guard of the United States, and the Air National Guard of the United States between the Department of the Army and Department of the Air Force…," and the fifty States, three

territories, and District of Columbia (54) in accordance with 10 U.S.C. § 10501(b) and DoD

Directive 5105.77.

8.      A state National Guard is part of the state's militia and ordinarily operates under

the command of the state's governor. Congress has also created the National Guard of the United

States, which is composed of all the members of the State National Guards, and is a federal

entity under the federal chain of command. A member of the National Guard serves

simultaneously in the State National Guard and as a member of the National Guard of the United

States, which is a reserve component of the U.S. Military. National Guard members serve under

the command of their governor in a state status unless ordered to active duty under Title 10 of the

U.S. Code. When ordered into federal service, members of the National Guard lose their status as

members of the state militia and serve under the command of the President as the Commander-

in-Chief. See *Perpich v. Dep't of Def.*, 496 U.S. 334, 338 (1990).

9.      There are numerous authorities upon which National Guard Service members can

mobilize. When under state command and control, National Guardsmen can mobilize in a purely

State Active-Duty status or in a federally funded status under the command and control of the

Governor pursuant to Title 32 of the U.S. Code. When under Federal command and control,

National Guardsmen will always be in a duty status under Title 10 of the U.S. Code.

10.      It is my understanding that section 12406 of Title 10 authorizes the President of

the United States to mobilize the militia for the purposes enumerated in the statute.

**Factual Background**

11.      The structure of the Illinois National Guard includes a JFHQ and an Adjutant

General who represents the Governor in dealings with the NGB on issues like federal

mobilizations. The Governor is the Commander-in-Chief in State Active Duty or Title 32. The

Adjutant General is the Commander of the Illinois National Guard and serves as the Director of

the Department of Military Affairs, which is "the channel of communication between the Federal

Government and the State of Illinois on all matters pertaining to the State military forces,"

according to the Military Code of Illinois. 20 ILCS 1805/20. Orders of the Adjutant General of

Illinois "shall be considered as emanating" from the governor. 20 ILCS 1805/22. The Illinois

Adjutant General is responsible for "the planning, development and execution of the program of

the military forces of the State" and is also "the preparation and execution of plans, for

organizing, supplying, equipping and mobilizing the Organized Militia, for use in the national

defense…." 20 ILCS 1805/22. Based on my experience, communication directly between the

Chief of the National Guard Bureau and a state adjutant general is standard practice when

communicating important Department of War policies and direction, especially during

emergencies.

12.     On October 3, 2025, I became aware of a Request for Assistance (RFA) to the

Department of War from the Department of Homeland Security (DHS) dated that same day. In

this RFA, DHS "request[ed] immediate and sustained assistance from the DoW in order to

safeguard federal personnel, facilities, and operation in the State of Illinois." *See* Ex. A. DHS

issued this RFA because "[f]ederal facilities including those directly supporting Immigration and

Customs Enforcement (ICE) and the Federal Protective Service (FPS) have come under

coordinated assault by violent groups intent on obstructing lawful federal enforcement actions."

*See id.*

13.     DHS elaborated that "these groups are actively aligned with designated domestic

terrorist organizations and have sought to impede the deportation and removal of criminal

noncitizens through violent protest, intimidation, and sabotage of federal operations." *See id.*

DHS, therefore, specifically requested the "deployment of up to 300 DoW personnel, trained and equipped for mission security in complex urban environments." *See id.*

14.     I am also aware that this RFA follows a previous request for assistance from DHS for DoW support in Illinois dated September 26, 2025. *See* Ex. B. The September 26 RFA requested similar assistance. I understand that the October 3 RFA has increased urgency based upon changes to the situation on the ground in Illinois and requests 300 National Guard personnel, rather than 100, to respond to the increasingly hostile and dangerous conditions.

15.     Also on October 3, 2025, I was notified by the Department of War that the Secretary of War was considering the mobilization of the Illinois National Guard in response to the DHS RFA.

16.     On October 4, 2025, I became aware that President Trump had issued a presidential memorandum in which he determined that "the situation in the State of Illinois, particularly in and around the city of Chicago, cannot continue." *See* Ex. C. President Trump reiterated key points from the DHS RFA and "determined that these incidents, as well as the credible threat of continued violence, impede the execution of the laws of the United States." *See id.* He further "determined that the regular forces of the United States are not sufficient to ensure the laws of the United States are faithfully executed, including in Chicago." *See id.* Therefore, President Trump, pursuant to 10 U.S.C. § 12406, "call[ed] into Federal service at least 300 members of the Illinois National Guard, until the Governor of Illinois consents to a federally funded mobilization." *See id.* The President's memorandum also contained reference to a previous Presidential determination, issued on June 7, 2025, finding that "[n]umerous incidents of violence and disorder have recently occurred and threaten to continue" in response to ICE and other government officials' enforcement of federal law, which necessitated "call[ing] into

Federal service members and units of the National Guard under 10 U.S.C. § 12406 to temporality

protect ICE and other United States Government personnel who are performing Federal

functions . . . and to protect Federal property, at locations where protests against these functions

are occurring[.]" *See* Ex. D.

17.     Following the President's determination, I was made aware that the Secretary of

War had authorized the mobilization of 300 Illinois National Guard in Title 32 status, which

would have kept them under the command and control of the Governor of Illinois.

18.     I prepared a memorandum directed to the Illinois Adjutant General requesting the

Illinois National Guard be mobilized in Title 32 status within 2 hours to respond to the time-

sensitive danger posed to federal personnel, property, and functions. *See* Ex. E.

19.     I transmitted this memorandum to the Illinois Adjutant General at 11:22am

Eastern Time (ET) on October 4, 2025.

20.     The Illinois Adjutant General acknowledged receipt at 1:11pm ET. At 1:27pm,

through a communication from the Illinois Adjutant General, the Illinois Governor denied the

request to mobilize in Title 32 status.

21.     Following this denial, the Secretary of War issued a memorandum directing the

mobilization of the Illinois National Guard in Title 10 status pursuant to President Trump's

determination in the October 4 memorandum. *See* Ex. F.

22.     U.S. Northern Command (USNORTHCOM) is one of the Department of War's

eleven unified combatant commands. Its missions include providing command and control of

homeland defense efforts and coordinating defense support of civil authorities. U.S. Army North

(ARNORTH) supports USNORTHCOM in its mission. When federalized, members of a state

National Guard serve pursuant to Title 10 of the U.S. Code under the command of the President

and the Secretary of War. In this case, the Secretary of War authorized USNORTHCOM and ARNORTH to execute command and control of mobilized and federalized members of the Illinois National Guard. USNORTHCOM has retained control over the activated portions of the Illinois National Guard since this time.

23.    On October 5, 2025, the Secretary of War issued another memorandum calling 400 members of the Texas National Guard into federal service. *See* Ex. G. In this memorandum, the Secretary of War stated: "The President has authorized me to coordinate with you on the mobilization of up to 400 members of the Texas National Guard under section 12406 of title 10, U.S. Code." *Id.* The purpose of this mobilization is to "perform federal protection missions where needed, including in the cities of Portland and Chicago." *Id.* The mobilized members of the Texas National Guard will be under the command and control of USNORTHCOM. *See id.*

24.    In my experience at the National Guard Bureau, as its Director of Operations and Chief, I have become familiar with the procedure and policies of National Guard mobilizations to respond to crises. I have learned that it is imperative that the National Guard be prepared to deploy quickly and efficiently in such times to prevent the loss of life and destruction of property. I have also observed that it is not unusual for the National Guard of one state to deploy to another state to meet an immediate need. In my experience with National Guard mobilizations in response to crises across the country, many involving risk of serious bodily harm or death to members of the public and service members, I have found that a delayed or insufficient response can aggravate situations and prevent a proper and sufficient response. Therefore, in response to the mobilization orders requiring immediate action, and in close coordination with the Illinois Adjutant General, the National Guard will work quickly to ensure a swift and appropriate response.

25.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

is true and correct.

NORDHAUS.STEVEN    Digitally signed by
.SCOTT.1075715478    NORDHAUS.STEVEN.SCOTT.1075
715478
Date: 2025.10.08 14:58:18 -04'00'

STEVEN S. NORDHAUS

GENERAL, U.S. AIR FORCE

CHIEF, NATIONAL GUARD BUREAU

Exhibit A

FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE



*Executive Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528

October 3, 2025

MEMORANDUM FOR:    COL Anthony Fuscellaro
Executive Secretary
U.S. Department of Defense

FROM:    Andrew J. Whitaker
Executive Secretary
U.S. Department of Homeland Security

SUBJECT:    **UPDATED Request for Assistance from the Department of War for Federal Facility Protection Support to the Department of Homeland Security (State of Illinois)**

## Overview

The Department of Homeland Security (DHS) requests immediate and sustained assistance from the Department of War (DoW) in order to safeguard federal personnel, facilities, and operations in the State of Illinois. Federal facilities, including those directly supporting Immigration and Customs Enforcement (ICE) and the Federal Protective Service (FPS), have come under coordinated assault by violent groups intent on obstructing lawful federal enforcement actions. These groups are actively aligned with designated domestic terrorist organizations and have sought to impede the deportation and removal of criminal noncitizens through violent protest, intimidation, and sabotage of federal operations.

At the President's direction, DHS is seeking to put an end to the migrant invasion and these lawless riots. This further executes and follows the intent of past Executive Orders: (1) Executive Order Clarifying the Military's Role in Protecting the Territorial Integrity of the U.S. (20 Jan 2025), section 2; (2) Executive Order Declaring a National Emergency at the Southern Border of the U.S. (20 Jan 2025); (3) Executive Order Guaranteeing the States Protection Against Invasion (20 Jan 2025). Additional requests may follow as the situation develops.

## DHS Overarching Goal

DHS seeks DoW support to ensure the continued protection of federal facilities in Illinois that are experiencing sustained unrest, thereby reinforcing the safety of federal personnel, safeguarding public property, and enabling uninterrupted execution of federal law enforcement missions.

FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE
**GA171**

FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE

**Subject: Request for Assistance from the Department of War for Federal Facility Protection Support to the Department of Homeland Security (State of Illinois)**
Page 2

<u>**Specific Topics for Request**</u>
DHS requests deployment element of up to 300 DoW personnel, trained and equipped for mission security in complex urban environments. These personnel would integrate with federal law enforcement operations, serving in direct support of federal facility protection, access control, and crowd control measures.

<u>**End of Mission**</u>
DHS requests that DoW-authorized support capabilities remain in place through the cessation of unrest and unlawful protests in Illinois.

<u>**Funding**</u>
DHS requests DoW provide support on a reimbursable basis.

Exhibit B

FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE

*Executive Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528

## Homeland Security

September 26, 2025

MEMORANDUM FOR:    COL Anthony Fuscellaro
Executive Secretary
U.S. Department of Defense

FROM:    Andrew J. Whitaker
Executive Secretary
U.S. Department of Homeland Security

SUBJECT:    **Request for Assistance from the Department of War for Federal Facility Protection Support to the Department of Homeland Security (State of Illinois)**

---

**Overview**

The Department of Homeland Security (DHS) requests immediate and sustained assistance from the Department of War (DoW) in order to safeguard federal personnel, facilities, and operations in the State of Illinois. Federal facilities, including those directly supporting Immigration and Customs Enforcement (ICE) and the Federal Protective Service (FPS), have come under coordinated assault by violent groups intent on obstructing lawful federal enforcement actions. These groups are actively aligned with designated domestic terrorist organizations and have sought to impede the deportation and removal of criminal noncitizens through violent protest, intimidation, and sabotage of federal operations.

At the President's direction, DHS is seeking to put an end to the migrant invasion and these lawless riots. This further executes and follows the intent of past Executive Orders: (1) Executive Order Clarifying the Military's Role in Protecting the Territorial Integrity of the U.S. (20 Jan 2025), section 2; (2) Executive Order Declaring a National Emergency at the Southern Border of the U.S. (20 Jan 2025); (3) Executive Order Guaranteeing the States Protection Against Invasion (20 Jan 2025). Additional requests may follow as the situation develops.

**DHS Overarching Goal**

DHS seeks DoW support to ensure the continued protection of federal facilities in Illinois that are experiencing sustained unrest, thereby reinforcing the safety of federal personnel, safeguarding public property, and enabling uninterrupted execution of federal law enforcement missions.

FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE
**GA174**

FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE

**Subject: Request for Assistance from the Department of War for Federal Facility Protection Support to the Department of Homeland Security (State of Illinois)**
Page 2

<u>**Specific Topics for Request**</u>
DHS requests deployment element of approximately 100 DoW personnel, trained and equipped for mission security in complex urban environments. These personnel would integrate with federal law enforcement operations, serving in direct support of federal facility protection, access control, and crowd control measures.

<u>**End of Mission**</u>
DHS requests that DoW-authorized support capabilities remain in place through the cessation of unrest and unlawful protests in Illinois.

<u>**Funding**</u>
DHS requests DoW provide support on a reimbursable basis.

Exhibit C

**THE WHITE HOUSE**

WASHINGTON

October 4, 2025

MEMORANDUM FOR THE SECRETARY OF WAR
                THE ATTORNEY GENERAL
                THE SECRETARY OF HOMELAND SECURITY

SUBJECT:        Department of War Security for the Protection
                of Federal Personnel and Property in Illinois

The situation in the State of Illinois, particularly in and
around the city of Chicago, cannot continue. Federal facilities
in Illinois, including those directly supporting Immigration and
Customs Enforcement (ICE) and the Federal Protective Services
(FPS), have come under coordinated assault by violent groups
intent on obstructing Federal law enforcement activities. These
groups have sought to impede the deportation and removal of
criminal aliens through violent demonstrations, intimidation,
and sabotage of Federal operations. These violent activities
appear to be increasing, and the situation in the State of
Illinois, particularly in and around the city of Chicago, cannot
continue.

These activities are not occurring in isolation. Instead, these
activities are similar to other ongoing efforts in multiple
States and cities around the country to disrupt the faithful
enforcement of Federal law. On June 7, 2025, I determined that
similar activities warranted the mobilization of the National
Guard. Likewise, at the end of September, I directed the
Secretary of War to mobilize the National Guard due to ongoing
violence and interference with Federal law enforcement in
Oregon.

In those prior directives and in this instance, I have
determined that these incidents, as well as the credible threat
of continued violence, impede the execution of the laws of the
United States. I have further determined that the regular
forces of the United States are not sufficient to ensure the
laws of the United States are faithfully executed, including
in Chicago.

**GA177**

2

In light of both past incidents in Chicago and the credible
threat of future incidents, and in light of my determinations,
by the authority vested in me as President by the Constitution
and the laws of the United States of America, including
10 U.S.C. 12406, I hereby call into Federal service at least
300 members of the Illinois National Guard, until the Governor
of Illinois consents to a federally-funded mobilization, under
Title 32 of the United States Code, of the Illinois National
Guard under State control.  The members of the Illinois National
Guard called into Federal service shall protect ICE, FPS, and
other United States Government personnel who are executing
Federal law in the State of Illinois, and Federal property in
the State of Illinois.  They shall do so at any locations at
which violent demonstrations prevent the execution of Federal
law or are likely to prevent the execution of Federal law based
on current threat assessments and planned operations.  The
duration of such Federal service shall be 60 days or at the
discretion of the Secretary of War.  Further, I direct and
delegate actions as necessary for the Secretary of War to
coordinate with the Governor of the State of Illinois and the
Chief of the National Guard Bureau in identifying and ordering
into Federal service the appropriate members and units of the
Illinois National Guard under this authority.

To carry out this mission, the deployed National Guard personnel
may perform those protective activities that the Secretary of
War determines are reasonably necessary to ensure the execution
of Federal law in Illinois, and to protect Federal property in
Illinois.  Following the deployment of any National Guard
personnel to any location in Illinois, the Secretary of War
shall consult with the Attorney General and the Secretary of
Homeland Security prior to withdrawing the personnel from such
location.  The Secretary of War and the Secretary of Homeland
Security may delegate to subordinate officials of their
respective Departments any of the authorities conferred upon
them by this memorandum.

**GA178**

Exhibit D

June 7, 2025

MEMORANDUM FOR THE SECRETARY OF DEFENSE
                THE ATTORNEY GENERAL
                THE SECRETARY OF HOMELAND SECURITY

SUBJECT:        Department of Defense Security for the Protection
                of Department of Homeland Security Functions


Numerous incidents of violence and disorder have recently
occurred and threaten to continue in response to the enforcement
of Federal law by U.S. Immigration and Customs Enforcement (ICE)
and other United States Government personnel who are performing
Federal functions and supporting the faithful execution of
Federal immigration laws.  In addition, violent protests
threaten the security of and significant damage to Federal
immigration detention facilities and other Federal property.  To
the extent that protests or acts of violence directly inhibit
the execution of the laws, they constitute a form of rebellion
against the authority of the Government of the United States.

In light of these incidents and credible threats of continued
violence, by the authority vested in me as President by the
Constitution and the laws of the United States of America, I
hereby call into Federal service members and units of the
National Guard under 10 U.S.C. 12406 to temporarily protect ICE
and other United States Government personnel who are performing
Federal functions, including the enforcement of Federal law, and
to protect Federal property, at locations where protests against
these functions are occurring or are likely to occur based on
current threat assessments and planned operations.  Further, I
direct and delegate actions as necessary for the Secretary of
Defense to coordinate with the Governors of the States and the
National Guard Bureau in identifying and ordering into Federal
service the appropriate members and units of the National Guard
under this authority.  The members and units of the National
Guard called into Federal service shall be at least 2,000
National Guard personnel and the duration of duty shall be for
60 days or at the discretion of the Secretary of Defense.  In
addition, the Secretary of Defense may employ any other members

**GA180**

2

of the regular Armed Forces as necessary to augment and support
the protection of Federal functions and property in any number
determined appropriate in his discretion.

To carry out this mission, the deployed military personnel may
perform those military protective activities that the Secretary
of Defense determines are reasonably necessary to ensure the
protection and safety of Federal personnel and property  The
Secretary of Defense shall consult with the Attorney General and
the Secretary of Homeland Security prior to withdrawing any
personnel from any location to which they are sent.  The
Secretaries of Defense and Homeland Security may delegate to
subordinate officials of their respective Departments any of the
authorities conferred upon them by this memorandum.


                    DONALD J. TRUMP

Exhibit E

**NATIONAL GUARD BUREAU**
**1636 DEFENSE PENTAGON**
**WASHINGTON, D.C.  20301-1636**

MEMORANDUM FOR THE ADJUTANT GENERAL, ILLINOIS NATIONAL GUARD

SUBJECT: Request for Illinois National Guard Federal Protection Mission

1.  I am writing to inform you that the President has directed the mobilization of at least 300 members of the Illinois National Guard (ILNG) to protect federal personnel, functions, and property in Illinois.  However, the Secretary of War has been authorized to first provide additional federal funding for 300 members of the ILNG under Title 32 United States Code, Section 502(f), and request that that they perform this mission in a non-federalized status under your command and control.

2.  Due to the circumstances and immediate nature of this requirement, if ILNG forces are not mobilized under Title 32 in the next 2 hours, the Secretary of War will direct the mobilization of as many members of the ILNG as he may deem necessary under Title 10 United States Code.

3.  The Department of War greatly appreciates your collaboration on this emergent situation. If your Governor agrees to a Title 32 mobilization of the ILNG, we will work with the Department of Homeland Security and other federal officials to coordinate mission details with you.  To be clear, we believe time is of the essence and failure to mobilize sufficient forces quickly to address the situation may risk lives and property damage.  I respectfully request that you inform me immediately if your Governor is unable or unwilling to mobilize the ILNG under Title 32 to perform the necessary protective functions.

NORDHAUS.STE
VEN.SCOTT.1075
715478

Digitally signed by
NORDHAUS.STEVEN.SCOTT.
1075715478
Date: 2025.10.04 10:57:53
-04'00'

STEVEN S. NORDHAUS
General, USAF
Chief, National Guard Bureau

**GA183**

Exhibit F

**SECRETARY OF WAR**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

OCT - 4 2025

MEMORANDUM FOR THE ADJUTANT GENERAL, ILLINOIS NATIONAL GUARD
THROUGH: THE GOVERNOR OF ILLINOIS

SUBJECT: Calling Members of the Illinois National Guard into Federal Service

On October 4, 2025, the President of the United States called forth at least 300 National Guard personnel into Federal service pursuant to section 12406 of title 10, U.S. Code, to protect U.S. Immigration and Customs Enforcement, Federal Protective Service, and other U.S. Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where violent demonstrations against these functions are occurring or are likely to occur based on current threat assessments and planned operations.

This memorandum further implements the President's direction. Up to 300 members of the Illinois National Guard will be called into Federal service effective immediately for a period of 60 days. The Chief of the National Guard Bureau will immediately coordinate the details of the mobilization with you, in coordination with the Chairman of the Joint Chiefs of Staff and Commander, U.S. Northern Command. The mobilized Service members will be under the command and control of the Commander, U.S. Northern Command.

cc:
Chairman of the Joint Chiefs of Staff
Chief, National Guard Bureau
Commander, U.S. Northern Command
Under Secretary of Defense for Policy
Under Secretary of Defense for Personnel and Readiness

Exhibit G

**SECRETARY OF WAR**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

OCT – 5 2025

MEMORANDUM FOR THE ADJUTANT GENERAL, TEXAS NATIONAL GUARD
THROUGH: THE GOVERNOR OF TEXAS

SUBJECT: Calling Members of the Texas National Guard into Federal Service

On June 7, 2025, the President of the United States called forth at least 2,000 National Guard personnel into Federal service pursuant to section 12406 of title 10, U.S. Code, to protect U.S. Immigration and Customs Enforcement and other U.S. Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where violent demonstrations against these functions are occurring or are likely to occur based on current threat assessments and planned operations. On October 4, 2025, the President determined that violent incidents, as well as the credible threat of continued violence, are impeding the execution of the laws of the United States in Illinois, Oregon, and other locations throughout the United States.

The President has authorized me to coordinate with you on the mobilization of up to 400 members of the Texas National Guard under section 12406 of title 10, U.S. Code. The orders will be effective immediately for an initial period of 60 days, and be subject to extension, to perform federal protection missions where needed, including in the cities of Portland and Chicago. The Chief of the National Guard Bureau will immediately coordinate the details of the mobilization with you, in coordination with the Chairman of the Joint Chiefs of Staff and Commander, U.S. Northern Command. The mobilized Service members will be under the command and control of the Commander, U.S. Northern Command.

cc:
Chairman of the Joint Chiefs of Staff
Chief, National Guard Bureau
Commander, U.S. Northern Command
Under Secretary of Defense for Policy
Under Secretary of Defense for Personnel and Readiness

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

STATE OF ILLINOIS, *et. al.*,

       *Plaintiff,*

v.

DONALD TRUMP, *et.al.*,

       *Defendants*.

No. 25-cv-12174

**DECLARATION OF FIELD OFFICE DIRECTOR RUSSELL HOTT**

I, Russell Hott, hereby declare as follows:

1. I am employed by the United States Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) as the Field Office Director (FOD) of the ERO Chicago Field Office. This includes oversight of ICE's Broadview Processing Center (BSSA), in Broadview, Illinois. I have held this position since August 2025.

2. Beginning in the fall of 2024, I served as the Acting Executive Associate Director (EAD) for ERO. In that role, I oversaw the operations of more than 7,600 ERO employees in field offices, at headquarters, and overseas. ERO manages and oversees all aspects of the removal process within ICE, including domestic transportation, detention, alternatives to detention programs, bond management, supervised release, and removal to more than 170 countries around the world. I previously served as Deputy EAD from January 2024. I began my service with the U.S. Government as a detention enforcement officer with the former Immigration and Naturalization Service in New York, New York. I have held the

following positions with ICE: Assistant Director for Enforcement and Custody Management, Field Operations, and Enforcement Divisions, FOD for the Washington Field Office, Deputy FOD for the Boston and Washington Field Offices, Chief of Staff for the ICE Deputy Director, acting Deputy Assistant Director for Domestic Operations – Western Operations, and Unit Chief in the Removal Division. As the FOD for ERO Chicago, I direct and oversee ICE's enforcement of federal immigration laws in the states of Illinois, Indiana, Wisconsin, Kansas, Kentucky, and Missouri.

3.  The Chicago Field Office has approximately 180 officers covering six states across two time zones. In and around the City of Chicago, ERO has approximately 65 officers, including 31 at BSSA.

4.  This declaration is submitted in support of Defendants' Opposition to Plaintiffs' Motion for Temporary Restraining Order (TRO). I have reviewed Plaintiffs' application for a TRO and supporting exhibits.

5.  The statements contained in this declaration are based upon my personal knowledge and information made available to me in the course of my official duties.

**Background**

6.  ICE is the largest investigative branch of DHS and is charged with enforcement of more than 400 federal statutes. The agency was created after the September 11, 2001, terrorist attacks, by combining components of the former Immigration and Naturalization Service and the former U.S. Customs Service, among other agencies, to more effectively enforce federal immigration and customs laws and to protect the United States against terrorist attacks. The mission of ICE is to protect the United States from the cross-border crime and illegal immigration that threaten national security and public safety. To carry out that

mission, ICE focuses on enforcing immigration laws, preventing terrorism, and combating transnational criminal threats. ICE consists of three core operational directorates: (1) ERO, which includes 25 field offices led by FODs; (2) Homeland Security Investigations (HSI), which includes 30 field offices led by Special Agents-in-Charge; and (3) the Office of the Principal Legal Advisor, which includes 25 field locations led by Chief Counsel.

7.   ERO deportation officers are immigration officers under 8 U.S.C. § 1357 and customs officers under 19 U.S.C. § 1589a. It is the mission of ERO to identify, arrest, and remove aliens who present a danger to national security or are a risk to public safety, as well as those who enter the United States illegally—including those who cross the border illegally, which is a federal misdemeanor, 8 U.S.C. § 1325, and those who illegally reenter after having been removed, which is a federal felony, 8 U.S.C. § 1326—or otherwise undermine the integrity of our immigration laws and our border control efforts.

8.   The majority of ERO's immigration enforcement operations take place in the interior of the country. ERO manages all logistical aspects of the removal process by identifying, apprehending, and, when appropriate, detaining removable aliens during the course of immigration proceedings and pending physical removal from the United States. This includes locating and taking into custody fugitive aliens and at large criminal aliens, as well as identifying aliens in federal, state, and local prisons and jails and working with those authorities to transfer them to ICE custody without releasing them into the community. When aliens are ordered removed, ERO is responsible for safely repatriating them, or otherwise overseeing their departure from the United States.

**Chicago's Restrictions on State and Local Cooperation with Federal Officials**

**(Chicago Code ch. 2-173)**

9.  In 2012, the Chicago City Council passed the "Welcoming City Ordinance," Chicago
    Code ch. 2-173, which sought to "clarify the communications and enforcement
    relationship between the City and the federal government," in addition to "establish[ing]
    the City's procedures concerning immigration status and enforcement of federal civil
    immigration laws." Chicago Code § 2-173-005.[1]

10. This Ordinance explicitly and intentionally limits local cooperation with federal
    immigration enforcement in numerous ways. It provides that no agent or agency shall
    "detain, or continue to detain a person based upon an immigration detainer" or "an
    administrative warrant, including, but not limited to, those entered into the Federal
    Bureau of Investigation's National Crime Information Center database, or successor or
    similar database maintained by the United States." Sections 2-173-020(a)(1). Moreover,
    no agent shall permit ICE agents "access, including by telephone, to a person being
    detained by, or in the custody of, the agency or agent," or "use of agency facilities for
    investigative interviews or other investigative purpose." *Id.* § 2-173-020(a)(2). Nor shall
    agents "expend their time responding to ICE inquiries or communicating with ICE
    regarding a person's custody status, release date, or contact information." *Id.* § 2-173-
    020(a)(3).

---

[1] Available at:
https://www.chicago.gov/content/dam/city/depts/mayor/Office%20of%20New%20Americans/PDFs/WelcomeCityOrdinance.pdf  (last visited on Oct. 7, 2025).

11. It is my understanding Chicago Mayor Brandon Johnson signed an executive order on October 6, 2025, prohibiting federal agents from using certain city-owned spaces for immigration enforcement activities.[2]

**Increased Violence and Insufficient Response**

12. Officers continue to face threats throughout the Chicago Field Office Area of Responsibility (AOR). For example, on June 16, 2025, a deportation officer was physically attacked by a rioter outside of the immigration court located at 55 E. Monroe, while the officer was conducting a civil immigration enforcement action.

13. On or around June 4, 2025, a huge crowd formed outside of a facility in the South Loop of Chicago run by ICE's contractor BI Incorporated for the Intensive Supervision Appearance Program (ISAP)[3], after some aliens on the ISAP were arrested following a routine check-in. Protesters and local officials clashed with ICE agents during these arrests, and at one point, a Chicago alderperson sat on the ground, blocking an ICE van.  Also, on or about June 17, 2025, protestors outside of the Immigration Court at 55 E. Monroe in Chicago blocked an ICE van, and at least one protestor pulled down the mask of an officer.

---

[2] Available at: https://www.chicago.gov/city/en/depts/mayor/press_room/press_releases/2025/october/city-property-executive-order.html (last visited Oct. 7, 2025) and https://www.nbcchicago.com/news/local/chicago-politics/chicago-mayor-signing-order-to-stop-federal-agents-from-using-certain-city-owned-spaces/3834094/ (last visited on Oct. 7, 2025).
[3] ICE's Alternatives to Detention (ATD) program exists to ensure compliance with release conditions and provides important case management services for non-detained aliens. ATD consists of the Intensive Supervision Appearance Program (ISAP). The ATD-ISAP program utilizes case management and technology tools to support aliens' compliance with release conditions while on ICE's non-detained docket. *See* https://www.ice.gov/features/atd (last visited Oct. 8, 2025).

Declaration of Field Office Director Russell Hott

14. A rally was advertised for June 10, 2025, to get "ICE out of Chicago!" One image in support of the rally depicted damaged police vehicles on a highway covered in objects (i.e., scooters, traffic cones, debris). [4]

15. Between approximately February 2025 and July 2025, an individual named Michael Stover posted threats against ICE agents and officers on social media platforms and called for violence against them, including according to the criminal complaint filed against him, calling for others to kill officials "on sight." Additional posts included comments like, "**Abolition is not enough, the goons themselves must be exterminated to the absolute last one. Masks off, photographs taken, then shoot em.**" Stover also stockpiled weapons and ammunition. After being monitored and investigated for months, in September 2025, he was arrested pursuant to a warrant and charged in the District Court for the Northern District of Illinois with threatening to kill federal immigration officers. Those charges remain pending.[5]

16. On or about August 20, 2025, HSI Springfield, Illinois received information indicating that an individual had posted a video to social media stating that all ICE agents are pedophiles and should be killed. This same individual encouraged people to dox ICE agents and go after their families. HSI Springfield initiated an investigation and made an arrest. This case remains open and ongoing.

17. On or about August 24, 2025, ERO officers and other federal law enforcement officers, were conducting an enforcement operation on the Westside of Chicago. While these officers were arresting occupants of a residence on that street, two subjects verbally

---

[4] Available at:
https://www.reddit.com/r/50501Chicago/comments/1l7c6hb/pop_up_protest_at_chicago_immigration_court/?rdt=52315 (last visited on Oct. 8, 2025).
[5] Downers Grove man charged with making threats against ICE agents, political figures (last visited Oct. 8, 2025).

threatened and physically assaulted law enforcement officers, including threatening one

officer, reaching for another officer's firearm, and grabbing yet another officer's

magazine from his chest and throwing it to the ground. Two of these officers were ICE

officers; one was a Customs and Border Protection (CBP) officer. All three officers were

wearing vests with "POLICE" on the front.

18.  On September 15, 2025, two illegal aliens escaped from ICE custody in West Chicago

while being arrested and restrained. There were 12 illegal aliens who were initially

detained for questioning, but protesters on-scene, including a local Illinois state senator,

interfered and disrupted the arrests. Most of ERO Officers who were present to conduct

arrests were instead forced to control the crowd of rioters, which allowed two of the

illegal aliens to escape, both of whom remain at-large. ERO Chicago believes the

members of the crowd aided the illegal aliens' escape and provided shelter from law

enforcement.

19. On September 22, 2025, several unidentified subjects followed ERO Chicago vehicles

transporting detainees from an ICE detention center to the flight line in Gary,

Indiana.  The airport security notified ERO and the Gary Police Department of rioters

attempting to climb fences onto the tarmac and attempting entry at other parts of the

airport where the detainees were located. Gary Police Department responded to this call,

and the rioters were dispersed.

20. On October 4, 2025, a CBP government-owned vehicle driven by and carrying federal

law enforcement personnel was intentionally boxed in on a public road by approximately

10 civilian vehicles. A black GMC Envoy driven by Anthony Ruiz and a silver Nissan

Rogue driven by Marimar Martinez attacked the officers by ramming their vehicles into

the government vehicle on both the passenger and driver's side.[6] Agents exited their vehicle to disperse civilians for safety and to prevent further assault. Martinez then drove her vehicle directly at a Border Patrol Agent. Faced with an imminent threat of death or great bodily harm given the high potential of being run over, the agent discharged his service-issued firearm at the Nissan Rogue striking Martinez, who fled the scene to a nearby business where she was subsequently transported to a local hospital. A handgun was later found within Martinez's purse. Both Ruiz and Martinez were criminally charged under 18 U.S.C. § 111(a) and (b) by the U.S. Attorney's Office for the Northern District of Illinois. Approximately 200 rioters converged near the scene of the shooting at three separate locations. Over the next four hours, rioters threw objects at agents, including glass bottles and traffic cones, and forcefully pushed the agents. The Chicago Police Department initially refused to assist, but over one hour later, they provided perimeter security.

21. Given the lack of an immediate Chicago Police Department response, ERO re-directed its Quick Response Force (QRF) Team to assist the besieged CBP officers. While enroute to the scene, the ERO QRF vehicle was also attacked when it was rammed by another vehicle, causing substantial damage.

22. Later in the day on October 4, 2025, ICE officers operating a government-owned vehicle were surrounded by rioters who slashed the tires of the van. The ICE officers called for emergency assistance, but no units were immediately available because of the ongoing active scenes from two vehicular rammings earlier in the day.[7] The scene quickly became

---

[6] Available at: https://www.dhs.gov/news/2025/10/04/update-dhs-deploys-special-operations-after-multiple-violent-attacks-federal-law (last visited on Oct. 7, 2025).
[7] Available at: https://www.youtube.com/watch?v=IVgTnMfn4ak (last visited on Oct. 7, 2025).

hostile and unsafe. The ICE officers abandoned the vehicle for their own personal

safety. Upon returning to the vehicle, all the windows had been smashed and additional

destruction of the vehicle had occurred. Chicago Police Department impounded the

vehicle, and ICE was required to pay to retrieve the vehicle.

23. Over the summer, one ERO officer was followed to his home, where he was confronted

aggressively. The officer was forced to call 911 out of concern for his safety. Roughly ten

days later, the same officer's garage was broken into, and his government-owned vehicle

was broken into and damaged. The perpetrator was even able to break into the safe in the

car and stole the officer's service weapon.

24. Multiple federal employees have been doxed, their families threatened, and their personal

property damaged. It is my understanding various criminal enterprises have placed

bounties on the murder and kidnapping of immigration officers. For example, on or

around October 6, 2025, federal agents in Chicago arrested Juan Espinoza Martinez, an

alleged Latin Kings gang leader for placing bounties on a senior immigration officer's

life. Martinez reportedly advertised online an offer of $2,000 upon the kidnapping of an

officer and $10,000 for the officer's murder with a photo of the targeted officer.[8] *See*

U.S. Attorney's Office, Northern District of Illinois Press Release, "Alleged Member of

Chicago Street Gang Charged with Soliciting the Murder of Senior Law Enforcement

Official Involved in "Operation Midway Blitz," (Oct. 6, 2025).

25. It is my understanding certain criminal enterprises have set forth clear intentions to

undermine immigration authorities and have escalated their tactics against federal law

---

[8] Available at: https://www.justice.gov/usao-ndil/pr/alleged-member-chicago-street-gang-charged-soliciting-murder-senior-law-enforcement (last visited on Oct. 7, 2025).

enforcement, such as using late model SUVs (due to the heavier chassis) to ram and disable law enforcement vehicles during immigration enforcement activities.

26. As threats, violence, and obstruction of operations increased, ERO Chicago was required to respond to increased threats and assaults on its employees and offices. ERO Chicago has leveraged the depth and breadth of its law enforcement authorities in response to acts of violence or aggression impacting its mission. This has included the criminal arrests of violent rioters for trespass and assault and referrals for federal prosecution. CBP was also deployed to Broadview to assist ERO due to increased violence.

27. As the public is increasingly aware of the Chicago Police Department's lack of response, this has emboldened bad actors to increase the violence and targeting of ICE officials, knowing there are no consequences from local police departments.

28. On October 4, 2025, ICE agents called Chicago Police Department to request assistance when officers were boxed in and surrounded following a vehicular ramming incident. An internal dispatch (pictured below) revealed that the Chief of Patrol ordered Chicago police officers not to respond.[9]

---

[9] Available at: https://www.foxnews.com/us/chicago-police-sources-blast-departments-response-after-officers-were-told-not-help-fed-agents-cover-a (last visited Oct. 7, 2025).



29. On September 13, 2025, ICE officers made three separate phone calls to police for assistance when rioters threw rocks near the facility's gates and damaged twelve vehicles resulting in slashed tires and flour poured into a vehicle's gas tank. Broadview Police Department informed officers that it would get back to them but never responded.

**ICE Broadview Processing Center**

30. Only a few miles outside of Chicago, the ICE Broadview Processing Center (BSSA) is beset by increasingly aggressive protesters and violent rioters. BSSA, located at 1930 Beach Street, in Broadview, Illinois, is an ICE-owned property used to intake and process individuals arrested by ICE and CBP for appropriate administrative or criminal action. Since the first week of September 2025, violent opportunists, rioters, and protesters have targeted BSSA and its employees. Because this facility is the only one in the area that serves as an intake and initial processing facility for ICE, protests at this location

interfere with immigration operations throughout the region, including ICE's targeted operations against criminal aliens.

31. Though issues began in early September, riots at the BSSA escalated from September 12 to the present. Rioters, among other things, blocked all means of ingress and egress at BSSA and physically assaulted personnel – law enforcement and non-law enforcement alike – who were attempting to go to and leave work.[10] Employees, who parked in an open lot, had to call the office when they arrived, so four officers could come out and escort them into the building. These "security details" retraced their steps when the employees departed. Vandalism of cars in the lots became common. Both government and personally owned vehicles were targeted. As a result, ICE employees would park further from BSSA, and ERO would have to send a van, which would be attacked by rioters, to retrieve them. Moving cars were also vandalized. In an attack that was repeated more than a dozen times, one rioter would jump on the hood of a car, and another would stand immediately behind the car. While the driver stopped the car in the face of these obstacles, others would run up to the car and slash the tires. My own tires were slashed in this fashion.

---

[10] Photos below available at: https://blockclubchicago.org/2025/09/19/ice-tear-gasses-detains-protesters-outside-broadview-facility/ (last visited October 7, 2025) and https://southsideweekly.com/we-want-them-back-protest-and-state-violence-at-broadview-ice-facility/ (last visited October 7, 2025).





32. Not only ICE personnel were impacted. These violent individuals accosted employees of

    nearby businesses, mistaking them for ICE employees. At least one of these employees

    also had their personally owned vehicle vandalized.

33. Property damage was significant, with graffiti (largely spray paint and permanent marker)

    on the building, concrete surfaces, signs, and the flagpole. The vandalism has included, in

    multiple locations: "F*CK ICE." BSSA's external plumbing systems were destroyed by

    the violent agitators when they broke off plumbing and downspouts. It has not yet been

    repaired, exposing the building to damage during inclement weather.

Declaration of Field Office Director Russell Hott





34. As threats, violence, and obstruction of operations increased, ERO Chicago was required to respond to increased threats and assaults on its officers and offices at BSSA by shifting its limited personnel and resources from the enforcement of federal immigration law to protecting its own employees and facilities. Because the facility is ICE-owned, it is not protected by the Federal Protective Service (FPS). ERO has been forced to shift resources from within its own organization. For example, five ERO SRT teams were flown into

Chicago from various cities, including El Paso, New York, and Phoenix, to assist with 24-hour security at BSSA. These ERO SRT teams are typically comprised of 16 officers. In addition, ERO has solicited help from Bureau of Prisons (BOP), Federal Bureau of Investigations (FBI), Bureau of Alcohol, Tobacco, and Firearms (ATF), Drug Enforcement Administration (DEA), and CBP. The only time that FPS appeared at BSSA was after a fence was installed around the property, to deter violence and protect employees and property, and the crowd moved to the other side of the building near a GSA parking lot.

35. Most troubling has been the sharp increase in physical assaults on personnel, including employees who are not law enforcement officers. On several occasions, officers have been hit and punched by rioters at BSSA. As the size of the crowds at BSSA have grown from a mere handful of people in early September to more than 300 immediately before the fence was erected on the night of September 22-23, 2025, the assaults became more significant and the clashes more violent.

36. Starting in early September, rioters shot fireworks at officers stationed outside BSSA.[11] This has the potential to cause burns, blindness, and more significant injury, depending on the distance at which the firework explodes.

---

[11] Photos available at: https://blockclubchicago.org/2025/09/19/ice-tear-gasses-detains-protesters-outside-broadview-facility/ (last visited October 7, 2025) and https://news2share.com/anti-ice-protesters-arrested-tents-dismantled/ (last visited October 7, 2025).





37. The weekends of September 12-14 and 19-21 were particularly violent. Rioters threw

bottles and rocks at officers, and even canisters of 2-chlorobenzylidene malononitrile

(also known as CS gas), which they brought to throw at federal officers at BSSA. CS is a

form of tear gas generally used for riot control.[12] Under Illinois Criminal Code of 2012, no person shall knowingly manufacture, possess, deliver, sell, purchase, carry, use, or employ in any manner any tear gas weapon or chemical weapon or device, unless issued a permit for commercial use from the Illinois Department of Professional Regulation.



38. At the same time, rioters would attempt to pull off officers' masks. When ERO fired its own CS canisters into the violent crowd, rioters would throw them back. When in scuffles, rioters would attempt (and sometimes succeed) to pull gear, such as gas masks or CS canisters, off officers' uniforms.

39. Because the larger and more aggressive crowds of protesters have made safe access to BSSA increasingly difficult, ERO Chicago has used $100,000 worth of less lethal munitions and chemicals for crowd control in two weeks spanning from September 6,

---

[12] Photo available at: https://www.usatoday.com/picture-gallery/news/nation/2025/10/03/chicago-protests-federal-ice-immigration-raids-photos/86503237007/ (last visited October 7, 2025).

2025, to September 20, 2025. ICE has never needed to use such munitions at this location previously.

40. Over the weekend of September 19-21, 2025, ERO discovered a round, green ball with a wick. Its purpose was unclear, but in an abundance of caution, ERO contacted the Bureau of Alcohol, Tobacco, Firearms, and Explosives, which labeled it an Improvised Explosive Device and removed it from the scene.[13]

41. It is clear that rioters have sought to permanently maim ERO personnel. When standing close to officers, rioters have used "Aztec Death Whistles," which sound like a human screaming and are generally 100-110 decibels in volume. They have also used bullhorns. At close quarters, either could cause long-term or even permanent hearing loss. Rioters have also shone strobe lights and lasers in offers' faces, risking their sight. Several rioters have been armed with loaded weapons, and they have been charged in federal court with assaulting or forcibly resisting federal agents. *See* U.S. Attorney's Office, Northern District of Illinois Press Release| Five Individuals Charged in Federal Court in Chicago with Assaulting or Resisting Federal Agents Engaged in Immigration Enforcement Operations | United States Department of Justice (Sept. 29, 2025).[14]

42. It is clear that these rioters are organized. They appear to gather offsite and then are brought onsite in vans. After several hours, the vans return with new rioters and take the people who have been outside for several hours away with them. When they arrive, rioters are armed with shields, gas masks, protective padding, and other tools that indicate that rioters are prepared or expecting to physically engage with federal personnel.

---

[13] Available at: https://x.com/DHSgov/status/1972297960319832252 (posted Sep. 28, 2025) (last visited Oct. 7, 2025).
[14] Available at: https://www.justice.gov/usao-ndil/pr/five-individuals-charged-federal-court-chicago-assaulting-or-resisting-federal-agents (last visited Oct. 7, 2025).

43. The agitators have been successful in their attempts to harm officers. More than thirty ERO officers have been injured during the assaults on federal law enforcement, including a torn ACL, a beard being ripped from an officer's face, multiple lacerations, cuts, and bruises, multiple hospitalizations, and a hyper-extended knee from an officer being tackled by a rioter at the legs.

44. Personnel have not been harmed or threatened only at BSSA. More than twenty officers have been doxed with their home addresses posted on social media, their families threatened, and their personal property damaged. Cartels and the Latin Kings gang have placed $10,000 bounties on the murder of any immigration officer.

45. As BSSA's staff became overwhelmed by this concentrated attack, ERO Chicago took additional steps to directly respond to the above-referenced violence. On or about September 8, 2025, ERO Chicago mandated 12-hour duty shifts for its SRT officers. SRT officers and agents are uniquely trained to serve in high-risk situations, such as serving warrants under hazardous conditions, arresting dangerous criminals, and assisting other law enforcement agencies during critical incidents. The addition of SRT officers to control the security risks at BSSA aimed to ensure that the most highly trained officers were safeguarding BSSA, officers, agents, and bystanders from unnecessary and unlawful violence. Among other things, SRT members created paths for ERO vehicles to enter and exit and pushed the crowds away from the building as the rioters threatened violence. The addition of SRT members to secure BSSA and the ongoing 12-hour shifts has diverted important limited resources away from federal law enforcement operations outside of BSSA. And despite the presence of SRT members and ICE's significant expenditure of resources, rioters continue to exhibit violent and obstructive behavior.

Declaration of Field Office Director Russell Hott
20

46. On at least twenty-five occasions, ERO Chicago solicited assistance from Homeland Security Investigations, another component within ICE, to add agents from its SRTs, to address the escalating violence.

47. Of ERO's 31 BSSA officers, approximately 21 have been diverted to secure the outside perimeter of the facility. This diversion of resources has caused the processing of aliens to slow down at BSSA, created a strain on BSSA employee work hours, and has caused another ICE facility to facilitate in the processing of aliens. Beginning on or around September 7, 2025, BSSA officers were mandated to increase their workload from an eight-hour five-day per week schedule to a twelve-hour six-day per week schedule. Because of this diversion away from officers' regular duties of transporting and booking, on or around September 14, 2025, the BSSA facility sent an entire plane of approximately 131 unprocessed aliens to the El Paso facility for processing, which then had the domino effect of straining El Paso's resources.

**Impediment to ICE Operations Nationwide**

48. Over the past few months, there has been a marked increase in aggressive and hostile actors obstructing the lawful execution of ICE's federal law enforcement mission nationwide. ICE officers have been harassed, attacked, and brutalized; their family members have been doxed and threatened; and Government property has been vandalized and destroyed.

49. This summer, ICE came under attack in Los Angeles, California, where despite assertions to the contrary, local law enforcement was unable to adequately provide security to officers and the public.[15] *See* Associated Press Report, "Protests Intensify in Los Angeles

---

[15] Available at: https://apnews.com/article/immigration-protests-raids-los-angeles-78eaba714dbdd322715bf7650fb543d7 (last visited on Oct. 7, 2025).

After Trump Deploys Hundreds of National Guard Troops," (June 8, 2025). On June 6,

2025, rioters turned to violence and began throwing objects at ICE vehicles. Later in the

day, Mayor Karen Bass posted on X inflammatory comments that escalated the violent

activities. Rioters began throwing concrete chunks, bottles of liquid, and other objects at

Federal Protective Service (FPS) officers as well as attempting to use large rolling

commercial dumpsters as a battering ram to breach the parking garage gate and damage

the federal building. On June 9, 2025, the federal building had to be shut down due to

ongoing violence. On June 14, 2025, the Los Angeles Police Department declared an

unlawful assembly outside 300 North Los Angeles Federal Building and Edward R.

Roybal Federal Building and U.S. Courthouse after violent opportunists in the crowd of

over 1,000 people began assaulting law enforcement officers with rocks, bricks, bottles,

fireworks, and other objects. *See* "Officers Deploy Tear Gas, Rubber Bullets to Clear

Protestors in Downtown Los Angeles."[16] Protestors blocked the parking garage exits on

Alameda Street, preventing ICE transport vehicles from exiting with approximately 130

immigration detainees. As the protests grew, ICE was forced to abandon its use of the

U.S. Marshals' transport bus. Only through the actions of the National Guard was ICE

able to move the detainees.

50. Moreover, in June 2025, two men were federally charged after throwing Molotov

cocktails during immigration enforcement protests in downtown Los Angeles. One of the

men was accused of throwing a flaming Molotov cocktail at Los Angeles County

Sherriff's deputies who were conducting crowd control. Police arrested the other man

who allegedly threw a Molotov cocktail at law enforcement officers when officers

---

[16] Available at: https://ktla.com/news/local-news/no-kings-protestors-ordered-to-disperse-tear-gassed-in-downtown-los-angeles/ (last visited on Oct. 7, 2025).

approached him.[17] *See* NBC4 Los Angeles News Report, "2 LA County Men Charged in Molotov Cocktail Attacks in Downtown LA and Paramount," (June 11, 2025).

51. In fact, the 300 North Los Angeles Street Federal Building in downtown Los Angeles, California, was closed for over a week due to rioters assaulting federal, state, and local law enforcement officers with rocks, fireworks, and other objects. Rioters and protestors also damaged federal property by spray painting death threats to federal law enforcement officers.[18]

---

[17] Available at: https://www.nbclosangeles.com/news/local/molotov-cocktail-attacks-la-paramount-protests/3721306/ (last visited on Oct. 7, 2025).

[18] Additional photos and videos for those assaults and threatening graffiti can be found here: https://www.dhs.gov/news/2025/06/10/dhs-sets-record-straight-la-riots-condemns-violence-against-law-enforcement (last visited Oct. 7, 2025).







52. Similar violent and hostile activity targeting ICE operations is spreading across the
Nation. Rioters at the ERO Portland Office have assaulted federal law enforcement
officers with rocks, bricks, pepper spray, and incendiary devices; some attacks have been
serious enough for FPS to refer for prosecution. In just one example, on July 4, 2025, ICE
officers observed several individuals defacing ICE property with graffiti. As an officer
pursued one individual, that individual ran towards the officer and kicked him in the leg,
causing the officer to trip. Another individual threw an incendiary device towards the
officers, which then detonated near the officers. These actions were severe enough for the
U.S. Attorney's Office for the District of Oregon to seek the prosecution of four involved
individuals. *See e.g.*, U.S. Attorney's Office District of Oregon Press Release, "Four
Defendants Charged with Assaulting Federal Law Enforcement Officers, Other Offenses
During Protests Near Local ICE Office (July 8, 2025) (reporting that the U.S. Attorney's
Office charged 22 defendants between June 13, 2025, and July 8, 2025, with offenses

committed at the Portland ERO building including assaulting federal officers, arson, possession of a destructive device, and depredation of government property).[19]

53. For more than 100 nights, the ICE facility in Portland, Oregon has effectively been under siege by violent rioters who not only clash with federal law enforcement but create an unsafe environment for Portland residents who live near the facility. These "protests" involve bottle rockets being fired at the ICE building, rocks thrown through windows, lasers targeting ICE officers' eyes, and barricades blocking ICE vehicles in and out of the facility. *See* Greg Wehner, Portland Police Chief Touts 'Crowd Support' Approach as ICE Facility Faces Ongoing Violence, *Fox News* (Oct. 5, 2025, 8:28 p.m. EDT).[20]

54. Upon information and belief, there are reports from nearby residents who have barely slept as the area has become a "war zone" and is "terrifying" as the encampment of protesters "blast loud music, engage in anti-government chants over loudspeakers and megaphones, and …. Violently clash with law enforcement officers." Joseph Treviño, Inside the Antifa Siege on 'War Zone' Portland — and the Resistance to the National Guard Cleaning It Up, *New York Post* (Oct. 1, 2025, 6:02 p.m. ET).[21] In the same vein, rioters have repeatedly tried to burn down the Portland ERO Office, risking the safety of the public at large and lives of both ICE personnel and any detainees who might have been held in the facility, in addition to property damage. For example, on June 11, 2025, federal officers observed a man ignite a flare and set fire to a range of materials that

---

[19] Available at: https://www.justice.gov/usao-or/pr/four-defendants-charged-assaulting-federal-law-enforcement-officers-other-offenses#:%7E:text=Since%20June%2013%2C%202025%2C%20the,and%20depredation%20of%20government%20property (last visited on Oct. 7, 2025).
[20] Available at: https://www.foxnews.com/us/portland-police-chief-touts-crowd-support-approach-ice-facility-faces-ongoing-violence (last visited on Oct. 7, 2025).
[21] Available at: https://nypost.com/2025/10/01/us-news/inside-the-antifa-siege-on-war-zone-portland-and-the-resistance-to-the-national-guard-cleaning-it-up/ (last visited Oct. 7, 2025).

rioters compiled to barricade against a vehicle gate. Other individuals then added items to the pile of materials, growing the flames further. The Federal Bureau of Investigations, FPS, and the Bureau of Alcohol, Tobacco, Firearms, and Explosives investigated this incident, and the U.S. Attorney's Office for the District of Oregon is prosecuting these acts of violent destruction. *See* U.S. Attorney's Office, District of Oregon Press Release, "Four Defendants Charged with Various Offenses Including Arson, Assaulting a Federal Officer, and Depredation of Federal Property During Protests Near Local ICE Office."[22]

55. Rioters have even gone to such extreme lengths to display their violent proclivities towards ICE officers by assembling and displaying a guillotine outside of the ERO Portland Office. *See* Greg Norman, Anti-ICE Portland Rioters Bring Guillotine, Clash with Police, Burn Flag in 'War-Like' Scenes, *Fox News* (Sept. 2, 2025, 10:53 a.m. EDT).[23]

---

[22] Available at: https://www.justice.gov/usao-or/pr/four-defendants-charged-various-offenses-including-arson-assaulting-federal-officer-and. (last visited Oct. 7, 2025). *See also* Protesters Place Flammable Material, Lit Flare Against ICE Building, Officers Arrest 3, *Portland Police Bureau* (June 12, 2025, 12:45 a.m. PDT), available at: https://www.portland.gov/police/news/2025/6/12/protesters-place-flammable-material-lit-flare-against-ice-building-officers (last visited on Oct. 7, 2025) and *FOX 12 Oregon* (July 1, 2025, 6:33 p.m. EDT), available at: https://www.kptv.com/2025/07/01/man-facing-federal-charges-starting-fire-portland-ice-facility (last visited Oct. 7, 2025).

[23] Available at: https://www.foxnews.com/us/anti-ice-portland-rioters-guillotine-clash-police-burn-flag-war-like-scenes (last visited Oct. 7, 2025).



Anti-ICE protesters are seen rolling out a guillotine on Monday, Sept. 1, 2025, in front of the ICE field office in Portland, Ore.
(X/@KatieDaviscourt)

56. These threats have gone even further. Upon information and belief, over the past several
    months, ICE officers in the Seattle Field Office Area of Responsibility (AOR),
    particularly those employed in the Portland ERO Office, have been under surveillance
    and subjected to written, verbal, and physical threats due to their employment with ICE.
    Several Portland ICE officers have had their names, photographs and even home
    addresses posted publicly in multiple locations throughout their residential
    neighborhoods and the Portland metro area, along with threatening messages. Multiple
    Portland ICE officers have had unknown individuals appear at their residences in vehicles
    and on foot, peering into their private homes and recording the officers entering and
    leaving. A sample of one recent flyer containing violent threats and a Portland ICE
    officer's personal information, including residential address (redacted for safety reasons),
    can be seen in the DHS Press Release referenced below. ICE has seen a dramatic increase
    in assault against ICE personnel as these doxxing websites have revealed their identity
    and their families' identity to the public, exposing personnel and their families to known

Declaration of Field Office Director Russell Hott

and suspected violent individuals. *See* DHS Press Release "Anarchists and Rioters in

Portland Illegally Dox ICE Officers and Federal Law Enforcement" (July 11, 2025).[24]

57. In addition, multiple social media users have threatened to murder Portland ICE officers,

as depicted in the screenshot below (captured on Sept. 9, 2025).



58. These threats against the lives of ICE officers, when considered in the shadow of the

recent shooting upon the ICE facility in Dallas, killing two people, cannot be discounted.

They are real.

---

[24] Available at: https://www.dhs.gov/news/2025/07/11/anarchists-and-rioters-portland-illegally-dox-ice-officers-and-federal-law (last visited Oct. 7, 2025).

59. On September 24, 2025, Joshua Jahn carried out a shooting at an ICE facility near Interstate 35E in Dallas, Texas, firing from a rooftop into the sally port.[25] Three detainees in a van were shot; one died at the scene, and another succumbed to injuries six days later.[26] Investigators found anti-ICE notes and a marked round of ammunition, concluding the attack was a premeditated terrorist act targeting ICE agents.[27]

60. On July 4, 2025, a group attacked an ICE facility in Alvarado, Texas, vandalizing property and setting off fireworks.[28] During the incident, a gunman fired on responding police, injuring an officer, who was struck in the neck.[29] Additionally, a month earlier, a man was arrested at a Dallas ICE facility for making a bomb threat.[30]

**National Guard Assistance Will Allow ICE To Enforce Federal Laws in Chicago**

61. It is my understanding that, at this time, National Guardsmen are deployed to the Chicago area providing protection of federal personnel, property, and functions.  I expect the National Guard will substantially aid in the protection of federal immigration officials from interference in their lawful enforcement efforts and their presence at federal facilities in the Chicago area.

---

[25] Available at: https://www.nbcnews.com/news/us-news/live-blog/dallas-ice-facility-shooting-rcna233385 (last visited Oct. 7, 2025); https://www.dhs.gov/news/2025/09/24/dhs-issues-statement-targeted-attack-dallas-ice-facility   (last visited Oct. 7, 2025).

[26] Available at https://www.nbcnews.com/news/us-news/live-blog/dallas-ice-facility-shooting-rcna233385 (last visited Oct. 7, 2025); *see also* https://www.kxii.com/2025/09/30/family-says-mexican-man-shot-dallas-ice-facility-has-died-becoming-attacks-second-victim/ (last visited Oct. 7, 2025).

[27] Available at: https://www.azfamily.com/2025/09/24/fbi-says-ammunition-found-dallas-detention-center-contained-anti-ice-messaging/ (last visited Oct. 7, 2025); *see also* https://www.npr.org/2025/09/25/nx-s1-5553470/latest-updates-dallas-ice-shooting (last visited Oct. 7, 2025); https://abcnews.go.com/US/dallas-ice-sniper-suspect/story?id=125909069 (last visited Oct. 7, 2025).

[28] Available at: https://www.keranews.org/news/2025-07-11/prairieland-detention-center-alvarado-u-s-immigration-and-customs-enforcement-shooting-alvarado-police-officer-questions (last visited Oct. 7, 2025).

[29] Available at: https://www.fox4news.com/news/benjamin-song-suspect-immigration-center-attack-previously-sued-over-drag-show-counter-protest (last visited Oct. 7, 2025).

[30] Available at: https://www.aljazeera.com/news/2025/9/25/who-is-joshua-jahn-what-we-know-about-the-dallas-ice-facility-shooting (last visited Oct. 7, 2025).

Declaration of Field Office Director Russell Hott

62. The presence of the National Guard will enable ICE to carry out its congressionally mandated duties in the Chicago area. The National Guard's additional personnel and resources– indeed, their mere presence – will provide the necessary security to local federal facilities and ensure the safety of those federal employees enforcing and executing federal laws in Chicago.

**Impact of Plaintiffs' Requested Relief**

63. If the Court grants Plaintiffs' temporary restraining order, ICE employees, detainees, the federal facilities, and the general public in the vicinity of the federal buildings and near federal enforcement actions will continue to be at serious risk of harm and aggressive actors, who the city of Chicago is unable to control, and these aggressive actors will continue to obstruct lawful federal enforcement actions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

October 8, 2025

Russell Hott
Field Office Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

Declaration of Field Office Director Russell Hott

32

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

<table>
<tr><td>

STATE OF ILLINOIS, *et. al.*,

      *Plaintiff*,

v.

DONALD TRUMP, *et.al.*,

      *Defendants*.

</td><td>

No. 25-cv-12174

</td></tr>
</table>

## <u>DECLARATION OF DEPUTY CHIEF PATROL AGENT DANIEL I. PARRA</u>

I, Daniel I. Parra, declare as follows:

1.  I am employed by U.S. Border Patrol, an operational component of U.S. Customs and Border Protection (CBP) within the Department of Homeland Security (DHS). CBP is charged with enforcing the Nation's immigration laws in order to protect national security and uphold the integrity of the immigration system. As part of this mission, CBP Border Patrol agents are responsible for preventing the unlawful entry of individuals into the United States, apprehending those who attempt to enter illegally or who have violated the immigration laws in accordance with the Constitution and other applicable laws. Through these activities, CBP seeks to secure the border, disrupt human smuggling and trafficking networks, and ensure consistent enforcement of the immigration laws of the United States.

2.  I am the Deputy Chief Patrol Agent of the El Centro Sector and have been in this position since May 8, 2022. In this role, I am responsible for managing U.S. Border Patrol

**GA220**

operations and administrative functions within the El Centro Sector, which encompasses 70 miles of land border, as well as inland areas of California extending to the Oregon State line. I oversee a workforce of over 1,200 employees and manage a multimillion-dollar budget.

3.  I entered on duty with the U.S. Border Patrol on July 28, 2002. My first assignment as a Border Patrol Agent was at the El Centro Station, El Centro Sector. Across the span of my career with the U.S. Border Patrol, I have served in a variety of leadership positions ranging in scope and complexity. These assignments include Supervisory Border Patrol Agent and Field Operations Supervisor, Indio Station, El Centro Sector; Executive Officer of Operations, El Centro Sector; Assistant Chief, U.S. Border Patrol Headquarters, Law Enforcement Operations Directorate - Pacific Corridor; Deputy Patrol Agent in Charge of Operations, Ajo Station, Tucson Sector; Patrol Agent in Charge, Blythe Station, Yuma Sector; and Division Chief, Law Enforcement Operational Programs, Tucson Sector. As the Division Chief, I oversaw multiple law enforcement operational programs in Tucson Sector, the largest and one of the busiest sectors in the nation. On June 8, 2025, I served as the Incident Commander for Operation at Large in Los Angeles, California.

4.  I have been assigned to be the Incident Commander for the current CBP operation in and around Chicago, Illinois since September 5, 2025. In this position, I have operational oversight and am responsible for all U.S. Border Patrol assets and operations in the greater Chicago area. Furthermore, I ensure that all personnel under my command have the proper resources, including the requisite training needed to operate in such a complex

and fluid environment. As the Incident Commander, I report directly to DHS Tactical Commander Gregory K. Bovino.

5. This declaration is submitted in support of Defendants' Opposition to Plaintiffs' Motion for Temporary Restraining Order (TRO) and sets out the current conditions on the ground in the Chicago area with respect to immigration enforcement operations and the security of ICE and CBP personnel and property. I have reviewed Plaintiffs' application for a TRO and supporting exhibits.

6. The statements contained in this declaration are based upon my personal knowledge and information made available to me in the course of my official duties.

7. Prior to arriving in Chicago, I discussed intelligence and operations with Chicago area federal agencies to better develop effective strategies to carry out CBP's mission in a safe and efficient manner. Additionally, I deployed a reconnaissance team two weeks prior to commencing operations to obtain real-time, in-person intelligence. Illinois law prevents state and local law enforcement agencies from sharing critical information with CBP that would have increased operational safety for CBP personnel, the public, and individuals identified for immigration enforcement action. Nevertheless, Tactical Commander Gregory Bovino met with local law enforcement to provide awareness of the operation.

8. On or about September 16, 2025, to support U.S. Immigration and Customs Enforcement (ICE), CBP agents and officers were deployed to Chicago, Illinois, as part of a national, multi-agency operation. The operation focuses on enhancing public safety and enforcing immigration law through law enforcement efforts. Due to the scope, complexity, and need for uniformed law enforcement presence, over 200 agents redeployed away from their patrol functions at the border to support this mission.

9.  As part of this operation, CBP officers and agents, in coordination with other federal agencies, are involved in a variety of different law enforcement encounters and enforcement actions.  Officers and agents regularly engage with members of the public, and effectuate investigative detentions, lawful warrantless arrests, and arrests pursuant to both immigration and criminal judicial warrants.

10. CBP officers and agents routinely bring individuals detained under the immigration laws during the ongoing operations to the ICE Broadview Service Station Area (BSSA) located at 1930 Beach Street, Broadview, Illinois for processing and temporary housing.

11. CBP officers and agents, and individuals within their legal custody, have faced escalating hostility and violence from rioters and other individuals in Chicago and nationwide.  I have served as a Border Patrol Agent for over 23 years, and, in my experience, the current level of violence against agents and officers is the highest I have seen.  The blatant disregard for law and order is unprecedented, which is why ICE asked for CBP's help.  Individuals and large groups of people have been increasingly willing to threaten CBP personnel, damage government property, and assault officers and agents performing their lawful duties.  Specifically, as Incident Commander, I have experienced and reviewed reports documenting the violent targeting of CBP personnel and government property in the Chicago area, and the intentional interference with their official law enforcement duties, including the following.

12. On September 19, 2025, protesters gathered outside of the BSSA and intentionally blocked the path of a Border Patrol vehicle transporting detainees to the facility.  ICE agents responded to the scene to deter rioters from obstructing the path of the vehicle and protect the detainees, but the rioters refused to move.  As a result, agents deployed less

lethal munitions to disperse the obstructing rioters and ensure the safety of agents and detainees. CBP personnel are trained in the deployment of less lethal munitions and only do so against assaultive subjects. CBP personnel issue warnings before deploying less lethal munitions.

13. On September 20, 2025, ICE discovered that tires of ten government vehicles parked at a General Services Administration parking lot adjacent to the BSSA had been slashed.

14. On September 26, 2025, rioters restricted vehicle access to the BSSA by blocking the nearby intersection of 25th Street and Harvard Street, just outside the BSSA, requiring the deployment of a specialized Border Patrol Tactical Unit (BORTAC) which was forced to use less lethal munitions to disperse the obstructing rioters and allow access to the BSSA. CBP deployed additional Special Response Team (SRT) and Mobile Field Force (MFF) officers to maintain control of the area thereafter as rioters refused to disperse.

15. On September 27, 2025, rioters again impeded CBP vehicles and personnel from entering and exiting the BSSA. As a result, dozens of officers and agents responded to allow access to the BSSA. On this occasion, agents arrested 11 individuals. Two arrestees were armed with loaded handguns.



16. On October 3, 2025, in the vicinity of 55th Street and Pulaski Road, Chicago, SRT operators, in rough duty SRT uniforms, with law enforcement identifiers clearly visible, were riding in an unmarked minivan when they were followed by four or five vehicles driven by civilians. The drivers were honking their horns, recording the minivan with their cell phones and shouting out the SRT operator's presence to the public. A pickup truck then accelerated to approach the minivan before striking its rear panel. After the collision, the truck continued to drive erratically and attempted to get in front of the minivan before falling back and striking the rear bumper. To prevent injury and further damage to the minivan, one SRT operator used a Pepper-ball Launching System against the windshield of the truck. The SRT operators drove to a Chicago Police Station to file a report. To date, I am not aware of the Chicago Police Department taking any action on this case.

17. On October 3, 2025, an alleged ranking member of a Chicago area street gang known as Latin Kings placed a $10,000 bounty on the Commander at Large of the U.S. Border Patrol Chief Gregory Bovino.[1] The gang member was subsequently charged with one count of murder-for-hire.

18. On October 3, 2025, two CBP officers arrived to relieve Border Patrol agents who were maintaining custody of an injured detainee at a hospital in Humboldt Park, Illinois. Upon arrival, a group of rioters confronted the officers, announced that "ICE" was present, blew whistles and yelled verbal threats. Given the volatile situation, the officers left the

---

[1] https://www.dhs.gov/news/2025/10/06/latin-kings-gang-member-arrested-illinois-after-placing-hit-commander-large-border. (Last visited Oct. 8, 2025).

scene, staged remotely, and then had to coordinate an alternate way to enter the hospital to resume their duties, causing extra work for both the hospital and CBP.

19. On October 4, 2025, a government vehicle used by Border Patrol agents assigned to a mobile response team was intentionally boxed in on a public road by approximately 10 civilian vehicles. A black GMC Envoy driven by a male driver and a silver Nissan Rogue driven by a female driver rammed the government vehicle on both the passenger and driver's side. Agents exited their vehicle to disperse civilians for safety and to prevent further assault. The female driver then drove her vehicle directly at a Border Patrol Agent. Faced with an imminent threat of death or great bodily harm given the high potential of being run over, an agent discharged his service-issued firearm at the Nissan Rogue, striking the female, who fled the scene but was eventually apprehended. A handgun was later found within the female driver's purse. Both drivers were criminally charged under 18 U.S.C. § 111(a) and (b).[2] Approximately 200 rioters converged near the scene of the shooting at three separate locations. Over the next four hours, rioters threw objects at agents, including glass bottles and traffic cones, and forcefully pushed the agents. The Chicago Police Department initially refused to assist, but over one hour later, they provided perimeter security. Again, based upon the situation, CBP personnel were forced to deploy less lethal munitions to disperse the rioters.

20. On October 6, 2025, in two separate incidents, drivers of two vehicles blocked Border Patrol vehicles and refused to move when given lawful commands to do so. Both drivers were arrested and charged under 18 U.S.C § 111. One driver had a loaded Glock 19 handgun with an additional loaded magazine in the passenger's seat.

---

[2] UPDATE: DHS Deploys Special Operations After Multiple Violent Attacks on Federal Law Enforcement by Domestic Terrorists in Chicago | Homeland Security.



21. CBP special operations teams are routinely needed to maintain crowd control in Chicago, given the size and activities of the rioters. Protestors routinely call for demonstrations outside the BSSA and other facilities that devolve into violent riots, where rioters seek to impede and obstruct law enforcement activities. During some protest events, Border Patrol agents have been surrounded and blocked from leaving, requiring the use of tear gas to disperse rioters. CBP's constant need to react and respond to the violent and obstructive actions of individuals and groups drain resources and impacts the Agency's ability to perform its law enforcement mission, especially given the lack of local law enforcement support.

22. The violence I have seen in Chicago is quickly eclipsing the violence experienced in Los Angeles. For example, we have arrested more individuals with semi-automatic weapons in Chicago that have assaulted, obstructed, or impeded agents over the last two weeks than in Los Angeles over the last four months. Never before have I witnessed ten vehicles coordinate an attack on law enforcement vehicles as I did on October 3, 2025. I

have never seen a bounty placed on a law enforcement officer simply for enforcing

immigration law, nor have I seen street gangs organize to assault, obstruct, and impede

operations.

23. State and local public officials have disparaged members of CBP and ICE in press

conferences. On October 6, 2025, Chicago Mayor Brandon Johnson, as reported by

WGN news, stated, "we have a rogue, reckless group of heavily armed and masked

individuals roaming throughout our city that are not accountable to the people of

Chicago."[3] Similarly, Illinois Governor JB Pritzker recently stated, "on a beautiful

weekend, when families were out enjoying their day in Chicago, armed Border Patrol

agents were downtown, marching up and down Michigan Avenue, harassing and

intimidating residents and tourists. Meanwhile, ICE's chief offender Gregory Bovino,

has been leading the disruption and causing mayhem while he gleefully poses for photo

ops and TikTok videos."[4] [5] In another statement, Governor Pritzker stated that agents

were "acting like jackbooted thugs."[6]

24. Due to the unprecedented level of political rhetoric against immigration enforcement,

individuals and large groups have been increasingly willing to threaten CBP personnel,

damage government property, and assault officers and agents performing their lawful

duties. One Border Patrol Agent assigned to the Chicago operations was "doxed" on

---

[3] ICE-Free Zones': Chicago Mayor Brandon Johnson signs executive order prohibiting ICE agents from operating on city-owned property (last visited Oct. 8, 2025).

[4] Pritzker says Trump administration seeking to deploy 100 troops to protect ICE in Illinois - CBS Chicago (last visited Oct. 8, 2025)

[5] Chief Patrol Agent Gregory Bovino, contrary to Governor Pritzker's statement, is an employee of CBP, not ICE.

[6] Illinois Gov. JB Pritzker calls armed immigration officers in Chicago an 'attack on Americans' (last visited Oct. 8, 2025)

social media and his photograph, name, hometown and former employment positions was shared on social media under the banner "Warning Suspected Kidnapper/Terrorist." Social media responded to the "doxing" with such comments as: "find his home and family;" "next to off himself;" and; "time to find him."

25. CBP allocated additional resources to ensure the security of our agents while on patrol as a result of the threats and attacks. This includes, but is not limited to, providing dedicated security and medical teams, as well as armored vehicles to accompany our patrol teams. These added measures have placed a strain on the special operations community, impacting operations not only in Chicago and Los Angeles but also compromising the safety of agents protecting the border who now have less resources.

26. CBP is not the only federal agency to divert resources to address escalating violence— Department of Justice components have also diverted resources. Over the past two weeks, we have received additional special operations support from the ATF, the U.S. Marshals Service, the FBI, the Federal Bureau of Prisons, and the DEA. In addition, the FBI and the U.S. Attorney's Office have provided investigators and attorneys to prosecute those who impede, obstruct and attack officers and agents.

27. Based upon the above-mentioned incidents in Chicago, and violence directed against CBP personnel in other cities such as Los Angeles, California and Portland, Oregon, I anticipate that without additional resources, individuals will continue to target and injure CBP and Federal personnel, damage government property, and impede the performance of CBP's duties. Not only does the propensity for violence place CBP personnel at risk, it also places the lives of detainees under our care at risk.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my

information, knowledge and belief.

Executed this 8th day of October, 2025, at North Chicago, Illinois.

_____
Daniel I. Parra

# EXHIBIT 2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

STATE OF ILLINOIS, a sovereign state;
and the CITY OF CHICAGO, an Illinois
municipal corporation,

        Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity
as President of the United States;
DEPARTMENT OF HOMELAND
SECURITY; KRISTI NOEM, in her official
capacity as Secretary of the Department of
Homeland Security; DEPARTMENT OF
DEFENSE; PETER B. HEGSETH, in his
official capacity as Secretary of the
Department of Defense; UNITED STATES
ARMY; DANIEL P. DRISCOLL, in his
official capacity as Secretary of the Army,

        Defendants.

Case No. 25-cv-12174

Judge April M. Perry

## DECLARATION OF CHICAGO POLICE DEPARTMENT
## SUPERINTENDENT LARRY SNELLING

I, Larry Snelling, declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1.    I am over the age of 18 and understand the obligations of an oath.

. 2.    I base this declaration on personal knowledge, consultation with my staff, and
records maintained in the ordinary course of Chicago Police Department operations. If called as a
witness, I could and would testify competently to the matters set forth below.

3.    I graduated from DePaul University with a degree in adult education. I joined the
Chicago Police Department (CPD) in 1992 as a patrol officer in my home community of
Englewood.

1

4.    I currently serve as the Superintendent of Police, the highest-ranking member of CPD. I was sworn in in September 2023 and serve at the pleasure of Mayor Brandon Johnson. As the Superintendent, I oversee the entire Department, which is the second largest police agency in the country. I manage a workforce of approximately 13,000 people and an operating budget of around $2 billion. Each year, I prepare the Department's annual budget and review its annual goals and objectives. I am responsible for critical functions such as facilitating and coordinating law enforcement services, planning and implementing the Community Policing Strategy, planning police coverage at public gatherings, addressing legal and legislative matters, administering labor agreements, and providing a liaison to the news media. I am responsible for CPD's relationship with the municipal government, outside agencies, and the entire community.

5.    Before becoming the Superintendent, I was the Chief of the Bureau of Counterterrorism. In that role, I was responsible for more than 20 units and teams, including the Intelligence Section, Special Weapons and Tactics (SWAT), Firearms Investigation Team, Canine Unit, Public Transportation Unit, Airport Operations Unit, Marine Operations Unit, Mounted Unit, Gang Investigations Division, and Bomb Squad. There are over 1,000 sworn officers comprising these units. In addition, I served as the Incident Commander for all major events, such as protests, festivals, and concerts. On a day-to-day basis, I supervised the operations of these units, managed administrative duties, and helped plan and coordinate Chicago's safety plans and responses to large-scale special events.

I.    **CPD SPECIAL ORDER S06-14-03**

6.    CPD Special Order S06-14-03,[1] titled "Responding to Incidents Involving Citizenship Status," states: "Department members will **not** participate in civil immigration

---

[1] This directive is available online at https://directives.chicagopolice.org/#directive/public/6495.

2

enforcement operations or assist the civil enforcement of federal immigration law." Special Order S06-14-03 § IV(C). However, "This does **not** preclude Department members from responding and taking police action should a contemporaneous public safety concern arise or in response to alleged violations of the Illinois Compiled Statutes or Municipal Code of Chicago." *Id.*

7.   . The Special Order explains: "If the Department receives a call for service or responds to an incident that indicates or includes a request from an immigration or other law enforcement agency to provide assistance with a civil immigration enforcement operation, the responding Department member will request a supervisor from the district of occurrence to respond to the scene." *Id.* § V(A).

8.   The notified supervisor from the district where the incident is taking place will then "respond to the scene, assume command and oversight of the incident, and will notify:" (1) "the watch operations lieutenant (WOL) of the district of occurrence, who will respond to the scene"; (2) "the district commander of the district of occurrence"; and (3) the Crime Prevention Information Center. *Id.* § V(B).

9.   Accordingly, pursuant to CPD Special Order S06-14-03, CPD officers will respond to reported crimes or threats to public safety, including reports by federal immigration agents. Responding officers will then take the necessary steps to protect the safety of people at the scene, including the safety of federal immigration agents.

## II.    The October 4 Brighton Park Incidents

10.   On Saturday, October 4, 2025 at 10:32 a.m., CPD received a call about a shooting at 39th and Kedzie in the Brighton Park neighborhood.

11.   By 10:36 a.m., CPD officers responded and located a woman who reported that she had been shot by federal agents.

3

**GA234**

12.     CPD officers coordinated with the Chicago Fire Department, and the woman was taken to the hospital to have her gunshot wounds treated. By 11:06 a.m., CPD officers were at the hospital with the injured woman.

13.     In the meantime, CPD officers controlled and preserved the scene where the woman's vehicle was located. At 11:36 a.m., CPD officers turned the scene over to federal authorities to conduct their investigation.

14.     At 12:12 p.m., in a separate incident, CPD received a report that a vehicle had collided with a vehicle driven by federal agents around 3200 West 35th Street. CPD officers went to the scene of the collision and documented the incident.

15.     At 12:28 p.m., federal agents requested additional CPD assistance due to a crowd gathering at 39th and Kedzie.

16.     By 1:09 p.m., additional CPD units from around the City were en route to 39th and Kedzie.

17.     At 1:15 p.m., at 39th and Kedzie, where CPD was already on scene, federal agents deployed tear gas.

18.     CPD officers established a perimeter at the scene, placing themselves in between the protesters and the federal agents.

19.     At 2:56 p.m., members of the public were throwing objects at CPD. Federal agents again deployed tear gas. Federal agents subsequently left the scene.

20.     By 3:48 p.m., the crowd had disbursed.

21.     In short, CPD officers were present and worked to maintain public safety in Brighton Park on October 4, 2025. As CPD officers always do, they put their physical safety at

4

**GA235**

jeopardy to keep the City safe. Indeed, 27 CPD officers reported sustaining injuries due to chemical agents deployed by federal agents.

22.     Contrary to some public reporting, at no time during the Brighton Park incidents on October 4 did CPD leadership instruct officers to refuse to help federal agents whom leadership believed to be in danger. CPD works to protect the safety of all individuals in Chicago—including federal immigration agents—and will continue to do so.

23.     On October 4, 2025, I spoke with someone in leadership at U.S. Customs and Border Protection. He expressed his appreciation for CPD's success in protecting federal agents during the Brighton Park incidents.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

    Dated: October 8, 2025

    Chicago, Illinois

5

**GA236**

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| STATE OF ILLINOIS and the CITY OF CHICAGO, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, *et al.*, in their official capacities, <br><br> *Defendants*. | Case No. 1:25-cv-12174 |

**NOTICE OF APPEAL**

PLEASE TAKE NOTICE that all Defendants in the above-captioned case hereby appeal to the United States Court of Appeals for the Seventh Circuit from this Court's October 9, 2025, Order Granting Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction. ECF No. 67.

Dated: October 9, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Federal Programs Branch

ALEXANDER K. HAAS
Director
Federal Programs Branch

JEAN LIN
Special Litigation Counsel
Federal Programs Branch

*/s/  J. Stephen Tagert*
CHRISTOPHER D. EDELMAN
(DC Bar No. 1033486)
Senior Counsel
MICHAEL J. GERARDI
(DC Bar No. 1017949)
Senior Trial Counsel
BENJAMIN S. KURLAND
(DC Bar No. 1617521)
KATHLEEN C. JACOBS
(TX Bar No. 24091154)
J. STEPHEN TAGERT
(VA Bar No. 99641)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel.: (202) 305-5486
Email: stephen.tagert@usdoj.gov

*Counsel for Defendants*

2
**GA238**

```
 1                 IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3    STATE OF ILLINOIS, a sovereign    )   Case No. 25 CV 12174
      state; and the CITY OF CHICAGO,   )
 4    an Illinois municipal             )
      corporation,                      )
 5                                       )
                     Plaintiff,          )
 6                                       )
              v.                         )
 7                                       )
      DONALD J. TRUMP, in his            )
 8    official capacity as President     )
      of the United States;             )
 9    Department of Homeland             )
      Security; KRISTI NOEM, in her      )
10    official capacity as Secretary     )
      of the Department of Homeland      )
11    Security; DEPARTMENT OF            )
      DEFENSE; PETER B. HEGSETH, in      )
12    his official capacity as           )
      Secretary of the Department of     )
13    Defense; UNITED STATES ARMY;       )
      DANIEL P. DRISCOLL, in his         )
14    official capacity as Secretary     )
      of the Army,                       )   Chicago, Illinois
15                                       )   October 9, 2025
                     Defendants.         )   11:00 a.m.
16
                 TRANSCRIPT OF PROCEEDINGS - HEARING
17              BEFORE THE HONORABLE APRIL M. PERRY

18    APPEARANCES:

19    For the Plaintiff     OFFICE OF THE ILLINOIS ATTORNEY GENERAL
      State of Illinois:    ASSISTANT ATTORNEYS GENERAL
20                          BY:  MR. CHRISTOPHER WELLS
                                 MS. SARAH NORTH
21                               MS. CARA HENDRICKSON
                            115 South LaSalle Street, 31st Floor
22                          Chicago, Illinois 60603

23    For the Plaintiff     CITY OF CHICAGO DEPARTMENT OF LAW
      City of Chicago:      BY:  MR. STEPHEN KANE
24                               MS. CHELSEY METCALF
                            121 North LaSalle Street, Room 600
25                          Chicago, Illinois 60602
```

1

2    APPEARANCES (Cont.'d):

3

     For the Defendants:     U.S. DEPARTMENT OF JUSTICE
4                            CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
                             BY:   MR. ERIC HAMILTON
5                                  MR. CHRISTOPHER EDELMAN
                             950 Pennsylvania Avenue NW
6                            WASHINGTON, D.C., 20530

7

8

9    Court Reporter:         NOREEN E. RESENDEZ, CSR, RPR, CRR
                             Official Court Reporter
10                           United States District Court
                             219 S. Dearborn Street, Suite 1725
11                           Chicago, Illinois 60604
                             (312) 582-5267
12                           Noreen_Resendez@ilnd.uscourts.gov

13

14

15

16

17

18

19

20

21

22

23                          *   *   *   *   *

24
                      PROCEEDINGS REPORTED BY STENOTYPE
25       TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION


**GA240**

1        (Proceedings heard in open court:)

2            THE CLERK:  Calling case, 25 CV 12174, State of

3    Illinois, et al. versus Trump, et al.

4            MR. WELLS:  Good morning, Your Honor.  Christopher

5    Wells on behalf of the State of Illinois.

6            MS. NORTH:  Good morning, Your Honor.  Sarah North on

7    behalf of the State of Illinois.

8            MR. KANE:  Good morning, Your Honor.  Stephen Kane on

9    behalf of the City of Chicago.

10           MS. METCALF:  Chelsey Metcalf, Your Honor.  Also on

11    behalf of the City.  Good morning.

12           THE COURT:  Good morning.

13           MR. HAMILTON:  Good morning, Your Honor.  Eric

14    Hamilton for defendants.

15           THE COURT:  Good morning.

16           MR. EDELMAN:  Christopher Edelman from the

17    U.S. Department of Justice for the defendants.

18           THE COURT:  Good morning, everyone.  I assume that

19    everyone saw the minute order regarding the order of operations

20    for today?  Great.  So you will each have your opening argument

21    time, then we'll have some questions, and then you'll have

22    closing argument time.  If at any point anybody needs a break,

23    please just let me know and we'll take a break.  I expect this

24    could go a while.

25           I have a lot of questions, so I'm very much hoping --

1  I know everyone is -- we're all lawyers, so it can be very,

2  very exciting to speak for long periods of time, but it will be

3  easiest if I ask you a yes or no question, if you give me a yes

4  or no answer so that we can move through them because I do have

5  several pages of questions for you all.

6          Is there anything you want to talk about before we

7  start?

8          MR. WELLS:  No, Your Honor.  I would note maybe on the

9  question point, I anticipate responding to most of the

10  questions.  Obviously, there's a lot of filings that came in

11  last night.  I have several highly capable colleagues --

12          THE COURT:  And this morning.

13          MR. WELLS:  Yes, and this morning.  And you know there

14  is a possibility that one or more of us may respond depending

15  on the situation, but I anticipate that I would be responding

16  to the majority of them.

17          THE COURT:  That is fine.

18          All right.  Everybody can be seated, get comfortable,

19  and then whoever is going to open, I will be keeping your time.

20          MR. WELLS:  I will do my best.  Thank you, Your Honor.

21          Rebellion, invasion, insurrection, war, these are

22  heavy words.  The people who wrote our constitution understood

23  the weight of these words.  The people who wrote our

24  constitution had lived these words, and they did not use them

25  lightly.  They left us a constitution built to preserve peace

1    and to promote prosperity through balance.  The balance of

2    state power against federal power.  The balance of one state's

3    power against the power of a sister state.  The balance of the

4    power given to Congress against the power given to the

5    executive and to the courts.  The Court is called upon today to

6    hold fast to that balance, to preserve that balance.

7         The defendants' deployment of federalized National

8    Guard troops in Illinois over the Governor's objection

9    threatens the careful balance of our constitutional system.

10   The defendants must be stopped.  The Court has the power and

11   the duty to stop them.

12        Since we were last together on Monday, Your Honor, our

13   need for relief has grown more acute.  After Your Honor

14   suggested that the federal government might strongly consider

15   taking a pause on this troop deployment until today, the

16   defendants plowed ahead anyway.  Now troops are here.  Tomorrow

17   they're being sent to this courthouse.  But it is only after

18   the troops hit the ground that we saw for the first time an

19   order issued under the president's signature, this new surprise

20   presidential memorandum of October 4th was attached to

21   defendants' filings last night at 11:30 p.m.  Why wasn't such a

22   consequential document made public immediately on October 4th?

23   The new presidential memorandum still doesn't answer which

24   specific predicate conditions under Section 12406 exist in

25   Illinois.

1        In their brief defendants claim there are two.  Under

2    Section 2 -- Subsection 2 of 12406 they claim there's a

3    rebellion or danger of rebellion.  And under Subsection 3, they

4    claim that the president is unable to execute the laws in the

5    United States in Illinois with the regular forces.

6        I am going to speak first about their Subsection 2

7    argument.  The President of the United States believes there is

8    a rebellion brewing in the United States.  That is such an

9    audacious claim.  What is equally audacious is the silence in

10    the president's memorandum regarding the facts of this brewing

11    rebellion.  Where is the rebellion?  Who are the rebels?  Are

12    the rebels well armed?

13        If this Court grants our motion, will the president

14    and his staff, including his Deputy Chief of Staff Stephen

15    Miller, consider that a judicial insurrection?  That's what

16    Mr. Miller called the District Court's two TROs in Oregon just

17    this past weekend.

18        The Court should absolutely take defendants'

19    subsection (2) assertion seriously, extremely seriously, but

20    not because it has any basis in fact, but because it shows how

21    brazen defendants are willing to be in their disregard for the

22    actual conditions on the ground in Illinois.  There is no

23    rebellion in Illinois.

24        I'm going to focus now on Section 3, Subsection (3) of

25    12406 where defendants also focus, and I expect the Court to

1     focus.  The Section 3, the language will be familiar to the

2     Court.  The president is unable with the regular forces to

3     execute the laws of the United States.  Defendants start from a

4     deficit here.  Why?  Because this Court is open.  Prosecutions

5     are ongoing.  Defendants themselves point to prosecutions.

6     That doesn't really help them.  The fact that there are

7     prosecutions happening in this building carried out by the

8     100 plus federal prosecutors who work here, that shows that the

9     president is fully capable of executing the laws of the United

10     States here.  And the United States Attorney has issued press

11     releases which we've cited in which he says protestors,

12     including protestors at Broadview, including protesters in

13     Chicago who, quote, cross the line into violence or crime,

14     those individuals will and are being prosecuted.

15        So what's not being enforced in Illinois?  Federal

16     immigration law is being enforced.  For the past month we've

17     all been witnessing this so-called Operation Midway Blitz.  On

18     October 3rd, the day before the president's October 4th

19     memorandum, DHS, the Department of Homeland Security, boasted

20     about 1,000 immigration related arrests in the course of

21     Operation Midway Blitz in less than one month.  So where

22     exactly is the problem?  Where in Illinois are the conditions

23     so severe that the president is unable to enforce federal law?

24     The defendants point to two sets of circumstances.  First,

25     protests outside a single detention facility in Broadview,

1  Illinois, 12 miles from downtown Chicago, is a village of

2  8,000 people.  Second, they point to sporadic spontaneous

3  public responses to ICE and CBP activity in Chicago.

4         Let's start with Broadview.  Early this morning Your

5  Honor received more evidence about the actual situation on the

6  ground in Broadview from internal ICE communications from the

7  folks who run the facility, and those communications occurred

8  at the same time as the mobilization orders that we're

9  challenging here.  So what did the ICE officials on the ground

10 in Broadview say when it wasn't being filtered by their

11 attorneys?  What did they say in the real world in real time

12 outside and before the litigation commenced?  They said the

13 situation was under control, and they said the situation was

14 under control because the professionals from state and local

15 law enforcement like the Illinois State Police are keeping it

16 that way.

17        Note the date and time of that e-mail, Sunday,

18 October 5th, 7:38 p.m.  Assistant field office director of ICE

19 at the Broadview facility providing report summarizing events

20 of the weekend, No protestors were on Beach Street, the front

21 of the ICE facility.  Twelve state police -- state and local

22 police cars were there.  Note that he calls the protesters that

23 weekend, protesters, not rioters, which is what we hear now in

24 the court submitted declarations, quoting, "To my knowledge,

25 DHS did not have to intervene with any protesters Saturday or

1    Sunday."  So that's Saturday, October 4th, the date of the

2    presidential memorandum, Sunday, October 5th, the date of --

3    the date we learned, at least, of the Texas troop deployment

4    order.

5            Further quoting, "It is clear that ISP is the

6    difference maker in this scenario, and we are grateful for

7    their leadership."  Two hours before this e-mail was sent, the

8    State of Illinois learned through informal channels that

9    federalized National Guard troops from Texas were being

10   dispatched to Illinois supposedly because of what was happening

11   in Broadview.  Two days later, after our case was filed on

12   October 6th, the next morning, October 7th, the director of the

13   ICE facility, Russell Hott, who also happens to have submitted

14   a declaration in this case, forwards the October 5th e-mail to

15   his ISP counterpart.  What does he say?  Does he say, Oh, my

16   gosh, we're unable to enforce federal law.  There's -- there's

17   lawless rioters who are about to overrun this facility run by

18   one of the largest law enforcement agencies in the world?

19   Uh-oh, 250, 350 people.  We are under siege.  We can't handle

20   this?  No.  What does he say?  "Kudos.  Kudos to the Illinois

21   State Police."  Why?  Because they have the professionalism,

22   they have the training to manage the protests around the

23   Broadview facility.  That sounds -- "kudos," that sounds pretty

24   different from Mr. Hott's lawyered up declaration filed last

25   night.  It's also pretty different from a joint statement

1   Mr. Hott signed onto announcing prosecutions being conducted in

2   this court.  I quote again from Mr. Hott, quote, Any criminal

3   actions taken against the brave men and women in uniform will

4   be met with swift criminal prosecution.  Our agencies will

5   continue to work closely with each other to execute federal law

6   fully and completely.  "To execute federal law fully and

7   completely."  Listen to Mr. Hott's words in the real world in

8   real time, not his after-the-fact litigation declaration.

9           Now, the evidence from Chicago --

10          THE COURT:  You are at time, but I'll give you two

11  extra minutes.

12          MR. WELLS:  Thank you, Your Honor.

13          So a couple categories of evidence.  Sporadic

14  protests, alleged criminal misconduct directed at some federal

15  officers that claim that the police aren't responding.  Well,

16  Superintendent Snelling emphatically denies that the police are

17  not responding.  Criminal misconduct directed against federal

18  officials, of course that is deplorable; but those individuals

19  are being prosecuted, if the federal government can actually

20  obtain indictments from the grand jury, which hasn't been the

21  case at least in two instances here.

22          So in the real world, the facts necessary to invoke

23  Section 2 or Section 3 don't exist.  So what do they do?  They

24  ask for deference.  They ask for deference, a startling degree

25  of deference, a degree of deference that is foreign to our

1  system of divided government, to our history and tradition, to
2  our founder's skepticism of the use of military power and
3  civilian life.  But this Court owes them no deference.  Why?
4  They may have gotten deference the first time when they sent
5  troops into Los Angeles, California, but that deference became
6  a license for misbehavior.  Los Angeles, California;
7  Washington, D.C.; Portland, Oregon; Chicago, Illinois.  Do you
8  notice a pattern?  That pattern is a fact that the Ninth
9  Circuit did not confront, but in this court that pattern cannot
10 be denied, and the pattern confirms everything that we have
11 shown about the true reason this is happening.  It is about the
12 president's animus for this community.
13        The defendants also have a self-serving idea of
14 deference.  They want to limit the deference to the official
15 memorandum, the lawyered up memos, not to what the president
16 says out of his own mouth to the public in statements from the
17 Oval Office, on social media, ignore that, don't -- don't --
18 don't worry about what everyone says over here, just listen to
19 the memos that have been run through the White House counsels'
20 office, just listen to that.  That's it, Judge.
21        You don't have to do that.  Take the president at his
22 word.  That's what we said in our brief.  Take the president at
23 his word, where it has been unfiltered by his attorneys.
24 Because of the president's words, what the president has done
25 to Illinois is illegal and lawless.  The deployment orders, all

1  of them, known and unknown, seen and unseen, are untethered

2  from reality and they are unlawful.  We ask the Court to now

3  enjoin those orders.  We ask the Court to reset the balance of

4  constitutional order in Illinois.  Thank you, Your Honor.

5          THE COURT:  Thank you.

6          MR. HAMILTON:  Good morning, Your Honor.

7          This Court should deny plaintiffs' motion.  Chicago is

8  seeing a brazen new form of hostility from rioters targeting

9  federal law enforcement.  They are not protestors; they are the

10  violent resistance to duly enacted immigration laws and to the

11  dedicated men and women of the Department of Homeland Security,

12  public servants who risk their lives every day to protect our

13  country.

14          Our declarations describe the tragic lawlessness in

15  the city in frightening detail.  Dozens of officers have been

16  injured.  They've been hit, punched, and tackled.  One agitator

17  even ripped the beard off the face of an officer.  Agitators

18  have brought guns, fireworks, tear gas, bottles, and rocks have

19  all been launched at officers.  An improvised explosive device

20  was recently found at the Broadview ICE facility.  That

21  facility never had to use less lethal munitions for crowd

22  control until recently.  In a recent two-week period last

23  month, ICE used $100,000 worth of such munitions countering the

24  violence and the risk.  Cartels and gangs placed a

25  $10,000 bounty on a CBP chief.  Over and over agitators have

1  blocked the paths of immigration vehicles, including those

2  transporting detainees.

3          In the last week, immigration enforcement vehicles

4  have been rammed by other vehicles at least twice.  This

5  included one highly choreographed incident where 10 cars

6  organized to box in a border patrol mobile response team

7  vehicle while two other cars rammed the border patrol vehicle.

8          The Parra declaration attached to our brief elaborates

9  on the organization seen here.  Mr. Parra explains that rioters

10  gather offsite and are brought to Broadview in vans.  They come

11  with shields, gas masks, padding, indicating they intend to

12  physically engage with the personnel.

13          Mr. Parra also applies his experience in describing

14  the violence for the Court.  He says that he served as a border

15  patrol agent for over 23 years, and in his experience, the

16  current level of violence against agents and officers is the

17  highest I have ever seen.  The blatant disregard for law and

18  order is unprecedented, meaning the recent events elsewhere in

19  the country.  Mr. Parra adds that the violence he's seen in

20  Chicago is, quote, Quickly eclipsing the violence experienced

21  in Los Angeles.  He adds, "We have arrested more individuals

22  with semiautomatic weapons in Chicago that have assaulted,

23  obstructed, or impeded agents over the last two weeks than in

24  Los Angeles over the last four months."

25          These facts establish the prerequisites for a

1    federalization of guardsmen under 10 USC 12406.  The

2    president's decision to federalize guardsmen under that

3    authority is unreviewable.  That's something the U.S. Supreme

4    Court recognized in analyzing this statute's predecessor

5    statute in Martin against Mott.  There the U.S. Supreme Court

6    said that the president is the sole and exclusive judge and the

7    decision whether the exigency has arisen belongs exclusively to

8    a president whose decision is conclusive upon all other

9    persons.

10           The Ninth Circuit disagreed with that argument but

11   still applied a highly deferential standard for the Court to

12   examine the conditions necessitating a 12406 federalization.

13           The Ninth Circuit's unanimous decision says that the

14   presidential judgment is reviewed with a great level of

15   deference to ensure it reflects a tolerable assessment of the

16   facts and law within a range of honest judgment.

17           Here, two of 12406 prerequisites are satisfied,

18   Subsections 2 and 3.  Let's start with Subsection 3, which

19   applies when there is an inability with the regular forces to

20   execute the laws.  I've already described some of the factual

21   record that we submitted yesterday in this case.  There are

22   additional facts detailed in our declarations, but the

23   sustained violence in these recent weeks are causing an

24   inability to execute the laws.  Violence against federal

25   agents, violence against federal property, those are federal

1  law violations, criminal violations that are not being executed

2  with the regular forces at present.  And the Ninth Circuit adds

3  that the standard does not require the president to be

4  completely precluded from executing the relevant laws.  It can

5  apply even if some continued execution of the law is feasible.

6        Separate and apart from Subsection 3, Subsection 2 of

7  12406 is also applicable here.  That subsection applies when

8  there is either a rebellion or a danger of a rebellion.  Our

9  brief identifies a number of dictionary definitions from the

10  time the statute was enacted into law.  One of those identifies

11  a rebellion to mean a deliberate organized resistance by force

12  and arms to the laws and operations of the government committed

13  by a subject.  But there doesn't have to be an actual rebellion

14  for there to be a 12406 federalization.  Congress quite

15  sensibly recognized that the president should have the ability

16  to federalize guardsmen in anticipation of that to prevent an

17  actual rebellion from materializing.  And so it is enough that

18  there is a danger of a rebellion here, which there is as the

19  declarations that we have submitted to the Court yesterday

20  explain.

21        Plaintiffs also make a procedural challenge to the

22  president's decision to federalize guardsmen.  They argue that

23  the Presidential memorandum was not submitted directly to

24  Governor Pritzker.  There's no requirement that that happen.

25  The statute 12406 has a sentence that describes a process, and

1   all that says is that the orders for the federalization

2   purposes shall be issued through the governors of the states.

3   The October 4th Presidential memorandum was directed to the

4   president's subordinates within the executive branch, Secretary

5   Hegseth who implemented that direction through a memorandum to

6   the Illinois adjutant general that went through the governor of

7   Illinois in full compliance with 12406.

8           Plaintiffs also make a Tenth Amendment argument.  That

9   argument fails.  Their Tenth Amendment claim is entirely

10  derivative of their 12406 argument.  The Tenth Amendment does

11  not apply to valid federal action under the powers that are

12  vested in the Congress in Article 1, Section 18, the Comstock

13  case from the U.S. Supreme Court discusses that proposition,

14  and plaintiffs don't challenge the constitutionality of

15  Section 12406.  So this deployment is lawful if it is within

16  12406's authority, which it definitely is.

17          There is no anti-commandeering problem with the

18  federalization of members of the Illinois guard.  Each

19  federalized guard or -- excuse me, each of the now federalized

20  members of the guard are simultaneously members of their state

21  guard as well as the National Guard of the United States, which

22  is something that I believe General Nordhaus' declaration

23  explains.  They are at any time able to be called upon under

24  federal or state authorities into active service, which is what

25  happened here.

1     Plaintiffs' argument that the deployment is some kind

2    of retaliation for sanctuary jurisdiction laws also fails.  As

3    the Presidential memorandum, the Department of Homeland

4    Security request explained, this federalization happened to

5    respond to an urgent and serious ongoing threat to officers'

6    safety and to the protection of property.

7     The argument also makes no sense in considering the

8    federalization of guardsmen in California.  There the president

9    federalized 4,000 guardsmen and sent 700 nonguard service

10   members to respond and that force has been responsibly drawn

11   down in the last few months.  So now there are only several

12   hundred federalized California guardsmen, even though there has

13   been no change to California's sanctuary status.

14     In addition on the Tenth Amendment, it is important to

15   note something unique about the October 4th Presidential

16   memorandum, which is -- before it was -- before Secretary

17   Hegseth transmitted his memorandum to the adjutant general,

18   Governor Pritzker had the opportunity to place Illinois

19   guardsmen in a Title 32 status with federal funding.

20   Department of War offered federal funding for these guardsmen.

21   And under that plan, the guard would have remained under

22   Governor Pritzker's chain of command.  He would have remained

23   in control of them while the federal government paid for this

24   mission.  He declined that.

25     When the president signed his October 4th Presidential

1   memorandum, he left open the continued possibility for Governor

2   Pritzker to do that saying that the federalization is until

3   Governor Pritzker places these guards in a Title 32 status and

4   that offer remains open to Governor Pritzker today to return

5   these guardsmen to his control with federal funding to provide

6   the protection and safety that is needed for federal personnel

7   and property.

8           Plaintiffs also suggest there is some sort of PCA

9   violation through the federalization of these guard.  The

10  plaintiff fails multiple times over.  To start, plaintiffs

11  filed a complaint, moved for injunctive relief at the very

12  beginning of this mission before guard even took a position in

13  the state of Illinois.  There is just no record for the Court

14  to conclude there has been any sort of PCA violation.

15          Judge Breyer held that there was a PCA violation in

16  California, a decision we strongly disagree with and have

17  appealed to the Ninth Circuit, but even he only reached that

18  judgment after there was discovery and a trial that described

19  the work the guard had been doing in California to provide

20  protection for personnel and property.  And then Judge Breyer

21  ruled after that trial.  He didn't hold that the entire project

22  of providing protection was inconsistent with the PCA.  Instead

23  he explicitly acknowledged that the guard had not violated the

24  PCA in providing protection for the Wilshire building in

25  Los Angeles.

1    THE COURT:  You are also over time now.  You have

2    three minutes until you match their overtimedness.

3    MR. HAMILTON:  Thank you, Your Honor.

4    So setting aside the fact that it is premature in this

5    case to really entertain any sort of question as to whether

6    there is a PCA violation, there are other threshold problems

7    with the PCA.  To start, the guard are in this federalized

8    status under 12406, the PCA doesn't apply to a 12406

9    federalization.  That is necessarily the case.  Because under

10   12406, and the express purpose of 12406 (3) is so the guard can

11   help execute the laws.  And the PCA expressly calls out the

12   execution of the laws as a prescribed act.  And so if this

13   weren't the case, the PCA would swallow 12406 rendering sub (3)

14   meaningless.

15   The PCA also contains a wilfulness requirement.

16   There's no evidence of any wilful violation of the PCA, and it

17   is also not a statute the plaintiffs can enforce.  The PCA is a

18   criminal statute.  Its text says how it is enforced.  Its

19   remedies are a fine, up to two years imprisonment or both,

20   period, end of sentence.  There is no civil enforcement of the

21   PCA.

22   Briefly, our brief explains why plaintiffs also lack

23   standing to challenge the federalization of Texas guard.  Those

24   guard are in a fully federal status.  It is no different than

25   if the defendants had sent additional federal protective

1  service agents here to Chicago instead of federalized guard

2  from another state.  And we cite examples where federalized

3  guard have been sent from one state to another.  There is

4  nothing extraordinary about that.  That all goes to the

5  likelihood of success on the merits.  Plaintiffs don't make any

6  valid showing of irreparable harm.  They spend hardly any time

7  in their brief discussing the balance of the equities in public

8  interest, which weighs sharply against any sort of injunctive

9  relief.  And for these reasons we would ask the Court to deny

10  plaintiff's motion.

11           THE COURT:  Thank you.  Why don't you stay at the

12  podium.

13           MR. HAMILTON:  Sure thing.

14           THE COURT:  Assuming you're going to be doing the

15  questions.

16           MR. HAMILTON:  I will.

17           THE COURT:  Okay.

18           So I understand from your brief that we are talking

19  about at the moment, 14 California National Guard troops,

20  200 from Texas, and 300 from Illinois?

21           MR. HAMILTON:  That's my understanding as well.

22           THE COURT:  Okay.  Well, I got that understanding from

23  you, so ...

24           But the memorandum, as I understand it, that's a

25  minimum and it sets no maximum.  So it could be any number,

1    minimum 500?

2          MR. HAMILTON:  Yeah.  I don't have the exact language,

3    but I can explain that that isn't inconsistent with what

4    happened in California either.  The June 7th Presidential

5    memorandum in California itself called for the federalization

6    of 2,000 guardsmen.  And then Secretary Hegseth, I think, two

7    days later federalized an additional 2,000 guardsmen to respond

8    to the threat in California; and as I noted, Secretary Hegseth

9    has responsibly drawn down that number as the situation has

10    improved in California.

11          THE COURT:  All right.  As I understand the deployment

12    you have said the area of operation is primarily within Cook

13    County.  That also I don't see as having any guardrails.  Does

14    that mean it will only be in Cook County or could it literally

15    be anywhere in the state of Illinois?

16          MR. HAMILTON:  I don't have any additional information

17    to add to what Major General Nordhaus submitted in response to

18    the Court's question.  I think the declaration probably

19    reflects the fact that that is the current plan, but of course

20    this is a dynamic situation that could change, and the

21    protection of our federal personnel and property is of the

22    highest priority.  And so I would expect that as conditions

23    develop, the authorities managing this response will respond

24    appropriately wherever there may be the need for the federal

25    protective mission to be performed.

1      THE COURT:  Anywhere in the state of Illinois?

2      MR. HAMILTON:  It could be if there is the need.  That

3   is something that is being managed by the Department of War and

4   upon request from the Department of Homeland Security.

5      THE COURT:  Now, help me understand this.  You said it

6   is unclear how Chicago will be hurt because Broadview is

7   12 miles away, but you are not committing to the idea that they

8   will be staying in Broadview.

9      MR. HAMILTON:  Right.  And the declaration from Major

10  General Knell even explains that the Department of Homeland

11  Security has requested assistance for protection for the

12  federal courthouse in Chicago for hearings tomorrow.

13     THE COURT:  Well, let's talk about that.

14      You have a declaration from Major General Naive Knell,

15  with the U.S. Army, 62-3 on the docket.  That declaration

16  states the FPS requested federalization of National Guard

17  personnel to support protection of the Federal District Court

18  on Friday, October 10th, 2025, and both parties have said that

19  this morning.

20      I have been informed by the chief judge of this court

21  that that's untrue.  That no one from the FPS requested any

22  National Guard troops.  That no one from the United States

23  Marshals requested National Guard troops.  They have not been

24  able to track down anyone who is actually responsible for

25  protecting this building who has made that statement.  So I am

1    going to ask you to provide further details about the factual

2    basis for that statement, and I will give you until

3    3:00 o'clock today to reach out to your witness, figure out why

4    your witness has a good-faith basis to say that, and file a

5    supplemental declaration if you would like or you can withdraw

6    that witness' declaration.

7         But based on the information that has been made

8    available to me and the chief judge has also issued a press

9    release this morning to that effect, that is not an accurate

10   statement.

11        Your memorandum states that the National Guard will

12   respond to requests for assistance from federal government

13   agents and agencies only when they are related to the

14   production of federal personnel performing official functions

15   as well as request protection duties such as protection of

16   federal buildings.  So that sounds to me that they are not

17   limited to just protecting federal buildings.  Is that your

18   understanding as well?

19        MR. HAMILTON:  Yes, yes.  That is consistent with how

20   the federalized guard were used in California where they were

21   also used for protection of ICE agents who had gone out and

22   done -- done immigration enforcement operations in Southern

23   California; and here as we note in our declarations, there have

24   been attacks on ICE agents out in the field.

25        THE COURT:  Well, not just limited to ICE, right?  If

1  the FBI executes a search warrant in what is considered a

2  dangerous neighborhood, they could ask the National Guard to

3  come along with them on that.

4       MR. HAMILTON:  I think that is probably true.

5       THE COURT:  So the National Guard could be at federal

6  buildings, but they could also be in neighborhoods, in

7  hospitals, in schools, wherever federal law enforcement decides

8  they want to be?

9       MR. HAMILTON:  Where there is -- yes, where there is a

10 request for protection from the Department of Homeland Security

11 and that request is then considered and vetted by the

12 Department of War and then a decision is made to provide that

13 protection.  As General Knell's declaration explains, there is

14 a vetting process for all of these requests before they are

15 granted.

16      THE COURT:  It is not just limited to Department of

17 Homeland Security.  It could be from any federal agency,

18 Department of Treasury, Department of Education, Department of

19 Agriculture.

20      MR. HAMILTON:  I don't know the answer to that.

21      THE COURT:  Okay.  What is your understanding of what

22 they are able to do when they are protecting federal agents or

23 property?

24      MR. HAMILTON:  I mean, I don't really have factual

25 information beyond the declarations that we've provided here,

1   but the guard are, I think, providing a presence and there to

2   provide protection when there is a risk of some harm and it is

3   distinct from law enforcement.

4          THE COURT:  How?

5          MR. HAMILTON:  Yes.  So the guard are not authorized

6   to carry out arrests or do anything like that.  And actually

7   this was described in the trial before Judge Breyer because

8   there the plaintiffs put on evidence of a temporary detention

9   that happened outside a federal building in Los Angeles.  An

10  individual repeatedly attempted to penetrate a boundary that

11  had been set up around the federal building to provide

12  protection to it, and the guard temporarily detained that

13  individual calling out for federal law enforcement to come, and

14  that individual was moved into federal law enforcement control,

15  who then made the law enforcement decision about what to do

16  with that individual; and Judge Breyer did not find that to be

17  a PCA violation in his opinion and order.

18         THE COURT:  So are they allowed to conduct searches?

19         MR. HAMILTON:  I don't have information to provide

20  beyond the declarations here.

21         THE COURT:  But they aren't allowed to make arrests is

22  your understanding?  They can temporarily detain; they can't

23  arrest?

24         MR. HAMILTON:  That's my understanding.  But I'm

25  relying upon, you know, kind of the experience we had with the

1  California -- the California case and the facts that were

2  developed there.

3        I mean, I think it is obvious from the fact that 14 or

4  15 California guard have been sent here to Illinois to provide

5  training for the guard here that there is some contemplation of

6  overlap in what the federal protective mission will look like

7  here.  But we took the Court's questions from the Monday

8  hearing, we took those to Department of War officials who we

9  thought could provide the clearest and most accurate

10  information, and so that's what we've submitted to the Court.

11  And I really don't have facts to submit to the record beyond

12  those that our declarants have provided to the Court.  If the

13  Court has additional questions, we can endeavor to answer

14  those, and we will do our best to chase down the Court's

15  question about the request for assistance at this building by

16  midafternoon today.

17        THE COURT:  Is it your understanding that they can

18  engage in crowd and traffic control, yes or no?

19        MR. HAMILTON:  I don't have information to provide on

20  that.

21        THE COURT:  Okay.  Are they allowed to patrol the

22  streets brandishing weapons?

23        MR. HAMILTON:  Again, this lawsuit was brought at the

24  very beginning of this mission, as training is ongoing, and I

25  believe it is only the last couple days that guard have

1   actually taken a position in Illinois, and so ...

2          THE COURT:  What are they being trained to do?  I

3   mean, you are the ones deploying them.  I understand it is

4   early, but you are representing the person who is actually

5   doing the deployment.  So what are they being trained and

6   deployed to do?

7          MR. HAMILTON:  I don't have additional information

8   beyond the declarations that we've submitted in the record on

9   that.

10         THE COURT:  I didn't see anything in the record,

11  although I could have missed it because there is an awful lot.

12  Is there anything in there about whether or not they are

13  allowed to pursue individuals or vehicles?

14         MR. HAMILTON:  I don't recall anything like that.

15  But, again, I would just add that, you know, with the case

16  before Judge Breyer all of this was litigated after there had

17  actually been operations under the federal protective

18  mission --

19         THE COURT:  That's only because his TRO was

20  overturned.

21         MR. HAMILTON:  No.  Because Judge Breyer considered

22  the PCA argument that the plaintiffs made, the plaintiffs in

23  the state of California, Governor Newsom, attempted the same

24  tactic with their litigation there as here, arguing that the

25  Court should enjoin the mission at the outset under the PCA.

1    And Judge Breyer said, no, I can't do that.  I don't have the

2    record before me to do that.  And so after he ruled on

3    different bases, bases like 12406, that are more centered on

4    the documents underlying the beginning of this mission, Judge

5    Breyer, once that was stayed, then entertained questions and

6    litigation over how the operation was actually being

7    implemented and carried out.

8            THE COURT:  All right.  Let me ask you this.  Will

9    they be solving crime in Chicago?

10           MR. HAMILTON:  So the -- certainly to an extent.  The

11   submission again is a federal protective one.  At the beginning

12   of my opening, I described a significant number of federal

13   crimes committed against law enforcement officers as well as

14   crimes against federal property.  Those are crimes and the

15   presence of the guard, we believe, will facilitate a reduction

16   in that horrible violence and so that violence we anticipate

17   will improve.  And it is what we saw in California where,

18   again, 4,000 guardsmen, 700 Marines were sent after very

19   serious violence in early June.  And thankfully that force has

20   been able to be drawn down as conditions have improved.

21           THE COURT:  The president has stated that they are

22   coming here for the purpose of solving crime, solving Chicago's

23   crime problem, not reducing assaults on federal agents or

24   assisting with immigration detention.  Solving crime.  Is it

25   your understanding that they are permitted to be deployed for

1    the purposes of solving crime in Chicago?  Like all of it?

2    MR. HAMILTON:  No, not solving all of the crime in

3    Chicago.  In the Presidential memorandum, the president has

4    said what this mission is about and that's set forth in the

5    president's words in the October 4th Presidential memorandum,

6    which is clear that this is a federal protective mission.

7    THE COURT:  But the president has also said that they

8    are coming to stop rapes and theft.  That's not a federal

9    crime, right?

10    MR. HAMILTON:  I believe in some instances it could

11    be, but the -- again, the document here that began and is the

12    foundation for the challenged conduct by the plaintiff is the

13    Presidential memorandum signed on October 4th, and we have also

14    submitted into the record Secretary Hegseth's memorandum

15    implementing that presidential directive also on October 4th.

16    It sets the recommended boundaries for this mission that is

17    what is before the Court for its review.

18    THE COURT:  Well, no.  I mean, what's before the Court

19    is a fulsome evidentiary record that includes those memorandums

20    with things that the president has said the National Guard in

21    an official memorandum will be allowed to do.  But also before

22    the Court is a whole lot of public statements on social media,

23    but also in press conferences made out of the Oval Office

24    describing what the National Guard will do.  Frankly, there is

25    a very large disconnect between those two bodies of evidence.

1  Which one do I credit?  Why do I only credit the ones that you

2  want me to and none of the other president's statements about

3  what they are coming here to do?

4       MR. HAMILTON:  The presidential memorandum is a

5  statement of the president and this isn't unlike --

6       THE COURT:  It is.

7       MR. HAMILTON:  So I would cite for the Court *Trump vs.*

8  *Hawaii* case where in, I think, 2017 the president rolled out

9  the travel ban policy.  Plaintiffs attempted to challenge that

10 policy with statements dating back from the campaign and at

11 other times saying, oh, the travel ban policy isn't really a

12 travel ban; it's something else.  And the Supreme Court said

13 that the facially legitimate and bona fide reason for the

14 policy contained in the documents that -- that undergird that

15 policy, that's what controls.  And so the U.S. Supreme Courts'

16 interpretation there applies here as well.

17      It's the presidential memorandum that the President of

18 the United States signed, setting the boundaries for this

19 mission and that the Secretary of War implemented through his

20 memorandum to Illinois' adjutant general that that is the

21 center of any sort of review, which again we have explained

22 that the standard in the Ninth Circuit is one of great

23 deference to the president.

24      As we note in our brief, we disagree with that and we

25 believe that under controlling -- you know, these U.S. Supreme

1   Court cases that were decided interpreting similar guard

2   deployments, it's actually an unreviewable decision of the

3   president.  But the Ninth Circuit still acknowledged that the

4   president is entitled to great deference here, and on this

5   record where there is a substantial record of very serious

6   violence in recent weeks, the federalization is lawful and

7   should be upheld.

8            THE COURT:  I understand completely your argument that

9   this isn't something that I get to pass on at all.  So I

10  appreciate you hearing from me here in the first place.  I have

11  no problem with giving great deference to the president.

12           Is it your understanding that *Trump vs. Hawaii* stands

13  for the proposition that in giving that deference, I have to

14  look only at one set of the president's statements and I'm not

15  allowed to look at the others?

16           MR. HAMILTON:  I don't know that it goes that far, but

17  it certainly puts substantially more emphasis on the documents

18  underlying the policy in question.

19           THE COURT:  Because I'm just trying to figure out what

20  to defer to?  If I defer to all of the statements, then I would

21  absolutely accept that the National Guard is being deployed for

22  certain purposes as outlined in the official memorandum, but

23  also that you all are reserving the right that they can do all

24  the other things that the president has said they will be able

25  to do.

1    What I am troubled by at the moment is that when I try

2   to nail down with you which specific of those things might

3   still be on the table, you have kind of said, Well, I don't

4   know.  I don't know really what they're trained to do or what

5   they're coming to do.  That leaves me with the conclusion that,

6   sure, they are here to protect federal property and resources

7   and also solve crime in any way, shape, or form that they

8   decide that's appropriate to do.

9    MR. HAMILTON:  Your Honor, I think we're talking about

10  the federal response to a dynamic and fluid situation.  The

11  response is going to be tailored to whatever the needs of the

12  moment are.  And right now we have put before the Court the

13  presidential memorandum setting out left and right boundaries,

14  Secretary Hegseth's memorandum implementing that, and a

15  declaration of a three star general -- major general explaining

16  how she understands the current status of that mission.

17    So I, of course, can't make representations about what

18  sort of violence -- what sort of circumstances could occur in

19  Illinois in the future.  I certainly hope that this is the

20  beginning of turning the corner on the very tragic and serious

21  acts of violence that have been committed against federal

22  property and personnel in this state, but we obviously can't

23  make representations about what the future holds and what may

24  be needed to protect our brave men and women serving the

25  Department of Homeland Security.

1          THE COURT:  Let's talk about your evidence of

2     aggression, violence, hostility, et cetera.  I think you would

3     agree with me, if nothing else, that your picture of what it is

4     like on the scene at these events does not in any way, shape,

5     or form reflect the picture of the Broadview Police Department

6     or the Illinois State Police; is that fair to say?

7          MR. HAMILTON:  I agree that there are different

8     understandings between two sides of the situation on the

9     ground.  But even plaintiffs acknowledge that there has been

10    violence.

11         THE COURT:  They did.

12         MR. HAMILTON:  And whereas here we have a statute

13    vesting power in the president to control the deployment of

14    military service members in line with his place, under the

15    Constitution, as Commander in Chief of the Armed Forces and

16    where he has great deference in deciding whether the conditions

17    are satisfied.  The disputes between the parties come nowhere

18    close to overcoming the deference that the president has in

19    making a judgment of this very serious type.

20         THE COURT:  What if he's relying on completely invalid

21    evidence that's been presented to him?  What if the DHS folks

22    are not tethered to reality in their assessment of events?

23         MR. HAMILTON:  Well, that --

24         THE COURT:  Does that matter?

25         MR. HAMILTON:  A couple points, one, that is, we

1    think, very much not the point here, and what is occurring here

2    where we've put on the evidence from DHS declarants explaining

3    their understanding of the situation on the ground, but this is

4    actually something that Martin against Mott and *Luther vs.*

5    *Borden* talk about.  And those are two U.S. Supreme Court cases,

6    which we understand that the president has unreviewable

7    discretion here, and what they acknowledge is that there is a

8    possibility for abuse and a possibility of a misapplication of

9    the authority.  What they say is the proper check there is

10   Congress and the political branches and that the president's

11   democratic accountability is a check on the abuse of any

12   authority here, not judicial review.

13        THE COURT:  And, again, I appreciate you humoring me

14   but hear me out on this one because I understand that you do

15   not think this is a reviewable decision.

16        Let's talk about your DHS assessment of conditions on

17   the ground.  So you referenced Parra's statement that there are

18   more people with guns in Chicago than LA, and first I just want

19   to make sure we're all clear.  Carrying a gun is a protected

20   constitutional right, correct?

21        MR. HAMILTON:  Yes.

22        THE COURT:  That's not a second-class right?

23        MR. HAMILTON:  Right.

24        THE COURT:  So that's just as important as my

25   First Amendment rights?

1          MR. HAMILTON:  Yes.

2          THE COURT:  So there's nothing wrong with the fact

3     that people are being arrested while carrying guns.  That's --

4     the carrying guns part is not a crime.

5          MR. HAMILTON:  Well, for some people it is, and I

6     think that fact just highlights the very serious risk here.  I

7     mean, moving people in vans from one location to another is not

8     itself unlawful, but the fact that we are seeing organized

9     people gear up in gas masks, padding, preparing for contact

10    with federal personnel, donning a gas mask is not unlawful

11    conduct, but it is a very serious sign of the threat that is

12    presented here to the safety of federal personnel and property.

13         THE COURT:  I would agree with you were it not in

14    evidence that ICE is indiscriminately gassing people, peaceful

15    protestors.  If I were a peaceful protestor outside of

16    Broadview and ICE had a habit of throwing smoke bombs at random

17    to groups of 10 or less, I too would wear a gas mask, not

18    because I want to do violence but because I'm trying to protect

19    myself.  I mean, that is a protective measure, correct?  It's

20    not an aggressive one.

21         MR. HAMILTON:  I don't think it is necessarily a -- I

22    think it can be interpreted as aggressive, especially where our

23    declarants have explained that the agitators have thrown tear

24    gas at federal protective -- excuse me -- federal law

25    enforcement agents.  So I don't know that we can categorically

1  say that there is no threat to be perceived from someone

2  putting on a gas mask, protective gear, bringing a shield,

3  things of the sort.

4         THE COURT:  Let's talk about Parra, paragraph 15.

5         MR. HAMILTON:  I'm going to retrieve the declaration.

6         THE COURT:  Sure.

7         MR. HAMILTON:  Okay.

8         THE COURT:  All right.  62-4, page 5.

9         MR. HAMILTON:  Okay.

10        THE COURT:  This paragraph talks about September 27

11  rioters, dozens of officers and agents responding, and

12  11 individuals being arrested and then you have two -- I'm not

13  a gun person, so I think these are scary looking guns

14  photographed here.  What -- are these the guns that were seized

15  from Ray Collins and Jocelyn Robledo?

16        MR. HAMILTON:  I have no idea.

17        THE COURT:  Okay.  Because September 27th there were

18  two individuals charged with assaulting federal agents and

19  carrying a firearm.  So I am assuming, tell me if I'm wrong,

20  that that's their guns.

21        MR. HAMILTON:  I don't have formal information to add

22  about this paragraph 15 beyond what Mr. Parra has said about it

23  in this declaration.

24        THE COURT:  Okay.  Because those were the two people

25  who were no billed by the grand jury, which means that the

1    grand jury found there was not probable cause that they

2    committed a crime.  They were arrested.  The agents wrote a

3    complaint charging them of a crime, and then the grand jury

4    disagreed a crime had occurred.  And I guess what I find

5    troubling about that idea is that this indicates to me a

6    certain lack of credibility of both your affiant and DHS

7    generally speaking.  I mean, to the extent you are asking me to

8    find that there is this out-of-control violence that they have

9    to respond to with arrests and you point to an arrest of people

10   who apparently did not actually commit a crime, that undercuts

11   the persuasive value of your declarant's affidavit.

12          MR. HAMILTON:  I think that this declaration contains

13   multiple instances of the commission of federal crimes that

14   plaintiffs would accept as well.  Again, I don't have

15   additional information to provide the Court on this

16   paragraph 15, but I maintain that bringing a gun to a federal

17   property is an indicator of a risk of a threat, which against

18   the backdrop of very real acts of violence over a period of

19   weeks, paints a picture of a serious risk that satisfies

20   12406's preconditions.

21          THE COURT:  But they have a constitutional right to

22   stand outside the building with the gun.  That's why we started

23   talking about the Second Amendment.  That is a protected

24   constitutional right.  I'm struggling with the idea that the

25   exercise of a protected constitutional right as important as

1  the Second Amendment is also evidence of criminality.

2          MR. HAMILTON:  I mean, again, I think even if the

3  Court does not find the evidence that these declarants have

4  submitted of the possession of firearms significant, there are

5  multiple other facts of criminal violations here with assaults,

6  again, that improvised explosive device being found at a

7  federal property that we have described; and here, even if the

8  president's judgment is to some extent reviewable, there is a

9  high, high level of deference to his judgment.  And I think the

10 fact that a CBP -- is this the ICE declarant -- I think the

11 fact that one DHS declarant has included information in his

12 declaration that the Court might not find persuasive is not

13 conclusive of whether the president properly invoked 12406.

14         THE COURT:  I agree it is not conclusive, but I have

15 two very differing bodies of evidence and I'm trying to figure

16 out where the facts lie in between them.  And when I'm trying

17 to determine the credibility of each affiant's statements,

18 things like this weigh into the analysis; so, too, do certain

19 findings made by other courts.  Are you aware that a TRO has

20 been issued against ICE for having violated First and Fourth

21 Amendment rights of protestors and using excessive force to

22 respond to lawful protests?

23         MR. HAMILTON:  I'm not aware of that.

24         THE COURT:  So that TRO was issued within the last

25 24 hours.  Judge Ellis concluded that DHS, ICE, CBP had

1    consistently violated the rights of peaceful protestors, both

2    in Broadview and also more generally.  And so when I think

3    about, you know, DHS's assessment of the view on the scene, the

4    fact that they are engaging in excessive force and violating

5    people's First, Second, and Fourth amendment rights seems to me

6    to be significant.  Do you agree with that?

7         MR. HAMILTON:  I do.  It's the president's judgment

8    whether the conditions exist for 12406 federalization, not the

9    Department of Homeland Securities.  And I mean, again, you

10   know, we have remarkable instances of violence, 10 vehicles

11   coordinating together to box in a DHS vehicle, ramming that

12   vehicle with two other vehicles.  The conditions are here that

13   justify a 12406 federalization, especially against the backdrop

14   of a highly deferential standard of review, if there is any

15   judicial review of the president's judgment.

16        THE COURT:  All right.  Let's drill down into 12406.

17   We're going to go real deep textually.  All right?

18        So you're claiming there's a danger of rebelling

19   against the United States.  You have cited various dictionary

20   definitions of rebellion.  One of the definitions you provided

21   is that rebellion is open resistance or opposition to an

22   authority or tradition, and another is that it is disobedience

23   of a legal command or summons.  Under that definition,

24   literally all nonviolent protests would be considered

25   rebellion, true?

1    MR. HAMILTON:  I don't --

2        THE COURT:  Open resistance or opposition to authority

3    or tradition.  So a bunch of protestors standing quietly giving

4    the finger to DHS, that would be rebellion?

5        MR. HAMILTON:  We are not rearguing that lawfully

6    protected acts of protest are themselves a rebellion.  You

7    know, this is a case where I don't think the Court has to

8    identify the outer limit of what a rebellion is where we have

9    weeks of violence, actual violence against lawful authorities,

10   the Department of Homeland Security personnel, as well as

11   buildings and there is at least a danger of a rebellion.  The

12   Court does not need to decide whether there is a rebellion.  A

13   danger of a rebellion is enough under the statute and

14   especially against the backdrop of high deference to the

15   president.  There is the record here to support that

16   conclusion.

17       THE COURT:  But if I'm interpreting the statute, don't

18   I need to start with what the terms in the statute mean?

19       MR. HAMILTON:  Yes.  And there are other definitions

20   we cite.  We cite in our brief the 1891 Black's Law Dictionary

21   definition, which is deliberate, organized, resistance by force

22   and arms to the laws or operations of the government committed

23   by a subject.

24       I think it's very clear that we have submitted

25   evidence of facts that meet that standard, but again the Court

1 would not need to agree with that.  It would be enough for

2 there to be a danger of a rebellion under the highly

3 deferential standard.

4         THE COURT:  But there still needs to be danger of a

5 defined term.  Your definitions, yes, you also provided that

6 one; but the three definitions you have cited are vastly

7 different.  One of them is disobedience of a legal command or

8 summons.  Under that definition, every time someone doesn't

9 show up for jury duty, they're engaging in a rebellion, right?

10         MR. HAMILTON:  Perhaps in some -- again, we cite

11 multiple definitions.

12         THE COURT:  You do.  Which one do you want me to use?

13         MR. HAMILTON:  The point, though, is that the standard

14 is much different from the one the plaintiffs are suggesting,

15 and, again, I don't think the Court has to decide exactly what

16 a rebellion is.  It would be --

17         THE COURT:  I think I do.  If I'm going to interpret a

18 statute, I really do think I should know what the words mean.

19         MR. HAMILTON:  We're very comfortable with the 1891

20 Black's Dictionary definition.  I think the point here is that

21 we have cited a number of dictionary definitions for the Court

22 to highlight the fact that plaintiffs' interpretation of this

23 term is wrong and that when Congress enacted the statute, it

24 did so against the backdrop of definitions and understandings

25 of rebellion that differ from the standard plaintiffs are

1    suggesting.  Again, I understand the Court disagrees.  But

2    where there's this highly deferential standard of review, the

3    danger of rebellion is enough.  In our view it would not need

4    to set the outer boundaries of when exactly a rebellion would

5    exist.

6         THE COURT:  Let's talk about the phrase "unable with

7    regular forces to execute the laws of the United States."  So

8    first, which laws is the president unable to execute?

9         MR. HAMILTON:  So the laws that criminalize and punish

10   acts of violence against federal law enforcement officers as

11   well as against federal property.  Those laws have been

12   violated over and over in recent weeks.  The regular forces are

13   very clearly insufficient to prevent those acts of crime.  And

14   I think that is the inability to execute the laws that is most

15   clear on this record.

16        THE COURT:  Oh, that's interesting.  I didn't actually

17   catch that part of your argument in your briefs.  So you think

18   that unable to execute the laws doesn't mean unable to respond

19   to legal violations; it's unable to prevent legal violations?

20        MR. HAMILTON:  Well, I think where there is the record

21   here of it happening over and over and, you know, a situation

22   where, you know, again we're seeing these complex organized

23   acts of criminality, I think all of that weighs in favor of the

24   president's conclusion that there is an inability to execute

25   the laws with the regular forces here.

1          THE COURT:  So it's proactive.  You need to be able to

2    prevent crime, not just detain, arrest, and prosecute criminals

3    under your understanding of the term, "unable to execute the

4    laws"?

5          MR. HAMILTON:  I mean --

6          THE COURT:  Because I've been approaching this with

7    the idea that it was unable to -- I mean, the executive

8    function with respect to laws isn't to prevent crime, right?

9    It's to investigate, to prosecute, it's to imprison.  That's

10   how I understand the executive authority with respect to the

11   law.  If you understand it differently, now is the time to tell

12   me.

13         MR. HAMILTON:  Well, I think the term can be

14   understood in both ways, and in addition, the fact that there

15   has been some diversion of resources would also reduce the

16   executive's ability to enforce laws to the extent that diverted

17   resources are being used to shore up security where there is

18   this threat to federal law enforcement and federal property.

19         THE COURT:  All right.  So let's play this out because

20   I had not thought of this coming into this.

21         Assuming that every single person who assaulted a

22   federal agent, vandalized federal property, committed some

23   offense against the federal agents, assuming every single one

24   of those people was successfully arrested and prosecuted, you

25   would still believe that because they keep getting up to

44

1   mischief, that the president is unable to execute the laws of

2   the United States?

3           MR. HAMILTON:  Yes.  Yes.

4           THE COURT:  Okay.

5           MR. HAMILTON:  Yes, I don't think that 12406(3) is all

6   about making sure that the Department of Justice's

7   U.S. Attorneys' offices are able to prosecute everyone who has

8   committed a crime in line with Subsections 1, 2 -- 1 and 2,

9   which are about countering threats to the stability of the

10  government, Subsection 3 is providing authority from the

11  president to federalize guard to maintain order and here

12  maintain the safety of federal personnel and property under

13  sustained attack.

14          THE COURT:  So you -- what does execute the laws mean?

15  I mean, your understanding, it sounds like, of execute is

16  prevent the laws from being violated.  You would read this,

17  unable to execute the laws of the United States to be the same

18  as unable to prevent the laws from being violated?

19          MR. HAMILTON:  Well, certainly -- I mean, so we're not

20  going as far as saying that if there is the commission of one

21  crime then the standard for Subsection 3 has been met.  Here we

22  have a record of actual repeated criminal violations over and

23  over that are harming the Department of Homeland Security.

24  They're both resulting in Department of Homeland Security --

25  crimes against DHS personnel and property as well as affecting

1    the -- you know, the overall mission of DHS.

2        THE COURT:  Okay.  So riddle me this, the federal laws

3    include controlled substances laws.  Arguably there have been

4    drugs dealt in the City of Chicago for many decades.  Can I

5    assume from that then, that unable to execute the laws of the

6    United States, specifically the controlled substances laws,

7    means that the president has had the authority for decades to

8    deploy the National Guard here?

9        MR. HAMILTON:  I think that hypothetically is very far

10   afield and would be a much, much harder case for a 12406

11   federalization, but here --

12       THE COURT:  The problem is you didn't tell me at the

13   beginning of this that you weren't going to use the National

14   Guard for those purposes.  We talked 20 minutes ago about how

15   any federal agency that needed an assist, could get one.  That

16   includes DEA, I suppose.  And now you've told me that you

17   understand "execute the laws" to include prevent the violation

18   of federal law, so I'm not sure we are.  If the deployment

19   order does not prohibit that activity, you've told me that you

20   won't commit to not engaging in that activity and you are

21   interpreting the statute in a way that would read that as a

22   totally viable use of the National Guard.

23       MR. HAMILTON:  But on top of all of that, we have the

24   direct interference with the Department of Homeland Security's

25   own law enforcement authorities.  These agitators have blocked

1  ICE vehicles from entering and exiting.  They surrounded those

2  vehicles, ramming those vehicles.  They are blocking entrance

3  and exit to ICE buildings.  They've attacked ICE vehicles that

4  contain detainees and that is itself --

5       THE COURT:  That is a federal crime, I get it.  So are

6  the drug laws.

7       MR. HAMILTON:  A federal crime, but it is also

8  impeding the DHS law enforcement's ability to execute Title

9  VIII laws, which is separate from the legal violations in the

10  form of crimes against law enforcement personnel and property.

11       THE COURT:  It is.  And I kind of expected when we

12  started this oral argument that you would tell me that the laws

13  that they are here to execute is immigration laws.

14       MR. HAMILTON:  Right.

15       THE COURT:  I believed that was the road we were going

16  down until you told me that "execute the laws" means prevent

17  federal law violations.

18       MR. HAMILTON:  It's both though.  We have both types

19  of laws, a failure to execute both of them --

20       THE COURT:  We do arguably.  So going back to my

21  original question, it sounds to me like your argument is that

22  12406 could mean anything.  I mean, for any repeated law the

23  National Guard -- law violation -- we do have a history of

24  violence in Chicago.  It is a very large city.  But the way you

25  are reading it indicates to me that you believe that 12406(3)

1  means that for any repetition of criminal law violation, the

2  National Guard can be deployed.

3        MR. HAMILTON:  I respectfully disagree.  I think here

4  we're asking the Court to hold that where there are repeated,

5  sustained acts of criminal violence against federal law

6  enforcement personnel and where those acts of violence are

7  impeding those law enforcement authorities ability to

8  themselves execute their own laws, here that would be the Title

9  VIII authorities that DHS is charged with implementing and we

10  have record evidence of a vehicle with detainees being

11  surrounded, blocking entrances and exits, things of the sort,

12  the Court would not need to hold that the commission of a crime

13  is by itself enough to satisfy Subsection 3.  We're not asking

14  the Court to hold that.  On this record, which, again, under

15  the applicable standard, the president is entitled to

16  substantial deference, if there is judicial review, conditions

17  are here for 12046(3).

18        THE COURT:  You keep using the word "impeding."  The

19  statute uses the word "unable" to execute.  Is it your

20  understanding that the word "unable" means "impeded"?

21        MR. HAMILTON:  Well, I would add that -- I -- so this

22  is something that the Ninth Circuit addressed.  The Ninth

23  Circuit certainly did not take -- enable us to have this

24  maximalist categorical interpretation.  The Ninth Circuit in

25  Newsom says it doesn't require the president to be completely

1  precluded from executing the relevant laws.  It applies even if

2  some continued execution of the law is feasible, so --

3          THE COURT:  What did they cite for that?

4          MR. HAMILTON:  I don't recall.

5          THE COURT:  I don't think it was anything.  I'm not

6  being snide.  Like my recollection of that portion of the

7  opinion is that they came up with a definition of "unable to

8  execute" but they didn't have either a dictionary definition,

9  case law.  Do you remember it differently?

10          MR. HAMILTON:  I don't have a firm recollection of

11  what exactly is cited there in Newsom, but I think that if we

12  take the maximalist position, that an inability to execute the

13  laws means 0.0 percent of laws in United States are being

14  enforced.  It's pretty hard to imagine 12406(3) being used.  I

15  would note that in our brief we talk about the fact that the

16  National Guard were called under this authority to help deliver

17  the mail in, I think, the 1970s; and there was not a

18  categorical inability to execute the laws in the United States.

19          There was a significant impact on the ability for a

20  subset of laws, those that direct the delivering of the mail to

21  be carried out, and that was enough for the then President of

22  the United States to invoke this authority on federalizing the

23  guard.

24          THE COURT:  Let me ask you this, the president has

25  made statements that could arguably be interpreted as stating

1  that he believes elected state officials are impeding his

2  ability to execute the law.  Is that a fair characterization of

3  some of the statements he's made publicly?

4          MR. HAMILTON:  Yes.

5          THE COURT:  Okay.  And that's largely based on the

6  sanctuary city policies and some of the other disagreements

7  they've had about different policy issues?

8          MR. HAMILTON:  I don't know the full scope of those.

9  I know certainly the sanctuary city -- sanctuary city

10 jurisdiction statutes only compound the problem here where

11 there's this hostility to lawful federal enforcement

12 operations.  We're deeply troubled by Governor Pritzker calling

13 these public servants jack-booted thugs and there is this

14 message of --

15         THE COURT:  Let's stick to the idea of if state

16 officials are in the president's opinion impeding the execution

17 of federal law because of the sanctuary city policies or nasty

18 words he's calling them, what have you, can the National Guard

19 be deployed?  Is 12406(3) met?

20         MR. HAMILTON:  Based on nasty words?  I mean --

21         THE COURT:  You mentioned nasty words.  I was trying

22 to stay narrowly --

23         MR. HAMILTON:  Yes.

24         THE COURT:  I guess my question is this, is 12406(3)

25 met for every sanctuary city?

1          MR. HAMILTON:  I don't think that by -- through the

2     legislature of a state and governor of a sanctuary city

3     jurisdiction, state law that 12406(3)'s conditions would

4     automatically be met.  And that isn't what the rationale is

5     here at all.

6          THE COURT:  It is what the president has stated.

7          MR. HAMILTON:  The president has expressed very

8     serious concerns with those policies, but his presidential

9     memorandum identifies the actual and threatened violence as the

10    reason.

11         THE COURT:  And the attorney general memorandum has

12    indicated that the chief law enforcement officer's opinion

13    those are federal legal violations.

14         MR. HAMILTON:  They are.  They are.

15         THE COURT:  Okay.  So if the state elected officials

16    are through their sanctuary city policies violating federal

17    law.  Why is 12406(3) not automatically met?

18         MR. HAMILTON:  So I mean, it's a hypothetical.  It is

19    very different than the situation here.

20         THE COURT:  It's not.  It's not a hypothetical.

21    Attorney General Bondi has said they are violating federal law.

22    President Trump has said they're violating federal law.  You

23    just told me that every fall law violation is on its own terms

24    a 12406(3) violation, and I have to give complete deference to

25    the president's opinion of that.

1    MR. HAMILTON:  I don't think that was exactly my

2  argument.  Here the -- the facts here show an inability for the

3  regular forces to counter the actual commission of federal

4  crimes against federal law enforcement and federal property,

5  and on top of that it is impeding the Title VIII enforcement

6  authority of the Department of Homeland Security.

7    Court's hypothetical where just the enactment of a law

8  by itself is a very different case and here there also is

9  clearly a way that the federalized guard are going to improve

10 the conditions on the ground with the inability for the regular

11 forces to execute the laws because their presence is able to

12 improve the security situation, which is exactly what happened

13 in the state of California where the guard provided that

14 presence in June and in the summer -- I think their brief even

15 talks about what happened, you know, in later months where they

16 then responded where there were repeated acts of violence even

17 after the initial federalization began.  And we are all very

18 glad that the federalized guard members in California have been

19 able to have been drawn down as conditions in that state have

20 improved.

21    THE COURT:  Okay.  I think we would be in a very

22 different position from my perspective, at least, if your

23 argument had been, We are having problems on federal property.

24 ICE and CDP agents are having problems enforcing the

25 immigration laws.  Here are examples of that.  And that is what

1   we are deploying our National Guard to solve.  That is what I

2   expected your argument would be.  But it's not.  You have not

3   committed that they are only going to be deployed at federal

4   property or in support of immigration and customs enforcement.

5   The memorandums that authorize their deployment have not

6   narrowed their scope in any way, shape, or form, to those types

7   of things; and so I am very much struggling to figure out where

8   this would ever stop.  Because the plaintiffs really believe

9   that it's not going to just stop with that.  You have not told

10  me it's just going to stop with that, and your definition that

11  you just gave me does not in any way, shape, or form require it

12  to stop at just immigration enforcement.  Help me understand if

13  what you are proposing to do here is really as broad as it

14  feels like at the moment it is.

15        MR. HAMILTON:  Yeah, I think we have actually put

16  forward evidence of a circumscribed and limited mission.  Major

17  General Knell's declaration identifies the limits on the

18  mission.  The presidential memorandum identifies it as a

19  federal protective mission.  That's consistent with how

20  Secretary Hegseth talks about the mission.  It's true that I

21  can't make representations about what happens in the future.

22  I, of course, cannot do that.  But that doesn't mean that the

23  information that -- we've put forward to the Court the current

24  scope of the mission here in Illinois.  If that changes,

25  plaintiffs are free to come back to the Court and we can talk

1    about what has happened if there's a change in the mission.

2    But Major General Knell's declaration describes a circumscribed

3    and limited mission directed to responding to the current, very

4    serious record of violence against federal personnel and

5    property.  That is what the small number of federalized guard

6    are here in Illinois to do.

7         THE COURT:  There has been evidence submitted that --

8    I'm trying to put this delicately.  I don't know if there is a

9    way to do so.  That the very presence of the federal agents and

10    the way that they are interacting with the populous is itself

11    the cause of the violence.  Both the Broadview police chief has

12    indicated that that is his opinion, there has been an expert

13    opinion submitted along those lines, the ISP has also indicated

14    that that's their belief.  Added to that we have the TRO issued

15    finding that ICE is repeatedly violating the First and Fourth

16    Amendment with respect to the peaceful protestors.  Added to

17    that you made the point earlier that showing up with masks and

18    protective gear, et cetera, is a clear sign or indication to do

19    violence, the protestors are doing that but actually the ICE

20    and CBP officers started it first, if we're going to reduce

21    this to a school-yard dispute.

22         So to the extent there is an inability to execute the

23    federal law and there is evidence that that is caused by the

24    federal agents, does that matter?

25         MR. HAMILTON:  No, Your Honor.  This isn't a lawsuit

1  about DHS personnel.  This is a lawsuit about federalized

2  Department of War personnel, federalized members of the

3  Illinois National Guard, and a small number of federalized

4  Texas guard members, and the, again, right-and-left boundaries

5  of what they can and cannot do are specified in Major General

6  Knell's declaration as well as the other documents submitted to

7  the Court.

8        THE COURT:  But just kind of thinking about the

9  definition of the phrase, "unable to execute the federal laws."

10 If the reason that ICE, or whoever, has been unable to execute

11 the federal laws is wholly internal, let's say they have a

12 whole bunch of Inspector Clouseau's on the payroll, "Can't get

13 a thing done," hypothetically speaking.  And the only way

14 they're ever going to get anything done is because of the

15 National Guard, but it's all their fault.  Does that trigger

16 12406 (3)?

17       MR. HAMILTON:  Your Honor, there's a highly

18 deferential standard here for the president.  The facts here

19 are that there are an inability to execute the laws many times

20 over and the president appropriately made that judgment but --

21       THE COURT:  Okay.  So one view of the evidence would

22 be for 19 years Broadview had nothing but peaceful prayer

23 vigils.  Individuals showing up every Friday to pray and watch,

24 bare witness, I think was their term they used.  And then CBP

25 shows up and then suddenly things take a turn for the worse.

1   There has been evidence presented that these folks, perhaps

2   either don't get training in deescalation techniques or aren't

3   using the training; but, in fact, they are escalating

4   situations.  They are coming in super hot according to some of

5   the evidence.  They're brandishing assault weapons in tourist

6   areas.  They're masking their faces.  They're deploying tear

7   gas cover spray at the drop of a hat whenever anybody gives

8   them some type of petty provocation.  And that's making people

9   super mad and they are responding in kind.  So if that is the

10  way I interpret the evidence, and the only reason they are

11  unable to execute the law is because of their own provocation,

12  does that matter under the law?

13          MR. HAMILTON:  No.  If that were true, the facts still

14  remain that we are seeing sustained violence against federal

15  personnel and property in Illinois and that the current

16  authorities in place are insufficient to provide protection to

17  federal law enforcement, who are, you know, conducting their

18  Title VIII enforcement authorities.  The *Martin vs. Mott* case

19  talks about the conclusiveness of the president's determination

20  here and any sort of analysis into, well, maybe there would be,

21  you know, there is violence but the reason for the violence --

22  that is so far afield, we think, from whatever standard of

23  review could apply in this context of the executive organizing

24  the ability for the federal government to provide safety to

25  federal law enforcement and property that is under attack.

1    THE COURT:  So if a CBP officer pushes down a peaceful

2    protestor, for no good reason, pushes him into the street.  And

3    that person slaps their hand away the next time they attack

4    them, and that is assault on a federal agent, they are then

5    unable execute the federal law even if they instigated that

6    assault?

7    MR. HAMILTON:  That is not what we've argued.  We are

8    arguing here today that there is a lengthy record of violence

9    in Chicago, of significant violence against federal personnel

10   and property, and that it is impeding the ability to implement

11   Title VIII laws with these violent agitators circling vehicles

12   with detainees, blocking entrances and exits for ICE buildings,

13   and blocking the movement and ramming ICE DHS vehicles.

14   THE COURT:  You had a phrase in your brief that law

15   enforcement is being prevented from vigorous enforcement of

16   existing laws.  I was struck by the word "vigorous" because I

17   think a lot of people would agree that's what it is.  Do they

18   have a right to vigorous enforcement or do they just have a

19   right to enforcement?

20   MR. HAMILTON:  Well, DHS doesn't have rights.  It has

21   a mandate from Congress to enforce federal laws.  It has an

22   obligation to enforce federal laws for DHS, that is, Title

23   VIII.  One of the -- it's either ICE or the CBP declaration,

24   explains that DHS has something like 400 statutes that it is

25   obligated to enforce and it does so consistent with the funding

1  that our Congress has given the Department of Homeland Security

2  and consistent with the laws that our Congress has put upon DHS

3  to enforce.

4        THE COURT:  Okay.  So you would agree with me that

5  they aren't unable to execute the laws just because they are

6  not able to do so in as vigorous a manner as they would prefer,

7  that that itself does not trigger 12406?

8        MR. HAMILTON:  I think there's significance to

9  vigor -- that's not a term in 12406.

10        THE COURT:  It's not.  But it was in your brief, so I

11  was curious.  I mean, part of the question, I suppose, is to

12  the extent I find that there have been acts of vandalism, there

13  have been slashed tires, keyed cars, and some of this frankly

14  sounds like a Carrie Underwood song, we've got these petty acts

15  of vandalism for sure.  But it's a struggle for me to take that

16  and conclude inability to execute the law just because you are

17  not doing it in as quick or as easy a manner as you want,

18  right?  So if someone blocks the path of a car, for example,

19  there is a lot of evidence that protestors have sometimes

20  encroached on the ICE's driveway.  They are stopping you from

21  getting in and out as quickly as would you like to.  Is that in

22  and of itself an inability to execute the laws?

23        MR. HAMILTON:  Your Honor, this is no Carrie Underwood

24  song.  We have 30 plus federal officers who have been injured,

25  including ripping the beard off an officer's face.  Officers

1  have been hit, punched, and tackled.  Rioters have launched

2  fireworks, tear gas, bottles and rocks at officers.  And as I

3  noted, there was an improvised explosive device recently found

4  outside the DHS facility.

5          THE COURT:  Can I ask about the IED.  What was in

6  that?

7          MR. HAMILTON:  I don't know.  The declaration

8  explains --

9          THE COURT:  Well, it explains it was a ball with

10 something sticking out of the top and that CBP didn't know what

11 it was, and ATF came out and did their thing.  And usually what

12 they do is shoot a water pistol at it and they dismantle it.

13 Do we know what it actually was?

14         MR. HAMILTON:  I don't have information to add beyond

15 what the declaration stated.

16         THE COURT:  I'm also curious about ripping the beard

17 off.  How did that happen?  Like an entire -- you have some

18 facial hair.  They ripped -- was it like real facial hair?

19         MR. HAMILTON:  I'm just relaying what our declarants

20 have told the Court about the conditions here in Chicago.

21         THE COURT:  And his beard, was that pieces of hair,

22 like his beard was ripped off the face.

23         MR. HAMILTON:  I believe that's what the declaration

24 says.

25         THE COURT:  Okay.  The plaintiffs have a bunch of

1  statistics in their brief showing that immigration detentions

2  and arrests have increased significantly.  That there have been

3  more than 1,000 arrests during Operation Midway Blitz, that

4  there have been more than 4,900 immigration detentions in 2025,

5  that there's a 59 percent increase in arrests, 185 increase in

6  detentions over 2024, that Broadview has processed 185 percent

7  more people this year than last year.

8           Are those statistics accurate to the best of your

9  knowledge?

10          MR. HAMILTON:  I don't have information on that.

11          THE COURT:  Okay.  And does it matter from your

12  perspective if ICE has been detaining, arresting, deporting

13  more than 100 percent over what they did last year?  Does

14  that -- should that not play into the analysis as to whether or

15  not the laws have been executed?

16          MR. HAMILTON:  Your Honor, it doesn't.  As the Newsom

17  court stated, the 12406(3) standard does not require the

18  president to be completely precluded from executing the

19  relevant laws, and that standard can be met even if some

20  continued execution of the law is feasible.

21          THE COURT:  What if it's doubled?  They're talking

22  about total preclusion, that would be 100 arrests to zero.

23  We're not talking about 100 arrests to zero or anywhere in

24  between.  We're talking about 100 arrests to 200 arrests.  Does

25  that not enter into the analysis whatsoever?

1      MR. HAMILTON:  It does not.  The record here shows

2   that Title VIII enforcement is being impeded.  Title VIII

3   enforcement that is funded by the Congress is consistent with

4   laws enacted by the Congress that prohibits the unlawful

5   immigration of aliens to the United States.  That mission is

6   being impeded by violent agitators in the Chicago area.

7      THE COURT:  Well, there are violent agitators, I will

8   give you that.  And I guess this is consistent with your

9   argument that the very presence of crime is an impediment on

10  the execution of the laws, fair?  I mean, you are being

11  consistent.  Any amount of violence, no matter how well ICE is

12  doing their job in every other category, even if they're going

13  gangbusters over what they did before, they are still unable to

14  execute the laws because there is still some violence against

15  them.

16     MR. HAMILTON:  Your Honor, we are not going as far as

17  to ask the Court to hold that when there is some violence

18  against a federal officer, 12406(3) is automatically met here.

19  There is a unique record of violence that if this judgment of

20  the president is reviewable, the analysis would flow from the

21  record here and it satisfies 12406(2) as well as (3).

22     THE COURT:  We have not talked about the words

23  "regular forces."  Do you have any sense of a definition of

24  what you would provide me for what regular forces mean?

25     MR. HAMILTON:  Not a specific definition but I think

1    it's the reference to the status quo when -- you know, for

2    whatever kind of situation is giving rise to the president's

3    decision to federalize.

4         THE COURT:  So does it include other federal law

5    enforcement?

6         MR. HAMILTON:  I think that's a harder question.  I

7    think that's a harder question.

8         THE COURT:  I agree.  What's the answer?

9         MR. HAMILTON:  Well, I think that the regular forces,

10   probably the best understanding is those forces who would

11   ordinarily be charged with providing protection at a facility;

12   and so, you know, once we get into the diversion of resources

13   and moving officials around, that can itself result in

14   significant impediments to the enforcement of laws, if you're

15   taking law enforcement officers from one place and having to

16   relocate them to a different place because of conditions where

17   the ordinary forces, the regular forces, the folk who are there

18   to provide that support in the regular course, that is and can

19   be its own impediment on the execution of the laws.

20        But, you know, I think there are many interesting

21   textual issues and questions with 12406.  Again, I would just

22   turn back to the standard here, which Your Honor knows from our

23   brief, we believe there is no judicial review of the

24   president's judgment here.  But if there is, if there is

25   judicial review, the great deference standard from the Newsom

1    case would apply and the record here is far away from the outer

2    boundaries of 12406 (2) or (3).

3        THE COURT:  So let me ask you this, you indicated that

4    a change in resources would perhaps trigger 12406.  For

5    example, we have all of our amazing court security personnel

6    who are here today -- thank you, gentlemen -- who would not

7    have been here otherwise.  Have we triggered 12406 (3) because

8    we have taken them off their ordinary course of duties?  Is

9    that enough to constitute normal forces being diverted?

10        MR. HAMILTON:  Well, Newsom says that no amount of

11    interference, to the extent that is the appropriate standard,

12    says that minimal interference would not be enough for

13    12406 (3).  Certainly looking at just that in isolation is a

14    very different case from what we have here in Chicago, which

15    again is weeks of violence, weeks of real problems with the

16    safety and security of law enforcement and property.

17        THE COURT:  On September 29th the Attorney General

18    directed ATF, USMS, DEA, and FBI to immediately direct all

19    necessary officers and agents to defend ICE facilities and

20    personnel.  Did that happen?

21        MR. HAMILTON:  I don't have information on that.

22        THE COURT:  Do you think there is --

23        MR. HAMILTON:  Sorry.  Can you say that again.  DOJ --

24        THE COURT:  It was a September 29th -- it was in

25    someone's exhibits.  It's an Attorney General memo from

1    September 29th.  Where she directed ATF, Marshals, DEA, and FBI

2    to direct all necessary officers and agents to defend ICE

3    facilities and personnel.

4         MR. HAMILTON:  Well, I think one of our declarations

5    might talk about that.

6         THE COURT:  Do you remember --

7         MR. HAMILTON:  I think -- so I can -- this is a line

8    in the Parra declaration.  It says, ATF --

9         THE COURT:  What page are you on?

10        MR. HAMILTON:  I don't have that in my notes.  I think

11   this is toward the end of the Parra declaration.  So paragraph

12   26.

13        THE COURT:  Got it.

14        MR. HAMILTON:  "Over the past two weeks we have

15   received additional special operations support from the ATF,

16   the US Marshal Service, the FBI, the Federal Bureau of Prisons,

17   and the DEA.  In addition the FBI and the U.S. Attorneys'

18   Office have provided investigators and attorneys to prosecute

19   those who impede, obstruct, and attack officers and agents."

20        THE COURT:  Got it.  So is it your interpretation that

21   those are the regular forces?  Do those people include, if

22   we're looking for definitions here, which I'm fairly certain I

23   have to -- I don't want to do it anymore than you want me to.

24   But if we're trying to define regular forces, are those people

25   part of the regular forces?

1       MR. HAMILTON:  Probably not because it sounds to me

2   like what is happening is because of the security situation

3   here in Chicago, other law enforcement agents are being pulled

4   off of their law enforcement missions and -- you know, whatever

5   their kind of standard regular mission would be and then being

6   sent here.  I'm just sort of kind of speculating from this

7   sentence here.  But I mean this sounds to me like the

8   redirection of law enforcement resources from one place to

9   another to respond to a situation where regular forces

10  themselves are not sufficient.

11      THE COURT:  So you seem to believe that 12406(3) would

12  be triggered any time that a singular agency would need to ask

13  for help from a brother or sister agency, it sounds like.

14      MR. HAMILTON:  I don't think we're asking the Court to

15  go that far.  Newsom does not go that far.  I think that the

16  analysis here is one that starts with actual facts here, which

17  are multiple law enforcement agencies having to contribute

18  resources to respond to the threat and impediment to the actual

19  Title VIII law enforcement activities that DHS is carrying out.

20      THE COURT:  So let me flip it around then so I'm clear

21  on what you're saying here.  Do you think that these other

22  federal agencies have an obligation to help their brother and

23  sister agents before the National Guard can be deployed or do

24  you think the National Guard can be deployed irrespective of

25  whether any other federal agency has tried to help?

1    MR. HAMILTON:  No.  No.  We do not think that

2  12406 (3) has packed into it some sort of federal law

3  enforcement exhaustion requirement.

4    THE COURT:  I don't even know that I'm talking about

5  exhaustion.  But do you read regular forces to mean very, very

6  narrowly if ICE and the people who they have chosen to deploy

7  to Chicago are not enough to get the job done, ICE does not

8  have an obligation to bring in ICE agents from somewhere else,

9  they do not have an obligation to ask other federal agencies

10  for help, they immediately -- the president can immediately

11  then federalize the National Guard?

12    MR. HAMILTON:  So that's different than the situation

13  we have here.  But that does sound correct to me because the

14  regular forces here are insufficient to execute the laws, and

15  federalized guard then are being brought in to fill the void

16  and provide the need, which I think is consistent with the

17  purpose and aim of the 12406 statute.

18    THE COURT:  So I guess what troubles me about that

19  reading of the statute is if the executive branch chose to

20  deploy one ice agent to the Chicagoland area and that person

21  was unable to solve all crime or even all of the immigration

22  crime, then the National Guard would be authorized to be

23  deployed?

24    MR. HAMILTON:  That is not our position.  That is very

25  different from the situation here in Chicago.

1    THE COURT:  But you've argued that regular forces

2  means just that agency as they've chosen to staff on the ground

3  in that location, that any pulling of people, either from

4  another location or another agency would be going outside of

5  the regular forces.  That would seem to put wholly within that

6  agency's control, the determination of whether or not the

7  National Guard gets called up.

8    MR. HAMILTON:  Actually, I think our argument is

9  asking the Court to hold that on the factual record here and

10  against the backdrop of a standard of review where there is at

11  least great deference to the president the standard for

12  12406 (2) and (3) is met.  The Court does not have to set the

13  outer boundaries of 12406.  The Ninth Circuit did not do that

14  in the Newsom case.  This, thankfully, is a statute that is not

15  invoked many times in history.  As I noted, the statute was

16  invoked in the 1970s when there was an inability to execute the

17  laws in the form of delivering the mail and in comparison to

18  that situation, this certainly is a more grave and serious and

19  needed federal response to counter the violence against federal

20  personnel and property.

21    THE COURT:  Well, it hadn't been invoked very often.

22  I agree with you that we have to go back to the 1970s for the

23  last time before the last several months it was invoked.  But

24  now it has been invoked how many times?  In the last 60 days,

25  90 days what are we looking at?

1          MR. HAMILTON:  Yeah.  There have been federalized

2    guards sent under this authority in California, Oregon, and

3    here in Illinois.  The guard in DC and Memphis, I think, are in

4    a different status from what I remember; but yeah, in any event

5    there have been multiple indications of this authority but also

6    we have violence that is truly extraordinary.  Mr. Parra's

7    declaration explains that when Mr. Parra was a border agent for

8    over 23 years, the current level of violence against agents and

9    officers is the highest he's ever seen.

10          So it is an unusual and acute threat right now to

11    federal law enforcement nationwide.  And, of course, just a few

12    weeks ago, we saw this horrible tragedy in Dallas, Texas, where

13    a sniper set up on a -- I think it was a nearby building to an

14    ICE facility in a city where there has been, from what I

15    understand, an overall kind of lower threat level to the safety

16    of federal personnel; and the individual with shell casings

17    containing anti-ICE messages rained bullets down on a vehicle

18    containing -- I think, it was two detainees were murdered and a

19    third was shot there.  So unfortunately nationwide it's a

20    serious situation for our federal law enforcement agents and a

21    particularly acute situation in California, Oregon, and

22    Illinois.

23          THE COURT:  I agree with you about the seriousness of

24    threats generally across the United States right now.  I don't

25    think there is a single public servant really who is not being

1    subject to threats.  Mine started about 10 minutes after I got

2    this case.  But I guess my question for you is, if that is the

3    way of the world now, if that's the way people seem to be

4    responding to just the general state of affairs, is there any

5    limit on 12406?

6         MR. HAMILTON:  Well, yes, the statute sets the times

7    during which it applies and --

8         THE COURT:  But to the extent public servants are

9    being threatened everywhere, all the time, I can tell you

10   amongst my class of judges, who came here around the same time,

11   all over the country, all over the country, not just limited to

12   certain states, judges are being threatened.  The gentlemen in

13   this room will tell you that it is happening everywhere and it

14   is happening all of the time.  If that is true, then does the

15   president have the authority to deploy the National Guard to

16   any state at any time to deal with that type of threat?

17        MR. HAMILTON:  It's a harder case from this one.  It's

18   a harder case from this one.  Here we have actual violence that

19   is impeding.  It's designed to actually obstruct Title VIII

20   enforcement actions.

21        THE COURT:  So are the threats to judges, right?

22   People aren't doing it just for funsies.  It's because they

23   want me to act in a certain way.

24        MR. HAMILTON:  Sure.  And we've seen tragic, actual

25   violence against judges.  But here, in just the last few weeks,

1    we have seen these repeated acts of violence against ICE agents

2    to, I think a different record from the hypothetical to the not

3    hypothetical, the reality that judges are facing threats right

4    now.  And this is a case about the violence against federal law

5    enforcement agents in the state of Illinois and under the

6    applicable standard of review of great deference to the

7    president, if there is judicial review of his judgment,

8    12406 is satisfied on this record.

9              THE COURT:  All right.  You are done.

10             MR. HAMILTON:  Okay.  Thank you, Your Honor.

11             THE COURT:  You are next.

12             MR. WELLS:  Yes, Your Honor.

13             THE COURT:  Okay.  We're going to start with

14    definitions.  What do you think rebellion means?

15             MR. WELLS:  Well, I think the District Court in Oregon

16    got it right.  Open, avowed, violent, armed, aimed at the

17    government as a whole, not at a specific issue.

18             THE COURT:  And how does that determination get made?

19    Whose judgment is it that matters, is it mine?  Is it the

20    president's?  Someone else's?

21             MR. WELLS:  Well, frankly under our constitutional

22    system, I think the president certainly can put forward a

23    claim, but it is the Court's duty under longstanding precedent

24    to exercise judicial review to determine whether the president

25    acts within the boundaries set by Congress and the

1    Constitution.  I think you can look at Youngstown Steel, you

2    can look at Ex parte Milligan, you can look at a long history

3    of cases, including cases from post 9/11, habeas situations in

4    Guantánamo Bay.  The president acts.  The president gets sued.

5    The president is held to account through the judicial process.

6    That is how our system has functioned for over 200 years.

7         THE COURT:  I agree with you that I get to come up

8    with the definition of rebellion.  But whose decision is it to

9    weigh the facts and determine whether or not that definition

10   has been met?

11        MR. WELLS:  Well, I think certainly in the first

12   instance a president makes a factual determination, but that

13   factual determination cannot be immune from review for all of

14   the reasons that I think the Court probably had a reaction, I

15   was certainly having a reaction.  If we were in a world where

16   that determination is not reviewed at all, the consequences are

17   startling and where does it stop?  But, yes, the president in

18   the first instance makes a factual judgment, and the Court can

19   review that judgment.

20        THE COURT:  Under what standard?

21        MR. WELLS:  So --

22        THE COURT:  Am I reviewing it for clear error or

23   de novo?

24        MR. WELLS:  So this is a preliminary injunction

25   proceeding so the Court's factual determinations will be

1  reviewed for a clear error.  We actually don't think the Court

2  necessarily even has to reach the question of the level of

3  deference provided because under any standard, including the

4  Ninth Circuit standard, the president's determination in this

5  case fails.  And it fails for -- you know, we've got sort of

6  two ways to think about the case.  One, the president has not

7  come forward or identified with any degree of specificity the

8  laws that he claims can't be enforced, why the regular forces

9  are inadequate to enforce those laws.  You know, contrast the

10  postal service memo from the '70s that Your Honor brought up.

11  So just as a matter of kind of what the president actually

12  relied upon here is, I think as Your Honor's question

13  suggested, we don't know.

14        THE COURT:  Do we deserve to know?  Why do we deserve

15  to know what he relied on?  I mean, I think there's certainly a

16  world in which it would be fair to suggest that the president

17  doesn't have to tell me what he's doing, but that I could still

18  conduct an independent review of whether the facts demonstrate

19  that whatever standard it should be has or has not been met.

20  Do you think the president has to tell you what he's relying

21  on?

22        MR. WELLS:  No, not proactively in the first instance.

23        THE COURT:  Just when you ask nicely?

24        MR. WELLS:  That's right.  For instance, I think there

25  is, consistent with the Court's Article III power, once a case,

1    you know, is properly before the court, there's parties with

2    standing.  As I think there's parties with standing here and

3    the question has been raised, then the judicial function kicks

4    in to assess that.  You know, there has been various other --

5    you know, the postal service strike is a good example, where

6    the president makes the determination, but there's not

7    litigation over it.  So the presidents had kind of the

8    presumption of regularity that used to exist -- would, I think,

9    to a degree allow decisionmaking and, of course, it allows

10   decisionmaking but it doesn't mean that a court then doesn't

11   review the adequacy of that at any point.

12        And, again, I think Youngstown Steel is a great

13   example of that.  Some of the other cases that involve, you

14   know, presidential decisionmaking of massive consequence in --

15   you know, Civil War scenarios, in foreign war scenarios, of

16   course, courts can ask questions of -- you know, what facts was

17   the president relying on, is that consistent with reality.

18   That is the function of courts since *Marbury vs. Madison*.

19        THE COURT:  Well, which one is it?  Is the question

20   what did the president rely on or is the question is the actual

21   facts on the ground enough to establish 12406?  Because those

22   were two different things.

23        MR. WELLS:  I think it's both.  I think it's both.  I

24   think you -- again, one of the things that we've highlighted is

25   the president's memorandum is so nonspecific, as I think the

1   Court alluded to, you don't know what you're deferring to in

2   the first instance; and then you don't know the kind of

3   evidentiary basis for the adequacy of that determination.  So

4   that, I think, is one of the fundamental problems with the

5   approach that they've taken here with this boundless

6   description of, oh, there's violent demonstrations and it can

7   be anywhere in the country and we can take it all into

8   consideration; but we're not going to tell you exactly what

9   we're talking about and, oh, by the way, maybe it was Broadview

10  at one point, but now it's Chicago too.  I mean, where does

11  their view of discretion and deference afforded to the

12  president stop?  It sounds like nowhere.

13          THE COURT:  What is your understanding of the phrase

14  "regular forces?"  What definition applies?

15          MR. WELLS:  I think it's federal law and enforcement

16  agencies of a nonmilitary nature.  So it would include, you

17  know, ATF, FBI, CBP, DHS, all DHS functions.

18          THE COURT:  Why do you think it's nonmilitary because

19  forces, generally speaking, if we look at dictionaries and case

20  law, "forces" tends to mean military.

21          MR. WELLS:  So I think because you've had things like

22  the marshal service really since very early in the Republic of

23  the United States that are distinct from a military function,

24  right?  And we have a longstanding tradition of robust

25  separation between what the military does outside the borders

1  of the United States and what law enforcement does.  And really

2  you see that manifest in many different ways including the

3  residual power vested in the states in the first instance to

4  exercise the police power.

5          So I think regular forces encompasses federal law

6  enforcement but not military for the reasons that, you know --

7          THE COURT:  What are you basing that on?

8          MR. WELLS:  The existence of the Posse Comitatus Act,

9  the very structure of 12406 in and of itself, right.  I mean,

10  it is Congress acting under the militia clauses defining very

11  specific and circumscribed criteria under which military forces

12  can be called forth.

13          THE COURT:  Right.  Wouldn't that be in the case of an

14  insurrection or rebellion?  Wouldn't the military be used to

15  quell that?

16          MR. WELLS:  Yes.  But the point is, prior to that, the

17  regular forces have shown to -- have been shown to be

18  inadequate to respond to that situation.

19          THE COURT:  Right.  That's my point.  If we look at

20  12406 and it talks about rebellion, invasion, execution of the

21  laws with the regular forces, I mean, you think the military

22  can step in in one, you think the military can step in in two,

23  but you think the military cannot step in in three?

24          MR. WELLS:  Well, I think if the criteria is satisfied

25  that there is true inability to enforce or execute federal law

1  with the regular forces, so that the ordinary course of law

2  enforcement is broken down, such that, you know, the postage

3  service, for example, where you have a federal function that is

4  essentially completely incapacitated nationwide, you know,

5  that's a federal function that is critical to commerce.  At

6  that time it was critical to the functioning of the courts

7  before we had electronic filing.  That is inability to execute

8  with the regular forces, because the regular force in that

9  instance, the postal service, was on strike.

10      THE COURT:  Is it your belief that the president could

11  not take 500 soldiers from Great Lakes and deploy them down to

12  Broadview to protect that building?

13      MR. WELLS:  I believe that in the first instance, the

14  president would need to rely upon the regular forces.  I don't

15  think there's an inherent authority to use military forces to

16  protect federal facilities.  We have, again, a kind of pretty

17  significant line in this country between the traditional role

18  of state, local, federal law enforcement on one side and

19  military on the other.  And as Your Honor pointed out, we have

20  court security here, we have a marshal service.  Those are the

21  regular forces that are responsible in the first instance for

22  protecting federal personnel and property.  Unless there is

23  some showing that that system has broken down and is

24  inoperable, then 12406 (3) has not been triggered.

25      THE COURT:  So setting aside 12406 (3).  What's the

1   prohibition on using the military so long as the Posse

2   Comitatus Act is not violated to protect federal property?

3           MR. WELLS:  Well, I think it would be -- I mean, it is

4   really the militia clauses in the first instance.  I think that

5   there are -- it's not clear to me.  I think the Posse Comitatus

6   Act is a crucial piece of that.

7           THE COURT:  Agreed.  But assuming that they are not

8   doing any of the things that are anti to the Posse Comitatus

9   Act, they are just standing around the building arm in arm,

10  creating a protective circle with their good will, what --

11  could the president do that?

12          MR. WELLS:  I think there's actually -- existing

13  practice is very informative here.  We have a declaration from

14  Gerald Buchanan, who goes into extensive detail about planning

15  for the state of the union and what this looks like in real

16  time and in the real world.  I think that there is, again, a

17  pretty well-recognized, you know, structural constitutional

18  assumption that Congress declares -- Congress determines the

19  conditions under which the military is set up and established.

20  All of that is subject to oversight by Congress, and I don't

21  think in the absence of, you know, specific constitutional or

22  statutory authority, that the president could summon troops to

23  locations where Congress has provided for protection to be

24  provided by other means.

25          The president has to act consistent with the

1  Constitution and pursuant to authority delegated to him by the

2  Constitution or by Congress, and they have not pointed to any

3  authority other than this nebulous, oh, it's just there because

4  he's the president.  That is not sufficient I think cases like

5  Youngstown point that out --

6          THE COURT:  Well, certainly he can deploy 500 more

7  guys to Great Lakes, right?  If he wants to transfer them from

8  Coronado to Great Lakes.

9          MR. WELLS:  Yes, because that would be consistent with

10  congressional statutes determining how the military -- you

11  know, the ownership, oversight, et cetera of the function of

12  that military base.  I mean, they're operating, again, under

13  the conditions in which the military is operating as defined by

14  the laws of Congress.

15          THE COURT:  And if the president wanted to take

16  500 FBI, ATF, DEA agents from Indianapolis and move them up

17  here to do these functions, you would agree with me that he has

18  that full authority?

19          MR. WELLS:  He does have that authority, yes.

20          THE COURT:  Let me ask you this, you have asked me to

21  enjoin the use of military forces like non National Guard ones.

22  Do you have any reason to believe that that is about to happen,

23  specifically other than just your gut?

24          MR. WELLS:  The gut is a powerful instinct in this

25  instance.

1          THE COURT:  I need evidence as to why the military

2    should be enjoined.

3          MR. WELLS:  I believe the experience in California and

4    the criteria under which, you know, this limitless definition

5    of when they think they can do this until a court tells them

6    they can't, strongly implies that we're next.

7          THE COURT:  Right.  But I need more than strongly

8    applies on a TRO.  I suggest you take a second.  I see many

9    notes being written to you right now.

10         MR. WELLS:  Yes.  And I think we have indicated in the

11   record that there are very specific instances of the president

12   intending to use the actual military, not just the National

13   Guard including the most recent speech on September 30th to the

14   assembled military leadership.  I mean that is pretty strong

15   evidence if you've got generals from all over the world who

16   have been summoned and you're telling them this is going to be

17   a big mission for all of you guys.  We're going into the

18   cities.

19         THE COURT:  Do you have a record cite on that?

20         MR. WELLS:  I do believe we have a record cite on

21   that.  I believe it is quoted at the end of our factual

22   background section on page 22 of our opening brief.

23         THE COURT:  How about the exhibit number though?

24         MR. WELLS:  I don't know the exhibit.  We're happy to

25   submit that to the Court or happy to provide it.  It may be

1    attached to Mr. Gabbard's declaration.

2         THE COURT:  It's not an emergency.  We're going to be

3    here for a while.  I promise your table will find this.

4         Let me ask you this, assuming that the National Guard

5    were used solely to protect federal property that they are

6    going to stay on that federal property and protect that federal

7    property, do you believe that you have been injured?

8         MR. WELLS:  Yes.  Because I think the Court alluded to

9    the mere preference of the troops, particularly given this

10    history -- this country's long tradition of the stark

11    distinction between what the military does and what law

12    enforcement does.  Standing around outside the courthouse, are

13    citizens and residents of the state of Illinois, are they going

14    to be deterred by the presence of military personnel against

15    the objection of the state's governor?  Are they going to be

16    deterred from coming to this court to petition for relief?  I

17    think that's a very real possibility.  And our obligation to

18    those citizens, to those residents as a coequal sovereign, yes,

19    we are injured by that.

20         THE COURT:  Do you have the cite?

21         MR. WELLS:  Paragraph 66 of the complaint, which

22    includes a very specific citation to Rollcall.com, which is a

23    transcript that summarizes the president's remarks.  There is

24    also -- we are happy to submit -- I'm pretty sure there's press

25    videos if it would be beneficial to the Court of the remarks in

1    real time.

2             THE COURT:  That's enough.  We found it.  Thank you.

3             MR. WELLS:  I'm sorry.  And that's the declaration --

4    it was not the complaint.  It was the declaration that I

5    mentioned earlier.

6             THE COURT:  Which one?

7             MR. WELLS:  ECF 13-10, paragraph 66.

8             THE COURT:  Got it.  All right.  We have been going

9    for over two hours.  You all are entitled to your concluding

10   remarks.  I do not have any more questions for you at least at

11   this point.  Do you want a break before you make those?

12            MR. HAMILTON:  I'd defer to the Court and plaintiffs.

13            THE COURT:  I am deferring to you.  You've just been

14   telling me how much I need to defer.  I'm deferring.

15            MR. HAMILTON:  Yes, perhaps a brief break.

16            MR. WELLS:  We would appreciate that, Your Honor.

17            THE COURT:  Five minutes enough?

18            MR. WELLS:  Yes.

19     (Recess from 1:08 p.m. to 1:18 p.m.)

20            THE COURT:  Are you going to reserve any time for

21   rebuttal?

22            MR. WELLS:  I'd like to reserve 5 minutes.  I probably

23   won't need it.

24            THE COURT:  How do you want me to signal you when you

25   get to your 10?

1      MR. WELLS:  Whatever your preference is, Your Honor.

2  You can just wave your hands.  However you would like.

3      THE COURT:  All right.

4      MR. WELLS:  Frankly, I don't believe I'll be long

5  here.

6      Your Honor, I can only say that I think what we heard

7  from the United States Department of Justice was startling,

8  unbounded, limitless, and not in accord with our system of

9  ordered liberty of federalism of a constitutional structure

10 that has protected this nation and allowed it to prosper for

11 hundreds of years.

12     It is clear from counsel's remarks that this appears

13 to be actually about preventing crime, that's what the

14 president said.  Any crime, not just crime that has actually

15 been committed but anticipated crime.  That's plainly unlawful,

16 Your Honor.  The Tenth Amendment at a minimum reserves the

17 general police power to the State of Illinois.  So the

18 president doesn't have authority under the Constitution to send

19 the troops in to, quote, prevent crime, any form of crime that

20 he determines he wants to use the troops for.  That violates

21 the Tenth Amendment.  Full stop.

22     I'd like to address too, Your Honor, the Ninth Circuit

23 standard.  To be clear, I don't think Your Honor actually even

24 needs to decide whether the Ninth Circuit got it right.  We

25 think they were clearly too deferential.  As I mentioned, the

1   deference was a license to misbehavior and candidly

2   lawlessness.  But even applying the Ninth Circuit standard, I'd

3   like to direct Your Honor's attention to a passage from that

4   case, so that's at -- it's the Lexis version, I'm sorry.  It's

5   around page 25 in the Lexis version, 248 actually in the F.4th

6   cite.

7           And what the Ninth Circuit does in figuring out, you

8   know -- there's clearly they apply a significant level of

9   deference but it wasn't total deference.  It wasn't immunity

10  from judicial review, which continues to the Department of

11  Justice's shocking, startling, authoritarian position.  What

12  the Ninth Circuit said is, quoting *Martin vs. Mott* and it

13  quoted Martin, and I'd like to focus on the beginning of what

14  it says.  "In addition to the high qualities, which the

15  executive must be presumed to possess, of public virtue and

16  honest devotion to the public interests.  It is the frequency

17  of elections and the watchfulness of the representatives of the

18  nation that carry with them all the checks, which can be useful

19  to guard against usurpation or wanton tyranny."

20          Public virtue, you know, it's easy to just look past

21  that term.  The founders of this country, the framers of the

22  Constitution, believed in something called republican virtue.

23  They were obsessed with Cincinnatus, a Roman general who after

24  saving the Roman republic retreated to his farm.

25          Washington is called the American Cincinnatus.  That

1    is the tradition in this country and that is what *Martin vs.*

2    *Mott* is referring to, public virtue.  That is what the Ninth

3    Circuit is deriving from the must have good faith, that

4    residual presumption of good faith.  At a minimum there must be

5    good faith.  This case is replete with evidence of bad faith,

6    of an abandonment of public virtue, of a lack of honest

7    devotion to the public interests and a grave risk of usurpation

8    or wanton tyranny.

9         Your Honor, I think we went under the Ninth Circuit

10   standard.  I think the perils of Ninth Circuit standard are

11   apparent and this Court has additional facts that the Ninth

12   Circuit did not have, including a pattern, a pattern of conduct

13   that is terrifying.  Your Honor is fully aware that the United

14   States Attorneys' Office continues to function in this

15   courthouse.  They are enforcing federal law.  The grand jury

16   system is working too.  I hear that as we've been sitting here,

17   yet another one of these indictments that they reference is out

18   the window, done.  Mr. Ivery, Paul Ivery, I believe.  It's

19   uncontested that the U.S. Attorneys' Office continues to

20   function.  It is uncontested that ICE continues to arrest many,

21   many, many people.  It continues to detain U.S. citizens,

22   children.  So unfortunately, yes, the president does have the

23   power, and he's using that power but that power is not

24   unlimited.  And this Court can check that power.

25        I reserve the remainder of my time.

1      MR. HAMILTON:  I won't be using all of my time, but

2  just to sort of recap our presentation today, we submitted

3  yesterday two declarations marshaling evidence of very serious

4  violence against federal law enforcement and personnel here in

5  the Chicago area.  That violence is coordinated, complex.  We

6  talked about the very unusual situation of 10 vehicles

7  coordinating together to box in an ICE vehicle while the

8  vehicle of the Department of Homeland Security was rammed by

9  two other vehicles, and a declarant explaining that the

10  agitators are organizing offsite, coming out in vans.  So this

11  is an unusual threat to federal personnel and property.

12  Mr. Parra's explains it's unlike anything he's ever seen

13  before.  And it's against the backdrop that the president

14  decided to federalize guardsmen here in Illinois to respond to

15  the urgent need for safety, for law enforcement personnel and

16  property.

17      The president's judgment is unreviewable under the

18  Martin against Mott case.  There the U.S. Supreme Court said

19  that the decision, whether the exigency has arisen, belongs

20  exclusively to the president whose decision is conclusive upon

21  other persons; but even if there is some level of review, that

22  would be a highly deferential standard, which is what the Ninth

23  Circuit found.  And the record we have submitted very clearly

24  satisfies the threshold there.

25      I think the Court has appropriately focused questions

1   today on 12406 because plaintiffs' other claims are entirely

2   meritless and premature.  The Tenth Amendment claim is entirely

3   derivative of the 12406 arguments that the plaintiffs made

4   today, and as I explained in my opening, there's no possible

5   way for the plaintiffs to establish a PCA violation, especially

6   at this very early stage of the case.  Neither the District

7   Courts in the Northern District of California or the District

8   of Oregon found a PCA violation when plaintiffs attempted to

9   litigation their arguments under the PCA and a motion for a

10  temporary restraining order at the beginning of the case.  And

11  in any event, there are multiple threshold reasons that those

12  PCA arguments fail.

13          In addition, our brief explains why plaintiffs have

14  not established any sort of irreparable harm.  That is an

15  entirely separate and distinct reason that plaintiffs' motion

16  for relief fail.  There is no possible irreparable injury from

17  500 members of the guard protecting federal property and

18  personnel in a state of 13 million people.

19          Plaintiffs' arguments about an inability to call up

20  the guard being an irreparable injury are wrong.  It is

21  entirely speculative that the State of Illinois will need to

22  call up the guard while this federal protective mission is in

23  motion.  And, again, it's only 300 Illinois guard who have been

24  called up out of a much larger force.  And on top of that, as I

25  noted earlier in the hearing, it is an entirely self-inflicted

1    injury.  Because under the terms of the presidential

2    memorandum, the protective mission is until the governor agrees

3    to place these guards in a Title 32 status, who would be under

4    his command and control.  Likewise, the plaintiffs' economic

5    harm theory of irreparable harm and standing is entirely

6    speculative, relies on assumptions.  And on top of that the

7    state and the city cannot sue as a parent padre for its

8    citizens under the U.S. Supreme Court's Alfred Snapp decision.

9         Likewise balance of the equities and public interest,

10   separate components of the Winter analysis for temporary

11   restraining orders and preliminary injunctions.  Both of those

12   factors count in our favor.  The relief that the plaintiffs are

13   seeking would interfere with the president's decision to

14   provide protection to federal personnel and property, who both

15   sides agree, have experienced violence.  And it is very

16   troubling for the plaintiffs to seek this injunction that would

17   have the effect of putting our law enforcement, public servants

18   at risk.

19        Finally just a few concluding points.  One, the end of

20   our brief notes that the Court should treat this as a

21   preliminary injunction proceeding not a temporary restraining

22   order.  Both sides have filed lengthy briefs.  We've had a

23   hearing here today.  So it is appropriate for the Court to rule

24   on the motion for a preliminary injunction that the plaintiffs'

25   have made.  If the Court does enter an injunction, it should be

1    narrowly tailored.  An injunction should only apply to the

2    plaintiffs here, the State of Illinois and Chicago and the

3    injunction should specifically say what activities the Court

4    has deemed to be inconsistent with -- and I'd note again, Your

5    Honor, I talked about how Judge Breyer when he found a PCA

6    violation, he didn't say that anything that the guard was doing

7    was inconsistent with the PCA.  He identified a subset of

8    activities that the guard had engaged in in California that he

9    viewed as inconsistent with the PCA and limited his opinion

10   accordingly, which again is an opinion we disagree with very

11   strongly and have appealed to the Ninth Circuit.

12        No injunction should issue against the president of

13   the United States, the Department of Homeland Security or

14   Secretary Noem.  As I said, the president federalized members

15   of the National Guard.  Those are Department of War personnel

16   that has been implemented by Secretary Hegseth.  I have not

17   heard the plaintiffs articulate any theory under which they can

18   obtain injunctive relief running against the Department of

19   Homeland Security or Secretary Noem, and the U.S. Supreme Court

20   has recognized that injunctive relief against the President of

21   the United States is beyond the Court's jurisdiction.

22        In addition we would request a stay pending appeal --

23   excuse me.  We request a stay pending any appeal that may be

24   authorized by the Solicitor General.  If the Court does not

25   enter a stay pending appeal of any injunction it might issue,

1    we would at least request an administrative stay of an

2    injunction that issues to allow for expedited, orderly

3    proceedings in the U.S. Court of Appeals for the Seventh

4    Circuit.

5              I also note that our brief explains that a bond is a

6    requirement for any injunction that issues under Rule 65, and

7    so a bond should be required here if the Court issues an

8    injunction.

9              And finally I know it's about 1:30 p.m. and the Court

10    has asked us to get back to it by 3:00 p.m. on the Court's

11    question about Major General Knell's declaration.  If we can

12    have some additional time to work on the declaration, perhaps

13    until 5:00 p.m. today, it would be appreciated; and I just

14    wanted to make that request of the Court.

15              THE COURT:  I am happy to give you -- well, not as

16    long as you need.  I'm happy to give you until 5:00.  I don't

17    feel like I can rely on it until we have that issue sorted.  My

18    general thought is I'm going to call you back here at 4:30 and

19    we will talk again then.  I'm trying to get all my ducks in a

20    row by then.  It could be closer to 5:00.  So that roughly

21    aligns.  Why don't you have sorted out by 4:00, if you could,

22    what you want to do, whether you're going to submit another

23    declaration, an amended declaration, withdraw that part of the

24    declaration.  Think about it with the witness and if you can

25    shoot everyone, my courtroom deputy, opposing counsel, not me,

1    an e-mail just telling us how you plan to proceed so that I

2    know whether or not I should rely on that declaration.

3             MR. HAMILTON:  Sure thing.  For our planning, we're

4    back at 4:30 today?

5             THE COURT:  I am going to say 4:30 and I will do my

6    best to be back at 4:30.

7             MR. HAMILTON:  Counsel should be present at 4:30.

8             THE COURT:  Do you have a flight to catch?

9             MR. HAMILTON:  I have a 6:00 p.m. flight.  Of course,

10   it could be changed.  Our priority of course is --

11            THE COURT:  That seems tricky to me between here and

12   O'Hare.  But I'm not going to get up in your business.

13            MR. HAMILTON:  Yeah.  We'll be back at 4:30.

14            THE COURT:  Okay.

15            MR. WELLS:  Briefly, Your Honor.

16            THE COURT:  You have seven minutes remaining.

17            MR. WELLS:  I will hopefully undercut that -- I mean,

18   fall beneath that.

19            Your Honor, briefly the Tenth Amendment claim is not

20   entirely derivative.  We have an NFIB coercion theory that lays

21   out, yet another, pattern of coercive conduct that has taken

22   the form of Supremacy Clause lawsuit, *United States vs.*

23   *Illinois*, which was dismissed by Judge Jenkins.  Supremacy

24   Clause conditions that have been deemed unlawful against

25   Illinois because of its, you know, so-called sanctuary status

1    invalidated twice over by the District Court in Rhode Island

2    and now we culminate with this, a troop deployment over the

3    objection of our governor.

4        So, no, it's not entirely derivative of 12406.  With

5    respect to 12406 (3) as well, Your Honor, there was a

6    suggestion that we didn't suggest that that provision would be

7    unconstitutional.  We do have an as-applied or at least a

8    constitutional avoidance argument under 12406 (3) because kind

9    of the limitless and, frankly, retaliatory and predatory use of

10    this statutory authority, even if it nominally could fall

11    within the scope of some statutory terms under this limitless

12    definition, even that use in the manner it has been used, would

13    be violative of the Tenth Amendment as applied.  So, yet

14    another reason not to adopt such a limitless interpretation.

15        I heard statements about law enforcement being at

16    risk.  We take that very seriously.  Most of our evidence comes

17    from law enforcement, comes from Illinois State Police, comes

18    from Broadview Police Department.  And as you, heard Your

19    Honor, in my opening remarks, the Illinois State Police has

20    been providing protection to federal agents.  They don't like

21    to do it.  There is some evidence in the record about how the

22    public perceives that.  That's also sovereign injury.  That's

23    also an irreparable injury.

24        There's some suggestion that there is not irreparable

25    harm here.  I think everyone in this courtroom perceives the

1    irreparable harm.

2              Your Honor, with respect to irreparable harm, the

3    troops are already -- Texas troops are already at the Broadview

4    ICE facility.  Sovereign injury has been incurred and grows

5    worse, and those troops are going to be at this courthouse

6    tomorrow.

7              The last thing I'll say, Your Honor, particularly on

8    the Tenth Amendment, the Constitution refers to the states or

9    the several states.  It doesn't refer to red states or blue

10   states.  Thank you, Your Honor.

11             We ask that you grant the injunction in accordance

12   with the terms that we lay out in our conclusion at the end of

13   our memorandum in support of our preliminary injunction.  Thank

14   you, Your Honor.

15             THE COURT:  Thank you all.  As I already alluded to, I

16   will do my best to be back at 4:30.  I'd ask you to be here at

17   4:30 as well.  It might take me a few minutes longer.  But we

18   are going to be working as quickly as we can.

19             I've been instructed to tell everyone in the gallery

20   that you don't get to hold your seats.  So once you leave, your

21   seat is gone.  You will need to come back in whatever procedure

22   that the CSOs and the marshals tell you to be able to reclaim

23   your place.

24             Is there anything else that we should talk about

25   before we take this break?

1          MR. WELLS:  Nothing from us, Your Honor.

2          MR. HAMILTON:  Just one final clarification on our

3   next steps.  We're to e-mail the courtroom deputy by 4:00 p.m.

4   today with our position on the Major General Knell's

5   declaration?

6          THE COURT:  Yes.  Thank you so much.  I appreciate it.

7   (Recess from 1:38 p.m. to 4:30 p.m.)

8          THE CLERK:  Recalling 25 CV 12174, State of Illinois,

9   et al., versus Trump, et al.

10         THE COURT:  Hello everybody.

11         Would you like to state your name for the record,

12  please.

13         MR. WELLS:  Good afternoon.  Christopher Wells on

14  behalf of the State of Illinois.

15         MS. NORTH:  Sarah North on behalf of the State of

16  Illinois.

17         MR. KANE:  Steve Kane on behalf of the City of

18  Chicago.

19         MS. METCALF:  Hi again, Your Honor.  Chelsey Metcalf

20  also for the City.

21         MR. HAMILTON:  Good afternoon, Your Honor.  Eric

22  Hamilton for defendants.

23         MR. EDELMAN:  Christopher Edelman from the

24  U.S. Department of Justice for the defendants.

25         THE COURT:  Thank you all.  I'm going to issue an oral

1  ruling.  It is a high-level summary of the opinion that I am

2  planning to issue tomorrow.  It is still long, so everybody get

3  comfortable.  After that, we will have some logistics to

4  discuss.

5       Since this country was founded, Americans have

6  disagreed about the appropriate division of power between the

7  federal government and the 50 states that make up our union.

8  This tension is a natural result of the system of federalism

9  that our founders created.  And yet not even Alexander Hamilton

10  himself, the most ardent supporter of a strong federal

11  government amongst the founding fathers believed that it would

12  ever come to pass that one state's militia could be sent to

13  another state for the purposes of political retribution.  In

14  Federalist 29 he called such a suggestion inflammatory, stating

15  that it would be impossible to believe that a president would

16  employ such preposterous means to accomplish such ends.

17       Plaintiffs contend that event has come to pass.  They

18  argue that the National Guard troops from both Illinois and

19  Texas have been deployed to Illinois because the President of

20  the United States wants to punish state elected officials whose

21  policies are different from his own.

22       The plaintiffs further argue that the president has

23  exceeded the authority granted to him by 10 U.S.C.

24  Section 12406, that he has violated the Tenth Amendment, and

25  that the deployment of federalized troops violates the Posse

1    Comitatus Act.

2        Before the Court is a request for a temporary

3    restraining order barring the mobilization of the National

4    Guard or deployment of the U.S. Military over the objection of

5    the governor of Illinois.  For the reasons that follow, the

6    plaintiffs' motion will be granted in part.

7        As I already said this is an oral ruling.  It's being

8    issued less than four hours after the hearing was completed and

9    about four days after we got about 500 pages of arguments and

10   exhibits from the plaintiffs, so it is not complete.  The

11   opinion I issue tomorrow will be much more fulsome going into

12   detail about my fact findings and my legal conclusions.

13   Today's ruling is intended to be a high-level summary only.

14   With that said, I'm going to start with my factual findings.

15       The events in this case largely take place in the

16   Village of Broadview, which is a small suburb approximately

17   12 miles west of downtown Chicago.  In addition to

18   8,000 residents, Broadview is also home to an Immigration and

19   Custom Enforcement Processing Center where ICE detainees are

20   temporarily held before being transferred elsewhere.  Across

21   the street is a parking lot leased by ICE for vehicles and for

22   equipment storage.

23       For the past 19 years, the ICE Processing Center has

24   regularly been visited by small groups who hold prayer vigils

25   outside.  Those prayer vigils took a sharp turn in early

1    September 2025.  Shortly after, ICE's Chicago field office

2    director informed the Broadview Police Department that

3    approximately 250 to 300 CBP agents would begin arriving in

4    Illinois for an immigration enforcement campaign that has been

5    called Operation Midway Blitz.  That escalation and enforcement

6    activity caused a corresponding increase in protests near the

7    ICE Processing Center.  On some occasions demonstrators have

8    stood or sat down on the driveway leading to the processing

9    center.  ICE has then removed those individuals or local law

10   enforcement has.  And the ICE vehicles have come and gone as

11   needed.  The typical number of protestors that have been

12   present is fewer than 50.  The crowd has never exceeded 200.

13         On September 12th there were between 80 and

14   100 protestors present singing, chanting, and holding small

15   musical instruments.  Around 10:00 a.m. 20 to 30 federal agents

16   parked across the street and walked towards the processing

17   center dressed in camouflage with masks covering their faces.

18   This has been described as a notable shift from the way the

19   agents had previously approached the building.

20         In the opinion of the Broadview police, that

21   particular development caused the tone of the protestors to

22   change in turn.  They grew louder and began to press closer to

23   the building.  Broadview Police responded, positioning

24   themselves between the processing center and the protestors.

25   When the agents went inside, the crowd calmed down and the

1    Broadview Police relocated to the outer perimeter of the crowd.

2         Throughout the rest of the day, the crowd chanted,

3    some individuals stood in the driveway.  ICE intermittently

4    took those people to move them physically out of the driveway.

5    Agents gave a dispersal order through the loud speaker

6    threatening to deploy chemical agents if the protestors did not

7    leave.

8         Approximately 20 to 30 minutes later, ICE did deploy

9    pepper spray at the crowd.  Since September 12th, Broadview

10   Police and the Illinois State Police, ISP, have set up

11   surveillance cameras to continually record and monitor activity

12   in the area.

13        Protestors have continued to assemble outside of the

14   Processing Center.  ICE agents are regularly deploying tear gas

15   to disperse the crowd or standing on top of the building to

16   shoot balls of pepper spray at protestors from above.  The

17   Broadview Police Department believes that the use of chemical

18   agents against protestors has often been arbitrary and

19   indiscriminate at times being used on crowds as small as 10

20   people.

21        On September 25 Illinois was asked to voluntarily send

22   Illinois National Guard troops to protect federal personnel and

23   property at the ICE Processing Center.  Governor Pritzker

24   declined that request, concluding that there were no past or

25   present current circumstances necessitating it.

1      On September 26th a group of between 100 to

2    150 protestors gathered outside of the processing center, and

3    ICE again deployed pepper spray and tear gas and jostled people

4    as they were physically moved.  Broadview police requested

5    assistance from Illinois' law enforcement's mutual aid network,

6    and the Illinois State Police, Maywood police, Westchester

7    police, and LaGrange sent a total of six cars.  One road was

8    closed for, approximately, five hours.  That same day, DHS sent

9    a memorandum requesting immediate and sustained assistance from

10   the Department of War in order to safeguard federal personnel,

11   facilities, and operations in the state of Illinois.

12      The memorandum claimed that federal facilities,

13   including those directly supporting ICE and the Federal

14   Protective Service have come under coordinated assault by

15   violent groups intent on obstructing lawful federal enforcement

16   actions.  They claim these groups are actively aligned with

17   designated domestic terrorist organizations and have sought to

18   impede the deportation and removal of criminal noncitizens

19   through violent protest, intimidation, and sabotage of federal

20   operations.

21      DHS requested deployment of, approximately,

22   100 Department of War personnel, trained and equipped for

23   mission security in complex urban environments.  They said

24   these personnel would integrate with federal law enforcement

25   operations, serving in direct support of federal facility

1   protection, access control, and crowd control.

2       On September 27th CBP informed Broadview police that

3   they should prepare for an increase in the use of chemical

4   agents and ICE activity in Broadview.  They claimed, quote,

5   that it was going to be a shitshow, unquote.

6       That day Broadview Police monitored the small, quiet

7   crowd of protestors who were gathered outside the ICE

8   Processing Center and watched as federal officials formed a

9   line and marched north up the street, pushing the crowd to

10  another location.  The Federal officials then dismantled a

11  water and snack tent that protestors had been using and later

12  deployed tear gas, pepper spray, and pepper balls at

13  protestors.

14      On October 2 Broadview police, ISP, Cook County

15  Sheriff's Office, Cook County Department of Emergency

16  Management and Regional Security, and the Illinois Emergency

17  Management Agency created what they termed a unified command to

18  coordinate public safety measures in Broadview around the ICE

19  Processing Center.

20      On October 3rd a very large crowd, as I mentioned

21  earlier, 200 protestors gathered outside of the ICE Processing

22  Center, some of whom were elected officials and members of the

23  media.  In turn, there were 100 state and local law enforcement

24  officers on site who had established designated protest areas.

25  Although some protestors attempted to come close to federal

1  vehicles, state and local law enforcement officers were able to

2  maintain control and arrested, approximately, five people for

3  disobeying or resisting law enforcement.  They were in that two

4  instances of battery or aggravated battery.  In turn federal

5  law enforcement detained 12 people.

6      On October 4th, the very next day, there were just

7  30 protestors.  According to DHS's representative at the ICE

8  Processing Center, the state and local authorities arrived

9  within five to ten minutes, immediately pushed the protestors

10 back to the designated protest areas and controlled the scene.

11 DHS did not on October 4th have to intervene with any

12 protestors.  Despite this, on October 4th, the same day, the

13 president issued a memorandum stating that the, quote,

14 Situation in the State of Illinois, particularly in and around

15 the city of Chicago, cannot continue.  Federal facilities in

16 Illinois, including those directly supporting ICE and the FPS

17 have come under coordinated assault by violent groups intent on

18 obstructing federal law enforcement activities.  I have

19 determined that these incidents, as well as the credible threat

20 of continued violence, impede the execution of the laws of the

21 United States.  I further determine that the regular forces of

22 the United States are not sufficient to ensure the laws of the

23 United States are faithfully executed, including in Chicago.

24     This memorandum authorized the federalization of

25 Illinois National Guard members under 10 U.S.C. Section 12406.

**GA337**

1   It further authorized those personnel to perform the protective

2   activities that the Secretary of War determines are reasonably

3   necessary to ensure the execution of federal law in Illinois,

4   and to protect Federal property in Illinois.

5       Also on October 4th the Department of War asked the

6   National Guard to mobilize 300 Illinois National Guard troops.

7   The Illinois National Guard were given two hours to voluntarily

8   mobilize.  If not, they were told that the Secretary of War

9   would direct their mobilization under Title 10.  Governor

10  Pritzker declined that request to mobilize under Title 32,

11  reaffirming his position that there was no public safety need.

12      Later that day, the Secretary of War issued a

13  memorandum calling forth at least 300 National Guard personnel

14  into federal service to protect U.S. Immigration and Customs

15  Enforcement, Federal Protective Service, and other U.S.

16  Government personnel who are performing Federal functions,

17      On October 5 a few dozen protestors were present at

18  the ICE Processing Center.  State and federal officers

19  responded with, approximately, one dozen patrol cars, and

20  DHS did not have to intervene with protestors.  Internal

21  communications between DHS and ISP Sunday night referred to it

22  as, Great thus far this weekend.  DHS further stated, It's

23  clear that ISP is the difference maker in this scenario and we

24  are grateful for their leadership.  Hopefully we can keep it up

25  for the long-haul.  And yet on October 5th the Secretary of War

1   issued a memorandum mobilizing up to 400 members of the Texas

2   National Guard.

3           Apart from the protest activity, ICE has reported to

4   Broadview police acts of vandalism like the slashing of tires

5   on 15 vehicles, the keying of ICE vehicles, and sugar or other

6   foreign substances being put in vehicles' fuel tanks.  The ICE

7   Processing Center has continuously remained open and

8   operational.

9           Broadview Police are not aware of any occasion where

10  an ICE vehicle was prevented from entering or exiting due to

11  activity by protestors.  In the opinion of the Broadview police

12  Department and ISP, state and local law enforcement officers

13  are able to maintain safety and control outside of that

14  processing center.

15          This evidence is largely based upon the declarations

16  submitted by plaintiffs.  Defendants' declarations present a

17  starkly different picture.  They report significantly more

18  unrest, not just in Broadview, but in the Chicagoland area as a

19  whole.  Defendants' declarations disagree about the

20  capabilities of state and local law enforcement to protect

21  federal property and federal personnel.  Suffice it to say,

22  this version of facts cannot be aligned with the perspectives

23  of the state and local law enforcement presented by plaintiffs,

24  which leaves this Court then in the position of making a

25  credibility determination.  While I do not doubt that there

1   have been acts of vandalism, civil disobedience, and even some

2   assaults on federal agents, I simply cannot credit Defendants'

3   declarations to the extent that they contradict state and local

4   law enforcements' assessments.  That is in large part due to

5   the growing body of independent and objective evidence that

6   DHS's perceptions of events are simply unreliable.

7          I'm going to talk about four things outside of the

8   record in this particular case.  First, there is a case pending

9   in this district, *Margarito Castanon Nava vs. The Department of*

10  *Homeland Security*.  On October 7th a District Judge in this

11  court ruled that ICE had violated a consent decree, which

12  consent decree constrained ICE's ability to make warrantless

13  arrests.  The way they did this was not only by making those

14  warrantless arrests, but on June 11th, 2025, ICE's principal

15  legal advisor sent an e-mail to all ICE employees that the

16  federal consent degree had been terminated.  That was the court

17  found an unequivocal violation of the consent decree.

18         Second, the same day of that finding, a federal grand

19  jury refused to return an indictment against a married couple

20  who had been arrested for allegedly assaulting a federal agent

21  during the September 27th protests at the Broadview ICE

22  processing center.  I believe that particular arrest has been

23  relied upon by the defendants as evidence of assault on federal

24  agents taking place.  But the fact that a grand jury disagrees

25  presents to me objective evidence that no crime occurred, or at

1    least that there was not probable cause to find one.

2         Third, on October 9th, two days later, a third

3    individual who had been arrested that same day for assault on

4    an agent had charges against them dismissed due to refusal of

5    the grand jury to return an indictment.

6         Fourth, also on October 9th, that's today, a District

7    Judge in this court entered a TRO against ICE and CBP finding

8    their treatment of protestors has repeatedly violated the First

9    and Fourth Amendments to the United States Constitution and

10   that DHS is not having issues protecting the Broadview facility

11   or carrying out their activities.

12        So to summarize in the last 48 hours, in four separate

13   unrelated legal decisions from different neutral parties, they

14   all cast significant doubt on DHS's credibility and assessment

15   of what is happening on the streets of Chicago.

16        Plaintiffs contend that despite what the formal

17   memorandums say, the deployment of Illinois and Texas National

18   Guard arise not due to any good-faith concern about activity

19   outside the Broadview or elsewhere in Chicagoland but rather

20   from President Trump's animus Illinois elected officials.  And

21   we discussed earlier today that, in fact, the Attorney General

22   has indicated that it is her belief that Illinois officials are

23   themselves violating federal law and has suggested that these

24   public officials should be prosecuted based upon that, and

25   specifically based upon their adoption of sanctuary city

1   policies.

2          Plaintiff has also presented evidence demonstrating

3   President Trump's longstanding belief that crime in Chicago is

4   out of control and that federal agents should be used to stop

5   that crime.  Another thing we discussed earlier today.

6          The legal standard for granting injunctive relief is a

7   high one.  A request for injunctive relief is an extraordinary

8   and drastic remedy one that should not be granted unless the

9   movant by a clear showing carries the burden of persuasion.

10         The standard for issuing a TRO is the same as required

11  to issue a preliminary injunction.  Specifically the movant

12  must demonstrate a likelihood of success on the merits, that

13  there is no adequate remedy at law, and the movant will suffer

14  irreparable harm if the relief is not granted.  If they make

15  that showing, the Court then must weigh the harm that the

16  plaintiff will suffer absent an injunction against the harm to

17  the defendant.

18         Finally, in balancing the harms, the court shall also

19  consider the public interest in granting or denying the

20  requested relief.

21         Just a word first about standing, which was challenged

22  by the defendants.  To have Article III standing, the plaintiff

23  must have suffered an injury in fact, be concrete and imminent

24  harm to a legally protected interest, that is fairly traceable

25  to the challenged conduct and is likely to be redressed by the

1    lawsuit.  That injury in fact must be both legally and

2    judicially cognizable.  For the sake of today's ruling,

3    although I will discuss this more in the written opinion

4    tomorrow, I will note that I find these factors to be present

5    and I will also talk about them a little more when we speak

6    about irreparable injury in a few minutes.

7         The next preparatory issue I need to reach is one of

8    justiciability, my power to hear the case.  In general the

9    judiciary has the responsibility to decide cases that are

10   properly before it.  The Supreme Court has carved out a narrow

11   exception to that rule known as the Political Question

12   Doctrine.  When a controversy turns on a political question,

13   the Court lacks authority to decide the dispute.  The Political

14   Question Doctrine doesn't apply simply because litigation

15   challenges authority of one of the coordinate political

16   branches or merely because the issues have political

17   implications.  Rather the Political Question Doctrine applies

18   when there is a textually demonstrable constitutional

19   commitment of the issue to a coordinate political department.

20   This is a question of political questions not political cases.

21        The defendants have argued that the president's

22   decision to invoke Section 12406 is simply not subject to

23   judicial review.  They have essentially two points in support

24   of that argument.  First, they have cited the rule that when a

25   valid statute commits a decision to the discretion of the

1    president, the president's exercise of discretion is simply not

2    subject to judicial review.  I don't take any issue with that

3    general premise, but I don't find it applies here.  Section

4    12406 permits the president to federalize National Guard

5    whenever one of three enumerated conditions are met, not

6    whenever he determines that one of them is met.

7         Defendants also rely on the case of *Martin vs. Mott,*

8    an oldie but a goody from 1827.  For the specific proposition

9    that the issue of whether the president has properly called up

10   the National Guard is not subject to judicial review.  The

11   backdrop of the case is this, during the War of 1812 between

12   the United States and Great Brittain, President Madison called

13   the New York militia into federal service.  The plaintiff

14   refused to report for duty, and he was then court marshalled

15   and the State seized his property to satisfy the debt.

16        Mott then brought an action for replevin in a state

17   court, arguing seizure was illegal because President Madison's

18   order federalizing the militia was invalid.  He also argued

19   that the taking of his property was fatally defective because

20   it failed to allege that the invasion, the exigency, in fact,

21   existed.

22        The operative precursor at this time, Section 12406,

23   stated that whenever the United States shall be invaded or be

24   in imminent danger of invasion from a foreign nation or an

25   Indian tribe, it shall be lawful for the president to call

1  forth such number of militia as he may judge necessary to repel

2  such invasion.

3       The Martin court held that whether this limited

4  authority had been properly invoked, that is, whether the

5  exigency of an actual or imminent invasion actually arisen was

6  an issue to be decided solely by the president and not subject

7  to be contested by every militia man who shall refuse to obey

8  the orders of the president.

9       The Martin Court reached that conclusion for several

10 reasons that don't apply here and in a context vastly different

11 from today's case.  In the 200 years of judicial review

12 jurisprudence since Martin, the court has provided ample

13 guidance for when and when not the Political Question Doctrine

14 applies.  In that time the Supreme Court has proclaimed that

15 when presented with claims of judicially cognizable injury

16 resulting from military intrusion into the civilian sector,

17 federal courts are fully empowered to consider claims of those

18 asserting such injury.  There's nothing in our nation's history

19 or in this court's decided cases including our holding today

20 that can properly be seen as giving indication that actual or

21 threatened injury by reason of unlawful activities of the

22 military would go unnoticed or unremedied.  And that's the 1972

23 Supreme Court case of *Laird vs. Tatum*.

24       Having found the facts and posture of this case to be

25 vastly different than those in Martin, I'm comfortable that

1    Martin's holding does not preclude my review of this particular

2    matter.

3            So proceeding on to likelihood of success on the

4    merits.  For the purpose of today's high-level summary, I'm

5    going to confine my analysis to Title 10, United States Code

6    Section 12406.  Whatever the president's authority to protect

7    federal property and personnel, he may not do so with the

8    National Guard unless one of the statutory predicates under

9    Section 12406 is met.  That statutory delegation is the only

10   source of the president's authority to federalize the militia.

11   Without it, the power remains entirely Congress and it would be

12   usurpation of congressional power to federalize the National

13   Guard that are not within the delegation.

14           Section 12406 has three different prongs.  The first

15   of which is, by all accounts, not at issue.  That involves when

16   the United States or any commonwealth or possession is invaded

17   or is in danger of invasion by a foreign nation.  To the extent

18   we can all agree on something, it's that we are not at the

19   moment about to be invaded by a foreign nation.

20           Prong two is at issue.  That prong states that the

21   National Guard may be called up when there's a rebellion or a

22   danger of a rebellion against the authority of the government

23   of the United States.  And what I heard, at least today, the

24   defendants to be arguing was that there was no active rebellion

25   but at the very least there was a danger of rebellion.  And

1   subsection 3, which is that the president is unable with the

2   regular forces to execute the laws of the United States.

3        When interpreting a statute that leaves key terms

4   undefined, the Court must interpret the words consistent with

5   their ordinary meaning at the time that the Congress enacted

6   the statute, meaning what the terms were ordinarily and

7   commonly understood to mean at that moment in history.

8        Several sources may be useful for determining an

9   ordinary meaning, such as judicial decisions or dictionary

10  definitions or how the term was used in other statutes enacted

11  around that time.  Statutory interpretation is though a

12  wholistic endeavor, which determines meaning not just by

13  looking at isolated words but to the text in context along with

14  the purpose and history.

15       To define the scope of the delegated authority, the

16  Supreme Court asks me to look to the text and context of and in

17  light of the statutory purpose.

18       Before turning to the meaning of Section 12406

19  subsections, a quick note on deference.  The defendants are not

20  entitled to deference on what constitutes a rebellion for the

21  purposes of the act or what it means to be unable with the

22  regular forces to execute the laws of the United States.  Those

23  issues are matters of statutory interpretation, a function that

24  is committed to the courts.

25       The president is entitled to deference on the issues

1    of whether the peculiar factual circumstances giving rise to

2    these proceedings constitute whatever the Court determines that

3    the statutory definitions mean.  Section 12406 prongs two and

4    three engage in matters of national security, and in that

5    context, the executive is better suited to evaluate the precise

6    nature of the threat than is this Court.  That said, defendants

7    must support their position by pointing to some nonconclusory

8    facts and offering some explanation which paints a reasonable

9    picture justifying the executive's position.

10        So beginning with prong 2, rebellion.  I substantially

11   agree with the opinions previously issued in the Northern

12   District of California and the District of Oregon as to the

13   meaning of term rebellion.  It is not defined by Title 10.

14   Turning to sources at the time, like 1800 and early 1900s, I am

15   persuaded by those court's opinion that rebellion was

16   understood to mean a deliberate, organized, resistance openly

17   and validly opposing the laws and authority of the government

18   as a whole by means of armed opposition and violence.

19        I will note, too, that during the late 1800s after the

20   close of the Civil War, the Supreme Court and other official

21   sources routinely referred to the Civil War as a rebellion,

22   which indicates to me a pretty high standard.

23        Even applying the deference due to the defendants, I

24   have seen no credible evidence that there is a danger of

25   rebellion in the state of Illinois.  Based upon the evidence

1   that I have credited, as I have already explained it, there has

2   been a great deal of protest activity, some civil disobedience,

3   some attacks on federal agents, and some federal property

4   damage; but all of those facts together, even with all of the

5   deference due to the president, do not indicate a danger of

6   rebellion under the definition as I have given.  I simply don't

7   find any evidence that 12406 (2)'s conditions have been

8   satisfied.  Turning to 12406 (3), the phrase unable with the

9   regular forces to execute the laws of the United States contain

10  several key terms, many of which we discussed today, many of

11  which will be discussed in more detail tomorrow in the written

12  opinion.  But at a high-level the keyword here I think is the

13  word unable.  Around 1908 unable was understood to mean not

14  having sufficient power or ability, being incapable.  You are

15  either able to do something or you're unable to do it.

16          I don't find the Ninth Circuit's definition of unable

17  meaning significantly impeded to be persuasive.  I certainly

18  don't find the defendant's position today that unable to

19  execute the laws means the same thing as legal violations are

20  occurring.  I think unable to execute the law represents a

21  higher bar.  Even if the Ninth Circuit is right that the proper

22  definition is significantly impeded in executing the laws, I

23  don't find any evidence that has happened.  Statistically

24  speaking, ICE's execution of the laws is significantly higher

25  than it was a year ago.  Deportations are up, arrests are up,

1    processing at Broadview is up.  The courthouse remains open and

2    always has.  The federal laws are being executed.  They are

3    also be broken, as they have been since the beginning of time.

4    But there is no evidence that the president is unable, with the

5    regular forces, to execute the laws of the United States; and

6    because of that, I find that the plaintiff's have demonstrated

7    a likelihood of success on the merits.

8            Turning to the next prong.  There is no adequate

9    remedy at law and irreparable harm.  This is also the

10   plaintiffs' burden to show that irreparable injury is likely in

11   the absence of an injunction.  For today's oral ruling, I'm

12   going to focus on just one particular irreparable harm,

13   although I will focus on others tomorrow in the opinion.

14           Specifically I find that the evidence demonstrates the

15   deployment of the National Guard is likely to lead to civil

16   unrest, requiring the deployment of state and local resources

17   to maintain order.  There has ben overwhelming evidence

18   presented.  The provocative nature of ICE's enforcement

19   activity, which one District Judge has found to be in violation

20   of a consent decree and another District Judge has concluded

21   has involved repeated constitutional violations has itself

22   caused a significant increase in protest activity, requiring

23   the Broadview police, the ISP, and other state and local law

24   enforcement to respond.  The National Guard are not trained in

25   deescalation or in other extremely important law enforcement

1   functions that would help to calm these problems.

2       There is evidence that National Guard members are

3   trained to, quote, effectively destroy enemies in combat

4   scenarios.  Based upon that, I find that allowing the National

5   Guard to deploy at the Broadview Processing Center or anywhere

6   else in Illinois, will only add fuel to the fire that the

7   defendants themselves have started.  And given that the

8   plaintiffs are quite literally responsible for putting out

9   those fires, that the Broadview police is responsible for

10  responding with their fire department personnel and their

11  paramedics to any issues that arise, I find that they will

12  suffer irreparable harm for which they have no adequate remedy

13  at law when they have to divert their limited state and local

14  resources if the National Guard were to be deployed.

15      Finally, the balancing of the equities in the public

16  interest weigh in favor of granting the request for TRO.  ICE's

17  enforcement activity, as I mentioned, has already resulted in

18  higher numbers of deportations and arrests in 2025 as compared

19  with 2024.  State and local police have indicated that they are

20  ready, willing, and able to keep the peace as ICE continues its

21  operations in Chicago.

22      The most recent evidence I have, e-mails from DHS to

23  ISP indicate that state and local law enforcement are, in fact,

24  keeping the peace.  Defendants remain free to employ as many

25  federal law enforcement officers as they believe is appropriate

1  to advance their mission.  In light of this, the harm of

2  denying defendants access to 500 National Guard members for the

3  next 14 days, which is how long the TRO lasts, is de minimus.

4       I balance it against the public interest and having

5  only well-trained law enforcement officers, which the evidence

6  has demonstrated the National Guard is not, deployed in their

7  communities and avoiding unnecessary shows of military force in

8  their neighborhoods.

9       Chicago's history of strained police community

10  relations is extremely well documented but also fairly nuanced.

11  It is something that I think the state and local authorities

12  understand extremely well.  And it can be hard for federal

13  authorities and certainly those from Texas to appreciate.  But

14  suffice it to say, to add militarized actors unfamiliar with

15  that local history and context, untrained in deescalation

16  techniques whose goal you have stated is the vigorous

17  enforcement of the law is not in the community's interest.

18       I have prepared two drafts for you all to review of

19  the temporary restraining order.  So we'll take a quick break.

20  I understand you object.  I understand you will likely appeal.

21  But I would ask you to take a look at this document and tell me

22  from a purely logistical standpoint whether there are edits

23  that you think should to be made.  You are reserving your right

24  to appeal.  I understand that you do not think I have the power

25  to do this at all.  But if you can take a look at the document,

1  tell me if you think we need to make any edits or changes to

2  it, we will talk about those after you had a chance to look at

3  it.

4          Based upon that does anyone have anything they would

5  like to argue now?  All right.  Let's take a brief break and

6  I'll let you think about it and we can talk about it after.

7      (Recess from 5:07 p.m. to 5:13 p.m.)

8          THE COURT:  Is everyone ready to proceed?

9          MR. WELLS:  Yes, Your Honor.

10         THE COURT:  Have you had a chance to look at the TRO?

11         MR. WELLS:  We have.  We would request addition of

12 language that is intended to cover National Guard from other

13 states or the National Guard of the United States.  We don't

14 want to get into an Oregon situation, and I think we've seen

15 how that has played out.  And the defendants have a tendency

16 to, as I said, engage in flanking maneuvers for courts that

17 disagree with them.  So we would request that after the

18 October 4th and October 5th, 2025, memorandums for --

19         THE COURT:  Would you argue it should just say

20 National Guard?

21         MS. HENDRICKSON:  Your Honor, Cara Hendrickson for the

22 State of Illinois.  My handwriting is illegible.  I apologize.

23         THE COURT:  Well, I don't have to read it.

24         MS. HENDRICKSON:  So, Your Honor, we're actually

25 suggesting two changes.  The first is to add after implementing

1    the October 4th and October 5th, 2025, memorandums or any other

2    order similarly ordering the federalization and deployment of

3    the Illinois National Guard.  The intent there, Your Honor, is

4    we have learned as the days have progressed of other orders

5    that we have not seen before and we are intending to make sure

6    that Your Honor's order does cover any orders that are serving

7    this purpose, to order the federalization and deployment of

8    these National Guards.  So that was the intent of that

9    suggestion.

10            The second, Your Honor, is what Mr. Wells was just

11   describing.  The list would include the deployment of Illinois

12   National Guard, the Texas National Guard, or the National Guard

13   of any other state to Illinois.

14            THE COURT:  Is there a reason I can't just say the

15   National Guard?

16            MR. WELLS:  You can say the National Guard of the

17   United States, Your Honor, that would have the same function is

18   our understanding.

19            THE COURT:  Understanding that you object to the TRO

20   as a whole, do you have special objections to those language

21   changes?

22            MR. HAMILTON:  As Your Honor noted, we do object to

23   the temporary restraining order.  We would certainly prefer the

24   language that is confined to the specific orders that have been

25   put before the Court, and I would also ask the Court to specify

1  which October 4th memorandum.  The president executed a

2  presidential memorandum on October 4th, Secretary Hegseth

3  implemented that memorandum through his own memorandum to the

4  adjutant general of Illinois.  I think that is the memorandum

5  that the Court is describing, because that would be parallel to

6  the October 5th memorandum, which is a memorandum from

7  Secretary Hegseth to the adjutant general of Texas.  So I just

8  wanted to flag the issue that there two October 4th memoranda

9  in the case.  And, secondly, flagging that this is limited to

10  the deployment in Illinois.

11        THE COURT:  That's fair.

12        MR. WELLS:  Your Honor, just to clarify on the

13  October 4th memorandum, so we would suggest that it should be

14  the presidential memorandum of October 4th, Secretary Hegseth's

15  October 4th memorandum, as well as the undated Texas

16  memorandum.  The memorandum that does not have a date on it

17  that we received at 5:00 p.m. on Sunday.  So we're happy also

18  to tender to the Court the three specific documents that we

19  believe should be expressly referenced.

20        THE COURT:  So you're asking for the October 4th

21  presidential memorandum?

22        MR. WELLS:  The one we found out about last night.

23        THE COURT:  The October 4th Secretary Hegseth

24  memorandum.  The October 5th --

25        MR. WELLS:  Received --

1          THE COURT:  We don't know the date of the next one?

2          MR. WELLS:  Correct.  So we -- it's the one that is

3     attached to Bria Scudder's declaration.  It is the Texas

4     mobilization order as referenced in the concluding paragraphs

5     of our brief, frankly because we received it at, you know,

6     5:00 p.m. on Sunday.  The specific exhibit number --

7          MS. HAMILTON:  Your Honor, while Mr. Wells is looking

8     at the exhibit number, as we're listing out orders here we are

9     aware that the California National Guard is present in

10    Illinois.  Our understandings is that they are mobilized

11    pursuant to a June 7th memorandum.  So we would ask that that

12    be included as well.

13         MR. WELLS:  So --

14         THE COURT:  Are they mobilized pursuant to Title 10?

15         MS. HAMILTON:  Yes, Your Honor.  Our understanding is

16    that they are the National Guard troops who were most recently

17    in Oregon and 14 of them have now been relocated to Illinois.

18         MR. WELLS:  ECF 13-3 is the October 4th memorandum,

19    the Illinois order.  So that's the first one that was received

20    on October 4th -- Saturday, October 4th in the morning.  Second

21    order undated but referencing Texas, Texas National Guard, 13-4

22    on the docket 13-4.  And then the presidential memorandum,

23    which, I believe, was provided to us along with the Court at

24    the same time last evening, at 11:30 p.m., Exhibit C to the

25    Nordhaus declaration, ECF 62-1.

1          THE COURT:  Do you have any objection to those three

2    being specifically cited?

3          MR. WELLS:  I'm sorry.  I have to add one more because

4    this document from October 4th was then published on the White

5    House's website on October 6th.

6          THE COURT:  But it is the same document?

7          MR. WELLS:  It's a different date though.

8          THE COURT:  But it's exactly the same document.

9          MR. WELLS:  We are a little surprised, frankly,

10   because immediately after this Court's Monday hearing, it went

11   up on the White House website dated October 6th.  We got it in

12   their filing last night.  It is dated October 4th.  Frankly the

13   exact timing whether it is the same document or a different

14   document, one was created on the 6th, one was created on the

15   4th, the record is unclear.  But in the interest of actually

16   effectuating the Court's remedy, we think both of them should

17   be included.

18         THE COURT:  Let me ask this, does anyone think I need

19   to state the memorandums or is it enough to just say are

20   temporarily enjoined from ordering the federalization,

21   deployment of the National Guard of United States within

22   Illinois?  Thoughts?

23         MR. HAMILTON:  We obviously object to that and think

24   it goes beyond the scope of what was litigated today.  I don't

25   know that I have much more to add than that.

1       THE COURT:  How does it go beyond the scope?

2       MR. HAMILTON:  Well, we were talking about the

3  federalization of the Illinois and Texas guard and specific

4  documents and the language that plaintiffs are proposing is

5  broader and contemplates, sounds like, other documents that --

6       THE COURT:  Let me ask you this -- I think their

7  concern is they don't know about all of the documents that

8  exist or perhaps they're concerned that another document will

9  be created tonight.

10       Would you take the position as you did in Oregon, that

11  another order could issue tonight either asking for any other

12  state's National Guard or just starting the process over again,

13  that would -- if we enter the language with respect to the very

14  specific orders and then someone else shows up, would you take

15  the position that my order did not cover that?

16       MR. HAMILTON:  Yes.  I agree that if the Court is

17  enjoining the implementation of specific documents then --

18       THE COURT:  Then you have the right to send anybody

19  from any other state tomorrow?

20       MR. HAMILTON:  Yes.

21       THE COURT:  Okay.  Then I'm going to go with the

22  broader language.  So the language currently reads, Defendants,

23  Footnote 1, President Trump does not get included, officers

24  agents assigned and all persons acting in concert with them are

25  temporarily enjoined from ordering the federalization and the

1   deployment of the National Guard of the United States within

2   Illinois.

3           Was there another change that someone had requested?

4           MR. WELLS:  That covers it.  The breadth of that

5   language covers it.  We appreciate it.

6           THE COURT:  Is there anything else that we need to

7   discuss?

8           MR. HAMILTON:  I just wanted to confirm the language

9   is in there limiting it to within the state of Illinois.

10          THE COURT:  Within Illinois, yes.

11          MR. HAMILTON:  Thank you, Your Honor.

12          THE COURT:  If there is nothing else, thank you all

13  very much.

14          MR. WELLS:  Could I ask a procedural question.  Well,

15  you'll set the status conference.  I appreciate it.

16          THE COURT:  Thank you.

17    (Concluded at 5:23 p.m.)

18                      *   *   *   *   *

19    I certify that the foregoing is a correct transcript from the

20  record of proceedings in the above-entitled matter.

21  _/s/Noreen E. Resendez_              _10/10/2025_
    Noreen E. Resendez                   Date
22  Official Court Reporter

23

24

25

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| STATE OF ILLINOIS, a sovereign state; and the CITY OF CHICAGO, an Illinois municipal corporation, | Case No. 25-cv-12174 |
| Plaintiffs, | Judge April M. Perry |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; DEPARTMENT OF DEFENSE; PETER B. HEGSETH, in his official capacity as Secretary of the Department of Defense; UNITED STATES ARMY; DANIEL P. DRISCOLL, in his official capacity as Secretary of the Army, | |
| Defendants. | |

## AGREED EXTENSION OF TEMPORARY RESTRAINING ORDER

In a hearing on October 22, 2025, the parties reached agreement to have the Temporary Restraining Order, entered on October 9, 2025, extended until a final judgment on the merits is reached in this case. Defendants proposed and consented to this extension in part due to their interest in allocating their legal resources most effectively given pending litigation in other venues. The Court also concludes that there is good cause to extend the TRO, consistent with the factual findings and legal reasoning set forth in its Opinion and Order of October 10, 2025. Doc. 70. Accordingly, upon consent of the parties and with good cause shown, the Court ORDERS as follows:

1. Defendants,[1] their officers, agents, assigns entered, and all persons acting in concert with them, continue to be temporarily enjoined from ordering the federalization and deployment of the National Guard of the United States within Illinois until a final judgment on the merits is reached in this case.

2. The injunction against federalization of the National Guard contained in paragraph 1, above, is stayed pending appeal consistent with the Seventh Circuit's Opinion of October 16, 2025, in Case No. 25-2798.

3. This Order is entered without prejudice to Defendants' right to pursue appellate relief and is subject to any relief granted on appeal.

4. Nothing in this Order abridges the right of any party to seek its modification by this Court in the future.

5. The $100 bond posted by Plaintiffs shall remain with the Court until a final disposition of this case, or until this Order is terminated.

Dated: October 23, 2025 at 2:42 p.m.

*April M. Perry*

APRIL M. PERRY
United States District Judge

---

[1] President Trump, one of the named Defendants, is not enjoined by this Order.

2

**GA361**

## CERTIFICATE OF RULE 30 COMPLIANCE

The appendix and short appendix include the materials required by Circuit Rule 30(a) and (b).

*/s/ J. Kain Day*
J. KAIN DAY

## CERTIFICATE OF SERVICE

I hereby certify that on November 19, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system on all counsel of record.


*/s/ J. Kain Day*
J. KAIN DAY