No. 25-2798

IN THE

UNITED STATES COURT OF APPEALS

FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| STATE OF ILLINOIS, a sovereign state; and the CITY OF CHICAGO, an Illinois municipal corporation, | ) ) ) ) | Interlocutory Appeal from the United States District Court for the Northern District of Illinois |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | No. 1:25-cv-12174 |
| DONALD J. TRUMP, in his official capacity as President of the United States; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; DEPARTMENT OF DEFENSE; PETER B. HEGSETH, in his official capacity as Secretary of the Department of Defense; UNITED STATES ARMY; DANIEL P. DRISCOLL, in his official capacity as Secretary of the Army, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | The Honorable APRIL M. PERRY, Judge Presiding. |
| Defendants-Appellants. | ) ) | |

**MOTION SEEKING SUMMARY AFFIRMANCE AND VACATUR OF PARTIAL STAY PENDING APPEAL**

In October 2025, the district court entered a temporary restraining order enjoining the federalization and deployment of the National Guard in Illinois. Shortly thereafter, this court denied defendants' motion to stay that order as to deployment of the Guard, but issued a partial stay of the temporary restraining order allowing the Guard to remain federalized. Defendants then sought emergency

1

relief from the Supreme Court, which was denied on December 23, 2025. The Supreme Court issued a decision in which it explained that defendants were not likely to succeed on the merits because they had failed to satisfy a threshold statutory predicate—specifically, that the President was "unable" with the "regular forces" to execute federal law under 10 U.S.C. § 12406(3). *See Trump v. Illinois*, 607 U.S. ___ (2025) (A1-A3). After that decision, the President announced that he was ending the federalization of troops in Chicago. In light of the foregoing, plaintiffs respectfully request that this court summarily affirm the district court's temporary restraining order and vacate this court's partial stay of the federalization portion of that order. As explained below, such relief is appropriate because the Supreme Court's determination as to likelihood of success on the merits, which was dispositive in the emergency application posture, will similarly be dispositive in this interlocutory appeal. Furthermore, circumstances have changed—as a matter of fact and law—confirming that the stay with respect to federalization is no longer warranted in Illinois.

## BACKGROUND

1.    On October 4, 2025, President Trump issued a memorandum federalizing at least 300 Illinois National Guard personnel to be deployed in Illinois under 10 U.S.C. § 12406, over the Illinois Governor's objection. Doc. 63-5; *see also* Doc. 13-3 (Hegseth memorandum). On October 5, the Illinois Adjutant General received a memorandum issued by Secretary Hegseth federalizing members of the Texas National Guard for use in Illinois. Doc. 13-2 at 7; Doc. 13-4. In the following

days, Texas and California National Guard personnel arrived in Illinois, and the
Illinois National Guard personnel prepared to mobilize.  Doc. 62-3 at 2-3.

2.     Meanwhile, on October 6, the State of Illinois and the City of Chicago
filed suit, Doc. 1, and moved for temporary and/or preliminary injunctive relief on
their claims that defendants' actions were *ultra vires* in violation of section 12406
and the Posse Comitatus Act and unconstitutional under the Tenth Amendment,
Doc. 13.

3.     On October 9, the district court granted temporary injunctive relief
enjoining the "federalization and deployment of the National Guard of the United
States within Illinois."  A95.  The following day, the court issued a written decision
concluding, as relevant here, that plaintiffs had shown a likelihood of success on the
merits of their section 12406 claim.  A67-A91.  In reaching this conclusion, the court
rejected defendants' arguments that the President had properly invoked his
authority under subsections (2) and (3) of section 12406.  *Id.*

4.     In particular, the district court concluded section 12406(3) did not
apply because the President was not "unable" to execute the laws of the United
States with the "regular forces."  A77-A87.  The court identified several,
independent bases for this determination, one of which was that, as a historical
matter, the term "regular forces" was understood "to mean the soldiers and officers
regularly enlisted with the Army and Navy, as opposed to militiamen."  A87.  This
interpretation, the court concluded, was further underscored by "the statutory
context surrounding Section 12406," which "makes repeated use of the words

3

'regular' and 'forces' in close proximity to each other to refer to the military (the Army, Navy, etc.) to the exclusion of the National Guard." A80. And because "Defendants have made no attempt to rely on the regular forces before resorting to federalization of the National Guard, nor do Defendants argue (nor is there any evidence to suggest) that the President is incapable with the regular forces of executing the laws[,] . . . the statutory predicate contained within Section 12406(3) has not been met on that basis alone." A81.

5.      In addition to its determination that plaintiffs were likely to succeed on the merits, the court determined that plaintiffs had demonstrated irreparable harm and that the balance of the equities and public interest favored entry of a temporary restraining order. A91-A94.

6.      Shortly thereafter, on October 10, defendants appealed from the entry of the temporary restraining order, Doc. 75, and filed a motion for an emergency stay of the temporary restraining order pending appeal with this court, 7th Cir. Doc. 6. On October 11, this court granted an administrative stay as to the "federalization of the National Guard" but not as to the "deployment of the National Guard." 7th Cir. Doc. 8.

7.      On October 16, this court granted defendants' motion in part, continuing to stay the portion of the district court's order enjoining defendants from federalizing the National Guard but declining to stay the portion enjoining defendants from deploying the Guard. A42-A43. As a threshold matter, this court concluded that it had jurisdiction to review the interlocutory appeal because the

temporary restraining order had "sufficient hallmarks of a preliminary injunction." A34. On the merits, this court first rejected defendants' argument that section 12406(2)—which may be invoked when there is a rebellion or danger of a rebellion— was satisfied here. A38-A39. Turning to section 12406(3), which requires that the President be "unable" to execute federal law with the "regular forces," this court "appl[ied] great deference to the administration's view of the facts," but held that, even with this deference, there was "insufficient evidence that protest activity in Illinois has significantly impeded the ability of federal officers to execute federal immigration laws." A40. Given that conclusion, this court did not "fully resolve [the] thorny and complex issues" related to determining the appropriate definition of "unable" or "regular forces." *Id.*

8. As for the remaining stay factors, this court reasoned that although defendants had a strong interest in protecting federal agents and property, the evidence showed they have succeeded in doing so without the National Guard's intervention. A41-A42. By contrast, defendants' violation of Illinois's sovereignty by deploying federalized National Guard troops within its borders over its governor's objection would constitute irreparable harm, only exacerbated by the fact that some of the troops would be from another State's Guard. *Id.* However, this court found the harm of temporarily permitting National Guard troops to remain under federal command "relatively minimal" at present. A42. Accordingly, this court held, "[t]he administration remains barred from deploying the National Guard

of the United States in Illinois," but the Guard members already in Illinois were not required to return home.  A43.

9.     On October 17, defendants filed an emergency application with the Supreme Court seeking a stay of the district court's temporary restraining order, which this court had analyzed as a preliminary injunction, pending appeal.  *See* Application, *Trump v. Illinois*, No. 25A443 (U.S. Oct. 17, 2025).  In support of this application, defendants again asserted that the President properly invoked his authority under subsections (2) and (3) of section 12406.  *Id.*  The Supreme Court requested a response, which plaintiffs filed on October 20.  *See* Response, *Trump v. Illinois*, No. 25A443 (U.S. Oct. 20, 2025).  Defendants filed a reply on October 21, reiterating the need for emergency relief.  *See* Reply, *Trump v. Illinois*, No. 25A443 (U.S. Oct. 21, 2025).

10.     The next day, on October 22, the district court held a status hearing at which defendants "propose[d] an extension of the TRO until a final decision on the merits is reached, without prejudice to Defendants' continued pursuit of appellate relief and subject to any relief granted on appeal."  Doc. 96.  Plaintiffs accepted that proposal, and the district court entered an order the following day (the day the temporary restraining order was set to expire), extending the temporary restraining order "until a final judgment on the merits is reached in this case."  Doc. 98 at 1.

11.     On October 29, the Supreme Court directed the parties to file supplemental letter briefs addressing "[w]hether the term 'regular forces' refers to

the regular forces of the United States military, and, if so, how that interpretation affects the operation of 10 U.S.C. § 12406(3)."

12.     Plaintiffs filed a letter brief explaining that, based on the relevant statutory text and context, as well as the historical context, the term "regular forces" refers to the regular forces of the United States military.  *See* Resp. Supp. Letter Br., *Trump v. Illinois*, No. 25A443 (U.S. Nov. 10, 2025).  In other words, to rely on section 12406(3) to federalize and deploy the National Guard in Illinois over the Governor's objection, the President must have been unable to execute federal law with the regular forces of the United States military.  *Id.*  And because defendants had not shown that the President was so unable—and, indeed, could not possibly show that the extraordinary conditions for domestic military deployment were present here—the application should be denied.  *Id.*  For their part, defendants submitted that the term "regular forces" refers to the civilian forces that regularly execute the laws at issue, but are unable to do so in present circumstances.  *See* Appl. Supp. Letter Br., *Trump v. Illinois*, No. 25A443 (U.S. Nov. 10, 2025).  According to defendants, because the President had properly determined that those civilian forces were unable to execute federal law, the requested stay was warranted.  *Id.*

13.     On December 23, 2025, the Supreme Court denied the application for a stay pending appeal and issued a written opinion accompanying that order.  *See* *Trump v. Illinois*, No. 25A443 (Dec. 23, 2025); A1.  In reaching this decision, the Court "conclude[d] that the term 'regular forces' in § 12406(3) likely refers to the

regular forces of the United States military," which "means that to call the Guard into active federal service under § 12406(3), the President must be 'unable' *with the regular military* 'to execute the laws of the United States.'" A2 (emphasis in original). And "[b]ecause the statute requires an assessment of the military's ability to execute the laws, it likely applies only where the military could legally execute the laws." *Id.* Those circumstances, the Court explained, are "exceptional," given that, under the Posse Comitatus Act, "the military is prohibited from 'execut[ing] the laws' 'except in cases and under circumstances expressly authorized by the Constitution or Act of Congress.'" *Id.* (quoting 18 U.S.C. § 1385) (alterations in original). Accordingly, "before the President can federalize the Guard under § 12406(3), he likely must have statutory or constitutional authority to execute the laws with the regular military and must be 'unable' with those forces to perform that function." *Id.*

14. And at this stage, the Court concluded, "the Government has failed to identify a source of authority that would allow the military to execute the laws in Illinois." *Id.* Specifically, the President has "not invoked a statute that provides an exception to the Posse Comitatus Act," and his reliance on "inherent constitutional authority" was misplaced. A2-A3. Indeed, while defendants claimed that this inherent authority allows the President "to use the military to protect federal personnel and property," defendants also asserted "that performing such protective functions does not constitute 'executing the laws' within the meaning of the Posse Comitatus Act." A3 (cleaned up). And if that is true, "it is hard to see how

8

performing those functions could constitute 'executing the laws' under § 12406(3)." *Id.* (cleaned up). Therefore, the Court concluded, "the Government has not carried its burden to show that § 12406(3) permits the President to federalize the Guard in the exercise of inherent authority to protect federal personnel and property in Illinois." *Id.* In denying the application, the Court also necessarily rejected defendants' arguments under section 12406(2). *Id.*

15.     On December 31, 2025, the President announced the removal of the remaining National Guard troops from Illinois.[1] The number of troops had previously been reduced by 40 percent when, in November 2025, defendants removed the 200 Texas National Guard troops from Illinois.[2]

16.     On January 9, 2026, plaintiffs and defendants acknowledged in a joint status report to the district court that the National Guard members federalized under the challenged orders are no longer present in Illinois. Doc. 116 at 4, 6. Specifically, plaintiffs understand that: members of the Texas and California National Guard departed Illinois last year; some members of the Illinois National Guard who were called forth into federal service have been demobilized and allowed to return home; and approximately 195 members of the Illinois National Guard are presently at Fort Bragg, North Carolina completing the demobilization process, which is expected to conclude by January 16, 2026. *Id.*

---

[1] @realDonald Trump, Truth Social, Dec. 31, 2025, 2:55 p.m., available at: https://truthsocial.com/@realDonaldTrump/posts/115816171466225987.

[2] *See, e.g.*, Texas National Guard Departs Illinois, Chi. Tribune (Nov. 17, 2025), https://www.chicagotribune.com/2025/11/17/texas-national-guard-illinois.

## ARGUMENT

17.     This court should dispense with additional briefing and summarily affirm the district court's temporary restraining order in view of the Supreme Court's denial of the emergency stay application and the decision accompanying that order.  Summary disposition of an appeal is appropriate in certain circumstances, including "when a recent appellate decision directly resolves the appeal" or in "substantially similar" circumstances.  *United States v. Fortner*, 455 F.3d 752, 754 (7th Cir. 2006); *see also Williams v. Chrans*, 42 F.3d 1137, 1139 (7th Cir. 1994) (granting summary affirmance where "further proceedings in this court at this point would be futile" because the submissions do not "raise any issue other than the one that this court has decided in [a published decision] and upon which the Supreme Court of the United States has declined further review"); *Speech First, Inc. v. Whitten*, No. 24-2501, 2024 WL 4363740, at *1 (7th Cir. Sept. 5, 2024) ("this court has determined that any issues which could be raised are foreclosed by this court's holding" in a published decision of this court).  *Cf. Whole Woman's Health All. v. Hill*, 937 F.3d 864, 868 (7th Cir. 2019) (resolving "main appeal" at same time as stay motion because "we have enough before us to resolve that appeal as well as the narrower stay issue").

18.     Such circumstances are present here.  As explained, the Supreme Court concluded that defendants had failed to satisfy a threshold statutory predicate—specifically, that the President was "unable" with the "regular forces" to

10

execute federal law. This determination, which was dispositive in the emergency application posture, will similarly be dispositive in this interlocutory appeal.

19.     At the outset, there is no material difference in the standard of review applied in an interlocutory appeal of an order entering preliminary relief and the standard employed by the Supreme Court when reviewing emergency applications; rather, both require an assessment of the likelihood of success on the merits and the existence of irreparable harm, as well as, in appropriate circumstances, the public interest and balance of equities. *E.g.*, *Bevis v. City of Naperville*, 85 F.4th 1175, 1188 (7th Cir. 2023), *cert denied sub nom. Harrel v. Raoul*, 144 S. Ct. 2491 (2024) ("there is substantial overlap between the criteria for a stay and the factors governing preliminary injunctions") (cleaned up). And here, the Supreme Court has determined that defendants cannot succeed under that standard because they have failed to satisfy a statutory prerequisite as a matter of law. *See* A2-A3 (rejecting defendants' stated legal basis for military deployment).

20.     Furthermore, this court will not be presented with any additional information that would counsel in favor of a different outcome. On the contrary, the record presented to this court for purposes of resolving the interlocutory appeal will be identical to the one reviewed by the Supreme Court in the context of the emergency application because both involve the same underlying district court order and the evidence considered by the court in reaching its decision. To be sure, the record may eventually expand as litigation progresses in the district court, but any such additional evidence will not be considered in this interlocutory appeal.

21.    Nor is it plausible that defendants would (or could) present additional legal arguments that would alter the outcome.  The Supreme Court's order—which, again, was based on a materially identical standard of review—was accompanied by a published opinion setting forth its reasoning.  This court is thus bound by the Court's conclusion that defendants are not likely to succeed on the merits because they have failed to satisfy their burden on this record.  *E.g.*, *File v. Martin*, 33 F.4th 385, 392 (7th Cir. 2022) (lower courts must apply precedent that "has direct application in a case"); *see also Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025) (noting that even Court's "interim orders," although "not conclusive as to the merits," "inform how a court should exercise its equitable discretion in like cases").  And the Court's decision, moreover, was made after the parties submitted extensive supplemental briefing on the legal question that the Court ultimately deemed dispositive.  It is fair to presume that, in such circumstances, defendants presented all available arguments to the Supreme Court about the President's legal and factual basis for invoking section 12406.

22.    In addition to summary affirmance, or, at the very least, as independent relief, this court should reconsider and vacate its partial stay.  *See, e.g.*, Order, *Newsom v. Trump*, No. 25-7781, ECF No. 24 (9th Cir. Dec. 31, 2025) (vacating stay); Order, *Oregon v. Trump*, No. 25-6268, ECF No. 108 (9th Cir. Jan. 8, 2026) (same).  As this court has recognized, it may reconsider its own interlocutory orders, including orders entering or denying a stay pending appeal.  *See, e.g.*, Order, *LSP Transmission Holdings II, LLC v. Huston*, No. 24-3249, ECF No. 51 (7th

Cir. Jan. 12, 2025) (granting motion to reconsider prior order granting stay pending appeal because of intervening events); *Democratic Nat'l Committee v. Bostelmann*, 977 F.3d 639, 641 (7th Cir. 2020) (granting "request for reconsideration" of prior order denying stay pending appeal in light of state supreme court's answer to certified question).  Indeed, this court has inherent discretion to "reconsider an issue that [it has] already decided in prior stages of litigation." *United States v. Story*, 137 F.3d 518, 520 (7th Cir. 1998).

23.    Such reconsideration is appropriate where, as here, "there has been an intervening change in the law underlying the decision" or "some other special circumstance" has arisen. *Kathrein v. City of Evanston*, 752 F.3d 680, 685 (7th Cir. 2014).  As explained, *supra*, the Supreme Court recently decided, as a matter of first impression, that the term "regular forces" in section 12406(3) "likely refers to the regular forces of the United States military."  A2.  And, as noted, the Court ultimately concluded that "the Government has not carried its burden to show that § 12406(3) permits the President to *federalize* the Guard" in Illinois.  A3 (emphasis added).

24.    The Supreme Court's decision provides at least two bases for this court to reconsider its decision entering a partial stay of the district court's order that allowed the National Guard to remain federalized within Illinois and vacate that portion of its decision.  First, the Court resolved a legal question of first impression that is directly relevant to that stay order.  Second, the Court concluded—based on the same record presented to this court—that defendants had failed to satisfy their

13

burden to show that federalization was statutorily authorized in Illinois. Based on these considerations, it would be appropriate for this court to reconsider and vacate its determination that a stay of the portion of the district court's order enjoining federalization was warranted.

25.     Furthermore, circumstances have evolved in the months since this court entered its partial stay. Not only has the Supreme Court confirmed that defendants have not satisfied their burden to federalize troops under section 12406, but also the President has announced that the federalization in Illinois is ending, as noted. Furthermore, defendants proposed an indefinite extension of the temporary restraining order on October 22, while the emergency application remained pending in the Supreme Court. Doc. 96. And defendants have since filed an extension motion seeking additional time to respond to the complaint. Doc. 113. Additionally, defendants made statements in the context of other cases that it no longer requires an increased federal presence at the immigration detention facility at issue here. *See In re Kristi Noem*, No. 25-2936, Doc. 1-1 at 7 n.2 (7th Cir. Oct. 29, 2025) ("Since October 3, increased coordination with local law-enforcement officers has reduced the need for federal officers to engage with protestors at [the] Broadview [detention facility]."); *Chi. Headline Club v. Noem*, No. 25-3023, Doc. 9 at 9 (7th Cir. Nov. 10, 2025) (acknowledging changed conditions at the Broadview facility once "state and local officials [took] primary responsibility of crowd control and arrests"). In other words, any emergency stemming from the temporary restraining order that was once purportedly facing defendants has abated.

**CONCLUSION**

This court should summarily affirm the district court's temporary restraining order and reconsider and vacate the partial stay pending appeal.

Respectfully submitted,

KWAME RAOUL
Attorney General
State of Illinois

JANE ELINOR NOTZ
Solicitor General

By:    /s/ Sarah A. Hunger
SARAH A. HUNGER
Deputy Solicitor General
BRIANNA YANG
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-5202
sarah.hunger@ilag.gov

Attorneys for the State of Illinois

**MARY B. RICHARDSON-LOWRY**
Corporation Counsel of the City of Chicago

By: /s/ Myriam Zreczny Kasper
MYRIAM ZRECZNY KASPER
Deputy Corporation Counsel
SUZANNE M. LOOSE
Chief Assistant Corporation Counsel
ELIZABETH M. TISHER
Assistant Corporation Counsel
City of Chicago Department of Law
2 North LaSalle Street, Suite 580

15

Chicago, Illinois 60602
312-744-3564
myriam.kasper@cityofchicago.org
suzanne.loose@cityofchicago.org
elizabeth.tisher@cityofchicago.org

Attorneys for the City of Chicago

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

I hereby certify that this motion complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 27(d)(1)(E) and Federal Rule of Appellate Procedure 32(a)(5) and 32(a)(6) because this motion has been prepared in proportionally spaced typeface using Microsoft Word 2013, in 12-point Century Schoolbook font, and complies with Federal Rule of Appellate Procedure 27(d)(2)(A) in that the motion contains 3,459 words.

/s/ Sarah A. Hunger
SARAH A. HUNGER

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on January 12, 2026, I electronically filed the foregoing Motion with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.  I further certify that the other participants in this appeal are CM/ECF users, and thus will be served via the CM/ECF system.

By:    /s/ Sarah A. Hunger
       SARAH A. HUNGER

**APPENDIX**

## TABLE OF CONTENTS

Opinion, *Trump v. Illinois,* 607 U.S. ____ (2025)................................................A1-A25

Opinion, *Illinois v. Trump*, 155 F.4th 929 (7th Cir. 2025) ..............................A26-A43

Memorandum Opinion (Oct. 10, 2025) ..............................................................A44-A94

Temporary Restraining Order (Oct. 9, 2025) ....................................................A95-A96

# SUPREME COURT OF THE UNITED STATES

————

No. 25A443

————

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* ILLINOIS, ET AL.

ON APPLICATION FOR STAY

[December 23, 2025]

Federal immigration-enforcement efforts have encountered significant resistance, as well as some violence, in Chicago. According to the Government, federal officers have been obstructed, threatened, and assaulted as they attempt to perform their duties. The Government also alleges that an Immigration and Customs Enforcement processing facility in Broadview, Illinois, has been the site of frequent and sometimes violent protests, damaging federal property and threatening the safety of federal officers. These attacks, the Government says, have greatly impeded its efforts to enforce the immigration laws.

On October 4, 2025, the President called 300 members of the Illinois National Guard into active federal service to protect federal personnel and property in Illinois, particularly in and around Chicago. The following day, members of the Texas National Guard were also federalized and sent to Chicago. In calling forth the Guard, the President relied on 10 U. S. C. §12406(3), which empowers him to federalize members of the Guard if he is "unable with the regular forces to execute the laws of the United States."

The United States District Court for the Northern District of Illinois entered a temporary restraining order barring the federalization and deployment of the Guard in Illinois. The Seventh Circuit denied in relevant part the Government's motion for a stay, permitting the Guard to

remain federalized within Illinois but maintaining the bar on deployment.

The Government asked this Court to stay the District Court's order. After the response and reply were filed, JUSTICE BARRETT referred the application to the Court. We directed the parties to file supplemental letter briefs on an issue that the District Court had addressed but the parties' initial briefs had not: the meaning of the term "regular forces" in §12406(3). In its supplemental brief, the Government argues that the term refers to civilian law enforcement officers, such as those employed by Immigration and Customs Enforcement or the Federal Protective Service. Respondents, echoing the District Court, maintain that the term refers to the regular forces of the United States military.

We conclude that the term "regular forces" in §12406(3) likely refers to the regular forces of the United States military. This interpretation means that to call the Guard into active federal service under §12406(3), the President must be "unable" *with the regular military* "to execute the laws of the United States." Because the statute requires an assessment of the military's ability to execute the laws, it likely applies only where the military could legally execute the laws. Such circumstances are exceptional: Under the Posse Comitatus Act, the military is prohibited from "execut[ing] the laws" "except in cases and under circumstances expressly authorized by the Constitution or Act of Congress." 18 U. S. C. §1385. So before the President can federalize the Guard under §12406(3), he likely must have statutory or constitutional authority to execute the laws with the regular military and must be "unable" with those forces to perform that function.

At this preliminary stage, the Government has failed to identify a source of authority that would allow the military to execute the laws in Illinois. The President has not invoked a statute that provides an exception to the Posse

KAVANAUGH, J., concurring in judgment

Comitatus Act. Instead, he relies on inherent constitutional authority that, according to the Government, allows him to use the military to protect federal personnel and property. But the Government also claims—consistent with the longstanding view of the Executive Branch—that performing such protective functions does not constitute "execut[ing] the laws" within the meaning of the Posse Comitatus Act. See Supp. Letter Reply Brief for Applicants 8; 1 Supp. Op. OLC 343, n. 1 (1971) (collecting sources). If that is correct, it is hard to see how performing those functions could constitute "execut[ing] the laws" under §12406(3). See *Azar* v. *Allina Health Services*, 587 U. S. 566, 574 (2019) ("This Court does not lightly assume that Congress silently attaches different meanings to the same term in the same or related statutes"). Thus, at least in this posture, the Government has not carried its burden to show that §12406(3) permits the President to federalize the Guard in the exercise of inherent authority to protect federal personnel and property in Illinois. We need not and do not address the reviewability of findings made by the President under §12406(3) or any other statute.

The application for stay is denied.

JUSTICE KAVANAUGH, concurring in the judgment.

To protect federal personnel and property in Illinois, the President federalized about 300 National Guard members. The State of Illinois sued, and as relevant here, the District Court barred the President from deploying the Guard. After the Seventh Circuit declined to stay the District Court's order, the Government applied to this Court for a stay. I agree with the Court's decision to deny the Government's application for a stay, but I would do so on narrower grounds.

To federalize the National Guard, the President first must determine that he is "unable with the regular forces to execute the laws of the United States." 10 U. S. C.

§12406(3). In my view, the statutory term "regular forces" likely refers to the U. S. military, not to federal civilian law enforcement officers. On the current record, however, it does not appear that the President has yet made the statutorily required determination that he is "unable" with the U. S. military, as distinct from federal civilian law enforcement officers, to ensure the execution of federal law in Illinois. (The President of course would have great discretion to make that determination, as the State itself acknowledges. See Supp. Letter Reply Brief for Respondents 7; *Department of Navy* v. *Egan*, 484 U. S. 518, 529–530 (1988).)

On that narrow ground, I would deny the Government's application for a stay. We need not decide more, so I would not decide more.

The Court goes further. The Court starts by concluding that "regular forces" means the U. S. military. (As noted above, I agree with that initial point.) From there, however, the Court conducts a complicated and debatable statutory analysis. The Court says that under the Government's argument, "it is hard to see how performing those functions"—that is, protecting federal personnel and property—"could constitute 'execut[ing] the laws' under §12406(3)." *Ante*, at 3. On that premise, the Court further states that "at least in this posture, the Government has not carried its burden to show that §12406(3) permits the President to federalize the Guard in the exercise of inherent authority to protect federal personnel and property in Illinois," *ante*, at 3—even if the President finds that he is "unable" with the U. S. military to protect federal personnel and property from harm.[1]

———————

[1] The statute also separately authorizes the President to federalize the National Guard if there is an "invasion" or "rebellion." 10 U. S. C. §§12406(1)–(2).

KAVANAUGH, J., concurring in judgment

The Court's legal interpretation, as I understand it, could lead to potentially significant implications for future crises that we cannot now foresee.  Consider a hypothetical example.  Suppose a mob rapidly gathers outside the U. S. Courthouse in Philadelphia in response to an unpopular decision (or to influence the outcome of a pending matter).  Suppose also that the mob is threatening to storm the courthouse and attack the federal judges, prosecutors, and other personnel inside, and to damage or burn down the building, thereby preventing the execution of federal law.  Suppose further that U. S. military forces cannot readily mobilize to deploy to the site in time, that the local police and federal court security officers are outnumbered, and that the President wants to federalize National Guard units to protect the courthouse and the judges, prosecutors, and other personnel.  Under the Court's order today, even in those circumstances the President presumably could not federalize the National Guard under §12406(3).[2]

Of course, that kind of hypothetical scenario does not often arise, and we can hope that it will not arise in the future.  But the potential consequences, combined with the

_____

[2] As I read it, the Court's opinion does not address the President's authority under the Insurrection Act.  See 10 U. S. C. §§252, 253.  Moreover, the Court's opinion does not address or purport to disturb the President's long-asserted Article II authority to use the U. S. military (as distinct from the National Guard) to protect federal personnel and property and thereby ensure the execution of federal law.  See 1 Supp. Op. OLC 343 (1971) (W. Rehnquist).  As Professor Goldsmith has succinctly explained: "The protective power is the president's inherent or independent Article II power to protect federal personnel, property, and functions.  The key point is that the president can assert the protective power *without reliance on Section 12406.*  He can deploy *regular armed forces* without any need to federalize the Guard.  Presidents often have."  J. Goldsmith, President Trump Holds the Legal Cards on the Use of the Military in the Domestic Sphere, Executive Functions (Oct. 8, 2025).  One apparent ramification of the Court's opinion is that it could cause the President to use the U. S. military more than the National Guard to protect federal personnel and property in the United States.

novelty and difficulty of the statutory issues addressed by the Court, underscore why I would not opine more broadly than necessary to resolve this application.[3]

Before addressing those challenging and far-reaching statutory questions at this stage of the case, I would have at least invited further briefing and possibly also held oral argument, either on the application itself or by granting certiorari before judgment, akin to what the Court has done on several recent occasions. See *Trump* v. *CASA, Inc.*, 606 U. S. 831 (2025); *Ohio* v. *EPA*, 603 U. S. 279 (2024); *National Federation of Independent Business* v. *OSHA*, 595 U. S. 109 (2022). As I have stated with respect to previous interim applications of substantial import and difficulty, the Court can help guard against mistakes or misjudgments by employing additional process when sufficient time is available—recognizing, of course, that time will not always be available. See *Trump* v. *Boyle*, 606 U. S. ___ (2025) (Kavanaugh, J., concurring); *Trump* v. *CASA, Inc.*, 606 U. S., at 876 (Kavanaugh, J., concurring); *A.A.R.P.* v. *Trump*, 605 U. S. 91, 100 (2025) (Kavanaugh, J., concurring); *Labrador* v. *Poe*, 601 U. S. 1110, 1127–1129 (2024) (Kavanaugh, J., concurring).[4]

---

[3]The Court's decision reflects only likely legal conclusions and comes at a "preliminary stage." *Ante*, at 2. That said, the decision will presumably be a form of precedent throughout the Federal Judiciary that requires a temporary injunction (either a preliminary injunction or an injunction pending appeal or certiorari) in like circumstances, unless and until this Court reaches a contrary conclusion. See *Trump* v. *Boyle*, 606 U. S. ___ (2025); *Trump* v. *CASA, Inc.*, 606 U. S. 831, 873 (2025) (Kavanaugh, J., concurring). The Court also emphasizes that the Government has failed to carry its "burden." *Ante*, at 3. In this context, that statement seems to convey the truisms that, in future litigation, the Court could reconsider its view of the law or the Government might seek to advance new or different arguments.

[4]The State's opposition to deployment of the National Guard appears to stem in part from the State's underlying objections to the activities of federal immigration officers when they make immigration stops and

Cite as: 607 U. S. ____ (2025)          7

KAVANAUGH, J., concurring in judgment

In sum, I vote to deny the application but would do so on narrow grounds and, at this time, would not reach the broader statutory issues addressed by the Court.

_____

arrests in Illinois. The State and the Government disagree about whether the immigration officers have violated the Constitution in making certain immigration stops and arrests. The basic constitutional rules governing that dispute are longstanding and clear: The Fourth Amendment requires that immigration stops must be based on reasonable suspicion of illegal presence, stops must be brief, arrests must be based on probable cause, and officers must not employ excessive force. Moreover, the officers must not make interior immigration stops or arrests based on race or ethnicity. Cf. *Whren* v. *United States*, 517 U. S. 806, 813 (1996) ("[T]he Constitution prohibits selective enforcement of the law based on considerations such as race"). This application does not require us to delve into the parties' underlying dispute and to determine whether any particular immigration encounter or series of encounters in Illinois has violated those basic constitutional principles.

Alito, J., dissenting

# SUPREME COURT OF THE UNITED STATES

————————

No. 25A443

————————

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* ILLINOIS, ET AL.

ON APPLICATION FOR STAY

[December 23, 2025]

JUSTICE ALITO, with whom JUSTICE THOMAS joins, dissenting.

"'In our adversarial system of adjudication, we follow the principle of party presentation.'" *Clark* v. *Sweeney*, 607 U. S. ___, ___ (2025) (*per curiam*) (slip op., at 2) (quoting *United States* v. *Sineneng-Smith*, 590 U. S. 371, 375 (2020)). If a party passes up what seems to us a promising argument, we do not assume the role of advocate. Instead, we normally decide the questions that the parties choose to present.

In this case, the Court has unnecessarily and unwisely departed from standard practice. It raised an argument that respondents waived below, and it now rules in respondents' favor on that ground. To make matters worse, the Court reaches out and expresses tentative views on other highly important issues on which there is no relevant judicial precedent and on which we have received scant briefing and no oral argument.

First, the Court suggests that the principal statutory provision involved in the case, 10 U. S. C. §12406(3), contains a restriction that has no grounding in the statutory text, namely, that "unable with the regular forces to execute the laws of the United States" actually means "unable with the regular forces to execute the laws of the United States *for reasons other than the lack of lawful authority to do*

**A8**

*so.*"  The Court in effect adds new language to the text Congress enacted.

Second, the Court implicitly suggests that §12406(3) does not constitute an "Act of Congress" within the meaning of that phrase in the Posse Comitatus Act.  §1385.  That is a surprising conclusion, to say the least.

Third, the Court expresses the tentative view that the phrase "execute the laws of the United States" in §12406(3) does not include "protective functions" so that even if the National Guard is properly deployed under that provision, it may not be given the task of preventing potentially lethal attacks on civilian federal law enforcement officers or the takeover or destruction of Government facilities.  According to the Court's apparent reasoning, National Guard members may enforce the immigration laws by, for example, arresting and processing aliens, but they may not perform the protective functions for which they are better suited.  That, too, is surprising.

On top of all this, the Court fails to explain why the President's inherent constitutional authority to protect federal officers and property is not sufficient to justify the use of National Guard members in the relevant area for precisely that purpose.

I am not prepared at this point to express a definite view on these questions, but I have serious doubts about the correctness of the Court's views.  And I strongly disagree with the manner in which the Court has disposed of this application.

I

A

The key statutory provision in this case, 10 U. S. C. §12406(3), provides in relevant part that "[w]henever . . . the President is unable with the regular forces to execute the laws of the United States," he "may call into Federal service members and units of the National Guard of any

ALITO, J., dissenting

State in such numbers as he considers necessary to . . . execute those laws."

In the lower courts, the parties agreed that the phrase "regular forces" means civilian federal law enforcement officers, not military service members. Respondents explicitly adopted this position in the District Court. That court disagreed, but when the Government challenged this holding in the Seventh Circuit, respondents declined to defend the lower court's interpretation, and the Seventh Circuit did not reach the issue. The Government's stay application in this Court asserted that any defense of the District Court's interpretation had been waived, and respondents did not dispute either that assertion or the correctness of the Government's contention that "regular forces" means federal civilian officers. Thus, the argument that "regular forces" means the military was either waived or forfeited three times over.

Ignoring this history, the Court ordered the parties to file supplemental briefs on the meaning of "regular forces." Respondents "[u]nderstandably . . . rode with an argument suggested by" the Court and argued, for the first time and contrary to their position below, that the "regular forces" means the military. *Sineneng-Smith*, 590 U. S., at 379. The majority now accepts this eleventh-hour argument. "Nevermind that [respondents] had presented a contrary theory of the case in the District Court." *Id.*, at 380. For the Court, respondents' "own arguments, differently directed, fell by the wayside, for they did not mesh with" the Court's own "theory of the case." *Id.*, at 379.

We should decide this application based on the "party-presented controversy." *Id.*, at 380. That controversy centered on the District Court's holding that, contrary to the President's determination, civilian federal law enforcement officers were in fact able to execute federal laws in the Chicago area. If the Court has doubts about the parties' interpretation of the phrase "regular forces," it could assume for

**A10**

the sake of argument that the parties' interpretation was
correct and proceed on that basis. The Court has done that
on many occasions. *E.g.*, *Warner Chappell Music, Inc.* v.
*Nealy*, 601 U. S. 366, 371 (2024) (assuming there is a dis-
covery rule for copyright claims); *Financial Oversight and
Management Bd. for P. R.* v. *Centro de Periodismo Investi-
gativo, Inc.*, 598 U. S. 339, 345, 346 (2023) ("assum[ing]
without deciding that Puerto Rico is immune from suit in
federal district court and that [a financial oversight board]
partakes of that immunity" because respondent "never ar-
gued" otherwise in the courts below); *Wisconsin Legislature*
v. *Wisconsin Elections Comm'n*, 595 U. S. 398, 401 (2022)
(*per curiam*) (assuming without deciding that complying
with the Voting Rights Act is a compelling interest);
*McDonough* v. *Smith*, 588 U. S. 109, 115 (2019) (assuming
without deciding that a due process fabricated-evidence
claim may be asserted under Rev. Stat. §1979, 42 U. S. C.
§1983).

    In this case, the Court has no good reason to stray beyond
the issues that the parties chose to present, and based on
those arguments, the Court should grant the application.
There is no basis for rejecting the President's determination
that he was unable to execute the federal immigration laws
using the civilian law enforcement resources at his com-
mand. In concluding otherwise, the District Court likely
committed both legal and factual error.

## B

### 1

    I will begin with the District Court's understanding of the
applicable law. The District Court held that a President is
"unable" to execute federal law within the meaning of 10
U. S. C. §12406 only if he is literally "incapable" of execut-
ing the law with the regular forces. App. to Application 23a.
That interpretation is implausible. If the term "regular
forces" means federal civilian law enforcement officers, that

ALITO, J., dissenting

interpretation would mean that the President would have to conclude that the immigration laws could not be enforced in Illinois even if all other federal law enforcement activities were put on hold and every federal law enforcement officer in the country—including every FBI, DEA, Secret Service, and ATF agent, every postal inspector and deputy marshal, and all the law enforcement officers employed by other agencies—were transferred to that area and assigned that task.

The District Court's interpretation would lead to even more outlandish results if "regular forces" means the military. In that case, a President could not call up the National Guard to execute the laws in one locale unless all the Nation's military forces, if transferred to the area in question, would be incapable of executing the laws.

A less extreme interpretation of "unable" is much more reasonable and consistent with the way the term is commonly used. In everyday speech, a person may say that he or she is "unable" to perform an act simply because the adverse consequences of performing that act would be unacceptable. For example, an attorney might tell a trial court judge that he or she is "unable" to start a trial on a particular day because the attorney is scheduled to argue a case in this Court on that date and no other attorney could prepare for the argument in time. That attorney would be *capable* of showing up for the trial on the day in question, but the attorney's use of the term "unable" would be entirely natural.

The District Court's interpretation of "unable" was implausible for an additional reason: It seems to prohibit deployment of the National Guard unless the President could not execute the laws to even the slightest extent. The District Court took what it termed "a binary approach: ability or not, capability or not." *Id.*, at 68a. As the Ninth Circuit has explained, however, "Section §12406(3) cannot plausibly be read to mean that so long as some amount of

**A12**

execution of the laws remains possible, the statute cannot be invoked, regardless of how much execution of the laws remains thwarted or how much personal danger federal personnel face during operations." *Newsom* v. *Trump*, 141 F. 4th 1032, 1051 (2025). It is more reasonable to interpret §12406(3) to mean that a President is "unable" to execute the laws when he is substantially impaired from doing so.

2

The District Court also erred in refusing to afford any deference to the President's determination that calling up the National Guard was needed to execute federal law. The most directly relevant Supreme Court precedent suggests that such a determination must be accepted by the courts. In *Martin* v. *Mott*, 12 Wheat. 19, 28 (1827), a militia member argued, among other things, that the standard for calling up the militia under the law in force at the time had not been met. See Act of Feb. 28, 1795, 1 Stat. 424. Section 1 of that law governed use of the militia when the country is invaded or threatened with invasion, and §2, much like §12406(3), authorized use of the militia when "the execution" of federal law is obstructed. Addressing the §1 standard, Justice Story's opinion for the unanimous Court held that "the authority to decide whether the exigency has arisen . . . belongs exclusively to the President." 12 Wheat., at 30. "[H]is decision," the Court held, "is conclusive," and therefore, application of the statute depends only on "his own judgment of the facts." *Id.*, at 30, 33; see also *Luther* v. *Borden*, 7 How. 1, 43–45 (1849) (reaffirming the holding in *Martin* and the unreviewability of the President's decision to call up the militia).

The District Court gave no weight to this precedent. It saw *Martin* as a relic, viewed its express holding as limited to the particular facts of the case, and thought it had been superseded by more recent political-question decisions. Such treatment of a Supreme Court precedent that has

**A13**

Alito, J., dissenting

never been overruled, narrowed, or questioned by this Court was inappropriate. See *Mallory* v. *Norfolk Southern R. Co.*, 600 U. S. 122, 136 (2023).

Even if *Martin* does not dictate judicial acceptance of a President's decision to call up the National Guard, both that precedent and a humble appreciation of the role of a single federal judge surely demanded that such a Presidential determination be given a modicum of deference. The District Court afforded none.

For these reasons, the District Court appears to have misunderstood what the law requires, and those legal errors alone justify a stay.

## C

Once the proper legal framework is recognized, the President's determination must almost certainly be sustained. The Government's declarations show that U. S. Immigration and Customs Enforcement (ICE) operations in and around Chicago have been the target of unprecedented sabotage and violence since June of this year. Hundreds of rioters have converged at the Department of Homeland Security facility in Broadview, Illinois, the only intake and processing center for ICE operations in the Chicago area. These rioters have been organized, gathering offsite and arriving in vans, then getting picked up several hours later by vans returning with new rioters. They have arrived armed with shields, gas masks, protective padding, and other tools for physical combat. And they have blocked entry and exit at the ICE facility, physically assaulted personnel attempting to enter or leave work, significantly damaged the building, and vandalized both Government and personally owned vehicles.

The resulting violence has endangered the lives of federal personnel. Multiple rioters have been found with loaded guns, some of them semi-automatic. Rioters have hit, punched, and shoved officers; thrown bottles, rocks, and

tear gas canisters at officers; attempted to grab officers' firearms and munitions; pulled gas masks and tear gas canisters off the officers' uniforms; targeted officers with bullhorns and whistles that can cause permanent hearing loss; aimed strobe lights and lasers at officers' faces; and shot fireworks at officers. On more than a dozen occasions, one rioter jumped on the hood of an incoming Government vehicle, and another took up a position immediately behind the vehicle. When the vehicle stopped, other rioters ran up and slashed the vehicle's tires. As of early October, more than 30 federal officers had suffered injuries, and multiple officers had been hospitalized.

In a widely publicized event on October 4, a federal vehicle carrying Border Patrol agents was boxed in on a public road by 10 civilian vehicles, and 2 of those vehicles rammed the Government vehicle. As the agents exited their vehicle, one of the civilian vehicles was driven directly at an agent, forcing the agent to fire in self-defense. Hundreds of rioters then converged near the scene, throwing glass bottles and other dangerous objects at the agents. A federal vehicle sent to assist the besieged agents was itself rammed. Later in the day, a federal van was surrounded by rioters who slashed its tires, but no emergency assistance was available because of damage done to other Government vehicles earlier that day.

Even when not on duty, federal officers have been targeted. They have been followed to their homes and "doxed." Officers and their families have been threatened, and their homes and vehicles have been vandalized. Criminal enterprises have offered bounties for kidnapping or murdering immigration officers. More than 20 officers have had their home addresses posted on social media, and posts have called for officials to be shot and killed on sight.

Local police departments have provided insufficient assistance. When the October 4 ramming incident was reported to the Chicago Police Department, an internal

**A15**

ALITO, J., dissenting

dispatch stated that "NO UNITS WILL RESPOND TO THIS." On September 13, when rioters threw rocks, slashed tires, and poured flour into a federal vehicle's gas tank, ICE officers called the Broadview Police Department three times to ask for assistance. The Broadview Police never responded.

In sum, injuries, threats, vandalism, and harassment have significantly impaired efforts to execute the laws. The agencies have had to reallocate resources from enforcing the immigration laws to the provision of security for officers, the Broadview facility, and other Government property. Even if the President's assessment of the situation is given no deference, these facts adequately show that federal civilian offers were "unable to" execute the immigration laws under what appears to be the correct understanding of that standard.

### D

The District Court disagreed but gave no good reason for doing so. Respondents, as the parties seeking interim relief, bore the burden of proof. See *Winter* v. *Natural Resources Defense Council, Inc.*, 555 U. S. 7, 22 (2008). But instead of evaluating whether respondents had borne their burden, the District Court brushed aside the facts set out in the Government's declarations (many of which were undisputed) based on two perceived weaknesses in those declarations.

Neither of the District Court's criticisms justified the wholesale dismissal of the Government's declarations. The court's first criticism concerned the failure of two declarants to acknowledge that grand juries had declined to indict three of the individuals whose arrests were mentioned in the declarations. The court saw the declarants' failure to mention the grand juries' actions as evidence of mendacity. But the court did not take into account the dates on which the declarations were filed and the dates on which the

**A16**

ALITO, J., dissenting

grand juries declined to indict, and it did not find that the declarants were aware of the grand juries' actions. Unless the declarants had such knowledge, however, there was no ground for impugning their candor.

Second, the court suggested that the same declarants' descriptions of the relevant events were exaggerated because they had submitted similar declarations in another case in which a different judge found that ICE officers had likely violated protestors' First Amendment rights. But again, more would have to be known before accepting this criticism. What we do know is that the cited order in the First Amendment case did not make any credibility findings and did not discuss the Government's declarations at all, much less find them false. See *Chicago Headline Club* v. *Noem*, No. 1:25–cv–12173, (ND Ill., Oct. 9, 2025), ECF Doc. 43.

For these reasons, the validity of the District Court's two criticisms is questionable, but even if they are taken at face value, they cannot justify the court's wholesale refusal to credit the declarations' uncontested description of serious and continuous violence.

Nor can the District Court's decision be justified by conclusory statements in respondents' declarations about the capability of state and local law enforcement to provide protection. *E.g.*, App. to Application 43a; Decl. of Major D. Orseno, No. 1:25–cv–12174, (ND Ill., Oct. 6, 2025), ECF Doc. 13–15. Such statements provided no reason to doubt the occurrence of the incidents of violence described in the Government's declarations. And there is an obvious difference between the capabilities of state and local police and their willingness to assist. Thus, even if we assume that a Presidential determination under §12406(3) is reviewable and not entitled to any special deference, the District Court erred in refusing to credit the unrefuted facts offered by the Government. And those facts provide more than enough support for the President's determination that he was

**A17**

unable to enforce federal law in the Chicago area using federal civilian law enforcement officers.

## II

Instead of abiding by the standard rule on party presentation, the Court took it upon itself to raise the question whether the parties' understanding of "regular forces" was correct. And taking a cue from this Court, respondents abandoned their position below and switched to the argument that the phrase "regular forces" refers to the military, not civilian federal law enforcement. The Court tentatively agrees with respondents' new argument, but even if that is correct, it does not follow that the President exceeded his lawful authority when he called the National Guard into federal service to assist in executing federal law in Illinois.

## A

Regardless of how the term "regular forces" is defined, the President appears to have complied with the requirements of §12406(3). The provision asks whether the "President is unable with the regular forces to execute the laws of the United States." And the President said unequivocally that he had "determined that the regular forces of the United States are not sufficient to ensure the laws of the United States are faithfully executed . . . in Chicago." Memorandum for Secretary of War et al., No. 1:25–cv–12174 (ND Ill.), ECF Doc. 62–1, pp. 16–17 (Presidential Memo). Not only is this statement sufficient on its face, but under the presumption of regularity, the Court must presume that the President properly arrived at his determination. See *Martin*, 12 Wheat., at 32–33 ("When the President exercises an authority confided to him by law, the presumption is, that it is exercised in pursuance of law").

The majority does not explain why the President's declaration falls short. Instead, it breezily concludes that a President's inability to execute the law cannot be established

ALITO, J., dissenting

unless "the military could *legally* execute the laws." *Ante*, at 2 (emphasis added). In effect, the Court adds new language to the statute so that it now requires that a President be "unable with the regular forces to execute the laws of the United States **for reasons other than the lack of lawful authority to do so."** We have no authority to add this new language to the text Congress enacted.

The sole requirement set out in the text of §12406(3) is that the President must be "unable with the regular forces to execute the laws of the United States." That text says nothing about the cause of the President's inability to execute the laws, and in ordinary usage, it is common to say that a person is "unable to" perform an act when the obstacle is a rule of law. For example, it would be natural to say that a person who is fully capable of operating a motor vehicle is nevertheless "unable to" drive to work because his or her license has been suspended. Or, to take one more example, it would be natural to say that a federal district court is "unable to" adjudicate a case in which the plaintiff sues a citizen of the same State under state law. See 28 U. S. C. §1332. This use of the term "unable" would be entirely appropriate even if the judge, as will almost certainly be the case, is fully capable of handling such a case.

By the same token, if we apply the ordinary meaning of "unable to" in a case involving §12406(3), a President may be "unable to" use the military to execute the laws due to either practical *or* legal constraints.

B

Even if §12406(3) contained the extra requirement that the Court adds, there would be reasonable grounds for concluding that the President had authority to take the actions at issue. Indeed, the Court seems to acknowledge as much. It notes that the President invokes his "inherent constitutional authority . . . to use the military to protect federal personnel and property," *ante,* at 3, and it cites with

ALITO, J., dissenting

apparent approval a body of Office of Legal Counsel opinions sanctioning this understanding of inherent Presidential power. Authority To Use Troops To Prevent Interference With Federal Employees by Mayday Demonstrations and Consequent Impairment of Government Functions, 1 Supp. Op. OLC 343, 343–344 (1971) (citing earlier opinions); see also *In re Neagle*, 135 U. S. 1, 58–59, 67 (1890) (recognizing an inherent authority to protect federal judges); *In re Debs*, 158 U. S. 564, 582 (1895) (recognizing an inherent authority to protect highways for the passage of interstate commerce and mail).

That is what happened here: The President authorized the National Guard to "perform those protective activities that the Secretary of War determines are reasonably necessary to ensure the execution of Federal law in Illinois, and to protect Federal property in Illinois." Presidential Memo. 17. Although the Court recognizes this inherent Presidential power, it does not explain why it is not sufficient to satisfy the new element that the Court has added to §12406(3).[1]

The Court seems to suggest that the Posse Comitatus Act, 18 U. S. C. §1385, stands in the way of what the President did here, but that is puzzling. Does the Court mean to suggest that the Posse Comitatus Act somehow limited a President's inherent *constitutional* authority? That is certainly not Congress's view. See 6 U. S. C. §466(a)(4) ("[B]y

_____

[1] If §12406(3) is triggered only when a President determines that he is unable to execute the law by using the military, it is not easy to see how a court could assess and reject such a determination. As discussed, inability under §12406 should likely be interpreted to require no more than serious detrimental consequences, and therefore the statutory predicate should likely be regarded as satisfied whenever the deployment of military units for the purpose of executing the laws at home would have such consequences. Assessing the impact of such a deployment would require a survey and analysis of all the Nation's military needs, and only a President and those under his command are equipped to make such an assessment.

**A20**

its express terms, the Posse Comitatus Act is not a complete barrier to the use of the Armed Forces for a range of domestic purposes, including law enforcement functions, when the use of the Armed Forces is authorized by Act of Congress or the President determines that the use of the Armed Forces is required to fulfill the President's obligations under the Constitution to respond promptly in time of war, insurrection, or other serious emergency"). And in any event, the Posse Comitatus Act expressly permits the use of the military to execute the laws when permitted by an Act of Congress,[2] and §12406(3) is of course part of such an Act.[3]

The Court finds the Posse Comitatus Act relevant largely because the same phrase—"to execute the laws"—also appears in §12406(3). The Court's reasoning appears to go as follows. Under a position long taken by the Government, the Posse Comitatus Act does not forbid the use of the military for "protective functions." This must mean that the performance of such functions does not constitute the

_____

[2] The Act states: "Whoever, *except in cases and under circumstances expressly authorized by* the Constitution or *Act of Congress*, willfully uses any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both." 18 U. S. C. §1385 (emphasis added).

[3] I would not take for granted that the Posse Comitatus Act applies to federalized National Guard units, another question that this Court has never addressed. Indeed, the Act's enumeration of other military components—"the Army, the Navy, the Marine Corps, the Air Force, [and] the Space Force"—makes the omission of the National Guard quite notable. If, as the Court states, the term "regular forces" in §12406 likely means the military, Congress clearly views the military and federalized National Guard units as distinct entities. Otherwise, §12406 would nonsensically say that the President may call up the National Guard when the National Guard is unable to execute the laws. It is therefore not obvious that the Posse Comitatus Act would ever apply to federalized National Guard units, as opposed to the regular military. As §12405 makes clear, some of the laws and regulations governing "members of the Regular Army or Regular Air Force" are not applicable to the National Guard "when called into Federal service." 10 U. S. C. §12405.

execution of the laws. Section 12406(3) allows the use of federalized National Guard members "to execute the laws." Therefore, it follows that the National Guard may not be used for protective functions.

The Court's reasoning rests on the *presumption* that a phrase has the same meaning when it is used in closely related statutory provisions, but that presumption is not conclusive, and there are reasons to question its application here. OLC's interpretation of the Posse Comitatus Act is based heavily on the history and purpose of that Act, not the ordinary meaning of the phrase "execute the laws," which easily encompasses protective functions. See 1 Supp. Op. OLC, at 344 (examining the "history," "purpose," and "desig[n]" of the Posse Comitatus Act). Moreover, one of OLC's reasons for narrowly interpreting the Posse Comitatus Act's reach was to avoid intrusion on the President's inherent Article II powers and duties. See *ibid.* (noting the "President's constitutional duty to protect [federal] functioning" and "inherent authority to use troops, if necessary, to carry out this duty"). Interpreting the phrase "execute the laws" in §12406 in accordance with the ordinary meaning of its terms would not pose any similar problem.

On the contrary, that interpretation would be consistent with the way the phrase is used elsewhere. Under Article II, §3 of the Constitution, the President must "take Care that the Laws be faithfully executed," and laws protecting federal officers and property are not excepted. Nor do we read the Insurrection Act, which authorizes the use of militia and armed forces to "enforce the laws," as preventing the President from ordering troops to serve protective functions. 10 U. S. C. §252. It is therefore entirely possible that the phrase has different meanings in §12406 and the Posse Comitatus Act, especially since what §12406 authorizes is not the use of the regular military but the National Guard.

We should not hastily dismiss that possibility because interpreting §12406(3) in the way the Court suggests would

have very strange consequences that Congress is unlikely to have intended. Under the Court's interpretation, National Guard members could arrest and process aliens who are subject to deportation, but they would lack statutory authorization to perform purely protective functions.

Our country has traditionally been wary of using soldiers as domestic police, but it has been comfortable with their use for purely protective purposes. The Court's interpretation of §12406(3) assumes that Congress meant for that provision to turn this approach on its head.

\*    \*    \*

In conclusion, the Court should have decided this application based on the arguments the parties chose to present, and on that basis should have granted a stay. Injecting another issue into the matter was unwise, and suggesting views on a host of important questions without adequate briefing, consideration, or explanation is imprudent.

Whatever one may think about the current administration's enforcement of the immigration laws or the way ICE has conducted its operations, the protection of federal officers from potentially lethal attacks should not be thwarted.

I therefore respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

_____

No. 25A443

_____

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* ILLINOIS, ET AL.

ON APPLICATION FOR STAY

[December 23, 2025]

JUSTICE GORSUCH, dissenting.

This case touches on sensitive and gravely consequential questions concerning what roles the National Guard and U. S. military may play in domestic law enforcement. To be sure, as the parties observe, Congress has supplied us with some relevant statutory guidance in 10 U. S. C. §12406(3). But, as my colleagues' writings attest, that statute raises as many questions as it answers.

Take just some examples. Before calling up the National Guard under §12406(3), must the President be unable to execute the laws merely with federal civilian law enforcement personnel—or must he be unable to do so even with military troops? Is a Presidential declaration that he is unable with the regular forces to execute the law judicially reviewable—and, if so, to what extent and under what standard? Does §12406(3) provide standalone authority permitting the President to deploy the Guard, and how does it interact with other statutes in the field, such as the Posse Comitatus Act, 18 U. S. C. §1385, and the Insurrection Act, 10 U. S. C. §§251–255? What, if any, inherent Article II power does the President have to deploy the Guard to protect federal personnel or property, and how might that inform the interpretation of §12406(3)? And if, as all parties seem to assume, today's Guard is the successor to the militia of the founding era, how far can this inherent Presidential authority extend before it intrudes on Congress's

prerogative to decide when the militia may be used to execute the laws?  See Art. I, §8, cl. 15.  If all those questions were not fraught enough, an even graver one lurks here too: When, if ever, may the federal government deploy the professional military for domestic law enforcement purposes consistent with the Constitution?  See, *e.g.*, Art. IV, §4; Amdt. 14, §5.

In the present posture of this case, I am not comfortable venturing an answer to any of those questions.  This Court has never decided a case about the meaning of §12406(3), let alone explored its interaction with other statutes in the field or the Constitution.  Nor do we have much help on many of these matters from the parties' briefs before us, understandably given that this case comes to us in an interlocutory posture on a highly compressed schedule.

Under these circumstances, caution seems to me key, and I would decide this application narrowly, based only on those few arguments the parties preserved and the evidentiary record as it stands.  See *United States* v. *Sineneng-Smith*, 590 U. S. 371, 375 (2020).  In their initial briefing before this Court, the parties proceeded on the premise that §12406(3) statutorily permits the President to call up and deploy the National Guard when he is unable to execute federal law with civilian federal law enforcement officials.  Proceeding on that same premise, I believe the declarations federal law enforcement officials submitted below support the grant of a stay for substantially the reasons given in Parts I–A, B–1, C, and D of JUSTICE ALITO's opinion.  See *ante,* at 2–11.  But I would hazard no opinion beyond that, leaving instead all the weighty questions outlined above for another case where they are properly preserved and can receive the full airing they so clearly deserve.

In the

# United States Court of Appeals

## For the Seventh Circuit

————————————

No. 25-2798

STATE OF ILLINOIS and
the CITY OF CHICAGO,

*Plaintiffs-Appellees,*

*v.*

DONALD J. TRUMP, et al.,

*Defendants-Appellants.*

————————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:25-cv-12174 — **April M. Perry**, *Judge.*

————————————

DECIDED OCTOBER 16, 2025

————————————

Before ROVNER, HAMILTON, and ST. EVE, *Circuit Judges.*

PER CURIAM. On October 4, 2025, President Donald Trump
invoked his authority under 10 U.S.C. § 12406 to federalize
and deploy members of the National Guard within Illinois,
over the objection of the state's Governor. He asserted that de-
ploying the Guard in the state was necessary to quell violent
assaults against federal immigration agents and property. The
State of Illinois and the City of Chicago promptly sued

**A26**

President Trump and members of his administration, arguing that none of the statutory predicates for federalizing the Guard under § 12406 had been met, and that the federalization also violated the Tenth Amendment and the Posse Comitatus Act, 18 U.S.C. § 1385.

The district court granted plaintiffs' request for a temporary restraining order, enjoining the administration from federalizing and deploying the Guard within Illinois. In the district court's view of the factual record, neither of the predicate conditions for federalization proffered by the administration was present in Illinois: There was insufficient evidence of rebellion or a danger of a rebellion, 10 U.S.C. § 12406(2), nor was there sufficient evidence that the President was unable with the regular forces to execute the laws of the United States, *see id.* § 12406(3). The administration immediately appealed and moved for a stay of the order pending appeal.

Because we conclude that the district court's factual findings at this preliminary stage were not clearly erroneous, and that the facts do not justify the President's actions in Illinois under § 12406, even giving substantial deference to his assertions, we deny the administration's motion for a stay pending appeal except to the extent we continue our stay of the portion of the order enjoining the federalization of the Guard.

## I

## A

We draw our account from the district court's factual findings in its opinion granting the temporary restraining order. On September 8, 2025, the Trump administration announced "Operation Midway Blitz"—an escalation of the administration's enforcement of the immigration laws in Illinois. Federal

law enforcement officers increased their presence in the Chicagoland area.

U.S. Immigration and Customs Enforcement (ICE) processes immigrant detainees at a facility in Broadview, Illinois, a village about twelve miles west of downtown Chicago. For the past nineteen years, protestors have engaged in small demonstrations outside the Broadview facility, including a weekly prayer vigil. But the protests grew in size and regularity following the commencement of Operation Midway Blitz. On some occasions, protestors have stood or sat down in the driveway leading to the Broadview facility, and ICE has physically removed those people. The number of protestors on a typical day is fewer than 50. According to Broadview Police, the crowd has never exceeded 200, though the administration suggests it may once have reached around 300. Since September 13, Broadview Police and the Illinois State Police (ISP) have set up surveillance cameras to record and monitor activity in the area.

On September 26, approximately 100 to 150 protestors gathered outside the Broadview facility, and ICE deployed pepper spray and tear gas. The Broadview Police Department requested assistance from Illinois's law enforcement mutual aid network, and state police and other local police departments sent six cars. The activity near the facility closed a nearby road for roughly five hours, but Illinois law enforcement was able to contain the scene. That same day, the Department of Homeland Security (DHS) requested from the Department of Defense 100 troops to protect ICE facilities in Illinois with "immediate and sustained assistance" because of a "coordinated assault" by unnamed "violent groups …

actively aligned with designated domestic terror organizations."

Operation Midway Blitz soon intensified. On September 27, Gregory Bovino of Customs and Border Protection (CBP) and other federal agents came to the Broadview Police station and said that there would be increased deployment of chemical arms, and that it was "going to be a shitshow." The same day, a federal officer requested that Illinois voluntarily send Illinois National Guard troops to protect federal personnel and property; the state declined.

In turn, Illinois law enforcement stepped up its efforts in Broadview. On October 2, the ISP created a "Unified Command" of state and local law enforcement and emergency response organizations to coordinate public safety measures at the DHS facility. On October 3, the ISP established designated protest areas. When some protestors attempted to approach federal personnel and property, state and local law enforcement maintained control, making five to seven arrests, and federal agents detained 12 people.

On October 4, a few dozen protestors demonstrated at the facility. State and local law enforcement quickly responded and controlled the scene. DHS did not have to intervene.

Also on October 4, the President invoked his authority to federalize the National Guard. He issued a memorandum stating that the "situation in the State of Illinois, particularly in and around the city of Chicago, cannot continue. Federal facilities in Illinois, including those directly supporting [ICE] and the Federal Protective Services (FPS), have come under coordinated assault by violent groups intent on obstructing Federal law enforcement activities… I have determined that

these incidents, as well as the credible threat of continued violence, impede the execution of the laws of the United States. I have further determined that the regular forces of the United States are not sufficient to ensure the laws of the United States are faithfully executed, including in Chicago." The memo authorized the federalization of Illinois National Guard members under 10 U.S.C. § 12406 to "perform those protective activities that the Secretary of War determines are reasonably necessary to ensure the execution of Federal law in Illinois, and to protect Federal property in Illinois."

Illinois state officials opposed the deployment of the National Guard. The same day, the National Guard Bureau notified the Adjutant General of the Illinois National Guard that the President had authorized the mobilization of at least 300 members of the Illinois National Guard and directed that Illinois mobilize the Guard under 32 U.S.C. § 502(f) within 2 hours, or the Secretary of Defense would do so under Title 10. The Adjutant General responded that Illinois Governor Pritzker would not call the National Guard into Title 32 status and objected to the federalization of the National Guard.

Secretary of Defense Pete Hegseth then called Illinois National Guard members into federal service under 10 U.S.C. § 12406. In a memo to the Adjutant General, the Secretary stated that he was invoking § 12406 to federalize Guard troops to "protect [ICE], [FPS], and other U.S. Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where violent demonstrations against these functions are occurring or are likely to occur based on current threat assessments and planned operations."

**A30**

The next day, Secretary Hegseth explained to the Adjutant General that the President was invoking § 12406 to federalize up to 400 National Guard troops from Texas and to deploy them in Illinois and Oregon because "violent incidents, as well as the credible threats of continued violence, are impeding the execution of the laws of the United States." There were also a few dozen protestors at the ICE facility in Broadview that day, but state and local law enforcement maintained control, and DHS did not need to intervene. That night, a leader at ICE's Broadview facility lauded, in an internal email, the effectiveness of state and local law enforcement's Unified Command.

Despite President Trump's federalization of Guard troops as necessary to enforce federal immigration law, DHS and ICE have touted the success of Operation Midway Blitz. In an October 3 press release, DHS stated that ICE and CBP have effected more than 1,000 immigration arrests since the start of the Operation. In a September 26 DHS press release, the Department declared that protests had not slowed ICE down, and, in fact, ICE has significantly increased its deportation and arrest numbers year over year.

**B**

On October 6, 2025, plaintiffs—the State of Illinois and the City of Chicago—filed this lawsuit, arguing that the Trump administration's orders federalizing National Guard troops in Illinois under 10 U.S.C. § 12406 were unlawful. 10 U.S.C. § 12406 provides:

> Whenever—
>
>> (1) the United States, or any of the Commonwealths or possessions, is invaded

> or is in danger of invasion by a foreign
> nation;
>
> (2) there is a rebellion or danger of a re-
> bellion against the authority of the Gov-
> ernment of the United States; or
>
> (3) the President is unable with the regu-
> lar forces to execute the laws of the
> United States;
>
> the President may call into Federal service
> members and units of the National Guard of
> any State in such numbers as he considers nec-
> essary to repel the invasion, suppress the rebel-
> lion, or execute those laws.

Plaintiffs argued that there is no rebellion or danger of re-
bellion in Illinois, nor is the President unable with the regular
forces to execute the laws of the United States. They further
contended that the federalization orders violate the Posse
Comitatus Act, 18 U.S.C. § 1385, and the Tenth Amendment.
Plaintiffs sought emergency injunctive relief preventing the
Trump administration from federalizing and deploying Na-
tional Guard troops in Illinois.

After holding a hearing and assessing the preliminary rec-
ord, the court granted in part plaintiffs' request for a tempo-
rary restraining order and enjoined the federalization and de-
ployment of the National Guard for 14 days. The court with-
held judgment on a preliminary injunction and did not extend
its order to non–National Guard military forces or the Presi-
dent himself. The district court recognized the substantial def-
erence due a President's assessment of whether § 12406(2)

**A32**

or (3)'s factual predicates are satisfied, but it concluded nonetheless that, under its factual findings, the statutory requirements were not met. Where the declarations of the administration conflicted with the declarations of state and local law enforcement concerning conditions on the ground, the court made a credibility determination in plaintiffs' favor. In particular, the court found that all three of the federal government's declarations from those with firsthand knowledge were unreliable to the extent they omitted material information or were undermined by independent, objective evidence.

The Trump administration promptly appealed. It also moved for a stay pending appeal and for an emergency administrative stay. We granted the motion for an administrative stay in part, allowing the Guard members in Illinois to remain under federal control but blocking their deployment while we considered the motion for a stay.

## II

Before we reach the merits of the administration's motion, we must assure ourselves that we have jurisdiction to review the district court's temporary restraining order. Generally, a temporary restraining order is not appealable under 28 U.S.C. § 1292(a)(1). *See Chi. United Indus., Ltd. v. City of Chicago*, 445 F.3d 940, 943 (7th Cir. 2006). The Supreme Court has explained, however, that when a temporary restraining order "carries many of the hallmarks of a preliminary injunction," it should be construed as an appealable injunction. *Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025) (per curiam); *see Abbott v. Perez*, 585 U.S. 579, 594 (2018). Among these hallmarks are the issuance of an order after an "adversary hearing" and a "strong[] challenge[]" to the court's basis for issuing an order. *Sampson v. Murray*, 415 U.S. 61, 87 (1974).

We conclude that the order is appealable. The district court issued a thorough, 51-page written opinion after holding an adversary hearing and receiving extensive factual submissions and briefing, and the administration has strongly challenged virtually every basis for the district court's order. We are therefore satisfied that sufficient hallmarks of a preliminary injunction are present here such that we can review the order under § 1292(a)(1).

### III

"In deciding whether to stay an injunction pending appeal, we apply a standard that parallels the preliminary injunction standard but also keeps in mind the district court's exercise of equitable discretion." *Camelot Banquet Rooms, Inc. v. U.S. Small Bus. Admin.*, 14 F.4th 624, 628 (7th Cir. 2021). Thus, a party seeking a stay must show (1) a likelihood of success on the merits, and (2) a threat of irreparable harm absent a stay. *Id.* If the moving party makes such a showing, this court must consider (3) "the balance of harms, primarily in terms of the balance of risks of irreparable harm in case of a judicial error," as well as (4) the public interest. *Id.*; *see Nken v. Holder*, 556 U.S. 418, 434 (2009). Generally, in reviewing an injunction, we take a fresh look at the legal issues but review the district court's factual findings for clear error. *Tully v. Okeson*, 977 F.3d 608, 612 (7th Cir. 2020).

The administration argues that the President's federalization of the Guard under § 12406 is not judicially reviewable at all. Alternatively, it contends that the factual predicates of § 12406(2) and (3) are satisfied in light of the deference due the President's decision to federalize the Guard. We conclude, at this preliminary stage and given the district court's factual

**A34**

findings, that the federal government does not appear likely to succeed on either argument.

## A

The administration principally asserts that the President's discretion to call up the National Guard simply is not judicially reviewable. This argument relies heavily on *Martin v. Mott*, 25 U.S. (12 Wheat.) 19 (1827). President Madison had invoked a precursor to § 12406 to mobilize the New York militia during the War of 1812, which President Madison deemed an invasion. Jacob Mott refused to report for duty and was court-martialed and fined. Martin (a Marshal) seized his property to pay the fine and Mott sued Martin, contesting President Madison's determination that there was an invasion permitting the federalization of the militia. The Court concluded that the determination whether an actual or imminent invasion had arisen was not "an open question, upon which every officer … may decide for himself" but "belongs exclusively to the President, and that his decision is conclusive upon all other persons." *Id.* at 29–30. The administration argues that those principles govern here, and that where, as here, a statute "commits [a] decision to the discretion of the President," the President's exercise of that discretion is not subject to judicial review. *Dalton v. Specter*, 511 U.S. 462, 474 (1994).

We do not think the holding of *Martin* can extend so far. The Court's broad language must be understood in its context. The Nation was then at war with the most powerful empire on earth. That empire had actually invaded the United States and was sacking its capital city in August 1814. The Court in *Martin* expressed incredulity at the prospect that every officer under the President's command could make his own determination whether an imminent threat of invasion

existed and could refuse to obey the President's orders or be subject to civil liability if he enforced what was later deemed an invalid order. 25 U.S. at 29–30. Here, by contrast, the question is whether courts, not subordinate militiamen, may review the President's determination under § 12406, primarily as to whether political protests have become violent to the extent that they constitute a rebellion or that the administration is "unable" to execute federal law with the "regular forces" available to it.

As the Ninth Circuit aptly noted, unlike in *Dalton*, "the statute here enumerates three predicate conditions for the President's decision to call forth the National Guard." *Newsom v. Trump*, 141 F.4th 1032, 1047 (9th Cir. 2025). Nothing in the text of § 12406 makes the President the sole judge of whether these preconditions exist. It follows that the President's decision to federalize and deploy the National Guard under the statute is reviewable. *See id.*

At this preliminary stage, then, we conclude the federal government is unlikely to prevail on its argument that *Martin* or *Dalton* foreclose all judicial review of the President's decision to federalize the National Guard under § 12406.

## B

Though we reject the administration's assertion that § 12406 instills the President with unreviewable discretion, we nevertheless agree with the Ninth Circuit that the President should be granted "a great level of deference" on the question of whether one of the statutory predicates exists. *Newsom*, 141 F.4th at 1048. As the Supreme Court has recognized, "when it comes to collecting evidence and drawing factual inferences" in the domain of national security and foreign

relations, "'the lack of competence on the part of the courts is marked,' and respect for the Government's conclusions is appropriate." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010) (quoting *Rostker v. Goldberg*, 453 U.S. 57, 65 (1981)); *cf. Sterling v. Constantin*, 287 U.S. 378, 399–400 (1932) (holding that governor was allowed a "permitted range of honest judgment" in exercising discretion to call up state military forces while acting in "good faith," but finding military deployment was in fact not justified and could not be "conclusively supported by mere executive fiat"). Precisely how deferential the standard should be is a question we do not endeavor to resolve at this early stage.

Even giving great deference to the administration's determinations, the district court's contrary factual findings—which, at this expedited phase of the case, are necessarily preliminary and tentative—are not clearly erroneous. The submitted evidence consists almost entirely of two sets of competing declarations describing the events in Broadview. The district court provided substantial and specific reasons for crediting the plaintiffs' declarations over the administration's, and the record includes ample support for that decision. Given the record support, the findings are not clearly erroneous. *See United States v. Nichols*, 847 F.3d 851, 857 (7th Cir. 2017) (explaining that "where the district court's factual findings are supported by the record, we will not disturb them" under clear-error review).

Where neither the President nor the district court is entitled to deference is on the meaning of the statute—what constitutes a "rebellion," and what it means to be "unable with the regular forces to execute the laws." 10 U.S.C. § 12406. These determinations are matters of statutory interpretation,

a function that is "precisely the business of the judiciary." *Seggerman Farms, Inc. v. Comm'r*, 308 F.3d 803, 806 (7th Cir. 2002); *see generally Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024). Our interpretation of the statute is de novo even on a motion for a stay. *See Tully*, 977 F.3d at 612.

At this stage, we cannot say the administration is likely to succeed in demonstrating that the President lawfully federalized the Guard under either § 12406(2) or § 12406(3).[†]

We start with § 12406(2) and the meaning of "rebellion or danger of a rebellion." The parties rely on the same dictionaries, from the late nineteenth and early twentieth centuries, with the administration arguing that "rebellion" should be read to mean "deliberate resistance to the government's laws and authority." Plaintiffs instead urge us to define rebellion more narrowly—as the district court did—as a violent, armed, organized, open and avowed resistance that is "against the government as a whole—often with the aim of overthrowing the government—rather than in opposition to a single law or issue." *Newsom v. Trump*, 786 F. Supp. 3d 1235, 1252–53 (N.D. Cal.), *stayed pending appeal on other grounds*, 141 F.4th 1032 (9th Cir. 2025) (citing *Rebellion*, *Black's Law Dictionary* (1st ed. 1891); *Rebellion*, *American Dictionary of the English Language* (1900); *Rebellion*, *The Cyclopedic Dictionary of Law*

---

[†] We acknowledge that President Trump has made many statements suggesting that the Guard should fight crime in Chicago generally, but the federal government confines its argument to the use of subsections (2) and (3) of § 12406 based on an inability to execute immigration laws, as opposed to general criminal laws. At this preliminary stage, and given the press of time, we therefore limit our analysis to those arguments for federalizing and deploying the Guard.

(1901); and *Rebellion*, *Webster's International Dictionary of the English Language* (1903)).

Although we substantially agree with the definition of rebellion set forth by the district court in *Newsom*, we emphasize that the critical analysis of a "rebellion" centers on the nature of the resistance to governmental authority. Political opposition is not rebellion. A protest does not become a rebellion merely because the protestors advocate for myriad legal or policy changes, are well organized, call for significant changes to the structure of the U.S. government, use civil disobedience as a form of protest, or exercise their Second Amendment right to carry firearms as the law currently allows. Nor does a protest become a rebellion merely because of sporadic and isolated incidents of unlawful activity or even violence committed by rogue participants in the protest. Such conduct exceeds the scope of the First Amendment, of course, and law enforcement has apprehended the perpetrators accordingly. But because rebellions at least use deliberate, organized violence to resist governmental authority, the problematic incidents in this record clearly fall within the considerable daylight between protected speech and rebellion.

Applying our tentative understanding of "rebellion" to the district court's factual findings, and even after affording great deference to the President's evaluation of the circumstances, we see insufficient evidence of a rebellion or danger of rebellion in Illinois. The spirited, sustained, and occasionally violent actions of demonstrators in protest of the federal government's immigration policies and actions, without more, does not give rise to a danger of rebellion against the government's authority. The administration thus has not demonstrated that it is likely to succeed on this issue.

We turn next to the meaning of § 12406(3)—"unable with the regular forces to execute the laws of the United States." The administration exhorts us to accept the Ninth Circuit's reading of this subsection. In *Newsom*, the Ninth Circuit interpreted "unable" to mean that the federal government was "significantly impeded," and "regular forces" to mean "federal officers." 141 F.4th at 1052. The district court in this case, by contrast, concluded that the definition of "unable" is "not having sufficient power or ability; being incapable." And it determined that "regular forces" means the soldiers and officers serving in the regular armed forces.

We need not fully resolve these thorny and complex issues of statutory interpretation now, because we conclude that the administration has not met its burden under either standard. Even applying great deference to the administration's view of the facts, under the facts as found by the district court, there is insufficient evidence that protest activity in Illinois has significantly impeded the ability of federal officers to execute federal immigration laws. Federal facilities, including the processing facility in Broadview, have remained open despite regular demonstrations against the administration's immigration policies. And though federal officers have encountered sporadic disruptions, they have been quickly contained by local, state, and federal authorities. At the same time, immigration arrests and deportations have proceeded apace in Illinois over the past year, and the administration has been proclaiming the success of its current efforts to enforce immigration laws in the Chicago area. The administration accordingly is also unlikely to succeed on this argument.

Both sides seem to agree that the Tenth Amendment question rises and falls with the statutory claim. The Tenth

Amendment provides that "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. These reserved powers include "the police power, which the Founders denied the National Government and reposed in the States." *United States v. Morrison*, 529 U.S. 598, 617–18 (2000). Because there are constitutionally recognized grounds for the federalization of the National Guard, *see* U.S. Const., art. I, § 8, cl. 15, the success of the Tenth Amendment claim is tied to the success of plaintiffs' claim that the President's invocation of § 12406 was unlawful. And because, in our preliminary assessment, the federal government does not appear likely to succeed on its argument that it satisfied § 12406, it does not appear likely to succeed in showing the Tenth Amendment permits the deployment of the Guard.

## C

Having concluded that the administration has not shown a likelihood of success on the merits at this early stage, we evaluate the remaining stay factors, which we conclude also weigh against a stay of the district court's order with respect to deployment. We recognize, as the Ninth Circuit did, that the federal government has a strong interest in the protection of its agents and property. *Newsom*, 141 F.4th at 1054. But given the district court's well-supported view of the record, the federal government has been able to protect federal property and personnel without the National Guard's help. By contrast, the administration's likely violation of Illinois's Tenth Amendment rights by deploying Guard troops in the state over the state's objection "constitutes proof of an irreparable harm." *Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th

Cir. 1978). And the deployment of National Guard members from Texas—an incursion on Illinois's sovereignty—makes the constitutional injury especially significant. The balance of harms thus weighs in plaintiffs' favor regarding the deployment of the Guard.

On the other hand, we conclude that the harm to plaintiffs of permitting Guard troops to remain temporarily under federal control, without deploying, as this case further progresses appears to be relatively minimal. (We acknowledge, however, that circumstances might arise that could increase plaintiffs' potential harm, including if Illinois needs its Guard members who have been commandeered by the federal government to assist with state matters.) Lastly, as the district court properly determined, the public has a significant interest in having only well-trained law enforcement officers deployed in their communities and avoiding unnecessary shows of military force in their neighborhoods, except when absolutely necessary and justified by law.

## IV

We reiterate that, because of the procedural posture of this appeal, our conclusions are preliminary and based on our review of the limited record before the district court. The issues presented are necessarily fact bound, and it is possible that events could transpire that satisfy one of § 12406's factual predicates. But even with the benefit of considerable deference to its judgments, the administration has not shown that is true today.

Because we conclude that the factors weigh against a stay of the deployment order pending appeal, IT IS ORDERED that the motion to stay pending appeal is GRANTED in part

and DENIED in part. We continue to STAY the district court's
October 9, 2025, order only to the extent it enjoined the feder-
alization of the National Guard within the state. The admin-
istration remains barred from deploying the National Guard
of the United States within Illinois.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| STATE OF ILLINOIS, a sovereign state; and the CITY OF CHICAGO, an Illinois municipal corporation, | Case No. 25-cv-12174 |
| Plaintiffs, | Judge April M. Perry |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; DEPARTMENT OF DEFENSE; PETER B. HEGSETH, in his official capacity as Secretary of the Department of Defense; UNITED STATES ARMY; DANIEL P. DRISCOLL, in his official capacity as Secretary of the Army, | |
| Defendants. | |

## OPINION AND ORDER

Since this country was founded, Americans have disagreed about the appropriate division of power between the federal government and the fifty states that make up our Union. This tension is a natural result of the system of federalism adopted by our Founders. And yet, not even the Founding Father most ardently in favor of a strong federal government believed that one state's militia could be sent to another state for the purposes of political retribution, calling such a suggestion "inflammatory," and stating "it is impossible to believe that [a President] would

1

**A44**

employ such preposterous means to accomplish their designs."[1] But Plaintiffs contend that such

an event has come to pass, and argue that National Guard troops from both Illinois and Texas

have been deployed to Illinois because the President of the United States wants to punish state

elected officials whose policies are different from his own. Doc. 13 at 8.[2] Plaintiffs further argue

that President Donald J. Trump has exceeded the authority granted to him by 10 U.S.C. § 12406,

violated the Tenth Amendment, and that the deployment of federalized troops violates the Posse

Comitatus Act. *Id*. at 9. Before this Court is a request for a temporary restraining order ("TRO")

and preliminary injunction barring mobilization of the National Guard or deployment of the U.S.

---

[1] "A sample of this is to be observed in the exaggerated and improbable suggestions which have taken place respecting the power of calling for the services of the militia. That of New-Hampshire is to be marched to Georgia, of Georgia to New-Hampshire, of New-York to Kentuke and of Kentuke to Lake Champlain. Nay the debts due to the French and Dutch are to be paid in Militia-men instead of Louis d'ors and ducats. At one moment there is to be a large army to lay prostrate the liberties of the people; at another moment the militia of Virginia are to be dragged from their homes five or six hundred miles to tame the republican contumacy of Massachusetts; and that of Massachusetts is to be transported an equal distance to subdue the refractory haughtiness of the aristocratic Virginians. Do the persons, who rave at this rate, imagine, that their art or their eloquence can impose any conceits or absurdities upon the people of America for infallible truths?

If there should be an army to be made use of as the engine of despotism what need of the militia? If there should be no army, whither would the militia, irritated by being called upon to undertake a distant and hopeless expedition for the purpose of rivetting the chains of slavery upon a part of their countrymen direct their course, but to the seat of the tyrants, who had meditated so foolish as well as so wicked a project; to crush them in their imagined intrenchments of power and to make them an example of the just vengeance of an abused and incensed people? Is this the way in which usurpers stride to dominion over a numerous and enlightened nation? Do they begin by exciting the detestation of the very instruments of their intended usurpations? Do they usually commence their career by wanton and disgustful acts of power calculated to answer no end, but to draw upon themselves universal hatred and execration? Are suppositions of this sort the sober admonitions of discerning patriots to a discerning people? Or are they the inflammatory ravings of chagrined incendiaries or distempered enthusiasts? If we were even to suppose the national rulers actuated by the most ungovernable ambition, it is impossible to believe that they would employ such preposterous means to accomplish their designs."

The Federalist No. 29, at 186-187 (Alexander Hamilton) (Jacob Ernest Cooke ed., 1961).

[2] All "Doc." citations reference the ECF docket number and page number assigned by the docketing system.

**A45**

military over the objection of the Governor of Illinois. Doc. 3. For the reasons that follow, Plaintiffs' motion for a TRO is GRANTED, in part.[3]

## FACTUAL BACKGROUND

The events relevant to this case begin in the unassuming Village of Broadview, a small suburb approximately twelve miles west of downtown Chicago. Doc. 13-5 at 2. In addition to approximately 8,000 residents, Broadview is also home to an Immigration and Customs Enforcement ("ICE") Processing Center, where ICE detainees are temporarily held before being transported elsewhere. *Id*. at 3. Across the street from the ICE Processing Center is a parking lot leased by ICE for vehicles and equipment storage. *Id*. For the past nineteen years, the ICE Processing Center has regularly been visited by small groups who hold prayer vigils outside. Doc. 13-6 at 3.

In early September 2025, ICE's Chicago Field Office Director informed the Broadview Police Department that approximately 250 to 300 Customs and Border Patrol ("CBP") agents would begin arriving in Illinois for an immigration enforcement campaign dubbed "Operation Midway Blitz." Doc. 13-5 at 2-5. This escalation in enforcement activity caused a corresponding increase in protests near the ICE Processing Center. *Id*. at 5. On some occasions, demonstrators have stood or sat down in the driveway leading to the ICE Processing Center. ICE has then physically removed those individuals, and ICE vehicles have come and gone as needed. *Id*. The typical number of protestors is fewer than fifty. *Id*. The crowd has never exceeded 200. *Id*.

---

[3] The Court declines at this time to enter a Preliminary Injunction, and also to extend the scope of the TRO to include the military, a complex issue that is discussed at length below.

**A46**

On September 12, there were between eighty and one hundred protestors present outside of the ICE Processing Center singing, chanting, and holding small musical instruments. *Id*. Around 10:00 a.m., twenty to thirty federal agents parked across the street and walked toward the ICE Processing Center in camouflage tactical gear with masks covering their faces, which represented a "noticeable shift" from the way agents had previously approached the building. *Id*. at 6. In the opinion of the Broadview Police, this development caused the tone of the protestors to change. *Id*. The crowd grew louder and began to press closer to the building. *Id*. Broadview Police responded, positioning themselves between the ICE Processing Center and the protestors, and when the agents went inside, the crowd calmed down and Broadview Police relocated to the outer perimeter of the crowd. *Id*. Throughout the rest of the day, the crowd chanted, and some individuals stood in the driveway to the ICE Processing Center. *Id*. ICE intermittently grabbed those people to move them physically out of the driveway. *Id*. ICE agents eventually gave a dispersal order through a loudspeaker, threatening to deploy chemical agents if the protestors did not leave. *Id*. Approximately twenty to thirty minutes later, ICE deployed tear gas and pepper spray at the crowd. *Id*. Since September 13, Broadview Police and the Illinois State Police ("ISP") have set up surveillance cameras to continually record and monitor activity in the area. *Id*. at 7.

Protestors have continued to assemble outside of the ICE Processing Center. *Id*. ICE agents regularly deploy tear gas to disperse the crowd or stand on top of the building to shoot balls of pepper spray at protestors from above. *Id*. at 7-8. It is the opinion of the Broadview Police Department that the use of chemical agents against protestors "has often been arbitrary and indiscriminate," at times being used on crowds as small as ten people. *Id*. at 8.

**A47**

On September 26, a group of between 100 to 150 protestors gathered outside of the ICE

Processing Center, and ICE again deployed pepper spray and tear gas. Doc. 13-5 at 9. The

Broadview Police Department requested assistance from Illinois's law enforcement mutual aid

network, and ISP, Maywood Police Department, Westchester Police Department, and LaGrange

Police Department sent a total of six cars. *Id*. at 9-10. One road was closed for approximately

five hours. *Id.* at 10.

That same day, DHS sent a memorandum requesting "immediate and sustained assistance

from the Department of War … in order to safeguard federal personnel, facilities, and operations

in the State of Illinois." Doc. 13-2 at 15. The memorandum claimed that "Federal facilities,

including those directly supporting Immigration and Customs Enforcement … and the Federal

Protective Service … have come under coordinated assault by violent groups intent on

obstructing lawful federal enforcement actions. These groups are actively aligned with

designated domestic terrorist organizations and have sought to impede the deportation and

removal of criminal noncitizens through violent protest, intimidation, and sabotage of federal

operations." *Id*. DHS requested deployment "of approximately 100 [Department of War]

personnel, trained and equipped for mission security in complex urban environments. These

personnel would integrate with federal law enforcement operations, serving in direct support of

federal facility protection, access control, and crowd control measures." *Id*. at 16.

On September 27, CBP informed Broadview Police that they should prepare for an

increase in the use of chemical agents and ICE activity in Broadview, and that it was "going to

be a shitshow." Doc. 13-5 at 10. That day, Broadview Police monitored the "small crowd of quiet

protestors" who were outside the ICE Processing Center and watched as federal officials formed

a line and marched north up the street, pushing the crowd to another location. *Id*. Federal

**A48**

officials dismantled a water and snack tent that protestors had been using and later that evening deployed tear gas, pepper spray, and pepper balls at protestors. *Id*. at 10-11.

On September 28, Illinois was asked to voluntarily send Illinois National Guard troops to protect federal personnel and property at the ICE Processing Center in Broadview. Doc. 13-2 at 4. Governor Pritzker declined that request, concluding that "there were no past or present current circumstances necessitating it." *Id*.

On October 2, Broadview Police, ISP, Cook County Sheriff's Office, Cook County Department of Emergency Management and Regional Security, and the Illinois Emergency Management Agency publicly announced a joint "Unified Command" to coordinate public safety measures in Broadview around the ICE Processing Center. Doc. 13-5 at 12.

On October 3, approximately 200 protestors gathered outside of the ICE Processing Center, some of whom were elected officials and members of the media. *Id*. at 13. In turn, there were approximately 100 state and local law enforcement officers on site who established designated protest areas. *Id*. Although some protestors attempted to come close to federal vehicles, state and local law enforcement officers were able to maintain control and arrested approximately five people for disobeying or resisting law enforcement, with two arrests for battery or aggravated battery. *Id*. at 15; Doc. 13-15 at 16. Federal law enforcement detained twelve people. Doc. 13-15 at 16.

On October 4, there were approximately thirty protestors at the ICE Processing Center. Doc. 63-2 at 10. According to DHS's representative at the ICE Processing Center, local law enforcement arrived within five to ten minutes, immediately pushed the protestors back to the

6

**A49**

designated protest areas, and controlled the scene. *Id*. at 10-11. DHS did not have to intervene with any protestors. *Id*. at 11.

Despite this, on the same day, the President issued a memorandum stating that the "situation in the State of Illinois, particularly in and around the city of Chicago, cannot continue. Federal facilities in Illinois, including those directly supporting Immigration and Customs Enforcement (ICE) and the Federal Protective Services (FPS), have come under coordinated assault by violent groups intent on obstructing Federal law enforcement activities…I have determined that these incidents, as well as the credible threat of continued violence, impede the execution of the laws of the United States. I have further determined that the regular forces of the United States are not sufficient to ensure the laws of the United States are faithfully executed, including in Chicago." Doc. 62-1 at 16. This memorandum authorized the federalization of Illinois National Guard members under 10 U.S.C. § 12406. *Id*. at 17. It further authorized those personnel to "perform those protective activities that the Secretary of War determines are reasonably necessary to ensure the execution of Federal law in Illinois, and to protect Federal property in Illinois." *Id*.

Also on October 4, the Department of War asked the Adjutant General of the Illinois National Guard to agree to the mobilization of 300 Illinois National Guard troops pursuant to 32 U.S.C. § 502(f). Doc. 13-2 at 5, 21. The Illinois National Guard Adjutant General was informed that if he did not agree in the next two hours, "the Secretary of War will direct the mobilization of as many members of the ILNG as he may deem necessary under Title 10 United States Code." *Id*. at 21. Governor Pritzker reaffirmed his position that there was no public safety need necessitating such a deployment. Doc. 13-15 at 24. Later that day, the Secretary of War issued a memorandum calling forth "at least 300 National Guard personnel into Federal service…to

**A50**

protect U.S. Immigration and Customs Enforcement, Federal Protective Service, and other U.S.

Government personnel who are performing Federal functions, including the enforcement of

Federal law, and to protect Federal property, at locations where violent demonstrations against

these functions are occurring or are likely to occur based on current threat assessments and

planned operations." *Id.* at 29.

On October 5, a few dozen protestors were present at the ICE Processing Center. Doc.

63-2 at 11. State and local officers responded with approximately one dozen patrol cars, and

DHS did not have to intervene with protestors. *Id.* Internal communications between DHS and

ISP Sunday night referred to it as "great thus far this weekend." *Id.* DHS further stated "It's clear

that ISP is the difference maker in this scenario, and we are grateful for their leadership.

Hopefully, we can keep it up for the long-haul." *Id.*

That same day, the Secretary of War issued a memorandum ("Texas Memorandum")

mobilizing up to 400 members of the Texas National Guard. Doc. 13-2 at 34. The Texas

Memorandum referenced a June 7, 2025 Presidential Memorandum federalizing "at least 2,000

National Guard personnel" pursuant to Title 10 "to protect U.S. Immigration and Customs

Enforcement and other U.S. Government personnel who are performing Federal functions,

including the enforcement of Federal law, and to protect Federal property, at locations where

violent demonstrations against these functions are occurring or are likely to occur based on

current threat assessments and planned operations." *Id.*; Doc. 13-11 at 2. It further stated that on

"October 4, 2025, the President determined that violent incidents, as well as the credible threat of

continued violence, are impeding the execution of the laws of the United States in Illinois,

Oregon, and other locations throughout the United States." Doc. 13-2 at 34.

**A51**

Apart from the above protest activity, ICE has reported to Broadview Police acts of vandalism like the slashing of tires on fifteen vehicles, the "keying" of ICE vehicles, and sugar being put in vehicles' fuel tanks. Doc. 13-5 at 8, 11. The ICE Processing Center has continuously remained open and operational throughout the protest activity. *Id*. at 11. Broadview Police are not aware of any occasion where an ICE vehicle was prevented from entering or exiting due to activity by protestors. *Id*. In the opinion of the Broadview Police Department and ISP, state and local law enforcement officers are able to maintain safety and control outside of the ICE Processing Center. *Id*.; Doc. 13-15 at 17. Similarly, the Superintendent of the Chicago Police Department has indicated that his officers have responded unrest involving ICE in order to maintain public safety. Doc. 63-3.

Defendants report significantly more violence in the Chicago area than the Broadview Police or ISP. Specifically, Defendants provided declarations from DHS Chicago Field Office Director Russell Hott and CBP Chief Patrol Agent Daniel Parra that detail various instances of violence across Cook County between June 2025 and the present. Doc. 62-2, Doc. 62-4. Some of what these declarants complain about is, while aggravating, insulting, or unpleasant, also Constitutionally protected. *See, e.g.*, Doc. 62-2 at 6 (describing a rally to "get ICE ouf of Chicago!" accompanied by a photograph of destroyed property); *id*. at 19 (describing protestors' use of bullhorns). For example, a protestor who happens to lawfully possess a weapon while protesting is exercising both their First and Second Amendment rights. There is no evidence within the declarations that, to the extent there have been acts of violence, those acts of violence have been linked to a common organization, group, or conspiracy.[4] And with respect to

---

[4] This is not to say that some acts of violence, like boxing in immigration enforcement vehicles, have not been coordinated acts among the people involved. There is simply no evidence linking these discrete acts to each other.

**A52**

Defendants' declarants' descriptions of the ICE Processing Center protests, the version of the facts set forth in these affidavits are impossible to align with the perspectives of state and local law enforcement presented by Plaintiffs.

The Court therefore must make a credibility assessment as to which version of the facts should be believed. While the Court does not doubt that there have been acts of vandalism, civil disobedience, and even assaults on federal agents, the Court cannot conclude that Defendants' declarations are reliable. Two of Defendants' declarations refer to arrests made on September 27, 2025 of individuals who were carrying weapons and assaulting federal agents. *See* Doc. 62-2 at 19; Doc. 62-4 at 5. But neither declaration discloses that federal grand juries have refused to return an indictment against at least three of those individuals, which equates to a finding of a lack of probable cause that any crime occurred. *See United States v. Ray Collins and Jocelyne Robledo*, 25-cr-608, Doc. 26 (N.D. Ill. Oct. 7, 2025); *United States v. Paul Ivery*, 25-cr-609 (N.D. Ill.). In addition to demonstrating a potential lack of candor by these affiants, it also calls into question their ability to accurately assess the facts. Similar declarations were provided by these same individuals in *Chicago Headline Club et. al. v. Noem*, 25-cv-12173, Doc. 35-1, Doc. 35-9 (N.D. Ill.), a case which challenged the Constitutionality of ICE's response to protestors at the Broadview ICE Processing Center. In issuing its TRO against DHS Secretary Kristi Noem, the court in that case found that the plaintiffs would likely be able to show that ICE's actions have violated protestors' First Amendment right to be free from retaliation while engaged in newsgathering, religious exercise, and protest, and Fourth Amendment rights to be free from excessive force. *Id*. at Doc. 43. Although this Court was not asked to make any such finding, it does note a troubling trend of Defendants' declarants equating protests with riots and a lack of appreciation for the wide spectrum that exists between citizens who are observing, questioning,

**A53**

and criticizing their government, and those who are obstructing, assaulting, or doing violence.[5] This indicates to the Court both bias and lack of objectivity. The lens through which we view the world changes our perception of the events around us. Law enforcement officers who go into an event expecting "a shitshow" are much more likely to experience one than those who go into the event prepared to de-escalate it. Ultimately, this Court must conclude that Defendants' declarants' perceptions are not reliable.[6]

Finally, the Court notes its concern about a third declaration submitted by Defendants, in which the declarant asserted that the FPS "requested federalized National Guard personnel to support protection of the Federal District Court on Friday, October 10, 2025." Doc. 62-3. This purported fact was incendiary and seized upon by both parties at oral argument. It was also inaccurate, as the Court noted on the record. To their credit, Defendants have since submitted a corrected declaration, and the affiant has declared that they did not make the error willfully. Doc. 65-1. All of the parties have been moving quickly to compile factual records and legal arguments, and mistakes in such a context are inevitable. That said, Defendants only presented declarations from three affiants with first-hand knowledge of events in Illinois. And, as described above, all three contain unreliable information.

---

[5] At oral argument, Defendants' counsel repeatedly referred to the idea that protestors who wear gas masks are demonstrating a desire to do physical violence to law enforcement, even when pressed by the Court that masks are protective equipment, not offensive weapons. Presumably, counsel does not believe that the CBP officers who have engaged in street patrols in and around Chicago are also demonstrating a desire to do physical violence, though they are both wearing masks and carrying weapons. Additionally, the Court notes that despite the claim that protestors are wearing gas masks, most of the photos submitted by Defendants show protesters wearing Covid-19 masks. Doc. 62-2 at 13.

[6] The Court also notes that DHS's informal email representations to ISP about the state of affairs in Broadview align more with ISP's declarations presented by Plaintiffs than they do with DHS's declarations.

**A54**

Plaintiffs contend that the deployment of the Illinois and Texas National Guard comes not from any good faith concern about the ability of federal law enforcement to do their jobs unimpeded, but rather from President Trump's animus for Illinois's elected officials. In support of this argument, Plaintiffs attach social media posts by President Trump attacking Illinois Governor JB Pritzker as "weak," "pathetic," "incompetent," and "crazy." Doc. 13-10 at 17, 19, 22-23. Plaintiffs have also presented evidence that President Trump strongly disagrees with various policy decisions by Illinois officials, including "sanctuary" policies in Illinois and the City of Chicago that limit the cooperation between local law enforcement and federal immigration authorities. *See, e.g.*, *id*. at 12 ("No more Sanctuary Cities! […] They are disgracing our Country […] Working on papers to withhold Federal Funding for any City or State that allows these Death Traps to exist!!!"); 32-33 ("This ICE operation will target the criminal illegal aliens who flocked to Chicago and Illinois because they knew Governor Pritzker and his sanctuary policies would protect them and allow them to roam free on American streets. President Trump and Secretary Noem stand with the victims of illegal alien crime while Governor Pritzker stands with criminal illegal aliens.").

Though courts have consistently upheld legal challenges to sanctuary policies as consistent with the rights reserved to states by the Tenth Amendment,[7] President Trump, Department of Homeland Security Secretary Kristi Noem, and Attorney General Pamela Bondi have stated that they believe Illinois officials are violating federal law, and have suggested that their support for these policies should result in criminal prosecution. For example, on August 13, 2025, Attorney General Bondi sent letters to Governor Pritzker and Chicago Mayor Brandon

---

[7] *See, e.g., United States v. Illinois*, No. 25-cv-1285, 2025 WL 2098688, at *27 (N.D. Ill. July 25, 2025) (collecting cases).

**A55**

Johnson informing them that "[a]s the chief law enforcement officer of the United States, I am committed to identifying state and local laws, policies, and practices that facilitate violations of federal immigration laws or impede lawful federal immigration operations, and taking legal action to challenge such laws, policies, or practices. Individuals operating under the color of law, using their official position to obstruct federal immigration enforcement efforts and facilitating or inducing illegal immigration may be subject to criminal charges….You are hereby notified that your jurisdiction has been identified as one that engages in sanctuary policies and practices that thwart federal immigration enforcement to the detriment of the interests of the United States. This ends now." Doc. 13-9 at 2-3.

Plaintiffs have also presented evidence demonstrating President Trump's longstanding belief that crime in Chicago is out of control, and that federal agents should be used to stop that crime. *See, e.g.,* Doc. 13-10 at 4 ("we need troops on the streets of Chicago, not in Syria"); *id.* at 8 ("If Chicago doesn't fix the horrible 'carnage' going on […] I will send in the Feds!"); *id.* at 10 (If Democrat leaders in Chicago "don't straighten it out, I'll straighten it out"); 11 ("The next president needs to send the National Guard to the most dangerous neighborhoods in Chicago until safety can be successfully restored, which can happen very, very quickly.") 17 ("[T]he National Guard has done such an incredible job [in Washington, D.C.] working with the police….Chicago's a mess. You have an incompetent mayor, grossly incompetent and we'll straighten that one out probably next. That'll be our next one after this and it won't even be tough."). On August 25, 2025, President Trump stated: [W]e will solve Chicago within one week, maybe less. But within one week we will have no crime in Chicago." *Id*. at 18.  On September 2, 2025, President Trump posted on social media: "Chicago is the worst and most dangerous city in the World, by far. Pritzker needs help badly, he just doesn't know it yet. I will

**A56**

solve the crime problem fast, just like I did in DC. Chicago will be safe again, and soon." *Id.* at

28. On September 3, 2025, President Trump sent a fundraising email which stated: "I turned our

Great Capital into a SAFE ZONE. There's virtually no crime. NOW I WANT TO LIBERATE

CHICAGO! The Radical Left Governors and Mayors of crime ridden cities don't want to stop

the radical crime. I wish they'd just give me a call. I'd gain respect for them. Now hear me:

WE'RE GOING TO DO IT ANYWAY." *Id.* at 29-30 (emphasis in original). When asked at oral

argument whether the National Guard was, in fact, being deployed to Illinois to "stop crime,"

Defendants' counsel did not disagree that this was the objective of the deployment. Nor did

counsel limit the scope of that mission in any meaningful sense.

## **HISTORICAL BACKGROUND**

As discussed, this case concerns questions of federalism and the Constitutional and

statutory limits placed on the President's ability to deploy National Guard troops for purposes of

domestic law enforcement. Especially at issue is the scope of 10 U.S.C. § 12406, the statutory

predicate for the current National Guard deployment in Illinois. Because there is not an

abundance of case law interpreting Section 12406, the Court begins with some historical

background.

### A.  **The Constitution**

During the Constitutional Convention of 1787, one topic of hot debate among the

Founders was how to properly scope the federal government's military powers. Indeed, among

the grievances directed against King George III by signatories to the Declaration of

Independence was his keeping "in Times of Peace, Standing Armies, without the Consent of our

Legislatures." Decl. of Independence para. 13 (U.S. 1776). Thus, while the Founders recognized

14

**A57**

that well-trained soldiers were necessary "for providing for the common defense" of our young nation, they were concerned "that a national standing Army posed an intolerable threat to individual liberty and to the sovereignty of the separate states." *Perpich v. Dept. of Defense*, 496 U.S. 334, 340 (1990); *see also Reid v. Covert*, 354 U.S. 1, 23–24 (1957) ("The Founders envisioned the army as a necessary institution, but one dangerous to liberty if not confined within its essential bounds."). Further informing some Founders' suspicion of standing armies was the fact that local militias of individual states had played a vital role in securing the recent victory in the Revolutionary War. *See* Frederick Bernays Wiener, *The Militia Clause of the Constitution*, 54 Harv. L. Rev. 181, 182–83 (1940).

Another concern among some Founders was the extent of the federal government's powers to deploy federal military forces—including federalized militia—for purposes of general law enforcement. For instance, in response to a proposal to add language to the Constitution which would empower the federal government to "call forth the force of the Union" against states that passed laws contravening those of the union, James Madison moved successfully for its removal, opining that such use of force against a state "would look more like a declaration of war, than an infliction of punishment." Robert W. Coakley, *The Role of Federal Military Forces in Domestic Disorders 1789–1879* 8 (citing Max Farrand, *The Records of the Federal Convention*, vol. 1 at 54). During the ratification debates, Patrick Henry expressed fears that the language of the Militia Clause allowing Congress to have the militia called forth to execute the laws of the Union would open the door to federal troops engaging in domestic law enforcement. 3 J. Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 387 (1836) [hereinafter "Elliot Debates"]. Antifederalist Henry Clay expressed similar concerns and asked the Federalists "for instances where opposition to the laws did not

15

**A58**

come within the idea of an insurrection." *Id*. at 410. To this, Madison replied that "there might be riots, to oppose the execution of the laws, *which the civil power might not be sufficient to quell*." *Id.* (emphasis added). Patrick Henry pressed the issue, charging that granting power of "calling the militia to enforce every execution indiscriminately" would be "unprecedented," and a "genius of despotism." *Id*. at 412. To this, Madison noted the "great deal of difference between calling forth the militia, when a combination is formed to prevent the execution of the laws, and the sheriff or constable carrying with him a body of militia to execute them in the first instance; which is a construction not warranted by the [Militia] clause." *Id.* at 415.

Confronted with such concerns, even federalist proponent Alexander Hamilton rejected the notion that the militia could enforce domestic law, opining that given "the supposition of a want of power to require the aid of the POSSE COMITATUS is entirely destitute of colour, it will follow, that the conclusion which has been drawn from it, in its application to the authority of the federal government over the militia is as uncandid as it is illogical." The Federalist No. 29, at 188 (Alexander Hamilton) (Jacob Ernest Cooke, ed., 1961). To Hamilton, then, it was nothing more than an "exaggerated and improbable suggestion[]" that the federal government would command one state's militia to march offensively into the territories of another, given how assuredly such conduct would invite "detestation" and "universal hatred" by the people of the would-be usurper. *Id*. at 186–87.

On September 17, 1787, the U.S. Constitution was ratified. Many of the concerns debated by the Founders reflect in its contours. Regarding the militia, the Founders chose to vest Congress—not the President—with constitutional power "to provide for calling forth the Militia to execute the laws of the Union, suppress insurrections, and repel invasions," U.S. Const. art. I, § 8, cl. 15 (the "Calling Forth Clause"), as well as to provide for the "organizing, arming, and

16

**A59**

disciplining the militia, and for governing such part of them as may be employed in the service of the United States." U.S. Const. art. I, § 8, cl. 16. The President, then, would be the "Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States." U.S. Const. art. 2, § 2, cl. 1.

That the Framers understood the Calling Forth Clause narrowly can be seen in Congress's earliest efforts to put the clause into legislative practice. In 1792, Congress enacted an Act to "provide for calling forth the Militia to execute the laws of the Union, suppress insurrections and repel invasions." Act of May 2, 1792, 1 Stat. 264 (1792). In 1795, Congress repealed the 1792 Act and passed an amended version. Act of February 28, 1795, 1 Stat. 424 (1795). In both versions, Congress authorized the President to call upon the militia in response to invasion or insurrection without much limitation. But for the President to call forth the militia in cases where "the laws of the United States shall be opposed, or the execution thereof obstructed," stricter controls were imposed. *Id.* Specifically, Congress authorized the calling forth of militia only when the forces of obstruction were "too powerful to be suppressed by the ordinary course of judicial proceedings, or by the powers vested in the marshals" by the Act. *Id.* These early efforts demonstrate contemporaneous understanding that military deployment for purpose of executing the laws was to be an act of last resort, only after other systems had failed.

Beyond the Calling Forth Clause, other Constitutional provisions respond to Founders' concerns about specters of military overreach. For instance, the Founders chose not to consolidate control over the nation's standing army and naval forces into a single branch of federal government. Power to command was vested in the President, U.S. Const. art. II, § 2, cl. 1, but power to actually "declare War," "raise and support armies," and "provide and maintain a

**A60**

Navy" entrusted to Congress. U.S. Const. art. I, § 8, cls. 11–13; *see also* The Federalist No. 24, at 153 (Alexander Hamilton) (Jacob Ernest Cooke, ed., 1961) (noting "the whole power of raising armies was lodged in the *legislature*, not in the *executive*") (emphasis in original). Moreover, two of the Constitution's first ten Amendments articulate safeguards against the military: the Second Amendment—with its assurance that well-regulated militias would be prepared and armed to fight for the security of the states—and the Third Amendment, with its prohibition on quartering of soldiers in times of peace.

Finally, the Constitution and its early amendments also reflect another long-standing American principle: that the states possess a "residuary and inviolable dual sovereignty." The Federalist No. 39, at 256 (James Madison) (Jacob Ernest Cooke, ed., 1961); *see also Printz v. United States*, 521 U.S. 898, 918 (1997) ("It is incontestible that the Constitution established a system of 'dual sovereignty'"); *Carter v. Carter Coal Co.*, 298 U.S. 238, 294 (1936) (the Framers "meant to carve from the general mass of legislative powers, then possessed by the states, only such portions as it was thought wise to confer upon the federal government"). This conception is reflected throughout the Constitution's text, but particularly in the Tenth Amendment, which states that "the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. These reserved and residuary powers include, among other things, "the police power, which the Founders denied the National Government and reposed in the States." *United States v. Morrison*, 529 U.S 598, 618 (2000); *see also Patterson v. State of Kentucky*, 97 U.S. 501, 503 (1878) (the "power to establish the ordinary regulations of police has been left with the individual States, and cannot be assumed by the national government"); *Carter*, 298 U.S. at 295 ("It is no longer open to question that the general government, unlike the

**A61**

states … possesses no inherent power in respect to the internal affairs of the states.") (citation omitted).

### B. Posse Comitatus Act

American rejection of military encroachment into domestic law enforcement was explicitly rejected in 1878, with the passage of the Posse Comitatus Act. As amended, it provides that:

> Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both.

18 U.S.C. § 1385.

The historical context that gave rise to the Posse Comitatus Act merits discussion. After the Civil War, federal troops were deployed to states of the former Confederacy for purposes of keeping public order and enforcing federal law. *See* Sean J. Kealy, *Reexamining the Posse Comitatus Act: Toward a Right to Civil Law Enforcement*, 21 Yale L. & Pol. Rev. 383, 393 (2003)*.* While deployed, these troops carried out such law enforcement duties as enforcing taxes, arresting members of the Ku Klux Klan, and guarding polling places to ensure newly enfranchised former slaves could cast their votes in accord with federal law protections. *Id*. n. 59. In response to this exercise of federal power, Congressmen from Southern states pushed for, and succeeded, in passing the Posse Comitatus Act as a means to "limit the direct active use of federal troops by law enforcement officers to enforce the laws of this nation." *United States v. Hartley*, 796 F.2d 112, 114 (5th Cir. 1986) (internal quotes and citations omitted).

As detailed further below, the Court's decision today does not turn on the merits of Plaintiffs' claim that Defendants violated the Posse Comitatus Act. That said, the Act represents

**A62**

another moment that America recognized the importance of checking military intrusion into civilian law enforcement.

### C.  The Origins of 10 U.S.C. § 12406

The final piece of our historical puzzle is 10 U.S.C. § 12406, which Defendants represent supplies the authority for the deployment of federalized National Guard troops into Illinois. In its current incarnation, it provides:

> Whenever
>
>> (1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;
>>
>> (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or
>>
>> (3) the President is unable with regular forces to execute the laws of the United States;
>>
>> the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel invasion, suppress rebellion, or execute those laws.

10 U.S.C. § 12406.

Key provisions of Section 12406's language originate with the Dick Act of January 21, 1903, 32 Stat. 775–80 (1903), and Militia Act of 1908, 35 Stat. 399–403 (1908). In the leadup to their enactment, leading federal executives expressed their views on the inadequacy of the nation's militia. *E.g.*, President Roosevelt, address to Congress (December 3, 1901) (commenting that the existing laws governing the organization of the militia were "obsolete and worthless"); *Id.* Secretary of War Elihu Root (sharing similar view on the lack of a disciplined militia system to support the nation's "small Regular Army"). Responding to these concerns, Congress passed the Dick Act. Among its innovations, the Dick Act authorized substantial

20

**A63**

funding for professional equipment (Section 3) and training by federal regular forces (Section 20). Dick Act, 32 Stat. 775. Beyond these modernizations, the Dick Act also represents the first statutory usage of the name "National Guards" to refer to the state militias. *Id*. at 333–34 (1988).  Congress revisited the subject matter of the newly modernized National Guard with the Militia Act enacted May 27, 1908 ("1908 Act"). By that time, the Dick Act's modernization efforts were largely understood a success. As then-Acting Secretary of War Robert Shaw put in his report to Congress on the 1908 bill, "As a result of the initial expenditure [under the Dick Act] the organized militia is now fairly well clothed, armed, and equipped for active military service." *See* H.R. Rep. No. 60-1067, at 6 (1908).

Among other amendments, the 1908 Act made two changes of note. First, it proposed to authorize the President to call forth the National Guard to serve "either within *or without* the territory of the United States" for the first time. 35 Stat. 400; cf. also *See* H.R. Rep. No. 1094, 57th Cong. (1902) at 22-23 (describing, at a time prior to this change, how "services required of the militia can be rendered only upon the soil of the United States or of its Territories"). This new language was accompanied by a change to the calling forth articles, which as of the 1908 Act read,

> That whenever the United States is invaded, or in danger of invasion from any foreign nation, or of rebellion against the authority of the Government of the United States, or the President is unable **with the regular forces at his command** to execute the laws of the Union in any part thereof, it shall be lawful for the President to call forth such number of the militia … as he may deem necessary to repel such invasion, suppress such rebellion, or to enable him to execute such laws.

**A64**

35 Stat. 400 (emphasis added). In his comments on the bill, Secretary Shaw characterized these

two changes—the new Presidential authority to call the militia abroad and changes to Section

4—as complementary provisions. Specifically, Shaw noted:

> This wholesome and patriotic provision [for the National Guard to
> operate outside the United States] originates in the organized
> militia and constitutes an offer of their services in case of national
> emergency during the entire period of the emergency as measured
> by the call of the President, and is coupled with the reasonable and
> proper requirement that—
>
> "When the **military needs** of the Federal Government arising from
> the necessity to execute the laws of the Union, suppress
> insurrection, or repel invasion can not be met by the regular forces,
> the organized militia shall be called into the service."

H.R. Rep. No. 60-1067, at 6 (1908) (emphasis added). Thus, Shaw understood the 1908 Act as a

step towards making the National Guard "an essential and integral part of the first line of

national defense." *Id*. at 6–7. Through the twentieth century, Congress continued to bring the

National Guard more into the fold of the nation's general military apparatus. *See generally*

Jeffrey A. Jacobs, Reform of the National Guard: A Proposal to Strengthen the National

Defense, 78 Geo. L.J. 625, 629—31 (1990).

## LEGAL STANDARD

A request for injunctive relief "is an extraordinary and drastic remedy, one that should not

be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v.

Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original). The standard for issuing a TRO is

the same as is required to issue a preliminary injunction. *See Merritte v. Kessel*, 561 Fed. Appx.

546, 548 (7th Cir. 2014). To obtain a TRO, the movant must demonstrate: (1) a likelihood of

success on the merits; (2) that there is no adequate remedy at law; and (3) that the movant will

suffer irreparable harm if the relief is not granted. *Smith v. Exec. Dir. of Indiana War Mem'ls*

**A65**

*Comm'n*, 742 F.3d 282, 286 (7th Cir. 2014). If the movant makes this showing, the court then "must weigh the harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction." *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019). Finally, in balancing the harms, the court must consider the public interest in granting or denying the requested relief. *Ty, Inc. v. Jones Grp., Inc.,* 237 F.3d 891, 895 (7th Cir. 2001).

## ANALYSIS

Plaintiffs allege that Defendants' actions have violated (1) the statutory authority granted to the President in 10 U.S.C. § 12406; (2) Illinois's sovereign rights as protected in the Tenth Amendment; and (3) the Posse Comitatus Act. Plaintiffs argue that they are likely to succeed on all of their claims, that they will suffer irreparable harm absent injunctive relief, and that the balance of equities and public interest weigh in their favor. Defendants respond that President Trump has determined that the statutory criteria under Section 12406 have been met, and that the Court must give that determination deference. Defendants further argue that if the Court finds that deployment of the National Guard was proper under Section 12406, Plaintiffs cannot succeed on the merits of any of their claims.

The Court notes that its determinations for the purposes of this TRO are necessarily preliminary ones, based on the materials presented thus far, and constrained by the amount of time that the Court has had to review this weighty and urgent matter. The Court has had less than five days to consider 200 years of history, a factual record of approximately 500 pages, extensive briefing that raises complex issues of law for which there is limited precedent, and the six amicus curiae briefs that have been filed. With those caveats in mind, the Court determines that a TRO is warranted.

**A66**

## I. Justiciability

Defendants first challenge Plaintiffs' standing to seek a TRO based on their claim that Defendants' deployment of federalized National Guard into Illinois violates 10 U.S.C. § 12406. Federal courts have jurisdiction only over "cases" and "controversies," U.S. Const. art. III § 2, cl. 1, and so "any person invoking the power of a federal court must demonstrate standing to do so." *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013). Article III standing requires that Plaintiffs have a concrete and particularized injury in fact, actual or imminent, that is fairly traceable to the defendant's conduct and likely to be redressed by judicial relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). A party moving for entry of a TRO must establish their standing to do so. *E.g., Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020). "The standards for granting a temporary restraining order and preliminary injunction are the same." *USA-Halal Chamber of Commerce, Inc. v. Best Choice Meats, Inc.*, 402 F. Supp. 3d 427, 433 n.5 (N.D. Ill. 2019) (collecting cases)). Because the "burden to demonstrate standing in the context of a preliminary injunction motion is at least as great as the burden of resisting a summary judgment motion," the party whose standing is challenged must establish that standing "by affidavit or other evidence … rather than general allegations of injury." *Speech First*, 968 F.3d at 638 (first quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 907 n.8 (1990); then quoting *Six Star Holdings, LLC v. City of Milwaukee*, 821 F.3d 795, 801 (7th Cir. 2016)).

A state has a recognized "interest in securing observance of the terms under which it participates in the federal system." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607–08 (1982). Accordingly, states have been found to possess standing "when they believe that the federal government has intruded upon areas traditionally within states' control." *Kentucky v. Biden*, 23 F.4th 585, 598 (6th Cir. 2022); *see also Texas v. United States*,

**A67**

809 F.3d 134, 153 (5th Cir. 2015) (noting "states may have standing based on … federal assertions of authority to regulate matters they believe they control). Here, Plaintiffs have introduced evidence suggesting that Defendants intend to unlawfully deploy the National Guard to Illinois, where they are to engage in crime-fighting and other activities falling within the ambit of Illinois's sovereign police powers. No more is needed from the record to establish Plaintiffs' standing to pursue a TRO.

The Court is not persuaded by Defendants' argument that Plaintiffs cannot challenge deployment of the Texas National Guard because the Illinois Governor has no legally protected interest in controlling the militia of another state. This misses the point: Plaintiffs' claimed injury is not loss of an ability to control or command, but the loss of its own sovereign rights.[8] Nor is the Court compelled by Defendants' assertion that intrusion into Plaintiffs' sovereign police powers is too generalized to support standing. It is true that grievances may be too generalized to support Article III injury if what the plaintiff seeks is "relief that no more directly and tangibly benefits him than it does the public at large." *Defs. Of Wildlife*, 504 U.S. at 573-74. That is not the case here, though, as Illinois's evidence describes injuries directed to its specific sovereign interests, not the interests of states generally.[9] For these reasons, the Court concludes that Plaintiffs have standing.

---

[8] The Court discusses these sovereign rights in the context of irreparable harm below.

[9] Defendants also argue that Plaintiffs lack standing because states to which National Guard are deployed fall outside Section 12406's "zone of interests." As a threshold matter, the Court questions how relevant the "zone of interests" test is to this case, given its primary usage in cases involving claims brought under the Administrative Procedure Act. *See Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 394–99 (1987) (concluding that "[t]he 'zone of interest' test is a guide for deciding whether, in view of Congress' evident intent to make agency action presumptively reviewable, a particular plaintiff should be heard to complain of a particular agency decision."). But even if the test applies, the Court has no trouble concluding that Illinois would fall within its zone of interests, given the history of the Militia Clause (from which Section 12406 draws its language) and the Founders' concerns regarding unchecked federal deployment of militias into the states.

25

**A68**

Next, the Court considers Defendants' argument that it is outside the power of the Judiciary to review this case. "In general, the Judiciary has a responsibility to decide cases properly before it." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194 (2012) (quoting *Cohens v. Virginia,* 6 Wheat. 264, 404, 5 L.Ed. 257 (1821)). The Supreme Court has carved out a "narrow exception to that rule, known as the 'political question' doctrine." *Id.* When a controversy turns on a political question, courts lack the authority to decide the dispute. *Id.* The political question doctrine does not apply simply because the litigation challenges the authority of one of the coordinate political branches, nor "merely 'because the issues have political implications.'" *Id.* at 196 (quoting *INS v. Chadha,* 462 U.S. 919, 943 (1983)). Rather, the political question doctrine applies "where there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it.'" *Id.* at 195 (quoting *Nixon v. United States,* 506 U.S. 224, 228 (1993)). The political question doctrine is a doctrine "of 'political *questions*,' not one of 'political cases.'" *Baker v. Carr*, 369 U.S. 186, 217 (1962).

Defendants raise two points in support of their argument that the President's decision to invoke Section 12406 is not reviewable. First, Defendants cite in passing the rule that when a valid statute "commits [a] decision to the discretion of the President," the President's exercise of discretion is not subject to judicial review. Doc. 62 at 28 (quoting *Dalton v. Specter*, 511 U.S. 462, 474 (1994)). The Court takes no issue with this general premise but finds it does not apply here. Section 12406 "permits the President to federalize the National Guard '[w]henever' one of the three enumerated conditions are met, not whenever <u>he determines</u> that one of them is met." *See Newsom v. Trump*, 786 F. Supp. 3d 1235, 1248 (N.D. Cal. 2025) (quoting 10 U.S.C. § 12406) (emphasis in original). Thus, the decision whether to federalize the National Guard,

**A69**

though undoubtedly a decision delegated to the President, is not one committed to his discretion alone. The political question doctrine does not apply on this ground.

Second, Defendants rely on *Martin v. Mott*, 25 U.S. (12 Wheat.) 19, 30 (1827) for the specific proposition, untethered to modern political question doctrine jurisprudence, that the issue of whether the President properly mobilized the National Guard is not subject to judicial review. *Martin* involved President Madison's use of the New York militia during the War of 1812. Plaintiff, Jacob Mott, refused to report for duty. Mott was court-martialed and fined, and the State seized his property to satisfy the debt. Mott then brought an action for replevin in state court, arguing that the seizure was illegal because President Madison's order federalizing the New York militia was invalid. Among other objections, Mott argued that the avowry (the pleading justifying the taking of Mott's property) was fatally defective because it failed to allege that the exigency (the invasion) in fact existed. *Id.* at 23–28. By the time these issues reached the Supreme Court, the war had taken thousands of American lives and had been over for nearly twelve years. Harry L. Cole, *The War of 1812* at 94 (1965).

At issue in *Martin* was the meaning of the 1795 Act,[10] a precursor to 10 U.S.C. § 12406, which provided: "[W]henever the United States shall be invaded, or be in imminent danger of invasion from any foreign nation or Indian tribe, it shall be lawful for the President ... to call forth such number of the militia ... as he may judge necessary to repel such invasion." *Martin*, 25 U.S. at 29. The Supreme Court held that whether the President's authority to call forth the militia had been properly invoked, that is, whether the exigency of an actual or imminent invasion had in fact arisen, was an issue to be decided solely by the President, and not subject to be contested

---

[10] Act of February 28, 1795, 2. Stat. 424 (1795). The Court discussed this statute earlier, noting the Act's separation of provisions for the President to call forth the militia in response to invasion or insurrection versus for purposes of executing domestic law.

**A70**

"by every militia-man who shall refuse to obey the orders of the President." *Id.* at 29–30. The

language of the opinion is strikingly forceful. *E.g.*, *id.* at 30 ("We are all of opinion, that the

authority to decide whether the exigency has arisen, belongs exclusively to the President, and

that his decision is conclusive upon all other persons."). However, the *Martin* Court reached its

decision with facts and in a context vastly different from those present here. This Court reads

*Martin*'s forcefulness of speech as a reaction to those particular facts, and not as conclusive on

the broader issue of whether a Court can ever decide whether a President has properly invoked

Section 12406.[11]

    In large part, *Martin* was a reaction to the challenger seeking review. The Supreme Court

there found it preposterous that whether an exigency existed could be "considered as an open

question, upon which every officer to whom the orders of the President are addressed, may

decide for himself, and equally open to be *contested by every militia-man* who shall refuse to

obey the orders of the President[.]" *Id.* at 29–30 (emphasis added). To that end, the Court found

that the President's conclusion must be unquestionable because militiamen's "prompt and

unhesitating obedience to orders is indispensable." *Id.*; *see also Zivotofsky ex rel. Zivotofsky v.

Clinton*, 566 U.S. 189, 206 n.1 (2012) (Sotomayor, J., and Breyer, J., concurring in part and

---

[11] It is not necessary, nor appropriate, for the Court to pass on the continued viability of *Martin*. *Newsom v. Trump*, 141 F.4th 1032, 1050–51 (9th Cir. 2025). *Martin* remains binding upon this Court until the Supreme Court says that it is not. However, case law does not govern where it does not apply. Moreover, as seemingly sweeping as the language of *Martin* is, so too is *Laird v. Tatum* in the opposite direction:

> when presented with claims of judicially cognizable injury resulting from military intrusion into the civilian sector, federal courts are fully empowered to consider claims of those asserting such injury; there is nothing in our Nation's history or in this Court's decided cases, including our holding today, that can properly be seen as giving any indication that actual or threatened injury by reason of unlawful activities of the military would go unnoticed or unremedied.

408 U.S. 1, 15–16 (1972).

**A71**

concurring in the judgment) (describing the need for prompt and unhesitating obedience to Presidential orders as the reasoning for the *Martin* decision). Moreover, *Martin* also relied on the "nature of the power itself"—the power to call forth the militia in response to an *invasion*. The Supreme Court has often recognized that the President's authority over foreign affairs and matters of war to be among the least appropriate for judicial review. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952) (acknowledging that policies regarding foreign relations and the War Powers are largely immune from judicial review). Here, the modern version of the foreign invasion prong of section 12406 is not at issue; the only relevant circumstances are purely domestic.[12]

Finally, in the 200 years of judicial-review jurisprudence since *Martin*, the Supreme Court has provided ample guidance for when the political question doctrine should or should not apply. In that time, the Supreme Court has instructed that courts must make a "discriminating inquiry into the precise facts and posture of the particular case" before deciding that the political question doctrine applies. *Baker v. Carr*, 369 U.S. 186, 217 (1962). Having done so here and

---

[12] *Luther v. Borden* is also distinguishable as resting on a rationale not relevant here. There, the President was asked to call forth the militia by one of two bodies of government competing for authority in Rhode Island, and by consenting to the request, the President necessarily recognized one as the lawful government. 48 U.S. 1, 44 (1849) ("For certainly no court of the United States, … would have been justified in recognizing [a different party than the President] as the lawful government; or in treating as wrongdoers or insurgents the officers of the government which the President had recognized, and was prepared to support by an armed force. In the case of foreign nations, the government acknowledged by the President is always recognized in the courts of justice."). This interpretation of *Luther* is well-settled. *See Baker v. Carr*, 369 U.S. 186, 222 (1962) ("[S]everal factors were thought by the Court in *Luther* to make the question there 'political': the commitment to the other branches of the decision as to which is the lawful state government; the unambiguous action by the President, in recognizing the charter government as the lawful authority; the need for finality in the executive's decision; and the lack of criteria by which a court could determine which form of government was republican."); *Hamdi v. Rumsfeld*, 542 U.S. 507, 590 (2004) (Thomas, J., dissenting) (explaining *Luther* as holding that "courts could not review the President's decision to recognize one of the competing legislatures or executives"); *see also Williams v. Suffolk Ins. Co.*, 38 U.S. 415, 418 (1839) ("When the executive branch of the government, ... assume[s] a fact in regard to the sovereignty of any island or country, it is conclusive on the judicial department."). The recognition of a foreign sovereign is not relevant to today's decision.

**A72**

having found the facts and posture of this case to be vastly different from those in *Martin*, the

Court is comfortable concluding that *Martin*'s holding does not bar judicial review.

## II. Likelihood of Success on the Merits

### A. 10 U.S.C. § 12406

Now that the Court has concluded that it can reach the merits of the case, it does so by

beginning with 10 U.S.C. §12406. [13]

> Section 12406 states:
>
>> Whenever—
>>
>> (1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;
>> (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or
>> (3) the President is unable with the regular forces to execute the laws of the United States;
>> the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws.

10 U.S.C. § 12406.

When interpreting a statute that leaves key terms undefined, the court must "interpret the

words consistent with their 'ordinary meaning ... at the time Congress enacted the statute.'"

*Wisconsin Cent. Ltd v. United States*, 585 U.S. 274, 277 (2018) (quoting *Perrin v. United States*,

---

[13] Plaintiffs pursue their claim that Defendants violated 10 U.S.C. § 12406 on an *ultra vires* basis. To bring an *ultra vires* claim, plaintiffs must demonstrate that a defendant "violated a clear statutory mandate and exceeded the scope of [their] delegated authority." *Am. Soc'y of Cataract & Refractive Surgery v. Thompson*, 279 F.3d 447, 456 (7th Cir. 2002). Section 12406 is nothing if not a delegation of authority, and so Court's analysis of whether Plaintiffs are likely to succeed on the merits will hinge on the degree to which Defendants' action are in violation of Section 12406's command.

**A73**

444 U.S. 37, 42 (1979)). Several sources may be useful for determining a term's ordinary meaning at a particular time, including contemporaneous judicial decisions and dictionary definitions, *see id*. at 277–78, and how the term was used in other statutes enacted around the time, *see Perrin*, 444 U.S. at 43. Statutory interpretation is, however, a holistic endeavor "which determines meaning by looking … to text in context, along with purpose and history." *Gundy v. United States*, 588 U.S. 128, 140–41 (2019). Similarly, when defining the scope of delegated authority, a court must look "to the text in context and in light of the statutory purpose." *Id.*

Before turning to the meaning of Section 12406's subsections, a note on deference: Defendants are not entitled to "deference" on the issue of what constitutes a rebellion for the purposes of the Act, nor what it means to be "unable with the regular forces to execute the laws." Those are matters of statutory interpretation, a function committed to the courts. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) ("Whatever respect an Executive Branch interpretation was due, a judge 'certainly would not be bound to adopt the construction given by the head of a department.' Otherwise, judicial judgment would not be independent at all.") (internal citation omitted); *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 131–32 (2015) (Thomas, J., concurring) ("[T]he Constitution does not empower Congress to issue a judicially binding interpretation of the Constitution or its laws. Lacking the power itself, it cannot delegate that power to an agency."). The Court will not, therefore, simply accept Defendants' assertion that the deployment satisfies the strictures of Section 12406. *See* Antonin Scalia and Bryan A. Garner, *Reading Law* 53 (2012) ("Every application of a text to particular circumstances entails interpretation.").

Defendants are, however, entitled to a certain amount of deference on the question of whether the facts constitute the predicates laid out in Section 12406. Section 12406 prongs (2)

**A74**

and (3) broadly engage with matters of national security, and in that context the Executive is necessarily better suited than the judiciary to evaluate the precise nature of the threat. *See Holder v. Humanitarian L. Project*, 561 U.S. 1, 33–35 (2010). Therefore, Defendants are "not required to conclusively link all the pieces in the puzzle before we grant weight to its empirical conclusions." *Id.* Still, Defendants must support their position by pointing the Court to some of the facts upon which it bases its conclusions and by offering explanations which paint a substantially reasonable picture justifying the Executive's position. *E.g.*, *id.* (requiring government to explain how support for terrorist organization's non-violent functions constituted material support to a terrorist organization, and concluding that explanation reasonable, rather than simply crediting government's belief that plaintiffs' conduct came within the statute's prohibition); *Hirabayashi v. United States*, 320 U.S. 81, 94–95 (1943) (giving Executive and Congress "wide scope for the exercise of judgment and discretion" but nonetheless basing its decision on "whether in the light of all the facts and circumstances there was any substantial basis for the conclusion ... that the curfew as applied [to Japanese Americans in the wake of Pearl Harbor] was a protective measure necessary to meet the threat of sabotage and espionage"). With that standard of review in mind, the Court proceeds to determine the applicability of Section 12406(2) or 12406(3) to the facts of this case as the Court has found them.

### 1. Section 12406(2)

Second 12406(2) permits the federalization of the National Guard when there is "rebellion or danger of a rebellion against the authority of the Government of the United States." "Rebellion" is not defined by Title 10, and so the Court turns to sources indicating the term's ordinary meaning at the time Congress enacted the statute. In so doing, the Court substantially agrees with the interpretation provided by the Northern District of California and the District of

**A75**

Oregon. *See Newsom v. Trump*, 786 F. Supp. 3d 1235, 1251–55 (N.D. Cal. 2025); *Oregon v. Trump*, No. 3:25-CV-1756-IM, 2025 WL 2817646, at *12–13 (D. Or. Oct. 4, 2025).

In the late 1800s and early 1900s, "rebellion" was understood to mean a deliberate, organized resistance, openly and avowedly opposing the laws and authority of the government as a whole by means of armed opposition and violence. *Newsom v. Trump*, 786 F. Supp. 3d 1235, 1251–53 (N.D. Cal. 2025) (collecting authorities). And should the dictionary definitions leave any doubt, the text of subsection (2) itself requires that the rebellion be "against the authority of the Government of the United States." 10 U.S.C. § 12406(2).

This sets a very high threshold for deployment of the National Guard: As an example, during the late 1800s, after the close of the Civil War, the Supreme Court and several statutes referred to the Civil War as constituting a "rebellion." *United States v. Anderson*, 76 U.S. 56, 71 (1869) ("As Congress, in its legislation for the army, has determined that the rebellion closed on the 20th day of August, 1866."); *id.* at 70 ("On the 20th day of August, 1866, the President of the United States, after reciting certain proclamations and acts of Congress concerning the rebellion, ... did proclaim ... that the whole insurrection was at an end, and that peace, order, and tranquility existed throughout the whole of the United States of America. This is the first official declaration that we have, on the part of the Executive, that the rebellion was wholly suppressed[.]"); Act of March 2, 1867, 14 Stat. 432 (approving in all respects President's proclamations as to those "charged with participation in the late rebellion against the United States").

Are we, then, in danger of something akin to another Civil War? The President would be entitled to great deference on the question of whether that state of affairs exists. But it does not appear as though President Trump has made that conclusion. The June 7, 2025 memorandum issued by President Trump states that "[t]o the extent that protests or acts of violence directly

**A76**

inhibit the execution of the laws, they constitute a form of rebellion against the authority of the Government of the United States." Doc. 62-1 at 19. This is a legal conclusion, not a factual one. And in all of the memoranda actually deploying the National Guard to Illinois, the Court does not see any factual determination by President Trump regarding a rebellion brewing here. Rather, those memoranda refer specifically to difficulty executing the laws, indicating that Section 12406(3), not 12406(2) provided the basis for the deployment of the National Guard.

This is sensible, because the Court cannot find reasonable support for a conclusion that there exists in Illinois a danger of rebellion satisfying the demands of Section 12406(2). The unrest Defendants complain of has consisted entirely of opposition (indeed, sometimes violent) to a particular federal agency and the laws it is charged with enforcing. That is not opposition to the authority of the federal government as a whole. Defendants have offered no explanation supporting the notion that widespread opposition to immigration enforcement constitutes the makings of a broader opposition to the authority of the federal government.[14]

### 2. Section 12406(3)

Turning to Section 12406(3), the parties dispute both its meaning and whether its conditions have been met. With no Seventh Circuit or Supreme Court decision on Section 12406(3)'s meaning, the Court embarks—as it must—on its own, text-based interpretation of the statute. The phrase "unable with the regular forces to execute the laws of the United States" contains several key terms.

---

[14] Even if the Court were to have credited Defendants' version of the facts, Defendants still would not have any support for the conclusion that the organized, repeated, violent, and increasingly hostile attacks on ICE agents, their personal property, and ICE property suggests anything more than an opposition to immigration law enforcement and immigration policy, as opposed to the authority of the Government as a whole.

**A77**

First, "unable." In the late 1800s and early 1900s, "unable" was understood to mean "not having sufficient power or ability," being incapable.  Universal Dictionary of the English Language Vol. 4 at 4900 (1900) ("Not able; not having sufficient power or ability; not equal to any task; incapable."); Noah Webster, A Dictionary of the English Language at 454 (1868) ("Not able; not having sufficient strength, knowledge, skill, or the like."); William Dwight Whitney, The Century Dictionary Vol. VIII at 6578 (1895) ("1. Not able. 2. Lacking in ability; incapable."). These definitions evoke a binary approach: ability or not, capability or not. This reading is consistent with the legislative history: In the words of Secretary Shaw, Section 12406(3) was to be used when "the military needs of the Federal Government arising from the necessity to execute the laws of the Union, … *can not* be met by the regular forces." H.R. Rep. No. 60-1067, at 6 (1908) (emphasis added).

Next, the meaning of "with the regular forces." Several historical sources indicate that the phrase "regular forces" was understood at the time of enactment to mean the soldiers and officers regularly enlisted with the Army and Navy, as opposed to militiamen who did not make it their livelihoods to serve their country but instead took up arms only when called forth in times of national emergency.

First, numerous statutes from the early 1800s through when Section 12406(3) was enacted use the word "regular" or "regular forces" to distinguish the standing army from the militia. For example, in 1806, Congress passed a statute entitled "An Act for establishing Rules and Articles for the government of the Armies of the Unites States" which primarily set forth the duties and obligations of soldiers and officers in the army. 2 Stat. 359 (1806). Most articles are to this effect, but the statute also includes an article stating,

> "All officers, serving by commission from the authority of any
> particular state, shall, on all detachments, courts martial, or other

**A78**

> duty, wherein they may be employed in conjunction with the
> *regular forces* of the United States, take rank, next after all officers
> of the like grade in said regular forces, notwithstanding the
> commissions *of such militia* or state officers may be elder than the
> commissions of the *officers of the regular forces* of the United
> States."

Act of April 10, 1806, 2 Stat. 359 (emphases added). The distinction again appears in 1903.

Then, Congress passed an act entitled "An Act to promote the efficiency of the militia and for

other purposes." 32 Stat. 775. That statute states, "That the militia, when called into the actual

service of the United States, shall be subject to the same Rules and Articles of War as the *regular*

troops of the United States." Act of January 21, 1903, 32 Stat. 775. And in 1908, in the same act

effecting the change which led to the modern Section 12406, section 2 states:

> [W]hether known and designated as National Guard, militia, or
> otherwise, [the militia] shall constitute the organized militia. On
> and after January twenty-first, nineteen hundred and ten, the
> organization, armament, and discipline of the organized militia in
> the Several States … shall be the same as that which is now or may
> hereafter be prescribed for the *Regular* Army of the United States

Act of May 27, 1908, 35 Stat. 399 § 2**.**

In addition to these statutory instances of the terms "regular" and "forces" being used to

distinguish the military (in particular the Army) from the militia, there are several examples of

courts discussing the important differences between the "regular forces" and the militia. In

*McClaughry v. Deming*, Justice Peckham explained:

> [A]t all times there has been a tendency on the part of the regular,
> whether officer or private, to regard with a good deal of reserve, to
> say the least, the men composing the militia as a branch not quite
> up to the standard of the Regular Army, either in knowledge of
> martial matters or in effectiveness of discipline, and it can be
> readily seen that there might naturally be apt to exist a feeling
> among the militia that they would not be as likely to receive what

**A79**

> they would think to be as fair treatment from regulars, as from
> members of their own force.

*McClaughry v. Deming*, 186 U.S. 49, 56 (1902). The opinion repeats this distinction throughout,

several times. *E.g., id.* at 56 ("there was a substantial difference between the regular forces and

the militia"); *id.* ("While it may be that there was then no particular distrust or jealousy of the

Regular Army, the provision in question recognized, as we have said, the difference there was

between the two bodies, the regulars and the militia or volunteers."). In the lower court decision

before the Eighth Circuit, it was similarly observed when speaking about the militia as compared

to the regular Army that,

> The decisions of the courts had recognized the two forces as
> different,— the one as temporary, called forth by the exigency of
> the time, to serve during war or its imminence, and then to be
> dissolved into its original elements; the other as permanent and
> perpetual, to be maintained in peace and in war.

*Deming v. McClaughry*, 113 F. 639, 643 (8th Cir.), *aff'd,* 186 U.S. 49 (1902) (emphasis added).

Even today in the statutory context surrounding Section 12406, Title 10 makes repeated

use of the words "regular" and "forces" in close proximity to each other to refer to the military

(the Army, Navy, etc.) to the exclusion of the National Guard. *See, e.g.*, 10 U.S.C. § 10103

("Whenever Congress determines that more units and organizations are needed for the national

security than are in the regular components of the ground and air forces, the Army National

Guard of the United States and the Air National Guard of the United States, or such parts of them

as are needed, … shall be ordered to active duty and retained as long as so needed.").

Altogether then, the phrase "unable with the regular forces to execute the laws of the

United States" means that in order for the President to call forth the militia to execute the laws,

the President must be incapable with the regular forces—that is, lacking the power and force

**A80**

with the military alone—to execute the laws. This understanding of "regular forces" is not only consistent with the ordinary meaning of "regular forces" at the time Section 12406's operative language was initially enacted, but it makes sense given the evolution of the Army over time.

At the Founding, the militia was understood to be the main fighting force of the nation. *Youngstown*, 343 U.S. at 644–45 (Jackson, J., concurring in the judgment). But by the early 1900s calling-forth act amendments, Congress had provided through several means for the military to become significantly stronger and more robust. In that context, Congress specified that the regular forces must be relied upon until the point of failure before the militia (by then named the National Guard) could be federalized. The specification was a recognition that by that time the regular forces (that is, the Army, Navy, etc.) were better equipped to handle matters of national emergency. *See McClaughry*, 186 U.S. at 57 ("History shows that no militia, when first called into active service, has ever been equal to a like number of regular troops.").

Here, Defendants have made no attempt to rely on the regular forces before resorting to federalization of the National Guard, nor do Defendants argue (nor is there any evidence to suggest) that the President is incapable with the regular forces of executing the laws. Therefore, the statutory predicate contained within Section 12406(3) has not been met on that basis alone.

The Court is not, of course, suggesting that the President can or should use the military to solve every domestic concern. The question remains when "the regular forces" may be called upon to execute the laws. And that answer must not lie in the Militia Clause alone. When Congress made reference in the 1908 Act to the regular forces being used to execute the laws, Congress implicitly drew on the War Powers, which govern declaring war and commanding of the armed forces. *Ex parte Quirin*, 317 U.S. 1, 26, *modified sub nom. U.S. ex rel. Quirin v. Cox*, 63 S. Ct. 22 (1942) ("The Constitution thus invests the President as Commander in Chief with

**A81**

the power to wage war which Congress has declared, and to carry into effect all laws passed by Congress for the conduct of war."). Thus, the answer to what it means for the regular forces to fail to execute the laws depends on both the meaning of the Militia Clause (from which the statute borrows the phrase "execute the Laws")[15] and the scope of the War Powers. The materials interpreting and explaining those sources suggest two important limitations.

First, the ratification debates suggest that the phrase "execute the Laws" within the Militia Clause itself (from which Section 12406 borrows its language) was only to apply in cases where the civil power had first failed. During the ratification debates, in response to the concerns of the antifederalists, James Madison repeatedly assured them that the "execute the Laws" portion of the Militia Clause was only to be utilized in the case of opposition to "the execution of the laws, *which the civil power might not be sufficient to quell*." Elliot Debates, *supra*, at 410 (emphasis added). Madison dismissed the idea that the Clause was granting the power to call forth the militia "to enforce every execution [of law] indiscriminately." *Id*. at 412. And Alexander Hamilton called the idea that the militia of one state would be brought to another to "tame" that state's "contumacy" an "absurdit[y]." The Federalist No. 29, at 186. Altogether then, the assurances of our Founders makes clear that the power to call forth the militia to execute the laws was not to be employed merely in cases of the need for law enforcement, nor even when a state might stubbornly oppose the authority of the federal government. Only when "the civil power might not be sufficient" was the provision allowing the calling forth of the militia to execute the laws to apply. This understanding of when the militia might execute the laws is consistent with the Framers' broader concerns:

---

[15] Scalia & Garner, *Reading Law* 73 ("[I]f a word is obviously transplanted from another legal source, ... it brings the old soil with it." (quoting Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947)). The Court applies this principle to the phrase "execute the laws" which has remained unchanged from the Militia Clause itself, save for capitalization.

**A82**

> The nation began its life in 1776, with a protest against military usurpation. It was one of the grievances set forth in the Declaration of Independence, that the king of Great Britain had 'affected to render the military independent of and superior to the *civil power.*' The attempts of General Gage, in Boston, and of Lord Dunmore, in Virginia, to enforce martial rule, excited the greatest indignation. Our fathers never forgot their principles; and though the war by which they maintained their independence was a revolutionary one, though their lives depended on their success in arms, they always asserted and enforced the subordination of the military to the civil arm.

*Ex parte Milligan*, 71 U.S. 2, 37 (1866) (emphasis added); *see also Luther v. Borden*, 48 U.S. 1, 61 (1849) (contrasting "civil power" with "martial law"); Act of February 28, 1795, 1 Stat. 424 (1795) (evidencing Congress's early understanding that the militia only be called forth when the forces of obstruction were "too powerful to be suppressed by the ordinary course of judicial proceedings, or by the powers vested in the marshals" by the Act).

Here, there has been no showing that the civil power has failed. The agitators who have violated the law by attacking federal authorities have been arrested. The courts are open, and the marshals are ready to see that any sentences of imprisonment are carried out. Resort to the military to execute the laws is not called for.

Second, the separation of powers and division of War Powers specifically suggests that in the absence of a total failure of the civil power, the President must have an independent source of authority (independent from the Militia Clause or the Section 12406 delegation) expressly authorizing him to deploy the military domestically:

> Congress, not the Executive, should control utilization of the war power as an instrument of domestic policy. Congress, fulfilling that function, has authorized the President to use the army to enforce certain civil rights. On the other hand, Congress has forbidden him to use the army for the purpose of executing general laws except when expressly authorized by the Constitution or by Act of Congress.

**A83**

*Youngstown Sheet & Tube Co.*, 343 U.S. at 644–45 (Jackson, J., concurring in the judgment). By
the express language of the Posse Comitatus Act, the answer to when the armed forces may be
utilized to execute the laws must at least be: exceedingly rarely. The Posse Comitatus Act was
passed not long before the Section 12406 language referring to the regular forces came into
being. 18 U.S.C. § 1385. The Posse Comitatus Act uses similar language to the precursor to
Section 12406, forbidding the willful use of "any part of the Army, the Navy, the Marine Corps,
the Air Force, or the Space Force as a posse comitatus or otherwise *to execute the laws*." *Id.* "We
generally presume that Congress is knowledgeable about existing law pertinent to the legislation
it enacts." *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 176 (1988). Thus, "laws dealing with
the same subject—being *in pari materia* (translated as "'in like manner') should if possible be
interpreted harmoniously." Antonin Scalia and Bryan A. Garner, *Reading Law* 252 (2012). The
Posse Comitatus Act makes it a criminal offence to use the Army, Navy, Marine Corps, and Air
Force to "execute the laws" unless expressly authorized by Congress. 18 U.S.C. § 1385. And as
Justice Jackson in his well-known *Youngstown* concurrence has recognized, while this
prohibition likely does not apply to hold the President criminally liable, the Act nonetheless
operates to "forbid[]" the President "to use the army for the purpose of executing general laws
except when expressly authorized by the Constitution or by Act of Congress." *Youngstown Sheet
& Tube Co.*, 343 U.S. at 644–45 (Jackson, J., concurring in the judgment). There is no indication
that Section 12406 was intended to repeal the Posse Comitatus Act and effect a sweeping
implied authorization for the President to use the armed forces for the purposes of executing the
laws. *See* Scalia and Garner, *Reading Law* 255 ("[R]epeals by implication are disfavored").
Therefore, military law enforcement must only be authorized as the Posse Comitatus Act
suggests, where it is *expressly* authorized.

**A84**

To that end, Congress has enacted a number of specific statutes that allow the armed forces to participate directly in law enforcement in certain circumstances. This last category includes the Insurrection Act and twenty-five other statutes. *E.g.,* 16 U.S.C. § 23 (empowering troops to prevent trespassers or intruders from entering the Yellowstone National Park), 16 U.S.C. § 78 (same, but with Sequoia National Park, the Yosemite National Park, and the General Grant National Park); 22 U.S.C. §§ 401–408 (empowering the President to "employ such part of the land or naval forces of the United States as he may deem necessary to carry out" provisions forbidding the illegal exportation of war materials); 25 U.S.C. § 180 (empowering president to employ military forces to remove persons settling on reservation land). Section 12406 is no such statute.

i.    *Alternative Interpretations*

Defendants offer their own interpretation of Section 12406(3), based on their reading of *Newsom v. Trump*, 141 F.4th 1032 (9th Cir. 2025), which is that it authorizes the President to call the National Guard whenever he is "unable to ensure to his satisfaction the faithful execution of the federal laws by the federal officers who regularly enforce them, without undue harm or risk to officers." Doc. 62 at 35. This interpretation is shockingly broad: Defense counsel confirmed during oral argument that it would allow the federalization of the National Guard if there was *any* repeated or ongoing violation of federal law in a community. Given that Defendants have also contended that every state official who implements a sanctuary city policy is violating federal law, Defendants' position also seems to be that the National Guard may be deployed solely on the basis of state officials exercising their Constitutionally protected right to implement these policies.

42

**A85**

Defendants' definition was properly rejected by the Ninth Circuit. On the issue of Section 12406(3)'s meaning, the Ninth Circuit in *Newsom* declined to adopt the lower court's definition of the section that "so long as some amount of execution of the laws remain[ed] possible, the statute cannot be invoked." *Newsom*, 141 F.4th at 1051. But it also rejected the position asserted by Defendants that "minimal interference with the execution of laws [would] justify invoking § 12406(3)," as such a reading "would swallow subsections one and two, because any invasion or rebellion renders the President unable to exercise *some* federal laws." *Id*. (emphasis in original). Rather, the Ninth Circuit held that since evidence suggested execution of federal law had been "significantly impeded," invocation of 12406(3) was proper. *Id*. at 1052. That is a far cry from Defendants' proposed definition.

In any event, while decisions of the Ninth Circuit are "not binding" on this Court, *Hays v. United States*, 397 F.3d 564, 567 (7th Cir. 2005), and the Court frankly does not agree that "significantly impeded" is the same thing as "unable," the Court would still find that Plaintiffs are likely to succeed on the merits even were the Ninth Circuit standard applied. As discussed, there is evidence of protests, some of which have included acts of violence. There is also evidence of property destruction, and discrete groups who have attempted to impede DHS agents. At the same time, there is significant evidence that DHS has not been unable to carry out its mission. All federal facilities have remained open. To the extent there have been disruptions, they have been of limited duration and swiftly controlled by authorities. Pairing all this with evidence that federal immigration officials have seen huge increases in arrests and deportations, *see* Doc. 13 at 34–35; *id.* at 34 n.124, the Court concludes that even under the Ninth Circuit standard, the factual conditions necessary for President Trump to have properly invoked Section 12406(3) simply do not exist.

**A86**

For the foregoing reasons, the Court finds Plaintiffs are likely to succeed on the merits of their *ultra vires* claim that Defendants' deployment of the National Guard to Illinois violated 10 U.S.C. § 12406.

### B. The Tenth Amendment and Posse Comitatus Act

Plaintiffs also allege that the National Guard deployment Defendants plan to carry out will involve a host of activity well outside the bounds of the President's authority, and that these acts would violate the Posse Comitatus Act and Tenth Amendment.

Plaintiffs offer substantial evidence in support of their concerns that the scope and purpose of the National Guard's deployment in Illinois could intrude into the general police powers generally reserved to the states. That evidence primarily consists of President Trump's social media posts concerning crime in Chicago. In one post, just about one month before President Trump authorized the deployment of the National Guard in Illinois, the President promised: "I will solve the crime problem" in Chicago, "just like I did in DC," where the President previously deployed the National Guard. Doc. 13-10 ¶ 59; *id.* ¶ 44 (similar, in August 2025). President Trump further stated: "Chicago will be safe again, and soon." *Id*. The following day, in a fundraising email, President Trump stated: "I turned our Great Capital into a SAFE ZONE. There's virtually no crime. NOW I WANT TO LIBERATE CHICAGO! The Radical Left Governors and Mayors of crime ridden cities don't want to stop the radical crime. I wish they'd just give me a call. I'd gain respect for them. Now hear me: WE'RE GOING TO DO IT ANYWAY." *Id*. ¶ 60.

The President of the United States's promises on official matters are to be treated with great respect, particularly those made during his Presidency and respecting specific matters of Executive action. Additionally, nothing within the official communications deploying the

**A87**

National Guard is inconsistent with President Trump's plan to utilize the National Guard to combat crime in Chicago. President Trump's October 4, 2025 memorandum authorizes the National Guard to "perform those protective activities that the Secretary of War determines are reasonably necessary to ensure the execution of Federal law in Illinois, and to protect Federal property in Illinois." Doc. 62-1 at 16.[16] At oral argument, the Court pressed counsel for Defendants to clarify the scope of the National Guard's mission. Asked if the National Guard would limit its operations to just Cook County, where the incidents of concern occurred, counsel noted that operations throughout Illinois were possible. Asked if the National Guard, once deployed, would be authorized to respond to assistance requests by employees of any federal agency—not just DHS—counsel did not know. And asked what sort of activities the Guard would be authorized to perform for purposes of carrying out their mission, counsel professed no knowledge as to whether or not the National Guard would engage in crowd and traffic control, street patrols, searches, or pursuits: the sort of regular police activities traditionally carried out by state and local law enforcement.

Defense counsel suggests that it is inappropriate to use any of President Trump's social media posts or speeches when considering this case, citing *Trump v. Hawaii*, 585 U.S. 667 (2018). In that case, the petitioner sought to establish that the President's proclamation restricting

---

[16] Defendants do not assert that any inherent power is a stand-alone source of the President's authority to deploy the National Guard, but at times appear to conflate the power to federalize the militia with the power to protect federal personnel and property. Whatever the President's authority to protect federal property and personnel, he may not do so *with the National Guard* unless one of the statutory predicates under section 12406 is met. That statutory delegation is the only source of the President's authority to federalize the militia; without it, the power would remain entirely with Congress, and it would be a usurpation of Congressional power to federalize the National Guard for reasons not covered by that delegation. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635–38 (1952) ("When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter.").

**A88**

the entry of aliens from several majority-Muslim nations but neutral to religion on its face, was

unlawful under the Establishment Clause. *Id.* at 702–06. Specifically, the petitioner sought to

establish that the proclamation "was motivated not by concerns pertaining to national security

but by animus toward Islam." *Id.* at 681. The statutory merits turned on whether the President,

under his grant of statutory authority, had found that the entry of the covered aliens "would be

detrimental to the interests of the United States," which the Court found the President had. *Id.* at

683. As for petitioner's Establishment Clause claim, that depended on whether the Proclamation

was unconstitutionally motivated by religious animus. *Id.* at 705–07. To prove their claim,

plaintiffs sought to rely on sever statements made by the "President and his advisers casting

doubt on the official objective of the Proclamation." *Id.* at 699. Prior to taking office, President

Trump's statements explicitly endorsed a "total and complete shutdown of Muslims entering the

United States." *Id.* at 700. But after taking office, the President's statements were less specific.

*Id.* at 700–01. In an appeal challenging the grant of a nationwide preliminary injunction on the

Proclamation, the Court held that it could consider the President's extrinsic statements but that it

would uphold the challenged proclamation "so long as it can reasonably be understood to result

from a justification independent of unconstitutional grounds." *Id.* at 705. The choice of this

standard was motivated in large part by the extraordinary deference owed to the office of the

President in matters of relations with foreign powers and precedent suggesting that decisions in

the arena of alien admission should be upheld so long as there existed a facially legitimate reason

for the decision. *Id.* at 703–04.

     Today's case differs from *Trump v. Hawaii* in several important respects. For one, the

issue here is not what motivated President Trump when he deployed the National Guard, but

rather what the authorization memoranda allows and how it will be carried out. Moreover, this

case does not concern foreign relations, an arena where the President's decisions are largely

immune from judicial review. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952).

Rather, this case concerns relations with the State of Illinois, a matter of federalism routinely

arbitrated by the courts. Finally, President Trump's statements were made during his Presidency,

close in time to his official action, and will likely be looked to by the members of his

administration who are tasked with implementing his order. For these reasons, the Court believes

*Trump v. Hawaii* does not preclude a finding that the National Guard have been deployed to

"solve crime" in Chicago.

That said, there has been little argument on this issue specifically and there is even less

evidence that has been presented about what, exactly, the National Guard are being trained to do

or where they would be doing it. Perhaps most importantly, a decision is not required for the

purposes of this TRO. In the interest of judicial restraint, the Court declines to make a finding at

this time what, exactly, the scope of the National Guard's mission entails.

Turning to the law: As discussed, the Tenth Amendment provides that "powers not

delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved

to the States respectively, or to the people." U.S. Const., Tenth Am. These reserved and

residuary powers include, among other things, "the police power, which the Founders denied the

National Government and reposed in the States." *United States v. Morrison*, 529 U.S 598, 617-

18 (2000); *see also Patterson v. State of Kentucky*, 97 U.S. 501, 503 (1878) (the "power to

establish the ordinary regulations of police has been left with the individual States, and cannot be

assumed by the national government"). One of Plaintiffs' theories of Tenth Amendment harm is

that by federalizing the Illinois National Guard, Defendants usurped Illinois's right to control its

own National Guard forces. As there are constitutionally recognized grounds for the National

**A90**

Guard to be called forth by the President, *see* U.S. Const., art. I § 8, cl. 15, the Court understands this theory to rise and fall with Plaintiffs' 10 U.S.C. § 12406 claim, insofar as the Court does not understand Plaintiffs' theory to be that even a proper invocation of 10 U.S.C. § 12406 would violate the Tenth Amendment. Given the Court's conclusion that Plaintiffs are likely to succeed on their *ultra vires* claim, it finds Plaintiffs would also be likely to succeed on this theory of a Tenth Amendment violation.[17]

Plaintiffs also contend that they are entitled to a TRO enjoining Defendants from deploying the federalized National Guard based on the Posse Comitatus Act. Defendants raise a number of arguments for why Plaintiffs are unlikely to succeed on the merits of this claim, including that (1) the Act provides no basis to enjoin deployment of the National Guard, only the Guards' activities; (2) Plaintiffs lack a cause of action to enforce the Act in either equity or through a private right of action; (3) the Act expressly permits federalized troops to engage in law enforcement; and (4) the Guard has not been authorized to execute the laws in violation of the Act. Given that the Court has already determined likelihood of success on the merits on other grounds, it declines to reach the merits of the Posse Comitatus Act claim at this time.

### III.  No Adequate Remedy at Law and Irreparable Harm

In addition to showing a likelihood of success on the merits, Plaintiffs must also show that "irreparable injury is likely in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Here, the Court concludes that Plaintiffs have demonstrated at least two types of irreparable harm.

---

[17] Plaintiffs press two additional theories of Tenth Amendment harm: that Defendants' deployment of the National Guard was a means to coerce and punish Illinois for enacting certain laws and that the deployment would intrude on Illinois's general police power. As they are not strictly necessary for this Court's decision on Plaintiff's motion for a TRO, the Court declines to reach these alternative theories at this time.

**A91**

First, as is discussed above, the Court concludes that Defendants' actions likely violate the Tenth Amendment, and "[t]he existence of a continuing constitutional violation constitutes proof of an irreparable harm." *Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978). The presence of National Guard members from Texas makes the constitutional injury especially significant. "Not only do States retain sovereignty under the Constitution, there is also a 'fundamental principle of *equal* sovereignty" among the States. *Shelby Cty. v. Holder*, 570 U.S. 529, 544 (2013) (emphasis in original). Alexander Hamilton defended state militias on the understanding that they would be made up of "our sons, our brothers, our neighbours, . . . men who are daily mingling with the rest of their countrymen," and who would be appointed by the elected leaders of that state. *See* The Federalist No. 29, at 185 (Alexander Hamilton) (Jacob Ernest Cooke, ed., 1961). Here, to have a National Guard from Texas be deployed to Illinois against the wishes of Illinois's elected leaders arguably empowers Texas at the expense of Illinois, injuring Illinois's right to be "equal in power, dignity, and authority" to every other state. *Coyle v. Smith*, 221 U.S. 559, 567 (1911).[18]

Second, the Court finds that deployment of National Guard members is likely to lead to civil unrest, requiring deployment of state and local resources to maintain order. There has been overwhelming evidence presented that the provocative nature of ICE's enforcement activity has caused a significant increase in protest activity, requiring the Broadview Police, ISP, and other state and local law enforcement agencies to respond. *See, e.g.*, Doc. 13-5; Doc. 13-15; Doc. 13-14. Given that National Guard members "are trained to effectively destroy enemies in combat

---

[18] For this same reason, the Court does not find persuasive Defendants' argument that Plaintiffs do not have standing to challenge the deployment of the Texas National Guard in Illinois. The Court easily concludes that a state may suffer injury by having another state's troops deployed within its jurisdiction. Given that they wear separate uniforms and have different training, the fact that all of the National Guard members have been "federalized" does not persuade the Court that they are all the same.

**A92**

scenarios" rather than to de-escalate conflicts, Doc. 13-7 ¶ 29, the Court believes that allowing them to deploy at the Broadview Processing Center or anywhere else in Illinois will only add fuel to the fire that Defendants themselves started.[19] And Plaintiffs, quite literally, are responsible for putting out those fires, as well as treating any injuries that may result. *See* Doc. 13-5 at 4 (noting that the Broadview Fire Department is responsible for providing paramedics and hospital transportation for the ICE Processing Center). This diversion of limited state and local resources is an irreparable harm for which Plaintiffs have no adequate remedy at law.

## IV. Balance of Harms and Public Interest

Finally, the balance of the equities and public interest weigh in favor of granting Plaintiffs' request for a TRO. ICE's enforcement activity has resulted in significantly higher numbers of deportations and arrests in 2025 as compared with 2024. Doc. 13 at 34, n.124. State and local police have indicated that they are ready, willing, and able to keep the peace as ICE continues its operations in Chicago. Doc. 13-5; Doc. 13-15. Defendants remain free to deploy as many federal law enforcement officers as they believe appropriate to advance their mission. Therefore, the harm of denying Defendants access to 500 National Guard members is *de minimis*. In contrast, the significance of the public's interest in having only well-trained law enforcement officers deployed in their communities and avoiding unnecessary shows of military force in their neighborhoods cannot be overstated. Chicago's history of strained police-community relations, which has stemmed in part from lack of police training and inappropriate uses of force, is well-documented. *See, e.g.*, *Illinois v. City of Chicago*, Case No. 17-CV-6260, 2019 WL 398703, at *1 (N.D. Ill. Jan. 31, 2019) (Chicago Police Department Consent Decree).

---

[19] In both Los Angeles and Portland, the National Guard's presence has caused an increase in civil unrest. *Oregon v. Trump*, Case No. 3:25-CV-1756-IM, 2025 WL 2817646, at *14 (D. Or. Oct. 4, 2025).

**A93**

To add to this milieu militarized actors unfamiliar with local history and context whose goal is "vigorous enforcement" of the law, Doc. 62 at 34, is not in the community's interest.

## **CONCLUSION**

For the foregoing reasons, the Court GRANTS Plaintiffs' request for a TRO. Pursuant to Federal Rule of Civil Procedure 65(d)(1) and *MillerCoors LLC v. Anheuser-Busch Cos.*, 940 F.3d 922 (7th Cir. 2019), the Court has entered the terms of the TRO in a separate document. Doc. 67.

Date: October 10, 2025

*April M Perry*

**United States District Judge**

**A94**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| STATE OF ILLINOIS, a sovereign state; and the CITY OF CHICAGO, an Illinois municipal corporation, | Case No. 25-cv-12174 |
| Plaintiffs, | **Judge April M. Perry** |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; DEPARTMENT OF DEFENSE; PETER B. HEGSETH, in his official capacity as Secretary of the Department of Defense; UNITED STATES ARMY; DANIEL P. DRISCOLL, in his official capacity as Secretary of the Army, | |
| Defendants. | |

## <u>TEMPORARY RESTRAINING ORDER</u>

This Court GRANTS Plaintiffs' Motion for a Temporary Restraining Order, Doc. 3, and ORDERS as follows:

1. Defendants,[1] their officers, agents, assigns entered, and all persons acting in concert with them, are temporarily enjoined from ordering the federalization and deployment of the National Guard of the United States within Illinois.

2. This Temporary Restraining Order is at 5:55 P.M. central time on this 9th day of October 2025 and expires on October 23, 2025 at 11:59 P.M.

---

[1] President Trump, one of the name Defendants, is not enjoined by this Order.

**A95**

3.  Within two (2) calendar days of entry of this Temporary Restraining Order, Plaintiffs shall post a nominal bond of $100. The bond shall be filed in the Clerk's Office and be deposited into the registry of the Court.

4.  Defendants' Request to Stay or Administratively Stay the Temporary Restraining Order, Doc. 62 at 58, is DENIED.

5.  A telephone hearing will be held on October 22, 2025, at 9:00 A.M. to address whether this Temporary Restraining Order should be extended for an additional fourteen (14) calendar days.

Dated: October 9, 2025

_____
APRIL M. PERRY
United States District Judge

2

**A96**